JULIA A. OLSON (OR Bar 062230)
JuliaAOlson@gmail.com
WILD EARTH ADVOCATES
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

DANIEL M. GALPERN (OR Bar 061950)
dan.galpern@gmail.com
LAW OFFICES OF DANIEL M. GALPERN
1641 Oak Street
Eugene, OR 97401
Tel: (541) 968-7164

JOSEPH W. COTCHETT
jcotchett@cpmlegal.com
PHILIP L. GREGORY
(applicant *pro hac vice*)
pgregory@cpmlegal.com
PAUL N. MCCLOSKEY
pmccloskey@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **KELSEY CASCADIA ROSE JULIANA**; **XIUHTEZCATL TONATIUH M.**, through his Guardian Tamara Roske-Martinez; et al. | Case No.: 6:15-cv-01517-TC |
| **Plaintiffs**, | MEMORANDUM OF PLAINTIFFS' IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS |
| v. | |
| The **UNITED STATES OF AMERICA**; **BARACK OBAMA**, in his official capacity as President of the United States; et al., | Oral Argument: February 17, 2016, 2:00 p.m. |
| **Federal Defendants**. | |

## <u>TABLE OF CONTENTS</u>

<div align="right">Page</div>

<u>INTRODUCTION</u> ............................................................................... 1

<u>STANDARD OF REVIEW</u> ................................................................ 3

<u>LEGAL ARGUMENT</u> ........................................................................ 4

    I.     THE FAC STATES CLAIMS UPON WHICH RELIEF CAN BE
          GRANTED ............................................................................ 4

          A.    THE *DESHANEY* EXCEPTIONS PROVIDE PLAINTIFFS WITH
                A SUBSTANTIVE DUE PROCESS CLAIM. ................................ 4

          B.    DEFENDANTS' ACTS IRREVERSIBLY DISCRIMINATE
                AGAINST PLAINTIFFS' EXERCISE OF CONSTITUTIONAL
                RIGHTS ........................................................................ 9

          C.    POSTERITY/FUTURE GENERATIONS ARE A SUSPECT
                CLASS IN NEED OF EXTRAORDINARY PROTECTION FROM
                THE POLITICAL PROCESS UNDER FIFTH AMENDMENT
                EQUAL PROTECTION ................................................... 14

          D.    THE PUBLIC TRUST DOCTRINE PROVIDES A CLAIM
                AGAINST DEFENDANTS OVER WHICH THIS COURT HAS
                JURISDICTION .......................................................... 19

               1.    The Public Trust Doctrine Applies to the Federal
                     Government .................................................... 19

                2.    Defendants Incorrectly Assert There Is No Public Trust
                     Doctrine........................................................ 23

                     a.    *PPL Montana* did not foreclose the federal Public
                          Trust Doctrine .................................... 23

                     b.    Defendants have admitted there is a federal
                            Public Trust Doctrine ......................... 24

                3.    The Scope of the Public Trust Doctrine is a Justiciable
                     Issue ............................................................. 27
</div>

II.     PLAINTIFFS HAVE ARTICLE III STANDING TO BRING
        THIS SUIT................................................................................ 29

        A.      YOUTH PLAINTIFFS HAVE CONCRETE, PARTICULARIZED,
                ACTUAL HARMS......................................................... 29

        B.      DEFENDANTS' ACTS HAVE MATERIALLY CAUSED, AND
                CONTINUE TO CAUSE, PLAINTIFFS' PARTICULARIZED
                HARMS.......................................................................... 35

        C.      PLAINTIFFS' INJURIES CAN BE REDRESSED BY THIS
                COURT.......................................................................... 37

        D.      FUTURE GENERATIONS ALSO HAVE STANDING ............... 40

CONCLUSION ........................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ............................................................................................. 9

*Alec L. v. Jackson*,
863 F.Supp.2d 11 (D.D.C. 2012) ....................................................................... 23

*Alec L. v. McCarthy*,
No. 13-5192, slip op. at 2 (D.C. Cir. June 5, 2014) ......................................... 23

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. ___ slip op. at 6 (2015) ...................................................................... 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................. 3

*Atwood v. Fort Peck Tribal Court Assiniboine*,
513 F.3d 943 (9th Cir. 2008) ............................................................................... 4

*Barnum Timber Co. v. EPA*,
633 F.3d 894, 901 (9th Cir. 2011) ..................................................................... 35

*Barrows v. Jackson*,
346 U.S. 249, 257-258 (1953) ........................................................................... 45

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ............................................................................................. 9

*Bonser-Lain v. Tex. Comm'n on Envtl Quality*,
No. D- 1-GN-11-002194, 2012 WL 2946041 (Tex. 201st Dist. Aug. 2, 2012) .......... 28

*Branch v. Tunnell*,
14 F.3d 449 (9th Cir. 1994) ................................................................................. 3

*Brown v. Board of Education*,
347 U.S. 483 (1954) .................................................................................... *passim*

*Brown v. Plata*,
563 U.S. 493 (2011) ........................................................................................... 39

*Camfield v. U.S.*,
167 U.S. 518 (1897) ........................................................................................... 22

*Campbell v. State Dep't of Soc. and Health Servs.*,
671 F.3d 837 (9th Cir. 2011) ............................................................................... 8

*Carroll v. Safford*,
3 How. 441 (1845) ............................................................................................. 40

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                                 iii
**Motion To Dismiss**

*Castaneda v. Pickard*,
  648 F.2d 989 (5th Cir. 1981) ................................................................. 42

*Cent. Delta Water Agency v. United States*,
  306 F.3d 938 (9th Cir. 2002) ................................................................. 33

*City of Alameda v. Todd Shipyards*,
  635 F.Supp. 1447 (N.D. Cal. 1986) ....................................................... 21

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) .............................................................. 15, 16, 18

*Conner v. U.S. Dep't of Interior*,
  73 F.Supp.2d 1215 (D. Nev. 1999) ......................................................... 27

*Covington v. Jefferson Cnty.*,
  358 F.3d 626 (9th Cir. 2004) ................................................................. 36

*Craig v. Boren*,
  429 U.S. 190 (1976) ............................................................................. 45

*Ctr. for Biological Diversity v. EPA*,
  90 F.Supp.3d 1177 (W.D. Wash. 2015) ............................................. 33, 38

*Ctr. for Biological Diversity v. FPL Group, Inc.*,
  166 Cal.App.4th 1349 (2008) ................................................................. 28

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ............................................................... 39

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ................................................................... *passim*

*Doe v. Claiborne Cnty.*,
  103 F.3d 495 (6th Cir. 1996) ................................................................. 13

*Ecological Rights Found. v. Pac. Lumber Co.*,
  230 F.3d 1141 (9th Cir. 2000) ............................................................... 29

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ............................................................... 46

*Federal Election Commission v. Atkins*,
  524 U.S. 11 (1998) ............................................................................... 34

*Foman v. Davis*,
  371 U.S. 178 (1962) ............................................................................. 46

*Foster v. Wash. Dep't. of Ecology*,
  No. 14-2-25295-1, slip op. at 8 (Wash. King Cnty. Super. Ct. Nov. 19, 2015) .......... 27

*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................. 29

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                    iv
**Motion To Dismiss**

*Galbraith v. County of Santa Clara,*
  307 F.3d 1119 (9th Cir. 2002) ....................................................... 3

*Garza v. Cnty. Of L.A.,*
  918 F.2d 763 (9th Cir. 1990) ........................................................ 44

*Geiger v. Kitzhaber,*
  994 F.Supp.2d 1128 (2014) ........................................................... 39

*Gilligan v. Jamco Dev. Corp.,*
  108 F.3d 246 (9th Cir. 1997) .......................................................... 4

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991)................................................................. 16, 17

*Griswold v. Connecticut,*
  381 U.S. 479 (1965) ............................................................... 12, 45

*Harris v. McRae,*
  448 U.S. 297 (1980)..................................................................... 9

*Hatch v. Riggs Nat'l Bank,*
  361 F.2d 559 (D.C. Cir. 1966) ...................................................... 44

*Heckler v. Mathews,*
  465 U.S. 728 (1984).................................................................... 41

*Hughes v. Oklahoma,*
  441 U.S. 322 (1979).................................................................... 20

*Idaho v. Coeur d'Alene Tribe,*
  521 U.S. 261 (1997)............................................................... 21, 27

*Ill. Cent. R.R. v. Illinois,*
  146 U.S. 387 (1892)............................................................... 20, 28

*Illinois v. City of Milwaukee,*
  406 U.S. 91 (1972).................................................................... 4

*In re Complaint of Steuart Transp. Co.,*
  495 F. Supp. 38 (E.D. Va. 1980) ........................................ 21, 22, 27

*Ingraham v. Wright,*
  430 U.S. 651 (1977)........................................................ 6, 12, 13

*Jenkins v. McKeithen,*
  395 U.S. 411 (1969).................................................................... 28

*Jones v. Thorne,*
  1999 WL 672222 (D.Or. 1999)..................................................... 41

*Kanuk v. State, Dep't of Natural Res.,*
  335 P.3d 1088 (Alaska 2014)....................................................... 28

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**          v
**Motion To Dismiss**

*Kennedy v. City of Ridgefield,*
    439 F.3d 1055 (9th Cir. 2006) ................................................................. 6, 8

*Krottner v. Starbucks Corp.,*
    628 F.3d 1139 (9th Cir. 2010) ................................................................. 29

*L.W. v. Grubbs,*
    92 F.3d 894 (9th Cir. 1996) ................................................................. 5, 6

*L.W. v. Grubbs,*
    974 F.2d 119 (9th Cir. 1992), *cert. denied,* 113 S. Ct. 2442 (1993) ............................. 5

*Lake Mich. Fed'n v. U.S. Army Corps of Engineers,*
    742 F.Supp. 441 (D. Ill. 1990) ................................................................. 28

*Larson v. Valente,*
    456 U.S. 228 (1982) ................................................................. 37

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ................................................................. 39

*League of Residential Neighborhood Advocates v. City of Los Angeles,*
    498 F.3d 1052 (9th Cir. 2007) ................................................................. 4

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) ................................................................. 3

*Light v. U.S.,*
    220 U.S. 523 (1911) ................................................................. 22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................. 4, 29, 35, 37

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) ................................................................. 33

*MacDonald v. Chicago,*
    561 U.S. 742 (2010) ................................................................. 11

*Marder v. Lopez,*
    450 F.3d 445 (9th Cir. 2006) ................................................................. 3

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................. 4, 34

*Massachusetts Bd. of Retirement v. Murgia,*
    427 U.S. 307 (1976) ................................................................. 16

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ................................................................. 2, 4, 35

*Munger v. City of Glasgow Police Department,*
    227 F.3d 1082 (9th Cir. 2000) ................................................................. 7, 8

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'
Motion To Dismiss**

*Natural Res. Def. Council v. EPA,*
   526 F.3d 591 (9th Cir. 2008) ................................................................. 29

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
   508 U.S. 656 (1993) ................................................................................ 41

*Neitzke v. Williams,*
   490 U.S. 319 (1989) .................................................................................. 3

*Nunez by Nunez v. City of San Diego,*
   114 F.3d 935 (9th Cir. 1997) ........................................................... 17, 18

*Obergefell v. Hodges,*
   576 U.S. ____, slip. op. at 10 (2015) ............................................... *passim*

*Ocean Advocates v. U.S. Army Corps of Engineers,*
   402 F.3d 846 (9th Cir. 2005) ........................................................... 29, 35

*Otero v. Mesa County Valley School Dist. No. 51,*
   568 F.2d 1312 (10th Cir. 1977) .............................................................. 42

*Papachristou v. City of Jacksonville,*
   405 U.S. 156 (1972) ................................................................................ 13

*Penilla v. City of Huntington Park,*
   115 F.3d 707 (9th Cir. 1997) ................................................................... 5

*Planned Parenthood v. Casey,*
   505 U.S. 833 (1992) ................................................................................ 44

*Pollard v. Hagan,*
   44 U.S. 212 (1845) .................................................................................. 21

*PPL Montana, LLC v. Montana,*
   132 S. Ct. 1215 (2012) ................................................................ 19, 23, 24

*Price v. Denison Indep. Sch. Dist.,*
   694 F.2d 334 (5th Cir. 1982) ................................................................. 42

*Raich v. Gonzales,*
   500 F.3d 850 (9th Cir. 2007) ................................................................. 11

*Ramos v. Town of Vernon,*
   353 F.3d 171 (2d Cir. 2003) ................................................................... 17

*Reno v. Flores,*
   507 U.S. 292 (1993) .................................................................................. 9

*Reynolds v. Sims,*
   37 U.S. 533 (1964) .................................................................................. 44

*Roe v. Wade,*
   410 U.S. 113 (1973) .......................................................................... 43, 44

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'
Motion To Dismiss**

*Romer v. Evans,*
   517 U.S. 620 (1996)................................................................ 14

*Russell v. Gregoire,*
   124 F.3d 1079 (9th Cir. 1997) ............................................... 6

*San Antonio Independent School Dist. v. Rodriguez,*
   411 U.S. 1 (1973)................................................................... 15

*Sanders-Reed v. Martinez,*
   350 P.3d 1221 (N.M. Ct. App. 2015) ................................... 27

*Schuette v. BAMN,*
   572 U.S. ___, slip. op. at 17 (2014) ...................................... 2

*Sec'y of State v. Joseph H. Munson Co.,*
   467 U.S. 947 (1984)............................................................... 45

*Shapiro v. Thompson,*
   394 U.S. 618 (1969)............................................................... 11

*Sierra Club v. Morton,*
   405 U.S. 727 (1972)............................................................... 41

