JULIA A. OLSON (OR Bar 062230)
JuliaAOlson@gmail.com
WILD EARTH ADVOCATES
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

DANIEL M. GALPERN (OR Bar 061950)
dan.galpern@gmail.com
LAW OFFICES OF DANIEL M. GALPERN
1641 Oak Street
Eugene, OR 97401
Tel: (541) 968-7164

JOSEPH W. COTCHETT
jcotchett@cpmlegal.com
PHILIP L. GREGORY (*pro hac vice*)
pgregory@cpmlegal.com
PAUL N. MCCLOSKEY
pmccloskey@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **KELSEY CASCADIA ROSE JULIANA**; **XIUHTEZCATL TONATIUH M.**, through his Guardian Tamara Roske-Martinez; et al. | Case No.: 6:15-cv-01517-TC |
| Plaintiffs, | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT INTERVENORS' MOTION TO DISMISS |
| v. | |
| The **UNITED STATES OF AMERICA**; **BARACK OBAMA**, in his official capacity as President of the United States; et al., | Oral Argument: March 9, 2016, 10:00 a.m. |
| Federal Defendants. | |

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................. 1

I.    NONE OF PLAINTIFFS' CONSTITUTIONAL OR PUBLIC TRUST
      CLAIMS IS DISPLACED................................................................. 3

II.   THE POLITICAL QUESTION DOCTRINE DOES NOT APPLY .... 9

      A.    HISTORY OF THE DEVELOPMENT OF THE POLITICAL QUESTION
            DOCTRINE UNDER FEDERAL COMMON LAW............................... 11

      B.    THE POLITICAL QUESTION DOCTRINE IS INAPPLICABLE TO
            PLAINTIFFS' CONSTITUTIONAL CAUSES OF ACTION .................. 13

      C.    THE POLITICAL QUESTION DOCTRINE IS INAPPLICABLE TO
            PLAINTIFFS' PUBLIC TRUST CAUSE OF ACTION ......................... 14

      D.    EVEN IF THE POLITICAL QUESTION DOCTRINE COULD APPLY TO
            CONSTITUTIONAL AND PUBLIC TRUST CLAIMS, THE BAKER
            FACTORS DO NOT APPLY IN THIS CASE ...................................... 15

            1.    There is No Textually Demonstrable Constitutional
                  Commitment of the Issue to a Coordinate Political
                  Department..................................................................... 16
            2.    There Are Judicially Discoverable and Manageable
                  Standards for Resolving the Issue ................................. 19
            3.    The Case Can Be Adjudicated and Remedied by
                  Respecting Other Branches of Government................. 22

III.  DEFENDANT INTERVENORS MISSTATE THE SUPREME
      COURT'S ANALYSIS OF EQUAL PROTECTION SUSPECT
      CLASS CLAIMS................................................................................ 26

CONCLUSION ................................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Akins v. State of Tex.*,
325 U.S. 398 (1945) ..................................................................... 28

*Alec L. v. Jackson*,
863 F. Supp. 2d 11 (D.D.C. 2012) ................................................. 5

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005) ....................................................... 19

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
70 F.3d 1045 (9th Cir. 1995) ...................................................... 13

*American Electric Power Co. v. Connecticut (AEP)*,
131 S. Ct. 2527 (2011)......................................................... 6, 7, 8, 9

*Baker v. Carr*,
369 U.S. 186 (1962)............................................................*passim*

*Belk v. Charlotte-Mecklenburg Bd. of Educ.*,
269 F.3d 305 (4th Cir. 2001) ...................................................... 23

*Bivens v. Six Unknown Fed. Narcotics Agents*,
403 U.S. 388 (1971).................................................................. 5, 6

*Blodgett v. Holden*,
275 U.S. 142 (1927).................................................................... 26

*Bond v. United States*,
131 S. Ct. 2355 (2011).................................................................. 9

*Bowsher v. Synar*,
478 U.S. 714 (1986)...................................................................... 9

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954)................................................................. 3, 29

*Brown v. Plata*,
563 U.S. 493 (2011)..................................................................... 23

*Bush v. Lucas*,
462 U.S. 367 (1983)....................................................................... 6

*Carlson v. Green*,
  446 U.S. 14 (1980)................................................................ 5, 6, 7, 8

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821).............................................. 9, 26

*Coleman v. Schwarzenegger*,
  Nos. CIV S-90-0520 LKK JFM P, C01-1351 THE, 2010 WL 99000
  (E.D. Cal & N.D. Cal. 2010)..................................................... 23

*Colgrove v. Green*,
  328 U.S. 549 (1946).................................................................. 11

*Ctr. for Biological Diversity v. FPL Grp.*,
  83 Cal. Rptr. 3d 588 (Cal. Ct. App. 2008) ............................... 15

*Davis v. Passman*,
  442 U.S. 228 (1979).......................................................... 7, 10, 18

*Funez v. Guzman*,
  687 F. Supp. 2d 1214 (D. Or. 2009) ......................................... 21

*Gaines v. Dougherty Cnty. Bd. of Educ.*,
  465 F.2d 363 (5th Cir. 1972) ..................................................... 23

*Gilligan v. Morgan*,
  413 U.S. 1 (1973)................................................................. 18, 24

*Gomillion v. Lightfoot*,
  270 F.2d 594 (5th Cir. 1959) ............................................... 11, 12

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960)......................................................... 11, 12, 13

*Gross v. German Found. Indus. Initiative*,
  456 F.3d 363 (3d Cir. 2006)...................................................... 11

*Hui v. Castaneda*,
  559 U.S. 799 (2010).................................................................... 6

*Ill. Cent. R.R. v. Illinois*,
  146. U.S. 387 (1892)......................................................... 3, 4, 15, 20

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  438 F. Supp. 2d 291 (S.D.N.Y. 2006) ....................................... 22

*INS v. Chadha*,
    462 U.S. 919 (1983)................................................................................... 11, 13, 14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986)................................................................................................. 17

*Jewel v. Nat'l Sec. Agency*,
    673 F.3d 902 (9th Cir. 2011) .................................................................................. 17

*Johnson v. City of Seattle*,
    474 F.3d 634 (9th Cir. 2007) .................................................................................. 21

*Kahawaiolaa v. Norton*,
    386 F.3d 1271 (9th Cir. 2004) ......................................................................... 13, 14

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) ............................................................................... 20

*Koohi v. United States*,
    976 F.2d 1328 (9th Cir. 1992) ............................................................................... 24

*Korematsu v. United States*,
    323 U.S. 214 (1944)................................................................................................. 21

*Lake Mich. Fed'n v. U.S. Army Corps of Eng'rs*,
    742 F. Supp. 441 (D. Ill. 1990) ............................................................................... 4

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990)......................................................................................... 17, 18

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)............................................................... 3, 10, 16, 29

*McCleary v. State*,
    269 P.3d 227 (Wash. 2012)................................................................................23-24

*Milliken v. Bradley*,
    433 U.S. 267 (1977)................................................................................................. 23

*Nat'l Audubon Soc'y v. Superior Court*,
    658 P.2d 709 (Cal. 1983) ........................................................................................ 29

*Nat'l Labor Relations Bd. v. Canning* (*NLRB*),
    134 S. Ct. 2550 (2014)......................................................................................... 9, 14

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**

*Native Vill. of Kivalina v. ExxonMobil Corp.,*
  663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd on other grounds,*
  696 F.3d 849 (9th Cir. 2012) ................................................................. 20

*Newton v. Comm'rs of Mahoning Cnty.,*
  100 U.S. 548 (1879) ............................................................................... 3

*Nixon v. Herndon,*
  273 U.S. 536 (1927) ............................................................................. 15

*NWF v. NMFS,*
  No. CV 01-640-RE, 2005 WL 2488447 (D. Or. 2005) ............................... 23

*Obergefell v. Hodges,*
  135 S. Ct. 2584 (2015) ..................................................................... 21, 24

*Powell v. McCormack,*
  395 U.S. 486 (1969) ............................................................................. 25

*PPL Montana, LLC v. Montana,*
  132 S. Ct. 1215 (2012) ........................................................................... 1

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ......................................................................... 26-27

*Robinson Twp. v. Commonwealth,*
  83 A.3d 901 (Pa. 2013) ........................................................................ 14

*Roe v. Wade,*
  410 U.S. 113 (1973) ............................................................................. 29

