Michelle A. Blackwell (OSB No. 002070)
Blackwell Law PC
1209 Pearl Street
Eugene, OR 97401
Tel: (541) 345-8800
mblackwell@blackwell.law
*Attorney for Amicus Curiae John E. Davidson*


### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### EUGENE DIVISION


| | |
|---|---|
| **KELSEY CASCADIA ROSE JULIANA**; **XIUHTEZCATL TONATIUH M.**, through his Guardian Tamara Roske-Martinez; et al. | Case No.: 6:15-cv-01517-TC |
| Plaintiffs, | MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF |
| v. | |
| **The UNITED STATES OF AMERICA**; **BARACK OBAMA**, in his official capacity as President of the United States; et al., | *Without Oral Argument* |
| Federal Defendants. | |

_____

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF

Professor John E. Davidson respectfully requests permission to file the attached *amicus curiae* brief in support of Plaintiffs in this case. Pursuant to Local Rule 7-1(a), the undersigned hereby certifies that a good faith effort was made to confer with counsel for Plaintiffs, Federal Defendants, and Intervenors on this motion. Plaintiffs consent to the motion and *amicus curiae*'s participation. Federal Defendants and Intervenors positions are unascertained.  This Motion is supported by the points and authorities below and the records and files herein.

Federal district courts possess the inherent authority to accept *amicus* briefs. *See, e.g., Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner,* 515 U.S. 472 (1995); *In re Bayshore Ford Truck Sales, Inc.,* 471 F.3d 1233, 149, n.34 (11th Cir. 2006) ("[D]istrict courts possess the inherent authority to appoint 'friends of the court' to assist in their proceedings."); *Jin v. Ministry of State Security*, 557 F. Supp. 2d 131, 136 (D. D.C. 2008) ("[D]istrict courts have inherent authority to appoint or deny *amici* which is derived from Rule 29 of the Federal Rules of Appellate Procedure."); *United States v. Davis*, 180 F. Supp. 797, 800 (E.D. La. 2001) (noting that district courts have authority to permit the filing of *amicus* briefs). The role of *amicus* briefs is to assist the court "in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision." *Newark Branch, N.A.A.C.P. v. Town of Harrison*, N.J., 940 F. 2d 792, 808 (3d Cir. 1991).

John Davidson has been researching the subject of intergenerational justice for over twenty-five years and it has been his primary field of study for the past fifteen years. He has focused on questions as to whether and how principles of intergenerational obligation are

expressly and implicitly imbedded in the United States Constitution, and whether and how those principles should affect constitutional interpretation, government action, and the exercise of judicial review. In researching those questions, he has thoroughly examined historical records expressive of the intergenerational philosophies and principles prevalent among the framers, as well as the text of the Constitution itself, and other foundational documents.

When John Davidson became aware of this litigation, involving as it does constitutional claims brought on behalf of Posterity and minor children to prevent government action and inaction alleged to be causing irreversible harms to critical public interests, he determined that his perspective might be of assistance to the court as it attempts to evaluate such novel and significant claims.

Proposed *amicus curiae* respectfully submit that an *amicus* brief is both necessary and helpful to this Court. John Davidson brings a perspective on the legal issues involved that is distinct from the Plaintiffs. The proffered brief reviews key constitutional issues, including the reserved powers doctrine, the intergenerational philosophy of the framers of the constitution, the constitutional protections for life, liberty, and property, and the constitutional rights of Posterity, or future generations. The legal issues in this case are of exceptional importance for this nation, for our federal courts, and for constitutional jurisprudence. Historical records and literature, as well as scholars' insights on those documents, are frequently review by courts when considering important constitutional claims, or constitutional claims that present an issue of first impression. *See, e.g., McDonald v. Chicago*, 561 U.S. 742 (2010). Considering John Davidson's analysis of the historical underpinnings of Plaintiffs' constitutional and public trust claims and his thorough review and evaluation of the historical records and literature, this *amicus* brief will help this

Court in analyzing the important legal claims presented by this case. Accordingly, John

Davidson requests leave to file the attached *amicus curiae* brief.

      DATED this 24th day of February, 2016.

      Respectfully submitted,

<div style="margin-left: 40%;">

s/ Michelle A. Blackwell
Michelle A. Blackwell (OSB No. 002070)
Blackwell Law PC
1209 Pearl Street
Eugene, OR 97401
Tel: (541) 345-8800
mblackwell@blackwell.law

*Attorney for Amicus Curiae John E.*
*Davidson*

</div>

Michelle A. Blackwell (OSB # 002070)
1209 Pearl St.
Eugene, OR 97401
Tel:  541-345-8800
Email: mblackwell@blackwell.law


*Attorney for Amicus Curiae John Davidson*


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


| | |
|---|---|
| **KELSEY CASCADIA ROSE JULIANA**; **XIUHTEZCATL TONATIUH M.**, through his Guardian Tamara Roske-Martinez; et al. | Case No.: 6:15-cv-01517-TC |
| Plaintiffs, | *AMICI CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS |
| v. | |
| **The UNITED STATES OF AMERICA**; **BARACK OBAMA**, in his official capacity as President of the United States; et al., | |
| Federal Defendants. | |

_____


*AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS                                    i

## TABLE OF CONTENTS

**TABLE OF CONTENTS**                                                                    ii

**TABLE OF AUTHORITIES**                                                                 iii

**I.      IDENTITY AND INTEREST OF AMICUS CURIAE**                                        1

**II.     SUMMARY OF ARGUMENT**                                                          2

**III.    ARGUMENT**                                                                     3

    **a.  The Reserved Powers Doctrine**                                                3

        **i.  Rule against Legislative Entrenchment**                                  3

        **ii.  Public Trust Doctrine as an Aspect of the RPD**                          6

        **iii.  Application of Reserved Powers to Federal Government**                   7

    **b.  Intergenerational Philosophy of Framers and Predecessors**                  8

        **i.  John Locke**                                                             8

        **ii.  Founders' Pervasive Concern for Future Generations**                    16

        **iii.  Natural Resources in the Framers' Philosophy**                         20

    **c.  Unalienable (Intergenerational) Rights to Life, Liberty, Property**          26

    **d.  Uniform Time Discount Rate Violates Intergenerational Justice**              28

**IV.    CONCLUSION**                                                                    29

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Fletcher v. Peck*, 10 U.S. 87, 135 (1810). ................................................................. 4-5

*Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387 (1892). ............................. 2, 6-7

*Newton v. Commissioners of Mahoning County*, 100 U.S. 548 (1879 ...................... 5-6

*Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932). ................................................. 8

*Stone v. Mississippi*, 101 U.S. 814, 817-20 (1879) ................................................. 5

*United States v. Winstar Corp.*, 518 U.S. 839, 888 (1996). ..................................... 8


### <u>Constitutional Provisions</u>

Haw. Const. art. IX, § 1 ...........................................................................................25

Ill. Const. art XI, § 1. ..............................................................................................25

Mont. Const. art. IX, § 1 ..........................................................................................25

Pa. Const. art. I, § 27 ...............................................................................................25

U.S. Const., Am. V ..................................................... 2-3, 12, 13, 26, 27, 28

U.S. Const., Am. XIV ..................................................................................... 2-3

U.S. Const. Art. I, Sec. 9, 10, ..................................................................................18

U.S. Const. pmbl. ..............................................................................................27, 29


### <u>Statutes</u>

National Environmental Policy Act of 1969, § 101(b)(1), 42 U.S.C. § 4331(b)(1) (1970) .........25

Virginia's 1786 Statute for Religious Freedom....................................................................4

iii

**Other Authorities**

2 Blackstone, Commentaries ........................................................................................3, 12, 23, 25

8ᵗʰ Thesis, in Kant's Political Writings 50 (H Reiss ed., H.B. Nisbet trans. 1970). ....................19

A.E. Dick Howard, *Commentaries on the Constitution of Virginia* (1974). .............................27

Adrienne Koch, *Jefferson and Madison: the Great Collaboration* (Alfred A. Knopf 1950). ........9

Agrippa [James Winthrop] X *Mass Gazette* (Boston) Jan. 1, 1788 .............................................19

Alan Craig Houston, *Algernon Sidney and the Republican Heritage in England and America* (1991). ........................................................................................................................................9

Alexander Hamilton, New York Convention, (June 1788) .........................................................19

Annette Baier, *For the Sake of Future Generations in Earthbound: New Introductory Essays in Environmental Ethics* (Tom Regan ed. 1984) ........................................................................19

Argument of the United States, *Fur Seal Arbitration* (U.S. v. Gr. Brit. 1893), *reprinted in* 9 Fur Seal Arbitration: Proceedings of the Tribunal of Arbitration (Gov't Printing Office 1895), also reprinted in 1 John Bassett Moore, History and Digest of the International Arbitrations to Which the United States Has Been A Party 755, 813-14 (1898). ............................................25

Carl L. Becker, *The Declaration of Independence: A Study in the History of Political Ideas* (1942) ........................................................................................................................................9

Charles A. Miller, *Jefferson and Nature: An Interpretation,* chap. 5, esp. 161-64. (Baltimore, 1988). ......................................................................................................................................21

Cicero, *Letters to Atticus* ...........................................................................................................3

