UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

KELSEY CASCADE ROSE JULIANA; et al.,

6:15-cv-1517-TC

Plaintiffs,

ORDER and
FINDINGS & RECOMMENDATION

v.

The UNITED STATES OF AMERICA; et al.,

Defendants.

COFFIN, Magistrate Judge:

The motions before the court are directed against a relatively unprecedented lawsuit that, in essence, seeks relief from government action and inaction that allegedly results in carbon pollution of the atmosphere, climate destabilization, and ocean acidification. The government action and inaction allegedly threatens catastrophic consequences which have already began and will progressively worsen in the near future.

Plaintiffs include a group of younger individuals (aged 8-19) who assert concrete harm from excessive carbon emissions. Also among the plaintiffs are associations of activists who assert they are beneficiaries of a federal public trust which is being harmed by allegedly substantial impairment and alienation of public trust resources through ongoing actions to allow fossil fuel exploitation. Finally, plaintiff Dr. James Hansen participates as a guardian for plaintiff "future generations."

Page 1 - FINDINGS & RECOMMENDATION

Plaintiffs are suing the United States and various government officials and agencies because, they assert, the government has known for decades that carbon dioxide ($CO_2$) pollution has been causing catastrophic climate change and has failed to take necessary action to curtail fossil fuel emissions. Moreover, plaintiffs allege that the government and its agencies have taken action or failed to take action that has resulted in increased carbon pollution through fossil fuel extraction, production, consumption, transportation, and exportation. Plaintiffs assert that a reduction of global $CO_2$ concentrations to less than 350 parts per million is possible, but action must be taken immediately to prevent further ocean acidification and ocean warming. Plaintiffs allege the current actions and omissions of defendants make it extremely difficult for plaintiffs to protect their vital natural systems and a livable world. Consequently, plaintiffs seek immediate action to restore energy balance and implementation of a plan to put the nation on a trajectory (that if adhered to by other major emitters) will reduce atmospheric $CO_2$ concentrations to no more than 350 parts per million by 2100.

Plaintiffs assert the actions and omissions of defendants that increased $CO_2$ emissions "shock the conscience," and are infringing the plaintiffs' right to life and liberty in violation of their substantive due process rights. Plaintiffs also allege defendants have violated plaintiffs' equal protection rights embedded in the Fifth Amendment by denying them protections afforded to previous generations and by favoring short term economic interests of certain citizens. Plaintiffs further allege defendants' acts and omissions violate the implicit right, via the Ninth Amendment, to a stable climate and an ocean and atmosphere free from dangerous levels of $CO_2$. Finally, plaintiffs allege defendants have violated a public trust doctrine, secured by the Ninth Amendment, by denying future generations essential natural resources.

Page 2 - FINDINGS & RECOMMENDATION

Through this action, plaintiffs ask the court to:

1.    Declare that Defendants have violated and are violating Plaintiffs' fundamental constitutional rights to life, liberty, and property by substantially causing or contributing to a dangerous concentration of $CO_2$ in the atmosphere, and that, in so doing, Defendants dangerously interfere with a stable climate system required by our nation and Plaintiffs alike;

2.    Enjoin Defendants from further violations of the Constitution underlying each claim for relief;

3.    Declare the Energy Policy Act, Section 201, to be unconstitutional on its face;

4.    Declare DOE/FE Order No. 3041, granting long-term multi-contract authorization to Jordan Cove Energy for LNG exports from its Coos Bay terminal, to be unconstitutional as applied and set it aside;

5.    Declare Defendants' public trust violations and enjoin Defendants from violating the public trust doctrine underlying each claim for relief;

6.    Order Defendants to prepare a consumption-based inventory of U.S. $CO_2$ emissions;

7.    Order Defendants to prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ so as to stabilize the climate system and protect the vital resources on which Plaintiffs now and in the future will depend ...

First Amended Complaint (#7) at 94. Plaintiffs also seek to have this court retain jurisdiction over this action to monitor and enforce defendants' compliance with a national remedial plan and associated orders requiring the above.

In essence, plaintiffs assert a novel theory somewhere between a civil rights action and NEPA/Clean Air Act/Clean Water Act suit to force the government to take action to reduce harmful pollution. Although, plaintiffs, for the most part, do not challenge a specific agency action and urge the court to order government-wide action for the benefit of the earth and mankind, they also seek "other relief as the Court deems just and proper." Id.

Page 3 - FINDINGS & RECOMMENDATION

The court has previously granted the National Association of Manufacturers (NAM), American Fuel & Petrochemical Manufacturers (AFPM), and American Petroleum Institute (API) motion to intervene in this action. These organizations represent various entities in the coal, oil, and gas industry, including businesses that extract, refine, and use such energy sources. The intervenors move to dismiss the amended complaint. The government similarly moves to dismiss all claims.[1]

Movants assert plaintiffs lack standing to bring this suit, raise non-justiciable political questions, and they fail to state a constitutional claim. In addition, the movants assert the public trust doctrine does not provide a cognizable federal cause of action.

