**C. Marie Eckert**, OSB No. 883490
marie.eckert@millernash.com
**Suzanne C. Lacampagne**, OSB No. 951705
suzanne.lacampagne@millernash.com
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  (503) 224-5858
Facsimile:  (503) 224-0155

**Roger R. Martella, Jr.**
rmartella@sidley.com
**Quin M. Sorenson**
qsorenson@sidley.com
**Benjamin E. Tannen**
btannen@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711

Attorneys for Intervenor-Defendants
  The National Association of Manufacturers
  American Fuel & Petrochemical Manufacturers
  American Petroleum Institute

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **KELSEY CASCADIA ROSE JULIANA**, et al.,<br><br>          Plaintiffs,<br><br>    **v.**<br><br>**UNITED STATES OF AMERICA**, et al.,<br><br>          Defendants. | Case No.  6:15-cv-01517-TC<br><br>**INTERVENOR-DEFENDANTS' OBJECTIONS TO MAGISTRATE'S FINDINGS AND RECOMMENDATION**<br><br>Request for Oral Argument |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF THE CASE............................................................................................... 4

STANDARD OF REVIEW ................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.    THE COMPLAINT DOES NOT ALLEGE A VALID FEDERAL CAUSE OF ACTION
      OR IMPLICATE A FEDERAL QUESTION SUBJECT TO FEDERAL JURISDICTION
      ..................................................................................................................................... 9

      A.    The "Public Trust Doctrine" Does Not Apply To The Federal Government
            And Cannot Support A Valid Claim For Relief In This Case ................................. 9

      B.    Neither The Due Process Clause Nor The Equal Protection Clause Provide
            The Plaintiffs With A Cognizable Cause Of Action.............................................. 16

      C.    Any Cause Of Action That Might Have Been Recognized As Supporting
            The Alleged Claims Has Been Displaced By Federal Statute ............................... 19

II.   THIS CASE PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS ................. 21

      A.    The Claims Implicate Issues That Are Textually Committed To The
            Executive And Legislative Branches .................................................................... 22

      B.    There Are No Judicially Discoverable Or Manageable Standards For
            Resolving The Claims .......................................................................................... 24

      C.    The Claims Could Not Be Adjudicated Without Expressing Lack Of
            Respect Due To Other Branches Of Government.................................................. 26

III.  THE PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS...................... 28

      A.    The Complaint Does Not Allege Imminent And Particularized Injuries.............. 28

      B.    The Injuries Alleged In The Complaint Are Neither Fairly Traceable To
            The Defendants Nor Likely Redressable By The Requested Relief...................... 31

CONCLUSION.................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alec L. v. Jackson,*
  863 F. Supp. 2d 11 (D.D.C. 2012), *aff'd*, 561 F. App'x 7 (D.C. Cir. 2014),
  *cert. denied*, 135 S. Ct. 774 (2014) ...................................................................................3, 5, 8

*Alec L. ex rel. Loorz v. McCarthy,*
  561 F. App'x 7 (D.C. Cir. 2014)...............................................................................3, 5, 8, 11

*Am. Elec. Power Co. v. Connecticut,*
  131 S. Ct. 2527 (2011).................................................................................2, 19, 20, 25, 26

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009).................................................................................................6, 32

*Baker v. Carr,*
  369 U.S. 186 (1962).............................................................................................21, 24, 26

*Barnes v. Chase Home Fin., LLC,*
  825 F. Supp. 2d 1057 (D. Or. 2011) ...........................................................................7

*Bonser-Lain v. Texas Comm'n on Envtl. Quality,*
  No. D-1-GN-11-002194, 2012 WL 3164561 (Tex. 201st Dist. Aug. 2, 2012),
  *rev'd*, 438 S.W.3d 887 (Tex. App. 2014) ...............................................................15

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988)......................................................................................................29

*Brigham Oil & Gas, L.P. v. N.D. Bd. of Univ. & Sch. Lands,*
  866 F. Supp. 2d 1082 (D.N.D. 2012) ........................................................................12

*Bush v. Lucas,*
  462 U.S. 367 (1983)......................................................................................................20

*City of Alameda v. Todd Shipyards Corp.,*
  635 F. Supp. 1447 (N.D. Cal. 1986) ..........................................................................13

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)......................................................................................................19

*Clegg v. Cult Awareness Network,*
  18 F.3d 752 (9th Cir. 1994) ...................................................................................6, 32

*Comer v. Murphy Oil USA, Inc.*,
 839 F. Supp. 2d 849 (S.D. Miss. 2012), *aff'd on other grounds*, 718 F.3d 460
 (5th Cir. 2013) ........................................................................................................32

*Ctr. for Biological Diversity v. Dep't of Interior*,
 563 F.3d 466 (D.C. Cir. 2009) ...............................................................................32

*Davis v. Bandemer*,
 478 U.S. 109 (1986)................................................................................................18

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
 489 U.S. 189 (1989)..........................................................................................16, 17

*Fed. Election Comm'n v. Akins*,
 524 U.S. 11 (1998)..................................................................................................31

*Foster v. Wash. Dep't of Ecology*,
 No. 14-2-25295-1, slip op. (Wash. King Cty. Super. Ct. Nov. 19, 2015) ...............14

*Gibson v. Matthews*,
 926 F.2d 532 (6th Cir. 1991) ..................................................................................19

*Gilligan v. Morgan*,
 413 U.S. 1 (1973)........................................................................................23, 26, 27

*Gladstone Realtors v. Vill. of Bellwood*,
 441 U.S. 91 (1979)..................................................................................................30

*Heckler v. Chaney*,
 470 U.S. 821 (1985)................................................................................................23

*Illinois Cent. R.R. Co. v. Illinois*,
 146 U.S. 387 (1892)........................................................................11, 14, 15, 16, 20

*Jones v. Rose*,
 No. CV 00-1795, 2005 WL 2218134 (D. Or. Sept. 9, 2005)...................................12

*Kneipp v. Tedder*,
 95 F.3d 1199 (3d Cir. 1996)....................................................................................17

*L.W. v. Grubbs*,
 92 F.3d 894 (9th Cir. 1996) ...............................................................................17, 18

*L.W. v. Grubbs*,
 974 F.2d 119 (9th Cir. 1992) ..............................................................................17, 18

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)..........................................................................28, 29, 30, 31, 32

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)..................................................................................22, 23

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..............................................................................23, 25, 26

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923)........................................................................................30

*McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.,*
    656 F.2d 1309 (9th Cir. 1981) ........................................................................7

*Munger v. City of Glasgow Police Dep't,*
    227 F.3d 1082 (9th Cir. 2000) ......................................................................17

*Native Vill. of Kivalina v. ExxonMobil Corp.,*
    663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd on other grounds,* 696 F.3d 849
    (9th Cir. 2012)..........................................................................................32, 33

*Nixon v. United States,*
    506 U.S. 224 (1993)........................................................................................21

*North Carolina ex rel. Cooper v. TVA,*
    615 F.3d 291 (4th Cir. 2010) ...................................................................31, 32

*Nunez by Nunez v. City of San Diego,*
    114 F.3d 935 (9th Cir. 1997) ........................................................................19

*Oregon v. Corvallis Sand & Gravel Co.,*
    429 U.S. 363 (1977)........................................................................................11

*PPL Montana, LLC v. Montana,*
    132 S. Ct. 1215 (2012)...............................................3, 6, 9, 10, 11, 12, 13, 14

*Penilla v. City of Huntington Park,*
    115 F.3d 707 (9th Cir. 1997) ........................................................................17

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)........................................................................................18

*Phillips Petrol. Co. v. Mississippi,*
    484 U.S. 469 (1988)........................................................................................11

*Ramos v. Town of Vernon,*
    353 F.3d 171 (2d Cir. 2003)...........................................................................19

*Reeves Bros., Inc. v. EPA,*
    956 F. Supp. 665 (W.D. Va. 1995) ...............................................................23

*Romer v. Evans*,
    517 U.S. 620 (1996)..................................................................................18

*Sanders-Reed ex rel. Sanders-Reed v. Martinez*,
    350 P.3d 1221 (N.M. Ct. App. 2015)....................................................15

*Sansotta v. Town of Nags Head*,
    724 F.3d 533 (4th Cir. 2013) .................................................................11

*Seminole Tribe v. Florida*,
    517 U.S. 44 (1996)..................................................................................14

*Shively v. Bowlby*,
    152 U.S. 1 (1894).........................................................................11, 12, 13

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)................................................................................29

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................28

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)................................................................................25

*United States v. 1.58 Acres of Land*,
    523 F. Supp. 120 (D. Mass. 1981) .........................................................13

*United States v. 32.42 Acres of Land*,
    683 F.3d 1030 (9th Cir. 2012) .......................................................11, 12, 13

*United States v. Flores-Villar*,
    536 F.3d 990 (9th Cir. 2008) .................................................................19

*United States v. Gaudin*,
    28 F.3d 943 (9th Cir. 1994) ...................................................................14

*United States v. Mission Rock Co.*,
    189 U.S. 391 (1903)...................................................................9, 14, 15, 16

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973)................................................................................31

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004)................................................................................21

*Washington Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) .............................................3, 6, 15, 28, 31, 32, 33

