IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

KELSEY CASCADIA ROSE JULIANA,
et al.,

                  Plaintiffs,

   v.

UNITED STATES OF AMERICA, et al,

                  Defendants.

Case No. 6:15-cv-01517-TC
OPINION AND ORDER

_____

AIKEN, Judge:[1]

      Plaintiffs in this civil rights action are a group of young people between the ages of eight and

nineteen ("youth plaintiffs"); Earth Guardians, an association of young environmental activists; and

---

      [1] Student externs worked on each stage of the preparation of this opinion, from initial
background research to final copyedits.  I would be remiss if I did not acknowledge the
invaluable contributions of Daniel Bodden (University of Kentucky), Elizabeth Jacklin
(University of Oregon School of Law), Ann Richan Metler (Willamette University College of
Law), James Mullins (University of Washington School of Law), Jessy R. Nations (University of
Washington School of Law), Lydeah Negro (Lewis & Clark Law School), and Eleanor J. Vincent
(University of Oregon School of Law.)

PAGE 1 - OPINION AND ORDER

Dr. James Hansen, acting as guardian for future generations.[2]  Plaintiffs filed this action against

defendants the United States, President Barack Obama, and numerous executive agencies.  Plaintiffs

allege defendants have known for more than fifty years that the carbon dioxide ("$CO_2$") produced

by burning fossil fuels was destabilizing the climate system in a way that would "significantly

endanger plaintiffs, with the damage persisting for millenia."  First. Am. Compl. ¶ 1.  Despite that

knowledge, plaintiffs assert defendants, "[b]y their exercise of sovereign authority over our country's

atmosphere and fossil fuel resources, . . . permitted, encouraged, and otherwise enabled continued

exploitation, production, and combustion of fossil fuels, . . . deliberately allow[ing] atmospheric $CO_2$

concentrations to escalate to levels unprecedented in human history[.]" *Id.* ¶ 5.  Although many

different entities contribute to greenhouse gas emissions, plaintiffs aver defendants bear "a higher

degree of responsibility than any other individual, entity, or country" for exposing plaintiffs to the

dangers of climate change. *Id.* ¶ 7.  Plaintiffs argue defendants' actions violate their substantive due

process rights to life, liberty, and property, and that defendants have violated their obligation to hold

certain natural resources in trust for the people and for future generations.

Plaintiffs assert there is a very short window in which defendants could act to phase out fossil

fuel exploitation and avert environmental catastrophe.  They seek (1) a declaration their

constitutional and public trust rights have been violated and (2) an order enjoining defendants from

violating those rights and directing defendants to develop a plan to reduce $CO_2$ emissions.

Defendants moved to dismiss this action for lack of subject matter jurisdiction and failure

---

[2] Although plaintiffs in this lawsuit hale from a number of different states, venue is proper in the District of Oregon.  The majority of youth plaintiffs, including lead plaintiff Kelsey Juliana, reside in the District of Oregon.  First Am. Compl. ¶¶ 16, 23, 31, 35, 44, 47, 50, 53, 57, 60.  In addition, plaintiff Earth Guardians has a chapter in Eugene, Oregon.

to state a claim. Doc. 27. Intervenors the National Association of Manufacturers, the American Fuel & Petrochemical Manufacturers, and the American Petroleum Institute moved to dismiss on the same grounds. Doc. 19. After oral argument, Magistrate Judge Coffin issued his Findings and Recommendation ("F&R") and recommended denying the motions to dismiss. Doc. 68. Judge Coffin then referred the matter to me for review pursuant to 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. Doc. 69. Defendants and intervenors filed objections (docs. 73 & 74), and on September 13, 2016, this Court heard oral argument.

For the reasons set forth below, I adopt Judge Coffin's F&R as elaborated in this opinion and deny the motions to dismiss.

## BACKGROUND

This is no ordinary lawsuit. Plaintiffs challenge the policies, acts, and omissions of the President of the United States, the Council on Environmental Quality, the Office of Management and Budget, the Office of Science and Technology Policy, the Department of Energy, the Department of the Interior, the Department of Transportation ("DOT"), the Department of Agriculture, the Department of Commerce, the Department of Defense, the Department of State, and the Environmental Protection Agency ("EPA"). This lawsuit challenges decisions defendants have made across a vast set of topics — decisions like whether and to what extent to regulate $CO_2$ emissions from power plants and vehicles, whether to permit fossil fuel extraction and development to take place on federal lands, how much to charge for use of those lands, whether to give tax breaks to the fossil fuel industry, whether to subsidize or directly fund that industry, whether to fund the construction of fossil fuel infrastructure such as natural gas pipelines at home and abroad, whether to permit the export and import of fossil fuels from and to the United States, and whether to

PAGE 3 - OPINION AND ORDER

authorize new marine coal terminal projects. Plaintiffs assert defendants' decisions on these topics

have substantially caused the planet to warm and the oceans to rise. They draw a direct causal line

between defendants' policy choices and floods, food shortages, destruction of property, species

extinction, and a host of other harms.

This lawsuit is not about proving that climate change is happening or that human activity is

driving it. For the purposes of this motion, those facts are undisputed.[3]  The questions before the

Court are whether defendants are responsible for some of the harm caused by climate change,

whether plaintiffs may challenge defendants' climate change policy in court, and whether this Court

can direct defendants to change their policy without running afoul of the separation of powers

doctrine.

## STANDARDS

The Magistrates Act authorizes a district court to "accept, reject or modify, in whole or in

part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  When

a party objects to any portion of the magistrate's findings and recommendation, the district court

must review *de novo* that portion of the magistrate judge's report. Fed. R. Civ. P. 72(b)(3); *see also*

---

[3] For the purposes of this motion, I proceed on the understanding that climate change
exists, is caused by humans, and poses a serious threat to our planet. Defendants open their
Objections to Judge Coffin's F&R by stating that "[c]limate change poses a monumental threat to
Americans' health and welfare by driving long-lasting changes in our climate, leading to an array
of severe negative effects, which will worsen over time." Fed. Defs.' Obj. to F&R 1 (doc. 78).
In the 2015 State of the Union address, defendant President Barack Obama declared "[n]o
challenge . . . poses a greater threat to future generations than climate change." President Barack
Obama, Remarks in State of the Union Address (Jan. 20, 2015), *available at*
www.whitehouse.gov/the-press-office/2015/01/20/remarks-president-state-union-address-
january-20-2015 (last visited Nov. 7, 2016).  When asked at oral argument if they agreed that
human-caused climate change poses a serious threat, intervenors declined to take a clear position.
All parties agree, however, that a dispute over the existence of climate change is not at the heart
of this case.

*McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981) (for dispositive motions, "the statute grants the broadest possible discretion to the reviewing district court").

Under Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if subject matter jurisdiction is lacking. A motion to dismiss under Rule 12(b)(1) may attack either the allegations of the complaint or the "existence of subject matter in fact." *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). The party seeking to invoke the district court's jurisdiction bears the burden of establishing subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint is construed in favor of the plaintiff, and its factual allegations are taken as true. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, the court need not accept as true "conclusory" allegations or unreasonable inferences. *Id.* Thus, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

## DISCUSSION

Judge Coffin recommended denying defendants' and intervenors' motions to dismiss and

holding that plaintiffs' public trust and due process claims may proceed. Defendants and intervenors object to those recommendations on a number of grounds. They contend plaintiffs' claims must be dismissed for lack of jurisdiction because the case presents non-justiciable political questions, plaintiffs lack standing to sue, and federal public trust claims cannot be asserted against the federal government. They further argue plaintiffs have failed to state a claim on which relief can be granted. I first address the threshold challenges to jurisdiction, and then proceed to address the viability of plaintiffs' due process and public trust claims.

I.    *Political Question*

If a case presents a political question, federal courts lack subject matter jurisdiction to decide that question. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007). The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. 186, 210 (1962). This limitation on the federal courts was recognized in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170 (1803), in which Chief Justice Marshall wrote, "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." However, the scope of the political question doctrine should not be overstated. As Alexis de Tocqueville observed, "[t]here is hardly any political question in the United States that sooner or later does not turn into a judicial question." 1 Alexis de Tocqueville, Democracy in America 440 (Liberty Fund 2012).

In *Baker,* the Supreme Court identified six criteria, each of which could individually signal the presence of a political question:

> [(1) A] textually demonstrable constitutional commitment of the issue to a coordinate political department; [(2)] a lack of judicially discoverable and manageable standards for resolving it; [(3)] the impossibility of deciding without an initial policy

determination of a kind clearly for nonjudicial discretion; [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. The *Baker* tests "are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality op.). The factors overlap, with the analyses "often collapsing into one another." *Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005). The "common underlying inquiry" is whether "the question is one that can properly be decided by the judiciary." *Id.*

Determining whether the political question doctrine requires abstention calls on a court to balance profoundly important interests. On the one hand, the separation of powers is fundamental to our system of government, known "[e]ven before the birth of this country" to be "a defense against tyranny." *Loving v. United States*, 517 U.S. 748, 756 (1996). It is a "basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 757. On the other hand, "[t]he decision to deny access to judicial relief" should never be made "lightly," because federal courts "have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Alperin*, 410 F.3d at 539 (quoting *Liu v. Rep. of China*, 892 F.2d 1419, 1433 (9th Cir. 1989) and *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990)). Accordingly, a court cannot simply err on the side of declining to exercise jurisdiction when it fears a political question may exist; it must instead diligently map the precise limits of jurisdiction.

Climate change, energy policy, and environmental regulation are certainly "political" in the

sense that they have "motivated partisan and sectional debate during important portions of our history." *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458 (1992). But a case does not present a political question merely because it "raises an issue of great importance to the political branches." *Id.* Instead, dismissal on political question grounds is appropriate only if one of the *Baker* considerations is "inextricable" from the case. *Baker*, 369 U.S. at 217. As a result, federal courts regularly adjudicate claims that arise in connection with politically charged issues. *See, e.g., Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (electronic surveillance); *Chiles v. Thornburgh*, 865 F.2d 1197, 1216 (11th Cir. 1989) (detention of undocumented immigrants); *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 838 F.2d 649, 656 (2d Cir. 1988) (international funding for birth control and abortion). In each of the above cases, the court engaged in "discriminating inquiry into the precise facts" before concluding the controversy was justiciable. *Baker*, 369 U.S. at 217. A similar rigorous analysis is necessary here.

    A.    *First* Baker *Factor*

The first *Baker* factor requires abstention "[w]hen a case would require a court to decide an issue whose resolution is textually committed to a coordinate political department" because "the court lacks authority to resolve that issue." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1431 (2012) (Sotomayor, J., concurring). Since *Baker*, the Supreme Court has found such "textual commitment" in very few cases. In *Nixon v. United States*, 506 U.S. 224 (1993), a former federal judge sought to challenge the Senate's processes for taking evidence during impeachment trials. *Id.* at 226. The Court found his claim nonjusticiable due to the Constitution's clear statement granting the Senate "the sole Power to try all Impeachments." *Id.* at 229 (quoting U.S. Const. art. I, § 3, cl. 6). The Court found the provision's use of the word "sole" to be "of considerable significance."

