JULIA A. OLSON (OR Bar 062230)
JuliaAOlson@gmail.com
Wild Earth Advocates
1216 Lincoln Street
Eugene, OR 97401
Tel: (415) 786-4825

ANDREA K. RODGERS (OR Bar 041029)
Andrearodgers42@gmail.com
Law Offices of Andrea K. Rodgers
3026 NW Esplanade
Seattle, WA 98117
Tel: (206) 696-2851

PHILIP L. GREGORY (*pro hac vice*)
pgregory@gregorylawgroup.com
Gregory Law Group
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

**KELSEY CASCADIA ROSE JULIANA**;
**XIUHTEZCATL TONATIUH M.**, through his
Guardian Tamara Roske-Martinez; et al.,

          Plaintiffs,

v.

**The UNITED STATES OF AMERICA**;
**DONALD TRUMP**, in his official capacity as
President of the United States; et al.,

          Defendants.

Case No.: 6:15-cv-01517-TC

**PLAINTIFFS' RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STANDARD OF REVIEW .................................................................................... 2

III.  ARGUMENT .........................................................................................................3

    A.  Plaintiffs Present Specific Material Facts Sufficient to Establish Their Article III
       Standing on Summary Judgment and Create a Triable Issue of Fact. ..........................3

            1.  Youth Plaintiffs Submit Sufficient Evidence of Their Concrete,
               Particularized, Actual Harms. ..........................................................................4

            2.  Plaintiffs Submit Sufficient Evidence Showing Their Injuries Are Fairly
               Traceable to Defendants' Misconduct. ............................................................11

                     1.  Creating, controlling, perpetuating, and promoting a national fossil
                        fuel-based energy system through planning and policies. ...................12

                     2.  Fostering, perpetuating, and promoting a national fossil fuel-based
                        energy system by leasing public lands for fossil fuel extraction and
                        production. ...........................................................................................13

                     3.  Fostering, perpetuating, and promoting the emission of GHGs, and
                        reducing carbon sequestration capacity, from land use activities by
                        allowing the harvesting of timber and grazing on federal public lands.
                        ........................................................................................................15

                     4.  Subsidizing and providing financial incentives and business support to
                        fossil fuel energy producers and users in support of a national fossil
                        fuel-based energy system. ................................................................ 15

                     5.  Conducting research and development in support of fossil fuel
                        extraction and energy technologies. .................................................15

                       6.  Permitting, authorizing, and promoting the import and export of fossil
                        fuels in support of a national fossil fuel-based energy system. ...............
                        ........................................................................................................16

7.  Permitting the interstate infrastructure and transport of fossil fuels as part of a national fossil fuel-based energy system..............................16

8.  Permitting the operations of fossil-fuel power plants and fossil fuel refineries, as part of a national fossil fuel-based energy system. ........17

9.  Setting energy, economy, and efficiency standards for vehicles, appliances, and buildings that use energy from the national energy system in a manner that fosters, perpetuates, and promotes fossil energy. ...............................................................................................17

10. Controlling and permitting all aviation travel and perpetuating the reliance thereof on fossil energy.......................................................18

11. Emitting GHGs through the use of fossil fuel energy in government buildings and activities. ....................................................................18

12. Utilizing discretionary authority to favor fossil fuels.........................18

3.  Plaintiffs Submit Sufficient Evidence Showing Their Injuries Can be Redressed...................................................................................23

B.  Plaintiffs' Constitutional Claims Are Not Governed by the APA...............................28

1.  This Court Has Already Determined That the Fifth Amendment Provides Plaintiffs' Right of Action. ...................................................................28

2.  Supreme Court and Ninth Circuit Precedent Establish That the APA is Not the Sole Means of Review for Constitutional Challenges to Agency Conduct..........29

3.  Limiting Plaintiffs' Constitutional Claims to the Strictures of the APA Would Violate Their Right to Procedural Due Process....................................................33

C.  Plaintiffs' Claims and Requested Relief Do Not Violate Separation of Powers Principles. ..........................................................................................................36

1.  Courts Have the Authority and Obligation to Address Claims of Constitutional Infringements and Public Trust Violations....................................................37

2.  Plaintiffs Properly Request Declaratory and Injunctive Relief for Their Injuries. 40

D.  Plaintiffs' Claims Do Not Fail as a Matter of Law....................................................42

1.  Material Facts are in Dispute Regarding Plaintiffs' Fundamental Right to a Climate System Capable of Sustaining Human Life..................................................42

2.  Plaintiffs' Proffer of Evidence of Material Facts Disputed by Defendants Demonstrates That the Federal Government Has Put Them in a Position of Danger in Violation of the Fifth Amendment. ............................................................................46

3.  Plaintiffs Submit Evidence of Material Facts Disputed by Defendants Regarding Their Claim That The Public Trust Doctrine Applies to the Federal Government's Management of Trust Resources. ............................................................................49

4.  Plaintiffs' Have Preserved Three Fifth Amendment Claims that are Not at Issue in Defendants' Motion.............................................................................................52

E.  This Court Should Not Certify a Denial of Defendants' Motion for Summary Judgment for Interlocutory Appeal.................................................................................54

IV.    Conclusion ...........................................................................................................55

## TABLE OF AUTHORITIES

### CASES

*AEP v. Connecticut*, 564 U.S. 410 (2011) .............................................................27,50

*Allen v. Wright*, 468 U.S. 737 (1984) ...............................................................37,39,41,

*Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118 (D.N.M. 2011) .................5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................................3, 4

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) ........................32, 33

*Armstrong v. Manzo*, 380 U.S. 545 (1965).................................................................35

*Atkins v. Virginia*, 536 U.S. 304 (2002) .................................................................43

*Baker v. Carr*, 369 U.S. 186 (1962) .................................................................38,41

*Bell v. Hood*, 327 U.S. 678 (1946). .................................................................32

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................20, 21

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).........31

*Bolling v. Sharp*, 347 U.S. 497 (1954) .................................................................31

*Bowsher v. Synar*, 478 U.S. 714 (1986) .............................................................37,39

*Brown v. Bd of Educ.*, 347 U.S. 483 (1954) .......................................................24,38,43

*Brown v. Bd. of Educ.*, 349 U.S. 294 (1955) ......................................................38,39,41

*Brown v. Plata*, 563 U.S. 493 (2011) .............................................................22, 24, 26

*Bush v. Lucas*, 462 U.S. 367 (1983) .................................................................31

*Carlson v. Green*, 446 U.S. 14 (1980) .................................................................31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).........................................................2

*Cent. Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002)....................3

*Chehalem Physical Therapy, Inc. v. Coventry Health Care, Inc.*, No. 09-CV-320-HU, 2010 WL 952273 (D. Or. 2010) ........................................................................................................55

*City of Oakland v. B.P*, Order Granting Motion to Dismiss, No. 3:17-cv-06011-WHA (N.D. Cal. June 25, 2018) ......................................................................................................................27

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................................3, 10

*Clinton v. Jones*, 520 U.S. 681 (1997) .........................................................................................38

*Conner v. U.S. Dep't of Interior*, 73 F. Supp. 2d 1215 (D. Nev. 1999) ......................................51

*Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015) ..............................................................................2

*Couch v. Telescope Inc.*, 611 F.3d 629 (9th Cir. 2010) ..........................................................54, 55

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,* 563 F.3d 466 (D.C. Cir. 2009) ............5

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 353 (2006) ................................................................10

*Davis v. Passman* 442 U.S. 228 (1979) ..................................................................................31, 33

*Deshaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189 (1989) ....................................46

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ...................................................................................38

*Florida v. Georgia*, No. 220142, 2018 WL 3129786 (S. Ct. June 27, 2018) ...............................26

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ........................................................................29

*Furman v. Georgia*, 408 U.S. 238 (1972) ....................................................................................43

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ...............................................................................27, 28

*Glasser v. United States*, 315 U.S. 60 (1942) ..............................................................................38

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ..............................................................................38

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ...........................................................................38

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) ...................41

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ..................................................................................43

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**　vi

*Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99 (1945) ....................................................................41

*Hawaii v. Trump,* 585 U.S. __ (2018) (slip op.)..........................................................................6

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944).................................................................................41

*Hills v. Gautreaux*, 425 U.S. 284 (1976) ...................................................................................30

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997) ..................................................................52

*Illinois Central Railroad v. Illinois*, 146 U.S. 387 (1892)..........................................................49

*In re Anchorage Nautical Tours, Inc.*, 145 B.R. 637 (B.A.P. 9th Cir. 1992) .............................55

*In re Steuart Transp. Co.*, 495 F. Supp. 38 (E.D. Va. 1980).......................................................51

*In re United States*, 884 F.3d 830 (9th Cir. 2018) ..........................................................36,50,55

*In re United States*, No. 17-71692 (9th Cir. June 9, 2017) .........................................................29

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Gen. Serv.*, 58 F. Supp. 3d 1191 (D.N.M. 2014) ..30

*Juliana v. United States*, 217 F. Supp. 3d 1224 (D. Or. 2016).............................................*passim*

*Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948) .......................................................................4

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)...............................................................................55

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................................24

*Laird v. Tatum*, 408 U.S. 1 (1972)...............................................................................................32

*Larson v. Valente*, 456 U.S. 228 (1982) ......................................................................................23

*Lawrence v. Texas*, 539 U.S. 558 (2003).....................................................................................43

*Lewis v. Casey*, 518 U.S. 343 (1996)......................................................................................23, 28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) ........................39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................................*passim*

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).....................................................................32

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...................................................................33

*Martin v. Waddell*, 41 U.S. 367 (1842) ....................................................................50

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ........................................................3, 21

*Matthews v. Eldridge*, 424 U.S. 319 (1976) .............................................................34

*McDonald v. City of Chicago, IL*, 561 U.S. 742 (2010) ............................................42

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) ....................................33

*Milliken v. Bradley*, 433 U.S. 267 (1977) .............................................................40,41

*Mowat Const. Co. v. Dorena Hydro, LLC*, No. 6:14-CV-00094-AA, 2015 WL 5665302, at *5

(D. Or. Sept. 23, 2015) ..............................................................................................54

*Navajo Nation v. U.S. Dept. of the Interior*, 876 F.3d 1144 (9th Cir. 2017) ..............30

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ................................................................41

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)........................................24, 32

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ................................................. *passim*

*Occupy Eugene v. U.S. Gen. Serv. Admin.*, No. 6:12-CV-02286-MC, 2013 WL 6331013 (D. Or.

Dec. 3, 2013) ............................................................................................................31

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005)...........11

*Pauluk v. Savage,* 836 F.3d 1117 (9th Cir. 2016) ...............................................47,49

*Perry v. Schwarzenegger,* 704 F. Supp. 2d 921 (N.D. Cal. 2010) .........................42,54

*Poe v. Ullman,* 367 U.S. 497 (1961) ........................................................................42

*PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012)................................................49

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ...........30

*Reynolds v. Sims*, 377 U.S. 533 (1964) ....................................................................28

*Roper v. Simmons*, 543 U.S. 551 (2005) ..................................................................43

*Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir. 1982) ........................................................40

*San Luis Unit Food Producers v. United States*, 709 F.3d 798 (9th Cir. 2013)...........................32

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ................................................32

*Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000) ................................................32

*Sierra Club v. U.S. Def. Energy Support Ctr.*, No. 01:11-cv-41, 2011 WL 3321296 (E.D. Va. July 29, 2011) ..............................................................................................5

*Simon v. E. Ky. Welfare Rights Org.* 426 U.S. 26 (1976) ..............................................20

*Swann v. Charlotte-Mecklenburg Bd. Of Educ.*, 402 U.S. 1 (1971).....................................26

*Taylor v. Louisiana*, 419 U.S. 552 (1975) ............................................................38

*Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010).....................................................2

*U.S. Rubber Co. v. Wright*, 359 F.2d 784 (9th Cir. 1966) ............................................55

*United States v. Bd. of Cty. Comm'rs of Cty. of Otero,* 843 F.3d 1208 (10th Cir. 2016)..............50

*United States v. Beebe*, 127 U.S. 338 (1888) ........................................................52

*United States v. Burlington N. R.R.*, 710 F. Supp. 1286 (D. Neb. 1989) ..............................51

*United States v. California*, 332 U.S. 19 (1947)......................................................52

*United States v. Causby*, 328 U.S. 256 (1946) .......................................................52

*United States v. CB & I Constructors, Inc.*, 685 F.3d 827 (9th Cir. 2011) ...........................51

*United States v. Oregon*, 295 U.S. 1 (1935)..........................................................52

*United States v. Trinidad Coal & Coking Co.*, 137 U.S. 160 (1890) ..................................52

*United States v. U.S. Dist. Court for Dist. of Or.*, No. 17-71692 (9th Cir. Dec. 11, 2017)..........29

*W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116 (9th Cir. 2009)..............................31

*Wash. Envtl. Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013) ........................................ *passim*

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ......................................................42

*Webster v. Doe*, 486 U.S. 592 (1998)..............................................................29, 33, 34

*WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77 (D.D.C. 2012) .......................................5

*Wilson v. Seiter*, 501 U.S. 294 (1991) ..........................................................................22

*Ziglar v. Abassi*, 137 S. Ct. 1843 (2017) ..............................................................31, 32

## CONSTITUTION

U.S. Const., art. III, § 2 ............................................................................................37

## STATUTES

5 U.S.C. § 702 .......................................................................................................28

15 U.S.C. §§ 2901-04 ............................................................................................25

16 U.S.C. § 551 ......................................................................................................25

16 U.S.C. § 576 ......................................................................................................25

16 U.S.C. §§ 1600-1611 .........................................................................................25

28 U.S.C. § 1292(b) ...............................................................................................52

30 U.S.C. §§ 181-287 .............................................................................................54

30 U.S.C. §§ 351-359 .............................................................................................25

33 U.S.C. § 403 ......................................................................................................25

33 U.S.C. § 1344 ....................................................................................................25

33 U.S.C. § 2706(b)(1) ......................................................................................25-26

33 U.S.C. § 2706(b)(2) ...........................................................................................51

42 U.S.C. § 4331(b)(1) ...........................................................................................51

42 U.S.C. §§ 6291-6296 ....................................................................................45, 51

42 U.S.C. § 7112 ....................................................................................................25

42 U.S.C. § 7321 ....................................................................................................25

42 U.S.C. §§ 7401-7431 .........................................................................................25

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**                                                          x

42 U.S.C. § 9607(f)(1)............................................................................................11

42 U.S.C. § 9607(f)(2)(A)......................................................................................45

43 U.S.C. § 1334....................................................................................................25

43 U.S.C. § 1337....................................................................................................25

43 U.S.C. §§ 1701-1784.........................................................................................25

49 U.S.C. § 32902..................................................................................................25

49 U.S.C. § 40102(a)(46).......................................................................................52

49 U.S.C. § 40103(a)(1).........................................................................................25

Clean Air Act § 4502.............................................................................................45

National Environmental Policy Act § 4502...........................................................45

## REGULATIONS

36 C.F.R. § 223(a)................................................................................................15

36 C.F.R. § 261.6(a).............................................................................................15

36 C.F.R. § 261.6(b).............................................................................................15

36 C.F.R. § 261.6(h).............................................................................................15

40 C.F.R. § 300.600(a).........................................................................................51

40 C.F.R. § 300.600(b).........................................................................................51

## RULES

Fed. R. Civ. P. 56(a)..............................................................................................2

## OTHER AUTHORITIES

Complaint of the United States of America, *United States v. BP Exploration & Production, Inc.*, No 2:10CV04536, 2010 WL 5094310, at ¶ 66 (E.D. La. 2010) ............................................52

Exec. Order No. 13337, 69 Fed. Reg. 25299.........................................................26

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**     xi

J. Inst. 2.1.1 (T. Sanders trans., 4th ed. 1867) ............................................................52

*Oceans Commission: Hearing Before the S. Comm. on Commerce, Sci., & Transp.*, 108th Cong. (Sept. 21, 2004) (statement by Admiral James D. Watkins USN (Ret.), http://www.commerce.senate.gov/public/index.cfm/hearings?Id=51065a2d-0cd0-41c7-b916-fbbb50cc9fec&Statement_id=4814F650-71F1-40A1-90E7-7F563C08D25A ..........................51

Oral Arg. Recording at 5:41-5:53, *United States v. U.S. Dist. Court for Dist. of Or.*, No. 17-71692 (9th Cir. Dec. 11, 2017), https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000012816 .............................55

Pub. L. No. 85-726, § 101(33), 72 Stat. 731, 740 (1958).............................................52

Review of the Standards of Performance for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Generating Units, 82 Fed. Reg. 16,330 (April 4, 2017).....................................................................................................................................27

The Federalist No. 46 (James Madison).....................................................................50

United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc No. 102-38, 1771 U.N.T.S. 107 .......................................................................................45

2 William Blackstone, *Commentaries on the Laws of England* 4 (1766) ....................52

## I.    INTRODUCTION

These young Plaintiffs seek the structural remedy necessary to protect them from Federal Defendants' active historic and ongoing infringements of their Fifth Amendment substantive Due Process rights. The scope of the case is directly proportional to the systemic nature and magnitude of Defendants' constitutionally violative conduct, persisting over decades, in controlling, perpetuating, and promoting a national fossil fuel-based energy system, despite long-standing knowledge of the resulting destruction to our nation and profound harm to future generations, including Plaintiffs. Had Defendants infringed Plaintiffs' fundamental rights through a discrete and isolated action or group of actions, this would be a different case. Plaintiffs cannot be denied justice, their rights, or a remedy simply because Defendants' infringement of these youth's inalienable rights is of a profound and systemic nature. Defendants now find it inconvenient to wrestle with the breadth of factual issues presented in a constitutional concern of their own making. Notwithstanding the position of this Administration, it is axiomatic that the federal government *must be held accountable under the Constitution for deliberate decisions that deprive Plaintiffs of life, liberty, or property* and *should be ordered to come into constitutional compliance* when it wields its power and discretion to betray our children, entire generations, our Founders' vision, and the underlying prerequisites of democracy itself. As the claims in this case are that significant, they must be fully vetted before this Court at trial based on a thorough evidentiary record. As a result, this Motion for Summary Judgment (ECF No. 207) ("MSJ") should be denied.