*Singleton v. Wulff,*
   428 U.S. 106 (1976)............................................................... 44

*Skinner v. Oklahoma,*
   316 U.S. 535 (1942)......................................................... 18, 19

*Smith v. Meese,*
   821 F.2d 1484 (11th Cir. 1987) ............................................ 42

*Swann v. Charlotte-Mecklenburn Bd. of Educ.,*
   401 U.S. 1 (1971)................................................................... 39

*Tex. Comm'n on Envtl. Quality v. Bonser-Lain,*
   438 S.W.3d 887 (Tex. App. Austin 2014) ............................ 28

*U.S. v. Beebe,*
   127 U.S. 338 (1888)............................................................... 21

*U.S. v. Burlington N. R.R.,*
   710 F. Supp. 1286 (D. Neb. 1989) ....................................... 27

*U.S. v. California,*
   332 U.S. 19 (1947)................................................................. 27

*U.S. v. Causby,*
   328 U.S. 256 (1946)............................................................... 27

*U.S. v. CB & I Constructors, Inc.,*
   685 F.3d 827 (9th Cir. 2011) ........................................... 21, 27

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**
**Motion To Dismiss**

*U.S. v. Missouri, K. & T. Ry. Co.*,
141 U.S. 358 (1891) ................................................................................. 20

*U.S. v. Oregon*,
295 U.S. 1 (1935) ...................................................................................... 27

*U.S. v. Ruby Co.*,
588 F.2d 697 (9th Cir. 1978) .................................................................... 22

*U.S. v. Students Challenging Regulatory Agency Procedures*,
412 U.S. 669 (1973) .................................................................................. 34

*U.S. v. Trinidad Coal*,
137 U.S. 160 (1890) .................................................................................. 22

*Union Pac. Ry. v. Botsford*,
141 U.S. 250 (1891) .................................................................................. 13

*United States v. 1.58 Acres of Land*,
523 F. Supp. 120 (D. Mass. 1981) ..................................................... 21, 28

*United States v. 32.42 Acres of Land*,
683 F.3d 1030 (9th Cir. 2012) .................................................................. 22

*United States v. BP Exploration & Production, Inc.*,
2010 WL 5094310 (E.D.La. 2010) ........................................................... 27

*United States v. Flores-Villar*,
536 F.3d 990 (9th Cir. 2008) .................................................................... 17

*United States v. Wheeler*,
254 U.S. 281 (1920) .................................................................................. 13

*Urgenda Foundation v The State of the Netherlands*
(Ministry of Infrastructure and the Environment) [2015]
Case C/09/456689/HA ZA 13-1396 ....................................................... 8, 9

*Vance v. Bradley*,
440 U.S. 93 (1979) ............................................................................... 16, 17

*Wang v. Reno*,
81 F.3d 808 (9th Cir. 1996) ........................................................................ 5

*Warth v. Seldin*,
422 U.S. 490 (1975) .................................................................................. 35

*Washington Envtl. Council v. Bellon*,
741 F.3d 1075 (9th Cir. 2014) ..................................................... 36, 37, 38

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ............................................................................ 11, 12

*Winston v. Lee*,
470 U.S. 753 (1985) .................................................................................. 13

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**          ix
**Motion To Dismiss**

*Wood v Ostrander*,
  879 F.2d 583 (9th Cir. 1989) .................................................................................. 6, 9

## STATUTES

28 U.S.C. § 1331 .................................................................................................... 4

33 U.S.C. § 2706 .................................................................................................. 25

33 U.S.C. § 1321 .................................................................................................. 23

33 U.S.C. § 2706 ............................................................................................ 22, 23

42 U.S.C. § 4331 .................................................................................................. 25

42 U.S.C. § 9607 ............................................................................................ 22, 25

43 U.S.C. § 1344 .................................................................................................. 16

49 U.S.C. § 40103 ................................................................................................ 27

## OTHER AUTHORITIES

1 J STORY, COMMENTARIES ON THE CONSTITUTION OF THE
  UNITED STATES § 462 (2d ed. 1885)........................................................... 43

2 William Blackstone, Commentaries on the Laws of England 4 (1766) ....................... 20

74 Fed. Reg. 66496, 66,516-36 (Dec. 15, 2009)................................................... 41

Charles L. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. DAVIS L.
  REV. 269, 315 (1980)...................................................................................... 19

Congressional Office of Technology Assessment, *Changing By Degrees:
  Steps to Reduce Greenhouse Gases* 3 (1991) ............................................... 18

David C. Slade, *Putting The Public Trust Doctrine To Work* 3-8, 15-24 (1990) ............ 24

David C. Slade, *The Public Trust Doctrine in Motion: Evolution of the Doctrine
  1997-2008* 23 (2008)....................................................................................... 19

Dawn Jourdan, Standing on Their Own: The Parallel Rights of Young People to
  Participate in Planning Processes and Defend Those Rights, 11 Sustainable
  Dev. L. & Pol'y 41 (2010).............................................................................. 43

Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois
  Central Railroad*, 33 ARIZ. ST. L.J. 849 (2001) ......................................... 22

Gardiner, A Perfect Moral Storm: The Ethical Tragedy of Climate Change (2011)........ 43

Gerald Torres & Nathan Bellinger, *The Public Trust: The Law's DNA*, 4 Wake Forest
    J.L. & Pol'y 281, 286-87 (2014)................................................................................. 19

*Important Rights and the Private Attorney General Doctrine*, 73
    Cal. L. Rev. 1929 (1985) ........................................................................................ 43

Jed Rubenfeld, The Right of Privacy, 102 HARV. L. REV. 737, 783–84 (1989) .......... 15

Justinian, Institutes, 1.2.1, 2.1.1 (T. Sandars trans. 1st Am. ed. 1876)........................... 20

Karl S. Coplan, *Public Trust Limits on Greenhouse Gas Trading Schemes:
    A Sustainable Middle Ground*, 35 Colum. J. Envtl. L. 287, 315 (2010) ..................... 19

Mank, Standing and Future Generations: Does *Massachusetts v. EPA* Open Standing for
    Generations to Come?, 34 Colum. J. Envtl. L. 1, 16-17 (2009) ................................... 41

Mary Christina Wood, *Advancing the Sovereign Trust of Government to Safeguard the
    Environment for Present and Future Generations (Part I): Ecological Realism and the
    Need for a Paradigm Shift*, 39 Envtl. L. 43, 69 (Winter 2009) .................................... 20

Matthew Hale, De Jure Maris, Harg. Law Tracts, reprinted in Stuart Moore, *A History of
    the Foreshore and the Law Relating Thereto* (3rd ed. 1888) ........................................ 20

Michael Blumm and Lynn Schaffer, *The Federal Public Trust Doctrine: Misinterpreting
    Justice Kennedy and Illinois Central*, 45 Envtl. L. 399, 406-07 (2015)................ 21, 23

Michael C. Blumm & Mary Christina Wood, *The Public Trust Doctrine in
    Environmental and Natural Resources Law* 12-13 (2013); J. Inst. 2.1.1
    (T. Sanders trans., 4th ed. 1867) .................................................................................. 20

*Oneida Indian Nation of N.Y. v. Cnty. of Oneida*,
    414 U.S. 661, 666 (1974)............................................................................................. 23

Pub. L. No. 85-726, § 101(33), 72 Stat. 731, 740 (1958) ................................................. 27

R. Abrams, *Walking the Beach to the Core of Sovereignty*, 40 U. Mich. J.L.
    Reform 861, 861 (Summer 2007) ................................................................................ 20

The Federalist No. 46 (James Madison) .......................................................................... 20

*Tomorrow's Standing Today: How the Equitable Jurisdiction Clause of
    Article III, Section 2 Confers Standing Upon Future Generations*, 28 Colum. J.
    Envt'l. L. 185, 191 (2003) ........................................................................................... 42

U.S. Const. Art. III §2................................................................................................... 43

UNFCC, May 9, 1992, 1771 U.N.T.S. 197 ................................................................... 43

## RULES

**Federal Rules of Civil Procedure**

Rule 12(b)(1)................................................................................ 4

Rule 12(b)(6)......................................................................... 3, 19

## INTRODUCTION

For over fifty years, Defendants have known carbon dioxide ("$CO_2$") pollution from burning fossil fuels was causing global warming and dangerous climate change, and that continuing to burn fossil fuels would destabilize the climate system and severely damage present and future generations of our nation, including Plaintiffs. *See* First Amended Complaint ("FAC"), ¶ 1. Defendants also knew the harmful impacts of their actions and inactions would significantly endanger Plaintiffs, with damage persisting into future generations. Despite this knowledge, Defendants continued their policies and practices of allowing the exploitation, consumption, and combustion of fossil fuels. In response, 21 Plaintiffs, including minor children and future generations, brought this action to redress the violations of their constitutional and public trust rights.

This Motion to Dismiss raises two key issues: standing and failure to state a claim under the Constitution and under the Public Trust Doctrine. For purposes of this Motion, Defendants do not dispute their conduct resulted in a 0.9° C of global temperature increase above pre-industrial levels, causing "significant harm to life, health, property, economies, and ecosystems."[1] Defendants also do not dispute they have promoted the exploration, extraction, development, production, refinement, transportation, export, import, and burning of fossil fuels, despite their knowledge that these policies and actions would enhance the dangerous climate situation. *See* FAC ¶ 1. The Motion implicitly concedes many Plaintiffs cannot vote and have no means of redress other than this Court for the constitutional and public trust violations caused by

---

[1]    Defendant John P. Holdren, Address on "Climate Science: 50 Years Later" AAAS-AMS-Carnegie Science-Linden Trust: Climate Science and Public Policy From (pre) 1965 to (post) 2015 14 (Oct. 29, 2015), attached to the Declaration of Julia Olson filed herewith as **Exhibit 1**.

[2]    *Urgenda Foundation v. The State of the Netherlands* (Ministry of Infrastructure and the Environment) [2015] Case C/09/456689/HA ZA 13-1396 at [4.66] (Engl. transl.), attached as Exhibit 6 to Olson Dec.

[3]    In asserting this Court must first "adopt a narrow definition of the interest at stake," Defendants rely on *Glucksberg, supra.*, 521 U.S. at 722, and *Raich v. Gonzales*, 500 F.3d 850,

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                                    1
**Motion To Dismiss**

Defendants' actions. Without judicial intervention, given the ongoing damage caused by Defendants, Plaintiffs' health and personal security have been damaged and are at great risk.

Despite its critical implications, this action poses questions akin to those that the judiciary has considered throughout our country's history, and seeks a remedy familiar to courts. "The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution." *Obergefell v. Hodges*, 576 U.S. ____, slip op. at 10 (2015). Plaintiffs' individual harms caused by Defendants are as significant as *Obergefell* was for Americans' right to marry, and as *Brown v. Board of Education* was for black Americans' rights to equal, non-segregated education. 347 U.S. 483 (1954). Neither the fundamental rights to marry nor equal non-segregated education are explicitly stated in the Constitution; yet our judiciary has declared them integral to our liberties and our democracy.

When rights "are violated, 'the Constitution requires redress by the courts,' notwithstanding the more general value of democratic decisionmaking." *Id*. at 24 (citing *Schuette v. BAMN*, 572 U.S. ___, slip op. at 17 (2014)). The questions posed as to Plaintiffs' fundamental rights under the Fifth and Ninth Amendments, and Defendants' obligations under the Public Trust Doctrine, are facially justiciable. Equally, the declaratory and equitable relief sought by Plaintiffs is both familiar to this Court, and necessary to redress the harms alleged.

In addition, Plaintiffs, through their declarations and those of their experts filed herewith, demonstrate each element of Article III standing. *See* FAC ¶¶ 16-97. No more is required as this Court must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Maya v. Centex Corp*., 658 F.3d 1060, 1068 (9th Cir. 2011).

This Court should deny Defendants' Motion to Dismiss in its entirety. The legal arguments offered by Defendants misconceive Plaintiffs' claims and requested relief. Further,

Defendants' moving papers consistently cite to law that is inapposite to the facts and theory of this case. With respect to Plaintiffs' constitutional claims, this Court has jurisdiction to consider whether Defendants' actions violate the Due Process clause of the Fifth Amendment, the Equal Protection principles in the Fifth Amendment, and Plaintiffs' unenumerated right to a stable climate system preserved under the Ninth Amendment and substantive Due Process. This Court should determine Defendants have a duty of care as trustees under the Public Trust Doctrine.

## STANDARD OF REVIEW

**Failure to State a Claim**:    Fed. R. Civ. P. 12(b)(6) permits a motion for "failure to state a claim upon which relief can be granted." A complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Fed. R. Civ. P. 8(a) only requires "a short and plain statement of the claim" showing Plaintiffs are entitled to relief."

This Court should not dismiss the FAC under Fed. R. Civ. P. 12(b)(6) unless it is certain that Plaintiffs cannot prove *any* set of facts that would entitle Plaintiffs to relief. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). In its consideration of a Rule 12(b)(6) motion, the court is limited to the allegations on the face of the complaint (including any documents attached thereto), matters properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds*, *Galbraith v. County of*

*Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

These claims, asserted under 28 U.S.C. § 1331, arise under federal law and the Constitution. *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 946 (9th Cir. 2008); *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007). The claims also apply federal common law or laws created by federal decisions. *Illinois v. City of Milwaukee*, 406 U.S. 91, 98-100 (1972). This Court need not find Plaintiffs will ultimately prevail on their claims, only that the FAC states valid claims for relief. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

**Subject Matter Jurisdiction**:       Defendants bring a facial attack on standing under Fed. R. Civ. P. 12(b)(1). In deciding standing, the Court must "accept as true all material allegations" and "construe the complaint in favor of the complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). To establish standing, only one plaintiff need allege: (1) an injury in fact; (2) fairly traceable to defendants' conduct; and (3) likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Mass. v. EPA*, 549 U.S. 497, 518 (2007). As demonstrated by the FAC ¶¶ 16-97, and declarations by Plaintiffs and experts filed herewith, Plaintiffs are suffering significant injuries fairly traceable to Defendants' actions which are likely to be redressed by a favorable decision by this Court.