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
  300 F. Supp. 1358 (W.D.N.C. 1969) ...................................................... 23

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
  402 U.S. 1 (1971) ................................................................................. 23

*U.S. v. Standard Oil Co. of Cal.,*
  332 U.S. 301 (1947) ............................................................................... 6

*U.S. v. W. Carroll Parish Sch. Dist.,*
  Civil Action No. 14428 (W.D. La. Nov. 28, 2005) .................................... 23

*Ungar v. Palestine Liberation Org.,*
  402 F.3d 274 (1st Cir. 2005) ................................................................. 11

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                                                                 v

*United States v. 1.58 Acres of Land,*
    523 F. Supp. 120 (D. Mass. 1981) ............................................................... 15

*United States v. Carolene Prods. Co.,*
    304 U.S. 144 (1938)........................................................................... 20, 27

*United States v. Munoz-Flores,*
    495 U.S. 385 (1990).................................................................................. 25

*United States v. Nixon,*
    418 U.S. 683 (1974).................................................................................. 15

*Washington v. Davis,*
    426 U.S. 229 (1976) ................................................................................ 28

*Webster v. Doe,*
    486 U.S. 592 (1988)................................................................................. 18

*Wood v. Ostrander,*
    879 F.2d 583 (9th Cir. 1989) ..................................................................... 22

*Yick Wo v Hopkins,*
    118 U.S. 356, 370 (1886)........................................................................... 27

*Zivotofsky v. Clinton,*
    132 S. Ct. 1421 (2012) ......................................................................... 9, 14

## STATUTES

28 U.S.C. § 2201(a) ........................................................................................ 21

42 U.S.C. §§ 7401 ........................................................................................... 6

## RULES

Rule 12(b)(6)...................................................................................................... 2

# OTHER AUTHORITIES

13C Charles A. Wright et al., *Federal Practice and Procedure* § 3534.1
(3d ed. 2008) ............................................................................................. 10

Bradley C. Bobertz, *Toward a Better Understanding of Intergenerational Justice,* 36
Buff. L. Rev. 165, 179-79 (1987) ............................................................. 28

Case Comment, *Constitutional Law: Disenfranchisement of Negroes by Alteration of
City Limits*, 11 Hastings L.J. 482 (1960) ................................................. 12

Daniel A. Farber & Paul A. Hemmersbaugh, *The Shadow of the Future: Discount Rates,
Later Generations, and the Environment*, 46 Vand. L. Rev. 267 (1993) ................... 28

Derek Parfit, *Energy Policy and the Further Future: The Social Discount Rate, in
Energy and the Future* (Douglas MacLean & Peter G. Brown eds. 1983).................. 28

Gerald Torres & Nathan Bellinger, *The Public Trust: The Law's DNA*,
4:2 Wake Forest J.L. & Pol'y 281 (2014).............................................. 3, 5

Howard Fink & Mark Tushnet, *Federal Jurisdiction: Policy and Practice*
(2d ed. 1987) ............................................................................................. 16

Interagency Working Group on Social Cost of Carbon, U.S. Gov't, *Technical Support
Document: Social Cost of Carbon for Regulatory Impact Analyses– Under Executive
Order 12866* (Feb. 2010) ......................................................................... 28

K. Arrow et al., *Determining Benefits and Costs for Future Generations*,
341 Science 349 (2013) ............................................................................ 28

Mary Christina Wood *et al.*, *Securing Planetary Life Sources for Future Generations:
Legal Actions Deriving from the Ancient Sovereign Trust Obligation, in Threatened
Island Nations: Legal Implications of Rising Seas and a Changing Climate*
(Michael B. Gerrard & Gregory E. Wannier eds., 2013)................................. 3

Melvin I. Urofsky, *Among the Most Humane Moments in All Our History*, *in Black,
White, and Brown* (Supreme Court Historical Society 2004)......................... 3

Paul R. Portney et al., *Discounting and Intergenerational Equity*
(Paul R. Portney & John P. Weyant eds. 1999)............................................ 28

Press Release, American Petroleum Institute, *API: New power plant rule harms
American workers and those struggling to pay for energy* (Aug. 3, 2015) .................. 7

Tyler Cowen & Derek Parfit, *Against the Social Discount Rate, in Justice between
Age Groups and Generations* (Peter Laslett & James S. Fishkin eds. 1992) .............. 28

## INTRODUCTION

In their Motion to Dismiss, Defendant Intervenors mischaracterize both Plaintiffs and their claims for relief. Plaintiffs are 21 young citizens, one youth organization advocating for human rights and a sustainable planet, and America's foremost climate scientist as guardian for his granddaughter and future generations. The mischaracterization of Plaintiffs' claims can be summarized as follows: Plaintiffs do not seek greenhouse gas emission reductions that "these plaintiffs deem acceptable," but the termination of actions by Federal Defendants that are damaging Plaintiffs' fundamental interests and a plan, based in the best scientific evidence, to eliminate the threats to those interests. *See* Defendant Intervenors' Mem. in Support of Mot. to Dismiss (Dkt. 20) ("INT MTD") 1. This case is both a challenge to aggregate and specific federal actions that are injuring Plaintiffs, and a case asserting monumental present and future harm to the fundamental constitutional rights and liberties of these young people and future generations. It places in sharp relief the question whether our Constitution and the federal Public Trust Doctrine protect Plaintiffs and "our Posterity" from substantial damage knowingly and deliberately caused by these Federal Defendants. While standing to sue lies with Plaintiffs, the ramifications of this Court's decision will affect the long-term viability of our nation, as well as America's present and future generations.

Defendant Intervenors seek to have this Court construe all four of Plaintiffs' claims as being brought under the Public Trust Doctrine and then uncritically dismiss these claims by blindly adhering to the unpublished, and wrongly decided, opinion in *Alec L. v. McCarthy*, 561 F. App'x 7 (D.C. Cir. 2014). This Court will see the erroneous basis for the D.C. Circuit's opinion after it performs a careful analysis of *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215 (2012) and Plaintiffs' arguments in their Memorandum in Opposition to Federal Defendants'

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                    1

Motion to Dismiss (Dkt. 41). The D.C. Circuit ignored a hundred years of Public Trust law in this country, the historical roots of the Public Trust Doctrine, as well as Federal Defendants' repeated admissions that, in fact, the Public Trust Doctrine does apply to the federal government. Moreover, Defendant Intervenors attempt to reduce Plaintiffs' plainly constitutional claims to variants of the Public Trust claim. This position must be rejected: Plaintiffs bring three of four claims for relief exclusively under the Fifth and Ninth Amendments to the U.S. Constitution.[1]

Defendant Intervenors make only two arguments for dismissal that were not raised by Federal Defendants: displacement and political question.[2] Both arguments fail. The practical and political reality of applying either of these doctrines to dismiss this case would result in an incomparable injustice, heavily tipping the balance of power toward the legislature that is, at

---

[1]    Defendant Intervenors err in asserting this action is "the second case in which the same claims have been made against the same federal defendants by plaintiffs represented by mostly the same counsel." INT MTD 3. No Plaintiff involved in this case was a plaintiff in *Alec L*. Moreover, whereas *Alec L*. exclusively posed a public trust challenge to the federal government's failure to act on climate change, this case challenges the aggregate acts of Federal Defendants, an Act of Congress, and a permit decision by Defendant DOE.

[2]    In light of the Court's order on briefing motions to dismiss (Dkt. 50), Plaintiffs do not repeat their arguments on standing or failure to state a claim under Rule 12(b)(6).

[3]    Melvin I. Urofsky, *Among the Most Humane Moments in All Our History*, in *Black, White, and Brown*, 1-24 (Supreme Court Historical Society, 2004).

[4]    Gerald Torres & Nathan Bellinger, *The Public Trust: The Law's DNA*, 4:2 Wake Forest J.L. & Pol'y 281, 288-94, 300-10 (2014); Mary Christina Wood *et al.*, *Securing Planetary Life Sources for Future Generations: Legal Actions Deriving from the Ancient Sovereign Trust Obligation*, in *Threatened Island Nations: Legal Implications of Rising Seas and a Changing Climate* 531, 575 (Michael B. Gerrard & Gregory E. Wannier eds., 2013).

---

[2]    In light of the Court's order on briefing motions to dismiss (Dkt. 50), Plaintiffs do not repeat their arguments on standing or failure to state a claim under Rule 12(b)(6).