Clark Wolf, *Contemporary Property Rights, Lockean Provisos, and the Interests of Future Generations*, 105 Ethics 791-818 (1995). ......................................................................9, 14

Clinton Rossiter, *Seedtime of the Republic* (1952) ......................................................................9

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

David A. Weisbach & Cass R. Sunstein, *Climate Change and Discounting the Future: A Guide for the Perplexed*, Reg-Markets Center Working Paper No. 08-19, Harvard Public Law Working Paper No. 08-20; Harvard Law School Program on Risk Regulation Research Paper No. 08-12, at 11 (Aug. 12, 2008) ...........................................................................29

David Dana & Susan Koniak, *Bargaining in the Shadow of Democracy*, 148 U. Pa. L. Rev. 473 (1999) ...............................................................................................................................4

David Hume, *Enquiries Concerning the Human Understanding and Concerning the Principles of Morals* 535 (Selby et al. eds. 1777). .........................................................................19

David N. Mayer, *The Constitutional Thought of Thomas Jefferson* (1994) ................................21

David Ramsey, *Columbian Herald,* Charleston, South Carolina, June 5, 1788 ..........................19

Douglas Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 Ariz. St. L.J. 849 (2001) .........................................................................7

Duncan, *Property as a Public Conversation, Not a Lockean Soliloquy: A Role for Intellectual and Legal History in Takings Analysis*, 26 Envtl. L. 1095, 1122 (1996) ..................15

Edmund Burke, *Reflections on the Revolution in France* (Dolphin ed. 1961). ..........................20

Elliot, *Future Generations, Locke's Proviso and Libertarian Justice*, 3 J. Applied Philosophy 217 (1986) ...................................................................................................................15

English *Bill of Rights* .................................................................................................................17

Eric A. Posner & Adrian Vermeule, *Legislative Entrenchment: A Reappraisal*, 111 Yale L.J. 1665 (2002). ....................................................................................................................3

Forrest McDonald, *Novus Ordo Seclorum: The Intellectual Origins of the Constitution* (1985) ..9

Francis Bacon, *The History of the Reign of King Henry VII* (1622) ............................................3

George Mason to George Washington, April 2, 1776, *The Papers of George Mason* 1:435 ......18

H. Commager, "America in Its Third Century – What Prospects?" (address before the National Town Meeting at the John F. Kennedy Center for the Performing Arts, Washington, D.C., March 17, 1976) ..........................................................................................................17

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Herbert Sloan, *Principles and Interest*, 60. .......................................................22, 25

Immanuel Kant, *Idea for a Universal History* (1784) ...............................................19

James Wilson, Opening address to the Pennsylvania ratifying convention (Nov. 24, 1787) .......19

Jim Gardner, *Discrimination Against Future Generations: The Possibility of Constitutional Limitation*, 9 Envtl. L. 29 (1978).............................................................................17

John C. Roberts & Erwin Chemerinsky, *Entrenchment of Ordinary Legislation: A Reply to Professors Posner and Vermeule*, 91 Calif. L. Rev. 1773 (2003). ..........................................3, 7

John Locke, *First Treatise* ......................................................................................12

John Locke, *Second Treatise* ................................................................10, 11, 15, 23

John Locke, *Two Treatises of Government* (1689) (Peter Laslett ed., 2d ed. 1967) ....................10

John Sanders, *Justice and the Initial Acquisition of Property*, 10 Harv. J.L. & Pub. Pol'y 390-91 (1987). ...............................................................................................................14

Joseph Ellis, *American Sphinx: The Character of Thomas Jefferson* 56-65 (Random House, New York 1998) ..........................................................................................................22, 28

Julian Eule, *Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity*, 12(2/3) Am. B. Found. Res. J. 379 (1987) ..............................................................................4

Kathleen M. Squadrito, *Locke's View of Dominion*, 1 Envtl. Ethics 255, 259 (1979) ................11

Letter from Thomas Jefferson to Richard Henry Lee, May 8, 1825, in *Boyd* ................................9

*Letters and Other Writings of James Madison* (1867) ................................................13

Lev. 26:14, 32, 35 ......................................................................................................10

M. Farrand, The Records of the Federal Convention of 1787.......................................................18

*Magna Carta* ............................................................................................................17

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Merrill D. Peterson, *Thomas Jefferson and the New Nation: A Biography* (New York 1970) ......9

Merrill Peterson, *Thomas Jefferson's 'Sovereignty of the Living Generation,'* 52 Virginia
    Quarterly Review 437-44 (1976) ...........................................................................21

Michael J. Klarman, *Majoritarian Judicial Review: The Entrenchment Problem*, 85 Geo. L. J.
    491 (1997) ..............................................................................................................4

Nathaniel Barrell to George Thatcher, Boston (January 15, 1788) ..............................19

Psalms 115:16...........................................................................................................10

Restatement (2d.) of the Law of Property § 12.1 (1) (1977) ........................................11

Scott D. Gerber, *To Secure These Rights: The Declaration of Independence and Constitutional
    Interpretation* (1995) ...........................................................................................9, 11

Sir Robert Chambers, *A Course of Lectures on the English Law, Delivered at the University of
    Oxford, 1767-1773,* 2:85, 2 vols. (Thomas M. Curley ed., Madison, Wis., 1986). ...................23

South Carolina's Ratification Proclamation (May 23, 1788) in Bailyn .......................27

Squadrito, *Locke's View of Dominion* ........................................................................15

Sutton, *Revolution to Secession: Constitution Making in the Old Dominion* (1987)...................27

The Federalist No. 10 (James Madison) ................................................................ 29-30

The Papers of George Mason (Robert A. Rutland ed. 1970) ......................................18

Thomas Jefferson to James Madison, September 6, 1789, in *Boyd* XV......................4, 21, 22, 24

Thomas Jefferson to John W. Eppes, Monticello, June 24, 1813**,** *The Writings of Thomas
    Jefferson* vol. XIII, 269-270 ................................................................................23, 24

Thomas Jefferson to Lafayette, April 11, 1787, in *The Portable Thomas Jefferson*....................24

Thomas Jefferson to Thomas Earle , September 24, 1823 ......................................22, 24

Thomas Jefferson, *Commonplace* ...............................................................................24

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Thomas Jefferson, *Notes on Virginia*, query XIII ...................................................... 18

Thomas Paine, *Agrarian Justice* ................................................................................. 25

Thomas Paine, *Common Sense*, Jan.1776 (Dover Publications, New York: 1997) ..................... 18

Thomas Paine, *The Rights of Man* (1791) in *Thomas Paine: Collected Writings* (Eric Foner ed., New York 1995). ............................................................................ 20

U.S. Declaration of Independence (1776) ............................................... 12, 17, 27, 28

U.S. Interagency Working Group on Social Cost of Carbon, "Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866" (2010) ........................................................................................... 29

Virginia Declaration of Rights ................................................................. 12, 26, 27

W. Hamilton Bryson, *The Use of Roman Law in Virginia Courts*, 28 Am. J. Legal Hist. 135-46 (1984) ........................................................................................... 22

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

## I.      Identity and Interest of Amicus

John Davidson has been researching the subject of intergenerational justice (the ethicaland legal rights and responsibilities that exist between earlier and later generations within a political society) for over twenty-five years.  It has been his primary field of study for the past fifteen years.  He has focused especially on questions as to whether and how principles of intergenerational obligation are expressly and implicitly imbedded in the United States Constitution, and whether and how those principles should affect constitutional interpretation, government action, and the exercise of judicial review. In researching those questions, he has thoroughly examined historical records expressive of the intergenerational philosophies and principles prevalent among the framers, as well as the text of the Constitution itself, and other foundational documents.

Professor Davidson received his J.D. from the University of Oregon School of Law in 1992.  After graduation from law school, he operated a small private practice and clerked for the Oregon Court of Appeals.  For the past 14 years, he has served as a Professor and Instructor in the Political Science department of the University of Oregon, where he teaches courses on the subjects of constitutional law and intergenerational justice.

When Professor Davidson became aware of this litigation, involving as it does constitutional claims brought on behalf of Posterity and minor children to prevent government action and inaction alleged to be causing irreversible harms to critical public interests, he determined that his perspective might be of assistance to the court as it attempts to evaluate such novel and significant claims.

1

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

II.    **Summary of Argument**

The Reserved Powers Doctrine, consistently recognized by the courts since this nation's inception, holds that one legislature may not legitimately infringe upon the equal sovereignty of later legislatures. The *Illinois Central* case established that certain critical natural resources are so essential to the long term wellbeing of the public that they must be treated as aspects of government, subject to reserved powers of later legislatures and the later publics that those legislatures represent. This principle prohibits earlier legislatures and agencies from pursuing policies that infringe on the equal interests of later generations in such critical resources. At the state level, this special application of the Reserved Powers Doctrine in the natural resource context now goes by the name of the Public Trust Doctrine. The Reserved Powers Doctrine is logically applicable to the federal government, and both the Supreme Court and government attorneys have recognized such application. Presumably, then, a natural resource aspect of the Reserved Powers Doctrine, analogous to the Public Trust Doctrine, also applies to the federal government

The principles of generational sovereignty and resource preservation that underlie the Reserved Powers Doctrine were a fundamental part of the political philosophy of this nation's founders and framers. John Locke discussed the principles in great detail, as did Jefferson and others of the founders. The rights to "life, liberty and property" were premised on a set of intergenerational duties, the most important being preservation of the human species. They would later be understood as "unalienable" rights, which, to the founders was understood as a shorthand for rights "of which, . . . [one generation] cannot, by any compact, deprive or divest their posterity." These rights were eventually incorporated into the Fifth and Fourteenth

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Amendments due process clauses, and therefore lie at the core of "substantive due process" doctrine.