A.    Standing

Plaintiffs must demonstrate standing for each claim they seek to press and for each form of relief sought. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). For Article III standing, plaintiffs must satisfy three "irreducible constitutional minimum" requirements: (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. Id. at 560–61.

1.    Concrete, Particularized, Imminent Injury

Plaintiffs allege that climate change endangers humanity and nature and is a consequence of human caused or influenced green house gases, primarily $CO_2$, derived from the combustion of fossil

---

[1]The government also moves to strike various exhibits to declarations and declarations submitted by plaintiffs in opposition to the motion to dismiss. This recommendation is made without resort to these materials. Accordingly, the motion to strike is denied.

fuels. First Amended Complaint (FAC) (#7) at ¶ 202. Plaintiffs allege because $CO_2$ persists in the atmosphere, future emissions will lead to severe impacts on children and future generations and the current level of $CO_2$ has already taken our country into the "danger zone." Id. At ¶¶ 206-07. Plaintiffs aver emissions must be rapidly and systematically reduced in order to avoid crossing the tipping points that set in motion disastrous, irrevocable impacts to human civilization and nature. Id. At ¶ 208. According to plaintiffs it will be nearly impossible for them to adapt to all of the current climate change impacts in the quick time-frame in which they will occur and that, therefore, "the survival and well-being of plaintiffs is significantly threatened by climate destabilization." Id. at ¶ 208, ¶ 211. Plaintiffs further allege that climate change is "already damaging human and natural systems, causing loss of life and pressing species to extinction." Id. at ¶ 213. Plaintiffs allege specifics regarding global changes that also lead to local harm such as: disintegration of both the West and East Antarctic ice sheets with concomitant sea level rise damaging coastal regions; changing rainfall and atmospheric conditions affecting water and heat distribution causing severe storm surges, floods, hurricanes, droughts, insect infestation, reduced crop yields, increased invasive vegetation, and fires; ocean acidification damaging sea life; increase in allergies, asthma, cancer, and other diseases; and harm to national security causing destabilization in various regions of the world. Id. at ¶¶ 213-241.

However, plaintiffs also assert injuries that are personal in nature such as: jeopardy to family farms resulting from the planned Jordan Cove gas line,[2] increased temperatures, and wildfires (FAC

_____

[2]Following oral argument on the motions, the Federal Energy Regulatory Commission denied applications to locate the Jordan Cove Energy Project in Coos Bay, Oregon and its associated pipeline. The decision, balancing the need of the project against adverse impacts on landowners and the environment appears to be primarily based on a lack of current market need from natural gas customers in Asia. The applicants, Veresen Inc. and the Williams Partners, are

Page 5 - FINDINGS & RECOMMENDATION

at ¶¶ 31-34, 23-30); lost recreational opportunities (e.g., FAC at ¶¶ 28-29, 31-34); and harm to family

dwellings from superstorms (e.g., FAC at ¶ 71-72),[3] etc.  See, Memorandum of Plaintiffs in

Opposition to Federal Defendants' Motion to Dismiss (#41) at pp. 29-33.  While the personal harms

are a consequence of the alleged broader harms, noted above, that does not discount the concrete

harms already suffered by individual plaintiffs or likely to be suffered by these plaintiffs in particular

in the future.  See Federal Election Com'n v. Akins, 524 U.S. 11, 24 (1998):

> Often the fact that an interest is abstract and the fact that it is widely shared go hand
> in hand. But their association is not invariable, and where a harm is concrete, though
> widely shared, the Court has found "injury in fact." See Public Citizen, 491 U.S., at
> 449–450, 109 S.Ct., at 2564–2565 ("The fact that other citizens or groups of citizens
> might make the same complaint after unsuccessfully demanding disclosure ... does
> not lessen [their] asserted injury"). Thus the fact that a political forum may be more
> readily available where an injury is widely shared (while counseling against, say,
> interpreting a statute as conferring standing) does not, by itself, automatically
> disqualify an interest for Article III purposes. Such an interest, where sufficiently
> concrete, may count as an "injury in fact." This conclusion seems particularly
> obvious where (to use a hypothetical example) large numbers of individuals suffer
> the same common-law injury (say, a widespread mass tort), or where large numbers
> of voters suffer interference with voting rights conferred by law. C.f. Lujan, supra,
> at 572, 112 S.Ct., at 2142–2143; Shaw v. Hunt, 517 U.S. 899, 905, 116 S.Ct. 1894,
> 1900–1901, 135 L.Ed.2d 207 (1996).