*Washington v. Davis,*
  426 U.S. 229 (1976)................................................................................18

*Webster v. Doe,*
  486 U.S. 592 (1988)................................................................................23

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000) ................................................................6

*Wood v. Ostrander,*
  879 F.2d 583 (9th Cir. 1989) ................................................................17

*Wynne v. Town of Great Falls, S.C.,*
  376 F.3d 292 (4th Cir. 2004) ................................................................14

**Constitution, Statutes and Regulations**

U.S. Const. art. I, § 1................................................................................22

U.S. Const. art. I, § 8................................................................................22

U.S. Const. art. II, § 1 ..............................................................................22

U.S. Const. art. IV, § 3..............................................................................13

Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, 121 Stat. 1844 ........................27

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat.
  1492........................................................................................................27

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776................................27

Energy Security Act of 1980, Pub. L. No. 96-294, 94 Stat. 611 ..................................27

Global Change Research Act of 1990, Pub. L. No. 101-606, 104 Stat. 3096................................27

Global Climate Protection Act of 1987, Pub. L. No. 100-204, tit. XI, 101 Stat.
  1331........................................................................................................27

National Climate Program Act of 1978, Pub. L. No. 95-367, 92 Stat. 601 ..................................26

15 U.S.C. § 717r ......................................................................................29

28 U.S.C. § 636........................................................................................7

42 U.S.C. § 7607......................................................................................23

75 Fed. Reg. 31514 (June 3, 2010) ................................................................1

76 Fed. Reg. 57106 (Sept. 15, 2011) ............................................................1

78 Fed. Reg. 66819 (Nov. 6, 2013)...............................................................1

80 Fed. Reg. 77420 (Dec. 14, 2015) ...........................................................1

**Rule**

Fed. R. Civ. P. 72..................................................................................7

**Administrative Order**

Order No. 3041, *In re Jordan Cove Energy Project, L.P.*,
    FE Docket No. 11-127-LNG (U.S. Dep't of Energy, Dec. 7, 2011) .....................................28

**Other Authorities**

Jean Chemnick, *Paris Agreement:  Kerry Signs Deal, Calls It a 'Turning Point' in
    Climate War*, Greenwire (Apr. 22, 2016), *available at*
    http://www.eenews.net/greenwire/2016/04/22/stories/1060036116; ........................................1

Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from
    Illinois Central Railroad*, 33 Ariz. St. L.J. 849, 870 (2001).....................................13

*Federal Climate Change Lawsuit*, OUR CHILDREN'S TRUST, *available at*
    http://ourchildrenstrust.org/us/federal-lawsuit (last visited Apr. 28, 2016)..............................3

Press Release, Youth Sue the Government to Preserve the Future and Halt
    Climate Change (May 4, 2011), *available at*
    http://ourchildrenstrust.org/sites/default/files/iMatter_Legal_Release_11.05.01
    .pdf ...................................................................................................3

## INTRODUCTION

In this extraordinary lawsuit, a group of private citizens and organizations asks this Court to commandeer the authority of the Office of the President and more than a dozen federal cabinet-level agencies and officials, and direct them "to cease their permitting, authorizing, and subsidizing of fossil fuels" and take whatever other actions are "necessary" to drastically reduce greenhouse gas emissions in the United States to levels these plaintiffs deem acceptable.  Doc. 7 ¶¶ 7, 12 ("Compl.").  Those agencies share regulatory and enforcement responsibilities over millions of enterprises, across every sector of the economy, and restrictions of the type the complaint seeks would have profound consequences for the Nation's economic development and productivity, social policies, security interests, and international standing.  They would also, in many cases, directly conflict with and undermine the carefully considered regulatory programs and policies (and international agreements) already adopted by the federal government to address issues relating to greenhouse gas emissions and climate change.[1]

---

[1] The federal government has in recent years taken a number of aggressive steps to reduce greenhouse gas emissions and address concerns over climate change.  Among other programs and policies, the Environmental Protection Agency ("EPA") has imposed new restrictions on permissible greenhouse gas emissions levels for industrial and commercial facilities throughout the Nation, and required them to implement the "best available control technology" for reducing those emissions further.  75 Fed. Reg. 31514 (June 3, 2010).  It has also adopted strict limitations governing greenhouse gas emissions from new motor vehicles and mandated that fuel sold in this country be produced using renewable materials, reducing greenhouse gas and other emissions during both production and use, 80 Fed. Reg. 77420 (Dec. 14, 2015); 76 Fed. Reg. 57106 (Sept. 15, 2011); moreover, all agencies of the Executive Branch have adopted formal plans to address issues relating to climate change, pursuant to presidential directive. 78 Fed. Reg. 66819 (Nov. 6, 2013).  And, internationally, the United States and nearly 200 other governments worldwide reached a historic agreement—the so-called "Paris Accords," signed on April 22, 2016—to establish defined targets for emissions reductions in each country, with the intent to lower global emissions levels and address identified risks of climate change.  *See*  Jean Chemnick, *Paris Agreement: Kerry Signs Deal, Calls It a 'Turning Point' in Climate War*, Greenwire (Apr. 22, 2016), *available at* http://www.eenews.net/greenwire/2016/04/22/stories/1060036116; *see also infra* note 12 (discussing legislative actions to address issues relating to climate change).

Never before has a court in this country recognized such an unprecedented lawsuit, and for good reason.  These claims openly seek to circumvent the legislative and regulatory processes established by statute and our Constitution to use the federal judiciary to compel massive technological and economic changes the plaintiffs believe are necessary to address climate change, substituting their judgment for that of the Legislative and Executive Branches. The plaintiffs would have this Court act essentially as a special master over the Office of the President and the many named agencies, monitoring and supervising them (potentially for decades) to determine on an ongoing basis whether their efforts are satisfactory and, if not, what measures they should or should not take to meet whatever emissions targets are deemed "appropriate" in light of changing environmental conditions and economic development in this and other countries.  Compl. at 4-5, 94.  None of the grounds cited in the complaint—the common law "public trust" doctrine and several broad constitutional principles—provide the plaintiffs with a cause of action to require the federal government to adopt a particular regulatory regime, much less one (like that demanded by these plaintiffs) that would directly contravene existing regulatory programs and policies as well as numerous legislative mandates, including those of the Clean Air Act "designat[ing] an expert agency, … EPA, as primary regulator of greenhouse gas emissions."  *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2539-40 (2011) ("*AEP*").

The magistrate judge assigned to this case, despite recognizing that the claims "appear[ ] to implicate authority of Congress" and "unmanageable issues," nevertheless recommended that motions to dismiss filed by the defendants and supporting intervenors be denied.[2]  Doc. 68 at 24

---

[2] Three intervenors—the National Association of Manufacturers, the American Fuel & Petrochemical Manufacturers, and the American Petroleum Institute—were previously granted leave to intervene as parties in this case in support of the federal defendants.  Doc. 50.

("Rep."). That recommendation is based on an overly generous reading of the complaint and the plaintiffs' briefs, giving deference to legal arguments that warrant none and crediting factual assertions that are on their face entirely speculative, clearly implausible, or sometimes both. It also fails to address or reconcile the several cases that have rejected these very arguments in analogous circumstances: for example (among others), the Supreme Court's decision in *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215 (2012), which held that the public trust doctrine is not a matter of federal law and cannot apply to the federal government; the Ninth Circuit's decision in *Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013), which held that individual plaintiffs do not have standing to bring claims challenging the government's alleged failure to regulate sufficiently greenhouse gas emissions; and the D.C. Circuit's decision in *Alec L. ex rel. Loorz v. McCarthy*, 561 F. App'x 7 (D.C. Cir. 2014), *aff'g* 863 F. Supp. 2d 11 (D.D.C. 2012), which dismissed *precisely* the same type of "public trust" claims when they were first brought in a different federal court in 2011 by some of the same counsel, also on behalf of a group of "youth" plaintiffs and environmental organizations.[3] The recommendation, if accepted by this Court, would represent a dramatic break with these decisions, creating a direct conflict with the Ninth Circuit and the Supreme Court, and a clear split with the D.C. Circuit.

The recommendation should be rejected, and the claims in this case dismissed.

---

[3] The complaint in *Alec L.*, like this one, included declarations from Dr. James Hansen—who in this case is identified not only as a witness but also as "guardian ad litem" for one of the plaintiffs and for "future generations." Compl. at 22, 34. In addition, both cases appear to be supported by the same environmental organization, Our Children's Trust. *See Federal Climate Change Lawsuit*, OUR CHILDREN'S TRUST, *available at* http://ourchildrenstrust.org/us/federal-lawsuit (last visited Apr. 28, 2016). That organization also supported the filing, at the same time of the filing of the complaint in *Alec L.*, of similar cases and administrative petitions (premised on the "public trust" doctrine) in all 50 States. *See* Press Release, Youth Sue the Government to Preserve the Future and Halt Climate Change (May 4, 2011), *available at* http://ourchildrenstrust.org/sites/default/files/iMatter_Legal_Release_11.05.01.pdf. The vast majority of those cases and petitions have been dismissed or denied.