*Id.* at 231. The Court also discussed the history of the clause at issue, noting that the "Framers labored over the question of where the impeachment power should lie" and "at least two considered" — and rejected — placing that power within the federal judiciary. *Id.* at 233.

In *Davis v. Passman*, 442 U.S. 228, 235 n.11 (1979), the Court characterized the Speech or Debate Clause as the "paradigm example" of a "textually demonstrable constitutional commitment." That clause provides that Senators and Representatives, "for any Speech or Debate in either House, . . . shall not be questioned in any other place." U.S. Const. Art. I, § 6, cl. 1. The Court explained that the clause plainly shields statements of federal legislators made during speech or debate in committees or on the House or Senate floor from *any* sort of judicial review, and thus speaks "directly to . . . separation-of-powers concerns." *Davis*, 442 U.S. at 235 n.11.

Most recently, in *Zivotofsky*, the Court held that the Constitution gives the president the exclusive authority to recognize foreign nations and governments. 135 S. Ct. at 2086. The Court acknowledged that the Constitution does not use the term "recognition." *Id.* at 2084. Nonetheless, the Court determined that the Constitution granted the recognition power to the Executive Branch "[a]s a matter of constitutional structure." *Id.* at 2085. The Court concluded that the clauses giving the president exclusive authority to receive ambassadors and to negotiate treaties implicitly granted the recognition power. *Id.* at 2086. That determination rested in part on the Court's conclusion that recognition was uniquely "a topic on which the Nation much speak with one voice." *Id.* at 2086 (quotation marks and ellipsis omitted). If Congress had the power to decline to recognize a foreign state the Executive had decided to recognize, the president would be unable to assure that foreign state that its ambassadors would be received, its officials would be immune from suit in federal court, and it would be permitted to initiate lawsuits in the United States to vindicate its rights. *Id.*

In issuing its decision, the Court expressly declined to hold that the Constitution gives the president the "unbounded power" to "conduct diplomatic relations" and exercise "the bulk of foreign-affairs powers." *Id.* at 2089.

Unlike in the constitutional provisions at issue *Nixon* and *Passman*, the constitutional provisions cited here contain nothing approaching a clear reference to the subject matter of this case. The Constitution does not mention environmental policy, atmospheric emissions, or global warming. And unlike in *Zivotofksy*, climate change policy is not a fundamental power on which any other power allocated exclusively to other branches of government rests. Intervenors correctly point out that the Constitution gives the political branches authority over commerce, foreign relations, national defense, and federal lands — all areas affected by climate change policy. *See* U.S. Const. art. I, § 8 cl. 3 (Congress has authority to "regulate commerce with foreign nations, and among the several states"); *Zivotofsky*, 135 S. Ct. at 2084-86 (discussing various constitutional provisions granting the Executive Branch foreign relations authority); U.S. Const. art. I, § 8 cl. 11-16 (detailing Congress's powers relating to war and the military); U.S. Const. art. II, § 2, cl. 1 (President is commander in chief of armed forces); U.S. Const. art. IV, § 3, cl. 2 (Congress has power to "dispose of and make all needful rules and regulations" regarding federal land). But holding the first *Baker* factor applies in any case relating to these topic areas would permit the exception to swallow the rule. The question is not whether a case *implicates* issues that appear in the portions of the Constitution allocating power to the Legislative and Executive Branches — such a test would, by definition, shield nearly all legislative and executive action from legal challenge. Rather, the question is whether adjudicating a claim would require the Judicial Branch to second-guess decisions committed exclusively to another branch of government.

In the lower courts, the first *Baker* factor has found its broadest application in foreign policy cases. *See, e.g., Corrie*, 503 F.3d at 983 ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."); *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1263 (D.C. Cir. 2006) (decision to take "drastic measures" to keep Chilean dictator Augusto Pinochet in power was a foreign policy decision textually committed to the Executive Branch); *Sadowski v. Bush*, 293 F. Supp. 2d 15, 21 (D. C. Cir. 2003) (decision to go to war in Afghanistan was not justiciable, "primarily because war powers have been explicitly committed to the political branches"). As a result, I give special consideration to the argument that granting plaintiffs' requested relief would usurp the Executive Branch's foreign relations authority. Climate change policy has global implications and so is sometimes the subject of international agreements. But unlike the decisions to go to war, take action to keep a particular foreign leader in power, or give aid to another country, climate change policy is not *inherently*, or even primarily, a foreign policy decision. Moreover, in the foreign policy context, *Baker* expressly warned against framing the "textually committed" inquiry too broadly. *See Baker*, 369 U.S. at 211 ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.") The first *Baker* factor does not apply.

B.    *Second and Third* Baker *Factors*

"The second and third *Baker* factors reflect circumstances in which a dispute calls for decisionmaking beyond courts' competence." *Zivotofsky*, 132 S. Ct. at 1432 (Sotomayor, J., concurring). "When a court is given no standard by which to adjudicate a dispute, or cannot resolve a dispute in the absence of a yet-unmade policy determination charged to a political branch, resolution of the suit is beyond the judicial role envisioned by Article III." *Id.*

Defendants' and intervenors' arguments on the second and third *Baker* factors can be divided into two main points. First, intervenors contend the Court cannot set a permissible emissions level without making *ad hoc* policy determinations about how to weigh competing economic and environmental concerns. But plaintiffs do not ask this Court to pinpoint the "best" emissions level; they ask this Court to determine what emissions level would be sufficient to redress their injuries. That question can be answered without any consideration of competing interests. *Cf. Coleman v. Schwarzenegger*, 2010 WL 99000, *1 (E.D. Cal. & N.D. Cal. Jan. 12, 2010) (requiring state to reduce the population of adult prisons to 137.5% of their total design capacity, a target which "extend[ed] no further than necessary to correct the violation of California inmates' federal constitutional rights"). The science may well be complex, but logistical difficulties are immaterial to the political question analysis. *See Alperin*, 410 F.3d at 552, 555 ("[T]he crux of th[e political question] inquiry is . . . not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint," but rather whether "a legal framework exists by which courts can evaluate . . . claims in a reasoned manner.").

Second, intervenors aver the Court would have to choose which agencies and sectors should reduce emissions, and by how much. At oral argument, intervenors contended this would require review of every environmental rule and regulation in the last one hundred years. These arguments mischaracterize the relief plaintiffs seek. Plaintiffs do not seek to have this Court direct any individual agency to issue or enforce any particular regulation. Rather, they ask the Court to declare the United States' current environmental policy infringes their fundamental rights, direct the agencies to conduct a consumption-based inventory of United States $CO_2$ emissions, and use that inventory to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions

and draw down excess atmospheric $CO_2$ so as to stabilize the climate system and protect the vital resources on which Plaintiffs now and in the future will depend." First Am. Compl. at 94. This Court could issue the requested declaration without directing any individual agency to take any particular action.

Finally, defendants and intervenors contend that plaintiffs' failure to identify violations of precise statutory or regulatory provisions leaves this court without any legal standard by which to judge plaintiffs' claims. Plaintiffs could have brought a lawsuit predicated on technical regulatory violations, but they chose a different path. As masters of their complaint, they have elected to assert constitutional rather than statutory claims. Every day, federal courts apply the legal standards governing due process claims to new sets of facts. The facts in this case, though novel, are amenable to those well-established standards. Neither the second nor the third *Baker* factor divests this Court of jurisdiction.

In the political question section of their objections to Judge Coffin's F&R, defendants assert the allegations in the complaint are not specific enough to put them on notice of plaintiffs' claims. This argument relates to the second and third *Baker* factors and the competence of this Court to adjudicate those claims, considerations which are addressed above. The argument also touches on concerns about causation and redressability, which are discussed in Section II of this opinion. However, the argument is also phrased in terms common to cases governing general pleading standards. *See Twombly*, 550 U.S. at 555 (complaint in federal court must contain enough information to "give the defendant fair notice" of both the claim and the "grounds upon which it rests" (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To the extent defendants challenge the First Amended Complaint as inadequately pleaded, that challenge fails. This is not a typical

PAGE 13 - OPINION AND ORDER

environmental case. Plaintiffs are not arguing defendants issued any particular permit in violation of a statutory provision in the Clean Air Act or the Clean Water Act. They are not arguing any specific tax break, royalty rate, or contract runs afoul of an agency's governing regulations. Rather, the theory of plaintiffs' case is much broader: it is that defendants' *aggregate actions* violate their substantive due process rights and the government's public trust obligations. That theory, which requires no citation to particular statutory or regulatory provisions, is clear from the face of the First Amended Complaint.

      C.     *Fourth through Sixth* Baker *Factors*

The fourth through sixth *Baker* factors "address circumstances in which prudence may counsel against a court's resolution of an issue presented." *Zivotofsky*, 132 S. Ct. at 1432 (Sotomayor, J., concurring). Only in "rare" cases will *Baker*'s "final factors alone render a case nonjusticiable." *Id.* at 1434.

Intervenors contend the fourth *Baker* factor, which concerns a court expressing lack of respect to another branch of government, applies in this case. They argue that because the Executive and Legislative branches have taken numerous steps to address climate change, a ruling in plaintiffs' favor would be disrespectful to those efforts. Intervenors would have this Court hold the political question doctrine prevents a court from determining whether the federal government has violated a plaintiff's constitutional rights so long as the government has taken some steps to mitigate the damage. However, intervenors cite no cases — and this Court is aware of none — to support such a broad application of the fourth *Baker* factor. Rather, courts have found the fourth factor applies in cases asking a court to "question the good faith with which another branch attests to the authenticity of its internal acts." *Id.* at 1433. The fourth factor has also been held relevant when

"judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).

Consistent with those formulations, federal appellate courts have found the fourth *Baker* factor present when judicial adjudication of a claim would be wholly incompatible with foreign-relations decisions made by one of the political branches. *See, e.g., Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 59 (2d Cir. 2005) (political question doctrine prevented court from adjudicating claims against Austrian government for seizure of property from Jewish families during World War II because two presidential administrations had "committed the United States to a policy of resolving Holocaust-era restitution claims through international agreements rather than litigation."); *Schneider v. Kissinger*, 412 F.3d 190, 198 (D.C. Cir. 2005) (political question doctrine barred review of Executive Branch decision to participate in covert operations in Chile, a decision that had already been the subject of congressional inquiry).

Although the United States has made international commitments regarding climate change, granting the relief requested here would be fully consistent with those commitments. There is no contradiction between promising other nations the United States will reduce $CO_2$ emissions and a judicial order directing the United States to go beyond its international commitments to *more aggressively* reduce $CO_2$ emissions. Because this Court could grant plaintiffs' requested relief without expressing disrespect for the Executive Branch's international climate change agreements, the fourth *Baker* factor does not apply.