In an attempt to circumvent the dire facts and dark history of their conduct, Defendants seek summary judgment solely on the law and by ignoring the seventeen expert reports Plaintiffs have served in this litigation and the prior testimony of Plaintiffs. Defendants contend Plaintiffs

cannot establish Article III standing and seek adjudication on only three of Plaintiffs' multiple

Fifth Amendment claims. Plaintiffs oppose this MSJ, submitting declarations by the 21 Plaintiffs

and 18 experts, along with hundreds of government records that support Plaintiffs' claims.[1] As

the underlying facts are highly relevant to each issue presented by Defendants' MSJ, and many

material facts remain in dispute, this Court should have a full opportunity to hear from the

experts and other witnesses so that its findings on the merits are fully informed. Summary

judgment should be denied and this case should proceed to trial beginning October 29, 2018.[2]

## II.    STANDARD OF REVIEW

Summary judgment may only be granted if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*;

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only once the moving party shows the

absence of genuine issues of material fact must the non-moving party go beyond the pleadings

and identify facts showing a genuine issue for trial. *Id.* at 324. The court views the evidence,

including all reasonable inferences, in favor of the non-moving party. *Cortez v. Skol*, 776 F.3d

1046, 1050 (9th Cir. 2015). "An issue of material fact is genuine if there is sufficient evidence

for a reasonable jury to return a verdict for the non-moving party." *Id.* (quoting *Thomas v.

Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)). Material facts are those necessary to the proof or

---

[1] Along with this Opposition, Plaintiffs are filing a Motion *in Limine* seeking judicial notice of a number of publicly available, government documents, many of which are referenced herein to

[2] Plaintiffs note that Defendants' stated strategy is to force this Court to issue another order prior to trial so that they can file another "mandamus petition in the Ninth Circuit and seek an immediate stay" of this action without addressing the hard facts. Declaration of J. Olson in Support of Plaintiffs' Response ("Olson Decl. MSJ"), ¶ 2, Ex. 1 at 1. This strategy parallels Defendants' persistent refusal to participate in discovery. Their overarching theme: do whatever it takes to prevent this case from being heard at trial. That would be a travesty of justice.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR    2
SUMMARY JUDGMENT**

defense of a claim, determined by referring to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## III.    ARGUMENT

This partial MSJ should be denied because Defendants failed to satisfy their burden of establishing the absence of genuine issues of material fact and are not entitled to judgment as a matter of law.[3] In addition, to highlight the inappropriateness of summary judgment, Plaintiffs oppose this MSJ by setting forth evidence showing genuine factual issues for trial regarding (1) standing, and (2) the merits of the subset of their claims that Defendants place at issue in their MSJ. Pursuant to Rule 56(e), these "specific facts" presented are taken as true for purposes of summary judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

### A. Plaintiffs Present Specific Material Facts Sufficient to Establish Their Article III Standing on Summary Judgment and Create a Triable Issue of Fact.

To establish standing, only one plaintiff need show: (1) an injury in fact; (2) fairly traceable to Defendants' conduct; and (3) likely to be redressed by a favorable decision. *Id.* at 560-61 (1992); *Mass. v. EPA*, 549 U.S. 497, 518 (2007). "[A]t the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).[4] Defendants' Answer (ECF No. 98 ("Answer")) to

---

[3] Defendants do not move for summary judgment on all of Plaintiffs' claims, as discussed in Section III(D)(4), *infra*. Defendants introduced facts, arguably, only on standing, offering paltry citations to the record. *See* MSJ at 9 (citing FAC at ¶¶ 171–78),11 (citing Decl. of Wanless, ECF No. 206-2 at ¶¶ 1–63), but ignoring all factual evidence proffered by Plaintiffs to date.

[4] Defendants mistakenly invoke *Clapper v. Amnesty Int'l USA* to create a heightened barrier to standing. The rigor outlined in *Clapper* is used when "the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs . . . ." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs do not request such review.

Plaintiffs' First Amended Complaint (ECF No. 7 ("FAC")) shows many triable questions

regarding standing.[5] Defendants' refusal to meaningfully engage in discovery aimed to resolve

these factual disputes has impeded the full development of relevant facts necessary to evaluate

Defendants' actions. *Compare* Answer ¶ 27 ("Defendants deny the allegation in the third

sentence that climate change is caused by [] Defendants.") *with* ECF 217-1 p. 15 (Defendants

filing protective order and refusing to answer RFA that "[o]ver the last decade, leases issued and

administered by the Department of the Interior have resulted in the production of over 4.4 billion

tons of coal from Federal lands.") The Supreme Court has recognized that, "[w]hile we might be

able, on the present record, to reach a conclusion that would decide the case, it might well be

found later to be lacking in the thoroughness that should precede judgment of this importance

and which it is the purpose of the judicial process to provide." *Kennedy v. Silas Mason Co.*, 334

U.S. 249, 257 (1948); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986).

While Plaintiffs herein introduce evidence sufficient to survive summary judgment,

further discovery and trial are necessary for full development of the relevant facts regarding

Plaintiffs' injuries caused by Defendants' misconduct and their redressability by this Court.

    **1.   Youth Plaintiffs Submit Sufficient Evidence of Their Concrete, Particularized, Actual Harms**

---

[5] *See* Answer at ¶¶ 27-29, 31, 35, 37, 40-42, 46, 52, 54, 55, 64-67, 77, 80, 86, 88, 89 (Defendants deny they cause climate change in response to specific allegations of harm by Plaintiffs); ¶¶ 211, 214, 215, 222, 229, 231, 233, 241, 247, 260 (Defendants claim vagueness or lack of information on scientific projections relevant to Plaintiffs' injury-in-fact); ¶¶ 100, 101, 105, 106, 110, 112, 115, 117, 119, 123, 127, 131, 146, 147, 149, 153, 159, 163, 169, 170-172, 179, 181-183, 185, 186, 188 (Defendants deny information about specific Defendants relevant to causation and redressability); and ¶¶ 10, 129, 164, 208, 211, 212, 213, 258, 259, 276 (Defendants claim vagueness or lack of information on scientific and legal information relevant to redressability); *see also* ECF 217 (Defendants refusing to answer hundreds of requests for admissions of facts extracted from publicly available, government documents). This is a non-exhaustive list of disputed allegations, which demonstrates the breadth of issues still in dispute. Plaintiffs have asked, and Defendants have refused to stipulate to facts they denied in their Answer, or even to stipulate not to dispute the facts. Olson Decl. MSJ, ¶ 3.

In the Declarations submitted herewith, Plaintiffs present specific facts showing the highly personalized ways in which they are concretely affected by Defendants' actions. Coupled with Defendants' denials in their Answer and their arguments in the MSJ, this evidence demonstrates genuine issues of material fact regarding injury. In their Answer, Defendants dispute Plaintiffs' particularized injuries and insist in their MSJ that Plaintiffs' injuries are "generalized grievance[s]" involving "generalized phenomena on a global scale" and, thus, cannot be "concrete and particularized."[6] Answer at ¶¶ 16-90; MSJ at 7. Plaintiffs' Declarations show the unique ways in which Plaintiffs' concrete and actual injuries vary according to their particular locations, interests, and circumstances. *See generally* Declarations of all Plaintiffs filed herewith.

Some Plaintiffs have been and continue to be concretely injured by extreme weather events and flooding to their homes, which harm their personal security, economic security, and physical health. Jayden Decl., ¶¶ 2–26, 28–32, 39–42 (e.g. ¶ 11: "Yet the floodwaters kept pouring in, through doors, toilets, sinks, bathtubs, and even the roof."); Journey Decl., ¶¶ 10, 13,

---

[6] Defendants' generalized grievance argument is equally mistaken on the law and has been rejected by this Court. *Juliana v. U.S.*, 217 F.Supp.3d 1224, 1243-44 (D.Or. 2016); *See also* ECF No. 146 at 14.  Pressing this Court to reverse itself on the law, Defendants turn to old, inapposite, out-of-circuit cases where climate change harms were found insufficient for standing largely because the harm did not particularly touch the individual plaintiffs. That authority is not precedential or persuasive here. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior,* 563 F.3d 466, 478 (D.C. Cir. 2009) (alleging injuries to the Arctic environment generally); *WildEarth Guardians v. Salazar*, 880 F.Supp.2d 77, 85 (D.D.C. 2012) (no evidence of "demonstrable increase in risk" to plaintiffs' interests from coal mining operations); *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F.Supp.2d 1118, 1128 (D.N.M. 2011) (plaintiffs' declarations were not supported by experts); *Sierra Club v. U.S. Def. Energy Support Ctr.*, No. 01:11-cv-41, 2011 WL 3321296 at 1-3 (E.D. Va. July 29, 2011) (alleging generalized injuries not connected to the specific contract or plan).

15, 17, 21–27 (e.g. ¶ 21: "In 2012, Kauaʻi was flooded from weeks of rain. My family and I were displaced and evacuated to a Red Cross shelter. I could not go to school for the entire week.").[7]

Some Plaintiffs have been and continue to be concretely injured by extreme heat, drought conditions, beetle-killed forests, increased and more dangerous wildfire seasons, and decreased air quality, which harm their homes, economic livelihoods, personal security, physical health, water sources, and ability to recreate safely.[8] Alexander Decl., ¶¶ 12–21, 22–25, 27–31, 33–41, 48 (e.g. ¶ 38: "A massive column of smoke from the Stouts Creek fire was visible from my family's farm. Seeing the columns of smoke caused significant emotional distress for my family and me and it made me fearful of losing my farm."); Kelsey Decl., ¶¶ 3, 6–7, 9, 11–12, 15, 22 (e.g. ¶ 15: "Smoke from . . . wildfires affected my ability to work, which made it more difficult to support myself during college and gain valuable work experience.").[9]

Some Plaintiffs have been and continue to be concretely injured by the lack of snow and ice, and the melting thereof, which impairs their recreational interests and their water sources.

---

[7] *See also* Avery Decl., ¶ 20; Hazel Decl., ¶ 4; Isaac Decl., ¶¶ 2, 9, 19; Kelsey Decl., ¶ 16; Levi Decl., ¶¶ 12–16, 18; Nathaniel Decl., ¶ 2; Nicholas Decl., ¶ 14; Sophie Decl., ¶¶ 3–5, 12; Tia Decl., ¶ 9; Victoria Decl., ¶¶ 8–9, 11–12, 15; Xiuhtezcatl Decl., ¶ 16; Trenberth Decl., Ex. 1 at 20-21; Pacheco Decl., Ex. 1 at 14-16, 30; Stiglitz Decl., Ex. 1 at 6-8, 15-17, 19-26; Wanless Decl., Ex. 1 at 18-20, 24-25; Frumkin Decl., Ex. 1 at 5, 11-15.

[8] Climate induced drought and water scarcity forced Plaintiff Jaime to leave her home, separating her from her relatives. Jaime Decl. at ¶ 4; *Hawaii v. Trump*, 585 U.S. __ (2018) (slip op. at 25) (separation from relatives established injury in fact).

[9] *See also* Aji Decl., ¶¶ 2–4, 7–8; Avery Decl., ¶¶ 10–15, 24–25; Hazel Decl., ¶ 12; Isaac Decl., ¶¶ 2–7, 10; Jacob Decl., ¶¶ 4, 7–15, 17; Jaime Decl., ¶¶ 4, 8, 15–20, 23, 25–28, 33; Jayden Decl., ¶¶ 33–36; Journey Decl., ¶ 7; Kiran Decl., ¶¶ 6–8; Miko Decl., ¶¶ 11–14; Nathaniel Decl., ¶ 4; Nicholas Decl., ¶¶ 2–10; Sahara Decl., ¶¶ 3, 6–7; Tia Decl., ¶ 6; Xiuhtezcatl Decl., ¶¶ 7–11, 15, 18; Zealand Decl., ¶¶ 5–7, 9, 14–15, 18; Trenberth Decl., Ex. 1 at 20-22; Pacheco Decl., Ex. 1 at 6-8, 11-17, 19-29; Frumkin Decl., Ex. 1 at 3-7, 11-15; Running Decl., Ex. 1 at 5-9, 12-18, 24-27, 29; Stiglitz Decl., Ex. 1 at 6-8, 12-14, 17-18, 19-26; Olson Decl. Exs. 42, 56 (USDA recognizing "[c]limate change has led to fire seasons that are now on average 78 days longer than in 1970."), 381.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**    6

Avery Decl., ¶¶ 18–19 (e.g. ¶ 19: "[My favorite] winter activities were not possible from 2013-2015 due to lack of snow."); Nicholas Decl., ¶¶ 15–16 ("It is a staggering sight for me to see mountains, which used to always have snow, now have no snow at all.").[10]

Some Plaintiffs have been and continue to be concretely injured by ocean warming and acidification and sea level rise, which harm their homes, health, economic livelihood, personal security, and places of recreation and spirituality. Levi Decl., ¶¶ 3, 7–10, 17 (e.g. ¶ 8: "I often swam in the Indian River Lagoon on the west side of the barrier island, but I can no longer swim there because of increasing flesh-eating bacteria, dead fish, and algae blooms."); Dr. Wanless opines that "we are in the danger zone in southern Florida, and any delay in a judicial remedy for Plaintiff Levi poses clear and irreversible harm to his interests and his future," due to the rising seas overtaking Levi's barrier island home. Wanless Decl., Ex. 1 at 30, 24 ("His island is already facing sea level rise and increased inundation during storms. At 90 cm (3 feet) of sea level rise, Levi's home will be in the sea.").[11]

Some Plaintiffs are already suffering from injuries to their physical health from climate change. Alexander Decl., ¶ 48 ("When I am suffering from asthma and allergies, I have difficulty

---

[10] *See also* Alexander Decl., ¶¶ 42, 46–47; Hazel Decl., ¶¶ 8–10; Isaac Decl., ¶¶ 11–12; Jacob Decl., ¶¶ 4, 18–19; Jaime Decl., ¶¶ 21–22, 24; Kelsey Decl., ¶¶ 6, 11; Kiran Decl., ¶¶ 1–2; Nathaniel Decl., ¶¶ 2, 5; Sahara Decl., ¶ 8; Tia Decl., ¶¶ 2, 4–5, 11–13; Xiuhtezcatl Decl., ¶¶ 7, 12–13; Zealand Decl., ¶¶ 10–12, 16; Running Decl., Ex. 1 at 9-11, 21-23, 29; Rignot Decl., Ex. 1 at 11-13, 18-19.