## LEGAL ARGUMENT

### I.    THE FAC STATES CLAIMS UPON WHICH RELIEF CAN BE GRANTED

#### A.    THE *DESHANEY* EXCEPTIONS PROVIDE PLAINTIFFS WITH A SUBSTANTIVE DUE PROCESS CLAIM.

Because Plaintiffs properly allege a violation of their constitutional security interests under the Fifth Amendment, Defendants do not argue the Due Process claim under *DeShaney*

and its progeny should be dismissed. The Due Process clause's purpose is "to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). However, "[i]t is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney,* 489 U.S. at 198. There are two Due Process claims that are exceptions to *DeShaney,* applicable to Defendants under the Fifth Amendment. *DeShaney*, 489 U.S. at 196; *see Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996).

The *first* exception involves a special relationship between the victim and the State, such as custody or involuntary hospitalization, which leads to a duty of care. *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 2442 (1993) (nurse directed to work with known violent sex offender was assaulted and raped). The *second* exception occurs when the State places the victim in a position of danger, or enhances the position of danger, and acts with deliberate indifference to the known danger the State helped create. This "danger creation" exception requires "affirmative conduct on the part of the state in placing the plaintiff in danger." *Id.* at 121-22 (physical custody not a prerequisite to "danger creation" exception). Plaintiffs can recover "when a state officer's conduct places a person in peril in deliberate indifference to their safety." *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997). The Ninth Circuit has held proving deliberate indifference requires "the defendant have actual knowledge of, or wilfully ignore, impending harm, *i.e.* the defendant knows that something *is* going to happen but ignores the risk and exposes someone to it." *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996). To establish "deliberate indifference," a complaint need only allege a serious risk of harm, the State's actual knowledge of (or, at least, willful blindness to) the harm, and the State's failure to take obvious steps to address that known, serious risk to which it exposed the plaintiff. *Id.* at 900.

The Court in *DeShaney* focused upon the role that the state played in creating or enhancing the danger the victim faced. There, the Court reasoned that "[w]hile the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201. In *Grubbs*, the Ninth Circuit interpreted *DeShaney* to mean that if affirmative conduct on the part of a state actor places a victim in danger, and the state actor proceeds in deliberate indifference to that victim's safety, a Due Process claim arises. The critical distinction is not an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk.

Under *Grubbs*, a state actor has a constitutional duty under the Due Process clause to protect an individual where the state places that victim in danger through affirmative conduct. *See Wood v Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989). Once it places the victim in danger, the State assumes a duty under the Due Process clause, and the State breaches this duty by exercising "deliberate indifference to [plaintiff's] interest in personal security." *Id.* at 588 (assertion of government power showing a disregard for plaintiff's safety amounts to deliberate indifference). The duty arises when "the state creates the danger and removes the individual's ability to protect himself." *Russell v. Gregoire*, 124 F.3d 1079, 1093 n.10 (9th Cir. 1997) (citations omitted). "[T]he Constitution protects a citizen's liberty interest in her own bodily security." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977); *Wood, supra.*, 879 F.2d at 589).

The FAC alleges Defendants have, for at least fifty years, known $CO_2$ pollution from burning fossil fuels caused global warming and dangerous climate change, and that continuing to burn fossil fuels would destabilize the climate system, damaging Plaintiffs. Defendants also

knew the harmful impacts of their actions would endanger Plaintiffs, with the damage persisting for millennia. FAC, ¶¶ 1, 5, 6, 8, 131-150, 202-255, 278-289; *see also* Declaration of James E. Hansen, ECF 7-1 ("Hansen Dec."). In spite of knowing the undisputed danger, since 1991, "Defendants have knowingly allowed at least an additional 130,466 million metric tons of $CO_2$ emissions from fossil fuel combustion." FAC, ¶¶ 151, 153. "[Ignoring] their own plans to slash emissions and reduce the risk of dangerous climate change, Defendants knowingly acted to exacerbate that risk" and harm Plaintiffs. *Id.* ¶ 154.

> The aggregate actions by Defendants in allowing fossil fuel production, consumption, and emissions to increase in the U.S. since 1965 ignored science driven considerations of climate system protection. These aggregate actions were taken with deliberate indifference to the need for a national carbon budget or a national plan that includes an analysis of the cumulative impacts of Defendants' actions upon the climate system and with respect to the fundamental rights of the present and future generations. *Id.*, ¶ 163.

The FAC alleges Defendants materially created and enhanced the dangerous climate situation for Plaintiffs by: allowing fossil fuel production on federal public lands (¶¶ 164-170); subsidizing the fossil fuel industry (¶¶ 171-178); approving the increasing interstate and international transport of fossil fuels (¶¶ 179-184); and allowing $CO_2$ pollution from combustion of fossil fuels in the energy, refinery, manufacturing, and transportation sectors (¶¶ 185-191). The FAC alleges Congressional mandating of natural gas exports, without any national interest consideration, enhanced an already dangerous climate situation. *Id.*, ¶¶ 192-201. Plaintiffs have no meaningful way of protection from the dangerous situation in which Defendants have placed them; only Defendants can reverse the danger. FAC, ¶¶ 97, 262, 275, 276.

In *Munger v. City of Glasgow Police Department*, an unruly bar patron was ejected by police; the police then refused him either re-entry to the bar or access to his truck. 227 F.3d 1082 (9th Cir. 2000). As a result, the victim died of hypothermia. *Id.* at 1084-85. The Ninth Circuit found a duty was owed under the Due Process clause because the officers intervened to eject

Munger from the bar, prohibited him from getting in his truck, and knew he was both impaired by alcohol and wearing insufficient clothing to survive. *Id.* at 1086. "[A] duty to protect arises where a police officer takes affirmative steps that increase the risk of danger to an individual." *Id.* at 1089; *see Kennedy, supra.*, 439 F.3d at 1061; *Campbell v. State Dep't of Soc. and Health Servs.*, 671 F.3d 837, 847 (9th Cir. 2011). As late as 1990, atmospheric $CO_2$ levels were within a range federal scientists believed would protect the climate system. However, Defendants took affirmative steps to ***increase*** the risk of danger to Plaintiffs through their pervasive control of the U.S. fossil fuel system, analogous to the state's intervention in *Munger*.

In *DeShaney*, while "the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation*, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201. Here, Defendants were both aware of the dangers and played, and continue to play, a material role in the creation of the dangers, which have made Plaintiffs more vulnerable to serious and irreversible harm.

A similar analysis concluding the State, like Defendants here, is the material source of climate danger was recently undertaken by the Dutch court in *Urgenda v. The State of the Netherlands*:

> [T]he State has the power to control the collective Dutch emission level (and that it indeed controls it). Since the State's acts or omissions are connected to the Dutch emissions a high level of meticulousness should be required of it in view of the security interests of third parties (citizens), including Urgenda. Apart from that, when it became a signatory to the UN Climate Change Convention and the Kyoto Protocol, the State expressly accepted its responsibility for the national emission level and in this context accepted the obligation to reduce this emission level as much as needed to prevent dangerous climate change. Moreover, citizens and businesses are dependent on the availability of non-fossil energy sources to make the transition to a sustainable society. This availability partly depends on the options for providing "green energy" .... *The State therefore plays a crucial role in the transition to a sustainable society and therefore has to take on a high level of care for establishing an adequate and effective statutory and instrumental framework to reduce the greenhouse gas emissions* in the Netherlands.

Rechtbank Den Haag 24 juni 2015, C/09/456689/HA ZA 13-1396 m.nt. E.H. Hulst en Ch.W.

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                    8
**Motion To Dismiss**

Backes (Stichting Urgenda/De Staat der Nederlanden (Ministerie van Infrastructuur en Milieu)) (Neth.).[2] The Court in *Urgenda* considered international agreements and state activities to determine "what degree of discretionary power the State is entitled to in how it exercises the tasks and authorities given to it" and "the minimum degree of care the State is expected to observe." *Id.* at 4.52. Like the Netherlands, Defendants here control $CO_2$ emissions in our country and are signatories to, and have ratified, the UNFCCC. FAC ¶ 145.

Therefore, the FAC states a viable Due Process claim under the second *DeShaney* exception: Defendants affirmatively created or enhanced a dangerous situation for Plaintiffs; and Defendants acted with "deliberate indifference to [Plaintiffs'] interest in personal security." *Wood,* 879 F.2d at 588. This Court should deny this Motion.

### B.  DEFENDANTS' ACTS IRREVERSIBLY DISCRIMINATE AGAINST PLAINTIFFS' EXERCISE OF CONSTITUTIONAL RIGHTS

The Fifth Amendment's guarantee of "Due Process of law" includes "a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 293, 299 (1993). Equal Protection principles of the Fifth Amendment contain two justiciable claims. The first, addressed here, marries substantive Due Process rights with the central precepts of equality articulated in the Fourteenth Amendment and allows a claim against the federal government to proceed when it acts in ways that discriminate against an individual's exercise of a fundamental constitutional right, regardless if the plaintiff is a member of a protected class. The Due Process clause of the Fifth Amendment also incorporates unenumerated rights applicable against the federal

---

[2]    *Urgenda Foundation v. The State of the Netherlands* (Ministry of Infrastructure and the Environment) [2015] Case C/09/456689/HA ZA 13-1396 at [4.66] (Engl. transl.), attached as Exhibit 6 to Olson Dec.

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                    9
**Motion To Dismiss**

government. *See Bolling v. Sharpe*, 347 U.S. 497 (1954); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *Harris v. McRae*, 448 U.S. 297, 317-18 (1980) (impliedly recognizing federal Due Process privacy right to abortion). Plaintiffs here properly state a Fifth Amendment Due Process-Equal Protection claim because Defendants' aggregate acts in promoting the fossil fuel system discriminate against Plaintiffs' ability to exercise their fundamental constitutional rights, whether enumerated or unenumerated.

Plaintiffs allege Defendants discriminate against their exercise of their fundamental *enumerated* constitutional rights to life, liberty, and property by irreversibly infringing those rights through Defendants' own fossil fuel activities. Plaintiffs seek to protect fundamental enumerated rights: the right not to have their lives and personal security irreversibly damaged by their government; to not have their property (both public and private) irreversibly threatened with destruction; to not be denied equal rights to education, to bear children, to travel, to meaningful suffrage, and to raise families, all of which are threatened by climate change. *See* FAC, ¶¶ 16, 19, 28, 29, 58, 72, 88, 278, 279, 283, 292, 298.

Defendants incorrectly assert Plaintiffs ask this Court to identify new rights "to be free of climate change" or "to be free of $CO_2$ emissions." Fed MTD 20-21. Defendants mischaracterize Plaintiffs' Due Process-Equal Protection claim. As the Supreme Court recently explained in *Obergefell v. Hodges*:

> *Loving* did not ask about a "right to interracial marriage"; *Turner* did not ask about a "right of inmates to marry"; and *Zablocki* did not ask about a "right of fathers with unpaid child support duties to marry." **Rather, each case inquired about the right to marry in its comprehensive sense, asking if there was a sufficient justification for excluding the relevant class from the right**. . . .

Slip op. at 18 (emphasis added). Here, Plaintiffs ask this Court to affirm the right to life in its comprehensive sense and consider whether Defendants may irreversibly discriminate against Plaintiffs' ability to survive, maintain property, and enjoy recognized liberties. Plaintiffs have a

right not to be placed in danger by the federal government, a right which Defendants materially imperil as a result of their control over $CO_2$ emissions. Defendants' acts jeopardize Plaintiffs' lives, liberties, and property rights by causing climate destabilization.

"The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, 'has not been reduced to any formula.'" *Obergefell*, slip op. 10; *see Shapiro v. Thompson*, 394 U.S. 618, 630-31 (1969) (right to travel has no source in specific constitutional provision, but is "so elementary" and "a necessary concomitant" of the Constitution). In determining whether Plaintiffs' constitutionally *unenumerated* rights are protected as a matter of substantive Due Process, this Court should consider "whether the right . . . is fundamental to our scheme of ordered liberty . . . ***or*** whether this right is 'deeply rooted in this nation's history and tradition.'" *MacDonald v. Chicago*, 561 U.S. 742 (2010) (altering the two-part formulation articulated in *Washington v. Glucksberg,* 521 U.S. 702 (1997)). However, those considerations only guide this Court's analysis; they do not set boundaries for identifying fundamental rights.[3] *Obergefell*, slip op. at 10-11. The Court clarified that history and tradition do not always guide the need for protection of fundamental rights:

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

*Obergefell*, slip op. 11.

---

[3]    In asserting this Court must first "adopt a narrow definition of the interest at stake," Defendants rely on *Glucksberg, supra.*, 521 U.S. at 722, and *Raich v. Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007). This analysis ignores more recent precedent, including *Obergefell* and *MacDonald,* which reject the two-part test and call for a broader definition of the fundamental interest at stake. *Obergefell*, slip op. at 18 (distinguishing *Glucksberg's* analysis as unique given the specific interest in physician-assisted suicide).