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                                                    **2**

present, heavily controlled by fossil fuel corporations and their owners represented by Defendant

Intervenors, and away from judicial protection of individual liberties. Similar arguments were

made during the Civil Rights era, when the Supreme Court, in *Baker v. Carr*, 369 U.S. 186

(1962), narrowed the application of the political question doctrine to rare instances. Even prior to

*Baker*, however, our Supreme Court treated the political question doctrine as inapplicable to

those seeking to preclude African Americans from their day in court when Congress, on its own,

manifestly would not, or could not, act to protect their fundamental rights. Through *Brown v.

Board of Education*, 347 U.S. 483 (1954) – among the most humane moments of U.S. History[3] –

the Court sought to rebalance power and secure the fundamental promise of our Constitution.

Unless such a decision is issued here and now, Federal Defendants will continue to infringe upon

fundamental constitutional interests of Plaintiffs and those for whom they stand.

I.      **NONE OF PLAINTIFFS' CONSTITUTIONAL OR PUBLIC TRUST CLAIMS IS
        DISPLACED**

        The availability of a claim under the Public Trust Doctrine cannot be displaced by statute

because the doctrine is an attribute of sovereignty and an element of the reserved powers

doctrine.[4] *See Newton v. Comm'rs of Mahoning Cnty.*, 100 U.S. 548, 559 (1879) ("It is vital to

the public welfare that each [legislature] should be able at all times to do whatever the varying

circumstances and present exigencies touching the subject involved may require. A different

result would be fraught with evil."); *Ill. Cent. R.R. v. Illinois*, 146. U.S. 387, 455 (1892) ("[T]he

decisions are numerous which declare that such property is held by the state, by virtue of its

---

[3]     Melvin I. Urofsky, *Among the Most Humane Moments in All Our History*, *in Black, White, and Brown*, 1-24 (Supreme Court Historical Society, 2004).

[4]     Gerald Torres & Nathan Bellinger, *The Public Trust: The Law's DNA*, 4:2 Wake Forest J.L. & Pol'y 281, 288-94, 300-10 (2014); Mary Christina Wood *et al.*, *Securing Planetary Life Sources for Future Generations: Legal Actions Deriving from the Ancient Sovereign Trust Obligation*, *in Threatened Island Nations: Legal Implications of Rising Seas and a Changing Climate* 531, 575 (Michael B. Gerrard & Gregory E. Wannier eds., 2013).

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**          3
**Dismiss**

sovereignty, in trust for the public."). Like the federal and state constitutions, the federal Public Trust Doctrine overlays all other acts of government, including the enactment of legislation or the promulgation of regulations. *See Ill. Cent. R.R.*, 146. U.S. at 452-53, 460. In *Marbury v. Madison*, the Supreme Court exemplified this construct when the Court compared the Constitution to government acts and determined whether the acts comport with the law of the land. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175-80 (1803) ("An act of congress repugnant to the constitution cannot become a law." *Id.* at 138). For the same reason that a single act of Congress could not displace the Constitution, a single act of Congress has not and cannot displace the federal Public Trust Doctrine.

The Supreme Court in *Illinois Central* explains this point. *Ill. Cent. R.R. v. Illinois*, 146 U.S. 387 (1892). In *Illinois Central*, Congress, the State, and the city had enacted laws that spoke precisely to the issue in the case: the transfer of title to lands to the railroad company to improve commerce around the harbor of Chicago. *Id.* at 439-40, 450-51. In reviewing the land transfer under the sovereign's public trust obligation, Justice Field explained that, even though the legislative acts allowed the transfer of public property, the Public Trust Doctrine limits the ability of the sovereign to transfer lands submerged by navigable waters because those navigable waters were a public trust resource deserving protection by the sovereign trustee. *Id.* at 452-64. The sovereign was not permitted to abrogate its trust and transfer public resources to private parties. *Id.* at 453-54 ("The State can no more abdicate its trust over property in which the whole people are interested . . . than it can abdicate its police powers in the administration of government and the preservation of the peace."). Even when a government legislates or regulates to prevent harm to the trust *res*, the basic trust question remains: Is the law or regulation adequate to protect trust assets for present and future generations? *See Lake Mich. Fed'n v. U.S.*

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**    4

*Army Corps of Eng'rs*, 742 F. Supp. 441, 446 (D. Ill. 1990) ("The very purpose of the public

trust doctrine is to police the legislature's disposition of public lands. If courts were to rubber

stamp legislative decisions . . . the doctrine would have no teeth. The legislature would have

unfettered discretion to breach the public trust as long as it was able to articulate some gain to the

public. . . . Therefore, we find that the legislative determination that the lakefill would serve the

public is no obstacle to our conclusion that the grant was in breach of the public trust.").[5]

As to Plaintiffs' constitutional claims, though Defendant Intervenors fail to make *any*

specific arguments that Plaintiffs' first three constitutional claims are displaced, they are correct

that *Carlson v. Green*, 446 U.S. 14 (1980), sets the test for when a *constitutional claim* may be

displaced by the availability of a statutory claim. INT MTD 8. In *Carlson*, the Supreme Court

held a constitutional claim is precluded only "when defendants show that Congress has provided

an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under

the Constitution and viewed as equally effective." *Id.* at 18-19 (citing *Bivens v. Six Unknown*

*Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971)). The Supreme Court affirmed the reasoning of

the Court of Appeals in *Carlson*, and refused to preclude federal claims for damages if such a

decision would "subvert" "the policy of allowing complete vindication of constitutional rights."

*Carlson*, 446 U.S. at 18.[6]

---

[5]    The D.C. District Court erred by stating in *dicta* that the Clean Air Act displaced any claim under the Public Trust Doctrine. *Alec L. v. Jackson*, 863 F. Supp. 2d 11, 16 (D.D.C. 2012). *See* Torres & Bellinger, *The Public Trust: The Law's DNA, supra* at 305, 307 ("There are no statutes, including the Clean Air Act, that 'speak directly' to this core inquiry of whether the government is complying with its fiduciary public trust duty to protect the atmosphere. [. . . ] Because the Clean Air Act does not ask whether the statute is sufficient for the government trustees to meet their trust obligation to protect the atmosphere from substantial impairment, displacement cannot prevent courts from engaging in this core inquiry.").

[6]    The arguments for an alternative specific statutory remedy for compensatory and punitive damages displacing a constitutional claim are more readily established than with an equitable

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**                    5
**Dismiss**

Defendant Intervenors cite no *alternative and equally effective* statutory remedy, which Congress has explicitly declared to be a substitute for equitable recovery for violations of the Fifth Amendment and the federal Public Trust Doctrine. *See Carlson*, 446 U.S. at 19 ("[W]e have here no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress. Petitioners point to nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations."). Congress knows how to explicitly create an exclusive remedy, and Defendant Intervenors fail to point to any such statute.[7] *Id.*

Instead of pointing to specific and equally effective relief Plaintiffs could seek pursuant to the *Carlson v. Green* test, Defendant Intervenors argue, wrongly, that the analysis in *American Electric Power Co. v. Connecticut (AEP)*, 131 S. Ct. 2527 (2011) should apply equally here. Defendant Intervenors' statutory analysis is essentially, "Congress has already legislated on these

---

relief case for Fifth Amendment violations. Still, the Supreme Court is careful to preclude claims only when constitutional rights can be fully vindicated through statutory claims.

[7]    Defendant Intervenors cite three cases, which clearly do not apply. *Bush v. Lucas* pertains to federal employees seeking nonstatutory monetary damages against their employer, where there are "comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Bush v. Lucas*, 462 U.S. 367, 368 (1983). No such meaningful statutory remedies exist for Plaintiffs here. *See id.* at 386-88 (statutory remedy allowed the opportunity to put the federal employee "in the same position he would have been in had the unjustified or erroneous personnel action not taken place."). Similarly, the Supreme Court explained the United States' claim to recover damages for injury to a federal employee from a car accident caused by Standard Oil was "outside the constitutional realm" and an area of "law of independent federal judicial decision." *U.S. v. Standard Oil Co. of Cal.,* 332 U.S. 301, 308 (1947). The Supreme Court's ruling in *Standard Oil* hinged on the United States' status as a "party plaintiff to the suit. And the United States has power at any time to create the liability. . . . That decision . . . is in this instance for the Congress, not for the courts." *Id.* at 316-17. Finally, *Hui v. Castaneda*, 559 U.S. 799 (2010), pertained to individual officer immunity created by an act of Congress, not statutory displacement.