The uniform discount rate currently applied by Defendant agencies, which treats future lives and deaths as having a fraction of the value of current lives and deaths, violates the rights to life, equal protection and due process that the framers intended to apply to both "ourselves and our Posterity."

### III.    Argument

### A. The Reserved Powers Doctrine

The ancient principle known modernly as the "reserved powers" doctrine recognizes that one legislature may not legitimately infringe upon the equal sovereignty of later legislatures.

1.    Future Legislatures and the Rule Against Legislative Entrenchment

One of the longest recognized applications of the reserved powers doctrine is the rule against legislative entrenchment: one legislature cannot bind a later legislature by enacting an irrepealable law. This rule is as close to an axiomatic principle of government as is known to jurisprudence,[1] having been endorsed by (among others) Cicero,[2] Bacon,[3] and Blackstone[4] before its adoption within American law and jurisprudence.

---

[1] For an extensive discussion of this traditional rule, *see* John C. Roberts & Erwin Chemerinsky, *Entrenchment of Ordinary Legislation: A Reply to Professors Posner and Vermeule*, 91 Calif. L. Rev. 1773 (2003). For a rare dissenting position, *see* Eric A. Posner & Adrian Vermeule, *Legislative Entrenchment: A Reappraisal*, 111 Yale L.J. 1665, 1666 (2002).

[2] Cicero, *Letters to Atticus* ("When you repeal the law itself, you at the same time repeal the prohibitory clause which guards against such repeal.").

[3] Francis Bacon, *The History of the Reign of King Henry VII* (1622) ("One Parliament may not by a precedent act . . . bind or frustrate a future [Parliament].").

[4] William Blackstone, *Commentaries on the Laws of England* (1769) ("The legislature, being in truth the sovereign power, is always of equal, always of absolute authority: it acknowledges no superior upon earth, which the prior legislature must have been if its ordinances could bind a subsequent parliament.").

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Although the principle is often expressed in terms of the inherent powers of a legislature or a parliament, the rule also vindicates a more general notion of generational sovereignty. Each sitting legislature derives its legitimate authority from the particular public that elects it. Recognizing the rights and powers of later legislatures is a way of recognizing the rights and powers of Posterity—the later incarnations of the citizenry who elect those later legislatures.[5] As Thomas Jefferson once famously reminded James Madison, "between society and society, or generation and generation, there is . . . no umpire but the law of nature. . . . one generation is to another as one independent nation to another."[6]

The reserved powers of later generations, and the companion rule against legislative entrenchment, have been recognized in the United States since the nation's inception. A typical example is Virginia's 1786 Statute for Religious Freedom, authored by Thomas Jefferson, which provides: "This assembly elected by the people for the purposes of normal legislation only, [has] no power to restrain the acts of succeeding assemblies, constituted with powers equal to our own . . . . Therefore to declare this act to be irrevocable would be of no effect in law."

As early as 1810, in *Fletcher v. Peck*, the Supreme Court recognized "[t]he principle . . . that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature. The

---

[5] *See* Julian Eule, *Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity*, 12(2/3) Am. B. Found. Res. J. 379 (1987) (the rule is an instance of the principle that an agent's powers may not exceed the legitimate powers of the principal); Michael J. Klarman, *Majoritarian Judicial Review: The Entrenchment Problem*, 85 Geo. L. J. 491, 491-92 (1997) (today's majority can control the present, but not the future); David Dana & Susan Koniak, *Bargaining in the Shadow of Democracy*, 148 U. Pa. L. Rev. 473, 533 (1999) ("If majority rule means anything, it means rule by the current majority and not by a majority of the past. That is the point of elections.").

[6] Thomas Jefferson to James Madison (Sept. 6, 1789).

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

4

correctness of this principle, so far as respects general legislation, can never be controverted." 10 U.S. 87, 135 (1810).

Subsequently, the Supreme Court confirmed that contracts dealing with core governmental powers would be treated as voidable and repealable under traditional reserved powers principles. In *Stone v. Mississippi*, for instance, the Supreme Court upheld a state legislature's criminalization of lotteries in the face of an earlier legislature's grant of private lottery franchises:

> [T]he legislature cannot bargain away the police power of a State. Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State; but no legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police. . . . No legislature can bargain away the public health or the public morals. . . . The supervision of both these subjects of governmental power is continuing in its nature. . . . [T]he power of governing is a trust committed by the people to the government, no part of which can be granted away.

101S. 814, 817-20 (1879) (quotations omitted).

In *Newton v. Commissioners of Mahoning County*, 100 U.S. 548 (1879), the Court had cause to further elaborate on this principle. The Court sustained the Ohio legislature's statutory relocation of a county seat over objections that the prior statutory assignment of the seat to a different town was perpetual. *Id.* The Court explained that the contracts exception to the reserved powers doctrine (articulated in *Fletcher*) was inapplicable when "the statute in question is a *public law* relating to a *public subject* within the domain of the general legislative power of the State, and involving the *public rights* and *public welfare* of the entire community affected by it." *Id.* at 557.

> In all these cases, there can be no contract and no irrepealable law, because they are 'governmental subjects,' and hence within the category before stated. They involve *public interests*, and legislative acts concerning them are necessarily *public laws*. Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require. A different result would be fraught with evil.

*Id.* at 559.

2.   The Public Trust Doctrine as an Aspect of the Reserved Powers Doctrine

In *Illinois Central Railroad Co. v. Illinois*, the Supreme Court indicated that the management of critical natural resources was sufficiently governmental that, pursuant to the reserved powers doctrine, control of such resources could not be wholly privatized so as to impair the sovereignty of later legislatures and generations. 146 U.S. 387 (1892). At issue were submerged lands beneath the Chicago harbor, which the Illinois legislature had purportedly granted to the Illinois Central Railroad. The first portion of the Court's opinion outlined the history of the Public Trust Doctrine as it had historically been applied to government interests in water and submerged lands, while outlining a theory of sovereign resources that extended beyond a narrow concern with such lands.

The state can no more abdicate its trust over property in which the whole people are interested, *like* navigable waters and soils under them, so as to leave them entirely under the use and control of private parties. . . than it can abdicate its police powers in the administration of government and the preservation of the peace. . . Any grant of the kind is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time. . . The trust with which they are held, therefore, is *governmental*, and cannot be alienated . . . .

*Ill. Cent. R.R.*, 146 U.S. at 453-55 (emphases added).

The Supreme Court grounded the latter portion of its *Illinois Central* opinion directly in the reserved powers analysis of *Newton v. Commissioners*:

In Newton v. Commissioners, . . . [the Court held] that there could be no contract and no irrepealable law upon governmental subjects, observing that legislative

6

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

acts concerning public interests are necessarily public laws; that every succeeding legislature possesses the same jurisdiction and power as its predecessor; that the latter have the same power of repeal and modification which the former had of enactment,-neither more nor less; that all occupy in this respect a footing of perfect equality; that this is necessarily so, in the nature of things; that it is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies attending the subject may require; and that a different result would be fraught with evil. . . . As counsel observe, if this is true doctrine as to the location of a county seat, it is apparent that it must apply with greater force to the control of the soils and beds of navigable waters in the great public harbors held by the people in trust for their common use and of common right, as an incident to their sovereignty. The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. . . . Every legislature must, at the time of its existence, exercise the power of the state in the execution of the trust devolved upon it.

*Id.* at 459-60.

It is significant that *Illinois Central* did not just reject formal, *de jure* legislative entrenchment. The earlier Illinois legislature had not expressly forbidden later legislatures from acting in the areas of land use or water management. But the legislative grant at issue had the practical effect or restricting later legislatures' equal freedom to provide equivalent opportunities and protections to the public that they would represent, by materially foreclosing certain options. These cases reflect the principle that the *de facto* destruction of a resource or opportunity offends reserved powers principles as much as, or more than, the formal legislative entrenchment of a policy provision.

     3.   Application of the Reserved Powers Doctrine to the Federal Government

Logic and precedent suggest the reserved powers doctrine applies to the federal government as much as to state governments.[7] Each iteration of Congress, just like each

---

[7] *See* Douglas Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 Ariz. St. L.J. 849, 877 (2001) ("[T]here is no reason why the reserved powers doctrine, with its inalienability principle, should not apply at the federal level as well as the state level."); Roberts & Chemerinsky, *supra* note 1, at 1795-1801.

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

iteration of a state legislature, is entitled to exercise the same powers as its predecessors, and to be protected from having those powers encroached upon by an earlier legislature's enactments and policies. The Supreme Court recognized as much in *Reichelderfer v. Quinn*: "The will of a particular Congress ... does not impose itself upon those to follow in succeeding years." 287 U.S. 315, 318 (1932). More recently, in its briefs for *United States v. Winstar Corp.*, the federal government acknowledged: "[t]he logic of the [reserved powers] doctrine ... applies equally to contracts alleged to have been made by the federal government." 518 U.S. 839, 888 (1996).