The court must accept the allegations as true and those allegations plausibly allege harm,

---

free to reapply in the future and the Commission will reconsider the planned pipeline if they can
demonstrate a market need for liquified natural gas.  In addition, the applicants plan to file a
request to rehear the decision.  For purposes of the motion to dismiss, the court takes as true the
allegations of an imminent threat from the proposed project.

[3]Plaintiff Victoria B's allegations(in addition to other plaintiffs) raise another issue not
addressed in the motions to dismiss regarding this court's jurisdiction to address harms arising
outside of the district from action and inaction by various government agencies that often also
arise outside of the District of Oregon.  See, e.g., FAC at ¶ 72-73 (damage to home and school in
New York as a result of superstorm Sandy).  While such allegations highlight the unwieldy
nature of the case, the allegations establish that $CO_2$ emissions cross geographic boundaries and
cause harm within the district and outside the district from many of the same sources regulated
by the defendants.

Page 6 - FINDINGS & RECOMMENDATION

though widespread, that is concrete.

Of course, federal courts are not forums in which to air generalized grievances about the conduct of government. See Flast v. Cohen, 392 U.S. § 83, 106 (1968). The constitutional limits on standing eliminate claims in which a plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, a plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72 (1978).

> Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim. For example, a litigant normally must assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens." Warth v. Seldin, 422 U.S., at 499, 95 S.Ct., at 2205. He also must assert his own legal interests rather than those of third parties. [footnote omitted] Ibid. Accord, Arlington Heights v. Metropolitan Housing Dev. Corp., supra, 429 U.S., at 263, 97 S.Ct., at 561.

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99-100 (1979).

Given the allegations of direct or threatened direct harm, albeit shared by most of the population or future population, the court should be loath to decline standing to persons suffering an alleged concrete injury of a constitutional magnitude. See U.S. v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687:

> standing is not to be denied simply because many people suffer the same injury. Indeed some of the cases on which we relied in Sierra Club demonstrated the patent fact that persons across the Nation could be adversely affected by major governmental actions. See, e.g., Environmental Defense Fund v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1097 (interests of consumers affected by decision of Secretary of Agriculture refusing to suspend registration of certain pesticides

containing DDT); Reade v. Ewing, 2 Cir., 205 F.2d 630, 631—632 (interests of consumers of oleomargarine in fair labeling of product regulated by Federal Security Administration). To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.

While the FAC identifies numerous climatic, meteorologic, and political harms that the Earth and its inhabitants will suffer as a result of the government's action and failure to act with respect to $CO_2$ emissions, the plaintiffs differentiate the impacts by alleging greater harm to youth and future generations.[4] At this stage of the proceedings, the allegations, which must be taken as true, establish action/inaction that injures plaintiffs in a concrete and personal way.

The debate about climate change and its impact has been before various political bodies for some time now. Plaintiffs give this debate justiciability by asserting harms that befall or will befall them personally and to a greater extent than older segments of society. It may be that eventually the alleged harms, assuming the correctness of plaintiffs' analysis of the impacts of global climate change, will befall all of us. But the intractability of the debates before Congress and state legislatures and the alleged valuing of short term economic interest despite the cost to human life, necessitates a need for the courts to evaluate the constitutional parameters of the action or inaction taken by the government. This is especially true when such harms have an alleged disparate impact on a discrete class of society.

To reiterate, at this stage of the proceedings the court must accept the allegations of concrete particularized harm or imminent threat of such harm as true. The question then becomes whether

---

[4]The plaintiffs essentially allege that the defendants have "discounted" emissions so as to pass on more severe impacts to younger and future generations to allow the present (and older) generations to reap the economic benefits of higher carbon emissions.

the alleged harm is traceable to defendants' conduct and whether the court can redress such harm.


2.    Causation

As noted above, there must be a causal connection between the injury and the conduct of which plaintiffs complained. In other words, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41–42 (1976).

At the pleading stage, general factual allegations of injury resulting from the defendants' conduct may suffice because the court must presume that general allegations embrace those specific facts that are necessary to support the claim. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The government asserts that the association between the complained of conduct (such as subsidizing the fossil fuel industry, favorable revenue code provisions, allowing transport of fossil fuels, and authorizing fossil fuel combustion in the energy/refinery/transportation/manufacturing sectors) and the associated greenhouse gas emissions that ultimately cause the harm is tenuous and filled with countless intervening actions by unidentified third parties. However, as alleged, without the complained of conduct, the third parties would not be able to engage as extensively in the activities that allegedly cause climate change and the resulting harm.