## STATEMENT OF THE CASE

The complaint asserts that the President of the United States and other federal officials and agencies—including the Departments of Agriculture, Commerce, Defense, Energy, Interior, State, and Transportation, as well as the Environmental Protection Agency—have "abrogated [their] duty to preserve and protect the atmosphere" by "authorizing, permitting, and incentivizing fossil fuel production, consumption, transportation, and combustion, causing the atmospheric [carbon dioxide] concentration to increase." Compl. ¶¶ 119, 130. It alleges that as a result, risks to the worldwide population and to the plaintiffs in this case are increasing. These risks, according to the complaint, infringe upon the plaintiffs' constitutional rights under the Due Process Clause, Equal Protection Clause, and Ninth Amendment, and also violate the federal government's responsibilities under the "public trust" doctrine. *Id.* at 84, 88, 91, 92.

The plaintiffs ask this Court to find and declare that all of the actions of the federal government over the last century relating to greenhouse gas emissions and fossil fuel production—including through statutory enactments, regulatory efforts, and international agreements dating to 1899 and continuing today—have not been "adequate" to fully address the risks of climate change, and that the Office of the President and other named federal officials and agencies "have violated and are violating [the p]laintiffs' fundamental constitutional rights to life, liberty, and property." *Id.* at 51, 94. It demands as relief for these alleged violations an order "enjoin[ing the d]efendants from violating the public trust doctrine" and directing them to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric [carbon dioxide]" and "to restore Earth's energy balance." *Id.* at 5, 94. This "plan"—which would be contrary to existing statutes and without apparent congressional oversight—would require the federal government to "cease the[ ] permitting … of

fossil fuels and … move to swiftly phase out [carbon dioxide] emissions, as well as take such other action as necessary to ensure that atmospheric [carbon dioxide] is no more concentrated than 350 [parts per million] by 2100." *Id.* ¶ 12 (emphasis omitted).  The Court would "[r]etain jurisdiction over this action to monitor and enforce [the d]efendants' compliance with the national remedial plan and all associated orders of this Court." *Id.* at 94.

The federal defendants and supporting intervenors filed motions to dismiss.  Doc. 20 ("Intv. Br."); Doc. 27-1 ("Fed. Br.").  They argued that the claims could not proceed for a number of reasons, including (*inter alia*) that:  the claims do not set forth a valid right to relief because the "public trust" doctrine does not apply to the federal government, because alleged regulatory inaction cannot establish a violation of that doctrine or individual constitutional rights, and because the claims have in any case been displaced under the Clean Air Act; the claims cannot be adjudicated consistent with the political question doctrine, because they would involve the judiciary in making public policy judgments committed to the other branches; and the plaintiffs lack standing, because greenhouse gas emissions and the associated risks of climate change are both caused by and impact all individuals and all jurisdictions worldwide and cannot be plausibly linked to or redressed by actions of the named agencies of the United States.  Intv. Br at 6-21; Fed. Br. at 7-29.  The motions also emphasized that a prior case raising materially identical claims against the federal government, under the "public trust" doctrine, had recently been dismissed in the D.C. Circuit (a decision the U.S. Supreme Court declined to review) in *Alec L. v. Jackson*, 863 F. Supp. 2d 11 (D.D.C. 2012), *aff'd*, 561 F. App'x 7 (D.C. Cir. 2014), *cert. denied*, 135 S. Ct. 774 (2014).

Following a hearing, the magistrate judge recommended that the motions be denied in a report issued on April 8, 2016.  Rep. at 24.  The report acknowledges that never before had such

claims been recognized in the federal judiciary (or any other court), and that the case "appears to implicate authority of Congress" and "does implicate some unmanageable issues"; nevertheless, it concludes that the claims should not be dismissed because the plaintiffs had asserted in the complaint that their rights had been violated and that the Court may craft appropriate relief.  *Id.* at 13, 14.  These assertions, the report states, should be accepted as true "[a]t this stage of the proceedings," even if it is later shown that the allegations do not actually state a claim for relief or support the plaintiffs' standing, or that the case involves a nonjusticiable political question. *Id.* at 8.  The report does not mention *Alec L.* or distinguish it from the instant case, notwithstanding its prominence in prior briefing and argument, and it dismisses facially contrary holdings of other courts on these issues, including decisions of the Supreme Court and Ninth Circuit,[4] as mere dicta or otherwise distinguishable.  *Id.* at 18-21.

## STANDARD OF REVIEW

Dismissal is required when a complaint fails to satisfy the plaintiffs' burden of pleading facts demonstrating that the claims are justiciable and within the jurisdiction of the court, and fails to state a valid cause of action for which relief may be granted.  *E.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  When ruling on a motion to dismiss, the Court should accept as true only those allegations of the complaint that are factual in nature and "facially plausible." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-51 (2009).  The Court need not and should not accept "conclusory" or "legal" allegations, or those inconsistent with governing law or standards.  *E.g.*, *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

---

[4] *See, e.g.*, *PPL Montana*, 132 S. Ct. at 1234-35 ("the public trust doctrine remains a matter of state law"); *Bellon*, 732 F.3d at 1143 ("[S]imply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way and to some undefined degree) to their injuries, relies on an 'attenuated chain of conjecture insufficient to support standing.'").

On review of a magistrate judge's report and recommendation, "the district court is charged to make a *de novo* determination of [any] portion" to which objections are made. *McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981); *see also Barnes v. Chase Home Fin., LLC*, 825 F. Supp. 2d 1057, 1059 (D. Or. 2011); Fed. R. Civ. P. 72(b)(3).  "[T]he court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).[5]

## ARGUMENT

The plaintiffs ask this Court to adjudge whether the federal government's ongoing statutory and regulatory efforts relating to greenhouse gas emissions and fossil fuel production over the last century have been "adequate" in light of the asserted risks of climate change and, if not, to declare that the government's failure to act has infringed upon the constitutional due process and equal protection rights of these individual plaintiffs and violated its obligations under the "public trust" doctrine.  Compl. ¶¶ 261, 280, 291, 310.  For a remedy, they demand an order directing the Office of the President and more than a dozen federal agencies and officials "to cease their permitting, authorizing, and subsidizing of fossil fuels" and to take whatever other actions are "necessary" to drastically reduce greenhouse gas emissions in the United States to levels that are determined by this Court (with the plaintiffs' input) to be "appropriate" to address those risks.  *Id.* ¶¶ 12, 97, 298.  They would then have this Court assume ongoing supervisory authority over these agencies, acting as a sort of special master, with the power and responsibility to determine (potentially for decades) whether any regulations and actions taken are "adequate" to address the risks of climate change and, if not, to order the agencies to adopt other measures.  *Id.* at 94.

---

[5] The intervenors in this case object to the report and recommendation in its entirety.

These unprecedented claims were dismissed at the pleading stage in the first case in which they were brought—a decision affirmed on appeal, *Alec L.*, 863 F. Supp. 2d 11, *aff'd*, 561 F. App'x 7—and they should be dismissed here as well. The Supreme Court has held unequivocally that the "public trust" doctrine is a matter of state law, with no application to the federal government, and decisions of both the Supreme Court and the Ninth Circuit have repeatedly admonished that allegations concerning the government's failure to regulate (or to regulate "adequately," Compl. ¶ 285) cannot give rise to a constitutional due process or equal protection claim. *Infra* Part I. These claims would also necessarily involve the judiciary in adjudicating matters of legislative and executive policy regarding the regulation of greenhouse gas emissions in light of national economic and other interests, issues committed to the political branches, and would have this Court assume and exercise direct control over the Office of the President and executive agencies and officials, in plain contravention of the political question doctrine. *Infra* Part II. And the Ninth Circuit recently affirmed in *Bellon* that claims by individual plaintiffs seeking increased regulation of greenhouse gas emissions, in order to address alleged risks of climate change, must be dismissed for lack of standing because there is no way to plausibly allege a direct link between the challenged emissions and possible future impacts or a reasonable probability that a reduction in particular emissions would alleviate those impacts. *Infra* Part III.

The decisions in *PPL Montana* and *Bellon*, and numerous others, squarely foreclose the claims in this case. The report's contrary recommendation appears to be based on the assumption that, at the pleading stage of the case, all of the allegations and arguments of the plaintiffs should be credited, even if they are "legal" or "conclusory" in nature and regardless of their facial plausibility. *See* Rep. at 6. But no mistake should be made: the conclusions of the

recommendation run directly counter to those decisions and, if accepted, would create a direct conflict with binding opinions of the Supreme Court and Ninth Circuit and with the D.C. Circuit's decision in *Alec L.* (which the recommendation never mentions). The recommendation should be rejected, the motions to dismiss granted, and the complaint dismissed.

## I. THE COMPLAINT DOES NOT ALLEGE A VALID FEDERAL CAUSE OF ACTION OR IMPLICATE A FEDERAL QUESTION SUBJECT TO FEDERAL JURISDICTION.

Dismissal is warranted, first, because the plaintiffs have not pled a valid cause of action within this Court's jurisdiction. Neither the "public trust" doctrine nor the constitutional provisions cited in the complaint can provide these plaintiffs with a claim against the federal government to compel adoption of a particular regulatory regime, much less one concerning worldwide atmospheric greenhouse gas levels or global climate change. *Infra* Part I.A. Moreover, any such claim that might have been recognized has been displaced by federal statute, most notably the Clean Air Act, which defines the exclusive process of administrative and judicial review by which regulatory action of this sort may be sought. *Infra* Part I.B.