Neither intervenors nor defendants suggest the fifth or sixth *Baker* factors apply here. Nonetheless, I address those factors because federal courts have an "independent obligation to assure

[them]selves of" the existence of subject matter jurisdiction. *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 769 n.5 (9th Cir. 2008).   On the face of the complaint, I see no evidence of an "unusual need for unquestioning adherence to a political decision already made" or any "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.   I conclude neither of the two final *Baker* factors deprives this Court of subject matter jurisdiction.

> D.     *Summary: This Case Does Not Raise a Nonjusticiable Political Question*

There is no need to step outside the core role of the judiciary to decide this case.   At its heart, this lawsuit asks this Court to determine whether defendants have violated plaintiffs' constitutional rights.   That question is squarely within the purview of the judiciary. *See INS v. Chadha*, 462 U.S. 919, 941 (1983) (judiciary is bound to determine whether the political branches have "chosen a constitutionally permissible means of implementing [their] power"); *Jewel*, 673 F.3d at 912 (although lawsuit challenging federal agencies' surveillance practices "strikes at the heart of a major public policy controversy," claims were justiciable because they were "straightforward claims of statutory and constitutional rights, not political questions").

This case shares some key features with *Baker* itself.   In *Baker*, a group of voters challenged a statute governing the apportionment of state legislative districts.   369 U.S. at 188-95.   Sixty years of population growth without legislative reapportionment had led to some votes carrying much more weight than others. *Id.* at 192-93.   Here, the majority of youth plaintiffs are minors who cannot vote and must depend on others to protect their political interests.   Thus, as amicus the League of Women Voters persuasively argues, the youth plaintiffs' claims are similar to the *Baker* claims because they are "rooted in a 'debasement of their votes' and an accompanying diminishment of their voice in

representational government." Br. for the League of Women Voters in the United States et al. as Amici Curiae at 19-20 (doc. 79-1).[4] In *Baker*, the Court acknowledged that the plaintiffs' claims had political dimensions and ramifications — but nonetheless concluded none of the *Baker* factors was inextricable from the case. 369 U.S. at 209. Similarly, as discussed in detail above, this case raises political issues yet is not barred by the political question doctrine.

Should plaintiffs prevail on the merits, this Court would no doubt be compelled to exercise great care to avoid separation-of-powers problems in crafting a remedy. The separation of powers might, for example, permit the Court to direct defendants to ameliorate plaintiffs' injuries but limit its ability to specify precisely how to do so. *Cf. S. Burlington Cnty. N.A.A.C.P. v. Mt. Laurel Twp.*, 336 A.2d 713, 734 (N.J. 1975) (leaving to municipality "in the first instance at least" the determination of how to remedy the constitutional problems with a local zoning ordinance). That said, federal courts retain broad authority "to fashion practical remedies when confronted with complex and intractable constitutional violations." *Brown v. Plata*, 563 U.S. 493, 526 (2011). In any event, speculation about the difficulty of crafting a remedy could not support dismissal at this early stage. *See Baker*, 369 U.S. at 198 ("Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at trial.") Because no *Baker* factor is inextricable from the merits of this case, the political question doctrine is not a barrier to plaintiffs' claims.

---

[4] The motion of the League of Women Voters of the United States and the League of Women Voters of Oregon to appear as amici curiae (doc. 79) is granted.

II.    *Standing to Sue*

"A threshold question in every federal case is . . . whether at least one plaintiff has standing." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citation and quotation marks omitted). Standing requires a plaintiff to allege "such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers[.]" *Warth v. Seldin*, 442 U.S. 490, 498 (1975). To demonstrate standing, a plaintiff must show (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). A plaintiff must support each element of the standing test "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Accordingly, at the motion to dismiss stage "general allegations" suffice to establish standing because those allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Id.* (citation and quotation marks omitted).

A.    *Injury in Fact*

In an environmental case, a plaintiff cannot demonstrate injury in fact merely by alleging injury to the environment; there must be an allegation that the challenged conduct is harming (or imminently will harm) the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000). For example, a plaintiff may meet the injury in fact requirement by alleging the challenged activity "impairs his or her economic interests or aesthetic and environmental well-being." *Wash. Envt'l Council v. Bellon*, 732 F.3d 1131, 1140 (9th Cir. 2013) (quotation marks omitted and alterations normalized).

Plaintiffs adequately allege injury in fact. Lead plaintiff Kelsey Juliana alleges algae blooms harm the water she drinks, and low water levels caused by drought kill the wild salmon she eats. First Am. Compl. ¶¶ 17-18. Plaintiff Xiuhtezcatl Roske-Martinez alleges increased wildfires and extreme flooding jeopardize his personal safety. *Id.* ¶ 21. Plaintiff Alexander Loznak alleges record-setting temperatures harm the health of the hazelnut orchard on his family farm, an important source of both revenue and food for him and his family. *Id.* ¶ 26. Plaintiff Jacob Lebel alleges drought conditions required his family to install an irrigation system at their farm. *Id.* ¶ 32. Plaintiff Zealand B. alleges he has been unable to ski during the winter as a result of decreased snowpack. *Id.* ¶ 38. Plaintiff Sahara V. alleges hot, dry conditions caused by forest fires aggravate her asthma. *Id.* ¶ 46.

The most recent allegations of injury appear in the supplemental declaration of plaintiff Jayden F., a thirteen-year-old resident of Rayne, Louisiana. Jayden alleges that at five o'clock the morning of August 13, 2016, her siblings woke her up. Decl. Jayden F. ¶ 5 Sept. 7, 2016 (doc. 78). She stepped out of bed into ankle-deep water. By the end of the day,

> Floodwaters were pouring into our home through every possible opening. We tried to stop it with towels, blankets, and boards. The water was flowing down the hallway, into my Mom's room and my sisters' room. The water drenched my living room and began to cover our kitchen floor. Our toilets, sinks, and bathtubs began to overflow with awful smelling sewage because our town's sewer system also flooded. Soon the sewage was everywhere. We had a stream of sewage and water running through our house.

*Id.* ¶ 8. With no shelters available and nowhere else to go, the family remained in the flooded house for weeks. *Id.* ¶ 10. The floodwaters eventually receded, but the damage remains: the carpets are soaked with sewage water. *Id.* ¶ 12. The water-logged walls must be torn down to prevent the growth of black mold. *Id.* The entire family sleeps together in the living room because the bedrooms are uninhabitable. *Id.* ¶ 15. Jayden alleges the storm that destroyed her home "ordinarily

would happen once every 1,000 years, but is happening now as a result of climate change." *Id.* ¶ 2.

The government contends these injuries are not particular to plaintiffs because they are caused by climate change, which broadly affects the entire planet (and all people on it) in some way. According to the government, this renders plaintiffs' injuries nonjusticiable generalized grievances. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014) (explaining that generalized grievances do not meet Article III's case or controversy requirement).

The government misunderstands the generalized grievance rule. As the Ninth Circuit recently explained, federal courts lack jurisdiction to hear a case when the harm at issue is "not only widely shared, but is also of an abstract and indefinite nature — for example, harm to the common concern for obedience to the law." *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quoting *Fed. Elec. Comm'n v. Akins*, 524 U.S. 11, 23 (1998)). Standing alone, "the fact that a harm is widely shared does not necessarily render it a generalized grievance." *Jewel*, 673 F.3d at 909; *see also Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) ("[I]t does not matter how many persons have been injured by the challenged action" so long as "the party bringing suit shows that the action injures him in a concrete and personal way." (quotation marks omitted and alterations normalized)); *Akins*, 524 U.S. at 24 ("[A]n injury . . . . widely shared . . . does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an 'injury in fact.'"); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 651 (9th Cir. 2004) (Gould, J., concurring) ("[T]he most recent Supreme Court precedent appears to have rejected the notion that injury to all is injury to none for standing purposes."); *Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001) ("So long as the plaintiff . . . has a concrete and particularized injury, it does not matter that legions of other persons have the same injury."). Indeed, even if "the experience at the

root of [the] complaint was shared by virtually every American," the inquiry remains whether that shared experience caused an injury that is concrete and particular *to the plaintiff. Jewel*, 673 F.3d at 910. Applying the correct formulation of the generalized grievance rule, plaintiffs' alleged injuries — harm to their personal, economic and aesthetic interests — are concrete and particularized, not abstract or indefinite.

That leaves imminence. Plaintiffs must demonstrate standing for each claim they seek to press and for each form of relief sought. *Daimler Chrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006). Because plaintiffs seek injunctive relief, they must show their injuries are "ongoing or likely to recur." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1197 (9th Cir. 2016) (quoting *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)). They have met this requirement. The complaint alleges that "[t]he present level of $CO_2$ and its warming, both realized and latent, are already in the zone of danger." First Am. Compl. ¶ 8. It also alleges that "our country is now in a period of carbon overshoot, with early consequences that are already threatening and that will, in the short term, rise to unbearable unless Defendants take immediate action[.]" *Id.* ¶ 10 (quotation marks omitted). Youth plaintiffs each allege harm that is ongoing and likely to continue in the future. *See, e.g., id.* ¶ 17 (alleging current harm and harm "[i]n the coming decades" from ocean acidification and rising sea levels); *id.* ¶ 45 (alleging damage to freshwater resources now and in the future "if immediate action is not taken" to reduce $CO_2$ emissions). This is sufficient to satisfy the imminence requirement.

By alleging injuries that are concrete, particularized, and actual or imminent, plaintiffs have satisfied the first prong of the standing test.

B.    *Causation*

The second requirement of standing is causation.  A plaintiff must show the injury alleged

is "fairly traceable" to the challenged action of the defendant and not the result of "the independent

action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (citation and quotation

marks omitted).  Although a defendant's action need not be the sole source of injury to support

standing, *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011), "[t]he line of causation

between the defendant's action and the plaintiff's harm must be more than attenuated," *Native Vill.*

*of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012) (citations and quotation marks

omitted).  However, a "causal chain does not fail simply because it has several links, provided those

links are not hypothetical or tenuous and remain plausible."  *Id.* (citations, quotation marks, and

bracket omitted).

The government contends plaintiffs have not adequately alleged causation, relying on the

Ninth Circuit's decision in *Bellon*.  In that case, environmental advocacy groups sought to compel

the Washington State Department of Ecology and other regional agencies "to regulate greenhouse

gas emissions" ("GHGs") from five oil refineries.  *Bellon*, 732 F.3d at 1135.  The court held

plaintiffs lacked standing to sue because the causal link between the agencies' regulatory decisions

and the plaintiffs' injuries was "too attenuated."  *Id.* at 1141.  The court explained the special

challenge of showing causation with respect to the production of greenhouse gases:

> Greenhouse gases, once emitted from a specific source, quickly mix and disperse in
> the global atmosphere and have a long atmospheric lifetime.  Current research on
> how greenhouse gases influence global climate change has focused on the cumulative
> environmental effects from aggregate regional or global sources. But there is limited
> scientific capability in assessing, detecting, or measuring the relationship between a
> certain GHG emission source and localized climate impacts in a given region.