[11] *See also* Aji Decl., ¶¶ 5–6; Alexander Decl., ¶¶ 43–45; Avery Decl., ¶¶ 21–23; Hazel Decl., ¶¶ 6–7; Jacob Decl., ¶¶ 20–23; Jayden Decl., ¶ 3; Journey Decl., ¶¶ 4–5, 7–20, 26; Kelsey Decl., ¶¶ 4–5, 13–14; Kiran Decl., ¶¶ 3–4, 10–11, 12; Miko Decl., ¶¶ 3–6, 9, 15; Sahara Decl., ¶¶ 4–5; Tia Decl., ¶¶ 8–9; Victoria Decl., ¶¶ 5–7, 9–10; Zealand Decl., ¶ 13; Hoegh-Guldberg Decl., Ex. 1 at 2-30; Hansen Decl., Ex. 1 at 39-41, Ex. 2-8, 26-34; Wanless Decl., Ex. 1 at 5-32; Rignot Decl., Ex. 1 at 1-11, 15-19; Pacheco Decl., Ex. 1 at 10-11, 30; Frumkin Decl., Ex. 1 at 11-15; Stiglitz Decl., Ex. 1 at 14, 18, 19-26.

partaking in outdoor activities. This harms both my ability to work on the farm and my ability to recreate and enjoy the beautiful forests and rivers surrounding my home.").[12]

Some Plaintiffs have suffered direct health impacts and threats to personal security from fossil fuel activities, such as breathing in air filled with coal dust, Victoria Decl., ¶¶ 14–15, and threats to their water resources caused by fossil fuel pipeline projects. Alexander Decl., ¶ 9, 49–58; Jacob Decl., ¶ 24–28 (proposed pipeline in water source a mile from home); *see also* Jayden Decl., ¶¶ 2–4, 25, 27, 36–37, 44–50 (air pollution and water quality; oil spills);; Kelsey Decl., ¶ 22 (air pollution from fossil fuel facilities); Kiran Decl., ¶ 13 (oil trains); Xiuhtezcatl Decl., ¶ 17 (fracking), ¶ 18 (oil fields); Pacheco Decl., Ex. 1 at 19-25.

Some Plaintiffs have been and continue to be concretely injured by impacts to wildlife, domesticated animals, and plants on which they depend for their food, livelihoods, and personal enjoyment. Nicholas Decl., ¶¶ 10–13, 17 (e.g. ¶ 17: "I am afraid that climate change is going to make it impossible to continue some of the traditions I have such as planting a garden, which has been an important part of my life."); Jaime Decl., ¶¶ 4–6, 8–13, 16, 26, 32 (e.g. ¶ 5: "On the reservation we simply stopped farming. . . . nothing would grow."; ¶ 8: "More and more wild animals are dying on the Reservation. . . . This is extremely disturbing to me because I care deeply about animals and their well-being.").[13]

---

[12] *See also* Aji Decl., ¶ 2; Avery Decl., ¶ 15; Hazel Decl., ¶¶ 4–5, 11; Isaac Decl., ¶¶ 3–6, 8, 1; Jaime Decl., ¶¶ 27–28; Jayden Decl., ¶¶ 19–21; Journey Decl., ¶¶ 1, 16, 18, 24; Kelsey Decl., ¶ 10; Kiran Decl., ¶¶ 5–6, 9; Levi Decl., ¶ 13; Nathaniel Decl., ¶¶ 3–4; Nicholas Decl., ¶¶ 5, 9; Sahara Decl., ¶ 6; Sophie Decl., ¶ 9; Tia Decl., ¶ 6; Victoria Decl., ¶ 13; Xiuhtezcatl Decl., ¶¶ 14, 17; Zealand Decl., ¶¶ 8–9, 18; Pacheco Decl., Ex. 1; Frumkin Decl., Ex. 1.

[13] *See also* Aji Decl., ¶¶ 5–6; Alexander Decl., ¶¶ 10–35, 44–45; Avery Decl., ¶¶ 5–6, 12, 16–17, 21–23, 25; Hazel Decl., ¶ 7; Isaac Decl., ¶ 2; Jacob Decl., ¶¶ 1–2, 5, 13–17, 20–23, 26, 29; Jayden Decl., ¶¶ 24, 27, 35; Journey Decl., ¶¶ 7, 10, 13, 15–16, 19–20; Kelsey Decl., ¶¶ 4–5, 7–8, 12–13, 16, 18; Kiran Decl., ¶¶ 3–4, 10; Levi Decl., ¶¶ 8–9, 12; Nathaniel Decl., ¶¶ 6–8;

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**    8

Some Plaintiffs have sustained and increasingly are sustaining particularized and concrete injuries to their spiritual, cultural, and/or indigenous practices and values. Miko Decl., ¶¶ 4, 6–7, 9 ("Without the land, there is no culture [for my people]."); Jaime Decl., ¶¶ 4, 12–14, 33 (e.g. ¶ 14: "Because we can no longer harvest these sacred objects, my people are losing our dignity and our way of life."); Xiuhtezcatl Decl., ¶¶ 6–8 (e.g. ¶ 6: "Protecting the forests, lakes, river, oceans, and wildlife from harm due to climate change is critical to my spiritual and cultural practices and identity. . . . Because I believe that I am a descendant of the land, climate change impacts that harm the land also harm me in a very personal way.").[14]

Each Plaintiff is suffering concrete emotional and mental health injuries to varying individualized degrees, which experts predict will become more severe as climate change worsens, in the absence of strong government action to stop imperiling their lives and meaningfully combatting the dangers of climate change. Victoria Decl., ¶¶ 8–10, 16–18, 19 (e.g. ¶ 18: "I would be a healthier person if I did not have to worry about how climate change is negatively affecting my life."); Jayden Decl., ¶¶ 10, 30, 32, 35, 37–42, 51 (e.g. ¶ 42: "The stress of living in an area that continually floods and is actively drilled in for more fossil fuels that I know will lead to more climate change is taking its toll on me. It affects my mental state and causes me anxiety."); Nicholas Decl., ¶¶ 4, 7, 17 (e.g. ¶ 4: "Seeing all of the beautiful land surrounding my home destroyed made me feel depressed. I thought about how it will take

---

Sophie Decl., ¶ 8; Sahara Decl., ¶ 4; Tia Decl., ¶ 13; Zealand Decl., ¶¶ 13, 17; Hoegh-Guldberg Decl., Ex. 1 at 11-28; Running Decl., Ex. 1 at 11, 19-21.

[14] *See also* Isaac Decl., ¶¶ 11, 14–16; Jacob Decl., ¶¶ 3–5, 13; Journey Decl., ¶¶ 1–2; Kelsey Decl., ¶¶ 3, 7–8, 18; Kiran Decl., ¶ 12; Nathaniel Decl., ¶¶ 1, 9; Nicholas Decl., ¶ 1; Tia Decl., ¶ 2; Victoria Decl., ¶¶ 6–7, 17, 19.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**    9

hundreds of years for the forest to recover, if ever, and felt hopeless.").[15] Not only have Plaintiffs

presented evidence of their actual, concrete and particularized injuries, they also present

evidence through expert declarations and government documents of their current and imminently

threatened future injuries. Plaintiffs are not required "to demonstrate that it is literally certain that

the harms they identify will come about . . . . [S]tanding [has been found] based on a 'substantial

risk' that the harm will occur . . . ." *Clapper*, 568 U.S. at 414 n.5. Plaintiffs' experts starkly

present reliable evidence that more injuries will undoubtedly befall Plaintiffs because the dangers

from $CO_2$ and other greenhouse gases (collectively "GHGs") are already locked in. Rignot Decl.,

Ex. 1 at 1 ("Thus between irreversible melting of portions of Greenland's and Antarctica's ice

sheets, humanity has already committed itself to a 3-6 m rise in sea level."). Plaintiffs also

present reliable evidence of the imminent and substantial risk of injury that projected increasing

GHG levels and temperatures will cause Plaintiffs if a remedy is not granted here. Hansen Decl.,

Exh. 1 at 1. Contrary to Defendants' position, there is no Article III requirement that each claim

of injury be connected "to a discrete and specifically identified agency action or failure to act" in

violation of federal law. MSJ at 8;[16] *See* Sections III(A)(2), III(B) *infra*. There are

unquestionably genuine issues of material fact on injury that preclude summary judgment here.

---

[15] *See also* Alexander Decl., ¶¶ 38, 48; Hazel Decl., ¶¶ 3, 12; Isaac Decl., ¶¶ 3, 6, 10, 13, 17, 19–21; Jacob Decl., ¶ 29; Jaime Decl., ¶¶ 4, 20, 26–27, 29–33; Journey Decl., ¶¶ 10, 19, 25, 27–28; Kelsey Decl., ¶¶ 11, 16, 18–19, 22, 24; Levi Decl., ¶¶ 5–6, 11, 15, 19–20; Miko Decl., ¶¶ 5–8, 11, 13–14; Nathaniel Decl., ¶¶ 1, 6, 9; Sahara Decl., ¶¶ 7, 9; Sophie Decl., ¶¶ 6, 10–12; Tia Decl., ¶¶ 14–15; Xiuhtezcatl Decl., ¶¶ 3, 5, 13, 15, 18–21; Zealand Decl., ¶¶ 12–15, 17–19; Van Susteren Decl., Ex. 1 at 1-24, Exhibit C; Pacheco Decl., Ex. 1 at 26-31; Frumkin Decl., Ex. 1 at 10-15.
[16] *Daimler Chrysler Corp. v. Cuno* is inapposite. 547 U.S. 353 (2006). There, where the claimants showed injury with respect to their *municipal* taxes, such injury did not entitle them to seek relief as to the *state* taxes, for which they lacked standing. *Id.* at 353. In contrast, as demonstrated in Section III(A)(2), Plaintiffs' injuries are directly connected to the aggregate acts comprising the systemic nature of Defendants' challenged conduct.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR    10**
**SUMMARY JUDGMENT**

## 2. Plaintiffs Submit Sufficient Evidence Showing Their Injuries Are Fairly Traceable to Defendants' Misconduct.

Taking Plaintiffs' evidentiary submissions as true, Plaintiffs have presented specific facts that, coupled with Defendants' denials and arguments, demonstrate genuine issues of material fact regarding whether Plaintiffs' injuries are causally linked or "fairly traceable" to Defendants' misconduct, and not the result of absent third parties. *Lujan*, 504 U.S. at 560-61; *Bellon*, 732 F.3d at 1146. At the summary judgment stage, the causal connection between plaintiffs' injuries and defendants' conduct "cannot be too speculative or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of litigation as to demonstrate that the plaintiffs would succeed on the merits." *Ocean Advocates*, 402 F.3d at 860. Plaintiffs' injuries are fairly traceable to Defendants, even if other parties or factors have also contributed to the harm. *Ocean Advocates*, 402 F.3d at 860. Defendants concede that standing is not precluded by indirect harm to Plaintiffs. MSJ at 9.

In the FAC, Plaintiffs alleged with *significant* specificity particular categories of Defendants' systemic affirmative actions, distinct failures to use delegated authority, and specific examples of the same, delineated by each Defendant, comprising Defendants' systemic conduct which has caused and is causing Plaintiffs' injuries. *See Juliana,* 217 F.Supp.3d 1224 at 1246 ("[P]laintiffs' causation allegations are not vague."). For instance, the FAC describes discrete categories of government policies, practices, and actions, showing how each Defendant permits, licenses, leases, authorizes, and/or incentivizes the extraction, development, processing, combustion, and transportation of fossil fuels, which cause Plaintiffs' injuries. FAC ¶¶ 5, 7, 11, 97, 99, 112, 115, 117, 119, 123, 125, 129-130, 151, 171, 179-181, 183, 186-187. In addition, Plaintiffs provided particular examples of actions, with numeric quantification by category, for particular Defendants. FAC at ¶¶ 160, 161, 164-70, 171-78, 180-84. After delineating specific

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**     11

actions within each category, Plaintiffs allege that, through each of these categories, "Defendants authorize the combustion of all fossil fuels in the U.S." and that historically, the United States is responsible for emitting 25% of the worlds cumulative $CO_2$ emissions," thereby establishing Defendants' causal contribution to Plaintiffs' injuries. FAC at ¶¶ 151, 185. Defendants admit the latter in their Answer. ¶ 151 ("[F]rom 1850 to 2012, $CO_2$ emissions from sources within the United States (including from land use) comprised more than 25% of cumulative global $CO_2$ emissions."). However, Defendants dispute that they have caused Plaintiffs' injuries.

Supporting their allegations, Plaintiffs have adduced facts showing their injuries are directly attributable to Defendants' creation, operation, perpetuation, and promotion of a national fossil fuel-based energy system that has resulted in dangerous and increasing levels of emissions and concentrations of GHGs.[17] *Lujan,* 504 U.S. at 562; *See* Speth Decl., ¶¶ 8-87; Jacobson Decl., Ex. 1 at 20-21; Erickson Decl., Ex. 1 at 3-20; Hansen Decl., Ex. 1 at 3-6, 15-16, 19-20, 24, 26-27, 34, 38-39, 41-43, 45-49; Van Susteren Decl., Ex. 1 at 15-18.

Specifically, Plaintiffs present evidence that Defendants cause GHG emissions and therefore climate change through their affirmative conduct of:

**1.  Creating, controlling, perpetuating, and promoting a national fossil fuel-based energy system through planning and policies**. Speth Decl., ¶¶ 4-16, 26, 29, 30, 36-37, 39-41, 44, 50-52, 57-60, 62-63, 66-68, 73, 75-87; Hansen Decl., Ex. 1 at 3-6, 15-16, 19-20, 24, 26-27, 34, 38-39, 41-43, 45-49; *See e.g.* Olson Decl., Exs. 94 (National Research Council reporting that a major focus of DOE has been to increase oil and gas production and to expand the resource base in keeping with national energy strategies); 95 (DOE stating in 2014 that "developing

---

[17] Defendants have had most of the expert reports since Summer 2017 and have had all but one of the expert reports since April 2018. In their MSJ, Defendants completely ignore all this evidence and failed to inform this Court of the existence of and statements within these expert reports.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**     12
**SUMMARY JUDGMENT**

unconventional domestic oil and gas resources plays an important role in our Nation's energy

future."); 100 (Defendant Secretary of Energy Rick Perry stating, "[T]he idea that there's

somehow or another this just beautiful, total free market in the power generation business? It's

nonsense. I mean, reality is that government affects it every day. I mean, we set regulations, we

set rules, and those are out there."); 101; 105; 106; 117 (DOS' Bureau of Energy Resources

"promotes an 'all of the above' energy strategy focusing on secure, stable, diversified, and

modern global energy systems."); 121; 132 (DOT recognizing the U.S.' "historic approach to

transportation and land use has created an energy-intensive system dependent on carbon-base

fuels and automobiles."); 201 (Deputy Secretary of the Interior David Bernhardt stating on

January 31, 2018: "Oil and gas lease sales on public land directly support domestic energy

production and the President's energy dominance and job growth priorities for America."); 228

(President Trump stating that under his Executive Order to Create Energy Independence: "We

will unlock job-producing natural gas, oil, and shale energy. We will produce American coal to

power American industry. We will transport American energy through American pipelines, made

with American steel.").