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**          11
**Motion To Dismiss**

The inherent and inalienable right to be free from danger in the use of essential natural resources, like the climate system, is implied in the rights fundamental to life, liberty, and property protected by substantive Due Process and retained by the People in the Ninth Amendment. *See Griswold v. Connecticut*, 381 U.S. 479, 486-492 (1965) (Goldberg, J., concurring) (Ninth Amendment safeguards unenumerated retained rights). If forced by Defendants to live in an unsafe climate system, Plaintiffs will not be able to enjoy the life, liberty, and property rights promised by our Constitution. It is not a specific right to "a healthy environment" that is at stake in this case, but a citizen's right not to have his or her survival, liberties, and property rights placed in extreme and irreversible danger by Defendants' acts toward the climate system.

In *Obergefell,* the Court found an important basis to protect the right to marry was that "it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education." *Obergefell,* slip op. at 14. "The Court has recognized these connections by describing the varied rights as a unified whole: '[T]he right to "marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause.'" *Id.* at 14. Similarly, protecting the right not to have life, liberty, and property placed in extreme danger by Defendants' acts toward the climate system safeguards children, families, and other liberties promised in our Constitution. The right not to be placed in danger by Defendants preserves our democracy and the central fabric of the Constitution. *See* FAC, ¶ 239 (climate change threatens our national security).

These fundamental rights meet both prongs in *Glucksberg*. First, the implicit liberty interests preserved by the Due Process Clause include "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Ingraham v. Wright*,

430 U.S. 651, 673 (1977). The Court recognized that "[n]o right is held more sacred, or is more carefully guarded … than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. v. Botsford,* 141 U.S. 250, 251 (1891). While threats to personal security usually arise in the context of government imposed punishment or physical restraint, courts have not limited protection to those settings. *Winston v. Lee*, 470 U.S. 753, 764-66 (1985). Individuals have "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, and this right is fundamental . . . the magnitude of the liberty deprivation that [the] abuse inflict upon the victim… strips the very essence of personhood." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 506-07 (6th Cir. 1996). Like the right to free movement, the right to vital natural resources should be deemed "historically part of the amenities of life as we have known them." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 164 (1972); *see also United States v. Wheeler*, 254 U.S. 281, 293 (1920) (citizens possess "the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective [s]tates, to move at will from place to place therein, and to have free ingress thereto and egress therefrom...."). Plaintiffs' personal security and wellbeing, and their ability to peacefully dwell within their states, has been, and is being, endangered by the actions of Defendants concerning the climate system. *See e.g.* FAC, ¶¶ 1,16, 19, 21, 24, 28, 33, 84, 86, 91, 96, 98, 99, 101, 112, 115, 117, 121, 123, 125, 130, 146, 151-201, 276, 279, 280.

As outlined more fully in the historical analysis contained in the Declaration of John Davidson filed herewith ("Davidson Dec.") ¶¶ 5-77. Plaintiffs' right to vital resources and to be protected from irreversible damage to their vital natural resources caused by the federal government is a central and historic underpinning of the Constitution and deeply rooted in the

traditions and history of our People. Plaintiffs properly state a claim.

**C.    POSTERITY/FUTURE GENERATIONS ARE A SUSPECT CLASS IN NEED OF EXTRAORDINARY PROTECTION FROM THE POLITICAL PROCESS UNDER FIFTH AMENDMENT EQUAL PROTECTION**

The claim asserted under the Equal Protection principles of the Fifth Amendment stems from traditional Fourteenth Amendment claims: Plaintiffs are members of a separate suspect class needing extraordinary protection from the majoritarian political process under principles of Equal Protection. *Romer v. Evans*, 517 U.S. 620, 631 (1996) (government acts that burden fundamental rights or target a suspect class violate principles of Equal Protection). Plaintiffs have properly stated an Equal Protection suspect class claim upon which relief can be granted.

Our Posterity/future generations need extraordinary protection from the political process as a result of Defendants' promotion of the fossil fuel system through their aggregate acts,[4] the Energy Policy Act's mandatory natural gas export approvals, and the authorization of LNG exports from the Jordan Cove Project. Because no decision by the Supreme Court or the Ninth Circuit forecloses such protection and because of this unique situation where Posterity is being intentionally damaged by Defendants, this Court should determine Posterity is a separate suspect class entitled to Equal Protection of the law.

Posterity, including living children without suffrage, is a suspect class because the group

---

[4]    In determining Equal Protection violations, the Supreme Court has reviewed both specific laws and entire government systems and programs to determine discrimination against a class. *See San Antonio Ind. School District v. Rodriguez*, 411 U.S. 1 (1973) (Texas school financing system); *Reynolds v. Sims*, 377 U.S. 533, 540 (1964) (legislative reapportionment schemes after more than fifty years of inaction denied equal suffrage). *Reynolds* explained the importance of judicial intervention in reviewing government schemes that deny Equal Protection: "Legislative inaction, coupled with the unavailability of any political or judicial remedy, had resulted, with the passage of years, in the perpetuated scheme becoming little more than an irrational anachronism. Consistent failure by the Alabama Legislature to comply with state constitutional requirements as to the frequency of reapportionment and the bases of legislative representation resulted in a minority strangle hold on the State Legislature." 377 U.S. at 570-71. The federal fossil fuel system is just such an anachronistic scheme.

endures a history of discrimination, has immutable characteristics, and is politically powerless,

three factors considered by the Court in deciding whether a suspect classification exists. *City of*

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 472, n.24 (1985) (Marshall, concurring);

*San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).

      Historical discrimination against Posterity is illustrated by the Founders' protection of the

class in the Preamble and in Article III, Section 3, Clause 2. U.S. Const. pream.[5] Defendants'

intentional acts over the past fifty years, despite knowing continued and increased $CO_2$ emissions

would condemn future generations to a largely uninhabitable nation, is further evidence of the

ongoing historical discrimination against Posterity. FAC, ¶¶ 3-11, 98-130, 141-201, 299.

      Because this case presents both irreversibility (of climate change) and irreplaceability (of

a stable climate and associated vital life support services) to Posterity, the immutability

characteristic is met. The underlying concern of the immutability factor is whether the affected

party has any avenue to avoid the relevant disadvantage, reshape the challenged policy, and live

the life they want to freely live. *See* Jed Rubenfeld, The Right of Privacy, 102 HARV. L. REV.

737, 783–84 (1989) (state acts that infringe on Equal Protection rights "do not simply proscribe

one act or remove one liberty; they inform the totality of a person's life"). As Plaintiffs allege,

due to the long life of $CO_2$ in the atmosphere, they will not be able to avoid the disadvantages to

their class or in a timely manner reshape federal policy, because the class has no rights of

suffrage or political power until long after Defendants' acts have materially contributed to the

ongoing accumulation of dangerous levels of $CO_2$ in the atmosphere. *See San Antonio*

*Independent School Dist.,* 411 U.S. at 20-21 (Equal Protection violations will be found where

members of a class "sustained an absolute deprivation of a meaningful opportunity to enjoy" a

benefit of citizenship, with no adequate substitute). It is critical to distinguish the unique

---

[5]    For a historical analysis of this issue, *see generally* Davidson Dec.

constitutional infringements presented by the irreversibility of the harm to this class of plaintiffs, which will dictate the quality of their lives from here on, from the category of entirely reversible age-based laws like curfews for minors. *See Vance v. Bradley*, 440 U.S. 93, 96-97 (1979) (distinguishing improvident government decisions that can be rectified as outside the realm of Equal Protection).

Posterity is also politically powerless as a class.  Posterity's interests in vital natural systems have been subjugated to the short-term interests of those who can and do vote. *See City of Cleburne, Tex.*, 473 U.S. at 472, n.24 (minors might be considered politically powerless where government acts with prejudice or indifference to their interests). The politically represented present adult generations have accrued disproportionate advantages from unsustainable fossil fuel policies by externalizing most of the costs onto later generations, who will not be politically represented until it is too late to reverse the permanent consequences of climate destabilization. *See* Davidson Dec., ¶¶ 72-74. Furthermore, the interests of Posterity in the outcome of executive decisions are further marginalized when the specific economic interests of polluters are required to be considered, but Posterity is not. *See* 43 U.S.C. § 1344(a)(2) (Outer Continental Shelf Lands Act requiring consideration of the leasing interests of potential oil and gas producers, but not impacts on future generations). As such, Posterity is a suspect class entitled to Equal Protection under the Fifth Amendment from Defendants' unconstitutional system of promoting fossil fuels to the significant harm to Plaintiffs.

Plaintiffs properly assert a claim even if the classification is minor children. While the Supreme Court has never found age to be a suspect classification, it has only rejected the older-aged as a suspect class, because its members have rights of suffrage and do not contain immutable characteristics. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *see also*

*Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) (applying rational basis to law discriminating against judges over 70). The class at issue here is politically powerless to protect their fundamental rights, especially given the urgency involved. *See Vance, supra.*, 440 U.S. at 96-97. Without judicial intervention, these minor children's fundamental rights to life, liberty, and property will be permanently and irreversibly abridged.

Some Circuits apply intermediate scrutiny to laws discriminating against minors. *See Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003) (reviewing local ordinance imposing curfew on juveniles with "intermediate scrutiny" for Equal Protection violations). In *United States v. Flores-Villar,* the Ninth Circuit held, without citing precedent, that "age is not a suspect class." 536 F.3d 990, 998 (9th Cir. 2008). However, that case was not about discrimination against minors as much as it was discrimination against men under 19 who had foreign-born children out of wedlock and whose offspring were denied citizenship by statute. *Id.* (noting differential treatment of mothers and fathers). *Flores-Villar* is also distinguishable because Plaintiffs here do not contend that "age is a suspect class"; rather, they argue that an entire generation of minor children faced with irreversible damage to the habitability of their country are a suspect class. In other contexts, the Ninth Circuit has overturned laws that abridge minors' fundamental rights. *Nunez by Nunez v. City of San Diego,* 114 F.3d 935, 944 (9th Cir. 1997) (law abridging minors' rights to free speech unconstitutional and denying suspect classification based on *Gregory v. Ashcroft*, 501 U.S. at 470, which had nothing to do with minors).

This Court should be guided by the Supreme Court's admonition that experience and history guide the analysis of whether the class is in need of special protection:

> No single talisman can define those groups likely to be the target of classifications offensive to the Fourteenth Amendment and therefore warranting heightened or strict scrutiny; experience, not abstract logic, must be the primary guide. . . . The political powerlessness of a group and the immutability of its defining trait are relevant insofar as they point to a social and cultural isolation that gives the

> majority little reason to respect or be concerned with that group's interests and needs. . . .
>
> The discreteness and insularity warranting a "more searching judicial inquiry," *United States v. Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938), must therefore be viewed from a social and cultural perspective as well as a political one.

*City of Cleburne, Tex.*, 473 U.S. at 472, n.24.

A single law that discriminates against people of a certain age is vastly different from Defendants' systemic discrimination against the fundamental rights of present and future children to personal security and vital natural resources.[6] Defendants incorrectly assert "no court has ever recognized a constitutional claim" that young or unborn plaintiffs "will confront an acute social problem during their expected lifetimes." Def. MTD 25. Black children in the 1950s successfully secured jurisdiction and the recognition of their Equal Protection and fundamental rights to end racial discrimination first in public schools and then elsewhere. *See Brown v. Br. Of Educ.,* 347 U.S. 483 (1954).[7] That the full ramifications of the discrimination to children today will not be fully experienced by them until they are older presents no ripeness issue. *See Skinner v. Oklahoma*, 316 U.S. 535 (1942) (unconstitutional to force sterilization of criminal as violating fundamental right to procreate even though procreation was not possible for decades until release from prison). In certain instances, the protection of a fundamental right requires judicial intervention today, even where the exercise of the right might not happen for decades.

---

[6]   Courts have often allowed age-based discriminatory laws that protect minors and reviewed children's constitutional rights differently because of children's peculiar vulnerability, their level of maturation, and the importance of parental rights in child rearing. *Nunez v. City of San Diego*, 114 F.3d 935, 945-46 (9th Cir. 1997) Here, Defendants are not acting to protect children, but are irreversibly threatening children's survival, personal security and other fundamental rights.
[7]   "[I]t is clear that the decision to limit emissions cannot await the time when the full impacts are evident. The lag time between emission of the gases and their full impact is on the order of decades to centuries; so too is the time needed to reverse any effects. Today's emissions [in 1991] thus commit the planet to changes well into the 21st century. Among individual countries, the United States is the leading contributor of greenhouse gases. With 5 percent of the world's population, the United States accounts for about 20 percent of the world's warming commitment. . . . originat[ing] almost exclusively from fossil fuel combustion." Congressional Office of Technology Assessment, *Changing By Degrees: Steps to Reduce Greenhouse Gases* 3 (1991).

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                              18
**Motion To Dismiss**

> Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, farreaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty."

*Id.* at 541.

If these Plaintiffs were only entitled to intermediate scrutiny or rational basis review of their constitutional claims, the proper course is to decide the claims on their merits, not to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### D.    THE PUBLIC TRUST DOCTRINE PROVIDES A CLAIM AGAINST DEFENDANTS OVER WHICH THIS COURT HAS JURISDICTION

Under the Public Trust Doctrine, our federal government has a duty to protect essential natural resources as a public trust. *See* Gerald Torres & Nathan Bellinger, *The Public Trust: The Law's DNA*, 4 Wake Forest J.L. & Pol'y 281, 286-87 (2014); David C. Slade, *The Public Trust Doctrine in Motion: Evolution of the Doctrine 1997-2008* 23 (2008). This Court should reject Defendants' plea to follow the improper reasoning of the D.C. Circuit in *Alec L. v. McCarthy*, which misread *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012) ("*PPL Montana*"), and determine Plaintiffs have properly stated a claim under the Public Trust Doctrine.