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**        **6**
**Dismiss**

issues, directing in the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, that EPA consider (as appropriate under statutory requirements) nationwide standards for greenhouse gas emissions." INT MTD 9. That Congress has directed EPA to *consider* emissions standards is not the equivalent of providing Plaintiffs with an alternative and equally effective statutory remedy for their specific constitutional and Public Trust claims arising from federal actions that cause and exacerbate the climate crisis. *Carlson*, 446 U.S. at 18-19. Neither does the Clean Air Act afford Plaintiffs complete vindication of their constitutional rights. *Id.* Defendant Intervenors fail to point to any provision of the Clean Air Act, which could provide an equivalent claim. In fact, outside of this litigation, they argue that EPA's greenhouse gas rules "overstep[] the authority given to the EPA under the Clean Air Act."[8]

Unlike the common law nuisance claim for relief displaced in *AEP*, these Fifth Amendment and federal Public Trust Doctrine claims are constitutionally enshrined. *AEP* is inapposite here because the public trust obligation of Federal Defendants is based on the duty of a sovereign to protect and secure the integrity of the public trust *res*, both for present *and future* generations. Moreover, the Fifth Amendment prevents Federal Defendants from endangering Plaintiffs, including future generations, or infringing on their fundamental rights to life, liberty, and property irrespective of the profit that select private companies may otherwise derive from the federal endangerment and infringement. A public nuisance claim, by contrast, focuses exclusively on individual parties causing "substantial and unreasonable interference with public rights" enjoyed by the present generation alone, and requires a balancing of the various interests at stake. *See AEP*, 131 S. Ct. at 2534. Public nuisance is not a constitutional claim. The Supreme

_____

[8]    *See* Press Release, American Petroleum Institute, *API: New power plant rule harms American workers and those struggling to pay for energy* (Aug. 3, 2015) *available at* http://www.api.org/News-and-Media/NewsItems/2015/August-2015/API-New-power-plant-rule-harms-American-workers-and-those-struggling-to-pay-for-energy.

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**          7
**Dismiss**

Court's analysis in *AEP* is inapplicable here and, indeed, contrary to Supreme Court precedent expressed in *Carlson* and numerous other cases. *See, e.g.*, *Davis v. Passman*, 442 U.S. 228 (1979).

In *AEP*, the Supreme Court held "[t]he test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." 131 S. Ct. at 2537. Even if *AEP* could be read to overrule *Carlson,* which it did not, *AEP* is distinguishable from this case. Whereas the nuisance claim was directed towards third party polluters and was, therefore, displaced by a regulatory scheme directed towards the same type of pollution caused by the same class of party, the Fifth Amendment and Public Trust claims here focus on the more fundamental question of whether the sovereign trustee is meeting its duty towards the citizens by adequately protecting the assets held in public trust and avoiding putting its citizenry in a dangerous situation. Defendant Intervenors point to no part of the Clean Air Act that speaks to the question of whether the sovereign trustee is meeting its duty to these young citizen beneficiaries to avoid substantial impairment of their trust resources. Nor does the Clean Air Act speak directly to the question of protecting Plaintiffs' fundamental rights under the Constitution.

In fact, much of the First Amended Complaint ("FAC") outlines ways in which many of Federal Defendants' aggregate actions, not just those of EPA, are substantially impairing public trust assets. For instance, the Department of Interior through its agencies is responsible for leasing public lands for fossil fuel extraction, an act over which EPA has no statutory authority. FAC ¶¶ 109-112, 164-170; *see also* FAC ¶ 174 (subsidies over which EPA has no control); ¶¶ 179-184 (EPA has no role in the approvals for transporting fossil fuels). Therefore, the Clean Air Act's statutory scheme does not "speak directly to the question" of the measures needed for the

sovereign to meet its fundamental fiduciary duties of public trust protection, even though EPA's discretionary regulatory authority may help it meet its public trust obligations upon an order of this Court that the Agency fully utilize such authority.

Furthermore, the separation of powers issues in *AEP* are not present here. A public trust claim against Federal Defendants does not require this Court to make policy determinations as to who should be regulated and to what extent, an unavoidable inquiry embedded in the "unreasonable" standard of a nuisance claim. *Cf. AEP*, 131 S. Ct. at 2539-40. Moreover, the separation of powers embedded in the structural provisions of Articles I-III of the Constitution

> reflect the founding generation's deep conviction that "checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U. S. 714, 722 (1986). It is for that reason that "the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond v. United States*, . . . 131 S. Ct. 2355, 2365 (2011) . . . Those decisions all rest on the bedrock principle that "the constitutional structure of our Government" is designed first and foremost not to look after the interests of the respective branches, but to "protec[t] individual liberty." *Bond*, . . . 131 S. Ct., at 2365.

*Nat'l Labor Relations Bd. v. Canning* (*NLRB*), 134 S. Ct. 2550, 2593 (2014) (Scalia, A., concurring).

## II.    THE POLITICAL QUESTION DOCTRINE DOES NOT APPLY

Defendant Intervenors argue Plaintiffs' claims for declaratory and injunctive relief are "subject to dismissal under the political question doctrine," even though Federal Defendants did not argue the claims presented here are exclusively reserved to them by the Constitution. INT MTD 11. In fact, these claims are justiciable and do not invoke the political question doctrine. "In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (the political question doctrine is "a narrow

exception to that rule")); *NLRB*, 134 S. Ct. at 2593-94 (Scalia, A., concurring) ("Since the

separation of powers exists for the protection of individual liberty, its vitality 'does not depend'

on 'whether 'the encroached-upon branch approves the encroachment.'' . . . Rather, policing the

'enduring structure' of constitutional government when the political branches fail to do so is 'one

of the most vital functions of this Court.'" (citations omitted)). The political question doctrine

properly may be invoked only to dismiss claims whose resolution *necessarily* embroils the Court

in resolving questions "beyond judicial competence." 13C Charles A. Wright et al., *Federal

Practice and Procedure* § 3534.1 (3d ed. 2008). Moreover, the doctrine provides that certain

issues are not justiciable where they have been constitutionally reserved to the political branches

of government. *Baker v. Carr*, 369 U.S. at 210. However,

> As James Madison stated when he presented the Bill of Rights to the Congress:
> "If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789).

> At least in the absence of "a textually demonstrable constitutional commitment of [an] issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217 . . . (1962), we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights. "The very essence of civil liberty," wrote Mr. Chief Justice Marshall in *Marbury v. Madison*, 5 U.S. 137, 163 . . . (1803), "certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Traditionally, therefore, "it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . ."

*Davis v. Passman*, 442 U.S. 228, 241-42 (1979) (alterations in original) (Fifth Amendment gender discrimination claim).

Defendant Intervenors' arguments fail, in part, because they ignore the nature of Plaintiffs' constitutional and public trust claims and misconstrue the relief sought. Equitable issues arising under the Fifth and Ninth Amendments and under the federal Public Trust Doctrine, requiring interpretation and enforcement by the judicial branch, intrinsically are *not* reserved to the political branches. The legislative and executive branches cannot be expected to police themselves and interpret their own laws; that is the purview of the judiciary.[9] Courts cannot avoid their responsibility merely "because the issues have political implications." *INS v. Chadha*, 462 U.S. 919, 943 (1983). Plaintiffs' allegations, if true, constitute the most pressing issue of injustice and constitutional infringement of our time. To squeeze Plaintiffs' claims into a narrow exception to justiciability would be incommensurate with this Court's role as a check and balance on the other branches of government.

A.    **History of the Development of the Political Question Doctrine under Federal Common Law**

An historical analysis of the political question doctrine, focusing on the age that led to the test in *Baker v. Carr*, is instructive here. 369 U.S. at 229-31. During the Civil Rights era, southern legislatures redrew political boundaries to exclude African Americans from voting in certain districts. While by 1957 the Supreme Court had struck down barriers to African American political participation in the South, an earlier line of cases indicated the Court's refusal to interfere with "political" issues of redistricting. *See, e.g.*, *Colgrove v. Green*, 328 U.S. 549

---

[9]    Further, the judicial function of construing a federal law and determining its constitutionality does not present a political question. When a District Court's role is to interpret and apply federal law, the political question doctrine does not bar the court's exercise of jurisdiction. *E.g.*, *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 377 (3d Cir. 2006); *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 280-81 (1st Cir. 2005).