There is no obvious reason why the environmental aspect of the reserved powers doctrine—the requirement that government respect the equal rights of future legislatures and generations to manage and benefit from sovereign resources over time—would not apply to the federal government. While some resources are of primarily local significance, and therefore primarily matters of state trust responsibility, other resources have interstate or international significance and would therefore seem to entail corollary federal rights and responsibilities. Although the current Court has suggested that the Public Trust Doctrine is purely a matter of state law, it has never been called upon to determine whether a parallel, natural resource aspect of the Reserved Powers Doctrine applies at the federal level.

**B. Intergenerational Philosophy of the Framers and Their Predecessors**

1. John Locke

The reserved powers doctrine is just one aspect of a much broader set of intergenerational justice principles recognized by the American founders and their ideological predecessors. In the late 16th and the 17th Centuries, English rights theorists such as Algernon Sidney and John Locke elaborated and refined traditions of intergenerational rights and responsibilities inherited from

the ancient Greeks and Romans. After their deaths, their theories exerted a profound influence upon America's founders.[8]

The tremendous influence of John Locke's thought on the early American republic has been amply documented, and I will not reiterate that scholarship here.[9] But at least one aspect of Locke's influence deserves more attention than it has hitherto received. Locke's theories of intergenerational obligation and stewardship, which lie at the heart of his political philosophy, have received far too little attention from the legal community.[10] By contrast, those same ideas were intimately familiar to America's founders.[11] Locke's views are essential components to a full understanding of the founders' ideas of intergenerational justice, and how those views might apply to modern issues.

---

[8]*See* Carl L. Becker, The Declaration of Independence: A Study in the History of Political Ideas (Random House 1942) 75 (noting that among revolutionary leaders "the political writings of Locke, Sidney, and Milton are frequently mentioned with respect and reverence"). Letter from Thomas Jefferson to Richard Henry Lee, May 8, 1825, in *Boyd* 16: 118-19 (Jefferson said of the Declaration of Independence: "All its authority rests then on the harmonizing sentiments of the day, whether expressed in conversation, in letters, in printed essays, or in the elementary books of public right, as Aristotle, Cicero, Locke, Sidney, etc."). *See also* Alan Craig Houston, Algernon Sidney and the Republican Heritage in England and America (Princeton Univ. Press, Princeton, NJ: 1991).

[9]*See* Scott D. Gerber, To Secure These Rights: The Declaration of Independence and Constitutional Interpretation 27-29 (New York University Press, New York & London 1995) (detailing Locke's influence on Jefferson, James Otis, John and Samuel Adams, James Wilson and Alexander Hamilton); Forrest McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution ix (Lawrence, Kansas 1985) ("that the central argument of the Declaration is based mainly upon John Locke's Second Treatise is indisputable"); *id.* at 7 (noting Locke's influence in the constitutional convention); Clinton Rossiter, Seedtime of the Republic (New York 1952) (esp. ch. 12); Carl L. Becker, The Declaration of Independence: A Study in the History of Political Ideas 27 (Random House 1942) ("most Americans had absorbed Locke's work as a kind of political gospel").

[10]*But see* Clark Wolf, *Contemporary Property Rights, Lockean Provisos, and the Interests of Future Generations*, 105 Ethics 791-818 (1995).

[11]For a discussion of Locke's influence on Jefferson's generational philosophy, *see* Merrill D. Peterson, Thomas Jefferson and the New Nation: A Biography 383 (New York 1970); Adrienne Koch, Jefferson and Madison: the Great Collaboration 65, 76, 78 (New York, Alfred A Knopf 1950).

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

John Locke's system of intergenerational ethics can be summarized in the form of five primary mandates: 1) We must preserve the human species; 2) We must treat the earth as though we were tenants, rather than owners; 3) We must not waste or destroy creation; 4) We must leave behind "enough and as good" for others; and 5) We must honor and preserve to the extent possible each generation's right to make its own political choices.

### *Preservation of the Human Species*

At the heart of Locke's system of intergenerational ethics is a concern for *preservation of the human species.* That is the primary and fundamental law, which is the standard and measure of all the other natural laws.[12] Of course, the principle has many more direct applications today than it did in Locke's time. In the 17th century, it would have been difficult to conceive of any action or set of actions which could entirely eliminate humanity. Today we can imagine such scenarios all too easily.

### *Acting as Tenants*

Locke adhered to the biblical notion that the earth exists for humankind as a sort of intergenerational commons. He cites King David for the proposition that "God gave the world to Adam and his posterity in common."[13] This notion fixes all real property interests as varying species of tenancy or trust. One of a tenant's chief obligations is to maintain property in as good

---

[12] John Locke, *Two Treatises of Government* ¶¶ 7, 16, 134, 135, 149, 159, 171, 183 (1689) (Peter Laslett ed., 2d ed. 1967).
[13] Locke, *Second Treatise*, ¶ 25 (citing *Psalms* 115:16) and ¶ 34. *See also* Lev. 26:14, 32, 35 ("The land must not be sold permanently, because the land is mine and you are but aliens and my tenants.").

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

and useful a condition as originally received.[14] Accordingly each generation, as tenant, is expected to steward the earth for both the landlord (God) and later tenant-generations. Scott Gerber paraphrases Locke aptly: "Every individual is acting as a trustee of his Creator's property, with the purpose of the trust being the preservation of mankind."[15] The use of the landlord-tenant analogy to describe intergenerational relations was anything but new by Locke's time. The metaphor was destined to become standard fare among the founders and their contemporaries.

### Eschewing Spoilage, Waste, and Destruction

A natural corollary to the "world as commons" idea is Locke's absolute prohibition against waste and destruction. If all our possessions are but temporary gifts from the Creator, then we obviously have an obligation to exercise due care in our custody of those possessions. "Nothing was made by God for man to spoil or destroy."[16]

Locke applies this prohibition in various ways. For instance, an individual in the state of nature who claimed a property interest in particular fruits of nature was bound to use or consume the claimed fruits before they spoiled, "else he took more than his share and robbed others."[17] While this prohibition of waste or spoilage could be understood simplistically as no more than a mandate for resource development,[18] there is more to it than that. In paragraph 6 of the *Second*

---

[14]*See, e.g.*, Restatement (2d.) of the Law of Property § 12.1 (1) (1977) (Tenants have the right to reasonable use of property, but must return it in good condition).
[15]Gerber, *supra* note 10, at 45.
[16]*Id. at* ¶ 31; *see also* Kathleen M. Squadrito, *Locke's View of Dominion*, 1 Envtl. Ethics 255, 259 (1979) ("The view of dominion that Locke adopts in *Some Thoughts Concerning Education* is one of responsible stewardship, an interpretation of Genesis that stresses man's duties and obligations towards all creation. . . To spoil or waste any part of God's creation is a sin.").
[17]Locke, *Second Treatise* at ¶ 46.
[18]*See id.* at ¶ 34 ("God gave the world to men in common; but . . . it cannot be supposed He meant it should always remain common and uncultivated") and ¶ 42 ("Land which is wholly left

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

*Treatise*, Locke identifies *preservation* as an affirmative value to be weighed alongside other values and property interests:

> ". . .[T]hough [the state of nature] be a state of liberty, yet it is not a state of license; though man in that state have an uncontrollable liberty to dispose of his person or possessions, *yet he has not liberty to destroy himself, or so much as any creature in his possession, but where some nobler use than its bare preservation calls for it.* The state of nature has a law of nature to govern it, which obliges every one. . ."[19]

Locke demands that an appropriate balance be struck between legitimate preservation interests and legitimate development interests. A failure to strike the appropriate balance constitutes "destruction, spoilage, and waste."[20]

In that same paragraph 6, Locke makes his famous assertion that "Reason . . . teaches all mankind who will but consult it, that, being all equal and independent, no one ought to harm another in his life, health, liberty, or possession." This passage is one of the primary sources for the "life, liberty, property" formulation that appears in various forms in the Virginia Declaration of Rights, the Declaration of Independence,[21] and the Due Process clause of the Fifth

---

to Nature, that hath no improvement of Pasturage, Tillage, or Planting is called, as indeed it is, *waste*. . ."

[19]*Id. at ¶* 6 (emphasis supplied). *See also* Locke, *First Treatise* ¶¶ 50-56 (God does not permit us "to destroy those he has given us the Charge and Care of"; God requires us to preserve his creation).

[20]In contemplating which modern practices Locke might condemn as "waste," it is helpful to consider the legal sense of "waste" which prevailed in pre-revolutionary England and which remains largely unchanged. *Waste* was defined by Blackstone as "a spoil or destruction in houses, gardens, trees, or other corporeal hereditaments, to the disheison of him that hath the remainder or reversion." 2 Blackstone, Commentaries at 281. This legal doctrine of waste is addressed more towards the prevention of *over-* or *mis-*utilization of resources than towards prevention of underutilization. In so far as the waste doctrine concerns itself with the protection of successors' interests, it readily lends itself to the analysis of intergenerational issues.

[21]"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness."