To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a line of causation between defendants' action and their alleged harm that is more than attenuated. Allen v. Wright, 468 U.S. 737, 757 (1984). A causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible. Nat'l Audubon Soc., Inc. v. Davis, 307 F.3d 835, 849 (9th Cir. 2002). In cases where a chain of causation

involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries, the causal chain may be too weak to support standing at the pleading stage. See Allen, 468 U.S. at 759.

But here, there is an alleged strong link between all the supposedly independent and numerous third party decisions given the government's regulation of $CO_2$ emissions. See, e.g., 42 U.S.C. § 7409 (providing the EPA the authority to regulate national ambient air quality standards for the attainment and maintenance of the public health); Massachusetts v. EPA, 549 U.S. 497 (2007) (EPA has power to regulate greenhouse gas emissions). If the allegations in the complaint are to be believed, the failure to regulate the emissions has resulted in a danger of constitutional proportions to the public health. Presumably, sweeping regulations by this agency (the EPA) alone could result in curtailing of major $CO_2$ producing activities by not just the defendant agencies, but by the purported independent third parties as well.[5]  At this pleading stage, the court need not sort out the necessity or propriety of all the various agencies and individuals to participate as defendants, at least with respect to issues of standing. For now, it is sufficient that EPA's action/inaction with respect to the regulation of greenhouse gases allegedly results in the numerous instances of emissions that purportedly cause or will cause the plaintiffs harm. Assuming lack of EPA or other government action to reduce emissions, the analysis turns to redressability.

---

[5]The court is aware that there are administrative procedures to petition EPA to make rules and that a denial of that decision is reviewable by the courts. The plaintiffs have apparently not sought such rulemaking to limit $CO_2$ emissions, but the court does have jurisdiction to address alleged constitutional violations by government agencies and to provide equitable relief. C.f. Reeves Brothers, Inc. v. EPA, 956 F.Supp. 665 (W.D.Va. 1995) (CERCLA general prohibition against federal court jurisdiction over challenges to remedial actions did not bar constitutional challenges to actions of EPA).

Page 10 - FINDINGS & RECOMMENDATION

3.    Redressability of the Injury

At this stage of the proceedings, the court's job is not to determine whether increased greenhouse gases have impacted the climate and will have dire consequences for future generations. The issue is whether the court can fashion a remedy to address that alleged harm should plaintiffs prove it. Redressability does not require certainty, but it does require a substantial likelihood that the injury will be redressed by a favorable judicial decision. Wolfson v. Brammer, 616 F.3d 1045, 1056 (9th Cir. 2010).

Assuming plaintiffs are correct that the United States is responsible for about 25% of the global $CO_2$ emissions, the court cannot say, without the record being developed, that it is speculation to posit that a court order to undertake regulation of greenhouse gas emissions to protect the public health will not effectively redress the alleged resulting harm. The impact is an issue for the experts to present to the court after the case moves beyond the pleading stage. And although this court has no authority outside of its jurisdiction, it is worth noting that a Dutch court, on June 24, 2015, did order a reduction of greenhouse gas emissions nationwide by at least 25% by 2020. See Urgenda Foundation v. The State of The Netherlands, The Hague District Court, Chamber for Commercial Affairs, Case No. C/09/456689/HA ZA 13-1396 (June 24, 2015) (http://deeplink.rechtspraak.nl/uitspraak?id=ECLI:NL:RBDHA:2015:7196) (rejecting arguments that a reduction of Netherlands' emissions would be ineffectual in light of other nations' practices, observing that "The state should not hide behind the argument that the solution to the global climate problem does not depend solely on Dutch efforts. Any reduction of emissions contributes to the prevention of dangerous climate change and as a developed country the Netherlands should take the lead in this."). Thus, regulation by this country, in combination with regulation already being

Page 11 - FINDINGS & RECOMMENDATION

undertaken by other countries, may very well have sufficient impact to redress the alleged harms. The effect may or may not be scientifically indiscernible, but that is an issue better resolved at summary judgment or trial rather than on a motion to dismiss. See Washington Environmental Council v. Bellon, 732 F.3d 1131, 1142-43 (9th Cir. 2013) (deciding at the summary judgment stage that numerous greenhouse gas sources inside and outside the U.S. contribute to the effect and that the nexus between the state's refinery emissions and localized impacts was too scientifically uncertain). Plaintiffs allege that expert evidence will show that the effect resulting from a court order for the government to take action to deter fossil fuel production and regulate emissions will have a discernible impact on the alleged constitutional harms likely to befall plaintiffs if the court does nothing.

At this stage, the court will not dismiss the premise that an order to regulate, per EPA's statutory authority to regulate $CO_2$, will result in that impact. The allegations establish that, for instance, the EPA's failure to regulate impacts the younger population within this district and it may very well be that an order to act to protect the public health as directed will address that harm.[6] Given the complexities of the allegations and the need for expert opinion to establish the harm associated with government action and the extent to which a court order can limit that harm, the issue may be better addressed at the summary judgment stage.