### A. The "Public Trust Doctrine" Does Not Apply To The Federal Government And Cannot Support A Valid Claim For Relief In This Case.

The "public trust" doctrine is an arcane and rarely used common law doctrine addressing state property rights in lands submerged beneath tidal and navigable waterways, restricting a state's ability in certain circumstances to alienate those resources. *United States v. Mission Rock Co.*, 189 U.S. 391, 407 (1903). The doctrine does not and cannot apply to the federal government, as the Supreme Court held in *PPL Montana*, 132 S. Ct. at 1235, and it does not and cannot support a cause of action to mandate affirmative government regulation of the atmosphere, a resource or environment not owned or controlled exclusively by that government, *Mission Rock*, 189 U.S. at 407. It has no application here.

1.      Finding otherwise, the report and recommendation concludes that the public trust doctrine is not only a state law principle, but also one grounded in the U.S. Constitution and binding on the federal government, and it further suggests that the Supreme Court did not hold to the contrary—or even address the issue—in *PPL Montana*.  Rep. at 18, 23 n.10.  That conclusion is belied by *PPL Montana* itself, as well as other opinions of the Supreme Court, the Ninth Circuit, and this Court, and *every* other court to consider the matter.

At issue in *PPL Montana* was whether the State of Montana held title to certain riverbed lands, as against claims to the same lands by the United States—which had been leasing the lands to a private company (PPL Montana).  132 S. Ct. at 1222.  One of the arguments raised by Montana was that the "public trust doctrine"—which it described, like the plaintiffs in this case, as "embodied in American law," including the U.S. Constitution and federal statutes, Br. for Resp. 20, 24-25, 52-53, 132 S. Ct. 1215 (No. 10-218)—applied to the federal government and prohibited the United States from exercising ownership rights over the lands in a way that would restrict "public access to the waters above those beds for purposes of navigation, fishing, and other recreational uses."  132 S. Ct. at 1235.  The doctrine thus required, Montana argued, that title to the lands vest with the State.  *Id.*

The Supreme Court rejected this argument, on grounds that the public trust doctrine does not apply to the federal government.  *Id.*  While noting that the doctrine is "of ancient origin" with "roots trac[ing] to Roman civil law … [and] English common law," and that several cases have said that under the Constitution, a "State takes title to the navigable waters and their beds in trust for the public" upon attaining statehood, the Court explained that "the public trust doctrine *remains a matter of state law*," whose "contours … do not depend upon the Constitution."  *Id.* at 1234-35 (emphasis added).  The opinion cites a number of prior Supreme Court cases that have

discussed the doctrine, including *Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387 (1892), and *Shively v. Bowlby*, 152 U.S. 1 (1894), and confirms that those decisions were "necessarily a statement of [state] law." 132 S. Ct. at 1235.

This discussion of the public trust doctrine in *PPL Montana* was neither dicta nor unclear. The Supreme Court held unequivocally that the doctrine is a matter of state law with no application to the federal government.[6]

That is, notably, how *every* other court to consider the issue has interpreted the Supreme Court's opinion. In *United States v. 32.42 Acres of Land*, 683 F.3d 1030 (9th Cir. 2012), the Ninth Circuit quoted the opinion in rejecting a claim that state lands taken by the United States through eminent domain were restricted by the public trust doctrine: "'the public trust doctrine remains a matter of state law,' the contours of which are determined by the states, not by the United States Constitution." *Id.* at 1038. In *Alec L.*, the D.C. Circuit dismissed precisely the same type of public trust claim presented here, stating that *PPL Montana* "directly and categorically rejected any federal constitutional foundation for [the public trust] doctrine, without qualification or reservation." 561 F. App'x at 8. The Fourth Circuit has said the same, citing *PPL Montana* for the proposition that the "[public trust] doctrine is a matter of state law." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 537 n.3 (4th Cir. 2013). This very Court concluded even before *PPL Montana* that the public trust doctrine has no application to the

---

[6] The public trust doctrine does have a tangential relationship to federal common law, but that relationship serves only to underscore its state-law nature. The "equal footing doctrine," which is a part of federal common law, provides that each State, upon admission to the United States, obtains the same rights over submerged lands within its borders as did the original thirteen states. *PPL Montana*, 132 S. Ct. at 1228, 1234-35. Once statehood is attained, however, the equal footing doctrine "d[oes] not operate after that date," and the development of the public trust doctrine is a matter of state law. *Oregon v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 371 (1977); *see also PPL Montana*, 132 S. Ct. at 1228, 1234-35; *Phillips Petrol. Co. v. Mississippi*, 484 U.S. 469, 473-74 (1988).

federal government, citing the "Supreme Court's repeated and unequivocal holdings" that the public trust doctrine is "a matter of state law." *Jones v. Rose*, No. CV 00-1795, 2005 WL 2218134, at \*26 (D. Or. Sept. 9, 2005); *see also, e.g.*, *Brigham Oil & Gas, L.P. v. N.D. Bd. of Univ. & Sch. Lands*, 866 F. Supp. 2d 1082, 1088 (D.N.D. 2012) ("The United States Supreme Court recently made clear that the public trust doctrine is a matter of state law.").

The report argues that neither *PPL Montana* nor *32.42 Acres* addressed the particular issue in this case, and thus do not bind this Court, and that in fact the prior opinion of the Supreme Court—in *Shively v. Bowlby*, 152 U.S. 1 (1894)—actually recognized a federal public trust doctrine. Rep. at 23 n.10. Not so. In both *PPL Montana* and *32.42 Acres*, the issue of whether the federal government was bound by public trust obligations was central to the issue under review, and in both cases, the court determined that the doctrine is a "matter of state law," not binding on the federal government. *PPL Montana*, 132 S. Ct. at 1235; *32.42 Acres of Land*, 683 F.3d at 1038.[7] And *Shively*, far from suggesting that the federal government's authority over acquired territories is cabined by the public trust doctrine, confirms that the United States possesses "entire domain and sovereignty" over those lands with full power to use or alienate the property as it sees fit. 152 U.S. at 48. While the United States generally holds territories "in trust for the several States to be ultimately created," a trust obligation to the general public arises only when a State is actually formed and admitted into the Union, at which time "title and

---

[7] The Ninth Circuit in *32.42 Acres* did not explicitly address a separate aspect of the district court's decision, suggesting that federal "public trust" obligations may apply to certain of the lands in dispute, because that issue was not raised by any party on appeal. 683 F.3d at 1039 n.2. That suggestion is, however, flatly inconsistent with the Ninth Circuit's ultimate holding and thus cannot be viewed as having any precedential or persuasive force. *Cf.* Br. for U.S. at 14, 683 F.3d 1030 (10-56568) ("Decisions of the Supreme Court have also made clear that the public trust doctrine is a limit on the authority of *states* to alienate public trust lands free of the trust …. The public trust doctrine is simply not a limit on the authority of the *federal government* ….") (emphasis in original).

rights … are governed by the laws of the … State[ ]." *Id.* at 57-58. In other words, *Shively* states—as *PPL Montana* later affirmed—that the public trust doctrine is governed by state law.[8] *Id.*; *see also* Douglas L. Grant, *Underpinnings of the Public Trust Doctrine: Lessons from Illinois Central Railroad*, 33 Ariz. St. L.J. 849, 870 (2001) ("[T]he Supreme Court has steadfastly treated the public trust doctrine as a matter of state law not federal law.").

In no case in the federal or state judiciary, so far as the report identifies (or research discloses), has any court recognized a free-standing federal version of the public trust doctrine of the type approved in the report. A few cases have suggested that a State's public trust obligations are conveyed with the land upon condemnation by the United States and thus bind the federal government, *see City of Alameda v. Todd Shipyards Corp.*, 635 F. Supp. 1447 (N.D. Cal. 1986); *United States v. 1.58 Acres of Land*, 523 F. Supp. 120 (D. Mass. 1981), but those cases do not hold that an independent federal public trust obligation exists and in any event are inconsistent with the more recent (post-*PPL Montana*) decision of the Ninth Circuit in *32.42 Acres*, 683 F.3d at 1038. Nor does the report explain the basis upon which a public trust obligation would be imposed upon the federal government: the Constitution says nothing about it and indeed, to the contrary, states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States." U.S. Const. art. IV, § 3. Particularly in light of this background, there is every

---

[8] While the language of *Shively* itself defeats any argument that it recognized a federal public trust doctrine, so too does the simple fact that the opinion is cited approvingly in *PPL Montana*. It is inconceivable that the Supreme Court, in an opinion stating that the public trust doctrine "is a matter of state law," 132 S. Ct. at 1235, would cite a decision that holds the opposite. The only reasonable conclusion is that, in fact, *Shively* also recognizes that the doctrine is a matter of state law.

reason to assume that the Supreme Court meant exactly what it said in *PPL Montana*—"the public trust doctrine remains a matter of state law." 132 S. Ct. at 1235.

In short, the report's conclusion that the public trust doctrine arises as a matter of federal law, binding on the federal government, contravenes a host of authorities, including *PPL Montana*. Even if there were some doubt over whether prior opinions addressed this particular issue, or whether the statements describing the doctrine as a state law matter are actually dicta, those statements are precisely the type of "considered dicta" that should be treated as authoritative. *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 295 n.3 (4th Cir. 2004); *United States v. Gaudin*, 28 F.3d 943, 956 n.2 (9th Cir. 1994); *see also Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). Because the doctrine cannot be found to apply to the federal government under this precedent, it cannot support the claims in this case.