*Id.* at 1143.  The court noted that the five oil refineries at issue were responsible for just under six percent of total greenhouse gas emissions produced in the state of Washington, and quoted the state's expert's declaration that the effect of those emissions on global climate change was "scientifically indiscernible, given the emission levels, the dispersal of GHGs world-wide, and the absence of any meaningful nexus between Washington refinery emissions and global GHG concentrations now or as projected in the future." *Id.* at 1144 (quotation marks omitted).  The court concluded the "causal chain [wa]s too tenuous to support standing." *Id.*

This case is distinguishable from *Bellon* in two important respects.  First, the procedural posture is different.  In *Bellon,* the appeal was taken from a grant of summary judgment. *Id.* at 1138. That procedural posture is underscored by the court's reliance on expert declarations in rendering its decision.  Plaintiffs have alleged a causal relationship between their injuries and defendants' conduct.  At this stage, I am bound to accept those allegations as true.  This rule appropriately acknowledges the limits of the judiciary's expertise: at the motion to dismiss stage, a federal court is in no position to say it is impossible to introduce evidence to support a well-pleaded causal connection. *See Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 347 (2d Cir. 2009) (holding that causation in climate change cases is "best left to the rigors of evidentiary proof at a future stage of the proceedings, rather than dispensed with as a threshold question of constitutional standing"), *rev'd on other grounds, Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 429 (2011).  I note, too, that climate science is constantly evolving. *See* Kirsten Engel & Jonathan Overpeck, *Adaptation and the Courtroom: Judging Climate Science*, 3 Mich. J. Envt'l & Admin. L. 1, 25 (2013) (although "climate impacts at the regional and local levels are subject, among other things, to the uncertainties of downscaling techniques[,] . . . our knowledge of the climate is

developing at a breakneck pace.")  As a result, I cannot interpret *Bellon* — which relied on a summary judgment record developed more than five years ago — to forever close the courthouse doors to climate change claims.

Second, the emissions at issue in this case, unlike the emissions at issue in *Bellon*, make up a significant share of global emissions.  In *Bellon*, as noted, the five oil refineries were responsible for just under six percent of the greenhouse gas emissions generated in the state of Washington.  The Ninth Circuit recently explained that in *Bellon*, "causation was lacking because the defendant oil refineries were such minor contributors to greenhouse gas emissions, and the independent third-party causes of climate change were so numerous, that the contribution of the defendant oil refineries was 'scientifically undiscernable.'" *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1158 (9th Cir. 2015) (quoting *Bellon*, 732 F.3d at 1144).  Here, by contrast, plaintiffs' chain of causation rests on the core allegation that defendants are responsible for a substantial share of worldwide greenhouse gas emissions.  Plaintiffs allege that over the 263 years between 1751 and 2014, the United States produced more than twenty-five percent of global $CO_2$ emissions.  First Am. Compl. ¶ 151.  Greenhouse gas emissions produced in the United States continue to increase.  *Id.*  ¶ 152. In 2012, the United States was the second largest producer and consumer of energy in the world. *Id.* ¶ 160.  *Bellon*'s reasoning, which rested on a determination the oil refineries were "minor contributors" to climate change, does not apply.  *WildEarth Guardians*, 795 F.3d at 1158.

The government broadly asserts that *Bellon* rejected "the argument that allegations that a source 'contributed' to climate change are sufficient to satisfy Article III's causation requirement[.]" Fed. Defs.' Mem. of Points & Auth. in Supp. of Mot. Dismiss at 12 (doc. 27-1).  Not so.  *Bellon* rejected — *at the summary judgment stage* — "vague, conclusory" statements purporting to establish

a causal relationship between the emissions of five refineries and the plaintiffs' injuries. 732 F.3d at 1142. Although the Constitution did not require the *Bellon* plaintiffs to "connect each molecule to their injuries," it demanded more than "simply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way and to some undefined degree) to their injuries[.]" *Id.* at 1142-43.

The causal chain alleged by plaintiffs here is conclusory, but that is because they have not yet had the opportunity to present evidence. And unlike in *Bellon*, plaintiffs' causation allegations are not vague. At oral argument, plaintiffs explained that their theory of causation has two components. The first relates to defendants' affirmative acts. Specifically, plaintiffs allege that fossil fuel combustion accounts for approximately ninety-four percent of United States $CO_2$ emissions. First Am. Compl. ¶ 158. Defendants lease public lands for oil, gas, and coal production; undercharge royalties in connection with those leases; provide tax breaks to companies to encourage fossil fuel development; permit the import and export of fossil fuels; and incentivize the purchase of sport utility vehicles. *Id.* ¶¶ 164, 166, 171, 173, 181, 190. Here, the chain of causation is: fossil fuel combustion accounts for the lion's share of greenhouse gas emissions produced in the United States; defendants have the power to increase or decrease those emissions; and defendants use that power to engage in a variety of activities that actively cause and promote higher levels of fossil fuel combustion.

The second component of plaintiffs' causation theory involves defendants' failure to act in areas where they have authority to do so. Plaintiffs allege that together, power plants and transportation produce nearly two-thirds of $CO_2$ emissions in the United States. *Id.* ¶ 115 (transportation produces approximately twenty-seven percent of annual emissions); *id.* ¶ 125 (power

plants produce roughly thirty-seven percent of annual emissions).  Plaintiffs also allege DOT and

EPA have broad power to set emissions standards in these sectors.  So the chain of causation is:

DOT and EPA have jurisdiction over sectors producing sixty-four percent of United States

emissions, which in turn constitute roughly fourteen percent of emissions worldwide; they allow high

emissions levels by failing to set demanding standards; high emissions levels cause climate change;

and climate change causes plaintiffs' injuries.

Each link in these causal chains may be difficult to prove, but the "spectre of difficulty down

the road does not inform [the] justiciability determination at this early stage of the proceedings."

*Alperin*, 410 F.3d at 539.  At the pleading stage, plaintiffs have adequately alleged a causal link

between defendants' conduct and the asserted injuries.

C.    *Redressability*

The final prong of the standing inquiry is redressability.  The causation and redressability

prongs of the standing inquiry "overlap and are two facets of a single causation requirement."

*Bellon*, 732 F.3d at 1146 (citation and quotation marks omitted).  They are distinct in that causation

"examines the connection between the alleged misconduct and injury, whereas redressability

analyzes the connection between the alleged injury and requested judicial relief."  *Id.*  A plaintiff

need not show a favorable decision is certain to redress his injury, but must show a substantial

likelihood it will do so.  *Id.*  It is sufficient for the redressability inquiry to show that the requested

remedy would "slow or reduce" the harm.  *Massachusetts,* 549 U.S. at 525 (citing *Larson v. Valente,*

456 U.S. 228, 243 n.15 (1982)).

The declaratory and injunctive relief plaintiffs request meets this standard.  Most notably,

plaintiffs ask this Court to "[o]rder Defendants to prepare and implement an enforceable national

remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$[.]" First Am. Compl. ¶ 94. If plaintiffs can show, as they have alleged, that defendants have control over a quarter of the planet's greenhouse gas emissions, and that a reduction in those emissions would reduce atmospheric $CO_2$ and slow climate change, then plaintiffs' requested relief would redress their injuries.

*Bellon* is not to the contrary. In *Bellon*, the court concluded the plaintiff's injuries would continue unabated even if the five oil refineries shut down, repeating its conclusion that the effect of the emissions produced by those refineries on global emissions levels was "scientifically indiscernable." 732 F.3d at 1147 (quotation marks omitted). Thus, *Bellon*'s redressability holding, like its causation holding, rested on a factor not present here: that the defendants were minor contributors to global climate change. Accordingly, *Bellon*'s reasoning does not apply.

Defendants and intervenors essentially argue that because many entities contribute to global warming, an injunction operating on one entity — even a major player — would offer no guarantee of an overall reduction in greenhouse gas emissions. But whether the Court could guarantee an overall reduction in greenhouse gas emissions is the wrong inquiry for at least two reasons. First, redressability does not require certainty, it requires only a substantial likelihood that the Court could provide meaningful relief. Second, the possibility that some other individual or entity might later cause the same injury does not defeat standing — the question is whether the injury *caused by the defendant* can be redressed.

Redressability in this case is scientifically complex, particularly in light of the specter of "irreversible climate change," wherein greenhouse gas emissions above a certain level push the planet past "points of no return, beyond which irreversible consequences become inevitable, out of

humanity's control." Hansen Decl. ¶ 13 & Ex. 2 at 13 Sept. 10, 2015 (docs. 7-1 & 7-3) (quotation marks omitted). This raises a host of questions, among them: What part of plaintiffs' injuries are attributable to causes beyond this Court's control? Even if emissions increase elsewhere, will the magnitude of plaintiffs' injuries be less if they obtain the relief they seek in this lawsuit? When would we reach this point of no return, and do defendants have it within their power to avert reaching it even without cooperation from third parties? All of these questions are inextricably bound up in the causation inquiry, and none of them can be answered at the motion to dismiss stage.

Plaintiffs ask this Court to "order Defendants to cease their permitting, authorizing, and subsidizing of fossil fuels and, instead, move to swiftly phase out $CO_2$ emissions, as well as take such other action necessary to ensure that atmospheric $CO_2$ is no more concentrated than 350 ppm by 2100, including to develop a national plan to restore Earth's energy balance, and implement that national plan so as to stabilize the climate system." First Am. Compl. ¶ 12 (emphasis omitted). Construing the complaint in plaintiffs' favor, they allege that this relief would at least partially redress their asserted injuries. Youth plaintiffs have adequately alleged they have standing to sue.[5]

III.    *Due Process Claims*[6]

The Due Process Clause of the Fifth Amendment to the United States Constitution bars the federal government from depriving a person of "life, liberty, or property" without "due process of

---

[5] Defendants and intervenors also challenge the standing of future generations plaintiffs on a number of grounds. It is not necessary to address these arguments because once a federal court concludes one plaintiff has standing, it need not determine whether the remaining plaintiffs have standing. *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

[6] Plaintiffs' due process claims encompass asserted equal protection violations and violations of unenumerated rights secured by the Ninth Amendment. For simplicity's sake, this opinion refers to these claims collectively as "due process claims."

law." U.S. Const. amend. V.  Plaintiffs allege defendants have violated their due process rights by "directly caus[ing] atmospheric $CO_2$ to rise to levels that dangerously interfere with a stable climate system required alike by our nation and Plaintiffs[,]" First Am. Compl. ¶ 279; "knowingly endanger[ing] Plaintiffs' health and welfare by approving and promoting fossil fuel development, including exploration, extraction, production, transportation, importation, exportation, and combustion," *id.* ¶ 280; and, "[a]fter knowingly creating this dangerous situation for Plaintiffs, . . . continu[ing] to knowingly enhance that danger by allowing fossil fuel production, consumption, and combustion at dangerous levels," *id.* ¶ 284.