**2. Fostering, perpetuating, and promoting a national fossil fuel-based energy system by**
**leasing public lands for fossil fuel extraction and production.** Erickson Decl., Ex. 1 at 12-13,

16-20; Olson Decl., Exs. 73 (more than 5 million acres of National Forest lands are leased for

oil, gas, coal, and phosphate development); 74 (in 2010, 16.7 million barrels of oil and 194

million cubic feet of natural gas were produced from 3200 wells on federal lands managed by

USDA); 75 (National Forest lands provide 25% of US coal production); 76 (the Forest Service

has authorized almost 20,000 active oil and gas wells on National Forest land); (196 (as of Fiscal

Year 2014, DOI administered 310 coal leases encompassing over 475,692 acres in ten states on

Federal public lands, which authorize the extraction of an estimated 7.75 billion tons of

recoverable coal); *id.* (over the last decade, leases issued and administered by DOI have

authorized the production of over 4.4 billion tons of coal from federal public land); 197 (more

than 40% of all coal produced in the U.S. is authorized by DOI to be extracted from Federal

public lands); 198 (between 80-90% of the coal produced in the U.S. on Federal public lands is

used for energy generation within the U.S.); 205 (of the 700 million acres of the federal

government's subsurface mineral estate managed by DOI, about 570 million acres are available

for coal leasing); 207 (In 2016, 27,207,018 acres of onshore Federal lands were under oil and gas

lease, with 12,771,829 acres in production); 208; 209; 210; 212 (in Fiscal Year 2015, fossil fuel

energy produced on Federal lands managed by DOI included 782 million barrels of crude oil,

five trillion cubic feet of natural gas, and 421 million tons of coal); 213; 214; 215 (as of January

2016, DOI administered more than 5000 active oil and gas leases on nearly 27 million Outer

Continental Shelf acres); *id.* (In FY 2015, DOI authorized the extraction of more than 550

million barrels of oil, accounting for 16% of U.S, oil production); 216 (from 2005-2017, DOI

authorized the production of 6,322,257,723 barrels of oil and 24,995,060,976 MCF of natural gas

from the Outer Continental Shelf); 217-226 (summarizing oil and natural gas DOI authorized to

be extracted from public lands from 1947-2016); 382 ("This executive order starts the process of

opening offshore areas to job-creating energy exploration. It reverses the previous

Administration's Arctic leasing ban."); 229-232; 254 (in 2000, oil and gas was produced on

about 8% of National Wildlife Refuge System lands managed by DOI); 255 (As of November

2016, there were over 5000 oil and gas wells on National Wildlife Refuge System lands managed

by DOI); 256 (between 2009-2015, DOI allowed oil and gas producers on Federal lands to vent,

flare, and/or leak approximately 462 BCF of natural gas); 257; 258 (until 2010, not a single commercial solar energy project on federal lands).

**3. Fostering, perpetuating, and promoting the emission of GHGs, and reducing carbon sequestration capacity, from land use activities by allowing the harvesting of timber and grazing on federal public lands.** 36 C.F.R. § 261.6(a), (b), (h) (person may not harvest timber from federal lands without USDA authorization); 36 C.F.R. 223(a) (livestock grazing federal lands must be authorized by a permit); Olson Decl. Ex. 42; 45 (USDA authorized the harvest of 525,484,148 MBF of timber from federal land in FY 1905-2016); 42; 46; 50-55; 52; 70 (livestock grazing is permitted on over 95 million acres of National Forest lands in 29 states); 212; 233 (DOI manages and administers nearly 18,000 livestock grazing permits and leases on 21,000 allotments over 155 million acres of federal public lands); 234-252.

**4. Subsidizing and providing financial incentives and business support to fossil fuel energy producers and users in support of a national fossil fuel-based energy system.** Stiglitz Decl., Ex. 1 at 7, 12, 15-16; Erickson Decl., Ex. 1 at 13-16; Olson Decl., Exs. 367 (Commerce developed report "to provide market intelligence to U.S. companies" about where "U.S. government resources can make the biggest impact in support of increased U.S. (oil and gas) equipment exports."), 303 (Army Corps of Engineers recommended changes to nationwide permits related to domestic energy production to "reduce burdens on domestic energy producers."), 83; 136 (U.S. gasoline tax is far lower than in other countries).

**5. Conducting research and development in support of fossil fuel extraction and energy technologies.** Olson Decl., Exs. 97-98 (DOE manages a methane hydrates program to facilitate methane production); 99 (in 2014, DOE, DOI, and EPA issued a strategy for coordinating "high priority research" to develop unconventional oil and gas); 264-266 (DOI funding and studying

the potential for recovering natural gas hydrates on the Alaskan North Slope); 94 (DOE

expended nearly $1.5 billion on oil and gas production research from 1978 through 2000, 1/3 of

which was to demonstrate shale oil technology at commercial scale).

**6. Permitting, authorizing, and promoting the import and export of fossil fuels in support**
**of a national fossil fuel-based energy system.** Olson Decl., Exs. 96 (DOE reporting that when

Congress lifted the ban on crude oil exports in December 2015, the result was "the rapid rise of

crude oil exports thereafter."); 117 (DOS "leads the promotion of U.S. liquid natural gas (LNG)

exports globally."); 118; 119 (DOS Deputy Assistant Secretary Sandra Oudkirk saying, "the

United States is a brand new LNG exporter. First exports happened in 2016. First permitting

began in 2014."); *id.* ("The United States is now the largest gas producer in the world.

Admittedly, most of that gas is consumed in the United States."); 120; 189 (no offshore liquefied

natural gas or oil import and export facility can legally operated without a license from DOT's

MARAD); 190; 361 (millions of barrels of crude oil authorized to be exported from the U.S.

between 1990-2017); 363 (U.S. crude oil exports have risen from 10 million barrels in 2007 to

over 24 million barrels in 2012, virtually all of which were destined for Canada); *id.* (In 2012,

DOC authorized the import of 3.1 billion barrels of crude oil); 364 (millions of barrels of

finished petroleum products DOC authorized to be exported from 1990-2017).

**7. Permitting the interstate infrastructure and transport of fossil fuels as part of a national**
**fossil fuel-based energy system**. Olson Decl., Exs. 168 (DOT develops and enforces regulations

for the operation of the U.S.' 2.6 million mile pipeline transportation system for fossil fuels); 170

(no pipeline to transport fossil fuels can begin operation until certified as safe by DOT); 171

(DOT stating: "The nation's more than 2.6 million miles of [pipelines] safely deliver trillions of

cubic feet of natural gas and hundreds of billions of ton/miles of liquid petroleum products each

year."); 172 (there are approximately 318,710 miles of natural gas transmission and gathering

pipelines in the U.S.); *id.* (there are approximately 2,233, 208 miles of total distribution main and

estimated service for gas distribution systems in the U.S.); 175 (billions of cubic feet of natural

gas delivered by the U.S. natural gas pipeline transportation network from 2000-2017); 181

(thousands of barrels of crude oil transported by DOT-regulated rail from 2012-2017); 183 (in

2015, 64.9% of domestic coal shipments were transported by DOT-regulated rail in the U.S.);

384 (requiring FERC approval for interstate transport of fossil fuel); 385 (requiring DOT

approval for transporting hazardous material like fossil fuels).

**8. Permitting the operations of fossil-fuel power plants and fossil fuel refineries, as part of a national fossil fuel-based energy system**. Olson Decl., Ex. 383 (requiring permits).

**9. Setting energy, economy, and efficiency standards for vehicles, appliances, and buildings that use energy from the national energy system in a manner that fosters, perpetuates, and promotes fossil energy.** Olson Decl., Exs. 92 (DOE sets energy conservations standards for

more than 60 categories of appliances and equipment, which covers about 90% of home energy

use); 93; 143 (DOT did not change fuel efficiency standards for passenger cars for twenty years

between model year 1990-2010); 151 (passenger cars and light trucks cannot be sold in the U.S.

unless in compliance with fuel economy standards set by DOT); 152 (The U.S. has historically

had one of the lowest fuel efficiency standards among developed nations); *id.* (DOT

acknowledging that when fuel efficiency standards are raised, automakers respond by creating

more fuel-efficient vehicles "which improves our nation's energy security and saves consumers

money at the pump, while also reducing greenhouse gas emissions."); 156 (fuel economy set by

DOT for long wheelbase light-duty vehicles was 17.4 mpg in 1993 and 17.4 mpg in 2016); 166

(DOT withdrew proposed rule to require manufacturers to rate replacement tires based on fuel

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**    17
**SUMMARY JUDGMENT**

efficiency performance, which would have saved about 1 to 2 billion gallons of fuel per year);

184 (GAO finding that the development and adoption of low-emissions technologies in aviation

is dependent in part on "any government policies that price aircraft emissions.").

**10. Controlling and permitting all aviation travel and perpetuating the reliance thereof on fossil energy**. Olson Decl., Ex. 188 ("Anyone who wants to fly an aircraft – manned or

unmanned – in U.S. airspace needs some level of approval from the FAA.").

**11. Emitting GHGs through the use of fossil fuel energy in government buildings and activities.** Olson Decl., Ex. 77 (80.5% of USDA electricity usage from non-renewable sources);

89, 90 (U.S.' Strategic Petroleum Reserve is the world's largest supply of emergency crude oil,

with a design capacity of 713.5 million barrels of oil); 136 (in 2016, federal government has

1,340,000 cars and 1,810,000 trucks in its fleet); *id.* (In 2015, federal fleet consumed 310,416

thousand gallons of gasoline); *id.* (In 2015, the federal fleet consumed 66,736 thousand gallons

of diesel); 91 (detailing the millions of barrels of oil released from the Strategic Petroleum

Reserve); 217 (DOD uses enough electricity to power 2.6 million average American homes); *id.*

(DOD's daily oil use is over 12,000,000 gallons); 272-273 (detailing DOD's energy use); 274 (in

FY 2014, DOD fleet vehicles consumed just over 72 million gallons of gasoline equivalent).

**12. Utilizing discretionary authority to favor fossil fuels.** Olson Decl. Exs. 215 (In 2011, DOI

approved 1381 of the 1413 requests (97.7%) received from private entities to extend deepwater

Gulf and Alaskan offshore oil leases after the Deepwater Horizon oil spill).

Plaintiffs adduce evidence that Defendants had numerous opportunities to transition the

national energy system off fossil fuels and control GHG pollution with technological and

economic feasibility and, despite such authority, have not done so.  Speth Decl., *passim*;

Jacobson Decl., Ex. 1 at 20-21; Olson Decl., Exs. 76; 105; 106; 342. Finally, Plaintiffs show the

present Defendants are going to great lengths to further exacerbate climate danger and Plaintiffs'

injuries, even though they have been on notice of Plaintiffs' injuries as stated in their FAC since

the day President Trump took office. Speth Decl., ¶¶ 77-80; Olson Decl. Exs. 87 (U.S. coal

exports have increased by nearly 60% in the first months of the Trump Administration), 108

(Secretary Perry: "[n]o source of energy is off limits if it can be developed affordably, cleanly

[and] bring about greater energy security in the United States."), 110-113, 121, 122-123 (issuing

new presidential permits for pipelines), 201, 202 (DOI official stating on January 4, 2018: "By

proposing to open up nearly the entire [Outer Continental Shelf] for potential oil and gas

exploration, the United States can advance the goal of moving from aspiring for energy

independence to attaining energy dominance."), 206; 228 ("My administration is putting an end

to the war on coal."), 228a; 229-232; *See also* ECF No. 208 n. 3 (non-exclusive list of President

Trump's actions causing and contributing to climate change).[18]

   Plaintiffs' evidence shows that any "indirect harm" resulting from the GHG emissions of

third parties is directly attributable to Defendants' policies and actions authorizing third parties

to engage in emission-causing activities, and indeed setting up an entire nation's energy system

intentionally entrenched in fossil fuels.

   Defendants' reliance on *Simon v. E. Ky. Welfare Rights Org.* is misplaced for several

reasons. First, the *Simon* plaintiffs only challenged the effect of a single revenue ruling by the

IRS on nonprofit hospitals' services to indigents. 426 U.S. 26, 28 (1976). Here, Plaintiffs

challenge Defendants' systemic affirmative actions and distinct failures to use delegated

authorities, which have caused and are causing Plaintiffs' injuries. *See* FAC ¶¶ 172-77. Second,

---

[18] *See also* Brad Plumer, *Trump Orders a Lifeline for Struggling Coal and Nuclear Plants*, New York Times (June 1, 2018) https://www.nytimes.com/2018/06/01/climate/trump-coal-nuclear-power.html.

the *Simon* plaintiffs failed to demonstrate a "substantial likelihood that victory" against the IRS would remedy the behavior of the independent hospitals. *Id*. at 45. Here, Plaintiffs provide evidence demonstrating Defendants' substantial control over the composition of the national energy system and GHG emissions in the U.S., showing that relief does not depend on speculative third-party behavior. *See* Section III(A)(3*)*, infra. Defendants can and do exercise control over the national energy system and third-party behavior and are *the only* parties that can transition that system away from fossil fuels quickly enough to remedy Plaintiffs' injuries. Hansen Decl., Exs. 1 at 44-49; *see, e.g.,* Olson Decl., Exs. 121 (DOS recognizing "the United States has a competitive edge in all segments of the energy sector."); 159 (DOT recognizing that new fuel efficiency standards "can achieve significant reductions in carbon emissions from transportation by decreasing the amount of carbon consumed per mile of travel."; 258 (DOI has considered that a fixed, global carbon budget may require purposefully limiting U.S. oil production); 259 (DOI identifying sites on public land suitable for renewable energy development). Defendants also influence and control third party land managers and can incentivize behavior needed to reduce and sequester GHG emissions. Olson Decl., Exs. 64; 78. Finally, Defendants' speculation about third-party behavior is erroneous. *Bennett v. Spear* rejected a similar argument about causation, noting the government:

> wrongly equates injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is "th[e] result [of] the *independent* action of some third party not before the court," . . . that does not exclude injury produced by determinative or coercive effect upon the action of someone else.

520 U.S. 154, 168–69 (1997) (internal citations omitted). Here, Plaintiffs' injuries are fairly traceable to Defendants' conduct because that conduct has a "determinative or coercive effect" on our entire energy system, including the actions of third party producers and consumers of

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR    20
SUMMARY JUDGMENT**

fossil fuels in the U.S. For example, even though Defendants' authorization of leasing on public lands for fossil fuel development are not the final steps in the causal chain leading to Plaintiffs' injuries, the decision to lease has a "determinative" impact on the available supply and economic viability of fossil fuels in relation to alternative energy sources. Olson Decl., Ex. 295 (major fossil fuel companies stating that federal government decisions "have expanded fossil fuel production and use . . . .").

The causal chain here is nothing like the "series of links strung together by conclusory, generalized statements of 'contribution'" from individual private emission sources that the *Bellon* court found insufficient. 732 F.3d at 1142-43; *compare Mass. v. EPA*, 549 U.S. at 524. In contrast, Defendants' own documents show that their systemic acts in authorizing, permitting, and incentivizing fossil fuel production, consumption, transportation, and combustion have caused atmospheric GHGs to increase to levels causing Plaintiffs harm. *See* Section III(A)(2), *supra*. Defendants admit that "from 1850 to 2012, $CO_2$ emissions from sources within the United States (including from land use) comprised more than 25 percent of cumulative global $CO_2$ emissions." Answer at ¶ 151. Plaintiffs have adduced evidence to show the vast majority of these emissions have been and continue to be authorized by Defendants. *See* Section III(A)(2), *supra*.

In *Bellon*, the plaintiffs argued that the state's failure to regulate emissions from five non-parties contributed to their climate harms, but expert evidence in the record indicated the effect of those emissions on global climate change was "scientifically indiscernible." 732 F.3d. at 1142–43. Here, Plaintiffs adduced specific facts showing the affirmative, systemic aggregate acts of Defendants, not their failure to regulate private sources, materially caused and continues to exacerbate climate change. *See generally* Declarations of Speth, Erickson, Frumkin, Hansen, Hoegh-Guldberg, Jacobson, Pacheco, Rignot, Robertson, Running, Stiglitz, Trenberth, Van

Susteren, Wanless, and Williams (expert opinions validating Plaintiffs' ongoing concrete injuries being caused by Defendants). Plaintiffs have presented sufficient evidence demonstrating a material issue as to whether Defendants' conduct is a material cause of Plaintiffs' injuries.

Defendants' contention that aggregated actions making up a systemic pattern of conduct cannot establish causation is directly contrary to Supreme Court precedent. In *Brown v. Plata*, the Supreme Court determined the collective policies and actions of California's state prison officials resulted in a "systemic" violation of prisoners' constitutional rights. 563 U.S. at 551. The Court recognized causation based upon aggregate, systemic acts like those at issue here:

> Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay–or any other particular deficiency in medical care complained of by the plaintiffs–would violate the Constitution…if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm . . . ."

*Id*. at 500 n.3. Similarly, in *Wilson v. Seiter*, discrete elements, which might not in themselves establish causation of a constitutional violation, established causation in the aggregate. 501 U.S. 294, 304 (1991). As in *Plata* and *Wilson*, Defendants' acts in causing and contributing to fossil fuel emissions, viewed in isolation, might not violate the Constitution. However, taken "in combination" and on a "systemwide" basis, this conduct has a "mutually enforcing effect" in violation of Plaintiffs' rights. *Plata*, 563 U.S. at 500 n.3; *Wilson*, 501 U.S. at 304.