### 1.    The Public Trust Doctrine Applies to the Federal Government

The Public Trust Doctrine is "rooted in the precept that some resources are so central to the well-being of the community that they must be protected by distinctive, judge-made principles." Charles L. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. DAVIS L. REV. 269, 315 (1980); *See* Karl S. Coplan, *Public Trust Limits on Greenhouse Gas Trading Schemes: A Sustainable Middle Ground*, 35 Colum. J. Envtl. L. 287, 315 (2010). Pursuant to the Public Trust Doctrine, the sovereign trustee is affirmatively obligated to prevent waste and use skill and care to preserve the trust property. *See* Mary Christina Wood, *Advancing*

*the Sovereign Trust of Government to Safeguard the Environment for Present and Future*

*Generations (Part I): Ecological Realism and the Need for a Paradigm Shift*, 39 Envtl. L. 43, 69

(Winter 2009). These obligations run to each branch of government. *See* R. Abrams, *Walking the*

*Beach to the Core of Sovereignty*, 40 U. Mich. J.L. Reform 861, 861 (Summer 2007).

      The Public Trust Doctrine is traced from Roman law through the Magna Carta to present

day decisions. *See* Michael C. Blumm & Mary Christina Wood, *The Public Trust Doctrine in*

*Environmental and Natural Resources Law* 12-13 (2013); J. Inst. 2.1.1 (T. Sanders trans., 4th ed.

1867); Matthew Hale, De Jure Maris, Harg. Law Tracts, reprinted in Stuart Moore, *A History of*

*the Foreshore and the Law Relating Thereto* (3rd ed. 1888); 2 William Blackstone,

Commentaries on the Laws of England 4 (1766) ("[T]here are some few things which,

notwithstanding the general introduction and continuance of property, must still unavoidably

remain in common . . . Such (among others) are the elements of light, air, and water . . . ."). In

the United States, the Doctrine is deeply rooted in our history and was included in colonial

charters, providing the same protection for natural resources in America as afforded by the

Crown in England. *See* The Federalist No. 46 (James Madison) ("The federal and State

governments are in fact but different agents and trustees of the people"); *Martin v. Waddell*, 41

U.S. 367, 413 (1842). The Supreme Court recognized the Public Trust Doctrine in *Ill. Cent. R.R.*

*v. Illinois,* 146 U.S. 387, 453 (1892); *see also Geer v. Connecticut*, 161 U.S. 519, 534 (1896),

*rev'd on other grounds*, *Hughes v. Oklahoma*, 441 U.S. 322 (1979). In *Illinois Cent. R.R.*, the

Court found the navigable waters of the Chicago harbor, and the land under them, are "a subject

of concern to the whole people of the state" and must be held "in trust for their common use and

of common right, as an incident of their sovereignty." 146 U.S. at 455, 459-60.

      The Supreme Court has recognized that the public trust clothes the federal government

with the power and authority to protect the public's natural resources from trespass and unlawful

appropriation. *U.S. v. Missouri, K. & T. Ry. Co.*, 141 U.S. 358, 381 (1891); *U.S. v. Beebe*, 127

U.S. 338, 342 (1888). Upon federation, "[t]he shores of navigable waters, and the soils under

them, were not granted by the Constitution to the United States, but were reserved to the states

respectively." *Pollard v. Hagan*, 44 U.S. 212, 230 (1845). The governments of the states held

title to these properties not for their own beneficial use, but in trust for present and future

generations. Except for very limited types of property, such as government vehicles and

buildings, government continues to hold public property in trust for its citizens and not for itself.

*See U.S. v. CB & I Constructors, Inc.*, 685 F.3d 827, 836 (9th Cir. 2012) (rejecting litigants'

attempts to analogize the federal government to a private corporation) (citing *Beebe,* 127 U.S. at

342). In creating the United States, the original thirteen colonies passed their sovereign trust

obligations to the federal government to manage federal lands that were not yet incorporated into

the union as states. "[T]he United States is presumed to have held navigable waters in acquired

territory for the ultimate benefit of future States." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261,

283 (1997). The way later states such as Montana became trustees over its navigable waters

(among other resources) was through the statehood acts of Congress. "[B]efore the equal footing

conveyance occurred, a trust applied to the federal lands that were subject to the conveyance."

*See* Michael Blumm and Lynn Schaffer, *The Federal Public Trust Doctrine: Misinterpreting*

*Justice Kennedy and Illinois Central*, 45 Envtl. L. 399, 406-07 (2015).

The Public Trust Doctrine imposes rights *and* duties on the federal government as to

public trust assets. *See United States v. 1.58 Acres of Land*, 523 F. Supp. 120, 125 (D. Mass.

1981); *City of Alameda v. Todd Shipyards*, 635 F. Supp. 1447 (N.D. Cal. 1986). The federal

government has an inalienable duty to preserve and protect public trust assets from damage or

loss. *In re Complaint of Steuart Transp. Co.*, 495 F. Supp. 38, 39-40 (E.D. Va. 1980) (Where migratory birds were killed due to an oil spill, U.S. filed suit to recover damages to public trust resources: "Under the Public Trust Doctrine, the State of Virginia and the United States have the right and the duty to protect and preserve the public's interest in natural wildlife resources. Such right does not derive from ownership of the resources but from a duty owing to the people.")

The Supreme Court has found a public trust in federal resources. *See Light v. U.S.*, 220 U.S. 523, 537 (1911); *U.S. v. Trinidad Coal*, 137 U.S. 160, 170 (1890); *Camfield v. U.S.*, 167 U.S. 518, 524 (1897). In *United States v. 32.42 Acres of Land*, 683 F.3d 1030, 1039, n.2 (9th Cir. 2012), the United States chose not to appeal, and the Ninth Circuit thus declined to address, the district court's determination that a federal public trust arose in tideland property acquired by the United States from California through eminent domain. Another Ninth Circuit decision describes the constitutional underpinnings to the federal government's trust responsibility:

> This [equity-policy] principle is a corollary to *the constitutional precept that public lands are held in trust by the federal government for all of the people*. U.S. Const. art. IV, § 3. Thus, while one may be sympathetic with the landowners in this case, we must not be unmindful that the land involved belongs to all the people of the United States. Therefore, even if the landowners had proven all the elements necessary for estoppel, they would additionally need to demonstrate such equities which, on balance, ***outweigh those inherent equitable considerations which the government asserts as the constitutional trustee on behalf of all the people***.

*U.S. v. Ruby Co.*, 588 F.2d 697, 704-05 (9th Cir. 1978) (emphasis added).

There are both Constitutional bases and statutory affirmations for Defendants' public trust obligations. As a fundamental attribute of sovereignty, under the reserved powers doctrine and the vesting clauses of the Constitution, the Public Trust Doctrine is reflected as a limitation on the federal government's power to allow damage to a public trust asset. *See* Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 ARIZ. ST. L.J. 849 (2001). Defendants' public trust duties are also recognized in statutes such as the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the

Oil Pollution Act ("OPA"), and the Clean Water Act ("CWA"). 42 U.S.C.S. § 9607(f); 33

U.S.C.S. § 2706; 33 U.S.C.S. § 1321. For example, the OPA designates federal trustees "who

shall act on behalf of the public as trustees for natural resources under this Act" and "develop

and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the

equivalent, of the natural resources under their trusteeship." 33 U.S.C.S. § 2706(b)-(c). Whether

Defendants, as trustees over the air, breached their public trust duties is a justiciable controversy.

### 2.    Defendants Incorrectly Assert There Is No Public Trust Doctrine

Defendants incorrectly assert the Public Trust Doctrine does not apply to them, basing

this contention on *Alec L. v. Jackson*, 863 F.Supp.2d 11 (D.D.C. 2012), and the unpublished

opinion *Alec L. v. McCarthy*, No. 13-5192, slip op. at 2 (D.C. Cir. June 5, 2014). However, the

D.C. Circuit's opinion rests on a misinterpretation of *PPL Montana*, and is contrary to the views

of the Public Trust Doctrine taken by Defendants themselves, as well as prior positions of the

Department of Justice. *See* Michael Blumm and Lynn Schaffer, *The Federal Public Trust

Doctrine: Misinterpreting Justice Kennedy and Illinois Central*, 45 Envtl. L. 399, 406-07 (2015).

This Court should not follow *Alec L.* and should recognize the Doctrine applies to Defendants.

### a.    *PPL Montana* did not foreclose the federal Public   Trust Doctrine

Defendants, relying on *Alec L.*, contend *PPL Montana* holds there is no federal Public

Trust Doctrine. *PPL Montana*, 132 S. Ct. at 1235. Defendants claim that, since the Supreme

Court stated the Public Trust Doctrine is a matter of state law, there is consequently no federal

public trust. Whether there is a federal public trust was not a question presented to, nor resolved

by, *PPL Montana* and, therefore, this claim is not foreclosed by any Supreme Court decision. *See

Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 414 U.S. 661, 666 (1974). *PPL Montana*

concerns itself with the application of the equal footing doctrine to navigable and non-navigable river segments at the time of Montana's entry into the Union. The holding is that the Montana Supreme Court should have adopted a segment-by-segment analysis of the rivers' navigability as of the time Montana entered the Union. *PPL Montana*, 132 S. Ct. at 1229. The question of Montana's Public Trust Doctrine is effectively relegated to an afternote; Justice Kennedy writes immediately prior to his discussion of the Public Trust Doctrine that "[t]he above analysis is sufficient to require reversal of the grant of summary judgment to Montana." *Id.* at 1234.

Where the Supreme Court does address the state Public Trust Doctrine, it does so only to contrast it with the equal footing rule concerning ownership of submerged lands at statehood. "While equal footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public . . . the contours of *that* public trust do not depend upon the Constitution." *Id.* at 1235 (emphasis added). The use of the modifier "that," is significant. The Court merely stated Montana's Public Trust Doctrine must give way to the equal footing doctrine as concerns *title to*, not trust over, submerged lands. While the Court held <u>states</u> were not subject to a <u>federal</u> Public Trust Doctrine, it did not hold that the <u>federal</u> government was not subject to the <u>federal</u> Public Trust Doctrine. *Id.* at 1234-35. To the contrary, the Court's decision affirmed the doctrine's underpinnings for imposing trust obligations on sovereigns. The Court's decision specifically cited David C. Slade, *Putting The Public Trust Doctrine To Work* 3-8, 15-24 (1990), which discusses both the state public trust doctrine *and* the federal public trust doctrine. *Id.* at 1235. This reading of *PPL Montana* is consistent with the historical roots and existing case law on the federal Public Trust Doctrine.

> **b.** **Defendants have admitted there is a federal Public Trust Doctrine**

While prior positions taken by Defendants do not form the origination of the federal

Public Trust Doctrine, they affirm the doctrine applies. In 1968, Congress declared the Federal

Government has "continuing responsibility" to "use all practicable means" so as to "fulfill the

responsibilities of each generation as trustee of the environment for succeeding generations." 42

U.S.C. § 4331(b)(1). Congress also declared the Federal Government is among the "trustees for

natural resources" and directed Defendants to act as trustees of all natural resources under their

management and control. 42 U.S.C. § 9607 (f)(1); *see also* 33 U.S.C. § 2706 (Oil Pollution Act).

Pursuant to Congressional direction, the President designated the following federal agencies to

act on behalf of the public as trustees for natural resources: the Departments of Agriculture,

Commerce, Defense, Energy, and Interior. These Defendants have defined the term natural

resources to "mean[] air, …, and other such resources …, held in trust by" Defendants 40 C.F.R.

§ 300.600(a); *see* 42 U.S.C. § 9607 (f)(2)(A).

According to the U.S. Commission on Ocean Policy, "the U.S. government holds ocean

and coastal resources in the public trust—a special responsibility that necessitates balancing

different uses of those resources for the continued benefit of all Americans."[8] The National

Oceanic and Atmospheric Administration ("NOAA") "has an obligation to conserve, protect, and

manage living marine resources in a way that ensures their continuation as functioning

components of marine ecosystems, affords economic opportunities, and enhances the quality of

life for the American public."[9] Further, Defendant DOI admits the Public Trust Doctrine

"encompasses all natural resources," including "land, …, air, water, … and other such resources

belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the

---

[8]    U.S. Senate Committee on Commerce, Science, & Transportation: Hearing on Oceans
Commission (Sept. 21, 2004) (statement by Admiral James D. Watkins USN (Ret.),
http://www.commerce.senate.gov/public/index.cfm/hearings?Id=51065a2d-0cd0-41c7-b916-
fbbb50cc9fec&Statement_id=4814F650-71F1-40A1-90E7-7F563C08D25A
[9]    NOAA, Strategic Plan, http://www.nmfs.noaa.gov/mb/strategic/ (last visited Dec. 31, 2015).