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                                              11

(1946). In his critical dissent to the Fifth Circuit's decision to uphold the 28-sided "sea dragon"

boundaries in Tuskegee, Alabama, which excluded nearly all four hundred registered African

American voters, Judge John R. Brown wrote: "[T]here can be no relief at the polls for those

who cannot register and vote." *Gomillion v. Lightfoot*, 270 F.2d 594, 611 (5th Cir. 1959)

(dissenting opinion), *rev'd*, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). Judge Brown's dissent

paved the way for later decisions that arose above "the political thicket" and overturned

redistricting decisions that denied citizens their right to participate in the political process.

*Gomillion*, 364 U.S. at 347 (holding political question doctrine inapplicable where the

allegations, if true, would violate a federally protected right: "'It is inconceivable that guaranties

embedded in the Constitution of the United States may thus be manipulated out of existence.'"

*Id.* at 345 (citations omitted)).

        The fundamental point of Judge Brown's dissent is instructive: the court "need not be that

'blind'" or "unable to see what 'all others can see and understand.'" *See Gomillion*, 270 F.2d at

608. Taking the central allegations of the FAC as true, and accepting that Plaintiffs' lives,

liberties, and property (both private and public) are being damaged by ongoing greenhouse gas

emissions that are the consequence of actions by the Federal Defendants, then Plaintiffs'

fundamental rights under the Constitution and the Public Trust Doctrine are at stake. This Court

should rise above "the political thicket" argument. When the political branches overstep their

bounds, "the Courts are the only haven for those citizens in the minority." *Id.* at 611. Plaintiffs

and future generations, largely without the right to vote or means to meaningfully participate in

the political process, have one haven for meaningful redress: this Court.

        As the Hastings Law Journal reported in 1960, before the Supreme Court reversed the

Fifth Circuit majority and agreed with Judge Brown in *Gomillion v. Lightfoot*:

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to     12
Dismiss**

> The majority opinion seems to represent those who feel that the best way to handle the situation is to let things work themselves out. The dissent, on the other hand, stands for the position that *the realities of the matter demand action by the federal government, and that the country has sat by long enough*. The approach finally chosen will determine the course of the most important domestic problem of the new decade.

Case Comment, *Constitutional Law: Disenfranchisement of Negroes by Alteration of City Limits*, 11 Hastings L.J. 482, 482 (1960) (emphasis added). So we stand today, faced with the most important domestic problem of this century, where "*the realities of the matter demand action by the federal government, and that the country has sat by long enough*" – where the knowing and dangerous disruption of our climate system presents an issue of intergenerational injustice and infringement of fundamental, inalienable constitutional rights.

### B.    The Political Question Doctrine is Inapplicable to Plaintiffs' Constitutional Causes of Action

There is no political question where the allegations, if true, would violate rights guaranteed under the Constitution. *Gomillion*, 364 U.S. at 347. With respect to Federal Defendants' aggregate actions, the question is whether Federal Defendants have used their constitutional and statutory authority and discretion to violate the Constitution by continuing to promote fossil fuel exploitation, production, and consumption in the face of their long-standing knowledge of the damage from accelerating global warming and climate change. Even those actions that Defendant Intervenors allege are wholly within the plenary power of the legislative and executive branches are still justiciable where constitutional rights are at stake. The constitutionality of government actions is a bona fide controversy and "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker*, 369 U.S. at 217. "[W]hile the controversy may be termed 'political,' the 'presence of constitutional issues with significant political overtones does not

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**    13

automatically invoke the political question doctrine." *Kahawaiolaa v. Norton*, 386 F.3d 1271,

1277 (9th Cir. 2004) (quoting *INS v. Chadha*, 462 U.S. 919, 942-43 (1983)).[10]

Plaintiffs' facial challenge to Section 201 of the Energy Policy Act, completely ignored

by Defendant Intervenors, is also justiciable. Although a facial challenge "is, of course, the most

difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987),

"the political question doctrine does not bar adjudication of a facial constitutional challenge even

though Congress has plenary authority, and the executive has broad delegation . . . ."

*Kahawaiolaa*, 386 F.3d at 1276; *see NLRB,* 134 S. Ct. at 2593-94 (Scalia, J. concurring) (The

court does not hesitate to set aside congressional or executive acts deemed unconstitutional

because "[a]bdication of responsibility is not part of the constitutional design."). If this Court

were to accept Defendant Intervenors' argument, then "virtually every challenge to the

constitutionality of a statute would be a political question." *INS*, 462 U.S. at 941. "No policy

underlying the political question doctrine suggests that Congress or the Executive, or both acting

in concert and in compliance with Art. I, can decide the constitutionality of a statute; that is a

decision for the courts." *Id.* at 941-42; *see also Zivotovsky*, 132 S. Ct. at 1428 ("[T]here is, of

course, no exclusive commitment to the Executive of the power to determine the constitutionality

of a statute."). Taking the central allegations in the FAC as true, so that Federal Defendants'

approval of fossil fuel extraction, transport, subsidies, and exports, among other actions, violates

Plaintiffs' rights under the Fifth Amendment and under the Public Trust Doctrine, then a statute

mandating approval of fossil fuel exports cannot stand.

C.     **The Political Question Doctrine is Inapplicable to Plaintiffs' Public Trust
Cause of Action**

---

[10]     *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995)
(allegedly selective enforcement of immigration laws based on protected associational activity).

Generally, an action under the Public Trust Doctrine does not implicate the political question doctrine.[11] Courts necessarily have jurisdiction to hear public trust cases, as a constitutionally based and judicially enforced doctrine. Federal courts have decided numerous public trust cases. *See, e.g., Ill. Cent. R.R.,* 146 U.S. 387; *see also United States v. 1.58 Acres of Land*, 523 F. Supp. 120, 124 (D. Mass. 1981). Plaintiffs, as beneficiaries of the public trust, retain the right to bring this action against the public trustees for failing to discharge their duties. *See Ctr. for Biological Diversity v. FPL Grp.*, 83 Cal. Rptr. 3d 588, 601 (Cal. Ct. App. 2008) (Many cases "have been brought by private parties to prevent agencies of government from abandoning or neglecting the rights of the public with respect to resources subject to the public trust." (citing *Ill. Cent. R.R.,* 146 U.S. 387)). Therefore, this Court has jurisdiction to hear Plaintiffs' Public Trust claim.

### D.    Even if the Political Question Doctrine Could Apply to Constitutional and Public Trust Claims, the *Baker* Factors Do Not Apply in this Case

The political question doctrine provides that courts should not decide certain allegations of unlawful government conduct, even though all of the jurisdictional and other justiciability requirements are met. Plaintiffs note, at the outset, that the doctrine's name is a misnomer. Courts deal with political cases all the time. The Supreme Court's involvement in the political process has included ending racial discrimination in political primaries and elections. *See Nixon*

---

[11]    *See, e.g.*, *Robinson Twp. v. Commonwealth,* 83 A.3d 901, 928 (Pa. 2013) ("There is no doubt that the General Assembly has made a policy decision respecting encouragement and accommodation of rapid exploitation of the Marcellus Shale Formation, and such a political determination is squarely within its bailiwick. But, the instant litigation does not challenge that power; it challenges whether, in the exercise of the power, the legislation produced by the policy runs afoul of constitutional command. Responsive litigation rhetoric raising the specter of judicial interference with legislative policy does not remove a legitimate legal claim from the Court's consideration; the political question doctrine is a shield and not a sword to deflect judicial review.").

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                    15

*v. Herndon*, 273 U.S. 536 (1927) (declaring unconstitutional racial discrimination in the Democratic political primary in Texas). In *United States v. Nixon*, 418 U.S. 683 (1974), the Supreme Court decided the President must comply with a subpoena to produce tapes of presidential conversations to the district court in a criminal trial. The political effect of the decision was to cause President Nixon to resign.

The Supreme Court first dealt with political questions in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Chief Justice Marshall's opinion addressed political power vested in the President, "in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Id.* at 165-66. Justice Marshall contrasted political questions with instances where individual rights were at stake; the latter never could be deemed nonjusticiable political questions. *Id.* at 170.[12] *Marbury*'s distinction between duties and the performance thereof is instructive. *Id.* In the instant case, Plaintiffs merely ask this Court to decide their rights, and conversely the duties of Federal Defendants with respect to these rights, under United States law. Determining these duties in no way requires this Court to determine *how* they are specifically carried out. Thus, applying the three *Baker v. Carr* factors argued by Defendant Intervenors, the political question doctrine does not apply to Plaintiffs' claims.