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Amendment,[22] and it therefore warrants special attention. In Locke's view, these inviolable personal liberties and property rights are, from their inception, subject to restraints against spoilage and destruction. In other words, while no individual ought to be wrongfully deprived of life, liberty, or possessions, those rights *never* extend so far as to include spoilage or destruction of the natural world, especially if that destruction could constitute a threat to preservation of the human species. This principle applies to governments as well as to individuals.

> "[The legislative power] can be no more than those persons had in a state of nature before they entered into society. . . [and a person has] in the state of nature no arbitrary power over the life, liberty, or possession of another, but only so much as the law of nature gave him for the preservation of himself, and the rest of mankind."

*Id.* at par. 135.

Any interpretation of Due Process rights based upon the founders' original intent must take this philosophic background into account.

*Leaving enough behind*

The above three principles imply a fourth: the "leave enough behind" rule, or "Locke's Proviso." According to this Proviso, an individual can legitimately create personal property interests in the bounties of nature only so long as *"there is enough and as good left in common for others."*[23] Locke applied this rule to the appropriation of land, water, animals, and the fruits of the earth.[24]

---

[22]U.S. Const., Am. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . ..").

[23]*Id.* at ¶ 27 (emphasis supplied); *see also* 4 Letters and Other Writings of James Madison 478 (property "embraces everything to which a man may attach a value and have a right, and *which leaves to every one else the like advantage"*)(emphasis in original).

[24]*Id.* at ¶ 32; *see also* ¶ 33 ("Nobody could think himself injured by the drinking of another man, though he took a good draught, who had a whole river of the same water left to quench his thirst; and the case of land and water, where there is enough of both, is perfectly the same.").

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

The Proviso was probably articulated with in*tra*generational concerns in mind, more than

in*ter*generational ones. Writing in the 17th century, Locke could not foresee how the over-

appropriation or overutilization of natural resources by one or more generations would prejudice

later generations: he expressly noted that "there is land enough in the world to suffice double the

inhabitants."[25] Over the intervening centuries, however, the world's population has doubled

many times over, and Locke's basic principles of just resource appropriation have implications

today that were not readily apparent when he first formulated them.

Extending the Proviso's coverage to include future generations gives due effect to the

underlying principles of equity and affected interest upon which the Proviso is based.[26] To

require that a person appropriating property leave "enough and as good" for the earth's future

tenants as well as its present tenants is to honor Locke's emphasis on the preservation of the

species along with his view of the Earth as an intergenerational commons. Read in this way, the

Proviso prohibits a variety of unsustainable practices – practices which result, individually or

cumulatively, in the depletion or spoilage of natural resources, and which threaten the wellbeing

of the human species. Because such practices do not leave "enough and as good" for later tenants

of the intergenerational commons, the right to engage in such practices would be a right which

could never be legitimately created or conveyed.

It is important to recognize that when Locke discussed the above four intergenerational

principles, he did not limit their application to some semi-mythical "state of nature." The rules

---

[25]*See id.* at ¶ 36.
[26]*See* Clark Wolf, *Contemporary Property Rights, Lockean Provisos, and the Interests of Future Generations*, 105 Ethics 791, 799 (1995) ("The strongest argument in favor of the proviso is that it is necessary if initial appropriation is to avoid unjustifiably harming others. Since future generations are among those who might be harmed, justified initial appropriation must leave enough and as good for them as well"); John Sanders, *Justice and the Initial Acquisition of Property*, 10 Harv. J.L. & Pub. Pol'y 390-91 (1987).

14

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

were held to be applicable to citizens living and working within political societies as well. The

laws of a commonwealth, he maintained:

> "[are] only so far right as they are founded on the law of nature, by which they are
> to be regulated and interpreted. . . . The rules that [legislators] make for other
> mens' actions must . . . be conformable to the law of nature, i.e., to the will of
> God, of which that is a declaration . . . [t]he fundamental law of nature being the
> preservation of mankind . . . The end and measure of the [political] power is the
> preservation of all . . . society -- that is, all mankind in general."[27]

Taken together, Locke's first four intergenerational mandates constitute an early, but

remarkably clear articulation of what, today, would be termed a "sustainability" ethic.[28]

*Generational Sovereignty*

What political duties are owed by later generations to earlier generations? Put another

way, what limits exist on an existing generation's authority to make political decisions that are

binding upon later generations? Locke's treatment of these questions constitutes the fifth major

facet of his intergenerational philosophy. Because it is the most overtly political aspect of his

philosophy, it was of special interest to this nation's founders.

---

[27]Locke, *Second Treatise* at ¶¶ 12, 135, 171; *see also id.* at ¶ 158 (the power of the legislature or
commonwealth "being but the joint power of every member of the society . . . it can be no more
than those persons had in a state of nature before they entered into society . . . for nobody can
transfer to another more power than he has in himself"); *id. at* ¶ 136, n. 3, (quoting Hooker's
*Ecclesiastical Polity,* III, 9 to the effect that "laws human must be made according to the general
laws of Nature . . . otherwise they are ill made.")

[28]*See e.g.* Duncan, *Property as a Public Conversation, Not a Lockean Soliloquy: A Role for
Intellectual and Legal History in Takings Analysis*, 26 Envtl. L. 1095, 1122 (1996) (recognizing
Locke's formulation of a "living within limits" ethic); Elliot, *Future Generations, Locke's
Proviso and Libertarian Justice*, 3 J. Applied Philosophy 217 (1986); Squadrito, *Locke's View of
Dominion* 262 ("Locke could not foresee the ecological crisis of the twentieth century. . . .
However . . . [s]ince ecological balance is essential to the survival of God's creation, and human
beings are commanded by God to preserve their own species, it is clear that Locke would not
endorse behavior that tends to disrupt the ecological balance of the Earth").

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Locke emphasized the right of each generation to be master of its own political destiny. He rejected the notion that parents or ancestors could oblige their descendants to pay allegiance to a particular government or form of government.

> "[W]hatever Engagements or Promises any one has made for himself, he is under the Obligation of them, but cannot by any Compact whatsoever, bind his children or Posterity".

*Id.* at par. 116.

Locke's theory of generational sovereignty would later prove attractive to American colonists seeking to justify departure from their ancestors' allegiance to the English crown.

To briefly recapitulate: Locke strongly influenced America's founders with his intergenerational philosophy. That philosophy concerned the political rights which exist between generations, as well as intergenerational rights and responsibilities related to land and other natural resources.

### 2. The Founders' Pervasive Concern for Future Generations

To what extent did the founders of the United States and the framers of the Constitution embrace these intergenerational philosophies? To what extent did the framers intend these traditions and ideas to inform the new government?

The founders occupied a unique period in history, a recognizable cusp between one age and the next. Their exceptional circumstances required them on at least two occasions to closely examine their relationship with prior and later generations. First, during the Revolution and the years leading up to it, they were compelled to explain, both to themselves and to the world as a whole, the circumstances which justified one generation's separation from the government of its

16

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

ancestors.[29] This was especially important, given that both the *Magna Carta* and the English *Bill of Rights* purported to bind not only those documents signatories, but their posterity as well.

Next, subsequent to the Revolution, as the founders set out to frame new state constitutions and an even more ambitious "*Novus Ordo Seclorum*,"[30] their tasks again demanded that they contemplate the effects of their actions upon posterity. What *considerations* must they show to later generations? What *duties* could they reasonably hope to impose upon those same generations? To what extent might such considerations and duties be dependent upon one another? These themes are explored endlessly in documents of the period. The founders made it perfectly clear – in their speeches and correspondence, and in the language of the Constitution they wrought – that a legitimate government must equitably balance the interests of both earlier and later generations.[31]

During the difficult trials of the Revolution, the colonists' concern for future generations strengthened their resolve. George Mason wrote to General Washington in April, 1776, "May God . . . be pleased to inspire us with spirit & resolution, to bear our present & future Sufferings, becoming Men determined to transmit to our Posterity, unimpair'd, the Blessings we have

---

[29]*See* The Declaration of Independence, July 4, 1776 ("When . . . it becomes necessary for one people to dissolve the political bands which have connected them with another . . . a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.")

[30] "A New Order for the Ages," United States national motto.

[31] *See* Gardner, *Discrimination Against Future Generations: The Possibility of Constitutional Limitation*, 9 Envtl. L. 29, 35 ("A close examination of the debates of the Federal Convention of 1787 reveals that the draftsmen of the Constitution invariably took the view that their generation had an obligation to protect the well-being of future generations"); H. Commager, "America in Its Third Century – What Prospects?" (address before the National Town Meeting at the John F. Kennedy Center for the Performing Arts, Washington, D.C., March 17, 1976) (Transcript on file at the Environmental Law office, The Lewis and Clark Law School) 7-8 ("[W]hat was uppermost in the minds of the founding fathers all the time [was a] sense of fiduciary obligation to posterity. Washington never stopped talking about it. Jefferson spoke of our descendants and thousands and thousands of generations. Tom Paine spoke about it, they all did.")