In sum, for the above reasons, the court should decline to dismiss the case for a lack of standing.

---

[6]Plaintiffs allege that "events, omissions, and harms giving rise to the claims herein arise in substantial part in this judicial district." (FAC at ¶ 15)

Page 12 - FINDINGS & RECOMMENDATION

B. Political Question

Closely related to the standing issue, is the issue of non-justiciable political questions. As

plaintiffs note, "Standing is just the obverse of political question. If a litigant claims that an

individual right has been invaded, the lawsuit by definition does not involve a political question."

Plaintiffs' Memorandum in Opposition to Intervenors' Motion to Dismiss (#56) at p. 16, n. 12 (citing

Howard Fink & Mark Tushnet, *Federal Jurisdiction: Policy and Practice* 231 (2d ed. 1987).

> It is apparent that several formulations which vary slightly according to the settings
> in which the questions arise may describe a political question, although each has one
> or more elements which identify it as essentially a function of the separation of
> powers. Prominent on the surface of any case held to involve a political question is
> found a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or a lack of judicially discoverable and manageable
> standards for resolving it; or the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or the impossibility of a
> court's undertaking independent resolution without expressing lack of the respect due
> coordinate branches of government; or an unusual need for unquestioning adherence
> to a political decision already made; or the potentiality of embarrassment from
> multifarious pronouncements by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217 (1962).

While on the surface this case appears to implicate authority of the Congress, courts can order

agencies delegated that authority (via Congress) to craft regulations, to engage in such process.

Some defendant agencies have undertaken regulation of greenhouse gases allegedly exercising their

discretion to prioritize relatively cheap energy over deleterious impacts to the environment. While

courts cannot intervene to assert "better" policy, see, e.g., Massachusetts v. E.P.A., 549 U.S. at 533

( once EPA has responded to a petition for rulemaking, its reasons for action or inaction must

conform to the authorizing statute), they can address constitutional violations by government

agencies and provide equitable relief. C.f. Reeves Brothers, Inc. v. EPA, 956 F.Supp. 665 (W.D.Va.

Page 13 - FINDINGS & RECOMMENDATION

1995) (CERCLA general prohibition against federal court jurisdiction over challenges to remedial actions did not bar constitutional challenges to actions of EPA). The complaint does raise issues of whether government action/inaction violates the Constitution and these are issues committed to the courts rather than either of the political branches.

As implied above, the amended complaint's broad request for relief does implicate some unmanageable issues, but that does not bar the case completely. As also noted, at a minimum, the EPA is charged with regulating greenhouse gas emissions to protect the public health. While the efficacy of any proposed regulations is perhaps beyond the expertise of the court, it can evaluate the competing experts on either side of the issues and direct the EPA to take a hard look at the best available scientific evidence. The court need not dictate any regulations, only direct the EPA to adopt standards that prevent the alleged constitutional harm to the youth and future generation plaintiffs, should plaintiffs prevail in demonstrating such is possible.[7] Again, it is too early in the proceedings to determine whether the issue can be resolved without expressing lack of respect due to the executive branch in conducting its rule-making authority delegated it by Congress. The motion to dismiss, on this basis, should be denied at this time.

Turning to the next issue, plaintiffs' standing and the lack of political questions require a valid constitutional claim.

_____

[7]Although not the route plaintiffs have expressly chosen in the prayer for remedies, they have asked for "other relief [deemed] just and proper" and, the court can compel EPA to perform nondiscretionary acts or duties. 42 U.S.C. § 7604(a)(2); see, e.g., Sierra Club v. Thomas, 828 F.2d 783, 787–92 (D.C.Cir. 1987). The court's authority in this regard demonstrates that simply ordering an agency to take action delegated it by Congress in order to avoid constitutional harms does implicate justiciability and negates a finding that the issue is committed solely to another branch of government.

C.      Valid Constitutional Claim

Defendants argue that there is no constitutional right to be free from $CO_2$ emissions, that the complaint fails to allege a classification appropriate for an equal protection claim, that the Ninth Amendment does not provide any substantive rights, and that the plaintiffs have failed to allege an otherwise complete lack of any rational basis for the purported aggregate action/inaction taken by defendants. However, at this stage of the proceedings, defendants take an overly simplistic approach in construing the constitutional claims raised by plaintiffs. The complaint does not assert a right to be free from $CO_2$ emissions.[8]  Plaintiffs assert that the defendants' action/inaction with respect to their obligations regarding regulating environmental pollutants has violated their substantive due process rights and has done so in favor of older generations.