2.  These claims could not proceed in any event, however, because the allegations of the complaint do not state a valid cause of action under any version of the public trust doctrine. That doctrine in its common-law form, applies only to a specific and limited set of natural resources within a State's jurisdiction—most specifically, lands submerged beneath tidal and navigable waterways—and serves only to restrict the government's ability to transfer title in those resources or otherwise alienate them. *Mission Rock*, 189 U.S. at 407; *Ill. Cent.*, 146 U.S. at 453.

No case has ever upheld the novel version of the common law public trust doctrine asserted by the plaintiffs here.[9]  They would have the doctrine apply to the atmosphere, a blanket of layers of gases across the Earth's surface that is both used and affected by all nations on the planet.  *See, e.g., Bellon*, 732 F.3d at 1143.  Nothing could be more different than the traditional type of "resource," a physical asset within the boundaries and control of a single jurisdiction, that would be covered by the public trust doctrine.  *See, e.g., Mission Rock*, 189 U.S. at 407.  The plaintiffs would also apply the doctrine to impose an affirmative duty upon governments to adopt a particular regulatory regime for the trust resource.  This is, again, contrary to a long line of cases that have consistently understood the doctrine as *limiting* the powers of government over trust resources—in particular, a government's authority to alienate or transfer title in the resource—and not as imposing affirmative regulatory obligations.  *See, e.g., Ill. Cent.*, 146 U.S. at 453.

The report does not appear to disagree with this characterization of the public trust doctrine, but it nevertheless concludes that the claims in this case may proceed, apparently because the alleged impacts of climate change may affect navigable waters of Oregon.  Rep. at 21, 23.  But, as described above, the public trust doctrine prohibits a government from taking affirmative regulatory action that itself alienates a resource or precludes its enjoyment.  *See, e.g., Mission Rock*, 189 U.S. at 407.  The federal government in this case is not alleged to have taken any affirmative action that alienates any waters of the United States or precludes their use;

---

[9] A review of state court cases which allegedly assert that the atmosphere can be a public trust resource reveals that all of those cases rely on specific state constitutional or statutory provisions that expand the public trust doctrine beyond its historical bounds.  *See, e.g., Foster v. Wash. Dep't of Ecology*, No. 14-2-25295-1, slip op. at 8 (Wash. King Cty. Super. Ct. Nov. 19, 2015); *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015); *Bonser-Lain v. Texas Comm'n on Envtl. Quality*, No. D-1-GN-11-002194, 2012 WL 3164561 (Tex. 201st Dist. Aug. 2, 2012), *rev'd*, 438 S.W.3d 887 (Tex. App. 2014).

Page 15 Intervenor-Defendants' Objections to Magistrate's Findings and Recommendation

rather, the government is alleged generally to have *failed* to take action to reduce greenhouse gas emissions in the United States, which in turn is alleged to have impacted the global atmosphere, which in turn is alleged to have increased the risks of certain climatological events that might in turn affect certain waters of the United States in the future.  This alleged chain of events, even if accepted as true (which it should not be, as there is no way to plausibly allege a direct link between greenhouse gas emissions from one jurisdiction and future impacts of climate change), is insufficient to trigger the public trust doctrine, because the doctrine is implicated only by government actions—not inaction—and only when the government action itself alienates a natural resource directly (*e.g.*, through a sale of the asset, *Ill. Cent.*, 146 U.S. at 453).  *Mission Rock*, 189 U.S. at 407.  Whatever impacts might occur to the waters of the United States under the complaint's scenario, those impacts are not the result of direct, affirmative actions of the United States and therefore cannot support a public trust claim.

There is, thus, no basis for a public trust claim, even if one assumes (contrary to governing precedent) that a federal version of the doctrine exists.  That claim should therefore be dismissed.

### B.    Neither The Due Process Clause Nor The Equal Protection Clause Provide The Plaintiffs With A Cognizable Cause Of Action.

The other claims raised by the plaintiffs fare no better.   Those claims, citing constitutional due process and equal protection principles, fail because they do not challenge any government action that allegedly infringes on the plaintiffs' individual rights but, rather, seek to compel affirmative government action.

1.    It is well-settled that the Due Process Clause cannot be used to compel government officials to act and does not "confer [any] affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests."  *DeShaney v.*

*Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  The only "exception" to this principle, commonly known as the "danger creation" exception, applies when there is "affirmative conduct on the part of the [S]tate in placing the plaintiff in danger."  *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992).  While the State need not take the individual into formal "custody," it must exercise some form of control or authority over the individual and then, with "deliberate indifference," place him or her in an imminently dangerous situation created by the government's actions.  *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996); *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997); *Kneipp v. Tedder*, 95 F.3d 1199, 1209 (3d Cir. 1996), *cited with approval in, Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086-87 (9th Cir. 2000); *Wood v. Ostrander*, 879 F.2d 583, 588-90 (9th Cir. 1989).

These circumstances are not present here.  The complaint does not and cannot allege that the federal government itself "created" climate change through its greenhouse gas emissions, that the federal government has intentionally acted to "create" climate change, or that any government official has exercised any control or authority over the plaintiffs to place them in imminent danger—must less with "deliberate indifference" to their safety.  Rather, the complaint alleges that the federal government has failed historically to take sufficient measures to regulate greenhouse gas emissions from sources throughout the country, and as a result of these emissions and others from around the world (over the last century or more), global atmospheric greenhouse gas concentrations have reached levels that these plaintiffs deem dangerous and that will, in the upcoming century, contribute to risks and harms from climate change.  Compl. at 4-5.  With no allegation of an exercise of control over the plaintiffs or creation of an imminent danger by the government, no due process claim can lie.

The report does not identify any allegations that would satisfy this standard, but rather suggests that the due process claim may proceed because the government's actions and inaction relating to the regulation of greenhouse gas emissions (as described in the complaint) might be deemed to constitute "deliberate indifference … to plaintiffs' safety" and to "shock[ ] the conscience." Rep. at 16, 17. That is not the standard to be applied, however. The government must take some affirmative action *against the plaintiff* that places the individual in a danger created by the government. *E.g.*, *Grubbs*, 974 F.2d at 121. Only in those circumstances, and then only if the government exhibited "deliberate indifference" in doing so, can the "danger creation" exception apply. *Grubbs*, 92 F.3d at 900. Because that standard has not been met and could not be met in this case, the due process claim should be dismissed.

2.    An equal protection claim also requires affirmative, purposeful conduct by the government. Such a claim may proceed only if there has been an intentional "classification" by government, created with the "purpose to discriminate," that results in disparate treatment of similarly situated individuals. *E.g., Romer v. Evans*, 517 U.S. 620, 632 (1996); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Washington v. Davis*, 426 U.S. 229, 245-47 (1976).

Neither a "classification" nor a "purpose to discriminate" has been alleged, or could be shown, in this case. The most that can be said is that, according to the complaint, the government has regulated (or failed to regulate) in a manner that disparately affects "youth" and "future generations." Compl. ¶ 294. Allegations of disparate impact are, however, insufficient to state an equal protection claim under long-settled law. *See, e.g.*, *Washington*, 426 U.S. at 245-47 (citing cases); *see also, e.g.*, *Davis v. Bandemer*, 478 U.S. 109, 127 (1986).

The report does not say anything to the contrary, but nevertheless appears to allow the equal protection claim to proceed because "the complaint does allege discrimination against a

class of younger individuals with respect to a fundamental right protected by substantive due process." Rep. at 15 n.8. Even ignoring that the report does not identify any actual "fundamental right" that may be implicated and that other courts have expressly rejected the proposition that "youth" is a protected class,[10] the fact remains that the complaint does not and could not allege that any of the governmental actions challenged in this case classified "youth" differently from other groups, or were taken with an intent to discriminate against "youth" as a class. Indeed, the plaintiffs' principal argument is not that the government acted improperly, but that it *failed* to act. These allegations cannot support an equal protection claim.[11]

### C.    Any Cause Of Action That Might Have Been Recognized As Supporting The Alleged Claims Has Been Displaced By Federal Statute.

The claims in this case could not proceed, even if they otherwise might have stated cognizable violations of the public trust doctrine or constitutional provisions, because Congress has displaced any such cause of action by statute. When Congress enacts a federal statute that "speak[s] directly to [the] question" previously addressed by a non-statutory cause of action, the cause of action is displaced and can no longer be recognized. *AEP*, 131 S. Ct. at 2537. The Supreme Court addressed the specific issue presented here in *AEP*—whether the Clean Air Act

---

[10] *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 472 n.24 (1985) (Marshall, J. concurring in part) ("I am not aware of any suggestion that legislation affecting [minors] be viewed with the suspicion of heightened scrutiny"); *United States v. Flores-Villar*, 536 F.3d 990, 998 (9th Cir. 2008) ("[A]ge is not a suspect class"); *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944, 946 (9th Cir. 1997) (holding that "age is not a suspect classification" in the context of analyzing juvenile curfew ordinance, but applying strict scrutiny due to fundamental rights involved); *Ramos v. Town of Vernon*, 353 F.3d 171, 172, 180, 181 (2d Cir. 2003) (applying intermediate scrutiny to juvenile curfew ordinance, but also holding that "[w]e do not conclude that youth are a suspect class").