Defendants and intervenors challenge plaintiffs' due process claims on two grounds.  First, they assert any challenge to defendants' affirmative actions (*i.e.* leasing land, issuing permits) cannot proceed because plaintiffs have failed to identify infringement of a fundamental right or discrimination against a suspect class of persons.  Second, they argue plaintiffs cannot challenge defendants' inaction (*i.e.*, failure to prevent third parties from emitting $CO_2$ at dangerous levels) because defendants have no affirmative duty to protect plaintiffs from climate change.

A.    *Infringement of a Fundamental Right*

When a plaintiff challenges affirmative government action under the due process clause, the threshold inquiry is the applicable level of judicial scrutiny.  *Witt v. Dep't of the Air Force*, 527 F.3d 806, 813 (9th Cir. 2008).  The default level of scrutiny is rational basis, which requires a reviewing court to uphold the challenged governmental action so long as it "implements a rational means of achieving a legitimate governmental end[.]"  *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997) (quotation marks omitted).  When the government infringes a "fundamental right," however, a reviewing court applies strict scrutiny.  *Witt*, 527 F.3d at 817.  Substantive due process "forbids

the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (emphasis in original). It appears undisputed by plaintiffs, and in any event is clear to this Court, that defendants' affirmative actions would survive rational basis review. Resolution of this part of the motions to dismiss therefore hinges on whether plaintiffs have alleged infringement of a fundamental right.[7]

Fundamental liberty rights include both rights enumerated elsewhere in the Constitution and rights and liberties which are either (1) "deeply rooted in this Nation's history and tradition" or (2) "fundamental to our scheme of ordered liberty[.]" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (internal citations, quotations, and emphasis omitted). The Supreme Court has cautioned that federal courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into" judicial policy preferences. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citation and quotation marks omitted).

This does not mean that "new" fundamental rights are out of bounds, though. When the Supreme Court broke new legal ground by recognizing a constitutional right to same-sex marriage, Justice Kennedy wrote that

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights . . . did not presume to know the extent of freedom in all its dimensions, and so they entrusted to future generations

---

[7] Strict scrutiny also is triggered by an allegation that the government discriminated on the basis of a suspect classification, regardless of whether the government action infringed a fundamental right. *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003). Because I conclude that plaintiffs have alleged a violation of their fundamental rights, I need not address whether youth or future generations are suspect classifications for equal protection purposes.

> a charter protecting the right of all persons to enjoy liberty as we learn its meaning.
> When new insight reveals discord between the Constitution's central protections and
> a received legal stricture, a claim to liberty must be addressed.

*Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015). Thus, "[t]he identification and protection of

fundamental rights is an enduring part of the judicial duty to interpret the Constitution . . . [that] has

not been reduced to any formula." *Id.* (citation and quotation marks omitted). In determining

whether a right is fundamental, courts must exercise "reasoned judgment," keeping in mind that

"[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries." *Id.* The

genius of the Constitution is that its text allows "future generations [to] protect . . . the right of all

persons to enjoy liberty as we learn its meaning." *Id.*

Often, an unenumerated fundamental right draws on more than one Constitutional source.

The idea is that certain rights may be necessary to enable the exercise of other rights, whether

enumerated or unenumerated. In *Roe v. Wade*, 410 U.S. 113, 152-53 (1973), the Court exhaustively

chronicled the jurisprudential history of the fundamental right to privacy — another right not

mentioned in the text of the Constitution. *Roe*'s central holding rests on the Due Process Clause of

the Fourteenth Amendment. *Id.* at 153. But the Court also found "roots" of the right to privacy in

the First Amendment, the Fourth Amendment, the Fifth Amendment, the penumbras of the Bill of

Rights, and the Ninth Amendment. *Id.* at 152. Similarly, in *Obergefell*, the Court's recognition of

a fundamental right to marry was grounded in an understanding of marriage as a right underlying and

supporting other vital liberties. *See* 135 S. Ct. at 2599 ("[I]t would be contradictory to recognize a

right to privacy with respect to other matters of family life and not with respect to the decision to

enter the relationship that is at the foundation of the family in our society." (citation and quotation

marks omitted)); *id.* at 2601 ("[M]arriage is a keystone of our social order.").

Exercising my "reasoned judgment," *id.* at 2598, I have no doubt that the right to a climate system capable of sustaining human life is fundamental to a free and ordered society. Just as marriage is the "foundation of the family," a stable climate system is quite literally the foundation "of society, without which there would be neither civilization nor progress." *Id.* (quoting *Maynard v. Hill*, 125 U.S. 190, 211 (1888)); *cf. Minors Oposa v. Sec'y of the Dep't of Envt'l & Natural Res.*, G.R. No. 101083, 33 I.L.M. 173, 187-88 (S.C., Jul. 30, 1993) (Phil.) (without "a balanced and healthful ecology," future generations "stand to inherit nothing but parched earth incapable of sustaining life.").

Defendants and intervenors contend plaintiffs are asserting a right to be free from pollution or climate change, and that courts have consistently rejected attempts to define such rights as fundamental. Defendants and intervenors mischaracterize the right plaintiffs assert. Plaintiffs do not object to the government's role in producing *any* pollution or in causing *any* climate change; rather, they assert the government has caused pollution and climate change on a catastrophic level, and that if the government's actions continue unchecked, they will permanently and irreversibly damage plaintiffs' property, their economic livelihood, their recreational opportunities, their health, and ultimately their (and their children's) ability to live long, healthy lives. Echoing *Obergefell*'s reasoning, plaintiffs allege a stable climate system is a necessary condition to exercising other rights to life, liberty, and property.

In framing the fundamental right at issue as the right to a climate system capable of sustaining human life, I intend to strike a balance and to provide some protection against the constitutionalization of all environmental claims. On the one hand, the phrase "capable of sustaining human life" should not be read to require a plaintiff to allege that governmental action will result in

the extinction of humans as a species. On the other hand, acknowledgment of this fundamental right does not transform any minor or even moderate act that contributes to the warming of the planet into a constitutional violation. In this opinion, this Court simply holds that where a complaint alleges governmental action is affirmatively and substantially damaging the climate system in a way that will cause human deaths, shorten human lifespans, result in widespread damage to property, threaten human food sources, and dramatically alter the planet's ecosystem, it states a claim for a due process violation. To hold otherwise would be to say that the Constitution affords no protection against a government's knowing decision to poison the air its citizens breathe or the water its citizens drink. Plaintiffs have adequately alleged infringement of a fundamental right.

> B.    *"Danger Creation" Challenge to Inaction*

With limited exceptions, the Due Process Clause does not impose on the government an affirmative obligation to act, even when "such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). This rule is subject to two exceptions: "(1) the 'special relationship' exception; and (2) the 'danger creation' exception." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). The "special relationship" exception provides that when the government takes an individual into custody against his or her will, it assumes some responsibility to ensure that individual's safety. *Id.* The "danger creation" exception permits a substantive due process claim when government conduct "places a person in peril in deliberate indifference to their safety[.]" *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997). Plaintiffs purport to challenge the government's failure to limit third-party $CO_2$ emissions pursuant to the danger creation *DeShaney* exception.

PAGE 33 - OPINION AND ORDER

In the Ninth Circuit, a plaintiff challenging government inaction on a danger creation theory must first show the "state actor create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). The state action must place the plaintiff "in a worse position than that in which he would have been had the state not acted at all." *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (quotation marks omitted and alterations normalized). Second, the plaintiff must show the "state actor . . . recognize[d]" the unreasonable risks to the plaintiff and "actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 846 (9th Cir. 2011) (brackets and quotation marks omitted). The defendant must have acted with "[d]eliberate indifference," which "requires a culpable mental state more than gross negligence." *Pauluk*, 836 F.3d at 1125 (quotation marks omitted).

Plaintiffs allege that "[a]cting with full appreciation of the consequences of their acts, Defendants knowingly caused, and continue to cause, dangerous interference with our atmosphere and climate system." First Am. Compl. ¶ 85. They allege this danger stems, "in substantial part, [from] Defendants' historic and continuing permitting, authorizing, and subsidizing of fossil fuel extraction, production, transportation, and utilization." *Id.* ¶ 279. Plaintiffs allege defendants acted "with full appreciation" of the consequences of their acts, *id.* ¶¶ 278-79, specifically "[harm to] Plaintiffs' dignity, including their capacity to provide for their basic human needs, safely raise families, practice their religious and spiritual beliefs, maintain their bodily integrity, and lead lives with access to clean air, water, shelter, and food." *Id.* ¶ 283. In the face of these risks, plaintiffs allege defendants "have had longstanding, actual knowledge of the serious risks of harm and have failed to take necessary steps to address and ameliorate the known, serious risk to which they have

PAGE 34 - OPINION AND ORDER

exposed Plaintiffs." *Id.* ¶ 285. In sum: plaintiffs allege defendants played a unique and central role in the creation of our current climate crisis; that they contributed to the crisis with full knowledge of the significant and unreasonable risks posed by climate change;[8] and that the Due Process Clause therefore imposes a special duty on defendants to use their statutory and regulatory authority to reduce greenhouse gas emissions. Accepting the allegations of the complaint as true, plaintiffs have adequately alleged a danger creation claim.

Defendants argue the *DeShaney* exceptions are inapplicable when the actor is the federal government rather than a state government. It is true that *DeShaney* was a section 1983 case and that the Ninth Circuit cases interpreting the *DeShaney* exceptions are also section 1983 cases. But in *DeShaney*, the Supreme Court was mapping the contours of the Due Process Clause, not section 1983. Defendants have cited no case or legal principle to justify limiting *DeShaney* to the section 1983 context.

Next, defendants contend application of the *DeShaney* danger creation exception in this context would permit plaintiffs to "raise a substantive due process claim to challenge virtually any government program" — for example, to challenge foreign policy decisions that heighten or exacerbate international tensions, or to health and safety regulations the plaintiff deems insufficiently

---

[8] At oral argument, plaintiffs supplied the Court with a timeline documenting purported evidence of defendants' knowledge of climate change. The timeline, which dates back to 1955, includes the 1988 testimony of Dr. James Hansen before the Senate Committee on Energy and Natural Resources. Dr. Hansen, who appears in this lawsuit as a guardian for his granddaughter and for future generations, testified about rising global temperatures and their relationship to human activity. First Session on the Greenhouse Effect and Global Climate Change Before the Comm. on Energy & Natural Res., 100th Cong. 39 (1988). He urged legislators to take action to limit greenhouse gas emissions. *Id.* at 158. Dr. Hansen's testimony was preceded by a statement from Senator Dale Bumpers of Arkansas, who bemoaned, "We're not going to have a lot of political support for this. Nobody wants to take on the automobile industry. Nobody wants to take on any of the industries that produce the things we throw up into the atmosphere." *Id.* at 38.

stringent. Fed. Defs.' Obj. 18. Defendants fail to recognize that *DeShaney* imposes rigorous proof requirements. A plaintiff asserting a danger-creation due process claim must show (1) the government's acts created the danger to the plaintiff; (2) the government *knew* its acts caused that danger; and (3) the government with *deliberate indifference* failed to act to prevent the alleged harm. These stringent standards are sufficient safeguards against the flood of litigation concerns raised by defendants — indeed, they pose a significant challenge for plaintiffs in this very lawsuit.[9]

Questions about difficulty of proof, however, must be left for another day. At the motion to dismiss stage, I am bound to accept the factual allegations in the complaint as true. Plaintiffs have alleged that defendants played a significant role in creating the current climate crisis, that defendants acted with full knowledge of the consequences of their actions, and that defendants have failed to correct or mitigate the harms they helped create in deliberate indifference to the injuries caused by climate change. They may therefore proceed with their substantive due process challenge to defendants' failure to adequately regulate $CO_2$ emissions.