Defendants cite only two cases in their ongoing attempt to invent a new "particular causation" requirement in the Article III standing analysis. Contrary to Defendants' implication, MSJ at 11, the Court in *Lewis v. Casey* merely reiterated the uncontroversial principle that a plaintiff "who has been subject to injurious conduct of one kind" does not have standing to challenge *unrelated* harms "to which he has not been subject." 518 U.S. 343, 358 n.6 (1996).

This principle is irrelevant here, where Plaintiffs are subject to GHG emissions resulting from each of Defendants' actions and omissions that, taken together, accumulate in the atmosphere and the oceans, thereby causing climate change, ocean acidification, and Plaintiffs' injuries. Because of the spatial character (i.e., dispersal throughout the atmosphere) and long-lived nature (i.e., persisting for hundreds of years) of GHG emissions, Plaintiffs are subject to the harms from all of Defendants' decisions allowing those accumulated emissions, obviating the need for Plaintiffs to specifically demonstrate connectivity to each of the myriad individual sources of emissions attributable to Defendants. Hansen Decl., Ex. 1 at 14-15; Hoegh-Guldberg Decl., Ex. 1 at 2-30. Plaintiffs' evidence demonstrates genuine issues of material fact as to whether Defendants are a fairly traceable cause of Plaintiffs' injuries.

### 3. Plaintiffs Submit Sufficient Evidence Showing Their Injuries Can Be Redressed.

The redressability element of standing does not require certainty but "only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Bellon*, 732 F.3d at 1146; *see Lujan*, 504 U.S. at 560–61. For standing, Plaintiffs need not establish that a favorable decision will redress every injury. *See Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982).

Plaintiffs presented facts demonstrate material issues of fact precluding summary judgment as to whether, if Defendants are so ordered, they can prepare and implement a remedial plan to decarbonize the U.S. energy system and protect carbon sinks, thereby substantially reducing GHG emissions, drawing down Defendants' contribution to excess $CO_2$ in the atmosphere, and redressing Plaintiffs' injuries. *See* Speth Decl.; Williams Decl., Ex. 1, Jacobson Decl., Ex. 1, Robertson Decl., Ex. 1; Stiglitz Decl., Ex. 1; Hansen Decl., Ex. 1 at 25-38, 44-49. The requested reductions in U.S. emissions with improved carbon sequestration efforts will, at minimum, slow the rising temperatures and carbon accumulation in Earth's sinks, and put the

U.S. on a pathway to return atmospheric $CO_2$ concentrations to levels that avoid dangerous anthropogenic climate change, all of which will reduce and minimize projected injuries to Plaintiffs, children as a class, and future generations. These expert declarations provide the basis for a remedy that could "move the needle on the complex phenomenon of global climate change," MSJ at 12, creating a dispute of fact; Answer ¶ 129 (Denying that "Defendant's retain authority to limit or to deny…extraction, production, transportation, and utilization of fossil fuels, and otherwise to limit or prohibit their emissions").

Defendants' reliance on *Norton v. Southern Utah Wilderness Alliance* for the proposition that the Court may only compel ministerial action is misplaced. *Norton* alleged violations of statutory law through the Administrative Procedure Act ("APA"). 542 U.S. 55, 57–58 (2004). As Plaintiffs and this Court have oft-repeated, this is not an APA case. *See* Section III(B), *infra*. Defendants' invocation of *Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986), is similarly unavailing because Plaintiffs are not seeking remedial action beyond Defendants' existing authority or requiring Congressional enactments. MSJ at 12. Rather, Plaintiffs seek relief that is frequently granted by and firmly within the competence of the federal judiciary: a declaration that Plaintiffs' constitutional rights have been violated and an order for the government to bring its conduct into constitutional compliance through a plan of Defendants' own devising. *See, e.g.*, *Brown v. Bd of Educ.*, 347 U.S. 483 (1954); *Plata*, 563 U.S. 493. Much of the same authority Defendants used to create and promote a national fossil fuel energy system can be employed to undo that system and create a clean, decarbonized energy system.

Additional to their broad authority to control pollution and protect public trust resources, Defendants have authority to design and implement components of a comprehensive remedial plan to transition the energy system to one that protects Plaintiffs' fundamental rights. *See, e.g.,*

42 U.S.C. § 7321 (Presidential authority and obligation to develop and propose to Congress a

National Energy Policy Plan every two years); 50 U.S.C. § 4502 (Presidential authority under the

Defense Production Act to "prepare for and respond" to "natural or man-caused disasters . . . .");

42 U.S.C. § 7112 (DOE authority to coordinate and administer federal energy policy and

programs to promote the general welfare and public interest); 42 U.S.C. §§ 6291-6296 (DOE

also can set efficiency standards for "consumer products" other than automobiles); 42 U.S.C. §§

7401-7431 (EPA can redress air pollution (including from $CO_2$) from stationary and mobile

sources through a variety of mechanisms authorized by the Clean Air Act); 42 U.S.C. § 7408

(establishing air quality criteria); 42 U.S.C. § 7409 (defining National Ambient Air Quality

Standards); 49 U.S.C. § 32902 (DOT can prescribe average fuel economy standards for new

model years of automobiles); 43 U.S.C. §§ 1334, 1337; 30 U.S.C §§ 181-287; 30 U.S.C §§ 351-

359 (DOI can discontinue leasing of federal property for the extraction of fossil fuels); 43 U.S.C.

§§ 1701-84 (DOI can adopt management practices that increase carbon sequestration and

storage); 16 U.S.C §§ 1600-1611 (USDA can ensure that GHG emissions from land use practices

are reduced and carbon sequestration and storage is enhanced); 16 U.S.C. §§ 551, 576 (USDA

has authority to protect national forests from destruction and to reforest those forests); 15 U.S.C.

§ 2901-04 (Commerce can broadly coordinate interagency assessments of the impacts of climate

change and development of appropriate recommendations for action); 33 U.S.C. § 403; 33

U.S.C. § 1344 (DOD can deny permits necessary for the transport of coal, oil, and natural gas);

Exec. Order No. 13,337, 69 Fed. Reg. 25,299 (DOS has authority to deny permits for the

"construction, connection, operation, or maintenance, at the borders of the United States, of

facilities for the exportation or importation…" of fossil fuels). In addition, the President may

issue Executive Orders directing agencies to act.

Further, courts retain broad authority "to fashion practical remedies when faced with complex and intractable constitutional violations." *Plata*, 363 U.S. at 526. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. Of Educ.*, 402 U.S. 1, 15 (1971); *see also Florida v. Georgia*, No. 220142, 2018 WL 3129786 at 15 (S. Ct. June 27, 2018) (in addressing redressability of an injury in a state-to-state water apportionment dispute, the Supreme Court made clear that redressability need not be proven with clear and convincing evidence as a threshold matter, and that the court can use flexibility and approximation in remedying the injury). Plaintiffs' request for further relief also allows this Court to fashion an equitable remedy consistent with the role of the judiciary. Plaintiffs do not seek for the Court to specify the step-by-step plan for Defendants to remedy their unconstitutional behavior. As in *Plata*, this Court can set the constitutional floor necessary for preserving Plaintiffs' rights—the minimum safe level of atmospheric $CO_2$ concentrations and the timeframe in which that level must be achieved—and leave to Defendants the specifics of developing and implementing a compliant plan using their existing statutory authorities. 563 U.S. at 533; *Juliana*, 217 F. Supp. 3d at 1241-42; ECF No. 146 at 8.

Defendants' argument that Plaintiffs' proposed remedy would collide with the Clean Air Act ("CAA") misstates Plaintiffs' desired relief and attempts to revive the political question and displacement arguments already rejected by this Court. *See, e.g.*, *Juliana*, 217 F.Supp.3d at 1235-42, 1259-60. Also, Defendants' reliance on *AEP v. Connecticut* for standing is misguided because the Supreme Court did not address standing or redressability; instead relief was foreclosed because the federal common law nuisance claims at issue had been displaced by the

CAA.[19] 564 U.S. 410, 424 (2011). Finally, even assuming the EPA regulations cited by

Defendants could adequately redress Plaintiffs' injuries (they cannot),[20] several of the rules cited

are either stayed or in the process of being repealed by Defendants, mooting the argument.[21]

      In sum, Defendants' arguments that this Court lacks the authority to craft a remedy to

redress Plaintiffs' injuries are unpersuasive. The Supreme Court recently reaffirmed that

remedies should be linked to the actions that produced the injury, and where a wholesale

structural remedy is necessary to redress a constitutional injury, a court may so order it. *Gill v.*

*Whitford*, 138 S. Ct. 1916, 1930 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). The

Court explained: "The plaintiffs' mistaken insistence that the claims in *Baker* and *Reynolds* were

'statewide in nature' rests on a failure to distinguish injury from remedy. In those

malapportionment cases, the only way to vindicate an individual plaintiff 's right to an equally

---

[19] Plaintiffs' requested relief is consistent with *City of Oakland v. B.P.*, an otherwise inapposite non-constitutional public nuisance case seeking monetary damages, wherein Judge Alsup clarified that "federal courts have authority to fashion…remedies for claims based on global warming" but "must also defer to the other co-equal branches of government when the problem…deserves a solution best addressed by those branches." Order Granting Motion to Dismiss, No. 3:17-cv-06011-WHA (N.D. Cal. June 25, 2018) Doc. No. 283 at 16, Olson Decl. MSJ, ¶ 4, Ex. 2. This is precisely the relief Plaintiffs request here. Plaintiffs ask the Court to assess the constitutionality of Defendants' systemic conduct, declare that conduct violates Plaintiffs' fundamental rights, and order Defendants to come into constitutional compliance while appropriately deferring to Defendants' judgment as to the best way to develop and implement a plan of their own devising.

[20] Defendants' disingenuous insistence that they are "responding to many of the concerns asserted by Plaintiffs," MSJ at 13, is belied, for example, by their averment that "the Clean Power Plan is not intended to 'preserve a habitable climate system.'" Answer ¶ 127, and the conduct of this Administration in exacerbating the climate crisis. Olson Decl. Ex. 368 (Secretary of Commerce Wilbur Ross stating: "Our oil and gas sector has already seen tremendous growth due to [the Trum[] Administration's deregulatory agenda, with more than 56 million feet drilled in the second quarter, up more than 38 percent since the fourth quarter of 2016.").

[21] *See* Review of the Standards of Performance for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Generating Units, 82 Fed. Reg. 16,330 (April 4, 2017) ("The Executive Order specifically directs EPA to review and, if appropriate, initiate reconsideration proceedings to suspend, revise or rescind the New Source Rule.").

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR    27
SUMMARY JUDGMENT**

weighted vote was through a wholesale 'restructuring of the geographical distribution of seats in a state legislature.'" *Gill*, 138 S. Ct. at 1930 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). Justice Kagan, in her concurrence, also explained that an appropriate remedy will depend upon what it takes "to cure all the packing and cracking," which caused the constitutional infringement. *Gill*, 138 S. Ct. at 1937 (Kagan, J., concurring).[22] Here, this Court should allow Plaintiffs to develop a full record on the structural remedial pathways that would vindicate their inalienable rights and redress their constitutional injuries from the climate "packing and cracking" perpetrated by Defendants. Plaintiffs have adduced evidence sufficient to create material disputes of fact as to their standing. This MSJ should be denied and this matter ordered to trial beginning October 29, 2018.

### B. Plaintiffs' Constitutional Claims Are Not Governed by the APA

#### 1. This Court Has Already Determined That the Fifth Amendment Provides Plaintiffs' Right of Action.

Equally unavailing is Defendants' argument that the APA "provides the sole mechanism" for Plaintiffs' challenge to the constitutionality of agency conduct. MSJ at 18.[23] This Court, affirmed by the Ninth Circuit under the "no clear error" standard, already rejected those arguments and held "it is the Fifth Amendment that provides the right of action" for Plaintiffs'

---

[22] "But with enough plaintiffs joined together—attacking all the packed and cracked districts in a statewide gerrymander—those obligatory revisions could amount to a wholesale restructuring of the State's districting plan. The Court recognizes as much. It states that a proper remedy in a vote dilution case 'does not *necessarily* require restructuring all of the State's legislative districts.' *Ibid.* (emphasis added). Not necessarily—but possibly. It all depends on how much redistricting is needed to cure all the packing and cracking that the mapmakers have done." *Id.*

[23] The APA unquestionably does not apply to or limit Plaintiffs' constitutional claims against the President. 5 U.S.C. § 702 (limiting APA's applicability to claims against "agency action").

claims. *Juliana*, 217 F.Supp.3d at 1261.[24] Judge Coffin confirmed disposition of this issue and there is no need for the Court to revisit it.[25] ECF No. 212 at 2.

### 2. Supreme Court and Ninth Circuit Precedent Establish That the APA is Not the Sole Means of Review for Constitutional Challenges to Agency Conduct

Even if this Court had not already decided the issue, Defendants' argument is foreclosed by clear precedent. The Supreme Court has ruled on several occasions that constitutional claims are not subject to the APA and may be brought independently. In *Franklin*, a case "rais[ing] claims under both the APA and the Constitution," the Court reached the merits of the constitutional claims against the Secretary of Commerce separately from its analysis of the APA claims, which the Court found were not viable for lack of "final agency action." 505 U.S. at 796–801, 803–06.[26] Similarly, in *Webster v. Doe*, the Supreme Court held a constitutional claim against an agency official was judicially reviewable even though not viable as an APA claim. 486 U.S. 592, 601, 603–05 (1998). Likewise, in *Hills v. Gautreuax*, a non-APA Fifth Amendment case, the Court approved a structural remedy similar to the relief requested here.

---

[24] *See* ECF No. 208 at 5-14 (Excerpting and explaining the numerous instances in which the Parties have addressed Defendants' argument and this Court's and the Ninth Circuit's resolution of the same); ECF No. 195 at 10-22. In their recent application to the Supreme Court for an extension of time, Defendants conceded they argued this APA issue to the Ninth Circuit. ECF No. 211-1 at ¶ 3 ("The government petitioned the Ninth Circuit for a writ of mandamus ordering dismissal, contending that the district court's order contravened fundamental limitations on judicial review imposed by . . . the Administrative Procedure Act.").

[25] In their Writ Petition, Defendants presented substantially similar arguments to those on page 18, footnote 7 of the MSJ regarding Plaintiffs' challenge to Section 201 of the Energy Policy Act and DOE Order No. 3041, which was mandatorily issued thereunder. *See* Pet. for Writ of Mandamus, 4 n.1, *In re United States*, No. 17-71692 (9th Cir. June 9, 2017), Dkt. No. 1. As Plaintiffs showed in answering Defendants' Petition, ECF 241-1 at 13–18, Plaintiffs' challenge is properly before this Court. If Section 201 of the Energy Policy Act is unconstitutional, all orders issued under it, including still operational DOE/FE Order No. 3041, are also unconstitutional. Rather than restate those arguments here, they are incorporated by reference.

[26] As Defendants concede, the Court in *Franklin* found that "the President's actions may still be reviewed for constitutionality" outside of the APA. ECF No. 231 at 3.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**    29

425 U.S. 284, 205 ("The order would have the same effect…as a discretionary decision by HUD

to use its statutory powers to provide the respondents with alternatives to the racially segregated

Chicago public housing system created by…HUD.")[27]

    Ninth Circuit precedent is also dispositive on this issue. *Presbyterian Church (U.S.A.) v.*

*U.S.* makes clear that "§ 702 [of the APA] waives sovereign immunity not only for suits brought

under § 702 itself, but for constitutional claims brought under the general federal question

jurisdiction statute, 28 U.S.C. § 1331." 870 F.2d 518, 525 n.9 (9th Cir. 1989). The Ninth Circuit

recently confirmed that constitutional challenges to agency conduct need not be brought under

the APA in *Navajo Nation v. Dept. of the Interior*: "Claims not grounded in the APA, like . . .

constitutional claims . . . 'do[ ] not depend on the cause of action found in the first sentence of §

702' and thus § 704's limitation [to 'final agency action'] does not apply to them." 876 F.3d

1144, 1170 (9th Cir. 2017) (citations omitted). The Ninth Circuit would have had no need to

distinguish between Section 704 claims and other constitutional claims not brought pursuant to

Section 704 if Congress had foreclosed such claims.