U.S."[10] DOI admits the Departments of Interior, Commerce, Energy, Agriculture, Defense, "and

any other Federal Land Managing Agency" are "Federal Trustees."[11] Defendant State

Department admits "an obligation to current and future generations to take action" on climate

change.[12]

The 1992 United Nations Framework Convention on Climate Change ("UNFCCC"),

signed by the President and ratified by the Senate, was executed to "protect the climate system

*for the benefit of present and future generations of humankind*," and evidences an

"overwhelming weight" of support for protection of the atmosphere under the principles of

intergenerational equity, the same principles recognized by the Public Trust Doctrine. UNFCCC,

Art. 3 (emphasis added). By Presidential Proclamation or Executive Order, our President has also

articulated the federal public trust obligations of his administration.[13]

---

[10]    U.S. Dep't of Interior, Natural Resource Trustees & Natural Resource Managers Freshwater
Spills Symposium (2009), http://www.epa.gov/oem/docs/oil/fss/fss09/hoguenatresmngts.pdf
[11]    U.S. Dep't of Interior, Natural Resource Trustees & Natural Resource Managers (2008),
http://www.nrt.org/production/NRT/RRTHome.nsf/resources/RRT4Feb2008Meetings1/$File/Tr
ustees_v_Managers_Hogue.pdf.
[12]    U.S. Dep't of Interior, Natural Resource Trustees & Natural Resource Managers (2008),
http://www.nrt.org/production/NRT/RRTHome.nsf/resources/RRT4Feb2008Meetings1/$File/Tr
ustees_v_Managers_Hogue.pdf.
[13]    Presidential Proclamation- Great Outdoors Month: "Climate change threatens our lands and
waters, as well as the health and well-being of future generations."
http://www.presidency.ucsb.edu/ws/index.php?pid=110256&st=&st1=
Presidential Proclamation- National Oceans Month: "During National Oceans Month, we
celebrate these life-sustaining ecosystems, and we reaffirm our vital role as stewards of our
planet."
http://www.presidency.ucsb.edu/ws/index.php?pid=110259&st=&st1=
Executive order on federal facilities for next decade: "Improved environmental performance will
help us protect our planet for future generations and save taxpayer dollars through avoided
energy costs and increased efficiency, while also making Federal facilities more resilient."
Planning for Federal Sustainability in the Next Decade, 80 FR 15871.
2009- Executive Order: "(l) ''sustainability'' and ''sustainable'' mean to create and maintain
conditions, under which humans and nature can exist in productive harmony, that permit
fulfilling the social, economic, and other requirements of present and future generations"- EO
13514, p 10, Oct., 5, 2009; http://www.gpo.gov/fdsys/pkg/FR-2009-10-08/pdf/E9-24518.pdf.

Defendants also have taken the position before federal courts that they are trustees over natural resources and have rights and obligations under the Public Trust Doctrine. *See, e.g.*, *U.S. v. CB & I Constructors, Inc.*, 685 F.3d 827 (9th Cir. 2011); *Conner v. U.S. Dep't of Interior*, 73 F. Supp. 2d 1215, 1219 (D. Nev. 1999); *U.S. v. Burlington N. R.R.*, 710 F. Supp. 1286 (D. Neb. 1989); *In Re Steuart Transp. Co.*, 495 F. Supp. 38 (E.D. Va. 1980). In a 2010 complaint filed against British Petroleum over their oil spill, the United States claimed damages for "[n]atural resources under the trusteeship of the United States." *United States v. BP Exploration & Production, Inc.*, 2010 WL 5094310 (E.D.La. 2010), Ex. 2 to Olson Dec.

### 3.    The Scope of the Public Trust Doctrine is a Justiciable Issue

This Court may properly decide which natural resources, such as the atmosphere, are subject to state sovereignty, federal sovereignty, or dual sovereignty. *U.S. v. Causby*, 328 U.S. 256, 261, 266 (1946); *U.S. v. California*, 332 U.S. 19, 29-30, 34-36 (1947); *see also Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 283-84 (1997); *U.S. v. Oregon*, 295 U.S. 1, 14 (1935). When it comes to the atmosphere, the Supreme Court has held, and Congress has codified, that "[t]he United States Government has exclusive sovereignty of airspace of the United States." 49 U.S.C. § 40103(a)(1); *see also Causby*, 328 U.S. at 260-61 ("the air is a public highway" of which the U.S. government is sovereign). In the 1958 Air Commerce and Safety Act, Congress defined the "United States" as "the several States, the District of Columbia, and the several Territories and possessions of the United States, ***including*** the territorial waters and ***the overlying airspace thereof***." Pub. L. No. 85-726, § 101(33), 72 Stat. 731, 740 (1958) (emphasis added). Several state courts have recognized that the atmosphere is a public trust resource. *See Foster v. Wash. Dep't. of Ecology*, No. 14-2-25295-1, slip op. at 8 (Wash. King Cnty. Super. Ct. Nov. 19, 2015), Ex. 3 to Olson Dec.; *Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015) (Ex.

3 to Olson Dec.); *Bonser-Lain v. Tex. Comm'n on Envtl Quality*, No. D- 1-GN-11-002194, 2012 WL 2946041 (Tex. 201st Dist. Aug. 2, 2012) (on review of denial of petition for rulemaking), *rev'd on other grounds, Tex. Comm'n on Envtl. Quality v. Bonser-Lain*, 438 S.W.3d 887 (Tex. App. Austin 2014); *Kanuk v. State, Dep't of Natural Res.*, 335 P.3d 1088, 1101-02 (Alaska 2014). The concurrent and coextensive state and federal trusts over resources such as the atmosphere is also a concept familiar to existing public trust jurisprudence. *See 1.58 Acres of Land*, 523 F.Supp. at 122.

Plaintiffs, as beneficiaries of the public trust, may bring this action against these Defendants for failing to discharge their duties as public trustee. *See Ctr. for Biological Diversity v. FPL Group, Inc.*, 166 Cal.App.4th 1349, 1366 (2008) (Many cases "have been brought by private parties to prevent agencies of government from abandoning or neglecting the rights of the public with respect to resources subject to the public trust." (citing *Ill. Cent. R.R. v. Illinois,* 146 U.S. 387). While Defendants claim as a defense that their affirmative actions protect against the climate crisis and substantial impairment of the trust resource, resolution of that defense is not properly before the Court in this Motion. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Even when a government legislates or regulates ostensibly to prevent harm to the trust—as Defendants suggest here with respect to, for example, the Clean Air Act and Clean Power Plan—the trust question remains as to whether such regulation is adequate to protect the trust asset for present and future generations. This principle applies even more forcefully to Section 201 of the Energy Policy Act, specifically the determination in subsection (c) that natural gas export to foreign nations with whom the U.S. has a free trade agreement is deemed to be in the public interest. *See Lake Mich. Fed'n v. U.S. Army Corps of Engineers*, 742 F. Supp. 441, 446 (D. Ill. 1990) ("The very purpose of the Public Trust Doctrine is to police the legislature's disposition of public lands.

If courts were to rubber stamp legislative decisions . . . the doctrine would have no teeth. The legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public. . . . Therefore, we find that the legislative determination that the lakefill would serve the public is no obstacle to our conclusion that the grant was in breach of the public trust."). Although this Circuit has not decided whether the atmosphere is a federal public trust resource, determination of this question is demonstrably justiciable.

## II.    PLAINTIFFS HAVE ARTICLE III STANDING TO BRING THIS SUIT

Contrary to Defendants' averments, Plaintiffs' complaint and declarations filed herewith clearly establish more than the "irreducible minimum" required to invoke federal jurisdiction. Fed MTD 7. Indeed, Plaintiffs have clearly alleged and established: (1) they suffer injury in fact; (2) their injuries are fairly traceable to Defendants' conduct; and (3) their injuries are likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

### A.    YOUTH PLAINTIFFS HAVE CONCRETE, PARTICULARIZED, ACTUAL HARMS.

Plaintiffs with environmental concerns "adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 183 (2000); *see also Natural Res. Def. Council v. EPA*, 526 F.3d 591, 601 (9th Cir. 2008). Plaintiffs can satisfy the injury requirement by showing that their economic interests or aesthetic and environmental well-being are injured. *Wash. Envtl Council v. Bellon*, 732 F.3d 1131, 1140 (9th Cir. 2013). "[N]othing necessitates a showing of existing environmental harm." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005). Rather, "an increased risk of harm can itself be injury in fact for standing." *Id.*; *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151-52 (9th Cir. 2000) ("'A

plaintiff need not wait until his lake becomes barren and sterile or assumes an unpleasant color and smell,'"); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010) (employee alleged theft of laptop subjected him to increased risk of future identity theft sufficient injury-in-fact for standing).

Plaintiffs allege highly personal, specific injuries from the aggregate acts of Defendants, which acts materially caused the ongoing endangerment of the climate system. Plaintiff Jacob Lebel alleges ongoing specific harm stemming from Defendants' complained-of actions, FAC ¶¶ 31-34, including their approval of a planned natural gas pipeline that would connect to the Jordan Cove LNG Terminal at Coos Bay, run directly behind his family Farm, jeopardize the Farm with risks of leaks and explosions, affect the landscape's integrity and biodiversity, and adversely affect his enjoyment and use of his property. *Id*. ¶ 34. Jacob derives educational, inspirational, and spiritual benefits from the Farm, *id*. ¶ 31, as well as milk, eggs, meat, vegetables, fruits, and nuts, products such as wool and timber, and recreational opportunities. Lebel Dec. ¶ 3, 4. The record high temperatures and heat waves cause stress to garden crops and livestock, increasing Jacob's workload and costing the Farm economic losses from water shortages. *Id*. ¶¶ 7, 12-13. Jacob has also suffered from climate-exacerbated wildfires near his Farm, including diminished air quality during the summer of 2015 that affected his enjoyment of outside work and hiking on the Farm, *id*., and jeopardized his home. *Id*. ¶ 8; *see also* Hansen Dec. ¶ 53 (mega heat waves), ¶57 (shifting climate zones); Hansen Supp. Dec. ¶ 10 (heat, ecological collapse), ¶ 21 (shifted temperature range), and ¶ 22 (lost work capacity); Declaration of Philip W. Mote Supporting Plaintiffs in *Chernaik v. Brown*, ¶ 3-4 (stressed forests/wildfire), Ex. 5 to Olson Dec (hereinafter "Mote Dec.").

Because of the warmer climate and weather extremes, including worsening drought in the summer and heavier than normal rains in the spring and winter, Jacob's Farm suffered from Suzuki fly (Spotted-Wing Drosophila) infestations the last four years. *Id.* ¶ 10. The extreme weather events "promote the spread" of the Suzuki fly by, variously, increasing its metabolism and weakening the resistance of fruit trees to defend themselves from the fly's attack. *Id.* Jacob assesses the value of associated crop loss at $20,000," *id.* ¶ 11, and, with the consequential loss of organic farming certification, they have suffered "an incalculable loss of profit" from their operations. *Id.*; *see also* Mote Dec., ¶ 3 (insect vulnerability in Pacific Northwest).

Plaintiff Alex Loznak alleged specific harm to his family Farm, damage to his own health, lost recreational opportunities, and concern for fragile natural resources, due to Defendants' actions causing or exacerbating global warming. FAC ¶¶ 23-30; *see* Loznak Dec. ¶¶ 9-19 (impacted in Oregon by drought, record high summer temperatures, climate-induced migration of forest species, increasingly severe regional wildfire, harm to family's crop yield and timber stands, compromised ability to work on and enjoy the family Farm, and consequent economic losses), ¶ 28 (cancelled camping trip due to wildfire); ¶ 29 (lost snow sports opportunities); 31 ¶ (interest in "narrow ecological ban" harboring Purple Shore Crab); ¶ 32 (recreational and aesthetic interest in Sea Lion Caves in Oregon, threatened with sea level rise); ¶ 33 (disappearing recreational opportunities to see glaciers); ¶ 35 (impacts to personal health); ¶ 37 (interest in the integrity of Pacific Crest Trail marred by natural gas pipeline project); ¶¶ 40-43 (impacted by threats of pipeline-related wildfire danger and its inverse); *see also* Hansen Dec. ¶¶ 40-48 (sea level rise), ¶49 (loss of Glacier National Park glaciers), ¶ 53 (mega heat waves), ¶57 (shifting climate zones); Hansen Supp. Dec. ¶ 10 (heat, ecological collapse); Mote Dec. ¶ 4, 6 (ocean acidity and temperature in northwest), ¶¶ 3-4 (stressed forests/ wildfire).

Plaintiff Victoria B. experiences harm by climate change superstorms, like Hurricane Sandy, which caused her family to lose power in their home, and closure of her public school and transportation. FAC, ¶¶ 71-72; Victoria Dec, ¶ 4. Her school in Manhattan will increasingly be impacted by rising seas and frequent storm surges. *Id.*, ¶ 4; *see also* ¶¶ 5-6 (recreational and health injuries from increasing summer temperatures). Plaintiff Journey Z., a resident of Kauai, Hawaiʻi, has standing due to the climate change threats to the supply of freshwater he relies upon on his Island, Journey Dec. ¶ 6, the lost productivity of the taro patch he works, ¶ 7, and the loss of the beach 300 feet from his family home to the rising seas, ¶ 9. *See* FAC, ¶¶ 68-70; *see also* Hansen Dec. ¶¶ 40-47; Hansen Supp. Dec., ¶¶ 23-33; and Ex. 3 to Hansen Supp. Dec., Graphics 5 (a) and (b). The family coastal home of Plaintiff Sahara V. in Yachats, Oregon, is within the zone threatened by seawater based on expert projections for sea level rise. Her ability to continue spending time at her Grandmother's home and to one day enjoy the family property with her own children is threatened by sea level rise. Sahara V. Dec. ¶ 3; *see* Ex. 3 to Hansen Supp. Dec., Graphics 6 (a) and (b) (showing sea level rise impact to Yachats, Oregon). Already, Sahara suffers increasingly from asthma as Oregon's climate changes. Sahara V. Dec., ¶ 4. Plaintiff Levi D. of Indialantic, Florida, is being harmed by rising seas swallowing his backyard beach, the consequential loss in property value of his home, and the rise of flesh-eating bacteria in the nearby lagoon and ocean. FAC ¶¶ 81-85; Levi D. Dec. ¶¶ 1-4; *see also* Ex. 3 to Hansen Supp. Dec., Graphics 5 (a) and (b) (sea level rise in Melbourne Beach, nearby to Indialantic, Florida).