1.   **There is No Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department**

Under the political question doctrine, a court should decline jurisdiction if there exists "a textually demonstrable constitutional commitment of the issue to a coordinate political

---

[12]   *See* Howard Fink & Mark Tushnet, *Federal Jurisdiction: Policy and Practice* 231 (2d ed. 1987) ("But notice the effect of Marbury's classification: Standing is just the obverse of political question. If a litigant claims that an individual right has been invaded, the lawsuit by definition does not involve a political question.").

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**          16
**Dismiss**

department." *Baker*, 369 U.S. at 217. Defendant Intervenors posit "the complaint asks this Court to direct [agencies] to promulgate specific regulations" and "to control or supervise the internal operations of agencies." INT MTD 11, 12 (citing FAC ¶¶ 1, 12). But the Defendant Intervenors' assertions here are simply false. Specifically, paragraphs one and twelve of the FAC make no mention of regulations, much less request this Court to direct the promulgation of *specific regulations* or to oversee internal agency operations; indeed, nowhere in the FAC can such a request be found.

Defendant Intervenors' political question arguments are entirely untethered to the narrow exception to justiciability created by the doctrine. That the Constitution commits legislative power to regulate commerce to Congress, or commits executive authority to the President, does not preclude judicial review of legislative acts of Congress or executive acts of the President and his agencies. Indeed, claims of infringement of constitutional rights and the Public Trust Doctrine by their nature challenge acts of Congress and the Executive. While justiciability exceptions are limited to political questions, they do not encompass *all* cases that touch on decisions rendered by the political branches. Determinations of such exceptions must be evaluated on a case-by-case basis. *Baker*, 369 U.S. at 211. Although Plaintiffs challenge "conduct that strikes at the heart of a major public controversy," and "although the claims arise from political conduct and in a context that has been highly politicized, [Plaintiffs] present straightforward claims of . . . constitutional rights, not political questions." *See Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). This Court should decline the invitation to shirk its constitutional responsibility, notwithstanding that its decision "may have significant political undertones." *Japan Whaling Ass'n*, 478 U.S. at 230. It would be inconsistent with the judiciary's

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**          17

role to presume, without more, that Federal Defendants' aggregate acts, along with the statutes under which they are purportedly justified, are matters constitutionally committed to the other branches in their entirety, completely exempt from judicial review.

Defendant Intervenors' reliance on *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990) is simply misplaced. The political question doctrine was not at issue in *Lujan*, a case brought pursuant to the Administrative Procedure Act ("APA") for alleged violations of the Federal Land Policy and Management Act of 1976 and the National Environmental Policy Act. There were no constitutional or public trust claims at issue in *Lujan*. The challenged program was governed by statutes under which claims for relief were brought, and thus so limited in scope. *Id.*; *see also Davis*, 442 U.S. at 241 ("the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution. . . . Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner."). *Webster v. Doe*, 486 U.S. 592, 601 (1988), is similarly inapposite because the National Security Act of 1947 committed employee discharges to the discretion of the NSA Director. Thus, the Court there held that judicial review was precluded under the APA – not because of the political question doctrine, but because Congress provided enough discretion to accord judicial deference to the Director. *Id.*

The only other authority Defendant Intervenors proffer is *Gilligan v. Morgan*, 413 U.S. 1 (1973), a constitutional case brought in response to National Guard violence at Kent State. The claim in *Gilligan* did not seek to enjoin some specified or imminently threatened unlawful action, but requested the court "assume continuing regulatory jurisdiction over the activities of the Ohio National Guard." 413 U.S. at 5. In deciding judicial review was precluded, the Supreme

Court pointed to Article I, section 8, clause 16, which vests in Congress the power "for organizing, arming, and disciplining the Militia (now the National Guard), with certain responsibilities being reserved to the respective States." *Id.* at 6. No parallel commitment to Congress exists here. *Cf. id.* at 10 ("The advisory nature of the judicial declaration sought is clear from respondents' argument and, indeed, from the very language of the court's remand. Added to this is that the nature of the questions to be resolved on remand are subjects committed expressly to the political branches of government. These factors, when coupled with the uncertainties as to whether a live controversy still exists and the infirmity of the posture of respondents as to standing, render the claim and the proposed issues on remand nonjusticiable.").

This Court has jurisdiction if it does not have to answer a political question as a threshold matter before addressing the substantive claim. Here, this Court is on solid Article III ground because the questions posed are constitutional, and not essentially political. Neither the text of the Constitution nor any of the founding documents expressly commit the issues of climate change, the destruction of public trust resources, the government's subsidization or exploitation of fossil fuel resources, or the survival of Plaintiffs and future generations to the political branches of government. These are inherently matters of shared responsibility, so that judicial action may not be avoided wherein the other branches have acted in the area to endanger Plaintiffs' fundamental rights and interests.

2. **There Are Judicially Discoverable and Manageable Standards for Resolving the Issue**

Defendant Intervenors assert there are no judicially discoverable or manageable standards under which a court could make judgments about carbon emission levels. INT MTD 12-13. As to whether a claim lacks "judicially discoverable and manageable standards," the crux of this inquiry is not whether a case is large, complicated, or difficult from a logistical standpoint, but

rather whether "a legal framework exists by which courts can evaluate these claims in a reasoned manner." *Alperin v. Vatican Bank*, 410 F.3d 532, 552 (9th Cir. 2005). First, Plaintiffs do not ask this Court to order the specific mechanisms Federal Defendants should use to reduce carbon dioxide emissions, nor to decide the appropriate level of emissions on a sector-by-sector basis, as Defendant Intervenors suggest. This Court has manageable standards to decide this case and controversy, by applying the abundance of case law concerning equal protection,[13] due process, and public trust rights to the factual evidence before it and fashion an order that leaves the details of a national climate recovery plan to Federal Defendants. Plaintiffs do not ask this Court to substitute its judgment for that of the legislature, but to find Federal Defendants violated Plaintiffs' constitutional rights, and Defendants' duties as trustees over public trust resources. Legal standards are readily available for these claims, including the "deliberate indifference" standard for due process violations; the "levels of scrutiny" tests for equal protection claims; and the "substantial impairment" standard for protecting public trust resources. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006); *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153, n.4 (1938); *Ill. Cent. R.R.*, 146 U.S. at 453.

Defendant Intervenors suggest this Court needs to balance the level of emission reductions with potential "enormous losses in productivity and economic development," as is done in nuisance cases. INT MTD 13. There is no such balancing of Plaintiffs' constitutional and public trust rights under the Fifth Amendment or the Public Trust Doctrine. In desegregation cases, the courts did not weigh arguments of fundamental rights of black children, on the one hand, with the white majority's arguments about balancing their potential economic and other impacts. *See* INT MTD 13 (citing *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d

---

[13]    *Baker*, 369 U.S. at 226 ("Judicial standards under the Equal Protection Clause are well developed and familiar.").

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**          20
**Dismiss**

863, 874-77 (N.D. Cal. 2009), *aff'd on other grounds*, 696 F.3d 849 (9th Cir. 2012)) (Evaluation of a nuisance claim involves balancing "the utility and benefit of the alleged nuisance against the harm caused." *Id.* at 874). This is not a nuisance case, nor a statutory APA case.

The FAC does not require this Court to address private parties' contributions to climate change. Federal Defendants are the officials and agencies ultimately responsible for U.S. policies and practices as to domestic fossil fuel exploitation, development, consumption, carbon pollution, and climate change. Federal Defendants have the greatest control over greenhouse gas emissions in the nation. Consequently, with respect to their constitutional claims, Plaintiffs, through the FAC seek a declaration that Federal Defendants have violated and are violating Plaintiffs' Fifth Amendment due process rights by affirmatively placing Plaintiffs in a position of harm vis-à-vis climate change, and exercising deliberate indifference with respect to this dangerous climate situation. *See Funez v. Guzman*, 687 F. Supp. 2d 1214, 1227 (D. Or. 2009) (citing *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007)). Plaintiffs also seek a declaration that Federal Defendants' aggregate acts in promoting the fossil fuel system discriminate against Plaintiffs' ability to exercise their fundamental constitutional rights. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2604-05 (2015). Similarly, the FAC seeks a judicial declaration that Federal Defendants' aggregate actions unconstitutionally discriminate against Plaintiffs as a suspect class. *See Korematsu v. United States*, 323 U.S. 214, 216 (1944). Finally, this Court can declare that Federal Defendants are trustees of the public trust *res*, have violated their duty to protect the *res*, and are required to cease such violations and, instead, protect the atmosphere so as to ensure a viable climate system for these Plaintiffs. 28 U.S.C. § 2201(a).