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

17

received from our Ancestors!"[32] In the revolutionary pamphlet *Common Sense*, Thomas Paine

suggested that, "In order to discover the line of our duty rightly, we should take our children in

our hand, and fix our station a few years farther into life; and that eminence will present a

prospect which a few present fears and prejudices conceal from our sight."[33]

Paine's *Common Sense* also included a cogent, intergenerational challenge to the

institution of hereditary monarchy. Because no one generation could rightfully presume to install

a leader to rule a later generation, Paine argued, "monarchy is a degradation and lessening of

ourselves, and hereditary succession . . . an insult and an imposition on posterity."[34] These

concerns were later reflected in the anti-nobility provisions of Article I, sections 9 and 10, of the

Constitution.

During the Constitutional Convention, intergenerational concerns were reiterated

frequently. Roger Sherman noted that, in drafting a constitution, the framers were "providing for

our posterity, for our children and our grandchildren . . ."[35] Madison stressed that, "In framing a

system which we wish to last for ages, we should not lose sight of the changes which ages will

produce."[36] George Mason, writing to his son at commencement of the convention, reflected:

> "[T]o view, thro the calm sedate Medium of Reason, the Influence which the
> Establishments now proposed may have upon the Happiness or Misery of
> Millions yet unborn, is an Object of such Magnitude, as absorbs, & in a Manner
> suspends the Operations of human Understanding."[37]

---

[32] George Mason to George Washington, April 2, 1776, *The Papers of George Mason* 1:435
[33] Thomas Paine, Common Sense, January, 1776 (Dover Publications, New York: 1997) 22.
[34] *Id*. 18. *See* Thomas Jefferson, *Notes on Virginia*, query XIII (praising *Common Sense* for introducing the idea of independence and a new form of government to the American colonies.) *See also* Ellis p. 58 (noting *Common Sense* "swept through the colonies like a firestorm.")
[35] M. Farrand, The Records of the Federal Convention of 1787, II:3.
[36] *Id*. at I:422
[37] The Papers of George Mason, ed. Robert A.Rutland (Chapel Hill, NC: University of North Carolina Press, 1970) 3:892-3.

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Later, during the ratification debates, similar sentiments would find expression in the arguments of both federalists[38] and antifederalists.[39]

Such generalized intergenerational concern accorded perfectly with the dominant moral philosophies of the time. David Hume stressed that future ills are "never the less real for being remote."[40] Immanuel Kant maintained "human nature is such that it cannot be indifferent even to the most remote epoch which may eventually affect our species, so long as this epoch may be expected with certainty."[41]

One interesting way to gauge the prevalence of the intergenerational outlook during the late 18th century is to study the arguments put forth by commentators of the day on a prominent

---

[38]*See* James Wilson's opening address to the Pennsylvania ratifying convention (Nov. 24, 1787) (remarking that the effects of the constitution would extend "to innumerable States yet unformed, and to myriads of citizens who in future ages shall inhabit the vast uncultivated regions of the continent"); Alexander Hamilton, New York Convention, June, 1788 (seeking to deflect charges of corruption and self-dealing on the part of the drafters: "What reasonable man, for the precarious enjoyment of rank and power, would establish a system, which would reduce his nearest friends and his posterity to slavery and ruin?"); David Ramsey, *Columbian Herald,* Charleston, South Carolina, June 5, 1788 ("To pull down one form of government without substituting something in its place that would answer the great ends for which men enter into society, would have been to trifle with posterity").

[39]*See* Agrippa [James Winthrop] X *Mass Gazette* (Boston) Jan. 1, 1788 (opposing the proposed constitution due to the absence of a bill of rights, and warning: "By adopting the form proposed by the convention, you will have the derision of foreigners, internal misery, *and the anathemas of posterity*. By amending the present confederation, and granting limited powers to Congress, you secure the admiration of strangers, internal happiness, *and the blessings and prosperity of all succeeding generations*.)" (emphasis supplied). *See also* Nathaniel Barrell to George Thatcher, Boston (January 15, 1788) ("I see it pregnant with the fate of our libertys and if I should not live to feel its baneful effects, I see it entails wretchedness on my posterity").

[40]David Hume, *Enquiries Concerning the Human Understanding and Concerning the Principles of Morals* 535 (Selby et al. eds. 1777).

[41] Immanuel Kant, *Idea for a Universal History* (1784), 8th Thesis, in Kant's Political Writings 50 (H Reiss ed., H.B. Nisbet trans. 1970). *See* Annette Baier, For the Sake of Future Generations in Earthbound: New Introductory Essays in Environmental Ethics 216-217 (Tom Regan ed., Philadelphia 1984) ("[T]o discern our duty to anybody, we must in a sense think of everybody, future persons included, according to Kant's test. . . . Any practice like dumping toxic wastes where they will poison soil, air, or water, seems forbidden by Kant's test – we cannot conceive of a system of nature in which all humans regularly do this, yet survive as a species.").

19

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

issue such as the French Revolution. Both the proponents and the detractors of that revolution

chose to frame their arguments in terms of generational rights. In *Reflections on the Revolution*

*in France*, Edmund Burke decried France's departure from monarchy on generational

entitlement grounds.[42] In an eloquent passage, Burke describes society as a sacred partnership:

> a partnership not only between those who are living, but between those who are
> living, those who are dead, and those who are to be born. Each contract of each
> particular state is but a clause in the great primeval contract of eternal society.[43]

Later in the same piece, Burke phrased his concerns in the language of estate

preservation, a language with strikingly modern environmental overtones:

> [O]ne of the first and most leading principles on which the commonwealth and
> the laws are consecrated is [that] the temporary possessors and life-renters in it
> [should be mindful] of what is due to their posterity . . . [and] should not think it
> among their rights to cut off the entail or commit waste on the inheritance by
> destroying at their pleasure the whole original fabric of society, hazarding to leave
> to those who come after them a ruin instead of a habitation . . ..[44]

Paine penned his highly popular *Rights of Man* as a response to Burke. Paine commended

the French revolution for erasing a host of feudal and ecclesiastical privileges which the favored

classes and families of past generations had claimed for themselves into perpetuity – at the

expense of later generations' majorities.[45]  Both men chose to frame their arguments in terms of

the rights of later generations.

     3.   Natural Resources in the Framers' Intergenerational Philosophy

The founders and their contemporaries understood and recognized each generation's

fundamental obligation to preserve the value and integrity of natural resources for later

generations.  This preservation principle, embedded in the Anglo-American legal constructs of

---

[42]Edmund Burke, Reflections on the Revolution 28 (Dolphin ed. 1961).
[43] *Id*. at 110.
[44]*Id*. at 108-110.
[45]Thomas Paine, *The Rights of Man* (1791) in *Thomas Paine: Collected Writings* (Eric Foner ed.,
New York 1995).

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

*entail, usufruct*, and *waste* were ethical bedrock in the late 1700's. Intergenerational

responsibility for land was more familiar, and more widely acknowledged, than intergenerational

political rights and economic rights. That is why, when writers of the period sought to describe

the proper *political* relations between generations, many of them, including Jefferson, relied

upon metaphors and analogies involving *land*.

When Burke wished to condemn the revolutionaries of France, he did so by

characterizing them as irresponsible life-tenants who would commit waste upon an estate.[46]

*Jefferson's Usufruct*

The most systematic treatment of intergenerational principles left to us by the founders

was provided by Jefferson in his famous letter of September 6, 1789.[47] That letter was

Jefferson's final installment in a two-year correspondence with James Madison on the proposed

Bill of Rights.[48] Given the importance of this letter as background material for the Bill of

---

[46]Burke, *Reflections* at 108 (". . . [O]ne of the first and most leading principles on which the commonwealth and the laws are consecrated is, lest the temporary possessors and life-renters in it, unmindful of what they have received from their ancestors or of what is due to their posterity, should act as if they were the entire masters, that they should not think it among their rights to cut off the entail or commit waste on the inheritance by destroying at their pleasure the whole original fabric of society, hazarding to leave to those who come after them a ruin instead of a habitation . . ..").

[47]Jefferson to James Madison, September 6, 1789, *Boyd* XV, 392-98. The letter has been extensively studied by Jefferson scholars; I make no attempt to fully recapitulate that scholarship in this article. Some of the better known treatments include: David N. Mayer, The Constitutional Thought of Thomas Jefferson 302-308 (University Press of Virginia: Charlottesville, 1994) "The Earth Belongs to the Living"; Merrill Peterson, *Thomas Jefferson's 'Sovereignty of the Living Generation,'* 52 Virginia Quarterly Review 437-44 (1976); Charles A. Miller, *Jefferson and Nature: An Interpretation,* chap. 5, esp. 161-64. (Baltimore, 1988).

[48]*See also* Thomas Jefferson to Madison, in *Boyd* at 12:439-43; 13:442-43; 14:188-89, 159-61; 15:367-68. Jefferson's interest in intergenerational equity at this time was inspired in part by a conversation which took place between himself, Thomas Paine and the Marquis de LaFayette in February, 1788 – a conversation prompted by James Wilson's arguments in the Pennsylvania ratification convention disputing the need for a bill of rights.

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Rights,[49] and its independent value as a seminal statement of intergenerational equity principles, it serves as the natural starting point for a discussion of the framers' views on generational sovereignty and the land.

Jefferson begins his letter by asserting that:

"The question [w]hether one generation of men has a right to bind another. . . is a question of such consequences as not only to merit decision, but place also among the fundamental principles of every government. . . . I set out on this ground, which I suppose to be self-evident, '*that the earth belongs in usufruct to the living*' . . .."[50]

Since Jefferson based his philosophy regarding generational political and economic relations upon this "self-evident" principle of usufructary ownership of the earth,[51] I will examine the language employed to express the principle. Of most importance is the word: *usufruct*.