The Fifth Amendment provides in part that "no person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

Courts must employ caution and restraint when employing substantive due process protections to government action. See Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 502 (1977). However, courts must not abandon substantive due process rights either. Id. Accordingly, substantive due process rights are limited by careful respect for the teachings of history and recognition of the basic values that underlie our society. Id. at 503. Therefore, only official conduct that "shocks the conscience" is cognizable as a due process violation. Porter v. Osborn, 546 U.S. 1131, 1137 (9th Cir. 2008).

--------

[8]Plaintiffs do, however, assert that future generations are a suspect class. The court should decline to create a new separate suspect class based on posterity. Nonetheless, the complaint does allege discrimination against a class of younger individuals with respect to a fundamental right protected by substantive due process.

Page 15 - FINDINGS & RECOMMENDATION

Generally, the Due Process Clause limits the government's power to act, but does not guarantee certain minimal levels of safety and security. DeShaney v. Winnebago County Dept. Of Social Services, 489 U.S. 189, 195 (1989). The language of the Due Process Clause does not impose an affirmative obligation on the government to ensure that those interests do not come to harm through other means. Id. However, there is an exception where government action creates the danger. See L.W. v. Grubbs, 974 F.2d 119, 121-22 (9th Cir. 1992). In such cases, deliberate indifference may suffice to establish a due process violation. See L.W. v. Grubbs, 92 F.3d 894, 896 (9th Cir. 1996). Deliberate indifference requires creation of a dangerous situation with actual knowledge or willful ignorance of impending harm. Id. at 900. Plaintiffs allege that the defendants' action in this case has created a life-threatening situation and that defendants have willfully ignored long-standing and overwhelming scientific evidence of that impending harm to the young and future generations.

The government argues that the complaint fails to allege a clear and present danger of imminent harm, an overt government act that proximately causes the dangerous situation, deliberate indifference on the part of the government to plaintiffs' safety, or subsequent physical harm or loss of life. For purposes of a motion to dismiss, plaintiffs need only plead government action, or failure to act where it has a duty to do so, which creates a threat of imminent harm, and the government's deliberate indifference to that threat of harm.

In this case, the government has allegedly taken action through subsidies, regulations, etc. that creates massive $CO_2$ emissions, and has failed to limit such emissions despite a duty to do so. Plaintiffs further allege they are prevented any means of escape from the resulting climate that threatens their property, health, and even existence. As noted above, the EPA has a duty to regulate

Page 16 - FINDINGS & RECOMMENDATION

$CO_2$ emissions for the benefit of the public health and plaintiffs allege a deliberate indifference to the purported catastrophic risk to their health and well-being. Whether such action, or inaction in the face of a duty to act, shocks the conscience cannot be determined on a motion to dismiss, which is focused solely on the plaintiffs' complaint and is bereft of any evidentiary record.[9] Accordingly, the court should decline to dismiss the complaint for failure to allege a substantive due process claim.

D.    Public Trust Doctrine

Similarly, the court should decline to dismiss any notions in the amended complaint that the Due Process Clause also provides a substantive right under the public trust doctrine. As noted above, the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," Moore , 431 U.S. at 503; Snyder v. Massachusetts, 291 U.S. 97, 105 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937).

Defendants argue that the Supreme Court and the Ninth Circuit have already foreclosed on the possibility of an independent cause of action under the doctrine against the federal government by a private individual. See PPL Montana, LLC v. Montana, 132 S.Ct. 1215, 1235 (2012) (the public

---

[9]For example, discovery may produce evidence regarding when defendants and intervenors were aware of the harmful effects of $CO_2$ emissions and whether the public was purposely misled about those effects, which evidence would be relevant to the "shocks the conscience" standard.

trust doctrine remains a matter of state law); U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal., 683 F.3d 1030, 1038 (9th Cir. 2012) (While the equal-footing doctrine is grounded in the Constitution, "the public trust doctrine remains a matter of state law").

However, the cases cited by defendants are distinguishable. In PPL Montana, LLC, the Supreme Court essentially held that the State of Montana did not hold title to riverbeds under segments of river that were non-navigable at the time of statehood. Under the equal footing doctrine, which is embedded in the Constitution, a State takes title to all riverbeds of navigable rivers upon statehood. In response to the State of Montana's argument that "denying the State title to the riverbeds here in dispute will undermine the public trust doctrine," the Court observed:

> While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, see Shively, 152 U.S., at 49, 15–17, 24, 46, 14 S.Ct. 548, the contours of that public trust do not depend upon the Constitution. Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.

PPL Montana, LLC, 132 S.Ct. at 1235.