[11] The complaint also alleged a claim under the Ninth Amendment, *see* Compl. at 54, but the plaintiffs appear to have abandoned that claim, as they did not raise or defend it in their previous briefs or at argument before the magistrate judge. That is entirely appropriate, as it is well-settled that the Ninth Amendment "does not confer substantive rights" and cannot support an independent cause of action. *Gibson v. Matthews*, 926 F.2d 532, 544 (6th Cir. 1991).

precludes non-statutory claims purportedly based in federal law seeking "curtailment of greenhouse gas emissions because of their contribution to global warming"—and held unambiguously "that the Clean Air Act and the EPA actions it authorizes" displace such claims. *Id.* Any applicable right of action that might have been recognized has, for this reason, been displaced.

The plaintiffs argued previously that their claims are not displaced, even though they address the same subject matter as the claims in *AEP*, either because public trust and constitutional claims "cannot be displaced by statute," or because the Clean Air Act does not provide them an opportunity to secure all of the relief they are seeking here. Doc. 33 at 3, 7-8 ("Pl. Intv. Opp."). Neither point is correct. To be sure, Congress cannot "displace the Constitution," *id.*, but Congress certainly can—and often does—displace rights of action created by the federal courts, including those intended to remedy a constitutional violation, *e.g., Bush v. Lucas*, 462 U.S. 367 (1983), and the Supreme Court has said that any "public trust" rights are "subject always to the paramount right of [C]ongress," *Ill. Cent.*, 146 U.S. at 435. Likewise, a statute need not offer the same avenue for adjudication or an equivalent remedial scheme in order to displace a common law constitutional (or public trust) claim; rather, whenever a statute "speaks directly" to the issues addressed by the claim and provides a mechanism to address those issues, *AEP*, 131 S. Ct. at 2537, the claim is displaced, even if the relief available under the statute is "not as effective as [a common law] remedy" and would not "fully compensate [the plaintiff] for the [alleged] harm," *Bush*, 462 U.S. at 372-73, 385-86.

The report does not accept or reject, or address, this argument. It is, however, a threshold issue governing the viability of the plaintiffs' claims, and (as described above) stands as one more reason why these claims cannot proceed.

## II.      THIS CASE PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS.

These claims are also, independently, subject to dismissal under the political question doctrine.  That doctrine bars adjudication of issues that: (i) are "textually . . . commit[ted]" to another branch by the Constitution; (ii) are not subject to "judicially discoverable and manageable standards"; or (iii) could not be resolved without "expressing lack of the respect due coordinate branches of government."  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  The claims in this case implicate all of these concerns, as explained below.

The report and recommendation does not address these issues in significant detail, but instead suggests that the political question doctrine does not apply in the first instance because the claims allege violations of "individual right[s]."  Rep. at 13.  That position (previously advocated by the plaintiffs, Pl. Intv. Opp. at 16) is plainly incorrect.  The justiciability limitations imposed by the political question doctrine flow from Article III of the Constitution and therefore apply to *all* causes presented to the federal judiciary, whatever the title appended to the claim or its asserted basis.  *Baker*, 369 U.S. at 214-16.  There has been no case cited, and to counsel's knowledge none exists, for the proposition that public trust or constitutional claims are somehow exempt from the political question doctrine if they allege violations of "individual rights."  Quite the opposite, numerous cases hold directly to the contrary, finding claims asserting that the plaintiff's "individual" constitutional rights to be barred by the political question doctrine.  *E.g.,* *Vieth v. Jubelirer*, 541 U.S. 267, 271, 292 (2004) (plurality); *Nixon v. United States*, 506 U.S. 224, 226, 238 (1993).

However framed, a claim presents a non-justiciable political question if, upon a "discriminating inquiry into the precise facts and posture of the [case]," *Baker*, 369 U.S. at 217, its adjudication would require the court to address an issue that should be reserved for the representative branches.  That is the situation here.

Page 21 Intervenor-Defendants' Objections to Magistrate's Findings and Recommendation

### A.  The Claims Implicate Issues That Are Textually Committed To The Executive And Legislative Branches.

Adjudication of the plaintiffs' claims would, without doubt, involve the judiciary in issues that are committed by the text of the Constitution to the coordinate branches of government.  The complaint asks this Court to direct agencies of the Executive Branch—as well as the President—to promulgate specific regulations to achieve a particular goal, without regard to their own expert determinations regarding the need for or suitability of those regulations and without regard to statutory prerequisites and directives enacted by Congress.  Compl. ¶¶ 1, 12. The Court would, in essence, be commandeering these agencies and placing them under its exclusive control for these purposes—issuing an order directing them to develop and implement "a national plan to restore Earth's energy balance . . . [and] stabilize the climate system" under which they would be required to take all actions that are "necessary" to ensure that "atmospheric [carbon dioxide] is no more concentrated than 350 [parts per million] by 2100."  *Id.*  The Court would then "[r]etain jurisdiction" over the President and Executive Branch "to monitor and enforce [their] compliance with the national remedial plan and all associated orders of this Court," potentially until 2100.  *Id.* at 94.

There could hardly be a clearer violation of the constitutional principle of separation of powers.  The Constitution by its terms commits legislative power—in particular, authority "[t]o regulate Commerce"—to Congress, U.S. Const. art. I, §§ 1, 8, and executive power to the President, *see* U.S. Const. art. II, § 1.  The political branches, which are ultimately responsible to the public, determine the need for and set regulatory standards.  There is simply no basis and no allowance in the Constitution for a court to control or supervise the internal operations of agencies, much less the Office of the President, or direct their regulatory discretion in the absence of any statute authorizing such judicial intervention.  *See, e.g., Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 891 (1990); *Webster v. Doe*, 486 U.S. 592, 601 (1988); *Heckler v. Chaney*, 470 U.S. 821, 829 (1985); *see also  Gilligan v. Morgan*, 413 U.S. 1, 5-7 (1973) (rejecting as non-justiciable claims that would require the judiciary to craft particular "standards" for governmental operations and monitor compliance thereafter).  Providing the relief sought by the plaintiffs would require the Court to exercise legislative and executive power denied to the judiciary by the Constitution.

The report, although acknowledging that the case "appears to implicate authority of the Congress," suggests that this concern is obviated by the fact that the defendants in this case are executive agencies, which have in prior cases been subject to court orders directing them to "craft regulations" and to redress constitutional violations.  Rep. at 13.  But this ignores that, unlike the claims here, none of those cases involved the court in the formation of legislative or executive policy.  Cases challenging an agency's failure to regulate are brought pursuant to express statutory procedures and require a court to assess only whether the agency has satisfied affirmative congressional directives, *e.g.*, *Massachusetts v. EPA*, 549 U.S. 497 (2007) (petition for review of rulemaking decision by EPA, brought in the D.C. Circuit pursuant to the Clean Air Act, 42 U.S.C. § 7607(b)(1)); likewise, cases alleging that an agency violated a plaintiff's constitutional rights are brought in response to affirmative actions of the agency that impact the plaintiff in some way and require a court to assess only whether the agency's action exceeded the limits imposed by the Constitution, *e.g.*, *Reeves Bros., Inc. v. EPA*, 956 F. Supp. 665 (W.D. Va. 1995).  Neither type of case implicates political question concerns because in neither is the judiciary instructing the other branches how legislative and executive authority should be exercised, but rather the court is adjudicating only whether that authority is being exercised consistent with statutory and constitutional requirements.

This case is the precise contrast.  These claims are not brought pursuant to any statutory authorization and would require this Court to adjudge how various federal agencies should have exercised—and how they should exercise—their authority over issues relating to greenhouse gas emissions and climate change.  Compl. at 4-5.  There is simply no way for the Court to address these claims without intruding into spheres of authority reserved by the Constitution to the other branches.

**B.      There Are No Judicially Discoverable Or Manageable Standards For Resolving The Claims.**

These claims are also non-justiciable because there are no "judicially discoverable and manageable standards" for resolving them.  *Baker*, 369 U.S. at 217.  The complaint asks the Court to declare that the regulations and policies of the federal government relating to greenhouse gas emissions over the past 50 years or more have not been "adequate" and to order the defendants to develop an "appropriate response to the climate crisis" by "prepar[ing] and implement[ing] … an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric [carbon dioxide] so as to stabilize the climate system."  Compl. at 49, 94.  To address these issues, however, the Court would need not only to resolve the scientific likelihood of the various risks of climate change, and their likely impact on the Nation, but also to weigh those risks against the possible benefits of emissions-producing activities (in the past and future) and associated reduction measures and then make a comparative judgment to determine which industries, sectors, and nations should have been required, and should now be required, to reduce their emissions and by how much.  In particular, among other issues, the plaintiffs' requested relief would require the Court to determine whether the plaintiffs' goal of reducing atmospheric greenhouse gas levels to 350 parts per million is an appropriate target, or if the targeted level should be lower or higher, and then decide the nature and timing of any

required emissions reductions and how they should be implemented.  A court could not make these determinations without relying on "ad hoc" policy judgments of the type prohibited by the political question doctrine.  *AEP*, 131 S. Ct. at 2539-40 (stating that greenhouse gas emissions regulations "cannot be prescribed in a vacuum" but must take account of "competing interests" relating to "national or international policy").