IV.    *Public Trust Claims*

In its broadest sense, the term "public trust" refers to the fundamental understanding that no government can legitimately abdicate its core sovereign powers. *See Stone v. Mississippi*, 101 U.S. 814, 820 (1879) ("[T]he power of governing is a trust committed by the people to the government, no part of which can be granted away.") The public trust doctrine rests on the fundamental principle that "[e]very succeeding legislature possesses the same jurisdiction and power with respect to [the public interest] as its predecessors." *Newton v. Mahoning Cnty. Comm'rs*, 100 U.S. 548, 559 (1879).

---

[9] There are other barriers to asserting defendants' hypothetical danger-creation claims. For example, as discussed in Part I of this opinion, the political question doctrine sharply limits judicial review of decisions inherently entangled with the conduct of foreign relations.

The doctrine conceives of certain powers and obligations — for example, the police power — as inherent aspects of sovereignty. *Id.* at 554. Permitting the government to permanently give one of these powers to another entity runs afoul of the public trust doctrine because it diminishes the power of future legislatures to promote the general welfare.

Plaintiffs' public trust claims arise from the particular application of the public trust doctrine to essential natural resources. With respect to these core resources, the sovereign's public trust obligations prevent it from "depriving a future legislature of the natural resources necessary to provide for the well-being and survival of its citizens." Br. of Amici Curiae Global Catholic Climate Movement and Leadership Council of Women Religious at 3 (footnote omitted) (doc. 51-1). Application of the public trust doctrine to natural resources predates the United States of America. Its roots are in the Institutes of Justinian, part of the Corpus Juris Civilis, the body of Roman law that is the "foundation for modern civil law systems." Timothy G. Kearley, *Justice Fred Blume and the Translation of Justinian's Code*, 99 Law Libr. J. 525, ¶ 1 (2007). The Institutes of Justinian declared "the following things are by natural law common to all — the air, running water, the sea, and consequently the seashore." J. Inst. 2.1.1 (J.B. Moyle trans.). The doctrine made its way to the United States through the English common law. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 284 (1997) ("American law adopted as its own much of the English law respecting navigable waters, including the principle that submerged lands are held for a public purpose."); *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 473 (1988) ("At common law, the title and dominion in lands flowed by the tide water were in the King for the benefit of the nation . . . Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders[.]" (quoting *Shively v. Bowlby*, 152 U.S. 1, 57 (1894)); Joseph L. Sax,

*The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 475-76 (1970) (discussing the history of the public trust doctrine in the United States).

The first court in this country to address the applicability of the public trust doctrine to natural resources was the New Jersey Supreme Court, in 1821. The court explained that public trust assets were part of a taxonomy of property:

> Every thing susceptible of property is considered as belonging to the nation that possesses the country, as forming the entire mass of its wealth. But the nation does not possess all those things in the same manner. By very far the greater part of them are divided among the individuals of the nation, and become *private property*. Those things not divided among the individuals still belong to the nation, and are called *public property*. Of these, again, some are reserved for the necessities of the state, and are used for the public benefit, and those are called "*the domain of the crown or of the republic*," others remain common to all the citizens, who take of them and use them, each according to his necessities, and according to the laws which regulate their use, and are called *common property*. Of this latter kind, according to the writers upon the law of nature and of nations, and upon the civil law, are the air, the running water, the sea, the fish, and the wild beasts.

*Arnold v. Mundy*, 6 N.J.L. 1, 71 (N.J. 1821) (emphasis in original).

The seminal United States Supreme Court case on the public trust is *Illinois Central Railroad Company v. Illinois*, 146 U.S. 387 (1892). The Illinois legislature had conveyed to the Illinois Central Railroad Company title to part of the submerged lands beneath the harbor of Chicago, with the intent to give the company control over the waters above the submerged lands "against any future exercise of power over them by the state." *Id.* at 452. The Supreme Court held the legislature's attempt to give up its title to lands submerged beneath navigable waters was either void on its face or always subject to revocation. *Id.* at 453. "The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them . . . than it can abdicate its police powers in the administration of government and the preservation of the peace."

PAGE 38 - OPINION AND ORDER

*Id.* In light of the "immense value" the harbor of Chicago carried for the people of Illinois, the "idea that its legislature can deprive the state of control over its bed and waters, and place the same in the hands of a private corporation" could not "be defended." *Id.* at 454.

The natural resources trust operates according to basic trust principles, which impose upon the trustee a fiduciary duty to "protect the trust property against damage or destruction." George G. Bogert et al., Bogert's Trusts and Trustees, § 582 (2016). The trustee owes this duty equally to both current and future beneficiaries of the trust. Restatement (Second) of Trusts § 183 (1959). In natural resources cases, the trust property consists of a set of resources important enough to the people to warrant public trust protection. *See* Mary C. Wood, A Nature's Trust: Environmental Law for a New Ecological Age 167-75 (2014). The government, as trustee, has a fiduciary duty to protect the trust assets from damage so that current and future trust beneficiaries will be able to enjoy the benefits of the trust. *Id.* The public trust doctrine is generally thought to impose three types of restrictions on governmental authority:

> [F]irst, the property subject to the trust must not only be used for a public purpose, but it must be held available for use by the general public; second, the property may not be sold, even for a fair cash equivalent; and third, the property must be maintained for particular types of uses.

Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 477 (1970).

This lawsuit is part of a wave of recent environmental cases asserting state and national governments have abdicated their responsibilities under the public trust doctrine. *See, e.g., Alec L. v. Jackson*, 863 F. Supp. 2d 11 (D.D.C. 2012); *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221 (N.M. Ct. App. 2015); *Kanuk ex rel. Kanuk v. State, Dep't of Natural Res.*, 335 P.3d 1088

PAGE 39 - OPINION AND ORDER

(Alaska 2014); *Chernaik v. Kitzhaber*, 328 P.3d 799 (Or. Ct. App. 2014). These lawsuits depart from the "traditional" public trust litigation model, which generally centers on the second restriction, the prohibition against alienation of a public trust asset. Instead, plaintiffs assert defendants have violated their duties as trustees by nominally retaining control over trust assets while actually allowing their depletion and destruction, effectively violating the first and third restrictions by excluding the public from use and enjoyment of public resources.

Defendants and intervenors argue the public trust doctrine has no application in this case. They advance four arguments: (1) the atmosphere, the central natural resource at issue in this lawsuit, is not a public trust asset; (2) the federal government, unlike the states, has no public trust obligations; (3) any common-law public trust claims have been displaced by federal statutes; and (4) even if there is a federal public trust, plaintiffs lack a right of action to enforce it. I address each contention in turn.

A.    *Scope of Public Trust Assets*

The complaint alleges defendants violated their duties as trustees by failing to protect the atmosphere, water, seas, seashores, and wildlife. First Am. Compl. ¶ 309. Defendants and intervenors argue plaintiffs' public trust claims fail because the complaint focuses on harm to the atmosphere, which is not a public trust asset. I conclude that it is not necessary at this stage to determine whether the atmosphere is a public trust asset because plaintiffs have alleged violations of the public trust doctrine in connection with the territorial sea.[10]

---

[10] To be clear, today's opinion should not be taken to suggest that the atmosphere is not a public trust asset. The Institutes of Justinian included the air in the list of assets "by natural law common to all." J. Inst. 2.1.1 (J.B. Moyle trans.). The New Jersey Supreme Court in *Arnold* similarly included air in its list of "common property." 6 N.J.L. at 71. Even Supreme Court case law suggests the atmosphere may properly be deemed part of the public trust *res. See United*

The federal government holds title to the submerged lands between three and twelve miles

from the coastlines of the United States. *See* Restatement (Third) of The Foreign Relations Law of

the United States § 511(a) (1987) (international law permits a nation to claim as its territorial sea an

area up to twelve miles from its coast); Presidential Proclamation of Dec. 27, 1988, No. 5928, 3

C.F.R. § 547 (1989) (President Reagan expanding United States' claim from three-mile territorial

sea to twelve-mile territorial sea); 43 U.S.C. § 1312 (seaward boundary of a coastal state is "a line

---

*States v. Causby*, 328 U.S. 256, 261 (1946) (holding that private rights to airspace have "no place
in the modern world" because recognition of such claims would "transfer into private ownership
that to which only the public has a just claim.") The dearth of litigation focusing on atmosphere
may reflect the limited state of scientific knowledge rather than signal a determination that the air
is outside the scope of the public trust. *See* Mary C. Wood, *Atmospheric Trust Litigation Across
the World*, *in* Fiduciary Duty and the Atmospheric Trust 113 (Ken Coghill et al. Eds. 2012)
(hypothesizing that the atmosphere does not appear in early public trust case law because air was
long thought to be indestructible and incapable of privatization).

Even if the atmosphere was not always considered a public trust asset, some courts have
concluded the doctrine should "be molded and extended to meet changing conditions and needs
of the public it was created to benefit." *Matthews v. Bay Head Improvement Ass'n*, 471 A.2d
355, 365 (N.J. 1984) (citation and quotation marks omitted). Just last year, Judge Hollis Hill
reasoned that it "misses the point" to mechanically rely on what has been identified as a public
trust asset in the past because "[t]he navigable waters and the atmosphere are intertwined and to
argue a separation of the two, or to argue that [greenhouse gas] emissions do not affect navigable
waters is nonsensical." *Foster v. Wash. Dep't of Ecology*, No. 14-2-25295-1, slip op. at 8 (Wash.
King Cnty. Super. Ct. Nov. 19, 2015). At least one state court has held in recent years that "the
concept of public natural resources includes not only state-owned lands, waterways, and mineral
reserves, but also resources that implicate the public interest, such as ambient air, surface and
ground water, wild flora, and fauna (including fish) that are outside the scope of purely private
property." *Robinson Twp., Wash. Cnty., Pa. v. Pennsylvania*, 83 A.3d 901, 955 (Pa. Sup. Ct.
2013).