    Defendants' statement that "the Supremacy Clause does not confer a cause of action" is

entirely irrelevant. MSJ at 16. Irrespective of whether any other constitutional provision creates a

right of action, it is well established that Plaintiffs may rest their claims "directly on the Due

Process Clause of the Fifth Amendment." *Davis v. Passman*, 442 U.S. 228, 243–44 (1979); *see*

---

[27] Defendants' reliance on *Jarita Mesa Livestock Grazing Ass'n v. U.S. Gen. Serv.*, 58 F. Supp. 3d 1191 (D.N.M. 2014) is misplaced. Besides being a non-binding out-of-circuit district court opinion, *Jarita* relied solely, and erroneously, on Justice Scalia's dissent in *Webster* for its conclusion. *Id.* at 1237. Further, *Jarita* is factually distinguishable in that plaintiffs challenged singular agency actions and brought an APA challenge to the same final agency action challenged as unconstitutional. *Jarita* did not, as here, involve aggregate, systemic, and unconstitutional conduct of multiple federal agencies and individual officials, a challenge not suited to the narrow strictures of the APA.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**    30
**SUMMARY JUDGMENT**

*also Bolling v. Sharp*, 347 U.S. 497 (1954) (remanding for grant of equitable relief in school desegregation case resting directly on the Fifth Amendment).

While correctly noting the distinction between constitutional claims seeking equitable relief and cases[28] where courts have considered extending a claim in *damages* for constitutional violations, Defendants misunderstand the reason the Supreme Court developed the distinction in the first place. MSJ at 15–16. In *Davis* and its progeny, the Supreme Court explained the distinction between equitable and monetary relief is of primary importance to the availability of a claim for violation of fundamental constitutional rights. The *Davis* Court recognized a private right of action for damages under the Fifth Amendment. 442 U.S. 228. In doing so, the Court first asked whether the Fifth Amendment provides a right of action, irrespective of the remedy sought, concluding a party may "rest[] her claim directly on the Due Process Clause . . . ." *Id.* at 243–44. Only then did the Court "consider whether a damages remedy is an appropriate form of relief." *Id.* at 244. The Court's subsequent jurisprudence on this issue focuses entirely on whether *damages* are available, absent statutory authorization, as a remedy for constitutional violations. *See, e.g.*, *Carlson v. Green*, 446 U.S. 14 (1980); *Bush v. Lucas*, 462 U.S. 367 (1983).

Courts need not conduct a comparable inquiry into the availability of a cause of action seeking equitable relief for fundamental rights violations because it is a central precept of constitutional law that such actions are and always have been available:

> [I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . . Moreover, where federally protected rights have been invaded, it has been the rule

---

[28] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *Davis v. Passman* (1979)*, 442 U.S. 228; *Carlson v. Green*, 446 U.S. 14 (1980); *Ziglar v. Abassi*, 137 S. Ct. 1843 (2017); *Occupy Eugene v. U.S. Gen. Serv. Admin.*, No. 6:12-CV-02286-MC, 2013 WL 6331013 (D. Or. Dec. 3, 2013); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116 (9th Cir. 2009).

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**                                                                31

> from the beginning that courts will be alert to adjust their remedies so as to grant
> the necessary relief.

*Bell v. Hood*, 327 U.S. 678 (1946). Contrary to Defendants' position, the right of every citizen to

injunctive relief from ongoing and prospective "official conduct prohibited" by the Constitution

does not "depend on a decision by" the legislature "to afford him a remedy. Such a position

would be incompatible with the presumed availability of federal equitable relief . . . ." *Bivens*,

403 U.S. at 400 (Harlan, J., concurring). The Court confirmed this reasoning in *Ziglar v. Abbasi*,

where plaintiffs sought damages against "high executive officers," challenging "large-scale

policy decisions" as violative of their Fifth Amendment substantive due process rights. 137 S.

Ct. 1843, 1851–52, 1862 (2017). In response, the Court stated "[t]o address these kinds of [large-

scale] policy decisions, detainees may seek injunctive relief." *Id*. at 1862; *see also Laird v.*

*Tatum*, 408 U.S. 1, 14 (1972) (where there is "actual present or immediately threatened injury

resulting from unlawful government action," systemwide relief may be appropriate).

Defendants' reliance on inapposite cases concerning the power of Congress to limit the

authority of courts to redress violations of statutorily created rights[29] and cases concerning the

limitations on actions brought under the APA[30] is wholly misplaced. As this Court

acknowledged, Plaintiffs' challenge "rests directly on the Due Process Clause of the Fifth

Amendment," *Juliana*, 217 F.Supp.3d at 1261 (citation omitted), and "it is the Fifth Amendment

that provides the right of action." *Id.* Defendants' argument that the APA provides the sole

---

[29] *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996).
[30] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *San Luis Unit Food Producers v. United States*, 709 F.3d 798 (9th Cir. 2013); *Sierra Club v. Peterson*, 228 F.3d 559 (5th Cir. 2000). Defendants' reliance on these cases is further misplaced as each challenged the violation of statutory law through the APA.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**    32
**SUMMARY JUDGMENT**

means to challenge the constitutionality of agency conduct has been rejected by this Court, is

contrary to established Ninth Circuit and Supreme Court precedent, and lacks merit.

### 3. Limiting Plaintiffs' Constitutional Claims to the Strictures of the APA Would Violate Their Right to Procedural Due Process

Limiting Plaintiffs to the strictures of the APA would violate Plaintiffs' procedural due

process right to meaningful review of their constitutional claims. *McNary v. Haitian Refugee*

*Ctr., Inc.*, 498 U.S. 479, 496 (1991) (limited judicial review procedures established by statute did

not apply where they would foreclose "meaningful judicial review" of challenge to agency's

pattern of unconstitutional conduct). As observed in *Marbury v. Madison*, "[t]he very essence of

civil liberty certainly consists in the right of every individual to claim the protection of the laws,

whenever he receives an injury." 5 (U.S. 1 Cranch) 137, 163 (1803). Courts "presume

constitutional rights are to be enforced through the courts." *Davis*, 442 U.S. at 242. This

presumption is rebutted only by a "textually demonstrable *constitutional* commitment of [an]

issue to a coordinate political department." *Id.* (citation omitted). Indeed, as stated in *Armstrong*

*v. Exceptional Child Center*, constitutional rights are "congressionally unalterable." 135 S. Ct. at

1383. Even assuming *arguendo* Congress could alter the judiciary's authority over constitutional

rights, "where Congress intends to preclude judicial review of constitutional claims, its intent to

do so must be clear." *Webster*, 486 U.S. at 603. This heightened showing "is required in part to

avoid the 'serious constitutional questions' that would arise if a federal statute were construed to

deny any judicial forum for a colorable constitutional claim." *Id.* (citations omitted).[31]

---

[31] The *Webster* majority clearly rejected Justice Scalia's reasoning in his dissent, which Defendants resurrect here, and allowed the plaintiff's constitutional claims (not his separate APA claims) to proceed to discovery. 486 U.S. 592.

Here, the APA contains no clear statement of intent to "preclude review of constitutional claims." *Id.* Even if the APA did contain such a statement, it would raise serious questions as to the constitutionality of such a restriction. As Defendants' systemic actions threaten these young Plaintiffs' constitutional rights, precluding Plaintiffs' claims by or limiting them through the strictures of the APA would violate their procedural due process right to "meaningful judicial review." *McNary*, 498 U.S. at 496; *Webster*, 486 U.S. 592, 599-605 (APA's limitations do not apply where they would preclude review of a constitutional claim).

Determining whether procedural limitations, like those governing review of agency conduct in the APA, effectuate a violation of due process, requires consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Each of these factors favors Plaintiffs.

*First*, the private interest at stake is unquestionably of the highest constitutional importance because, as this Court has determined, "Plaintiffs have adequately alleged infringement" of their fundamental constitutional rights. *Juliana*, 217 F. Supp. 3d at 1250.

*Second*, there is an absolute risk of erroneous deprivation of Plaintiffs' fundamental rights if Plaintiffs must plead their claims under and subject to the strictures of the APA. Defendants argue that Plaintiffs must individually challenge "thousands of discrete agency actions" rather than Defendants' systemic conduct. MSJ at 16 (citations omitted); *see* ECF No. 195 at 16-22. Any law that required Plaintiffs to individually challenge each of the "thousands" of agency actions which have contributed to Plaintiffs' injuries, including those dating from before these youth were born, would be a herculean, if not impossible, task, and would avoid

presenting the true case and controversy of Defendant's affirmative and unconstitutional systemic conduct, which is the cause of Plaintiffs' injuries. FAC ¶ 129 ("The vastness of our nation's fossil fuel enterprise renders it infeasible for Plaintiffs to challenge every instance of Defendants' violations, and, even if feasible, challenging each of Defendants' actions would overwhelm the Court."); *see McNary*, 498 U.S. at 496 (Limiting review of agency's pattern of unconstitutional violations to administrative records would preclude meaningful review); *see Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (Procedural safeguards must be offered "at a meaningful time and in a meaningful manner."). It is not isolated individual agency action that has caused Plaintiffs' systemic injuries. As the Supreme Court just ruled in *Gill v. Whitford*, a remedy should be tied to the government action that caused the injury, not more expansive, nor less. 138 S. Ct. 1916, 1930 (2018). While the APA may not permit challenges to "broad programmatic" or systemic agency action (*see Norton*, 542 U.S. at 64), such challenges can undoubtedly proceed directly under the Fifth Amendment. *See, e.g. Ziglar*, 137 S. Ct. at 1862; *McNary*, 498 U.S. 479. To hold otherwise would subject Plaintiffs to more than a mere risk of erroneous deprivation of their rights, it would render such deprivation inevitable.

 *Third*, the government's interest in administrative efficiency favors litigating Plaintiffs' claims as a single systemic challenge rather than a myriad of challenges to a vast multitude of individual agency actions, which would undoubtedly prove costly, inefficient, and unduly burdensome for all parties involved, as well as the courts.

 Thus, every *Eldridge* factor strongly favors proceeding with Plaintiffs' claims as pleaded in order to avoid a procedural due process violation.  It is unimaginable in our divided system of government that the systemic, catastrophic constitutional violations at issue here could be placed beyond the Court's basic power and duty to safeguard individual fundamental rights. Even if

Defendants were not completely wrong on the law, there would be genuine issues of material fact in dispute as to whether limiting Plaintiffs' claims to the strictures of the APA would violate their substantive and procedural due process rights. In their Answer, Defendants dispute that the systemic nature of their conduct has caused and is causing the profound harms underlying Plaintiffs' claims.[32] Plaintiffs submit evidence demonstrating genuine issues of material fact as to standing (Section III(A), *supra*) and the merits of their constitutional claims (Section III(D), *infra*). Because limiting Plaintiffs' claims to the APA would render inevitable a deprivation of their fundamental rights, as explained *supra*, this evidence also demonstrates genuine issues of disputed material fact as to whether so limiting Plaintiffs' claims would result in a violation of their substantive and procedural constitutional rights. In addition to Defendants' APA arguments being wholly without merit, summary judgment on this issue could easily be denied for the further reason of the existence of genuine issues of material fact.

### C.  Plaintiffs' Claims and Requested Relief Do Not Violate Separation of Powers Principles.

Defendants recycle their separation of powers argument, which is rooted in their fundamental mischaracterization of Plaintiffs' requested relief and advances a dangerously narrow construction of the Due Process Clause. This Court has already analyzed and found Plaintiffs' claims fall within those "cases" or "controversies" amenable to judicial resolution, and the Ninth Circuit found no clear error with that analysis. *Juliana*, 217 F. Supp. 3d at 1235-42; *In re United States*, 884 F.3d 830 (9th Cir. 2018). Here, Plaintiffs' again address the argument showing disputed issues of material fact pertinent to any separation of powers consideration on the merits. Whether "governmental action is affirmatively and substantially damaging the climate system" is eminently suitable for judicial resolution without implicating separation of

---

[32] *See* n.5, *supra*.

powers concerns. *Juliana*, 217 F. Supp. 3d at 1250; *Bowsher v. Synar*, 478 U.S. 714, 721 (1986);

*Marbury*, 5 U.S. (1 Cranch) at 163. The judiciary has consistently served as a bastion of

protection from systemic infringements of constitutional rights and can craft a remedy consonant

with separation of powers after a thorough examination of Plaintiffs' claims, injuries, and

evidence at trial. The stakes of the climate crisis effectively leave the judiciary as Plaintiffs' "last

resort" and exercise of judicial jurisdiction is a "necessity." *Allen*, 468 U.S. at 752.

### 1. Courts have the authority and obligation to address claims of constitutional infringements and public trust violations.

This Court has the authority and obligation to address Plaintiffs' claims of constitutional

infringements and public trust violations. U.S. Const., art. III, § 2 ("The judicial power shall

extend to all cases, in law and equity, arising under the Constitution . . . ."); *Obergefell v.

Hodges*, 135 S. Ct. 2584, 2598 (2015) ("The identification and protection of fundamental rights

is an enduring part of the judicial duty to interpret the Constitution."). Defendants make much of

the unprecedented nature of Plaintiffs' claims, yet these claims simply mirror the unprecedented

magnitude of harm from Defendants' misconduct. As the Supreme Court recently explained, our

Constitution was built to adapt to evolving notions of liberty:

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning.

*Obergefell*, 135 S. Ct. at 2598.

That Plaintiffs allege pervasive and systemic harms only reinforces the vital role of the

judiciary here. Defendants misconstrue the Due Process Clause as inapt for resolving matters

"affecting every person in the country." MSJ at 22. To the contrary, the Due Process Clause has

consistently been moved our nation towards evolving notions of justice and liberty *for everyone*.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**    37
**SUMMARY JUDGMENT**

*See, e.g.*, *Baker v. Carr*, 369 U.S. 186 (1962) (preservation of democratic process by addressing malapportionment); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (racial discrimination in elections); *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483 (1954) (desegregation); *Obergefell*, 135 S. Ct. at 2608 (the right of same-sex couples to "exercise the fundamental right to marry in all States."); *Glasser v. U.S.*, 315 U.S. 60 (1942); *Taylor v. Louisiana*, 419 U.S. 552 (1975) (remedying systematic exclusion of women from jury service); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (limits on contraception conflict with fundamental rights of married people); *Eisenstadt v. Baird*, 405 U.S. 438, 443 (1972) (extending right of privacy to contraception for non-married people). Federal courts routinely address systemic harms and are equipped to do so when the infringements emanate systemically from another branch of government—that is how our tripartite system is intended to function. *Brown v. Plata*, 563 U.S. 493 (2011) (challenge to systemic conditions across state prison system); *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955) (systemic racial injustice in school systems).

Our carefully constructed system of checks and balances was designed to protect individuals from "the unlawful exercise of governmental power" by the other branches of government. *Obergefell*, 135 S. Ct. at 2605 (internal quotation marks and citation omitted). When the legislative or executive branches violate individual rights, courts have a duty to provide redress even if doing so "affects issues of the utmost importance and sensitivity." *Obergefell*, 135 S. Ct. at 2605; *Brown*, 349 U.S. 298 ("All provisions of federal, state, or local law requiring or permitting such discrimination must yield to [the principle that racial discrimination in public education is unconstitutional]."). Consequently, "[a]n individual can invoke a right to constitutional protection when he or she is harmed, even if . . . the legislature refuses to act" on that issue. *Obergefell*, 135 S. Ct. at 2605; *see also Clinton*, 520 U.S. at 682

("[T]he Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct."). To deprive Plaintiffs of their day in court would be to skew the balance of power towards a legislature and executive that have not only refused to act, but that have systemically and affirmatively infringed Plaintiffs' constitutional and public trust rights.

The longevity and magnitude of Defendants' harms alongside separation of powers principles not only allow, but *demand* this case be heard. *See Allen*, 468 U.S. at 760, *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) (the judiciary must monitor "wisdom and soundness of Executive action" in the event of "actual present or immediately threatened injury resulting from unlawful government action") (citation and internal quotation marks omitted). "The declared purpose of separating and dividing the powers of government, of course, was to diffuse power, the better to secure liberty" not to better protect the executive and legislature when they wield power to infringe inalienable rights. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). For at least four decades, Defendants have knowingly administered a dangerous fossil fuel-based system that presents an "actual present or immediately threatened injury," *Allen*, 468 U.S. at 760, upon which Plaintiffs' claims are founded. *See* Section III(A)(1), (2) *supra*. Separation of powers principles are properly invoked here, not as a reason to disregard Plaintiffs' claims, but rather as the reason to consider them.