Plaintiff Jaime B. has specific, concrete injuries from the changing climate. FAC ¶¶ 65-67; Jaime B. Dec. ¶¶ 5-7 (pine beetle infestations and forest fires causing Plaintiff to flee neighborhood); ¶ 10 (worsening allergies); *see also* Mote Dec. ¶¶ 3-4, 10. Plaintiff Kelsey Juliana has specific climate injuries. FAC ¶¶ 16-19; Juliana Dec. ¶11 (algal blooms stemming

from warming temperatures preclude use of favored lakes for swimming or drinking); ¶ 14 (run out of camping due to wildfires and weather extremes); ¶ 16 (increasing loss of aesthetic and recreational interests as forests and wildlife Plaintiff visits lose ability to adapt to climate change caused by Defendants); *see also* Mote Dec. ¶¶ 4-5 (warmer stream temperatures, lower flows, impacts to hydrological cycle), ¶ 7 (wildfire threat to Pacific Northwest forests).

Plaintiff Xiuhtezcatl M. also attests to his concrete personal harm. FAC ¶¶ 20-22; Xiuhtezcatl M. Dec. ¶ 11 (2010 wildfires destroyed forests in which he recreates); ¶ 12 (in 2013, Xiuhtezcatl impacted by destructive Colorado fires and an unprecedented flood in his hometown of Boulder). Plaintiff Zealand B. alleged concrete, personalized injury. FAC ¶¶ 35-39; Zealand B. Dec.: ¶¶ 5-6 (climate change-induced drought conditions and large fires cancelled or shortened family trips and threatened personal safety); ¶¶ 7-8 (personal harm due to exacerbated allergies from increasing pollen counts, decreased snow recreation, and lost family income); *see* Mote Dec. ¶¶ 4-5, 7-9 (hydrological impacts to rivers, heat, wildfire, pollen, human health). These injuries alleged by Plaintiffs are consistent with the observations of climate scientists who have examined present and projected impacts of global warming to the nation. *See* Hansen Dec., ¶¶ 40-60; Hansen Supp. Dec., ¶¶ 19-33; Mote Dec., ¶¶ 3-10. These specific facts regarding Plaintiffs' imminent, concrete injuries establish injury in fact. *See Ctr. for Biological Diversity v. EPA,* 90 F.Supp.3d 1177, 1187-88 (W.D. Wash. 2015); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947, 949–50 (9th Cir. 2002) (agreeing with circuits that have recognized "a credible threat of harm is sufficient to constitute actual injury for standing purposes, whether or not a statutory violation has occurred" in suit by downstream farmers to prevent release of water they alleged would adversely affect their irrigated crops).

These particularized injuries rebut Defendants' erroneous hyperbole that "Plaintiffs'

alleged injuries are not particular to them but are shared by every person in the Nation, living or yet to be born." Fed MTD 8. Plaintiffs' individual injuries contrast sharply with the type of overly-general assertions of personal interest the Supreme Court found inadequate in *Lujan*, 497 U.S. at 888 (Plaintiff failed to specify she actually uses the adversely impacted lands). Moreover, Plaintiffs' injuries are not universally shared.[14] However, even if, *arguendo*, many persons share the same injury, that would not be a reason to withhold jurisdiction. *U.S. v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686-88 (1973) ("To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."); *see Federal Election Comm'n v. Atkins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found injury in fact").

Defendants attempt, but fail to distinguish, the climate injury in *Massachusetts v. EPA*, 549 U.S. 497 (2007), of the "loss of state-owned lands to rising sea levels caused by global warming" from Plaintiffs' injuries here. Fed MTD 9-10. Even though the Commonwealth owned public coastal lands, Plaintiffs and their families also own property being injured by Defendants' acts. *See* Decs of Lebel, Sahara V., Loznak, Levi D., Journey Z., ¶ 9 ("I used to be able to swim at Kapaa Beach …, but there is no beach left."). The Supreme Court did not preclude standing by individuals with public or private property injuries in climate change cases. The Court found injury to the Commonwealth from the sea level rise threats along the State's public coast. It did not limit climate change injuries to coastal loss or to State-plaintiffs.

It is true, as Defendants concede, that the nation as a whole retains an overriding interest

---

[14]    For example, not everyone retains an irrigation pond that was run dry during last year's unprecedented summer heat in Oregon, or owns property bordering the path of a natural gas pipeline to be developed by a company with a history of explosions, or has lost a backyard to the rising sea, or has been harmed by climate change-induced toxic algal blooms at a favored lake.

in a stable climate system, even though Defendants – proceeding on an at best schizophrenic

path, Hansen Dec. ¶ 4, that risks catastrophic harm, ¶ 45 – have yet to cease their myriad actions

that further endanger both the climate system and Plaintiffs. However, it was just as true that the

nation retained an interest in school desegregation and the end of legalized racial discrimination

before *Brown v. Board of Education* and its progeny. Many children were harmed by the same

government acts of discrimination as were the children in *Brown*, yet that did not bar standing.

Finally, Defendants' conflation of "grievances" with "injuries" should not be persuasive.

Fed MTD 10. The Supreme Court has indeed held that a widespread grievance held in common

and equally by citizens or taxpayers will not, without more, ground a court's exercise of

jurisdiction over a claim, even a constitutional claim. *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

That is not this case. Plaintiffs have done much more than assert a grievance that the government

has not followed the law; their injuries are particular, individualized, and egregious, and clearly

*not* "shared by every person in the Nation." Def. MTD 8.

## B. DEFENDANTS' ACTS HAVE MATERIALLY CAUSED, AND CONTINUE TO CAUSE, PLAINTIFFS' PARTICULARIZED HARMS.

In order to satisfy the causation prong of standing, Plaintiffs have alleged and now show

that their injuries are causally linked or "fairly traceable" to Defendants' alleged misconduct, and

not the result of misconduct of a third party not before the court. *Lujan*, 504 U.S. at 560-61;

*Bellon*, 732 F.3d at 1146. The causal connection "cannot be too speculative or rely on conjecture

about the behavior of other parties, but need not be so airtight at this stage of litigation as to

demonstrate that the plaintiffs would succeed on the merits." *Ocean Advocates*, 402 F.3d at 860.

A "causal chain does not fail simply because it has several 'links,' provided those links are not

hypothetical or tenuous and remain plausible." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th

Cir. 2011). Plaintiffs need not show Defendants are the "sole source" of their injuries, and "need

not eliminate any other contributing causes to establish [their] standing." *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011); *see also Ocean Advocates*, 402 F.3d at 860 (although other factors also caused plaintiffs' injury, the link between the agency's action and the injury was "not tenuous or abstract").

There is no dispute that climate change and ocean acidification are caused by $CO_2$ emissions from burning fossil fuels. Just because Plaintiffs challenge the systemic, aggregate acts of Defendants, and not a determination by one federal agency, does not lessen the causal link to Plaintiffs' injuries; quite the opposite, it strengthens the causation element. FAC ¶ 5.

The causal chain here is nothing like the "series of links strung together by conclusory, generalized statements of 'contribution'" from individual private emission sources the court found in *Bellon.* 732 F.3d at 1142-43; *compare Mass. v. EPA*, 549 U.S. at 524; *Covington v. Jefferson Cnty.*, 358 F.3d 626, 654 (9th Cir. 2004) (Gould, J., concurring); *Wash. Envtl. Council v. Bellon*, 741 F.3d 1075, 1080 (9th Cir. 2014) (Gould, J., dissenting from denial of rehearing en banc). In contrast, Plaintiffs allege the aggregate acts of Defendants in "authorizing, permitting, and incentivizing fossil fuel production, consumption, transportation, and combustion" has caused atmospheric $CO_2$ to increase to levels causing Plaintiffs harm. FAC ¶ 130, *see also* ¶¶ 98-129 (detailing specific role each Defendant plays in $CO_2$ emissions); ¶¶ 152-201 (detailing specific amounts of $CO_2$ emissions and fossil fuel consumption for which Defendants are responsible). Plaintiffs specify that Defendants have been responsible for causing 25.5% of the world's cumulative $CO_2$ emissions, causing the atmospheric $CO_2$ concentration to increase to at least 400 ppm and, thus, substantial harm to Plaintiffs. FAC ¶ 151; Hansen Dec., ¶¶ 77-81; FAC ¶¶ 202-212 (detailing harm caused in material part by ongoing emissions).

In *Bellon*, plaintiffs argued that the *failure to regulate* emissions from five *third parties* contributed to their climate harms; but expert evidence in the record indicated the effect of those emissions on global climate change was "scientifically indiscernible." 732 F.3d. at 1142-43. Here, Plaintiffs claim the affirmative aggregate acts of Defendants, *not their failure* to regulate private sources, materially caused and continue to worsen climate change. Expert evidence shows Defendants are ultimately responsible for a quarter of the world's historic emissions and 16% of annual global emissions, a scientifically discernible number. Hansen Dec., ¶ 77; MacCracken Dec., ¶ 4; *see Bellon*, 732 F.3d at 1143, citing *Massachusetts*, 549 U.S. at 525 (relying on MacCracken's expertise and finding 6% of global emissions is a "meaningful contribution" for purposes of causation). Based on Supreme Court precedent, and consistent with *Bellon*, it follows that Defendants' aggregate acts here are a material cause of climate change, ocean acidification, and the related injuries to Plaintiffs.[15]

### C.    PLAINTIFFS' INJURIES CAN BE REDRESSED BY THIS COURT.

A favorable decision by this Court will redress the injuries that Plaintiffs are suffering and will suffer. The redressability requirement does not require a plaintiff to show with certainty that a favorable decision will redress the injuries but "only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Bellon*, 732 F.3d at 1146; *see also Lujan,* 504 U.S. at 560–61. Nor need Plaintiffs establish a favorable decision will redress every injury. *See Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982). The FAC properly alleges redressability, FAC ¶¶ 3, 129, 141-44, 149, 275, and Plaintiffs further demonstrate redressability through declarations submitted with this brief.

---

[15]    Further, *Bellon* was a summary judgment decision on standing, whereas here, Defendants have brought only a facial challenge. *Id.* at 1143, fn. 6.

In *Massachusetts v. EPA*, the Supreme Court determined that 6% of global emissions at issue in the case made a "meaningful contribution" to global GHG levels. 549 U.S. 524, 544 (emissions constituted 6% percent of *global* $CO_2$ emissions); *compare Bellon*, 732 F.3d at 1145-46 (Plaintiffs failed to show how 5.9% of *Washington state's* GHG emissions constituted a "meaningful contribution" to global GHG levels). The GHG emissions at issue here include those from the U.S. transportation sector and electricity generation sector (together accounting for approx. 10% of global $CO_2$ emissions), emissions from fossil fuels extracted from public lands (approx. 25% of U.S. $CO_2$ emissions), as well as GHG emissions from other sources under federal control. MacCracken Dec. ¶¶ 6, 8; FAC, ¶¶ 151, 164-70. The emissions at issue here greatly exceeds the amount of GHG emissions at issue in *Massachusetts v. EPA*. MacCracken Dec. ¶ 9. Thus, following the reasoning in *Massachusetts v. EPA*, the GHG emissions here make a "meaningful contribution" to global GHG levels sufficient to establish redressability. In *Bellon*, the record was "devoid of any evidence" that a favorable decision would "curb a significant amount of GHG emissions" and thereby "reduce the pollution causing Plaintiffs' injuries." 732 F.3d at 1146. Here, the record demonstrates a favorable decision will redress Plaintiffs' injuries. *Ctr. for Biological Diversity v. EPA*, 90 F.Supp.3d 1177 (record showed redressability).

A favorable decision in this case leading to domestic emission reductions could result in reductions of GHGs in other countries, further redressing Plaintiffs' injuries.[16] MacCracken Dec. ¶ 10; FAC ¶ 143; *see* President Obama, Remarks at the First Session of COP 21 (Nov. 30, 2015) ("[t]he United States of America not only recognizes our role in creating [climate change], we

---

[16]   Environmental Pollution Panel: President's Science Advisory Committee, Restoring the Quality of Our Environment 2 (1965) (stating that it is "mandatory that the Federal Government assume leadership and exert its influence in pollution abatement on a national scale"), Ex. 4 to Olson Dec.; Office of Technology Assessment, Changing by Degrees: Steps to Reduce Greenhouse Gases (1991) ("the United States could influence emissions growth rates in developing countries").

embrace our responsibility to do something about it.).” Defendants’ agreement at COP 21 to

reduce GHG emissions supports Plaintiffs’ position that reductions in domestic GHG emissions

will redress their injuries. *Mass. v. EPA*, 497 U.S. at 526 (Attaching “considerable significance to

EPA’s ‘agree[ment] with the President that ‘we must address the issue of global climate change,’

and to EPA’s ardent support for various voluntary emission-reduction programs. As Judge Tatel

observed in dissent below, ‘EPA would presumably not bother with such efforts if it thought

emissions reductions would have no discernable impact on future global warming.’”).

The global nature of climate change and ocean acidification does not preclude Plaintiffs

from establish redressability. “That a first step [to remedy climate change] might be tentative

does not by itself support the notion that federal courts lack jurisdiction to determine whether

that step conforms to law.” *Mass. v. EPA*, 549 U.S. at 524. A “reduction in domestic emissions

would slow the pace of global emissions increases, no matter what happens elsewhere.” *Id.* at

526; *see Ctr. for Biological Diversity v. Nat’l Highway Traffic Safety Admin.*, 538 F.3d 1172,

1217 (9th Cir. 2008) (global phenomenon does not release government’s duty).