Plaintiffs recognize that deciding this case will be a formidable task. It involves attending to the harms caused by Federal Defendants and ordering Federal Defendants to develop

appropriate remedies to cease the violations. Yet the magnitude of the problem should not nullify the principle that the Court must decide properly pleaded constitutional claims. This Court retains decades of precedents and adaptable standards on which to decide these claims.

### 3. The Case Can Be Adjudicated and Remedied by Respecting Other Branches of Government

Under *Baker v. Carr*, courts lack jurisdiction where it is "*impossible*" to undertake "independent resolution without expressing lack of the respect due coordinate branches of government." 369 U.S. at 217 (emphasis added). The "impossibility" standard only bars this Court's jurisdiction where "judicial resolution of a question 'would contradict prior decisions taken by a political branch in those *limited contexts* where such contradiction would *seriously interfere* with important government interests.'" *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 438 F. Supp. 2d 291, 298 (S.D.N.Y. 2006) (emphasis added). Here, once the constitutional and public trust violations are established, Federal Defendants have no legitimate entitlement to respect for infringing on the fundamental constitutional rights of children and future generations.

Defendant Intervenors argue action by the executive and legislative branches to address climate change, primarily by delegating these responsibilities to expert agencies, forecloses the judiciary from hearing this case. As amply demonstrated above, this argument is simply incorrect. Under the Fifth Amendment right to due process, Federal Defendants retain a duty towards Plaintiffs where they have created or enhanced a dangerous situation. *Wood v. Ostrander,* 879 F.2d 583, 590 (9th Cir. 1989). This duty extends to expert agencies. It would be extraordinary for this Court to determine that existing and ongoing actions undertaken by Federal Defendants – measures that both create and exacerbate dangerous interference with the climate system with deliberate indifference to the direct harm caused to Plaintiffs – nonetheless are insulated from Plaintiffs' request for relief under the Constitution.

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                                      22

Similarly, the relief requested by the FAC complements and seeks to enforce existing law under the Public Trust Doctrine. It *does not* require the dismantling of any existing statutory or regulatory scheme addressing climate change (with the exception of section 201 of the Energy Policy Act, which Plaintiffs allege is unconstitutional). It *does not* strip the other branches of their ability to craft a plan to meet their fiduciary obligation to protect the atmosphere. The relief requested requires Federal Defendants *only* to stop enhancing an already dangerous situation and to protect the atmosphere consistent with their fiduciary duties as trustees of the Public Trust and constitutional duties under the Fifth Amendment. The FAC does not seek to circumvent the political process through the courts. Quite the contrary, the FAC asks this Court to determine the impact of that process on Plaintiffs' rights and on the public trust, and to craft a remedy aimed to abate those violations once the violations have been determined. "[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).[14]

---

[14]    The remedy sought here is an ordinary tool of the federal courts. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 300 F. Supp. 1358, 1373 (W.D.N.C. 1969) ("The defendant is directed to submit by May 15, 1969, a plan for the active and complete desegregation of teachers in the Charlotte-Mecklenburg school system . . . . In formulating its plan the Board is, of course, free to use all of its own resources and any or all of the numerous methods which have been advanced . . . ."); *Gaines v. Dougherty Cnty. Bd. of Educ.*, 465 F.2d 363 (5th Cir. 1972) (remanding case to district court to develop a revised desegregation plan); *Milliken v. Bradley*, 433 U.S. 267 (1977) (affirming District Court's order requiring the Detroit School Board to submit and institute comprehensive desegregation plans). In a case brought by the United States, it requested a court order that the school district "develop, adopt, and implement a plan approved by this Court that promises realistically to work now to eliminate the vestiges of discrimination to the extent practicable in student assignments" and "submit periodic reports to this Court and to the United States about the District's progress in desegregating its schools to the extent practicable." United States Motion for Further Relief at 3, *U.S. v. W. Carroll Parish Sch. Dist.*, Civil Action No. 14428 (W.D. La. Nov. 28, 2005); *see also Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 319 (4th Cir. 2001) ("To determine whether a school was racially balanced or imbalanced, the district court adopted a plus/minus fifteen percent variance from the district-wide ratio of black to white students."); *NWF v. NMFS*, No. CV 01-640-RE, 2005 WL 2488447, at *3 (D. Or. 2005) (court must actively participate in remand because "[w]ithout real

It is a fundamental role of the judiciary to guard against violations of the Constitution when such are squarely alleged in a proper case. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598, 2605 (2015). Similarly, violations of the Public Trust Doctrine may be determined where Federal Defendants allegedly do not meet their clear fiduciary duties to citizens. Adjudication of Plaintiffs' claims alleging such breaches does not, in and of itself, compel any lack of respect under *Baker*. Quite the opposite: this Court's exercise of jurisdiction is imperative to maintain the appropriate check on the legislature or executive wherein the latter's actions arguably (and here, patently) violate Plaintiffs' fundamental rights. It is required here, moreover, when neither coordinate branch is compliant with its duty to protect Plaintiffs' fundamental rights.

Defendant Intervenors also argue the request for injunctive relief may require this Court "to engage in the type of operational decision-making beyond their competence and constitutionally-committed to other branches," thereby implicating a political question. *See Koohi v. United States,* 976 F.2d 1328, 1332 (9th Cir. 1992) (citing *Gilligan v. Morgan,* 413 U.S. 1, 11 (1973)). *Gilligan* held "it is difficult to conceive of an area of governmental activity in which the courts have less competence" than "[t]he complex, subtle, and professional decisions as to the composition, equipping and control of the military force[, which] are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." 413 U.S. at 10. In concluding "[t]he ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to

---

action from the Action Agencies, the result will be the loss of the wild salmon."); *Coleman v. Schwarzenegger*, Nos. CIV S-90-0520 LKK JFM P, C01-1351 THE, 2010 WL 99000, at *3 (E.D. Cal & N.D. Cal. 2010), *aff'd*, *Brown v. Plata*, 563 U.S. 493 (2011) (ordering specific reductions in prison population within set time periods and a report to the court); *McCleary v. State*, 269 P.3d 227, 261 (Wash. 2012) (ordering legislative remand with continuing court jurisdiction to "help ensure progress in the State's plan to fully implement education reforms by 2018").

electoral accountability," *id.* at 10, the Court also emphasized: "We hold only that no such [judicial] questions are presented in *this* case." *Id.* at 12 (emphasis added). This case presents no questions about the internal makeup and internal operations of any of the Federal Defendant agencies.

Here, the physical and chemical processes of climate change operate on a time-scale wholly incommensurate with the electoral cycle.[15] A substantial proportion of an increment to $CO_2$ will remain in the atmosphere for centuries. Because of the time it takes for the climate system to respond to changes in atmospheric $CO_2$ composition, there is substantial additional warming already "in the pipeline." Declaration of Dr. James E. Hansen, Dkt. 7-1, ¶ 33. That young people and the unborn do not have the right to vote, and will not gain this right in time to stop these physical and chemical processes, necessitates injunctive relief to prevent future harm from present actions and renders damages wholly inadequate as a remedy.

Courts should be particularly cautious before forgoing adjudication of a dispute on the basis that judicial intervention risks "embarrassment from multifarious pronouncements by various departments on one question," and a "lack of the respect due coordinate branches of government," or because there exists an "unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217. The Supreme Court has repeatedly rejected the view that these thresholds are met whenever a court is called upon to resolve the constitutionality or propriety of the act of another branch of government. *See, e.g., United States v. Munoz-Flores*, 495 U.S. 385, 390-91 (1990) (contention that a statute violated the Origination Clause was not a

---

[15]    While the full impact of unabated climate change will be felt by future generations, the Declarations of Dr. James E. Hansen—establishing that Earth's energy imbalance is caused in large part by the past and present actions of Federal Defendants—delineate the unconstitutionally unacceptable current and near-term risks to Plaintiffs that those actions impose. *See* Dkt. 7-1 at 14-30; Dkt. 47 at 6-9; Dkt. 42-3 (maps indicating sea-level rise risks to Plaintiffs, potentially within decades).