The legal concept of usufruct can be traced back at least as far as ancient Roman law[52] and has changed little over the centuries. In Jefferson's time, as now, "usufruct" referred to "the right to make all the use and profit of a thing that can be made without injuring the substance of

---

[49] Jefferson's letter was written just a few weeks before Congress passed the Bill of Rights. *See* Ellis p. 123-25 (describing Jefferson's influential role as bill of rights proponent).

[50] Jefferson to James Madison, September 6, 1789, *supra* note 55 (emphasis in original).

[51] The reference to intergenerational rights as "self-evident" recalls the Declaration of Independence: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights . . .." Jefferson would continue for the remainder of his life to characterize intergenerational obligations in this way. *See* Jefferson to Thomas Earle, September 24, 1823 ("That our Creator made the earth for the use of the living and not of the dead; . . . that one generation of men cannot foreclose or burden its use to another . . . . these are axioms so self-evident that no explanation can make them plainer").

[52] *See, e.g.* W. Hamilton Bryson, *The Use of Roman Law in Virginia Courts*, 28 Am. J. Legal Hist. 135-46 (1984); Sloan, p. 82 ("Like a trusted family counselor, Jefferson drew up a deed of settlement ensuring future generations the right to benefit from the common property, and the means he employed . . . was familiar doctrine to eighteenth-century Anglo-American lawyers.")

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

the thing itself."[53] A usufruct described the rights and responsibilities of tenants, trustees, or other parties temporarily entrusted with the use of an asset – usually land.[54]

Under the common law, the doctrine of *usufruct* was (and remains) closely conjoined with the doctrine prohibiting *waste*, defined by Blackstone as "a spoil or destruction in houses, gardens, trees, or other corporeal hereditaments, to the disheison of him that hath the remainder or reversion."[55] Taken together, the two doctrines of usufruct and waste provide that a present possessor is entitled to the beneficial use of the natural estate and its fruits, but cannot prejudice future interest holders by destroying or impairing the estate's essential character or long-term productivity.[56] Jefferson's philosophy that the earth belongs *in usufruct* to the living partially reiterates the biblical/Lockean paradigm of the earth as intergenerational commons, the benefits of which should be accessible to every member of every generation.

Relying on this widely shared principle of intergenerational stewardship, Jefferson maintained that each individual, and each generation collectively, had the obligation to pass on the natural estate undiminished and unencumbered to later generations:

>  [N]o man can by natural right, oblige lands he occupied... to the payment of debts contracted by him. For if he could, he might, during his own life, *eat up the usufruct of the lands for several generations to come*, and then the lands would

---

[53] Sir Robert Chambers, *A Course of Lectures on the English Law, Delivered at the University of Oxford, 1767-1773,* 2:85, 2 vols. (Thomas M. Curley ed., Madison, Wis., 1986).

[54] By using the terminology of tenancies to describe the relations between generations, Jefferson endorses a metaphor as old as the Old Testament. Jefferson later explicates and embellishes this landlord-tenant analogy. *See, e.g.* Thomas Jefferson to John W. Eppes, Monticello, June 24, 1813**,** *The Writings of Thomas Jefferson* vol. XIII, 269-270 ("Each generation has the usufruct of the earth during the period of its continuance. . . . . [T]he case may be likened to the ordinary one of a tenant for life, who may hypothecate the land for his debts, during the continuance of his usufruct; but at his death, the reversioner (who is also for life only) receives it exonerated from all burthen.").

[55] 2 Blackstone, Commentaries at 281.

[56] The legal doctrines of usufruct and waste resemble Locke's prohibition against spoilage or destruction of "the fruits of nature." *See* Locke, *Second Treatise*, ¶¶ 31 and 46. It is likely that Locke based his prohibitions, at least in part, upon these accepted legal doctrines.

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

belong to the dead rather than the living, which would be the reverse of our
principal. What is true of every member of the society individually, is true of
them all collectively, since the rights of the whole can be no more than the sum of
the rights of the individuals.[57]

For Jefferson, "eating up the usufruct" means extinguishing the next generation's ability

to share equitably in the benefits of a natural resource. No individual or society has authority to

cause such extinction, whatever personal or collective rights they may allege. The contemporary

issue to which Jefferson's arguments most literally apply is the problem of topsoil depletion. As

a planter of predominantly agrarian Virginia, Jefferson often phrased his discussions of

intergenerational issues -- even economic issues -- in terms of soil:

"Are [later generations] bound to acknowledge [a national debt created to satisfy
short-term interests], to consider the preceding generation as having had a right to
eat up the whole soil of their country, in the course of a life . . .? Every one will
say no; that the soil is the gift of God to the living, as much as it had been to the
deceased generation . . .."[58]

Jefferson asserts that each generation has the right to inherit, undiminished, the same

topsoil capital that its predecessors enjoyed.[59]

---

[57] Jefferson to Madison, September 6, 1789, *supra.*, n. 54 (emphasis added). *See also* Jefferson to
Thomas Earle, September 24, 1823, L and B 15:470-71 ("That our Creator made the earth for the
use of the living and not of the dead; . . . that one generation of men cannot foreclose or burden
its use to another, . . . . . [T]hese are axioms so self-evident that no explanation can make them
plainer . . ."). Herbert Sloan characterizes Jefferson's convictions accurately: "The earth may
belong to the living, but the living enjoy only its usufruct, only its current product. That
qualification is critical, for it forbids the living generation to commit waste, and thus each
generation becomes a mere tenant for life, empowered only to enjoy the fruits of the estate, not
to dispose of it in its entirety. . . . [E]ach generation will serve as a custodian charged with the
duty of passing on intact what it receives from its predecessors. The impression such a project
creates is decidedly conservative. . . His answer is to . . . husband existing resources." Sloan,
*Principles and Interest*, 60.
[58] Jefferson to Eppes, *The Writings of Thomas Jefferson* vol. XIII, 269-270
[59] As evidence of Jefferson's special concern for long-term soil productivity, *see* his
*Commonplace* Book pp. 166-67; and Jefferson to Lafayette, April 11, 1787, The Portable
Thomas Jefferson 421-23.

24

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

The same experiences and authorities that shaped Jefferson's conception of intergenerational obligations—authorities such as Plato, the Old Testament prophets, Aquinas, Locke, and Sidney—also helped to shape the views of his contemporaries. The biblical notion that God granted the world to Adam and his posterity in common was part of mainstream American legal thought.[60] In his exhaustive examination of Jefferson's generational theories, Herbert Sloan remarks that, "what makes Jefferson's views important . . . is not so much that he held them, but that they were widely shared."[61] These widely shared principles of usufructary responsibility for natural resources were significant in shaping the early traditions and conscience of America and find voice in state constitutions[62] and federal statutes today.[63]

The United States' arguments in 1893 in the Tribunal of Arbitration illustrate the continuing vitality of these principles over the next century:

> The earth was designed as the permanent abode of man through ceaseless generations. Each generation, as it appears upon the scene, is entitled only to use the fair inheritance. It is against the law of nature that any waste should be committed to the disadvantage of the succeeding tenants. . . . That one generation may not only consume or destroy the annual increase of the products of the earth, but the stock also, thus leaving an inadequate provision for the multitude of successors which it brings into life, is a notion so repugnant to reason as scarcely to need formal refutation."[64]

---

[60]*See* Blackstone, *Commentaries*, 2:3 ("The earth therefore, and all things therein, are the general property of all mankind, exclusive of other beings, from the immediate gift of the creator.") *See also* Thomas Paine, *Agrarian Justice*, 396 ("It is wrong to say that God made *Rich* and *Poor*; he made only *Male* and *Female*; and he gave them the earth for their inheritance").

[61]Sloan, *Principles and Interest* 5. *See also* Sloan at 75 (detailing how the earth-as-commons theme played a significant role in the political theories of Locke, Sidney, and Paine.)

[62] *See, e.g.,* Pa. Const. art. I, § 27; Mont. Const. art. IX, § 1; Haw. Const. art. IX, § 1; and Ill. Const. art XI, § 1.

[63] *See, e.g.,* National Environmental Policy Act of 1969, § 101(b)(1), 42 U.S.C. § 4331(b)(1) (1970) ("[I]t is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations.").

[64] Argument of the United States, *Fur Seal Arbitration* (U.S. v. Gr. Brit. 1893), *reprinted in* 9 Fur Seal Arbitration: Proceedings of the Tribunal of Arbitration (Gov't Printing Office 1895);

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

C.  **Unalienable (Intergenerational) Rights to Life, Liberty and Property**

One of the most potent philosophic ideas of 18th century America was the concept of "unalienable" rights,[65] which denoted a set of rights that one *generation* could not alienate from another *generation*.

As is noted above, the framers were as concerned with the proper balancing of interests *between* generations as with the proper balancing of interests *within* generations; both concerns informed their understanding of the named rights in the Constitution.