In other words, Montana's argument essentially was an attempt to conflate the equal footing doctrine with the public trust doctrine resulting in the State having title to even non-navigable riverbeds pursuant to the latter doctrine. The Court merely rejected this contention as "apples and oranges," pointing out that the equal footing doctrine requires that a State take title to riverbeds of navigable rivers upon statehood, and that thereafter state law determines the scope of the public trust over such waters. The question whether the United States has public trust obligations for waters over which it alone has sovereignty (e.g., the territorial seas of its coastline) was simply not presented to or decided by the Court in PPL Montana, LLC.

Page 18 - FINDINGS & RECOMMENDATION

The seminal case for the public trust doctrine is Illinois Cent. R. Co. v. State of Illinois, 146

U.S. 387 (1892) which likewise implicated an equal footing question and in which the Court noted:

> That the state holds the title to the lands under the navigable waters of Lake
> Michigan, within its limits, in the same manner that the state holds title to soils under
> tide water, by the common law, we have already shown; and that title necessarily
> carries with it control over the waters above them, whenever the lands are subjected
> to use. But it is a title different in character from that which the state holds in lands
> intended for sale. It is different from the title which the United States hold in the
> public lands which are open to pre-emption and sale. It is a title held in trust for the
> people of the state, that they may enjoy the navigation of the waters, carry on
> commerce over them, and have liberty of fishing therein, freed from the obstruction
> or interference of private parties.

Id. at 452.

Once the State obtains sovereignty over navigable riverbeds, the United States has ceded all

its title and thus the public trust doctrine governing the State's disposition of such lands "remains a

matter of state law." PPL Montana, LLC, 132 S.Ct. at 1235.

Likewise, in U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal.,

the Ninth Circuit dealt with a case wherein the federal government exercised its powers of eminent

domain to acquire San Diego Port District tidelands (for use by the United States Navy) which had

been transferred to the State of California under the equal footing doctrine in 1850 when California

was admitted to the Union. In response to the California Lands Commission argument that the

public trust doctrine restricted the ability of both federal and State governments to alienate public

trust lands free of the public trust, the Ninth Circuit held:

> While the equal-footing doctrine is grounded in the Constitution, "the public trust
> doctrine remains a matter of state law," the contours of which are determined by the
> states, not by the United States Constitution. PPL Montana, 132 S.Ct. 1215 at 1235.
> Holding that California's public trust interest in the Property survives the federal
> government's attempt to condemn it would subjugate the federal government's
> eminent domain power to California's state law public trust doctrine. See Carmack,

Page 19 - FINDINGS & RECOMMENDATION

329 U.S. at 240–42, 67 S.Ct. 252; United States v. 11.037 Acres of Land, 685 F.Supp. 214, 217 (N.D.Cal. 1988) (holding that California's public trust is extinguished by United States' declaration of taking because state law public trust is trumped by federal power). The Supremacy Clause prevents this outcome. U.S. Const., art. VI, cl. 2.

U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal., 683 F.3d at 1038.

I also note that in the 32.42 Acres case the district court had specifically found, over the government's objection, that a portion of the land acquired by the United States within the tidelands (4.88 acres) was acquired subject to its own federal trust. See Order dated April 28, 2006 (#24) at p. 11 in United States v. 32.42 Acres of Land, Case No. 05-cv-1137-DMS, (S.D.Cal. April 28, 2006) (emphases added). The government did not cross-appeal this part of the district court's order and it was not disturbed or addressed by the Ninth Circuit.

This case is different in that it does not at all implicate the equal footing doctrine or public trust obligations of the State of Oregon. The public trust doctrine invoked instead is directed against the United States and its unique sovereign interests over the territorial ocean waters and atmosphere of the nation.

The doctrine is deeply rooted in our nation's history and indeed predates it. See, e.g., Shively v. Bowlby, 152 U.S. 1 (1894) (recounting the American history of the doctrine). As observed in Shively:

> At common law, the title and the dominion in lands flowed by the tide were in the king for the benefit of the nation. Upon the settlement of the colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original states within their respective borders, subject to the rights surrendered by the constitution to the United States.
> Upon the acquisition of a territory by the United States, whether by cession from one of the states, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit

Page 20 - FINDINGS & RECOMMENDATION

of the whole people, and in trust for the several states to be ultimately created out of the territory.

The new states admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several states, subject to the rights granted to the United States by the Constitution.

Id. at 57-58.

While the scope of the public trust doctrine may only reach the low water mark on the regions of the sea and great lakes, the water over those lands, and the waters and streams of any consequence, see, e.g., *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 556 (1970), the complaint touches upon protected areas (territorial ocean waters at a minimum) impacted by the government's alleged conduct and harm to many plaintiffs given the alleged sea level rise, ocean acidification, and atmosphere change.