The Supreme Court has made this very point in prior cases.  In *Massachusetts v. EPA*, for example, after holding that the Clean Air Act authorized EPA to consider whether to regulate greenhouse gas emissions under certain circumstances, the Court refused to address whether the agency should actually exercise that discretion on grounds that it would implicate "policy judgments" that the federal judiciary has "neither the expertise nor the authority to evaluate." 549 U.S. at 533-34.  Likewise, in *AEP*, the Court refused to address the "appropriate amount of regulation in any particular greenhouse gas-producing sector" because that inquiry, "as with other questions of national or international policy," would require balancing a number of "competing interests," including among other things "the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption."  131 S. Ct. at 2539-40.  Only the legislative and executive branches have the capacity and authority under our Constitution to assess and weigh these questions of "high policy" and decide whether regulations, such as those the plaintiffs seek, are appropriate.  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 647 (1981).

The report acknowledges at the outset that the complaint's "request for relief does implicate some unmanageable issues," but then suggests that this problem can be avoided by restricting the scope of any relief ultimately entered—perhaps to an order that "only direct[s] the EPA to adopt standards that prevent the alleged constitutional harm[s]."  Rep. at 14.  But the

problem here is not only the relief requested; it is the claims themselves. The adjudication of these claims on the merits would require the Court to address and adjudge whether the federal government's past regulation of greenhouse gas emissions was "adequate" to protect against the risks of climate change. Compl. ¶ 261. That assessment itself (and any resulting declaration) would be guided not by any defined or established standard but would necessarily depend on *policy* considerations. In addition, even ignoring these concerns, relief of the type proposed in the recommendation—directing EPA and multiple other agencies to adopt regulations, without dictating precisely what those regulations should be—would not obviate the political question, as the decision of *whether* to regulate is in many ways more dependent on policy judgments than the decision of *how* to do so. *Massachusetts*, 549 U.S. at 533-34; *see also Gilligan*, 413 U.S. at 5-7 (rejecting as non-justiciable claims that would require the judiciary to craft particular "standards" for governmental operations and monitor compliance thereafter). However the claims are characterized, and whatever the relief ultimately available, the claims implicate policy considerations that are fundamentally ill-suited for judicial resolution.

### C. The Claims Could Not Be Adjudicated Without Expressing Lack Of Respect Due To Other Branches Of Government.

These claims are non-justiciable for the additional reason that they cannot be adjudicated without "expressing lack of the respect due" other branches of government. *Baker*, 369 U.S. at 217. Congress and executive agencies have taken a wide range of steps to assess and address the potential impacts and risks of climate change. In particular, in the Clean Air Act, the Supreme Court has said, Congress "designated an expert agency, … EPA, as best suited to serve as primary regulator of greenhouse gas emissions." *AEP*, 131 S. Ct. at 2539-40.[12]

---

[12] Congressional efforts to consider and address issues relating to climate change stretch back to at least the 1970s. *See, e.g.*, National Climate Program Act of 1978, Pub. L. No. 95-367, 92 Stat. 601 (establishing a "national climate program," with the purpose of improving

The plaintiffs ask this Court to substitute its judgment for that of the Legislative and Executive Branches. They would, in essence, have the court tell those branches how to legislate and how to regulate. The complaint specifically requests that the court "[r]etain jurisdiction over this action," potentially until 2100, in order to ensure that the named agencies follow their obligations under the approved recovery plan. Compl. at 94. It is hard to imagine how the judiciary could show a greater "lack of respect" for the political branches than by issuing an order that supersedes their considered judgment concerning matters within their constitutional authority and further subjects them to potentially decades of continuing supervision by a single federal judge. *See Gilligan*, 413 U.S. at 5-8 (claims calling upon court "to assume continuing regulatory jurisdiction" over governmental department constitute non-justiciable political questions).

The report does not address this aspect of the political question doctrine, or offer any reason why the claims in this case could be adjudicated consistent with its limitations. And, to be sure, there is none. "[A]llowing courts to oversee legislative or executive action," as would the claims in this case, "would significantly alter the allocation of power … away from a

understanding of global climate change through research and international cooperation); Energy Policy Act of 1992, Pub. L. No. 102-486, tit. XVI, § 1601, 106 Stat. 2776, 2999 (mandating further study and regulatory action regarding the impact of greenhouse gas emissions and climate change); Global Change Research Act of 1990, Pub. L. No. 101-606, 104 Stat. 3096 (same); Energy Security Act of 1980, Pub. L. No. 96-294, tit. VII, § 711, 94 Stat. 611, 774-75 (same); Global Climate Protection Act of 1987, Pub. L. No. 100-204, tit. XI, § 1002, 101 Stat. 1331, 1408 (directing executive officials to coordinate international negotiations concerning global climate change); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (establishing nationwide greenhouse gas reduction targets to be satisfied through modified biofuel production methods and increased fuel efficiency standards on cars and certain trucks); Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, tit. II, 121 Stat. 1844, 2128 (2007) (directing EPA to "develop and publish a … rule … to require mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy of the United States"). Efforts by the Executive Branch relating to greenhouse gas emissions and climate change have been similarly comprehensive. *See supra* note 1.

democratic form of government." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks omitted).[13]

## III.    THE PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS.

The claims also cannot proceed because the plaintiffs lack standing under Article III.  To satisfy the "irreducible constitutional minimum of standing," a plaintiff must plead facts showing an "injury in fact" that is "imminent" and "particularized," "fairly traceable to the challenged action of the defendant," and "likely … redress[able] by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations and internal quotation marks omitted).  The Ninth Circuit recently held that this standard cannot be met by plaintiffs seeking reductions in greenhouse gas emissions to address the risks of climate change, as they cannot show a plausible link between the challenged emissions and an imminent injury-in-fact that might be remedied through a court order.  *Bellon*, 732 F.3d at 1139-40.  That holding applies directly to this case and requires dismissal of the claims.

### A.    The Complaint Does Not Allege Imminent And Particularized Injuries.

The allegations in the complaint, first, fail to satisfy the "core" constitutional requirement of an injury that is "imminent" and "particularized."  Most of the adverse impacts alleged are to the environment or the public generally, rather than the plaintiffs personally, *e.g.*, Compl. at 26,

---

[13] The justiciability problems associated with this claim are all the more pronounced because many of the agency operations at issue here relate to foreign relations or national defense, fields that the Constitution plainly commits to the political branches.  *E.g.*, Compl. ¶¶ 121, 123.  The complaint requests, for example, that the Court declare invalid and void an order authorizing exports of liquefied natural gas to foreign nations, as well as the statute under which authorization was permitted.  *Id.* at 94.  But that order was issued in accordance with this country's obligations under free trade agreements with those foreign nations.  *See* Order No. 3041 at 10-11, *In re Jordan Cove Energy Project, L.P.*, FE Docket No. 11-127-LNG (U.S. Dep't of Energy, Dec. 7, 2011).  The complaint thus asks the judiciary to abrogate agreements that were negotiated and approved by the United States and foreign governments—which have not been (and could not be) challenged in this case.

29, 32, 72, 76-77 (alleging harms to forests and glaciers, "infrastructure" and "ecosystem," and "human civilization"), or concern events in the past, *e.g.*, *id.* at 24, 31 (discussing past experiences of the plaintiffs and their families), which could not support claims for prospective injunctive relief.  *See Lujan*, 504 U.S. at 563 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief …."). Other asserted harms are to the *interests* for which the plaintiffs advocate, *see, e.g.*, Compl. ¶¶ 30, 91, not actual injuries to the plaintiffs themselves, and are likewise inadequate.  *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972).  And many of the allegations—including those relating to the Jordan Cove export facility, on which the complaint focuses but which is not operational and has actually been *denied* permitting approval, Rep. at 5 n.2—concern speculative events or injuries that have not and may never occur, which are for that reason not ripe for review.  *See, e.g.*, Compl. ¶¶ 19, 22, 34, 46, 58, 63 (discussing the *possibility* that emissions-producing activities will occur or that the plaintiffs will visit or reside in areas that may be affected by climate change).[14]  Indeed, rather than seeking to redress "imminent" or "actual" harms, the complaint acknowledges that its purpose is to produce changes to the atmosphere *in the future*, not until 2100, and to protect the interests of "future generations" not before this Court.  *Id.* ¶ 97.