The Supreme Court arguably endorsed this pragmatic approach to the identification of
trust assets in *Illinois Central*, where it held, contrary to English common law, that lakes and
rivers unaffected by the ebb and flow of the tide could be navigable waters within the meaning of
the public trust doctrine. 146 U.S. at 436 (English rule for determining navigability would not
work in the United States, which contains "rivers [that] are navigable for great distances above
the flow of the tide — indeed, for hundreds of miles").

PAGE 41 - OPINION AND ORDER

three geographical miles distant from its coast line"). Time and again, the Supreme Court has held

that the public trust doctrine applies to "lands beneath tidal waters." *See Phillips Petroleum Co.*, 484

U.S. at 474 (discussing *Shively*, 152 U.S. at 57 and *Knight v. U.S. Land Ass'n*, 142 U.S. 161, 183

(1891)); *Alabama v. Texas*, 347 U.S. 272, 278 (1954) (Black, J., dissenting) ("In ocean waters

bordering our country, if nowhere else, day-to-day national power — complete, undivided, flexible,

and immediately available — is an essential attribute of federal sovereignty."); *id.* at 282 (Douglas,

J., dissenting) ("Thus we are dealing here with incidents of national sovereignty . . . . The authority

over [the sea] can no more be abdicated than any of the other great powers of the Federal

Government. It is to be exercised for the benefit of the whole."); *see also* Joseph L. Sax, *The Public

Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 556

(1970) (public trust law covers "that aspect of the public domain below the low-water mark on the

margin of the sea and the great lakes, the waters over those lands, and the waters within rivers and

streams of any consequence"). Because a number of plaintiffs' injuries relate to the effects of ocean

acidification and rising ocean temperatures,[11] they have adequately alleged harm to public trust

assets.

---

[11] *See, e.g.*, First Am. Compl. ¶ 16 ("An important part of Kelsey's diet includes food that comes from the marine waters and freshwater rivers, including salmon, cod, tuna, clams, mussels, and crab."); *id.* ¶ 27 ("Other food sources for Alex, including crab and seafood, are negatively impacted by ocean acidification, warming, and sea level rise caused by Defendants."); *id.* ¶ 33 ("Ocean acidification caused by Defendants has already begun to adversely impact shellfish along the coast, and is predicted to take its toll on crab, mussels, and all shelled seafood."); *id.* ¶ 45 ("On the Oregon coast, Sahara enjoys climbing rocks and sand dunes, swimming, and tidepooling to see marine life. Sahara's enjoyment of these activities is being increasingly harmed in the future by sea level rise, greater erosion, enhanced ocean acidification, and increased water temperatures.").

B.    *Applicability of Public Trust to the Federal Government*

Defendants and intervenors contend that in the United States, the public trust doctrine applies only to the states and not to the federal government. This argument rests primarily on a passing statement in *PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012). A close examination of that case reveals that it cannot fairly be read to foreclose application of the public trust doctrine to assets owned by the federal government.

*PPL Montana* was not a public trust case. Its central concern was the equal footing doctrine. PPL Montana, LLC used three rivers flowing through the state of Montana for hydroelectric projects. *Id.* at 580. Montana sought rent for the use of the riverbeds, arguing it had gained title to the rivers pursuant to the equal footing doctrine when it became a state in 1889. *Id.* The Montana Supreme Court granted summary judgment on title to Montana. On writ of certiorari to the United States Supreme Court, review hinged on whether the rivers in question were "navigable" in 1889, because the "title consequences of the equal-footing doctrine" are that "[u]pon statehood, the State gains title within its borders to the beds of waters then navigable (or tidally influenced . . .)[.]" *Id.* at 589-90. The Court reversed and remanded, holding that the Montana courts had applied the wrong methodology for determining navigability.

In addition to its main argument that the rivers were navigable, Montana argued that denying it title to the riverbeds in dispute would "undermine the public trust doctrine." *Id.* at 601. The Supreme Court rejected this argument in short order:

> Unlike the equal-footing doctrine, . . . which is the constitutional foundation for the navigability rule of riverbed title, the public trust doctrine remains a matter of state law, subject as well to the federal power to regulate vessels and navigation under the Commerce Clause and admiralty power. While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, the

> contours of that public trust do not depend upon the Constitution. Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.

*Id.* at 603 (citations omitted).

Defendants and intervenors take the phrase "the public trust doctrine remains a matter of state law," and interpret it in isolation to foreclose all federal public trust claims. That is not a plausible interpretation of *PPL Montana*. The Court was simply stating that federal law, not state law, determined whether Montana has title to the riverbeds, and that if Montana had title, state law would define the scope of Montana's public trust obligations. *PPL Montana* said nothing at all about the viability of federal public trust claims with respect to federally-owned trust assets.

In a string citation, *PPL Montana* cited *Coeur d'Alene*, 521 U.S. at 285, and *Appleby v. City of New York*, 271 U.S. 364, 395 (1926), for the proposition that *Illinois Central* "was necessarily a statement of Illinois law." 132 S. Ct. at 1235. That statement is not surprising given the nature of the public trust doctrine. Public trust obligations are inherent aspects of sovereignty; it follows that any case applying the public trust doctrine to a particular state is necessarily a statement of that state's law rather than a statement of the law of another sovereign. In *Coeur d'Alene*, the Supreme Court explained that even though *Illinois Central* interpreted Illinois law, its central tenets could be applied broadly (for example, to Idaho) because it "invoked the principle in American law recognizing the weighty public interests in submerged lands." 521 U.S. at 285. The Court then detailed how the American public trust doctrine, which has diverged from the English public trust doctrine in important ways, has developed as "a natural outgrowth of the perceived public character of submerged lands, a perception which underlies and informs the principle that these lands are tied

PAGE 44 - OPINION AND ORDER

in a unique way to sovereignty." *Id.* at 286. There is no reason why the central tenets of *Illinois Central* should apply to another state, but not to the federal government.

Defendants and intervenors also contend recognizing a federal public trust claim is contrary to *United States v. 32.42 Acres of Land, More or Less, Located in San Diego County, California*, 683 F.3d 1030, 1038 (9th Cir. 2012), which repeated *PPL Montana*'s statement that "the public trust doctrine remains a matter of state law" in concluding that the federal government's eminent domain powers trumped any state-law public trust concerns. That case did not foreclose a federal public trust claim, however, because the Ninth Circuit *expressly* declined to address the viability of the federal public trust the district court imposed on the federal government after it ruled the land could be taken pursuant to eminent domain. *Id.* at 1033 & 1039 n.2.

In 2012, the federal district court for the District of Columbia held the public trust doctrine does not apply to the federal government. *Alec L.* was substantially similar to the instant action: five youth plaintiffs and two environmental advocacy organizations sued a variety of heads of federal agencies, alleging the defendants had "wasted and failed to preserve and protect the atmosphere Public Trust asset." 863 F. Supp. 2d at 12. The court dismissed the suit with prejudice, holding the plaintiffs' federal public trust claims were foreclosed by *PPL Montana*'s statement that "the public trust doctrine remains a mater of state law." *Id.* at 15 (quoting *PPL Montana*, 565 U.S. at 603). The court also relied on the D.C. Circuit's observation that "'[i]n this country the public trust doctrine has developed almost exclusively as a matter of state law.'" *Id.* (quoting *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1082 (D.C. Cir. 1984)). In an unpublished memorandum decision, the D.C. Circuit affirmed, holding that "[t]he Supreme Court in *PPL Montana* . . . directly and categorically rejected any federal constitutional foundation for that doctrine, without qualification

or reservation." *Alec L. ex rel. Loorz v. McCarthy*, 561 F. App'x 7, 8 (D.C. Cir. 2014).

I am not persuaded by the reasoning of the *Alec L.* courts. As explained above, a close reading of *PPL Montana* reveals that it says nothing about the viability of federal public trust claims. And in *Air Florida*, the D.C. Circuit emphasized that "we imply no opinion regarding either the applicability of the public trust doctrine to the federal government or the appropriateness of using the doctrine to afford trustees a means for recovering from tortfeasors the cost of restoring public waters to their pre-injury condition." 750 F.2d at 1084.

Two federal courts —– the district courts for the Northern District of California and the District of Massachusetts — have concluded the public trust doctrine applies to the federal government. The decisions, from the 1980s, concerned the federal government's acquisition of various state-owned public trust assets —– for example, submerged land beneath navigable rivers or tidelands —– through the power of eminent domain. The courts held that the federal government has no public trust obligations under *state* law, but does take the land subject to a *federal* public trust. As one court explained, "[t]he trust is of such a nature that it can be held only by the sovereign, and can only be destroyed by the destruction of the sovereign." *United States v. 1.58 Acres of Land Situated in the City of Boston, Suffolk Cnty., Mass.*, 523 F. Supp. 120, 124 (D. Mass. 1981). Through eminent domain, the federal government "may take property . . . in 'full fee simple' insofar as no other principal may hold a greater right to such land. It must be recognized, however, that the federal government is as restricted as the Commonwealth in its ability to abdicate to private individuals" its title to the land. *Id.* at 124-25. In other words, "[b]y condemnation, the United States simply acquires the land subject to the public trust as though no party had held an interest in the land before." *City of Alameda v. Todd Shipyards Corp.*, 635 F. Supp. 1447, 1450 (N.D. Cal.

1986). *32.42 Acres of Land* is wholly consistent with these opinions; in that case, the Ninth Circuit

held that when the federal government condemns state land, it takes title free and clear of any *state*

public trust obligations — and that to hold otherwise would violate the Supremacy Clause by

subjugating the federal eminent domain power to state public trust law. 683 F.3d at 1038. As noted,

however, the court said nothing about the lower court's determination that the condemned tidelands

had been taken subject to a federal public trust. *32.42 Acres of Land*, 683 F.3d at 1033 & 1039 n.2.

I am persuaded that the *City of Alameda* and *1.58 Acres of Land* courts were correct. Their

decisions rested on the history of the public trust doctrine and the public trust's unique relationship

to sovereignty. I can think of no reason why the public trust doctrine, which came to this country

through the Roman and English roots of our civil law system, would apply to the states but not to

the federal government.

Defendants' final argument is that recognition of a federal public trust doctrine cannot be

reconciled with *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976), in which the Supreme Court stated

that "[t]he power over public land" entrusted to Congress by the Property Clause of the United States

Constitution is "without limitations." Again, defendants take the Supreme Court's statement out of

context. In *Kleppe*, New Mexico challenged the federal government's authority to regulate and

protect wild horses and burros, arguing that the Constitution granted Congress only the power to

"dispose of and make incidental rules regarding the use of federal property" and "the power to

protect" the federal property itself, *i.e.*, the land but not animals living on it. 426 U.S. at 536. The

Supreme Court rejected New Mexico's attempt to limit Congress's power to regulate wildlife living

on federal lands. It is in that context that the Court stated the "power over public land" was "without

limitations." *Id.* at 539. Indeed, in the *very same sentence* the Supreme Court acknowledged that

"the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved[.]" *Id.* The Supreme Court in *Kleppe* simply did not have before it the question whether the Constitution grants the federal government unlimited authority to do whatever it wants with any parcel of federal land, regardless of whether its actions violate individual constitutional rights or run afoul of public trust obligations.