Defendants' tactic to suggest Plaintiffs pursue piecemeal action has previously been rejected for addressing systemic constitutional harms. The *Obergefell* court, for example, declined to permit "slower, case-by-case determination[s]" of the rights of same-sex couples because doing so would permit ongoing violations of fundamental rights. 135 S. Ct. at 2606; *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 249, 299 (1955) (holding courts of equity can eliminate obstacles to desegregation in a systemic manner to abide the constitutional principles).

### 2.   Plaintiffs properly request declaratory and injunctive relief for their injuries.

Defendants' perpetual mischaracterization of Plaintiffs' claims and requests for relief does not warrant summary judgment. *See, e.g.*, ECF No. 27-1 at 17–18 (describing the remedy as "transform[ing] the district court into a super-regulator setting national climate policy"); ECF No. 74 at 33 ("Such an order would place the judiciary in the position of a *de facto* superagency . . . and it would raise profound separation of powers problems"); Plaintiffs have not requested, and this Court need not order, specific regulatory action by Defendants. FAC, Prayer for Relief. Rather, Plaintiffs seek to have their rights vindicated through declaratory and injunctive relief, a well-worn pathway for rectifying constitutional violations. *See Juliana*, 217 F. Supp. 3d at 1241.

This Court has the judicial powers and expertise to delineate the scope of Plaintiffs' rights, examine the extent of Defendants' violations, and fashion relief based on those findings. *See Milliken v. Bradley*, 433 U.S. 267, 280 (1977) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation."). Summary judgment is inappropriate on separation of powers grounds where this Court has not yet determined the scope of Defendants' violations or Plaintiffs' injuries. *Baker*, 369 U.S. at 198 ("Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at trial."); *see also Ruiz v. Estelle,* 679 F.2d 1115, 1155 (5th Cir. 1982) ("Injunctive relief need not be confined to an order to cease an illegal practice. Once a constitutional violation has been proved, the court may, if necessary, exert its equitable power to prevent repetition of the violation, not only by the force of the contempt sanction but also by commanding measures that safeguard against recurrence."). This case should continue with

discovery to allow the "discriminating inquiry into the precise facts and posture of the particular case" necessary before dismissal case on separation of powers grounds. *Baker*, 369 U.S. at 199.

Nor are the inherent factual and scientific complexities of this case grounds for summary judgment. Plaintiffs do not ask this Court to make "energy and environmental policy," MSJ at 20, but to weigh the relevant facts and evidence on climate change and Plaintiffs' injuries and set constitutional standards. *See* ECF 146 at 9. Nor is political tension surrounding climate change grounds for summary judgment; "federal courts regularly adjudicate claims that arise in connection with politically charged issues." *Juliana*, 217 F.Supp.3d at 1236; *See also Brown*, 349 U.S. at 299 ("School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles."). Defendants cite no convincing reason why this Court cannot take a similar approach here.

Finally, Defendants make the untenable argument that this Court cannot grant relief because such relief is not within traditional notions of equity. MSJ at 21. Judicial review of the political branches has been a historic stalwart of separation of powers principles. *Nixon v. Fitzgerald*, 457 U.S. 731, 761 (1982). Equity is an inherently flexible power. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The authorities Defendants cite ostensibly refuting this interpretation are inapposite to the systemic constitutional harms alleged here. *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99 (1945) (examining equity principles applied to federal courts' ability to enforce non-federal rights); *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) (relying on principles of private debtor-creditor law). Plaintiffs' claims should proceed to trial and, after considering all the evidence to determine the "nature and scope of the constitutional violation," this Court can construct an proper remedy. *Milliken*, 433 U.S. at 280.

### D. Plaintiffs' Claims Do Not Fail as a Matter of Law

Defendants move for partial summary judgment on only three of Plaintiffs' Fifth

Amendment substantive due process claims. Defendants argue again that there is no implied

Fifth Amendment right to a climate system capable of sustaining human life and that the public

trust doctrine does not apply here. They repeat their contention that the state-created danger

doctrine of the Fifth Amendment only applies when a governmental body takes control over a

particular individual's person. MSJ at 24-28. This Court already rejected these legal arguments

and need not decide them again as a matter of law without a fully developed factual record.

*Juliana*, 217 F. Supp. 3d at 1250. All of Plaintiffs' claims require an empirical scientific and

historical analysis. ECF 146 at 11 ("plaintiffs' substantive due process claim presents a mixed

question of law and fact that mandates an opportunity to develop the record."). Defendants have

not, however, moved for summary judgment on three of Plaintiffs' Fifth Amendment claims;

therefore, the merits of these claims are not at issue in Defendants' MSJ nor Plaintiffs' Response.

### 1. Material Facts are in Dispute Regarding Plaintiffs' Fundamental Right to a Climate System Capable of Sustaining Human Life.

The Supreme Court has intentionally availed itself to review and recognize new

fundamental rights. "The identification and protection of fundamental rights is an enduring part

of the judicial duty to interpret the Constitution [and] 'has not been reduced to any formula.'"

*Obergefell,* 135 S. Ct. at 2598 (quoting *Poe v. Ullman,* 367 U.S. 497, 542 (1961)). In deciding

whether to recognize a newly asserted fundamental right, the Supreme Court has asked "whether

that right is fundamental to the Nation's scheme of ordered liberty . . . or . . . whether it is

'deeply rooted in this Nation's history and tradition.'" *McDonald v. City of Chicago, IL*, 561

U.S. 742, 744 (2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). A full

fundamental rights analysis involves an empirical inquiry. *See Perry v. Schwarzenegger,* 704

F.Supp.2d 921 (N.D. Cal. 2010) (holding bench trial). Here, both historical and scientific factual evidence are material to this analysis, which should be fully developed at trial so that the appellate courts have a full record to consider with findings of fact and conclusions of law.[33]

The right, already recognized by this Court, "to a climate system capable of sustaining human life" is both fundamental to ordered liberty and deeply rooted in our history and traditions as a nation. *Juliana*, 217 F.Supp.3d at 1250. As this Court held, "roots" of the right are found in the penumbras of the Bill of Rights and the various amendments. *Id*. Often, a newly recognized unenumerated fundamental right is a "right underlying and supporting other vital liberties." *Id.*

A full merits decision of this newly recognized right and its contours involves an empirical analysis. Thus, Plaintiffs proffer material facts and opinion in the expert report of historian Andrea Wulf describing the deep roots of this fundamental right in the Nation's history and traditions. Wulf Decl., Ex. 1. Wulf explains that the natural environment was a critical underlying principle of liberty on which Jefferson, Washington, Madison, and Adams founded the Nation. The Founders were rooted in the principle Alexander von Humboldt[34] best described as: "Nature is the domain of liberty." *Id.* at 3. Humboldt wrote that "nature's balance was created by diversity, which might in turn be taken as a blueprint for political and moral truth." *Id.* The Founders echoed Humboldt's teachings in their own writings and speeches. *Id.* Washington said that the proper management of the lands would contribute more to the welfare of the states than

---

[33] Important fundamental rights cases were all decided on appeal of merits decisions: *Brown v. Bd. of Ed.*, 347 U.S. 483, 486 n.1 (1954) (four district court records); *Plata*, 563 U.S. at 499-500 (two district courts)*, Obergefell*, 135 S.Ct. 2584 (three final decisions for plaintiffs and one preliminary injunction)*, Grutter v. Bollinger*, 539 U.S. 306 (2003), *Lawrence v. Texas*, 539 U.S. 558 (2003), *Furman v. Georgia*, 408 U.S. 238 (1972); *Atkins v. Virginia*,536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551 (2005).

[34] The Founders spent time with and were greatly influenced by the German explorer and scientist Alexander von Humboldt. *Id.* at 2. They read his books, kept their own climate journals, worried about the state of the natural environment, and were, at their core, farmers who understood the importance of protecting nature for future generations of Americans. *Id.*

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**          43

anything else and they linked national "happiness, dignity and independence" to the quality of

the lands. *Id.* at 3-4. Wulf opines that "it was America's nature, soil and plants that provided a

transcendent feeling of nationhood. Nature was inextricably linked to guarding liberty." *Id.* at 4.

James Madison's speech of 1818, after ending his Presidency, was especially prophetic

and "emblematic of how deeply rooted the importance of nature in balance was to the founders

and to the young nation:"

> Madison was the first American politician to write that 'the atmosphere is the
> breath of life. Deprived of it, they all equally perish,' referencing animals, man
> and plants. He spoke of the balanced composition of the atmosphere and the give
> and take of animals and plants, which allowed the atmosphere the aptitude to
> function so as to support life and the health of beings, according to nature's laws.
> The threat to nature in 1818 was largely from deforestation, the degradation of
> soils and the agricultural practices that Humboldt spoke of—threats to what
> Madison called the 'symmetry of nature.'

*Id.*

Defendants contend that, "unlike the right recognized in *Obergefell*, the right to a

climate-system capable of sustaining human life has no relationship to 'certain personal choice

central to individual dignity and autonomy,'" thereby creating a dispute of empirical historical

and scientific fact that should be resolved at trial. MSJ at 25. Expert Wulf disagrees. Wulf Decl.,

Ex. 1 at 4, 7-8 (President Roosevelt explaining: "The function of our Government is to insure to

all its citizens, now and hereafter, their rights to life, liberty and the pursuit of happiness. If we of

this generation destroy the resources from which our children would otherwise derive their

livelihood, we reduce the capacity of our land to support a population, and so either degrade the

standard of living or deprive the coming generations of their right to life on this continent.").

Plaintiffs and their experts make clear that the dangers of climate destabilization do in

fact, as President Roosevelt predicted, threaten personal choice central to individual dignity and

autonomy. Jaime Decl., ¶¶ 4, 12–14, 26–27 (drought and lack of water forced her from her home

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR    44
SUMMARY JUDGMENT**

on the Navajo Nation reservation, eliminated her ability to harvest important traditional plants and medicines, and extreme heat forces her to stay inside all day when she would rather be active outdoors); Nicholas Decl., ¶ 7 ("Colorado is my home and where I want to spend the rest of my life. It is my dream to live in the foothills of the Rocky Mountains but I am now too scared to move there because of the threat of wildfires."); Running Decl., Ex. 1 at 5-9, 12-18, 24-27, 29; Trenberth Decl., Ex. 1 at 21; Van Susteren Decl., Exhibit C to Ex. 1 (filed pursuant to protective order). Thus, like the historical roots of the fundamental right to marry, the same can be said for the climate. *Obergefell*, 135 S. Ct. at 2594; Hansen Decl., Ex. 1 at 44-49; Wulf Decl., Ex. 1.

Defendants incorrectly contend that the Court's recognition of a fundamental right to a climate system capable of sustaining human life "wrests fundamental policy issues" from the Legislative branch. MSJ at 34. This argument ignores Supreme Court precedent that the declaration and protection of fundamental rights is the *duty* of the judicial branch. *Obergefell*, 135 S. Ct. at 2598. Defendants' theory that a fundamental rights analysis should be rejected when the right would require a change to large government policies and systems would have been the downfall of cases on desegregation, prison reform, same-sex marriage, or the right of women to serve on juries and have access to contraception, among other rights. *See supra* C.1. In contrast to those cases, the United States already has a clear policy of protecting the climate system by ratifying the United Nations Framework Convention on Climate Change and in our nation's conservation legislation, and thus the Court's recognition of this fundamental right is not inconsistent with policy decisions that have already been made.[35]

---

[35] *See, e.g.*, UNFCCC, *adopted* May 9, 1992, 1771 U.N.T.S. 107, S. Treaty Doc. No. 102-38 (1992); Clean Air Act § 101, 42 U.S.C. § 7401; National Environmental Policy Act § 101, 42 U.S.C. § 4331(b)(1) ("[I]t is the responsibility of the Federal Government to . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations.").

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**                45

Defendants cite no compelling authority or evidence to support their dispute with the Court's finding that "a stable climate system is quite literally the foundation 'of society, without which there would be neither civilization nor progress.'" *Juliana*, 217 F.Supp.3d at 1250. Wulf explains that there is ample support for this in the historic record:

> The 'breath of life' that the atmosphere, forests, soils, waters (the climate system) was to the agrarian society in which the founding fathers lived was also foundational to the liberties they staked out for their new nation. There may be no other implicit liberty right more rooted in the history and traditions of the United States than the right to a climate that sustains life the life that humans have enjoyed for generations and that is now catastrophically threatened.

Wulf Decl., Ex. 1 at 4. Defendants raised a disputed fact as to this claim by denying the historical and scientific facts and empirical evidence demonstrating the unenumerated right recognized by this Court has deep roots in our nation's history and is implicit, as demonstrated by hard scientific evidence, in the concept of ordered liberty. That is both a factual and legal inquiry that courts must engage, one best suited for the merits at trial.

### 2. Plaintiffs' Proffer of Evidence of Material Facts Disputed by Defendants Demonstrates That the Federal Government Has Put Them in a Position of Danger in Violation of the Fifth Amendment.

This Court has recognized Plaintiffs' allegations that their injuries stem from Defendants' affirmative actions and deliberate indifference to the dangers of climate change constitute a valid State-created danger claim under the Due Process Clause. *Juliana*, 217 F.Supp.3d at 1251-1252. Defendants suggest that proving a State-created danger claim requires "a clear and present danger of imminent physical harm to a specific plaintiff with whom the government had a distinct relationship, an overt government act that proximately caused the dangerous situation, deliberate indifference by the government to the particular plaintiff's safety, and subsequent physical harm or loss of life." MSJ at 27. But Defendants cite no authority for so construing the principles articulated in *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189 and its

progeny. Rather, as this Court stated, "A plaintiff asserting a danger-creation due process claim must show (1) the government's acts created the danger to the plaintiff; (2) the government *knew* its acts caused that danger; and (3) the government with *deliberate indifference* failed to act to prevent the alleged harm." *Juliana,* 217 F.Supp.3d at 1252 (emphasis in original).

Although a State-created danger claim "imposes rigorous proof requirements," *Id.*, Plaintiffs proffer ample evidence to make a triable issue of material fact for each limb of the test articulated by this Court. With respect to the first limb, Plaintiffs proffer material facts for each link in the causal chain establishing that Defendants at minimum placed Plaintiffs "in a worse position than that in which [they] would have been had the state not acted at all." *Pauluk,* 836 F.3d at 1125 (internal quotation marks and citations omitted). Plaintiffs submit evidence that the U.S. is responsible for a substantial percentage of current and historical $CO_2$ emissions, and that Defendants' aggregate actions—including but not limited to fossil fuel subsidies and leasing of federal land to fossil fuel exploration—perpetuate a fossil fuel energy system and result in greater $CO_2$ emissions than would occur in the absence of Defendants' aggregate actions. *See* Hansen Decl., Ex. 1 at 26; Erickson Decl., Ex. 1 at 4-20; *See* Section III(A)(2), *supra*. Plaintiffs proffer evidence that these excess GHGs cause and enhance myriad dangers to Plaintiffs. *See* Section III(A)(1). Plaintiffs present evidence that they are personally suffering harm from these dangers. *Id.*

Defendants argue the harm suffered under the State-created danger exception must be "physical harm." MSJ at 36. There is no reasoned basis and Defendants cite no authority for the proposition that psychological harms are excluded from a State-created danger claim. Although Plaintiffs proffer disputed material facts of physical harm, and thus do not need to solely rely on psychological harm, Plaintiffs' evidence of psychological harm from Defendants' actions is

staggering, and in many respects equivalent to the proffered evidence of physical harm. As summarized in the expert opinion of Dr. Lise Van Susteren,

> [T]hese youth Plaintiffs, and many other children, are already experiencing acute and chronic mental health impacts as a result of climate change and its impacts. These mental health impacts are exacerbated because climate change is a direct result of actions taken by the federal defendants, who are supposed to be protecting the Plaintiffs and future generations. Some of the Plaintiffs are in a state of despair, others are angry and have feelings of hopelessness. They are extremely worried about their futures and the world that they will grow up in. Without immediate action by the federal defendants to address climate change, it is my expert opinion that these Plaintiffs will continue to suffer acute and chronic mental health impacts and that their suffering will worsen. These conclusions are consistent with what I have seen in my practice and the literature."

Van Susteren Decl., Ex. 1 at 23. As one example of the gravity of Plaintiffs' psychological harms, Plaintiff Levi D. describes having recurring nightmares about climate change damage to his home. Levi Decl. at ¶5.