Defendants are wrong that this Court does not have authority to issue an order that would

redress Plaintiffs injuries. Def. MTD 13. It is within this Court’s authority to declare a violation

of Plaintiffs’ constitutional rights. Indeed, courts do this all the time. *See, e.g., Obergefell*, 576

U.S. ___, slip op.*, Brown v. Bd of Educ.*, 347 U.S. 483 (1954)*, Lawrence v. Texas*, 539 U.S. 558

(2003); *Geiger v. Kitzhaber*, 994 F.Supp.2d 1128 (2014). Furthermore, once determining that

constitutional rights are being violated, courts have the equitable authority and jurisdiction to

order defendants to enjoin unconstitutional acts and prepare a plan in order to ensure that the

violations of Plaintiffs constitutional rights are remedied. *See, e.g., Brown v. Plata*, 563 U.S. 493

(2011); *Swann v. Charlotte-Mecklenburn Bd. of Educ.*, 401 U.S. 1 (1971); *Carroll v. Safford*, 3

How. 441, 463 (1845) ("[I]n a proper case, relief may be given in a court of equity … to prevent an injurious act by a public officer."); *Armstrong v. Exceptional Child Ctr.*, 575 U.S. ___ slip op. at 6 (2015) ([A]bility to sue to enjoin unconstitutional actions by federal officers "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."). Contrary to Defendants' suggestions, Plaintiffs are not asking this Court to order Defendants to rewrite energy regulations, negate the purpose of existing statutes, or order agencies to do something that they do not have statutory authority to do. Def. MTD 14-15. Simply put, Plaintiffs are asking this Court to declare the law and order Defendants to remedy violations of the law—such relief is not outside this Court's "competence and jurisdiction," as Defendants argue. Def. MTD 14-15.

Plaintiffs' request for further relief also allows the Court to fashion an equitable remedy consistent with the role of the judiciary. Other possible remedies include, but are not limited to, enjoining additional fossil fuel production and extraction on federal public lands, setting aside subsidies that support fossil fuel production, invalidating section 201 of the Energy Policy Act, or setting aside fossil fuel export authorizations under the unconstitutional statute.

### D. FUTURE GENERATIONS ALSO HAVE STANDING

Youth Plaintiffs have established standing. Thus, this Court need not address standing of future generations because standing for one is standing for all. However, Defendants incorrectly assert the injury to future generations has not already occurred or is not imminent. Indeed, the corpus of the public trust resources future generations are entitled to inherit are *already* substantially impaired in large part by the actions of Defendants. Present *and* future generations have already suffered an injury in fact to their interests vis-a-vis their government trustees. *See* FAC ¶¶ 202-241; Hansen Dec. ¶¶ 7, 9-10, 42-43, Supplemental Hansen Dec. ¶¶ 14-15, 19, 27-

33, MacCracken Dec. ¶¶ 3, 11-12.

No federal court has held that preborn persons and generations not yet born *do not* have constitutional rights that may be impaired. *See* Fed MTD 16-17. "Posterity" are expressly named beneficiaries to the Constitution, *see* Davidson Dec. ¶¶ 20, 35-44, 63-71, and Defendants concede the health and welfare of future generations are endangered by Defendants' actions. Thus, this Court should recognize the Article III standing of future generations due to the extraordinary irreversible harms involved in this case and their lack of other remedies.[17]

Unequal treatment is "a type of personal injury [that] ha[s] long [been] recognized as judicially cognizable." *Heckler v. Mathews*, 465 U.S. 728, 738 (1984); *see* 74 Fed. Reg. 66496, 66,516-36 (Dec. 15, 2009) ("The increased risk associated with [climate change] impacts also endangers the welfare of current and future generations, with an increasing risk of greater adverse impacts in the future."). The injuries herein are actual injuries for standing purposes, as the right to equal treatment is at stake. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) (Injury in fact is "denial of equal treatment . . . ."); *see Jones v. Thorne,* 1999 WL 672222 (D.Or. 1999) ("Actions that destroy or affect the scenery and wildlife of an area and impair the enjoyment of the area for future generations are the types of harm that are 'judicially cognizable interests' and can be 'injuries in fact.'"); *Sierra Club v. Morton*, 405 U.S. 727, at 734 (1972). As discussed in the Public Trust Doctrine section and in the Davidson Dec. ¶¶ 5-71, our nation's tradition and legal framework is established to protect future generations. *See* Mank, Standing and Future Generations: Does *Massachusetts v.*

---

[17]    Defendants stress that Plaintiffs have only asserted generalized grievances, rather than a particularized harms.  The argument is used both to challenge Future Generations' standing, Fed MTD 8-11, and as a more general challenge. *Id.* at 17-19.  The interests of preborn persons and persons not yet born differ significantly and relevantly from those of the present public.  This is a consequence of the unique nature of the time lag at work in global warming, which insures that the heaviest costs and harms accrue long after the relevant injurious conduct has transpired.

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                    41
**Motion To Dismiss**

*EPA* Open Standing for Generations to Come?, 34 Colum. J. Envtl. L. 1, 16-17 (2009).

In assessing causality, the Court considered evidence from computer models of damage to coastlines that would be done by GHGs through 2100, implicitly recognizing standing for future generations of citizens of the Commonwealth. *Mass. v. EPA*, 549 U.S. at 523 n.20. This consideration of future harm should be extended to allow third parties to have standing to represent future generations when the injury is especially severe, like environmental catastrophes associated with climate change.

Redressability, the third prong of standing, is "easily established in a case where," as here, "the alleged injury arises from an identifiable discriminatory policy." *Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987). While this Court cannot predict "the exact nature of the possible relief . . . without a full development of the facts, an order enjoining the policy and requiring non-discriminatory investigation and enforcement would redress the injury." *Id*.

Young plaintiffs have brought suit for third parties under Due Process claims. *Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334, 375 (5th Cir. 1982). The *Price* Court granted standing to "black students and parents" on behalf of minority teachers when they asserted "that their Fourteenth Amendment rights were violated because minority students were denied role models by the DISD's failure to promote black teachers to elementary or junior high school principalships or vice principalships." *Id.*; *see Castaneda v. Pickard*, 648 F.2d 989, 999 (5th Cir. 1981); *Otero v. Mesa County Valley School Dist. No. 51*, 568 F.2d 1312, 1314 (10th Cir. 1977).

The need for "intergenerational justice" is recognized in federal environmental policy as well as in international accords to which the United States is a signatory party. Davidson, *Tomorrow's Standing Today: How the Equitable Jurisdiction Clause of Article III, Section 2 Confers Standing Upon Future Generations*, 28 Colum. J. Envt'l. L. 185, 191 (2003). This

principle also derives support from our Constitution: "We the People . . . to ourselves and our Posterity, do ordain and establish the Constitution."[18] *Id.* at 193.

These are unique claims for which there is no currently recognized cause of action, and for which there is great public need. This Court should insure constitutional injuries resulting in delayed harms do not escape judicial review. The distinctive harms of climate change, as well as the lack of effective legislative and executive remedies for future generations, make it the proper role of this Court to fashion a remedy. Jurisdiction extends "to all Cases, in Law *and Equity*, arising under this Constitution." U.S. Const. Art. III §2. This jurisdiction exists, in part, to assure constitutional violations do not go permanently un-redressed.[19] To avoid such a result from the overzealous application of mootness doctrine, the Supreme Court developed the "capable of repetition yet evading review" exception. *Roe v. Wade*, 410 U.S. 113, 125 (1973).

This Court should recognize an extension of the private attorney general doctrine, allowing for "the enforcement of public rights through the use of private lawsuits." Cheng, *Important Rights and the Private Attorney General Doctrine*, 73 Cal. L. Rev. 1929, 1929 n.1 (1985). The private attorney general doctrine applies to situations in which "a party brings suit to

---

[18]    Defendants correctly state the Preamble does not, of its own force, create substantive rights. However, "[it] is properly resorted to, where doubts or ambiguities arise upon the words of the enacting part. . . . Its true office is to expound the nature, and extent, and application of the powers actually conferred by the constitution . . . ." 1 J STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 462 (2d ed. 1885). Plaintiffs do not claim that Posterity holds rights directly from the Preamble.  However rights listed elsewhere in the Constitution – such as those to life, liberty, property, and equal protection – should not be arbitrarily withheld from a class of persons explicitly named in the Preamble. *See* Dawn Jourdan, Standing on Their Own: The Parallel Rights of Young People to Participate in Planning Processes and Defend Those Rights, 11 Sustainable Dev. L. & Pol'y 41 (2010); UNFCC, May 9, 1992, 1771 U.N.T.S. 197 (Preamble: "[d]etermined to protect the climate system for present and future generations;" and Art. 3: "The Parties should protect the climate system for the benefit of present and future generations of humankind.").
[19]    Here, the present public and their elected representatives cannot be assumed to fairly account for the interests of preborn persons and future generations not yet born insofar as their interests are in fact adverse. "[T]he bad effects of current emissions are likely to fall, or fall disproportionately, on future generations, whereas the benefits of emissions accrue largely to the present." Gardiner, A Perfect Moral Storm: The Ethical Tragedy of Climate Change (2011).

**Memorandum Of Plaintiffs' In Opposition To Federal Defendants'**                    43
**Motion To Dismiss**

enforce a right left unenforced by the ordinary enforcement mechanisms of the political process." *Id*. at 1929. Plaintiffs seek to enforce such a right on behalf of preborn persons and generations not yet born to ensure their future is not compromised by the destruction of climate change. Thus, this Court should allow standing for third parties to represent future generations.

The political process doctrine supports extending standing to vulnerable parties that lack legislative remedies. The Court has protected the availability of future liberties to vulnerable groups under the Fourteenth Amendment. *See Roe v. Wade*, 410 U.S. 113, 153 (1973) (protecting future women from "a distressful life and future."); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (protecting future women's right to privacy). Extending the protection even further, the Court allowed standing for doctors to raise claims to safeguard the privacy rights of patients in suits against restrictive abortion laws, which outlawed the use of state Medicaid benefits to fund nontherapeutic abortions. *See Singleton v. Wulff*, 428 U.S. 106 (1976).[20]

Children are not able to vote, but they have a vital stake in the affairs of our Nation, just as the Nation has a vital stake in its children. While "[l]egislators represent people," *Reynolds v. Sims*, 37 U.S. 533, 562 (1964), they do not represent children. Children's interests are certainly affected by the political process. *Garza v. Cnty. Of L.A.*, 918 F.2d 763,774-76 (9th Cir. 1990). Thus, courts act to protect different rights for parties who lack adequate political representation. *See, e.g., Brown v. Bd. of Ed.*, 347 U.S. 483 (1954); *Craig v. Boren*, 429 U.S. 190 (1976);

---

[20]    Defendants acknowledge "some federal and state courts have recognized that viable and even pre-viability fetuses may have legal interests under state tort law." Def. Memo at 16. This has long been considered part of the courts' equitable jurisdiction, especially in the area of trust law:

> The efficacy of a guardian ad litem appointed to protect the interests of unborn persons is no different whether he be appointed pursuant to statute or the court's inherent power. Given such protection, the equitable doctrine of representation embraces the flexibility, born of convenience and necessity, to act upon the interests of unborn contingent remaindermen to the same effect as if they had been sui juris and parties. . . . Though the persons whose interests the guardian ad litem represents would be unascertainable as individuals, they are identifiable as a class and their interest, as such, recognizable.

*Hatch v. Riggs Nat'l Bank*, 361 F.2d 559, 565-66 (D.C. Cir. 1966).

*Griswold v. Connecticut*, 381 U.S. 479 (1965). An individual may assert the rights of a third party not before the court when substantial obstacles block that third party from asserting its own rights. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) ("Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized the doctrine of *jus tertii* standing"); *see Barrows v. Jackson*, 346 U.S. 249, 257-258 (1953) (granted third-party standing to Barrows, a white person, who asserted the rights of black community members after Barrows was sued for breaking a restrictive covenant). In protecting the vulnerable third party, the Court noted "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance[s] before any court." *Id.* at 257.

Preborn persons and generations not yet born must be able to assert their rights in this case. As in *Barrows*, "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance[s] before any court." Future generations are vulnerable: they cannot participate in the political process until they are adults, long after the climate change harm is done. *Massachusetts v. EPA* recognized this: "The risk of catastrophic harm, though remote, is nevertheless real. That risk would be reduced to some extent if petitioners received the relief they seek." 549 U.S. at 526.  The FAC makes it clear: the risk of catastrophic harm in *Massachusetts* is no longer remote, making the need for the relief requested by Plaintiffs all the more urgent.

## <u>CONCLUSION</u>

Plaintiffs' claims constitute the most pressing issue of constitutional injustice of our time. This Court should deny Defendants' motion. Plaintiffs have standing to proceed to the merits. If this Court finds facial deficiencies with Plaintiffs' standing allegations or finds the FAC fails to state a claim, Plaintiffs respectfully request leave to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

Respectfully submitted this 6th day of January, 2016,

*s/ Julia A. Olson*
JULIA OLSON (OR Bar 062230)
JuliaAOlson@gmail.com
**WILD EARTH ADVOCATES**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY (applicant *pro hac vice*)
pgregory@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

DANIEL M. GALPERN (OR Bar 061950)
dan.galpern@gmail.com
**LAW OFFICES OF DANIEL M. GALPERN**
1641 Oak Street
Eugene, OR 97401 Tel: (541) 968-7164

*Attorneys for Plaintiffs*