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to**          25
**Dismiss**

political question); *Powell v. McCormack*, 395 U.S. 486, 548, 549 (1969) (challenge to House of Representatives' refusal to seat petitioner not barred by the political question doctrine). Nor may courts decline to resolve a controversy within their competence and proper jurisdiction simply because the question is difficult, the consequences weighty, or that there exists the potential for conflict with policy preferences of the political branches. The exercise of such authority is among the "gravest and most delicate dut[ies] that this Court is called on to perform," *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring), but it is the role assigned courts by the Constitution. The Supreme Court has long held, "[q]uestions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

That this case presents compelling and momentous issues is certain. That fact, however, is not dispositive of this Court's jurisdiction based on respect owed to the other branches. Indeed, this *Baker* factor never comes into play because Plaintiffs ask this Court to interpret and enforce the Constitution and the Public Trust, not to "contradict" or "seriously interfere" with existing law, and certainly not to legislate from the bench.

III.    **DEFENDANT INTERVENORS MISSTATE THE SUPREME COURT'S ANALYSIS OF EQUAL PROTECTION SUSPECT CLASS CLAIMS**

Defendant Intervenors argue equal protection principles apply *only* when a law's purpose is to impermissibly discriminate against members of a protected class, and there is no requirement for government to act to protect citizens' equal protection rights. INT MTD 8.[16] However, the malapportionment line of equal protection cases belies their assertions. In *Reynolds*

---

[16] This argument applies to only one of Plaintiffs' equal protection arguments: suspect classifications. It does not apply to the combined due process/equal protection claim where a fundamental right is at stake. Further, failure to establish a suspect class or intentional discrimination does not mean the claim fails as Defendant Intervenors imply. At minimum, the Court would apply rational basis review.

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                                                          26

*v. Sims*, the Supreme Court held malapportionment in either house of a legislature would be treated as a violation of equal protection, even where there was no demonstration of discriminatory intent. 377 U.S. 533, 568, 577 (1964). In malapportionment cases, the plaintiffs challenged legislative *inaction* because geographic schemes of representation, which may have at one time provided for equal representation, later resulted in malapportionment because of shifting population centers. *Id.* at 540, 567-68. Yet the Supreme Court found an equal protection violation. *Id.* at 565-66 (equal protection requires "the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged.").

The underlying constitutional violation in malapportionment cases shares a commonality with Plaintiffs' claims here: both involve harms that are significantly difficult to redress through the normal political process, and both present questions of fundamental preservative rights, essential in a free and democratic society. *See id.* at 554-56, 560-62; *Yick Wo v Hopkins*, 118 U.S. 356, 370 (1886) (voting rights are "preservative of all rights"). The voters injured by malapportionment cannot rely on the normal political process to redress the injury because the crux of their injury is that they have unequal access to that process. Similarly here, Plaintiffs cannot rely on the normal political process to redress their injuries, resulting from the irreversible impacts of carbon emissions and climate change, since, by the time they are in a position to influence that process, the injury will be a *fait accompli*. In both situations, the affected party cannot rely on "those political processes which can ordinarily be expected to bring about repeal of undesirable legislation"; in this case and the malapportionment cases, plaintiffs face the loss of preservative rights: the right to vote and the right to have vital resources, on which their very lives depend, free from government endangerment. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**                    27

Even if intentional and ongoing discrimination is a necessary component of Plaintiffs'
equal protection suspect class claim, the FAC alleges intentional and ongoing discrimination by
Federal Defendants through a clear, systematic pattern of non-neutral aggregate actions by which
Federal Defendants consistently favor the development of fossil fuels and the short-term interests
of the fossil fuel industry and the current adult generation over the inevitable and foreseeable
adverse consequences such actions are having and will continue to have on Plaintiffs and future
generations. FAC ¶¶ 163, 179, 280, 284, 285, 292-94, 298-301; *see Washington v. Davis*, 426
U.S. 229, 239-42 (1976) ("invidious discriminatory purpose may often be inferred from the
totality of the relevant facts," "which may be proven by systematic exclusion," "non-neutral
selection procedures," or "deliberately and systematically deny[ing]" participation). Federal
Defendants have continuously reaffirmed this course of action resulting in the deliberate and
systematic denial of Plaintiffs' fundamental rights.[17]

---

[17] In exercising their discretion over public trust resources and fossil fuel development, Federal
Defendants have used time discounting mechanisms to evaluate the "social cost of carbon." *See*
Interagency Working Group on Social Cost of Carbon, U.S. Gov't, *Technical Support
Document: Social Cost of Carbon for Regulatory Impact Analyses– Under Executive Order
12866* (Feb. 2010), *available at* http://www.epa.gov/oms/climate/regulations/scc-tsd.pdf. In so
doing, Federal Defendants value future lives and future harms to citizens and property at a
fraction of the value of present lives when performing their cost-benefit analyses, a clear
example of express and deliberate discrimination. *See* Declaration of John Davidson, Dkt. 46, ¶¶
72-74; *Akins v. State of Tex.*, 325 U.S. 398, 403-04 (1945) (Defendants are entitled to require that
those selecting jurors shall not pursue a course of conduct resulting in discrimination in the
selection of jurors on racial grounds. To constitute denial of "equal protection" in selecting
juries, a purpose to discriminate may be proven by systematic exclusion of eligible jurymen of
the proscribed race or by unequal application of the law showing intentional discrimination.); K.
Arrow et al., *Determining Benefits and Costs for Future Generations*, 341 Science 349 (2013);
Daniel A. Farber & Paul A. Hemmersbaugh, *The Shadow of the Future: Discount Rates, Later
Generations, and the Environment*, 46 Vand. L. Rev. 267 (1993); Bradley C. Bobertz, *Toward a
Better Understanding of Intergenerational Justice,* 36 Buff. L. Rev. 165, 179-79 (1987); Paul R.
Portney et al., *Discounting and Intergenerational Equity* (Paul R. Portney & John P. Weyant eds.
1999); Derek Parfit, *Energy Policy and the Further Future: The Social Discount Rate, in Energy
and the Future* 31-37 (Douglas MacLean & Peter G. Brown eds. 1983); Tyler Cowen & Derek
Parfit, *Against the Social Discount Rate, in Justice between Age Groups and Generations* 144-61

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to
Dismiss**                                                                              28

## CONCLUSION

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. "If the issue of justiciability is in doubt, it should be resolved in favor of justiciability in cases of great public interest." *Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709, 717 n.14 (Cal. 1983). Given the growing impacts of climate change in our nation, and the looming crisis as atmospheric concentrations of greenhouse gases reach a tipping point, this case is undoubtedly of great public interest. In spite of Defendant Intervenors' allegation, this Court is presented with a justiciable controversy within its jurisdiction. Defendant Intervenors' motion to dismiss on the ground of displacement or under the political question doctrine must be denied. Courts deal with rights. This case involves broad questions of protecting the interests of these relatively disadvantaged Plaintiffs under the United States Constitution and the Public Trust Doctrine. Cases such as *Brown v. Board of Education* and *Roe v. Wade*, 410 U.S. 113 (1973), produced major change because the other branches of government failed to act or acted in violation of the claimant's rights. Plaintiffs are not asking this Court to decide policy, but rather to determine what the Constitution requires.

Respectfully submitted this 2nd day of February, 2016,

s/ Julia A. Olson
JULIA OLSON (OR Bar 062230)
JuliaAOlson@gmail.com
WILD EARTH ADVOCATES
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

PHILIP L. GREGORY (*pro hac vice*)
pgregory@cpmlegal.com

(Peter Laslett & James S. Fishkin eds. 1992) (explaining difference between legitimately discounting remote effects which are less likely to occur and illegitimately discounting remote effects by giving less weight to the value of future lives).

**Plaintiffs' Memorandum in Opposition to Defendant Intervenors' Motion to Dismiss**    29

COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577

DANIEL M. GALPERN (OR Bar 061950)
dan.galpern@gmail.com
LAW OFFICES OF DANIEL M. GALPERN
1641 Oak Street
Eugene, OR 97401 Tel: (541) 968-7164

*Attorneys for Plaintiffs*