A clear example of this tendency is the set of rights – life, liberty, and property – protected by the Due Process clause of the Fifth Amendment. This particular grouping of rights had a rich political and philosophical background with which the framers were intimately familiar.  They had been acknowledged by John Locke, among others. In response to British claims that the colonists had lost such rights (recognized by the *Magna Carta* and English *Bill of Rights*) through waiver or acquiescence on the part of their ancestors, the colonists affirmed that no such waiver was possible, because the rights were "unalienable." The Virginia Bill of Rights (1776) is illustrative. Its preamble states that it is a "Declaration of Rights made by the good people of Virginia in the exercise of their sovereign powers, *which rights do pertain to them and their posterity*, as the basis and foundation of government." It goes on in Article one to explain that:

> [A]ll men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot . . . *deprive or divest their posterity*; namely, the enjoyment of life and liberty with the means of

---

also reprinted in 1 John Bassett Moore, History and Digest of the International Arbitrations to Which the United States Has Been A Party 755, 813-14 (1898).

[65]Although "inalienable" is the standard modern usage, the Declaration of Independence used the phrase "*un*alienable rights."

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

acquiring and possessing property, and pursuing and obtaining happiness and safety.

(emphasis added)

While some of these unalienable intergenerational rights, such as the right to liberty, were primarily individual in nature, others, such as the unalienable right to "alter or abolish" government, were public rights,[66] belonging to posterity collectively.

Professor A.E. Dick Howard maintains that the committee draft of the Virginia declaration, cited above, is "the most influential constitutional document in American history."[67] The Virginia document's intergenerational focus would eventually find an echo in the Due Process and Posterity clauses of the Constitution – not surprising, given the heavy involvement of George Mason and James Madison, both of whom helped to draft the Virginia Declaration, in the Constitutional Convention.[68]

Before the drafting of the Constitution, the philosophy of the Virginia Declaration found its way into the Declaration of Independence. Joseph Ellis has emphasized the role which the

---

[66]*See United States Declaration of Independence*, par. 2 (1776) ("[W]henever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government . . ."). *See also* Virginia *Declaration of Right,* Art III ("whenever any government shall be found inadequate or contrary to these purposes, a majority of the community hath an indubitable, unalienable, and indefeasible right to reform, alter or abolish it"); "South Carolina's Ratification Proclamation" (May 23, 1788) in Bailyn at 2: 556 ("The [state's] right to regulate elections to the Federal Legislature, and to direct the manner, times, and places of holding the same is, and ought to remain to all posterity, a fundamental right").

[67]Howard, *Commentaries on the Constitution of Virginia* 56 (1974).

[68]Sutton, Revolution to Secession: Constitution Making in the Old Dominion 20-21 (1987) (also on the committee was Patrick Henry).

27

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

Virginia document played in the shaping of the federal Declaration.[69] It is a matter of record that

the Virginia declaration was adopted June 12, 1776. Jefferson received a copy in Philadelphia,

and drafted his first version of the Declaration of Independence sometime the following week.[70]

> The Declaration of Independence proclaims that:

> We hold these truths to be self-evident, that all men are created equal, *that they are endowed by their Creator with certain unalienable Rights*, that among these are Life, Liberty, and the pursuit of Happiness.[71]

> Jefferson substituted the phrase "unalienable rights" for "cannot deprive or divest their

posterity," but the meaning was clear to his contemporaries. By conjoining the "life, liberty . . ."

formulation of the *Second Treatise* with the Virginia Declaration's intergenerational unalienable

principle, Jefferson and the other signatories strongly referenced Locke's intergenerational

philosophy and the rights of later generations.

> Accordingly, the intergenerational aspects of the founders "unalienable rights"

philosophy must be accorded due weight in any analysis of Posterity's asserted rights under the

Due Process clause of the Fifth Amendment.

### D. A Uniform Time Discount Rate is Inconsistent with Principles of Intergenerational Justice

> One recent governmental practice that is markedly inconsistent with the framers'

intergenerational philosophies expressed above is that of "pure time discounting." The

---

[69]Joseph Ellis, *American Sphinx: The Character of Thomas Jefferson* 56-65 (Random House, New York 1998) ("On the eve of writing the Declaration, Jefferson was thinking … about Virginia's new constitution.").
[70]*Id.*
[71] *United States Declaration of Independence*, par. 2 (1776) (emphasis added).

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

International Panel on Climate Change ("IPCC") estimates that time discount rates are the second most important factor in evaluating the effects of climate change.[72]

When federal agencies perform required cost benefit analyses during the development of policies likely to affect levels of carbon emissions, they apply a pure discount rate.[73]  Critics of discounting have noted that "discounting ensures that future generations will receive less attention, and perhaps far less attention, than those now living."[74] Application of a pure discount rate literally treats future harms and future deaths as having only a fraction of the value of present harms and deaths.  Assuming that the rights to life, liberty, due process and equal protection apply to future generations, as the Posterity clause of the Preamble suggests, this deliberate procedural discrimination would seem to constitute a *prima facie* constitutional violation.

**IV.    Conclusion**

The interests of children and future generations in protecting their vital resources from irreversible damage is deeply rooted in the history and traditions of the Nation, and a central underpinning of the Constitution itself. In the Preamble, the framers ordained and established the Constitution "to ourselves and our Posterity." U.S. Const. pmbl.

If plaintiffs factual allegations are correct, then it would appear that the present adult generations, acting through their elected representatives, have become the sort politically

---

[72] *See* David A. Weisbach & Cass R. Sunstein, *Climate Change and Discounting the Future: A Guide for the Perplexed*, Reg-Markets Center Working Paper No. 08-19, Harvard Public Law Working Paper No. 08-20; Harvard Law School Program on Risk Regulation Research Paper No. 08-12, at 11 (Aug. 12, 2008), available at http://ssrn.com/abstract=1223448 or http://dx.doi.org/10.2139/ssrn.1223448.
[73] U.S. Interagency Working Group on Social Cost of Carbon, "Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866" 17-23 (2010).
[74] Weisbach & Sunstein, *supra* note 92, at 3.

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

29

dominant "faction" that the founders sought to guard against.[75] If Plaintiffs' allegations are correct, then the politically represented present adult generations have accrued disproportionate advantages from unsustainable fossil fuel policies by externalizing most of the costs onto later generations, who will not be politically represented until it is too late to reverse the permanent consequences of climate destabilization and consequent threats to their constitutional rights. Plaintiffs raise a cognizable constitutional claim.

DATED this 24th day of February, 2016.

Respectfully submitted,

s/ Michelle A. Blackwell

Michelle A. Blackwell (OSB No. 002070)
Blackwell Law PC
1209 Pearl Street
Eugene, OR 97401
Tel: (541) 345-8800

mblackwell@blackwell.law

---

[75] *See* The Federalist No. 10 (James Madison) (defining a political faction as "a number of citizens . . . who are united and actuated by some common impulse of passion, or of interest, *adverse to the rights of other citizens or to the permanent and aggregate interests of the community.*") (emphasis supplied).

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS

30

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the applicable word-count limitation under LR 7-2(b) because it contains less than 35 pages and 6,564 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 24th day of February, 2016.

Respectfully submitted,

s/ Michelle A. Blackwell
Michelle A. Blackwell (OSB No. 002070)
Blackwell Law PC
1209 Pearl Street
Eugene, OR 97401
Tel: (541) 345-8800
mblackwell@blackwell.law

*Attorney for Amicus Curiae John E. Davidson*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2016, I filed a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically generate service to the following counsel of record:

JULIA OLSON (OR Bar 062230)
JuliaAOlson@gmail.com
WILD EARTH ADVOCATES
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

DANIEL M. GALPERN (OR Bar 061950)
dan.galpern@gmail.com
LAW OFFICES OF DANIEL M.
GALPERN
1641 Oak Street
Eugene, OR 97401
Tel: 541-968-7164

JOSEPH W. COTCHETT
jcotchett@cpmlegal.com
PHILIP L. GREGORY (pro hac vice)
pgregory@cpmlegal.com
PAUL N. MCCLOSKEY
pmccloskey@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Tel: 650-697-6000
Fax: 650-697-0577

*Attorneys for Plaintiffs*

SEAN C. DUFFY
U.S. Department of Justice Environment &
Natural Resources Division
P.O. Box 7611
Washington, DC 20044
Tel: 202-305-0445
Fax: 202-305-0506
Email: sean.c.duffy@usdoj.gov

*Attorney for Federal Defendants*

BENJAMIN E. TANNEN
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel: 202-736-8574
Fax: 202-736-8711
Email: btannen@sidley.com

C. MARIE ECKERT
Miller Nash Graham & Dunn LLP
111 SW Fifth Avenue
Suite 3400
Portland, OR 97204
Tel: 503-205-2477
Fax: 503-224-0155
Email: marie.eckert@millernash.com

QUIN M. SORENSON
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel: 202-736-8000
Fax: 202-736-8711
Email: qsorenson@sidley.com

ROGER R. MARTELLA, JR.
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel: 202-736-8097
Fax: 202-736-8711
Email: rmartella@sidley.com

*Attorneys for Intervenors-Defendants*


By:    s/ Michelle A. Blackwell
       Michelle A. Blackwell (OSB No. 002070)
       Blackwell Law PC
       1209 Pearl Street
       Eugene, OR 97401
       Tel: (541) 345-8800
       mblackwell@blackwell.law