What emerges from an analysis of the public trust doctrine is that it is rare to find instances where the United States retains vestiges of trust obligations once territories become states and title vests in the newly formed state pursuant to the equal footing doctrine of the Constitution. Some guidance is found, however, in those cases wherein the United States has re-acquired tidelands through eminent domain from the State. One such case is United States v. 32.42 Acres of Land, supra. Another is City of Alameda v. Todd Shipyards Corp., 635 F.Supp. 1447 (N.D.Cal. 1986), wherein the court squarely held that "The United States may not abdicate the role of trustee for the public when it acquires land by condemnation." Id. at 1450. See also United States v. 1.58 Acres of Land Situated in City of Boston, Suffolk County, Com. of Mass., 523 F.Supp. 120, 124-25 (D.Mass. 1981):

we hold that the federal government may take property below the low water mark in "full fee simple" insofar as no other principal may hold a greater right to such land. It must be recognized, however, that the federal government is as restricted as the Commonwealth in its ability to abdicate to private individuals its sovereign jus publicum in the land. So restricted, neither the Commonwealth's nor the federal government's trust responsibilities are destroyed by virtue of this taking, since neither government has the power to destroy the trust or to destroy the other sovereign.

The court's intervention in this area may seemingly touch upon powers committed to Congress under Article IV, § 3, Cl. 2 (Congress shall have the power to dispose and make all needful rules and regulations respecting the territory and other property of the United States). In addition, it is not for the courts to say how the trust in resources and the territory shall be administered, that is for Congress to determine. State of Alabama v. State of Texas, 347 U.S. 272, 273 (1954) (citing United States v. California, 332 U.S. 19, 27 (1947) ("the constitutional power of Congress under Article IV, § 3, Cl. 2 is without limitation."). However, even defendant Department of the Interior has recognized limits on government control over the territorial sea. See United States Department of Justice, Office of Legal Counsel, Memorandum Opinion for the Solicitor Department of the Interior, *Administration of Coral Reef Resources in the Northwest Hawaiian Islands,* 2000 WL 34475732 at *7 (September 15, 2000) ( the public trust doctrine, which the Court did not address in Alabama, might limit in some ways the extent of the Government's control over the territorial sea). The Department further noted that doctrine does grant the government power to exercise dominion over that area to protect it and its resources for public enjoyment and noted the government's role as public trustee. Id. And, as noted above, courts have noted and restricted the federal government's actions with respect to tidelands based on the federal public trust. United States v. 32.42 Acres of Land, Case No. 05-cv-1137-DMS, supra; City of Alameda v. Todd Shipyards Corp., 635 F.Supp. 1447, supra.

Page 22 - FINDINGS & RECOMMENDATION

At the hearing on defendants and intervenors' motions to dismiss, the court their queried counsel whether, hypothetically, Congress could alienate the territorial waters of the United States off the West Coast to a private corporation, or whether that would implicate a public trust issue under the Constitution. Both parties suggested Congress could cede the territorial waters to a private corporation, and that <u>PPL Montana, LLC,</u> forecloses any argument that the public trust doctrine applies to the federal government.

As explained above, I cannot read <u>PPL Montana, LLC,</u> given the context of the argument being addressed by the Court, to have such a sweeping and profound effect.[10] Nor can I imagine that our coastal sea waters could possibly be privatized without implicating principles that reflect core values of our Constitution and the very essence of the purpose of our nation's government.

When combined with the EPA's duty to protect the public health from airborne pollutants and the government's public trust duties deeply ingrained in this country's history, the allegations in the complaint state, for purposes of a motion to dismiss, a substantive due process claim. At this stage of the proceedings, the court cannot say that the public trust doctrine does not provide at least some substantive due process protections for some plaintiffs within the navigable water areas of Oregon. Accordingly, the court should not dismiss any claims under the public trust doctrine to that extent.

The nascent nature of these proceedings dictate further development of the record before the court can adjudicate whether any claims or parties should not survive for trial. Accordingly, the

---

[10]In <u>Shively</u>, which the Court cited in its <u>PPL Montana, LLC</u> decision, expressly held that "[u]pon the acquisition of a territory by the United States, whether by cession from one of the states, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and <u>in trust</u> for the several states to be ultimately created out of the territory. <u>Shively</u>, 152 U.S. at 57. Thus, a federal public trust doctrine was recognized in <u>Shively</u>, and <u>PPL Montana, LLC</u> did not overrule this precedent.

Page 23 - FINDINGS & RECOMMENDATION

court should deny the motions to dismiss.

## CONCLUSION

For the reasons stated above, the intervenors' motion to dismiss (#19) and the government's motion to dismiss (#27) should be denied. The government's motion to strike (#58) is denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this $\mathcal{8}^T$ day of April 2016.

THOMAS M. COFFIN
United States Magistrate Judge

Page 24 - FINDINGS & RECOMMENDATION