The fundamental deficiency of these allegations is reflected in the fact that they are not in any way limited, or "particularized," *Lujan*, 504 U.S. at 560-61, as to these plaintiffs.  The complaint asserts that the plaintiffs have standing to sue because they may in the future

---

[14] In addition, any challenge to the Department of Energy's approval of Jordan Cove exports could be made only within the context of those proceedings—not here.  It appears from the complaint that the plaintiffs did in fact raise such a challenge in certain proceedings before the Department of Energy but were denied relief, Compl. ¶ 96, and this case thus represents a collateral attack on the agency's decision—which is flatly contrary to settled principles of administrative law, *see, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988), and federal statutes conferring jurisdiction over many such claims in the federal courts of appeals, *see, e.g.,* 15 U.S.C. § 717r (D.C. Circuit).

experience effects of climate change, and it identifies as those effects nearly every climatological, economic, epidemiological, meteorological, and political occurrence on the planet, including "[t]he melting of mountain glaciers," "rising sea levels," "biodiversity [losses]," "extreme weather events" including floods and droughts, "decreased tourism revenue," geopolitical changes such "regional instability" and "terrorism," as well as essentially *all* known medical conditions—"allergies, asthma, cancer, cardiovascular disease, stroke, heat-related morbidity and mortality, food-borne diseases, injuries, toxic exposures, mental health and stress disorders, and neurological diseases and disorders."  Compl. ¶¶ 121, 219, 226, 227, 235, 237, 239, 240.

This is plainly not a valid theory of standing.  The risks and harms alleged in the complaint, if accepted as true, would impact each and every person on the planet, and for that reason, if those allegations are deemed sufficient to confer standing on these plaintiffs, they could likewise support standing for anyone or everyone to bring the same types of claims in this Court or any other in the country, seeking to force adoption of regulations that in their own view are reasonably warranted.  These are precisely the sort of non-particularized risks and harms, affecting "society" in general that the Supreme Court has characterized as a "generalized grievance" insufficient to confer standing.  *Lujan*, 504 U.S. at 573-74; *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 111-14 (1979); *see also Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923) ("If one [citizen] may champion and litigate such a cause, then every other [citizen] may do the same.").

The report suggests that the asserted impacts of climate change, even if they will allegedly be suffered by the entirety of "Earth and its inhabitants," are not generalized because according to the complaint, they will "befall the [youth plaintiffs and future generations] … to a

greater extent than older segments of society." Rep. at 8. But this point is irrelevant to the standing analysis. Whatever differences might exist in the way these and other parties may in the future experience any alleged effects of climate change, the essential legal injury asserted here is not to the plaintiffs themselves but to the global environment, and the interests asserted in the complaint in addressing that injury are shared equally by each and every citizen. It is thus the archetypal example of an "abstract" and "generalized grievance" that cannot support standing. *See Lujan*, 504 U.S. at 573-74; *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23-24 (1998); *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 687-689 (1973).

> **B.    The Injuries Alleged In The Complaint Are Neither Fairly Traceable To The Defendants Nor Likely Redressable By The Requested Relief.**

The plaintiffs also cannot show that their injuries are "fairly traceable" to these defendants or "likely redressable" by the requested relief. There is simply no way to determine whether and how emissions of greenhouse gases from regulated sources within the United States will impact global atmospheric levels in the future, given that such emissions arise from all jurisdictions around the planet and a majority of emissions are from sources outside the United States, which would not and could not be reached by a decree in this case. *See, e.g.*, *North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 302 (4th Cir. 2010). The Ninth Circuit made precisely this point in *Bellon*, holding that the plaintiffs lacked standing to challenge the federal government's alleged failure to adequately regulate greenhouse gas emissions: "simply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way and to some undefined degree) to their injuries, relies on an 'attenuated chain of conjecture insufficient to support standing.'" 732 F.3d at 1142-1143 (quoting *Salmon Spawning*

*& Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008)).  That language, and the Court's holding, apply equally here.

There is indeed no basis to believe that reductions ordered here would lead to *any* overall reduction, much less the reduction allegedly needed to achieve the plaintiffs' goal of 350 parts per million carbon dioxide globally, or prevent, or even slow, the ongoing global warming effect that the plaintiffs allege.  To the contrary, it is just as possible that greenhouse gas emissions in other nations would *increase* if severe limits were imposed in the United States, thereby negating the purported benefit achieved by the emissions reductions sought in this case.  *See, e.g.*, *Bellon*, 732 F.3d at 1143; *North Carolina*, 615 F.3d at 302.  Other decisions, including (again) *Bellon* have held that claims seeking reductions in greenhouse gas emissions must be dismissed for precisely this reason.  *E.g.*, *Bellon*, 732 F.3d at 1143; *Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 857-62 (S.D. Miss. 2012),  *aff'd on other grounds*, 718 F.3d 460 (5th Cir. 2013); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 879-80 (N.D. Cal. 2009), *aff'd on other grounds*, 696 F.3d 849 (9th Cir. 2012); *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 478-79 (D.C. Cir. 2009) (rejecting similar causation theory).

Notwithstanding the Ninth Circuit's decision in *Bellon*, and a host of similar holdings in other "climate change" cases, the report and recommendation defers to the allegations of the complaint, concluding (in essence) that causation and redressability have been established because the complaint alleges that they have been.  Rep. at 10, 11.  It is well-settled, however, that a court need not and should not accept "legal" or "conclusory" allegations of this type but must, particularly with respect to standing, conduct a rigorous assessment of the complaint to determine whether a plausible showing of causation and redressability can be made.  *Lujan*, 504 U.S. at 560-61; *see also, e.g.*, *Iqbal*, 556 U.S. at 667; *Clegg*, 18 F.3d at 754-55.  That is not the

case here.  All of the factual allegations of the complaint can be accepted as true—that greenhouse gas emissions result in changes to the global atmosphere and environment, that those changes produce widespread adverse climatological impacts, and that these plaintiffs will be exposed to these impacts—and, yet, the plaintiffs still do not and cannot establish causation and redressability.  That is because, as the Ninth Circuit said in *Bellon*, greenhouse gas emissions are and will continue to be emitted by sources worldwide, aggregating in the global atmosphere to produce effects worldwide, and it is for that reason impossible to prove that a reduction of emissions from certain sources or one jurisdiction (*e.g.,* the United States) will eliminate or alleviate any of the risks to which certain areas or individuals (*e.g.*, these plaintiffs) will be exposed.  732 F.3d at 1143.  The deficiency with the complaint at this stage is, in other words, not a lack of evidence—which might be remedied through discovery—but rather a lack of facial plausibility.  *See, e.g., Kivalina*, 663 F. Supp. 2d at 879-82.

The complaint must, in short, be dismissed because the plaintiffs have not and cannot satisfy the "irreducible constitutional minimum" requirements for Article III standing.  A number of prior cases, including *Bellon* and *Massachusetts*, recognize that individual plaintiffs cannot establish causation or redressability between greenhouse gas emissions and risks of climate change.  *Bellon*, 732 F.3d at 1147.  Those decisions are binding here.[15]

---

[15] It should go without saying that a single opinion of a Dutch district-level court—the only authority cited in the report and recommendation in support of causation and redressability, Rep. 11 (citing *Urgenda v. The State of the Netherlands*)—does not in any sense overrule or override the binding decisions in *Bellon* and *Massachusetts*, or counsel a different result from the unanimous holdings of courts in the United States, applying United States law.

## CONCLUSION

For these reasons, the Court should reject the findings and recommendation of the magistrate judge, and dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) and (b)(6).

DATED this 2nd day of May, 2016.

MILLER NASH GRAHAM & DUNN LLP

/s/ C. Marie Eckert
C. Marie Eckert, OSB No. 883490
marie.eckert@millernash.com
Suzanne C. Lacampagne, OSB No. 951705
suzanne.lacampagne@millernash.com
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  (503) 224-5858

SIDLEY AUSTIN LLP

/s/ Roger R. Martella, Jr.
Roger R. Martella, Jr.
rmartella@sidley.com
Quin M. Sorenson
qsorenson@sidley.com
Benjamin E. Tannen
btannen@sidley.com
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 736-8000

*Attorneys for Intervenor-Defendants*
*The National Association of Manufacturers,*
*American Fuel & Petrochemical Manufacturers,*
*and American Petroleum Institute*

I hereby certify that I served the foregoing Intervenor-Defendants' Objections to

Magistrate's Findings and Recommendation on:

Julia A. Olson
Wild Earth Advocates
1216 Lincoln Street
Eugene, Oregon  97401
E-mail:  juliaaolson@gmail.com

*Attorney for Plaintiffs*

Philip L. Gregory
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, California  94010
E-mail:  pgregory@cpmlegal.com

*Attorney for Plaintiffs*

Charles M. Tebbutt
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence
Eugene, Oregon  97401
E-mail:  charlie@tebbuttlaw.com

*Attorney for Amici Curiae Global Catholic*
*Climate Movement and Leadership Council*
*of Women Religious*

Daniel M. Galpern
Law Offices of Daniel M. Galpern
1641 Oak Street
Eugene, Oregon  97401
E-mail:  dan.galpern@gmail.com

*Attorney for Plaintiffs*

Sean C. Duffy
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C.  20044
E-mail:  sean.c.duffy@usdoj.gov

*Attorney for Defendants*

Michelle A. Blackwell
Blackwell Law PC
P.O. Box 10326
Eugene, Oregon  97440
E-mail:  mblackwell@blackwell.law

*Attorney for Amicus Curiae John Davidson*

by the following indicated method on the date set forth below:

☒        **CM/ECF system transmission.**

DATED this 2nd day of May, 2016.

/s/ C. Marie Eckert

C. Marie Eckert, P.C.
Oregon State Bar No. 883490

*Of Attorneys for Intervenor-Defendants The*
*National Association of Manufacturers,*
*American Fuel & Petrochemical*
*Manufacturers, and American Petroleum*
*Institute*