The federal government, like the states, holds public assets — at a minimum, the territorial seas — in trust for the people. Plaintiffs' federal public trust claims are cognizable in federal court.

C.    *Displacement of Public Trust Claims*

Defendants and intervenors next argue that any common-law public trust claims have been displaced by a variety of acts of Congress, including the Clean Air Act and the Clean Water Act. For this proposition, they rely on *American Electric Power Company, Inc. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*"). In *AEP*, the plaintiffs sued five power companies, alleging the companies' $CO_2$ emissions were a public nuisance under federal common law. *Id.* at 415. The Supreme Court held the nuisance claim could not proceed because "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." *Id.* at 424.

Defendants and intervenors contend that *AEP* controls the displacement analysis. The district court in *Alec L.* agreed with them.[12] The court relied heavily on *AEP*'s statement that the Clean Air Act displaces "'any federal common law right'" to challenge $CO_2$ emissions, and also discussed at length the *AEP* court's concerns that authorizing a judicial order setting $CO_2$ emissions limits would require federal judges to make decisions involving competing policy interests — decisions an

---

[12] The D.C. Circuit did not address the displacement question on appeal.

"expert agency 'is surely better equipped to [make] than individual district judges issuing ad hoc, case-by-case injunctions.'" *Alec L.*, 863 F. Supp. 2d at 16 (quoting *AEP*, 564 U.S. at 424, 428).

I am not persuaded by the *Alec L.* court's reasoning regarding displacement. In *AEP*, the Court did not have public trust claims before it and so it had no cause to consider the differences between public trust claims and other types of claims. Public trust claims are unique because they concern inherent attributes of sovereignty. The public trust imposes on the government an obligation to protect the *res* of the trust. A defining feature of that obligation is that it cannot be legislated away. Because of the nature of public trust claims, a displacement analysis simply does not apply.

The interplay between Congress's decision to grant regulatory authority to various federal agencies and the authority of the courts to adjudicate public trust claims raises weightier concerns. Those concerns go to whether this case presents a nonjusticiable political question, and have been addressed in Section I of this opinion.

D.    *Enforceability of Public Trust Obligations in Federal Court*

As a final challenge to plaintiffs' public trust claims, defendants contend that even if the public trust doctrine applies to the federal government, plaintiffs lack a cause of action to enforce the public trust obligations. Relatedly, defendants argue that creation of a right of action to permit plaintiffs to assert their claims in federal court would be an exercise in federal common law-making subject to the same statutory displacement arguments outlined above.

In order to evaluate the merits of these arguments, I must first locate the source of plaintiffs' public trust claims. I conclude plaintiffs' public trust rights both predated the Constitution and are secured by it. *See* Gerald Torres & Nathan Bellinger, *The Public Trust: The Law's DNA*, 4 Wake Forest J. L. & Pol'y 281, 288-94 (2014).

The public trust doctrine defines inherent aspects of sovereignty. The Social Contract theory, which heavily influenced Thomas Jefferson and other Founding Fathers, provides that people possess certain inalienable rights and that governments were established by consent of the governed for the purpose of securing those rights.[13] Accordingly, the Declaration of Independence and the Constitution did not *create* the rights to life, liberty, or the pursuit of happiness — the documents are, instead, vehicles for protecting and promoting those already-existing rights. *Cf. Robinson Twp.*, 83 A.3d at 948 (plurality opinion) (rights expressed in the public trust provision of Pennsylvania Constitution are "preserved rather than created" by that document); *Minors Oposa*, 33 I.L.M. at 187 (the right of future generations to a "balanced and healthful ecology" is so basic that it "need not even be written in the Constitution for [it is] assumed to exist from the inception of humankind"). Governments, in turn, possess certain powers that permit them to safeguard the rights of the people; these powers are inherent in the authority to govern and cannot be sold or bargained away. One example is the police power. *Stone*, 101 U.S. at 817. Another is the status as trustee pursuant to the

_____

[13] The Founding Fathers were also influenced by intergenerational considerations. They believed the inalienable rights to life, liberty, and property were rooted in a philosophy of intergenerational equity. Thomas Jefferson, for example, thought that each generation had the obligation to pass the natural estate undiminished to future generations. *See* Br. of Amicus Curiae John Davidson at 21-25 (doc. 60). In a 1789 letter to James Madison, Jefferson wrote that "no man can, by natural right, oblige lands he occupied . . . to the payments of debts contracted by him. For if he could, he might, during his own life, eat up the usufruct of the lands for several generations to come, and then the lands would belong to the dead, and not to than the living, which would be the reverse of our principle. What is true of every member of the society individually is true of them all collectively, since the rights of the whole can be no more than the sum of the rights of the individuals." Letter from Thomas Jefferson to James Madison, Sept. 6, 1789, *in* The Founders' Constitution (Philip B. Kurland & Ralph Lerner, eds.) (1986), *available at* press-pubs.uchicago.edu/founders/documents/v1ch2s23.html (last visited Nov. 7, 2016). Although I find it unnecessary today to address the standing of future generations or the merits of plaintiffs' argument that youth and posterity are suspect classifications, I am mindful of the intergenerational dimensions of the public trust doctrine in issuing this opinion.

public trust doctrine. *Illinois Central*, 146 U.S. at 459-60.

Although the public trust predates the Constitution, plaintiffs' right of action to enforce the government's obligations as trustee arises from the Constitution. I agree with Judge Coffin that plaintiffs' public trust claims are properly categorized as substantive due process claims. As explained, the Due Process Clause's substantive component safeguards fundamental rights that are "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition." *McDonald*, 561 U.S. at 761, 767 (internal citations, quotations, and emphasis omitted). Plaintiffs' public trust rights, related as they are to inherent aspects of sovereignty and the consent of the governed from which the United States' authority derives, satisfy both tests. Because the public trust is not enumerated in the Constitution, substantive due process protection also derives from the Ninth Amendment. *See* U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."); *Raich v. Gonzalez*, 500 F.3d 850, 861-66 (9th Cir. 2007) (considering whether the right to use medical marijuana was a fundamental right safeguarded by the Ninth Amendment and the Fifth Amendment's substantive due process clause). But it is the Fifth Amendment that provides the right of action.

Plaintiffs' claims rest "directly on the Due Process Clause of the Fifth Amendment." *Davis*, 442 U.S. at 243 (1979); *see also Carlson v. Green*, 446 U.S. 14, 18 (1980) ("[T]he victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.") They may, therefore, be asserted in federal court.

## CONCLUSION

Throughout their objections, defendants and intervenors attempt to subject a lawsuit alleging

constitutional injuries to case law governing statutory and common-law environmental claims. They are correct that plaintiffs likely could not obtain the relief they seek through citizen suits brought under the Clean Air Act, the Clean Water Act, or other environmental laws. But that argument misses the point. This action is of a different order than the typical environmental case. It alleges that defendants' actions and inactions — whether or not they violate any specific statutory duty — have so profoundly damaged our home planet that they threaten plaintiffs' fundamental constitutional rights to life and liberty.

A deep resistance to change runs through defendants' and intervenors' arguments for dismissal: they contend a decision recognizing plaintiffs' standing to sue, deeming the controversy justiciable, and recognizing a federal public trust and a fundamental right to climate system capable of sustaining human life would be unprecedented, as though that alone requires its dismissal. This lawsuit may be groundbreaking, but that fact does not alter the legal standards governing the motions to dismiss. Indeed, the seriousness of plaintiffs' allegations underscores how vitally important it is for this Court to apply those standards carefully and correctly.

Federal courts too often have been cautious and overly deferential in the arena of environmental law, and the world has suffered for it. As Judge Goodwin recently wrote,

> The current state of affairs . . . reveals a wholesale failure of the legal system to protect humanity from the collapse of finite natural resources by the uncontrolled pursuit of short-term profits. . . . [T]he modern judiciary has enfeebled itself to the point that law enforcement can rarely be accomplished by taking environmental predators to court. . . .
>
> The third branch can, and should, take another long and careful look at the barriers to litigation created by modern doctrines of subject-matter jurisdiction and deference to the legislative and administrative branches of government.

Alfred T. Goodwin, *A Wake-Up Call for Judges*, 2015 Wis. L. Rev. 785, 785-86, 788 (2015).

Judge Goodwin is no stranger to highly politicized legal disputes. Nearly fifty years ago, he authored the landmark opinion that secured Oregon's ocean beaches for public use. Private landowners wanted to construct fences and otherwise keep private the beaches in front of their properties; they brought suit to challenge an Oregon state law requiring public access to all dry sand beaches. *State ex rel. Thornton v. Hay*, 462 P.2d 671, 672-73 (Or. 1969). Writing for five of the six members of the Oregon Supreme Court, then-Justice Goodwin rooted his determination the beaches were public property in a concept from English common law:

> Because so much of our law is the product of legislation, we sometimes lose sight of the importance of custom as a source of law in our society. It seems particularly appropriate in the case at bar to look to an ancient and accepted custom in this state as the source of a rule of law. The rule in this case, based upon custom, is salutary in confirming a public right, and at the same time it takes from no man anything which he has a legitimate reason to regard as exclusively his.[14]

*Id.* at 678.

In an argument with strong echoes in defendants' and intervenors' objections here, the plaintiff private property owner contended it was "constitutionally impermissible . . . to dredge up an inapplicable, ancient English doctrine that has been universally rejected in modern America." Kathryn A. Straton, *Oregon's Beaches: A Birthright Preserved* 65 (Or. State Parks & Recreation 1977). The Oregon Supreme Court was not persuaded by this call to judicial conservatism. Because of the application of an ancient doctrine, Oregon's beaches remain open to the public now and forever.

---

[14] The sixth justice concurred in the judgment. He found the English rule of custom useful by analogy, but would have held the beaches were public property pursuant to the public trust doctrine. *Hay*, 462 P.2d at 679 (Denecke, J., concurring) ("These rights of the public in tidelands and in the beds of navigable streams have been called 'jus publicum' and we have consistently and recently reaffirmed their existence.").

PAGE 53 - OPINION AND ORDER

"A strong and independent judiciary is the cornerstone of our liberties." These words, spoken by Oregon Senator Mark O. Hatfield, are etched into the walls of the Portland United States courthouse for the District of Oregon. The words appear on the first floor, a daily reminder that it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. Even when a case implicates hotly contested political issues, the judiciary must not shrink from its role as a coequal branch of government.

I ADOPT Judge Coffin's Findings & Recommendation (doc. 68), as elaborated in this opinion. Defendants' Motion to Dismiss (doc. 27) and Intervenors' Motion to Dismiss (doc. 19) are DENIED.

IT IS SO ORDERED.

Dated this _10th_ day of November 2016.

Ann Aiken
United States District Judge