With respect to the second limb of the State-created danger test, Plaintiffs, through the expert declaration of James Gustave "Gus" Speth, proffer decades of material facts of Defendants' knowledge that its actions caused dangers to Plaintiffs:

> [I]t is my expert opinion that the U.S. government, including Federal Defendants and the highest levels of the Executive Branch and Congress, knew by the late 1970s, with enough certainty to act, that the ongoing reliance on fossil fuels posed a serious threat to earth's climate system, the nation, and future generations. It is also my opinion that Federal Defendants were well informed and advised about alternative energy pathways for the nation that were within their authority to pursue, which would have minimized or avoided the increasing threat of climate change caused by greenhouse gas emissions and met the energy and security needs of the nation.

Speth Decl. ¶ 8. Speth's opinion is supported not only by his years of service within the Carter Administration and decades of public service outside the U.S. government, but also by his expert historical analysis of an extensive record of government documents.

With respect to the third limb of the State-created danger test, the Speth declaration also proffers material facts of Defendants' deliberate indifference:

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR      48**
**SUMMARY JUDGMENT**

> The Federal Defendants' actions managing the national energy system from each administration after Carter is, in my view, *the greatest dereliction of civic responsibility in the history of the Republic*. And it is worse today than ever. This shocking historical conduct, government malfeasance on a grand scale, summarized below, has left current and future generations enormously vulnerable to substantial danger.

Speth Decl. ¶ 11 (emphasis added). Speth explains how, "year by year, and administration by administration, Federal Defendants knowingly pursued and enacted national fossil fuel-based energy policies and planning that would increase climate change-inducing greenhouse gas emissions" despite full and ever-growing knowledge of the grave consequences of these actions. *Id.* at ¶ 8. Plaintiffs submit evidence establishing that Defendants' culpable state transcends "gross negligence" and falls within the conscience-shocking realm of deliberate indifference. *Pauluk*, 836 F.3d at 1125 (quotation marks omitted). To hold otherwise would set an impossibly high factual threshold for culpability and insulate "the greatest dereliction of civic responsibility in the history of the Republic" from constitutional scrutiny. Plaintiffs have identified material facts going to each limb of the State-created danger test and have demonstrated that there are genuine issues for trial with respect to this claim. This Court should deny summary judgment.

### 3. Plaintiffs Submit Evidence of Material Facts Disputed by Defendants Regarding Their Claim That The Public Trust Doctrine Applies to the Federal Government's Management of Trust Resources.

This Court has previously determined the Public Trust Doctrine "is deeply rooted in our nation's history and indeed predates it," and provides Plaintiffs a cause of action under the Fifth Amendment Substantive Due Process Clause. *Id.* at 1274-1276. This Court provided a well-reasoned analysis in rejecting Defendants' arguments that: (1) *PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012), precludes a federal Public Trust Doctrine claim; (2) *Illinois Central Railroad v. Illinois*, 146 U.S. 387 (1892), was only a statement of law relevant to State sovereigns and not the Federal sovereign; (3) the Property Clause entrusts Congress exclusively

with unlimited power over public lands without limitation;[36] and (4) under *AEP v. Connecticut*, 564 U.S. (2011), the Clean Air Act displaces any Public Trust Doctrine claim. *Juliana*, 217 F. Supp. 3d at 1272-1276. Under the clear error standard, the Ninth Circuit upheld this Court's order. *In re United States*, 884 F.3d 830 (2018).

Defendants' argument that the Public Trust Doctrine does not apply to Defendants' management of the atmosphere presents mixed questions of law and disputed material facts and fails on summary judgment. Resting strictly on the identical legal arguments Defendants made in their Motion to Dismiss and Petition for Writ of Mandamus, Defendants do not make any legal or factual arguments as to why the atmosphere is not a public trust resource subject to protection, even though they raise it in the MSJ. It should be rejected for that reason alone.

Moreover, the contours of the federal Public Trust Doctrine, and whether the atmosphere or climate system is part of the federal trust *res* is a mixed question of law and fact. The Doctrine is deeply rooted in United States history and tradition. *See* Wulf Decl., Ex. 1 at 2 (Founders saw "nature as the foundation of the nation."); Smith Decl., Ex. 1 at 6-18; The Federalist No. 46 (James Madison) ("The federal and State governments are in fact but different agents and trustees of the people"); *Martin v. Waddell*, 41 U.S. 367, 413 (1842). The Founders saw the atmosphere and the climate as integral to their liberties. *See* Wulf Decl., Ex. 1 at 21-22.

---

[36] Defendants cite one new case, *United States v. Bd. of Cty. Comm'rs of Cty. of Otero,* which stands for the proposition that, due to the Supremacy Clause, the federal government's power to protect federal lands under the Property Clause preempts contradictory *state* or *local* laws. 843 F.3d 1208, 1213 (10th Cir. 2016), *cert. denied,* 138 S. Ct. 84 (2017). Neither *Otero* nor *Kleppe* stand for the proposition that the federal government has no *federal* public trust obligation to protect public trust resources or that the federal government cannot be constrained by *federal* law in how it manages federal property. In fact, *County of Otero* expressly left open the question of whether the Forest Service could be held liable under *federal* common law. *Id.* at 1215.

Further evidence exists in public laws, which do not form the origination of the federal

Public Trust Doctrine, but affirm the Doctrine applies, and its contours. 42 U.S.C. § 4331(b)(1)

(declaring government has "continuing responsibility" to "use all practicable means" so as to

"fulfill the responsibilities of each generation as trustee of the environment for succeeding

generations."); 42 U.S.C. § 9607(f)(1) (directing Defendants to act as trustees of *all natural*

*resources* under their management and control); *see also* 33 U.S.C. § 2706 (b)(1)&(2) (Oil

Pollution Act); 40 C.F.R. § 300.600(b) (designating Departments of Agriculture, Commerce,

Defense, Energy, and Interior ); 40 C.F.R. § 300.600(a) (defining  natural resources to "mean[]

air, . . . , and other such resources . . . , held in trust by" Defendants); 42 U.S.C. § 9607(f)(2)(A).

According to the U.S. Commission on Ocean Policy, "the U.S. government holds ocean

and coastal resources in the public trust—a special responsibility that necessitates balancing

different uses of those resources for the continued benefit of all Americans."[37] *See also* Olson

Decl. Ex. 371 ("NOAA recognizes it has the duty to protect public trust resources such as fish

and shellfish, and that climate change threatens those resources.").

Defendants also have taken the position before federal courts that they are trustees over

natural resources and have rights and obligations under the Public Trust Doctrine. *See, e.g.*, *U.S.*

*v. CB & I Constructors, Inc.*, 685 F.3d 827 (9th Cir. 2011); *Conner v. U.S. Dep't of Interior*, 73

F.Supp.2d 1215, 1219 (D. Nev. 1999); *U.S. v. Burlington N. R.R.*, 710 F.Supp. 1286 (D. Neb.

1989); *In Re Steuart Transp. Co.*, 495 F.Supp. 38 (E.D. Va. 1980). In a case against British

Petroleum over their oil spill, the United States claimed damages for "[n]atural resources under

---

[37]    U.S. Senate Committee on Commerce, Science, & Transportation: Hearing on Oceans
Commission (Sept. 21, 2004) (statement by Admiral James D. Watkins USN (Ret.),
http://www.commerce.senate.gov/public/index.cfm/hearings?Id=51065a2d-0cd0-41c7-b916-
fbbb50cc9fec&Statement_id=4814F650-71F1-40A1-90E7-7F563C08D25A

the trusteeship of the United States." Compl., *United States v. BP Exploration & Production, Inc.*, No 2:10CV04536, 2010 WL 5094310, ¶ 66 (E.D. La. 2010).

Defendants remain sovereign trustees for public trust resources still within the federal public domain, which transcends state borders and includes the air and atmosphere, the oceans, migratory wildlife, and federal public lands. *See* J. Inst. 2.1.1 (T. Sanders trans., 4th ed. 1867); 2 William Blackstone, Commentaries on the Laws of England 4 (1766) ("[T]here are some few things which . . . must still unavoidably remain in common . . . Such (among others) are the elements of light, air, and water . . . ."); *United States v. Beebe*, 127 U.S. 338, 342 (1888); *United States v. California*, 332 U.S. 19, 33 (1889); *United States v. Causby*, 328 U.S. 256, 260, 266 (1946) (holding airspace is part of the federal public domain); *United States v. Trinidad Coal & Coking Co.*, 137 U.S. 160, 170 (1890) (finding public lands are "held in trust for all the people"); *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 283-84 (1997); *U.S. v. Oregon*, 295 U.S. 1, 14 (1935); 49 U.S.C. § 40103(a)(1) ("[t]he United States Government has exclusive sovereignty of airspace of the United States."); *see* 1958 Air Commerce and Safety Act, Pub. L. No. 85-726, § 101(33), 72 Stat. 731, 740 (1958).

This Court may properly decide which natural resources, such as the atmosphere, are subject to state sovereignty, federal sovereignty, or dual sovereignty, after a full factual record is developed, including consideration of expert testimony. *See* Wulf Decl., Ex. 1.

### 4. Plaintiffs' Have Preserved Three Fifth Amendment Claims that are Not at Issue in Defendants' Motion

Defendants have not sought summary judgment on the Fifth Amendment Substantive Due Process claim for government infringement of Plaintiffs' enumerated rights of life and property and already recognized implicit liberties. This Claim includes Plaintiffs' implied recognized rights to move freely, to family, and to personal security. FAC Claim One, ¶¶ 277-89.

Defendants did not move on the Fifth Amendment Substantive Due Process and Equal Protection Claim for systemic government discrimination against Plaintiffs with respect to the exercise of their fundamental rights. FAC Claim Two, ¶¶ 290-93, 298-301. Finally, summary judgment is not sought on the Fifth Amendment Substantive Due Process Equal Protection Claim for government discrimination against Plaintiffs as a class of children, who should have suspect or quasi-suspect classification and some heightened level of constitutional protection against discrimination. FAC Claim Two, ¶¶ 290-91,294-301. Plaintiffs have put forth significant expert testimony regarding this claim not yet addressed by the Court. *See, e.g.*, Smith Decl., Ex. 1; Pacheco Decl., Ex. 1; Ackerman Decl., Ex. 1; Stiglitz Decl., Ex. 1; Hansen Decl., Ex. 1. Importantly, even were no fundamental right at stake, rational basis review would *not* apply if children are afforded a suspect or quasi-suspect classification, a combined factual and legal issue that the court has not ruled on and which should be fully developed at trial.

Plaintiffs have likewise not abandoned the argument that their Equal Protection Claim would survive rational basis even if children are not a protected class and even if there were no fundamental right at stake. Although the Court indicated that "defendants' affirmative actions would survive rational basis review," it premised this statement, at least partially, on its belief that satisfaction of the rational basis test "appears undisputed by plaintiffs." *Juliana*, 217 F. Supp. 3d at 1249. However, Plaintiffs have always disputed and continue to dispute that Defendants' actions can survive rational basis review, which Plaintiffs should have the opportunity to prove through expert testimony and Defendants' admissions,. ECF No. 159 at 18-19; Stiglitz Decl., Ex. 1 at 27, 40, 80, 47 ("No rational calculus"); Speth Decl., ¶¶ 8-16; Jacobson Decl., Ex. 1 at 20-21; Answer ¶¶ 7, 278-306; Olson Decl. Ex. 47; 105 (DOE stating "[a]s part of prudent risk management, our responsibility to future generations is to eliminate most of our

carbon emissions and transition to a sustainable energy future."); 275 (climate change is likely to

pose "wide-ranging" national security challenges); 290 (DOD stating: "Climate change will

affect the Department of Defense's ability to defend the Nation and poses immediate risks to

U.S. national security."). Whether Plaintiffs could survive rational basis review is a factual

inquiry for trial. *See Perry v. Schwarzenegger,* 704 F.Supp.2d 921 (N.D. Cal. 2010) (applying all

three levels of scrutiny to facts at trial). Plaintiffs preserved each of these claims and will proffer

evidence to prove them at trial. Nor did Defendants move on these claims in their MSJ.

### E. This Court Should Not Certify a Denial of Defendants' Motion for Summary Judgment for Interlocutory Appeal.

Contrary to Defendants' mischaracterization, the Ninth Circuit did not invite or

"contemplat[e] future certification," for interlocutory appeal, MSJ at 39, but only stated that, as

in any case, "defendants retain the option of asking the district court to certify orders for

interlocutory appeal of later rulings." *In re United States*, 884 F.3d at 838. Under 28 U.S.C. §

1292(b), an otherwise non-final order may be subject to interlocutory appeal only if the district

court certifies, in writing that: (1) the order involves a "controlling issue of law"; (2) for which

there is a "substantial ground for difference of opinion"; and (3) "an immediate appeal from the

order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

The party seeking interlocutory appeal bears the burden of establishing that all three criteria are

met. *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). Yet, "even when all three

statutory criteria are satisfied, district court judges have unfettered discretion to deny

certification." *Mowat Const. Co. v. Dorena Hydro, LLC*, No. 6:14-CV-00094-AA, 2015 WL

5665302, at *5 (D. Or. Sept. 23, 2015) (Aiken, C.J.) (quotations and citation omitted). Congress

"carefully confined the availability" of review under section 1292(b) to exceedingly rare

circumstances to prevent debilitating effects of piecemeal appeals. *Id.* at 471, 474; *U.S. Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966).

Defendants' fails to satisfy their burden and seek certification for the same issues for which they sought interlocutory appeal after denial of their Motion to Dismiss. *See* ECF No. 172; *see also* Pl's Resp. to Def's Obj's re: Mot. to Certify for Interlocutory Appeal, ECF No. 159.[38]

Defendants cannot satisfy the standard on any issue in their MSJ. Each of the issues in the MSJ implicates a genuine issue of material fact. *See Chehalem Physical Therapy, Inc. v. Coventry Health Care, Inc.*, No. 09-CV-320-HU, 2010 WL 952273, at *3 (D. Or. 2010). In turn, appellate review is aided by a developed record and full consideration of issues by the trial courts. *In re United States*, 884 F.3d at 837.

There are also no substantial grounds for differences of opinion on these issues just because this Court is the first to rule on them. *Couch*, 611 F.3d at 633. Further, no issue presented in the MSJ, excepting standing,[39] is dispositive as to Plaintiffs' entire complaint so as to "materially advance the ultimate termination of the litigation." Thus, denial of this MSJ is not appropriate for interlocutory appeal on any grounds. *See* ECF No. 172 at 4; ECF No. 146 at 14.

## IV.    CONCLUSION

Plaintiffs respectfully request Defendants' partial MSJ be deferred or denied until a full factual record can be prepared to resolve genuine disputes as to issues of material facts.

---

[38] Contrary to Defendants' misleading parenthetical, MSJ at 30, Judge Berzon's complete statement regarding interlocutory appeal was as follows: "So really what this is is an objection to the fact that [the Court] didn't certify it – the interlocutory appeal. And maybe many judges would have but she didn't and that's the system and that's the way it's set up." *See* Oral Arg. Recording at 5:41-5:53, *United States v. U.S. Dist. Court for Dist. of Or.*, No. 17-71692 (9th Cir. Dec. 11, 2017), https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000012816.

[39] Standing does not satisfy the other criteria for interlocutory appeal. *See In re Anchorage Nautical Tours, Inc.*, 145 B.R. 637, 641 (B.A.P. 9th Cir. 1992) (mixed question of fact and law)

DATED this June 28, 2018.                    Respectfully submitted,


                        _____*/s/ Julia A. Olson*_____
                        JULIA A. OLSON (OR Bar 062230)
                        JuliaAOlson@gmail.com
                        WILD EARTH ADVOCATES
                        1216 Lincoln Street
                        Eugene, OR 97401
                        Tel: (415) 786-4825


                        _____*/s/ Philip L. Gregory*_____
                        PHILIP L. GREGORY (*pro hac vice*)
                        pgregory@gregorylawgroup.com
                        Gregory Law Group
                        1250 Godetia Drive
                        Redwood City, CA 94062
                        Tel: (650) 278-2957


                        _____*/s/ Andrea K. Rodgers*_____
                        ANDREA K. RODGERS (OR Bar
                        041029)
                        Andrearodgers42@gmail.com
                        Law Offices of Andrea K. Rodgers
                        3026 NW Esplanade
                        Seattle, WA 98117
                        Tel: (206) 696-2851


                        *Attorneys for Plaintiffs*


**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**    56
**SUMMARY JUDGMENT**