No. 17A-_____

_____
_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

UNITED STATES OF AMERICA, ET AL., APPLICANTS

v.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

_____

APPLICATION FOR A STAY PENDING DISPOSITION BY THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
OF A PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON
AND ANY FURTHER PROCEEDINGS IN THIS COURT
AND REQUEST FOR AN ADMINISTRATIVE STAY

_____

NOEL J. FRANCISCO
  Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____
_____

PARTIES TO THE PROCEEDING

Petitioners (defendants in the district court, and mandamus petitioners in the court of appeals) are the United States of America; Donald J. Trump, in his official capacity as the President of the United States; Office of the President of the United States; the Director of Council on Environmental Quality; Mick Mulvaney, in his official capacity as the Director of the Office of Management and Budget; the Director of the Office of Science and Technology Policy; U.S. Department of Agriculture; Sonny Perdue, in his official capacity as the Secretary of Agriculture; U.S. Department of Commerce; Wilbur Ross, in his official capacity as the Secretary of Commerce; U.S. Department of Defense; James N. Mattis, in his official capacity as the Secretary of Defense; U.S. Department of Energy; Rick Perry, in his official capacity as the Secretary of Energy; U.S. Environmental Protection Agency (EPA); Andrew R. Wheeler, in his official capacity as the Acting Administrator of the EPA; U.S. Department of the Interior; Ryan Zinke, in his official capacity as the Secretary of the Interior; U.S. Department of State; Michael R. Pompeo, in his official capacity as the Secretary of State; U.S. Department of Transportation; and Elaine Chao, in her official capacity as the Secretary of Transportation.

Respondent in this Court is the United States District Court for the District of Oregon. Respondents also include Kelsey

II

Cascadia Rose Juliana; Xiuhtezcatl Tonatiuh M., through his
Guardian Tamara Roske-Martinez; Alexander Loznak; Jacob Lebel;
Zealand B., through his Guardian Kimberly Pash-Bell; Avery M.,
through her Guardian Holly McRae; Sahara V., through her Guardian
Toña Aguilar; Kiran Isaac Oommen; Tia Marie Hatton; Isaac V.,
through his Guardian Pamela Vergun; Miko V., through her Guardian
Pamela Vergun; Hazel V., through her Guardian Margo Van Ummersen;
Sophie K., through her Guardian Dr. James Hansen; Jaime B., through
her Guardian Jamescita Peshlakai; Journey Z., through his Guardian
Erika Schneider; Victoria B., through her Guardian Daisy Calderon;
Nathaniel B., through his Guardian Sharon Baring; Aji P., through
his Guardian Helaina Piper; Levi D., through his Guardian Leigh-
Ann Draheim; Jayden F., through her Guardian Cherri Foytlin;
Nicholas V., through his Guardian Marie Venner; Earth Guardians,
a nonprofit organization; and future generations, through their
Guardian Dr. James Hansen (collectively plaintiffs in the district
court, and real parties in interest in the court of appeals).

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 17A-_____

UNITED STATES OF AMERICA, ET AL., APPLICANTS

v.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

_____

APPLICATION FOR A STAY PENDING DISPOSITION BY THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
OF A PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON
AND ANY FURTHER PROCEEDINGS IN THIS COURT
AND REQUEST FOR AN ADMINISTRATIVE STAY

_____

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of the United States, the President of the United States, the Executive Office of the President, the U.S. Environmental Protection Agency, the U.S. Departments of Agriculture, Commerce, Defense, Energy, the Interior, State, and Transportation, and all other federal parties, respectfully applies for a stay of discovery and trial in the United States District Court for the District of Oregon, pending the disposition of the government's petition for a writ of mandamus filed on July 5, 2018, in the United States Court of Appeals for the Ninth Circuit and any further proceedings in this

2

Court.  Petitioners also request an administrative stay pending the Court's consideration of this stay application.

This suit is an attempt to redirect federal environmental and energy policies through the courts rather than through the political process, by asserting a new and unsupported fundamental due process right to certain climate conditions.  Rather than challenging any specific agency action or inaction (save one), the plaintiffs allege that the "affirmative aggregate acts" of the federal defendants for the past 50 years in the area of fossil-fuel production and use are causing a "dangerous climate system" and systematically violating their asserted substantive due process rights.  Am. Compl. ¶ 289.  The plaintiffs ask the district court to address these alleged wrongs by ordering the President and the defendant agencies to prepare and implement a national remedial plan, without regard to the procedural and substantive limitations of those agencies' organic statutes and the Administrative Procedure Act (APA), and by retaining jurisdiction indefinitely to ensure compliance.

Remarkably, the district court has allowed this improper suit to proceed for nearly three years over the repeated objections of the government and has now set aside 50 trial days this fall for the plaintiffs' requested "Trial of the Century."[1]  In 2016, the court refused to dismiss the plaintiffs' claims, concluding that

---

[1]    Youth v. Gov, Draw #youthvgov., http://www.youthvgov.org/artist-search/ (last visited July 16, 2018).

3

the plaintiffs had adequately pleaded facts sufficient to establish Article III standing, that the plaintiffs had stated a violation of an asserted fundamental right to "a climate system capable of sustaining human life," App., infra, 27a, and that the court could remedy that violation by ordering defendants to "move to swiftly phase out $CO_2$ emissions, as well as take such other action necessary to ensure that atmospheric $CO_2$ is no more concentrated than 350 ppm by 2100, including to develop a national plan to restore Earth's energy balance, and implement that national plan so as to stabilize the climate system," id. at 24a-25a.

After the district court declined to certify its ruling for interlocutory appeal, the government immediately sought from the Ninth Circuit a writ of mandamus ordering dismissal. That court declined to intervene. The court of appeals observed that no order concerning discovery had yet issued and the government had not yet moved for a protective order, to dismiss the President, or for summary judgment. In the court's view, there remained the opportunity for the government to raise and re-raise legal objections to the plaintiffs' claims and for the district court to reconsider its prior decisions, including whether the claims are "too broad to be legally sustainable" and whether this litigation must be "focus[ed] * * * on specific governmental decisions and orders." App., infra, 61a-62a. The court of appeals stated that it expected the claims to be "vastly narrowed as litigation

4

proceed[ed]" beyond that "very early stage" of litigation.  Id. at 62a-63a.

Following the Ninth Circuit's decision, the government took every step contemplated by that court in its decision.  In a motion for judgment on the pleadings, the government moved to dismiss the President and made two additional arguments for why the plaintiffs' claims in this case are not justiciable.  In a motion for summary judgment, the government restated its prior objections to the plaintiffs' standing and to the merits of their claims, permitting the district court to reconsider those rulings on the basis of a more developed record.  And the government moved for a protective order against all discovery, explaining that discovery is categorically inappropriate because it would violate the APA's judicial-review provisions, as well as the APA's comprehensive regulation of agency decisionmaking and the Constitution's separation of powers.

Meanwhile, the plaintiffs have done nothing to narrow their claims or focus them on specifically identified agency actions.  Nonetheless, the district court summarily denied the government's motion for a protective order and denied the government's request for a stay pending consideration of the two dispositive motions that would obviate the occasion for any discovery.  The court has repeatedly stated its expectation that, absent intervention from a higher court, trial will begin in just over three months and will likely proceed for 50 trial days.

5

In light of these developments, on July 5, 2018, the government again petitioned the Ninth Circuit for mandamus relief, requesting an order directing dismissal of this ill-conceived suit or, at a minimum, an order directing the district court to stay all discovery and trial pending the resolution of the government's pending dispositive motions. In accordance with Supreme Court Rule 23.3, the government also separately moved in the district court and the court of appeals for a stay of discovery and trial pending disposition of its petition for a writ of mandamus filed in the court of appeals. The district court has not yet acted on the government's motion. After briefing from the parties, the Ninth Circuit yesterday denied the government's motion for a stay.

The standards for granting a stay pending consideration of a matter in the court of appeals are readily met in this case. If the Ninth Circuit does not grant the government's mandamus petition, this Court is likely to grant review to consider the district court's manifestly wrong recognition of a new fundamental substantive due process right to certain climate conditions in the context of litigation over which the district court lacks jurisdiction under Article III and that is otherwise deeply flawed as a procedural matter. Absent relief from the Ninth Circuit or this Court, the government will be forced to participate in a highly compacted period of discovery and trial preparation followed by a 50-day trial, all of which will itself violate bedrock limitations on agency decisionmaking and the judicial

6

process imposed by the APA and the separation of powers. In light of these impending harms, the Court is therefore likely to order dismissal of this suit or, at a minimum, direct the district court to stay discovery and trial until the government's pending dispositive motions are resolved. In contrast to the obvious harms to the government, respondents can make no credible claim of imminent, irreparable harm. Their alleged injuries stem from the cumulative effects of $CO_2$ emissions from every source in the world over decades; whatever additions to the global atmosphere that may somehow be attributed to the government over the time it takes to resolve the pending mandamus petition are plainly de minimis.

Accordingly, the government requests that this Court stay discovery and trial pending the Ninth Circuit's consideration of the government's mandamus petition and any further proceedings in this Court. Alternatively, given the numerous manifest defects in this suit and the district court's egregious errors, the government respectfully submits that the Court may wish to construe this application as a petition for a writ of mandamus or as a petition for a writ of certiorari from the Ninth Circuit's prior mandamus decision and directly order dismissal of this suit or a stay of discovery and trial until the government's pending dispositive motions are resolved.

STATEMENT

1. The plaintiffs below (respondents in this Court) are 21 minor individuals, an organization known as Earth Guardians, and

7

future generations (by and through their self-appointed guardian Dr. James Hansen). They filed this suit in 2015 against President Obama, the Executive Office of the President, and numerous Cabinet-level Executive agencies, alleging that these Executive officials and agencies contributed to climate change in violation of rights that respondents assert under the Fifth and Ninth Amendments to the Constitution and an asserted federal public-trust doctrine. Am. Compl. ¶¶ 277-310. Respondents allege that the federal defendants (now President Trump and officials in his Administration) have, through action and inaction, enabled the combustion of fossil fuels, which releases greenhouse gases into the atmosphere. Id. ¶ 1. With one exception, respondents do not challenge any specific agency actions, such as agency orders, permits, adjudications, or rulemakings, or even any failure to undertake any specific required actions. Instead, they challenge what they term the government's "aggregate actions," id. ¶ 129, which they assert have caused "climate instability" that injures their prospects for long and healthy lives, id. ¶ 288.

Respondents ask the district court to declare that they have the right under the Constitution to a particular climate system and to require that the Executive Branch "prepare a consumption-based inventory of U.S. $CO_2$ emissions" and "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$." Am. Compl. 94. In addition, they ask the court to retain jurisdiction for an

8

indefinite period of time to monitor the government's compliance with this "national remedial plan." Ibid.

2.  In November 2016, the district court denied the government's motion to dismiss respondents' claims for lack of jurisdiction and failure to state a claim. App., infra, 1a-53a. The court found that respondents had established Article III standing by alleging that they had been harmed by the effects of climate change through increased droughts, wildfires, and flooding; and that the government's regulation of (and failure to further regulate) fossil fuels had caused respondents' injuries. The court determined that it could redress those injuries by "order[ing] [the government] to cease [its] permitting, authorizing, and subsidizing of fossil fuels and, instead, move to swiftly phase out $CO_2$ emissions, as well as take such other action necessary to ensure that atmospheric $CO_2$ is no more concentrated than 350 ppm by 2100, including to develop a national plan to restore Earth's energy balance, and implement that national plan so as to stabilize the climate system." Id. at 24a-25a (citation omitted); see id. at 19a-25a.

On the merits, the district court concluded that respondents had stated a claim under the Fifth Amendment's Due Process Clause and a federal public-trust doctrine. App., infra, 25a-38a. The court found in the Fifth Amendment's protection against the deprivation of "life, liberty, or property, without due process of law," U.S. Const. Amend. V, a previously unrecognized fundamental

9

right to a "climate system capable of sustaining human life," and the court determined that respondents had adequately alleged infringement of that fundamental right, App., _infra_, 27a. The court further determined that respondents had adequately stated a claim under a federal public-trust doctrine, which it held imposes a judicially enforceable prohibition on the federal government against "depriving a future legislature of the natural resources necessary to provide for the well-being and survival of its citizens." _Id._ at 30a (citation omitted). Respondents' claims under this doctrine, the court concluded, are also "properly categorized as substantive due process claims." _Id._ at 38a.

3. The government petitioned the Ninth Circuit for a writ of mandamus ordering dismissal, contending that the district court's order denying the motion to dismiss contravened fundamental limitations on judicial review imposed by Article III of the Constitution and clearly erred in recognizing a sweeping new fundamental right to certain climate conditions under the Due Process Clause. The government further requested a stay of the litigation pending the court of appeals' consideration of the mandamus petition.

On July 25, 2017, the court of appeals granted the government's request for a stay. App., _infra_, 54a. But on March 7, 2018, the court ultimately "decline[d] to exercise [its] discretion to grant mandamus relief at th[at] stage of the litigation." App., _infra_, 63a; see _id._ at 55a-63a. In its

10

decision, the court recognized that "some of [respondents'] claims as currently pleaded are quite broad, and some of the remedies [respondents] seek may not be available as redress." Id. at 62a. The court reasoned, however, that "the district court need[ed] to consider those issues further in the first instance." Id. at 63a. The court of appeals "underscore[d] that this case [wa]s at a very early stage, and that the [government] [would] have ample opportunity to raise legal challenges to decisions made by the district court on a more fully developed record, including decisions as to whether to focus the litigation on specific governmental decisions and orders." Id. at 62a.  The court of appeals observed that "[c]laims and remedies often are vastly narrowed as litigation proceeds" and that it had "no reason to assume this case will be any different." Id. at 63a.  And the court stated that the governmental defendants could continue to "raise and litigate any legal objections they have," id. at 62a, including by challenging future discovery orders; moving to "dismiss the President as a party"; "reasserting a challenge to standing, particularly as to redressability"; "seeking mandamus in the future"; or "asking the district court to certify orders for interlocutory appeal of later rulings," id. at 61a, 63a.

On May 29, 2018, Justice Kennedy extended the time within which to file a petition for a writ of certiorari to review the Ninth Circuit's decision to and including July 5.  On June 25, Justice Kennedy further extended the time within which to file a

11

petition for a writ of certiorari to review the Ninth Circuit's decision to and including August 4, 2018.

4. Following the court of appeals' decision, the government filed a series of motions in the district court as contemplated by the Ninth Circuit's decision.

First, the government filed a motion for judgment on the pleadings, reiterating its prior arguments for dismissal: respondents lack standing, and their novel assertion of judicially enforceable fundamental rights to a particular climate system lacks any support in the Constitution or this Nation's history and tradition. See D. Ct. Doc. 195, at 6-7 (May 9, 2018). The government also set forth three new grounds for dismissing some or all of respondents' claims: (1) the President must be dismissed because the court lacks jurisdiction to enjoin him in the performance of his official duties; (2) all of respondents' claims must be dismissed because the APA provides the mechanism for challenging the federal administrative actions that underlie respondents' claims, but respondents fail to challenge discrete, identified agency actions or alleged failures to act, as the APA requires; and (3) in any event, respondents' claims and requested relief violate the constitutional separation of powers by effectively requiring the district court to usurp the role of Congress in enacting a government-wide regulatory framework and the President in calling on the expertise and resources of the Executive Branch to formulate environmental and energy policies

12

and to make recommendations to Congress concerning changes to laws governing those policies.  Id. at 7-25.

Second, on the same day, the government filed a motion for a protective order barring all discovery or, at a minimum, a stay of all discovery pending resolution of its motion for judgment on the pleadings and its forthcoming motion for summary judgment.  D. Ct. Doc. 196, at 1-2 (May 9, 2018).  The government argued that, because this case may proceed only under the APA, judicial review must be based on the administrative record of specifically identified actions or decisions, and therefore no discovery is proper.  Id. at 9-14.  The government also contended that, even if review were not otherwise limited to the administrative record of specific agency actions, discovery in this case would be independently barred by the procedural requirements that the APA imposes on agency fact-finding and decisionmaking and the separation of powers.  Id. at 14-19.  Finally, the government argued that, at a minimum, the district court should stay all discovery until the court ruled on the government's pending motion for judgment on the pleadings and its forthcoming motion for summary judgment, the granting of which would either eliminate any occasion for discovery or substantially affect its scope.  Id. at 19-20.

Third, the government filed a motion for summary judgment, arguing that (1) respondents lack standing both as a matter of law and as judged against the evidentiary record; (2) respondents have

13

failed to identify a right of action for their claims apart from the APA and have not satisfied the APA's requirement to challenge discrete agency actions or inactions; and (3) respondents' claims fail on the merits. D. Ct. Doc. 207, at 5-19, 24-30 (May 22, 2018). In addition, the government contended that it was entitled to summary judgment because, even aside from respondents' lack of standing, this suit is not a case or controversy within the meaning of Article III. Id. at 20-24.

5. In the meantime, both respondents and the district court wholly failed to narrow or focus the claims in this case. Immediately following the court of appeals' prior decision, the district court ordered the parties to proceed with discovery, and it set an opening trial date of October 29, 2018. D. Ct. Doc. 189 (Mar. 26, 2018); D. Ct. Doc. 192 (Apr. 12, 2018). The court indicated its expectation that the trial will last for approximately 50 trial days. See, e.g., 4/12/18 Tr. 8 (Coffin, J.) (estimating "five weeks per side in essence"). And the court has repeatedly made clear that it has no intention of delaying trial. See, e.g., 5/23/18 Tr. 16 (Aiken, J.) ("[A]s we have talked about in this case before, we are not delaying the trial at this point. We are moving forward."); id. at 17 ("[W]e have got a trial date and we are moving forward."); 5/10/18 Tr. 27 (Coffin, J.) ("[H]ere's the big picture. October 29, 2018, trial starts unless some higher court says no."); D. Ct. Doc. 239 (June 14, 2018) (Aiken, J.) (denying request to extend the trial date for the same

period as extension of time for respondents to oppose summary judgment).

At the same time, the district court extended the deadline for respondents to respond to the government's motion for judgment on the pleadings to June 15, D. Ct. Doc. 210 (May 23, 2018), and set argument on that motion for July 18, D. Ct. Doc. 214 (May 30, 2018). It similarly extended the deadline for respondents to respond to the government's motion for summary judgment until June 28. D. Ct. Doc. 240 (June 14, 2018). After the government filed its mandamus petition, the court granted the government's request to set argument on the motion for summary judgment for the July 18 hearing. D. Ct. Doc. 316 (July 13, 2018).

Meanwhile, in April 2018, respondents served the government with 17 expert reports. In May 2018, respondents served 413 requests for admissions (RFAs) and Federal Rule of Civil Procedure 30(b)(6) deposition notices on the U.S. Departments of Agriculture, the Interior, and Transportation. These RFAs are broad in scope, seeking admissions dating back to the 1960s on topics such as whether, in the agencies' views, certain resources are "at risk"; and admissions concerning "cultural services" such as "spiritual renewal[] and aesthetic enjoyment." See, e.g., D. Ct. Doc. 194-3, at 17 (May 8, 2018); D. Ct. Doc. 194-4, at 29. Among the topics noticed for the Rule 30(b)(6) depositions, respondents demanded that the government designate witnesses to express the defendant agencies' official positions on "[a]ny

15

analysis or evaluation" related to "atmospheric $CO_2$ concentrations, climate change targets, or greenhouse gas emission" that "would avoid endangerment of human health and welfare for current and future generations," as well as on the role of the agencies in implementing President Trump's energy policy. D. Ct. Doc. 196-1, at 6 (capitalization omitted) (Rule 30(b)(6) notice of deposition of U.S. Department of the Interior); D. Ct. Doc. 196-2, at 6 (capitalization omitted) (Rule 30(b)(6) notice of deposition of U.S. Department of Agriculture); D. Ct. Doc. 217-6, at 6 (June 4, 2018) (capitalization omitted) (Rule 30(b)(6) notice of deposition of U.S. Department of Transportation).

In June 2018, respondents served similar RFAs and nearly identical Rule 30(b)(6) deposition notices on the U.S. Departments of Energy and Defense. When the government sought a protective order with respect to the May RFAs and deposition notices on multiple grounds, respondents refused to withdraw the requests but asked the district court to hold the government's responses in abeyance while respondents seek to obtain the same information through contention interrogatories and requests for judicial notice. D. Ct. Doc. 247, at 2-4 (June 25, 2018).

6. Magistrate Judge Coffin denied the government's motion for a protective order for all discovery or, at a minimum, a stay of all discovery pending resolution of the government's motions for judgment on the pleadings and summary judgment. App., _infra_,

16

64a-66a.   Judge Coffin determined that respondents' complaint does not assert claims arising under the APA because their claims are "based on alleged violations of their constitutional rights."  Id. at 65a.  He expressed the view that the district court had already rejected the government's argument that respondents must bring their claims under the APA.  Ibid.  And he refused to grant a protective order based on the separation of powers, ruling instead that "[s]hould a specific discovery request arise during discovery in this case that implicates a claim of privilege the government wishes to assert, the government may file a motion for a protective order directed at any such specific request."  Id. at 66a.  Judge Coffin denied the government's request for a stay of discovery without explanation.  Ibid.

On June 29, the district court summarily affirmed Judge Coffin's order, stating that it had "carefully reviewed [that] order in light of [the government's] objections" and "conclude[d] that the order is not clearly erroneous or contrary to law."  App., infra, 68a; see id. at 67a-68a.  The court provided no additional explanation for its decision.  Also without explanation, the court "decline[d] to certify [its] decision for interlocutory appeal under 28 U.S.C. § 1292(b)."  Id. at 68a.  Meanwhile, the government's trial-preparation burdens continue, as the October trial date fast approaches.  Among other obligations, the government is required to provide expert reports to respondents by August 13, 2018.  D. Ct. Doc. 192.

17

7.   On July 5, the government again petitioned the Ninth Circuit for a writ of mandamus and a stay pending the court's consideration of the government's petition.   The government explained that, in an effort to terminate or narrow this case, it had taken every step that the Ninth Circuit had contemplated in its prior decision.   And yet respondents had failed to narrow their claims in any respect, and the district court's orders made clear that this case will not be terminated or respondents will not be required to narrow their manifestly overbroad claims in time to have any meaningful effect on discovery or trial.   Accordingly, the government asked the Ninth Circuit (1) to direct the district court to dismiss this case or (2) at a minimum, to direct the district court to stay all discovery and trial pending the resolution of the government's dispositive motions, and consider certifying for interlocutory appeal any rulings on those motions, and (3) to stay all discovery and trial while the court of appeals considered the government's mandamus petition.

The court of appeals ordered respondents to respond to the government's stay request by July 10, with the government to file any reply the following day.   On July 16, the court denied the stay request, stating that it would rule on the government's mandamus petition "on an expedited basis." App., _infra_, 69a.   The court has not yet ordered a response to the government's mandamus petition.

18

ARGUMENT

The government respectfully requests that this Court grant a stay of all discovery and trial pending the Ninth Circuit's resolution of the government's petition for a writ of mandamus and any further proceedings in this Court. The government also respectfully requests an administrative stay pending this Court's ruling on this application for a stay. Under this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, a single Justice or the Court has authority to enter a stay pending proceedings in a court of appeals.[2] In considering an application for such a stay, the Court or Circuit Justice considers whether four Justices are likely to vote to grant a writ of certiorari if the court of appeals ultimately rules against the applicant; whether five Justices would then likely conclude that the case was erroneously decided below; and whether, on balancing the equities, the injury asserted by the applicant outweighs the harm to the other parties or the public. See San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. 1301, 1302 (2006) (Kennedy, J., in chambers); Hilton v. Braunskill, 481 U.S. 770, 776 (1987) (traditional stay factors). All of those factors support a stay here.

1. This Court is likely to grant review if the court of appeals denies the government's petition for mandamus. The

---

[2]    See, e.g., Trump v. International Refugee Assistance Project, 138 S. Ct. 542 (2017); West Virginia v. EPA, 136 S. Ct. 1000 (2016); Stephen M. Shapiro et al., Supreme Court Practice § 17.6, at 881–884 (10th ed. 2013).

19

district court has egregiously erred in declaring a never-before-
recognized fundamental right to a particular climate system that
lacks any support in the Constitution, this Court's precedents, or
this Nation's history and tradition.  It has done so in the context
of litigation over which the court lacks Article III jurisdiction
in multiple respects and is otherwise fundamentally procedurally
flawed.  Absent relief from the Ninth Circuit or this Court, this
litigation is barreling toward an extremely compacted period of
discovery that, in one form or another, will force the government
to violate its obligations under the APA and the separation of
powers, followed immediately by a 50-day trial that would itself
violate the same constraints.  If the court of appeals sanctions
such a dramatic "depart[ure] from the accepted and usual course of
judicial proceedings," an exercise of this Court's supervisory
power would be warranted.  Sup. Ct. R. 10(a).

       2.  Moreover,  if  the  court  of  appeals  denies  the
government's petition, a majority of this Court will likely reverse
the Ninth Circuit's denial of mandamus relief or issue a writ of
mandamus directly to the district court.  As this Court has
observed, the traditional use of mandamus has been "to confine the
court against which mandamus is sought to a lawful exercise of its
prescribed jurisdiction."  Cheney v. United States Dist. Court,
542 U.S. 367, 380 (2004) (brackets and citation omitted).
Moreover, mandamus may also be justified by errors "amounting to
a judicial 'usurpation of power'" or a "clear abuse of discretion."

20

Ibid. (citation omitted).  A court may issue a writ of mandamus when the petitioner establishes that (1) the petitioner's "right to issuance of the writ is 'clear and indisputable'"; (2) "no other adequate means [exist] to attain the relief he desires"; and (3) "the writ is appropriate under the circumstances." Hollingsworth v. Perry, 558 U.S. 183, 190 (2010) (per curiam) (quoting Cheney, 542 U.S. at 380-381) (brackets in original).  Each of those prerequisites for mandamus relief is met here.

a.   The government's right to the dismissal of this case is "clear and indisputable."  Perry, 558 U.S. at 190 (citation omitted).   Respondents' implausible and far-reaching claims are procedurally and substantially defective in at least three ways.

i.   Most fundamentally, the district court lacks jurisdiction over respondents' claims.  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)).  This suit fails to qualify as a "Case[]" or "Controvers[y]" within the meaning of Article III for two independent reasons.  U.S. Const. Art. III, § 2, Cl. 1.

First, respondents lack Article III standing.  To demonstrate standing, respondents must prove that (1) they "have suffered an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

21

imminent, not conjectural or hypothetical"; (2) the injury is
"fairly . . . trace[able] to the challenged action of the
defendant, and not . . . th[e] result [of] the independent action
of some third party not before the court"; and (3) it is "likely,
as opposed to merely speculative, that the injury will be redressed
by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S.
555, 560-561 (1992) (citations, footnote, and internal quotation
marks omitted; brackets in original).  The purpose of these
standing requirements is "to prevent the judicial process from
being used to usurp the powers of the political branches." Clapper
v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  "In keeping with
that purpose," a court's inquiry must be "'especially rigorous
when reaching the merits of the dispute would force [it] to decide
whether an action taken by one of the other two branches of the
Federal Government was unconstitutional.'" Ibid. (citation
omitted).  Respondents cannot establish any of the standing
requirements here.

Respondents assert "generalized grievance[s]," not "concrete
and particularized" injuries sufficient to satisfy the first prong
of the standing analysis. See, e.g., Lexmark Int'l, Inc. v. Static
Control Components, Inc., 134 S. Ct. 1377, 1386, 1387 n.3 (2014);
Lance v. Coffman, 549 U.S. 437, 439 (2007) (per curiam); Cuno,
547 U.S. at 344-346.  This Court has made clear that "standing to
sue may not be predicated upon an interest * * * which is held
in common by all members of the public, because of the necessarily

22

abstract nature of the injury all citizens share." <u>Schlesinger</u> v. <u>Reservists Comm. to Stop the War</u>, 418 U.S. 208, 220 (1974).  The injuries that respondents claim all involve the diffuse effects of a generalized phenomenon on a global scale that are the same as those felt by any other person in their communities, in the United States, or throughout the world at large.

Moreover, respondents cannot establish that the government policies they challenge -- expressed in broad and undifferentiated terms, rather than directed to discrete agency actions -- caused their asserted injuries.  See <u>Defenders of Wildlife</u>, 504 U.S. at 560.  Respondents principally complain of the government's regulation (or lack thereof) of private parties not before the district court.  Among their widely scattered objections, for example, respondents claim that the United States subsidizes the fossil-fuel industry.  Am. Compl. ¶¶ 171-178.  But when a plaintiff's alleged harms may have been caused directly by the conduct of parties other than the defendants (and only indirectly by the defendants), it is "substantially more difficult to meet the minimum requirement of Art. III:  to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 504-505 (1975).  And respondents cannot establish a causal link between the amorphously described policy decisions and the specific harms that they allege, as opposed to the independent

23

actions by private persons both within and outside the United States.

Finally, even if respondents could somehow establish injury-in-fact and causation, they could not establish that it is likely that their asserted injuries could be redressed by an order of a federal court. Indeed, respondents have not even begun to articulate a remedy that a federal court would have authority to award and that could move the needle on the complex phenomenon of global climate change, much less likely redress their alleged injuries. See, e.g., Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 40-46 (1976) (holding that plaintiffs challenging tax subsidies for hospitals serving indigent patients lacked standing where they could only speculate on whether a change in policy would "result in [the plaintiffs] receiving the hospital services they desire"). The district court assumed that it had the authority to "[o]rder Defendants to prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$." App., infra, 41a (quoting Am. Compl. 94). But neither respondents nor the court cited any legal authority that would permit such a usurpation of legislative and executive authority by an Article III court.

Second, quite aside from these fatal flaws with respect to standing, this suit simply is not one that a federal court may entertain consistent with the Constitution. The "judicial Power of the United States," U.S. Const. Art. III, § 1, is "'one to

24

render dispositive judgments'" in "cases and controversies" as defined by Article III.  Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-219 (1995) (citation omitted).  It can "come into play only in matters that were the traditional concern of the courts at Westminster" and only when those matters arise "in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.'"  Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 774 (2000) (citation omitted).

Respondents' suit is not such a case or controversy cognizable under Article III.  Respondents ask the district court to review and assess the entirety of Congress's and the Executive Branch's programs and policies relating to climate change and then to undertake to pass upon the comprehensive constitutionality of all of those policies, programs, and inaction in the aggregate.  See, e.g., Am. Compl. ¶¶ 277-310.  No federal court, nor the courts at Westminster, has ever purported to use the "judicial Power" to perform such a review -- and for good reason:  the Constitution commits to Congress the power to enact comprehensive government-wide measures of the sort respondents seek.  And it commits to the President the power to oversee the Executive Branch in its administration of existing law and to draw on its expertise and formulate policy proposals for changing existing law.  Such functions are not the province of Article III courts.  See U.S. Const. Art. I, § 1; id. Art. II, § 2, Cl. 1; id. § 3; cf. Cheney, 542 U.S. at 385.

25

Respondents appeal to the district court's equitable powers as justifying the review they seek in this case.  But a federal court's equitable powers are "subject to restrictions:  the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery."  Guaranty Trust Co. v. York, 326 U.S. 99, 105 (1945).  The relief respondents request is plainly not of the sort "traditionally accorded by courts of equity."  Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 319 (1999).  "There simply are certain things that courts, in order to remain courts, cannot and should not do."  Missouri v. Jenkins, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).  One of those things is "running Executive Branch agencies."  Id. at 133.  And it surely includes running all of them.

ii.  Beyond these limitations imposed by Article III, a suit challenging an agency's regulatory measures would have to be targeted at specifically identified agency actions or alleged failures to act, and review would have to be based on the administrative record for those actions.  The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. 702.  The APA authorizes a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

26

with law" or "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. 706(2)(A)-(B), and to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. 706(1). The APA thus provides a "comprehensive remedial scheme" for a "person 'adversely affected' * * * by agency action" or alleged failure to act with respect to regulatory requirements and standards, permitting, and other administrative measures. Western Radio Servs. Co. v. United States Forest Serv., 578 F.3d 1116, 1122-1123 (9th Cir. 2009) (citation omitted), cert. denied, 559 U.S. 1106 (2010); see Wilkie v. Robbins, 551 U.S. 537, 551-554 (2007) (describing the APA as the remedial scheme for vindicating complaints against "unfavorable agency actions"); Webster v. Doe, 486 U.S. 592, 607 n.* (1988) (Scalia, J., dissenting) (explaining that the APA "is an umbrella statute governing judicial review of all federal agency action" and that "if review is not available under the APA it is not available at all").

Respondents allege that a vast number of (mostly unspecified) "agency action[s]" and inactions spanning the last several decades are, in the words of the APA, "contrary to constitutional right." 5 U.S.C. 702, 706(2)(B). As currently formulated, however, respondents' claims cannot proceed under the APA, because the APA allows only for challenges to "circumscribed, discrete" final agency action, not the sort of "broad programmatic attack" on agency policies that respondents assert here. Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 62, 64 (2004) (SUWA); see

27

_Lujan_ v. _National Wildlife Fed'n_, 497 U.S. 871, 891 (1990). Respondents expressly cast their claims as a challenge to "affirmative aggregate actions" by the numerous defendant agencies that "permitted, encouraged, and otherwise enabled continued exploitation, production, and combustion of fossil fuels." Am. Compl. ¶¶ 1, 5. A challenge to "aggregate actions" is the antithesis of the "_discrete_ agency action" that this Court has explained must be challenged under the APA. _SUWA_, 542 U.S. at 64.

Respondents suggest that they can evade the APA's limitations because the Constitution itself provides the right of action for constitutional claims. Am. Compl. ¶ 13. But this Court has never held that the Constitution itself provides an across-the-board right of action for all constitutional claims -- and especially for the sweeping constitutional claims concerning governmental regulation that respondents advance here and the sweeping relief they seek. Cf. _Armstrong_ v. _Exceptional Child Ctr., Inc._, 135 S. Ct. 1378, 1384 (2015) ("[T]he Supremacy Clause does not confer a right of action."). Federal courts do have equitable authority in some circumstances "to enjoin unlawful executive action." _Id._ at 1385. But that equitable power is "subject to express and implied statutory limitations." _Ibid._ Thus, "[w]here Congress has created a remedial scheme for the enforcement of a particular federal right," courts "have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary." _Seminole Tribe of Fla._ v. _Florida_, 517 U.S. 44, 74

(1996).  Here, even if the equitable authority of an Article III court could ever extend to a case of this sort, the APA provides "express  * * *  statutory limitations" that "'foreclose,'" Armstrong, 135 S. Ct. at 1385 (citation omitted), respondents' asserted constitutional claims against the broad and largely unspecified "aggregate actions" of the federal government as a whole, Am. Compl. ¶ 129.

iii.  Even if a court could reach the merits of respondents' constitutional theories, they plainly fail.  In denying the government's motion to dismiss, the district court concluded that respondents stated two related constitutional claims based on substantive due process:  (1) a previously unidentified judicially enforceable fundamental right to "a climate system capable of sustaining human life"; and (2) a federal public-trust doctrine to the same effect.  App., infra, 27a; see id. at 25a-38a.  Those claims are baseless.

This Court has instructed courts considering novel due process claims to "'exercise the utmost care whenever * * * asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed" into judicial policy preferences, and lest important issues be placed "outside the arena of public debate and legislative action." Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citation omitted).  The Court has "regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are,

29

objectively, 'deeply rooted in this Nation's history and tradition.'" Id. at 720-721 (citation omitted). The district court's recognition of an "unenumerated fundamental right" to "a climate system capable of sustaining human life," App., infra, 26a-27a, is entirely without basis in this Nation's history or tradition. It threatens to wrest fundamental policy issues of energy development and environmental regulation affecting everyone in the country from "the arena of public debate and legislative action," Glucksberg, 521 U.S. at 720, and to thrust them into the supervision of the federal courts -- indeed, here, into a single district court at the behest of a handful of individuals, a person purporting to act on behalf of future generations, and a single environmental organization, advancing just one perspective on the complex issues involved.

The district court relied principally on the Court's recognition of a fundamental right to same-sex marriage in Obergefell v. Hodges, 135 S. Ct. 2584 (2015). App., infra, 26a. There is no relationship, however, between a distinctly personal and circumscribed right to same-sex marriage and the alleged right to a climate system capable of sustaining human life that apparently would run indiscriminately to every individual in the United States. The right recognized by the district court has no relationship to any right as "fundamental as a matter of history and tradition" as the right to marry recognized in Obergefell. 135 S. Ct. at 2602. Nor was the Obergefell Court's recognition of

30

that narrow right an invitation to abandon the cautious approach to recognizing new fundamental rights that is demanded by the Court's prior decisions.

Respondents' public-trust claim fares no better. The roots of a public-trust doctrine "trace to Roman civil law and its principles can be found in the English common law on public navigation and fishing rights over tidal lands and in the state laws of this country." PPL Montana, LLC v. Montana, 565 U.S. 576, 603 (2012). Where it applies, such a doctrine generally holds that the sovereign "owns all of its navigable waterways and the lands lying beneath them as trustee of a public trust for the benefit of the people." National Audubon Soc'y v. Superior Court, 658 P.2d 709, 718 (Cal.), cert. denied, 464 U.S. 977 (1983) (citation and internal quotation marks omitted).

Respondents attempt to invoke that doctrine to impose judicially enforceable, extra-statutory obligations on the federal government's regulation of the fossil-fuel industry and its alleged effects on the atmosphere. They fail, however, to identify a single decision applying the public-trust doctrine in this novel manner. And even if such a doctrine could ever dictate a sovereign's regulation of private parties, respondents' claim would be unavailing because, as this Court has repeatedly recognized, the public-trust doctrine is purely a matter of state law and pertains only to a State's functions. See, e.g., PPL Montana, 565 U.S. at 603 ("[T]he public trust doctrine remains a

31

matter of state law.") (citing <u>Idaho</u> v. <u>Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 285 (1997)).  Indeed, the D.C. Circuit recently concluded that a nearly identical public-trust claim was so insubstantial that it could not provide even a basis for federal court subject-matter jurisdiction.  See <u>Alec L. ex rel. Loorz</u> v. <u>McCarthy</u>, 561 Fed. Appx. 7, 8 (per curiam), <u>cert. denied</u>, 135 S. Ct. 774 (2014).

iv.  Finally, even if the Court were hesitant at this moment to direct dismissal in light of all these defects, it is likely at least to direct the district court to stay discovery and trial pending resolution of the government's motion for judgment on the pleadings and its motion for summary judgment.  A favorable ruling on either motion would terminate the litigation or substantially narrow it to allow challenges only to specifically identifiable agency action under the APA, thus eliminating any occasion for discovery or trial.  At the very least, such a ruling would substantially affect the scope of any trial or discovery, including the government's expert reports that are due in the coming weeks.

In similar circumstances, this Court recently held that the Ninth Circuit erred in denying the government's petition for a writ of mandamus against district court orders that would have required the government to produce certain materials before the district court had resolved the government's threshold arguments for dismissal.  See <u>In re United States</u>, 138 S. Ct. 443 (2017) (per curiam).  In that case, the district court had refused to

32

stay all discovery pending resolution of the government's motion to dismiss the case as nonjusticiable and the court ordered the expansion of the administrative record that the government had produced.  Id. at 444.  After the Ninth Circuit denied the government's mandamus petition challenging those orders, this Court unanimously vacated the decision, remanding with instructions that the district court first rule on the government's threshold arguments and then "consider certifying that ruling for interlocutory appeal under 28 U.S.C. § 1292(b) if appropriate." Id. at 445.  At the very least, the same relief is warranted here.

b.  Mandamus is an appropriate remedy to correct the district court's egregious errors because the government has no adequate means to obtain relief from the court's refusal to dismiss this litigation or to prevent the impending discovery and trial. This Court observed in Cheney that mandamus may be used to correct a "judicial 'usurpation of power,'" 542 U.S. at 380 (citation omitted), and "mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities," id. at 382; see ibid. (recognizing the "paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties").  Here, as a result of the district court's denial of a protective order, the defendant agencies will now be required to proceed with discovery and, in

all likelihood, participate in a fast-approaching 50-day trial that is not only flatly inconsistent with the APA's rules requiring a challenge to be directed to specific agency actions based on record review, but would also (i) violate the APA's carefully reticulated scheme for agencies to make factual assessments and policy determinations through rulemaking and adjudication in matters within their jurisdiction and (ii) contravene the constitutional separation of powers.

i.    The APA sets forth a "comprehensive regulation of procedures" for agency decisionmaking. Wong Yang Sung v. McGrath, 339 U.S. 33, 36, modified, 339 U.S. 908 (1950); see 5 U.S.C. 551-554.    "Time and again," this Court has explained that the APA establishes the exclusive procedural requirements for agency decisionmaking, and courts are not free to alter those requirements.    Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1207 (2015).    To require agencies to comply with discovery seeking official positions on factual assessments and questions of policy concerning the climate and then participate in a trial to impose on them an "enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$," Am. Compl. 94, would impermissibly conflict with the procedures prescribed by the APA and deprive other interested parties and the public of the ability to provide input where the APA's rulemaking provisions or agency procedures require.

34

In pending discovery requests, for example, respondents seek to depose under Rule 30(b)(6) an official representative of the U.S. Department of Transportation on the agency's "role in implementing President Trump's America First Energy Plan," D. Ct. Doc. 217-6, at 6, and have the agency "admi[t]" propositions such as "[p]etroleum use in the transportation sector in the United States is expected to remain at about 13.5 million barrels per day through 2040 and beyond," D. Ct. Doc. 217-9, at 19 (capitalization omitted).   If discovery proceeds in this case, the agencies' official statements and conclusions on such topics would be offered without public input from other stakeholders and without any of the relevant orderly procedures of agency decisionmaking contemplated by the APA. See 5 U.S.C. 553, 554.  Those and similar required responses to discovery thus would be in direct contravention of Congress's judgment in the APA and the agencies' respective organic statutes to vest such determinations in the agencies' administrative processes in the first instance.   And trial on such matters seeking to bind the defendant agencies (much less the President) would be fundamentally inconsistent with the APA and the agencies' organic statutes.

ii.  Discovery and trial in this case would also violate the Constitution's separation of powers.  Even before the enactment of the APA, this Court recognized that permitting an agency's "findings to be attacked or supported in court by new evidence would substitute the court for the administrative tribunal," Tagg

35

Bros. & Moorhead v. United States, 280 U.S. 420, 444 (1930), a
step that would improperly allow the court to "usurp[] the agency's
function," Unemployment Comp. Comm'n v. Aragon, 329 U.S. 143, 155
(1946).  Moreover, "in cases where Congress has simply provided
for review, without setting forth the standards to be used or the
procedures to be followed," the Court "has held that consideration
is to be confined to the administrative record and that no de novo
proceeding may be held."  United States v. Carlo Bianchi & Co.,
373 U.S. 709, 715 (1963).

Limiting judicial review to the administrative record of
actions taken within the scope of the agency's authority as
conferred by Congress in its organic statute reflects fundamental
separation-of-powers principles.  This suit, in which respondents
seek discovery in aid of requiring the defendant agencies (and the
President) to develop and implement a comprehensive, government-
wide climate policy outside the congressionally prescribed
statutory framework runs roughshod over those principles.  It
violates the vesting of the "legislative Power" in Congress to the
extent it would require agencies to transgress the substantive and
procedural constraints imposed on them by statute.  U.S. Const.
Art. I, § 1.  And to the extent it seeks to require the President
and Executive agencies to develop and implement such policies, it
violates the Constitution's vesting of "executive Power  *  *  *  in
a President of the United States."  Id. Art. II, § 1, Cl. 1.

Allowing respondents to simply file a complaint in federal court and then leverage the civil litigation system to marshal the views of federal agencies on broad questions concerning climate conditions and national environmental and energy policies would displace the President in his superintendence of the Executive Branch and encroach on his exclusive authority to elicit the views of federal agencies in formulating national policies for addressing important issues of general concern. See U.S. Const. Art. II, § 2, Cl. 1 (vesting in the President the exclusive power to "require the Opinion * * * of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices"); id. § 3 (vesting the President with power to "recommend to" Congress for "Consideration such Measures as he shall judge necessary and expedient"). Just as the President may not compel an advisory opinion from a court on a question of law, see, e.g., Flast v. Cohen, 392 U.S. 83, 96 & n.14 (1968), a court may not compel the opinions and proposals of executive officials on such matters. The Court should grant mandamus relief to prevent the irreparable harm that would be caused by such intrusions.

3.   The balance of equities strongly supports granting a stay of discovery and trial pending consideration of the government's mandamus petition. Absent a stay, the government will be forced to proceed with burdensome discovery on a highly compressed timeframe and to prepare for (and eventually

37

participate in) a fast-approaching 50-day trial while, at the same time, violating its obligations under the APA and transgressing the separation of powers under the Constitution. Most immediately, by August 13 the government must produce expert reports rebutting respondents' 17 expert witnesses. Respondents' expert reports opine on wide-ranging topics from the merits _vel non_ of implementing a carbon tax, D. Ct. Doc. 266-1, at 33-35 (June 28, 2018), to the technological and economic feasibility of converting 100% of the United States' energy from fossil fuels to renewable energy for all sectors by 2050, D. Ct. Doc. 261-1, at 4-11 (June 28, 2018). Respondents also have not withdrawn their requests for admission propounded on the U.S. Departments of Agriculture, Defense, Energy, the Interior, and Transportation or their Rule 30(b)(6) notices seeking an official designee from the same agencies to testify to each agency's positions on various aspects of climate change and the agency's view of its role in implementing the President's energy policies. See pp. 14-15, _supra_. Indeed, respondents have promised that more discovery requests on similar topics will be served soon, D. Ct. Doc. 247, at 4, all of which are unlawful and unnecessary.

By contrast, respondents can make no credible claim that a relatively brief stay to decide the government's petition will cause them irreparable harm. Because respondents' alleged injuries stem from the cumulative effects of $CO_2$ emissions from every source in the world over decades, whatever additions to the

global atmosphere that may somehow be attributed to the defendant agencies over the time it takes to resolve the government's pending petition are plainly de minimis in context and not a source of irreparable harm.

CONCLUSION

For the foregoing reasons, this Court should stay discovery and trial pending the court of appeals' disposition of the government's petition for a writ of mandamus and any further proceedings in this Court.   Alternatively, the Court should construe this application as a petition for a writ of mandamus to the district court, or as a petition for a writ of certiorari seeking review of the Ninth Circuit's prior mandamus decision (App., infra, 55a-63a), and it should order that the district court dismiss this suit or that the district court stay discovery and trial until the government's pending dispositive motions are resolved and then consider certifying for interlocutory appeal any rulings on those motions.   The government also requests that this Court enter an administrative stay pending its consideration of this stay application.

Respectfully submitted.

NOEL J. FRANCISCO
Solicitor General

JULY 2018

APPENDIX

Order Denying Motion to Dismiss (D. Or. Nov. 10, 2016).........1a

Order Granting Stay (9th Cir. July 25, 2017).................54a

Opinion Denying Petition for a Writ of Mandamus
    (9th Cir. Mar. 7, 2018) ...................................55a

Order Denying Motion for Protective Order and Stay
    (D. Or. May 25, 2018) ....................................64a

Order Affirming Denial of Motion for Protective Order
    and Stay (D. Or. June 29, 2018) ..........................67a

Order Denying Stay (9th Cir. July 16, 2018).................69a

(citing *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 761, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) and Hughes Tool Co., 104 N.L.R.B. 318, 324–25 (1953) ("[A] union could not assess nonmembers for costs arising from contract negotiations for the latter are the exclusive duty and prerogative of the certified representative which the nonmember minority is both entitled to and bound under.")). As the *Sweeney* Court explained:

> The powers of the bargaining representative are 'comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents.' The duty of fair representation is therefore a 'corresponding duty' imposed in exchange for the powers granted to the Union as an exclusive representative. It seems disingenuous not to recognize that the Union's position as a sole representative comes with a set of powers and benefits as well as responsibilities and duties.

*Id.* (quoting *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)).

Because Local 370 is "fully and adequately compensated by its rights as the sole and exclusive member at the negotiating table," Local 370 fails to state a Fifth Amendment claim. *Id.*

### ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1. Defendant's Motion to Dismiss FAC (Dkt. 16) is **GRANTED**. This case is dismissed in its entirety, with prejudice.

2. Defendant's Motion to Dismiss Complaint (Dkt. 11) is **MOOT** and is therefore **DENIED**.



Kelsey Cascadia Rose JULIANA, et al., Plaintiffs,

v.

UNITED STATES of America, et al, Defendants.

Case No. 6:15–cv–01517–TC

United States District Court, D. Oregon, Eugene Division.

Signed 11/10/2016

**Background:** Environmental activists who were too young to vote, and purported guardian for future generations, brought action for declaratory and injunctive relief against United States, the President, and numerous executive agencies, alleging that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system, and asserting violations of substantive due process and defendants' obligation to hold natural resources in public trust. The District Court, Coffin, United States Magistrate Judge, 2016 WL 183903, allowed industry associations to intervene as defendants. Defendants and intervenors filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim.

**Holdings:** The District Court, Aiken, J., adopted the report and recommendation of Coffin, United States Magistrate Judge, and held that:

(1) a nonjusticiable political question was not raised;

(2) activists alleged a concrete and particularized injury, as required for Article III standing;

(3) the alleged injury was imminent;

(4) the right to a climate system capable of sustaining human life is a fundamental right protected by substantive due process;

JULIANA v. U.S.    **1225**
Cite as 217 F.Supp.3d 1224 (D.Or. 2016)

(5) activists stated a claim for a substantive due process violation based on a danger creation theory;

(6) activists adequately alleged harm to public trust assets;

(7) the public trust doctrine can apply to the federal government; and

(8) activists had a right of action to enforce the public trust doctrine.

Motions denied.

**1. Federal Courts** ⟜2078, 2080

A motion to dismiss for lack of subject matter jurisdiction may attack either the allegations of the complaint or the existence of subject matter in fact. Fed. R. Civ. P. 12(b)(1).

**2. Federal Courts** ⟜2081

The party seeking to invoke the district court's jurisdiction bears the burden of establishing subject matter jurisdiction.

**3. Constitutional Law** ⟜2580

If a case presents a political question, federal courts lack subject matter jurisdiction to decide that question.

**4. Constitutional Law** ⟜2580

The political question doctrine, as basis for abstention by federal courts, is primarily a function of the constitutional separation of powers.

**5. Constitutional Law** ⟜2580

Six criteria, each of which could individually signal the presence of a nonjusticiable political question, are: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

**6. Constitutional Law** ⟜2330

Constitutional separation of powers is fundamental to the system of government, known even before the birth of the country to be a defense against tyranny.

**7. Constitutional Law** ⟜2332

Under separation of powers, it is a basic principle of the constitutional scheme that one branch of the government may not intrude upon the central prerogatives of another.

**8. Constitutional Law** ⟜2580

The decision to deny access to judicial relief, based on the political question doctrine, should never be made lightly, because federal courts have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them; accordingly, a court cannot simply err on the side of declining to exercise jurisdiction when it fears a political question may exist, and it must instead diligently map the precise limits of jurisdiction. U.S. Const. art. 3, § 2, cl. 1.

**9. Constitutional Law** ⟜2580

A case does not present a nonjusticiable political question merely because it raises an issue of great importance to the political branches; instead, dismissal on political question grounds is appropriate only if one of the considerations for finding a political question is inextricable from the case.

**10. Declaratory Judgment** ⟜203

There was no textually demonstrable constitutional commitment, to a coordinate political department, of issue of whether greenhouse gas emissions from carbon di-

**1226**         **217 FEDERAL SUPPLEMENT, 3d SERIES**

oxide, produced by burning fossil fuels, were destabilizing the climate system, as would provide basis for nonjusticiability under political question doctrine, in environmental activists' action for declaratory and injunctive relief against President and executive branch agencies, asserting substantive due process claim; Constitution did not mention environmental policy, atmospheric emissions, or global warming, and climate change policy was not a fundamental power on which any other power allocated exclusively to other branches of government rested. U.S. Const. Amend. 5.

**11. Declaratory Judgment ⬅203**

Environmental activists were not asking federal court to pinpoint the best greenhouse gas emissions level, and thus, action for declaratory and injunctive relief against President and executive branch agencies, asserting substantive due process claim alleging that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system, did not suffer from lack of judicially discoverable and manageable standards or from impossibility of making a decision without an initial policy determination of a kind clearly for nonjudicial discretion, as would provide basis for nonjusticiability under political question doctrine; activists were seeking a determination of what emissions level would be sufficient to redress their injuries, which question could be answered without any consideration of competing interests. U.S. Const. Amend. 5.

**12. Declaratory Judgment ⬅203**

Environmental activists were not asking the federal court to choose which agencies and sectors should reduce greenhouse gas emissions, and by how much, and thus, action for declaratory and injunctive relief against President and executive branch agencies, asserting substantive due process claim alleging that greenhouse gas

emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system, did not suffer from lack of judicially discoverable and manageable standards or from impossibility of making a decision without an initial policy determination of a kind clearly for nonjudicial discretion, as would provide basis for nonjusticiability under political question doctrine; activists were asking federal court to direct the agencies to conduct a consumption-based inventory of carbon dioxide emissions and use that inventory to prepare and implement an enforceable national remedial plan. U.S. Const. Amend. 5.

**13. Declaratory Judgment ⬅203**

Environmental activists' action concerning climate change, by asserting a constitutional claim against President and executive branch agencies for violation of substantive due process, rather than asserting violations of precise statutes or regulations, did not present a claim for which judicially discoverable and manageable standards for resolution were lacking, as would provide basis for nonjusticiability under political question doctrine, in action for declaratory and injunctive relief, alleging that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; every day, federal courts applied legal standards governing due process claims to new sets of facts. U.S. Const. Amend. 5.

**14. Declaratory Judgment ⬅319**

While environmental activists did not cite particular statutory or regulatory provisions, the allegations in their complaint were specific enough to put President and executive branch agencies on notice of their claims, as required under general pleading standards, in action for declaratory and injunctive relief, alleging that greenhouse gas emissions from carbon di-

oxide, produced by burning fossil fuels, were destabilizing the climate system; activists' theory was that defendants' aggregate actions violated their substantive due process rights and government's public trust obligations. U.S. Const. Amend. 5; Fed. R. Civ. P. 8, 12.

**15. Declaratory Judgment ⟲203**

Even if executive and legislative branches had taken numerous steps to address climate change, judicial resolution of environmental activists' action concerning climate change, asserting a constitutional claim against President and executive branch agencies for violation of substantive due process, would not express a lack of respect for another branch of government, as would provide basis for nonjusticiability under political question doctrine, in action for declaratory and injunctive relief, alleging that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system. U.S. Const. Amend. 5.

**16. Federal Courts ⟲2073**

Federal courts have an independent obligation to assure themselves of the existence of subject matter jurisdiction.

**17. Declaratory Judgment ⟲203**

A nonjusticiable political question was not raised in action concerning climate change, brought by environmental activists who were too young to vote, alleging a substantive due process violation and seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system. U.S. Const. Amend. 5.

**18. Constitutional Law ⟲2450**

Despite constitutional separation of powers, federal courts retain broad authority to fashion practical remedies when confronted with complex and intractable constitutional violations.

**19. Declaratory Judgment ⟲328**

Speculation about the difficulty of crafting a remedy without violating constitutional separation of powers did not support early-stage dismissal on a motion asserting lack of subject matter jurisdiction, based on political question doctrine, in environmental activists' action concerning climate change, alleging a substantive due process violation and seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system. U.S. Const. Amend. 5; Fed. R. Civ. P. 12(b)(1).

**20. Federal Civil Procedure ⟲103.2**

A threshold question in every federal case is whether at least one plaintiff has standing.

**21. Federal Civil Procedure ⟲103.2**

Standing requires a plaintiff to allege such a personal stake in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers.

**22. Federal Civil Procedure ⟲103.2, 103.3**

To demonstrate Article III standing, a plaintiff must show: (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. U.S. Const. art. 3, § 2, cl. 1.

**23. Federal Civil Procedure ⟲103.2**

A plaintiff must support each element of the test for Article III standing with the

**1228**        **217 FEDERAL SUPPLEMENT, 3d SERIES**

manner and degree of evidence required at the successive stages of the litigation. U.S. Const. art. 3, § 2, cl. 1.

**24. Federal Civil Procedure ⟷103.5, 1829**

At the motion to dismiss stage, general allegations suffice to establish Article III standing, because those allegations are presumed to embrace those specific facts that are necessary to support the claim. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**25. Environmental Law ⟷651**

In an environmental case, a plaintiff cannot demonstrate injury in fact, as element for Article III standing, merely by alleging injury to the environment; there must be an allegation that the challenged conduct is harming or imminently will harm the plaintiff. U.S. Const. art. 3, § 2, cl. 1.

**26. Environmental Law ⟷656**

Environmental activists who were too young to vote sufficiently alleged injury in fact, as element for Article III standing, in action alleging a substantive due process violation and seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; activists alleged harm to their personal, economic, and aesthetic interests that were concrete and particularized, not abstract or indefinite, and that harms to youths and future generations were greater. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 5.

**27. Federal Civil Procedure ⟷103.2, 103.4**

Federal courts lack jurisdiction to hear a case, because the injury in fact element for Article III standing is not satisfied, where the harm at issue is not only widely shared, but is also of an ab-

stract and indefinite nature, for example, harm to the common concern for obedience to the law. U.S. Const. art. 3, § 2, cl. 1.

**28. Federal Civil Procedure ⟷103.4**

The fact that a harm is widely shared, alone, does not necessarily render it a generalized grievance that is insufficient to satisfy the injury-in-fact element for Article III standing. U.S. Const. art. 3, § 2, cl. 1.

**29. Federal Civil Procedure ⟷103.2**

Even if the experience at the root of the complaint is shared by virtually every American, the inquiry regarding the injury-in-fact element for Article III standing remains whether that shared experience caused an injury that is concrete and particular to the plaintiff. U.S. Const. art. 3, § 2, cl. 1.

**30. Federal Civil Procedure ⟷103.2**

Plaintiffs must demonstrate Article III standing for each claim they seek to press and for each form of relief sought. U.S. Const. art. 3, § 2, cl. 1.

**31. Injunction ⟷1044**

Plaintiffs seeking injunctive relief must show their injuries are ongoing or likely to recur.

**32. Declaratory Judgment ⟷300**
  **Environmental Law ⟷656**

Environmental activists sufficiently alleged the imminence of their injuries, for purposes of injury-in-fact element for Article III standing, in action alleging a substantive due process violation and seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; complaint alleged that present level of carbon dioxide and its warming, both realized and latent, were

already in zone of danger, and that early consequences of carbon overshoot were already threatening and would, in the short term, rise to an unbearable level unless immediate action was taken by defendants. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 5.

**33. Federal Civil Procedure ⬅103.3**

Although a defendant's action need not be the sole source of injury, to support the causation element for Article III standing, the line of causation between the defendant's action and the plaintiff's harm must be more than attenuated. U.S. Const. art. 3, § 2, cl. 1.

**34. Federal Civil Procedure ⬅103.3**

A causal chain does not fail, for purposes of Article III standing, simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible. U.S. Const. art. 3, § 2, cl. 1.

**35. Environmental Law ⬅656**

Environmental activists satisfied causation element for Article III standing, in action alleging a substantive due process violation and seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; the emissions at issue, produced in the United States, allegedly made up one-fourth of global emissions, and activists' theory of causation involved both defendants' affirmative acts and their failure to act. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 5.

**36. Federal Civil Procedure ⬅103.3**

A plaintiff need not show a favorable decision is certain to redress his injury, in order to establish Article III standing, but must show a substantial likelihood it will do so. U.S. Const. art. 3, § 2, cl. 1.

**37. Federal Civil Procedure ⬅103.3**

It is sufficient, for the redressability element for Article III standing, to show that the requested remedy would slow or reduce the harm. U.S. Const. art. 3, § 2, cl. 1.

**38. Environmental Law ⬅656**

Environmental activists satisfied redressability element for Article III standing, in action alleging a substantive due process violation and seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; activists alleged that defendants controlled over one-fourth of planet's greenhouse gas emissions, and they were asking the court to order defendants to prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric carbon dioxide. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 5.

**39. Federal Civil Procedure ⬅103.3**

The possibility that some other individual or entity might later cause the same injury does not defeat the redressability element for Article III standing; the question is whether the injury caused by the defendant can be redressed. U.S. Const. art. 3, § 2, cl. 1.

**40. Federal Civil Procedure ⬅103.2**

Once a federal court concludes one plaintiff has Article III standing, it need not determine whether the remaining plaintiffs have standing. U.S. Const. art. 3, § 2, cl. 1.

**41. Constitutional Law ⬅3877, 3901**

When a plaintiff challenges affirmative government action under the Due Process Clause, the threshold inquiry is the applicable level of judicial scrutiny, and the

default level of scrutiny is rational basis, which requires a reviewing court to uphold the challenged governmental action so long as it implements a rational means of achieving a legitimate governmental end. U.S. Const. Amend. 5.

**42. Constitutional Law ⚖3901**

When the government infringes a fundamental right, a reviewing court applies strict scrutiny for a due process violation. U.S. Const. Amend. 5.

**43. Constitutional Law ⚖3901**

Substantive due process forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. U.S. Const. Amend. 5.

**44. Constitutional Law ⚖3894**

Fundamental liberty rights, protected by the substantive component of the Due Process Clause, include both rights enumerated elsewhere in the Constitution and rights and liberties which are either: (1) deeply rooted in the Nation's history and tradition, or (2) fundamental to the scheme of ordered liberty. U.S. Const. Amend. 5.

**45. Constitutional Law ⚖3894**

Federal courts must exercise the utmost care whenever they are asked to break new ground in the field of substantive due process, lest the liberty protected by the Due Process Clause be subtly transformed into judicial policy preferences. U.S. Const. Amend. 5.

**46. Constitutional Law ⚖3894**

The identification and protection of fundamental rights protected by the substantive component of the Due Process Clause is an enduring part of the judicial duty to interpret the Constitution, which has not been reduced to any formula. U.S. Const. Amend. 5.

**47. Constitutional Law ⚖3894**

In determining whether a right is fundamental, for purposes of substantive due process, courts must exercise reasoned judgment, keeping in mind that history and tradition guide and discipline this inquiry but do not set its outer boundaries. U.S. Const. Amend. 5.

**48. Constitutional Law ⚖4320**

   **Environmental Law ⚖700**

The right to a climate system capable of sustaining human life was fundamental to a free and ordered society, and thus, strict scrutiny for a violation of substantive due process was applicable, in environmental activists' action seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; a stable climate system was quite literally the foundation of society, without which there would be neither civilization nor progress. U.S. Const. Amend. 5.

**49. Constitutional Law ⚖4048**

With limited exceptions, the Due Process Clause does not impose on the government an affirmative obligation to act, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. U.S. Const. Amend. 5.

**50. Constitutional Law ⚖4049, 4050**

There are two exceptions to the general rule that the Due Process Clause does not impose on the government an affirmative obligation to act: (1) the special relationship exception, and (2) the danger creation exception. U.S. Const. Amend. 5.

**51. Constitutional Law ⚖4049**

The special relationship exception, to the general rule that the Due Process

Clause does not impose on the government an affirmative obligation to act, provides that when the government takes an individual into custody against his or her will, it assumes some responsibility to ensure that individual's safety. U.S. Const. Amend. 5.

**52. Constitutional Law** ⟷**4050**

The danger creation exception, to the general rule that the Due Process Clause does not impose on the government an affirmative obligation to act, permits a substantive due process claim when government conduct places a person in peril in deliberate indifference to their safety. U.S. Const. Amend. 5.

**53. Constitutional Law** ⟷**4050**

A plaintiff challenging government inaction on a danger creation theory of a violation of substantive due process must show the government actor created or exposed the plaintiff to a danger which he or she would not have otherwise faced; the government action must place the plaintiff in a worse position than that in which he or she would have been had the government not acted at all. U.S. Const. Amend. 5.

**54. Constitutional Law** ⟷**4050**

When challenging government inaction on a danger creation theory of a violation of substantive due process, the plaintiff must show the government actor recognized the unreasonable risks to the plaintiff and actually intended to expose the plaintiff to such risks without regard to the consequences to the plaintiff; the government actor must have acted with deliberate indifference, which requires a culpable mental state more than gross negligence. U.S. Const. Amend. 5.

**55. Constitutional Law** ⟷**4320**
   **Environmental Law** ⟷**700**

Environmental activists stated a claim for a substantive due process violation based on a danger creation theory, in action seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system; activists alleged that defendants knowingly, with full appreciation of the consequences, caused, and continued to cause, dangerous interference with the atmosphere and climate system by permitting, authorizing, and subsidizing fossil fuel extraction, production, transportation, and utilization. U.S. Const. Amend. 5.

**56. Public Lands** ⟷**7**

In its broadest sense, the term "public trust," in context of public trust doctrine, refers to the fundamental understanding that the federal government cannot legitimately abdicate its core sovereign powers.

   See publication Words and Phrases
   for other judicial constructions and
   definitions.

**57. Public Lands** ⟷**7**

The public trust doctrine rests on the fundamental principle that every succeeding legislature possesses the same jurisdiction and power with respect to the public interest as its predecessors.

**58. Public Lands** ⟷**7**

The public trust doctrine conceives of certain powers and obligations, such as the police power, as inherent aspects of sovereignty, and recognizes that permitting the government to permanently give one of these powers to another entity diminishes the power of future legislatures to promote the general welfare.

**59. Public Lands** ⟷**7**

With respect to essential natural resources, the sovereign's public trust obligations prevent it from depriving a future legislature of the natural resources necessary to provide for the well-being and survival of its citizens.

**1232**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

**60. Public Lands** ⇔7

The public trust doctrine, with respect to natural resources, operates according to basic trust principles, which impose upon the trustee a fiduciary duty to protect the trust property against damage or destruction, and the trustee owes this duty equally to both current and future beneficiaries of the trust.

**61. Public Lands** ⇔7

The public trust doctrine is generally thought to impose three types of restrictions on governmental authority: (1) the property subject to the trust must not only be used for a public purpose, but it must be held available for use by the general public; (2) the property may not be sold, even for a fair cash equivalent; and (3) the property must be maintained for particular types of uses.

**62. Declaratory Judgment** ⇔203
    **Water Law** ⇔2651

Allegation of environmental activists, that the federal government was failing to protect the territorial sea, involved a public trust asset, for purposes of stating a claim for violation of public trust doctrine, in action seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system. 43 U.S.C.A. § 1312.

**63. Water Law** ⇔2660

The public trust doctrine applies to lands beneath tidal waters.

**64. Declaratory Judgment** ⇔203
    **Water Law** ⇔2651

Environmental activists, by alleging injuries relating to effects of ocean acidification and rising ocean temperatures, adequately alleged harm to public trust assets, for purposes of stating a claim for violation of public trust doctrine, in action seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system.

**65. Public Lands** ⇔7

The public trust doctrine can apply to the federal government.

**66. Constitutional Law** ⇔4320
    **Environmental Law** ⇔700

Environmental activists' right of action, to enforce the federal government's obligations as trustee under the public trust doctrine, arose from the Due Process Clause's substantive component, in action seeking declaratory and injunctive relief against President and executive branch agencies, based on allegations that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing the climate system. U.S. Const. Amend. 5.

**67. Federal Civil Procedure** ⇔103.2,
    103.4

Even when a case falls within the constitutional boundaries for Article III standing, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated, and to limit access to the federal courts to those litigants best suited to assert a particular claim. U.S. Const. art. 3, § 2, cl. 1.

**68. Constitutional Law** ⇔3896

Substantive due process rights are limited by careful respect for the teachings of history and recognition of the basic values that underlie society, and therefore, only official conduct that shocks the conscience is cognizable as a due process violation. U.S. Const. Amend. 5.

JULIANA v. U.S.    **1233**
Cite as 217 F.Supp.3d 1224 (D.Or. 2016)

Julia A. Olson, Wild Earth Advocates, Daniel M. Galpern, Law Offices of Daniel M. Galpern, Eugene, OR, Philip L. Gregory, Cotchett, Pitre & McCarthy, LLP, Burlingame, CA, for Plaintiffs.

Sean C. Duffy, U.S. Department of Justice, Washington, DC, for Defendants.

OPINION AND ORDER

Aiken, Judge:[1]

Plaintiffs in this civil rights action are a group of young people between the ages of eight and nineteen ("youth plaintiffs"); Earth Guardians, an association of young environmental activists; and Dr. James Hansen, acting as guardian for future generations.[2] Plaintiffs filed this action against defendants the United States, President Barack Obama, and numerous executive agencies. Plaintiffs allege defendants have known for more than fifty years that the carbon dioxide ("$CO_2$") produced by burning fossil fuels was destabilizing the climate system in a way that would "significantly endanger plaintiffs, with the damage persisting for millenia." First. Am. Compl. ¶ 1. Despite that knowledge, plaintiffs assert defendants, "[b]y their exercise of sovereign authority over our country's atmosphere and fossil fuel resources, . . . permitted, encouraged, and otherwise enabled continued exploitation, production, and combustion of fossil fuels, . . . deliberately allow[ing] atmospheric $CO_2$ concentrations to escalate to levels unprecedented in human history[.]" *Id.* ¶ 5. Although many different entities contribute to greenhouse gas emissions, plaintiffs aver defendants bear "a higher degree of responsibility than any other individual, entity, or country" for exposing plaintiffs to the dangers of climate change. *Id.* ¶ 7. Plaintiffs argue defendants' actions violate their substantive due process rights to life, liberty, and property, and that defendants have violated their obligation to hold certain natural resources in trust for the people and for future generations.

Plaintiffs assert there is a very short window in which defendants could act to phase out fossil fuel exploitation and avert environmental catastrophe. They seek (1) a declaration their constitutional and public trust rights have been violated and (2) an order enjoining defendants from violating those rights and directing defendants to develop a plan to reduce $CO_2$ emissions.

Defendants moved to dismiss this action for lack of subject matter jurisdiction and failure to state a claim. Doc. 27. Intervenors the National Association of Manufacturers, the American Fuel & Petrochemical Manufacturers, and the American Petroleum Institute moved to dismiss on the same grounds. Doc. 19. After oral argument, Magistrate Judge Coffin issued his Findings and Recommendation ("F & R") and recommended denying the motions to dismiss. Doc. 68. Judge Coffin then referred the matter to me for review pursuant to 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. Doc. 69. Defendants and interve-

---

**1.** Student externs worked on each stage of the preparation of this opinion, from initial background research to final copyedits. I would be remiss if I did not acknowledge the invaluable contributions of Daniel Bodden (University of Kentucky), Elizabeth Jacklin (University of Oregon School of Law), Ann Richan Metier (Willamette University College of Law), James Mullins (University of Washington School of Law), Jessy R. Nations (University of Washington School of Law), Lydeah Negro (Lewis

& Clark Law School), and Eleanor J. Vincent (University of Oregon School of Law.)

**2.** Although plaintiffs in this lawsuit hale from a number of different states, venue is proper in the District of Oregon. The majority of youth plaintiffs, including lead plaintiff Kelsey Juliana, reside in the District of Oregon. First Am. Compl. ¶¶ 16, 23, 31, 35, 44, 47, 50, 53, 57, 60. In addition, plaintiff Earth Guardians has a chapter in Eugene, Oregon.

**1234**                    **217 FEDERAL SUPPLEMENT, 3d SERIES**

nors filed objections (docs. 73 & 74), and on September 13, 2016, this Court heard oral argument.

For the reasons set forth below, I adopt Judge Coffin's F & R as elaborated in this opinion and deny the motions to dismiss.

## BACKGROUND

This is no ordinary lawsuit. Plaintiffs challenge the policies, acts, and omissions of the President of the United States, the Council on Environmental Quality, the Office of Management and Budget, the Office of Science and Technology Policy, the Department of Energy, the Department of the Interior, the Department of Transportation ("DOT"), the Department of Agriculture, the Department of Commerce, the Department of Defense, the Department of State, and the Environmental Protection Agency ("EPA"). This lawsuit challenges decisions defendants have made across a vast set of topics—decisions like whether and to what extent to regulate $CO_2$ emissions from power plants and vehicles, whether to permit fossil fuel extraction and development to take place on federal lands, how much to charge for use of those lands, whether to give tax breaks to the fossil fuel industry, whether to subsidize or directly fund that industry, whether to fund the construction of fossil fuel infrastructure such as natural gas pipelines at home and abroad, whether to permit the export and import of fossil fuels from and to the United States, and whether to au-

thorize new marine coal terminal projects. Plaintiffs assert defendants' decisions on these topics have substantially caused the planet to warm and the oceans to rise. They draw a direct causal line between defendants' policy choices and floods, food shortages, destruction of property, species extinction, and a host of other harms.

This lawsuit is not about proving that climate change is happening or that human activity is driving it. For the purposes of this motion, those facts are undisputed.[3] The questions before the Court are whether defendants are responsible for some of the harm caused by climate change, whether plaintiffs may challenge defendants' climate change policy in court, and whether this Court can direct defendants to change their policy without running afoul of the separation of powers doctrine.

## STANDARDS

The Magistrates Act authorizes a district court to "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When a party objects to any portion of the magistrate's findings and recommendation, the district court must review *de novo* that portion of the magistrate judge's report. Fed. R. Civ. P. 72(b)(3); *see also McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981) (for dispositive motions, "the statute

---

**3.** For the purposes of this motion, I proceed on the understanding that climate change exists, is caused by humans, and poses a serious threat to our planet. Defendants open their Objections to Judge Coffin's F & R by stating that "[c]limate change poses a monumental threat to Americans' health and welfare by driving long-lasting changes in our climate, leading to an array of severe negative effects, which will worsen over time," Fed. Defs.' Obj. to F & R 1 (doc. 78). In the 2015 State of the Union address, defendant President Barack Obama declared "[n]o chal-

lenge ... poses a greater threat to future generations than climate change," President Barack Obama, Remarks in State of the Union Address (Jan. 20, 2015), *available at* www.whitehouse.gov/the-press-office/2015/01/20/remarks-president-state-union-address-january-20–2015 (last visited Nov. 7, 2016). When asked at oral argument if they agreed that human-caused climate change poses a serious threat, intervenors declined to take a clear position. All parties agree, however, that a dispute over the existence of climate change is not at the heart of this case.

grants the broadest possible discretion to the reviewing district court").

**[1, 2]**   Under Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if subject matter jurisdiction is lacking. A motion to dismiss under Rule 12(b)(1) may attack either the allegations of the complaint or the "existence of subject matter in fact." *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). The party seeking to invoke the district court's jurisdiction bears the burden of establishing subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint is construed in favor of the plaintiff, and its factual allegations are taken as true. *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010), However, the court need not accept as true "conclusory" allegations or unreasonable inferences. *Id.* Thus, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**DISCUSSION**

Judge Coffin recommended denying defendants' and intervenors' motions to dismiss and holding that plaintiffs' public trust and due process claims may proceed. Defendants and intervenors object to those recommendations on a number of grounds. They contend plaintiffs' claims must be dismissed for lack of jurisdiction because the case presents non-justiciable political questions, plaintiffs lack standing to sue, and federal public trust claims cannot be asserted against the federal government. They further argue plaintiffs have failed to state a claim on which relief can be granted. I first address the threshold challenges to jurisdiction, and then proceed to address the viability of plaintiffs' due process and public trust claims.

*I. Political Question*

**[3, 4]**   If a case presents a political question, federal courts lack subject matter jurisdiction to decide that question. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007). The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). This limitation on the federal courts was recognized in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803), in which Chief Justice Marshall wrote, "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." However, the scope of the political question doctrine should not be overstated. As Alexis de Tocqueviile observed, "[t]here is hardly any political question in the United States that sooner or later does not turn into a judicial question." 1 Alexis de Tocqueville, Democracy in America 440 (Liberty Fund 2012).

**[5]**   In *Baker*, the Supreme Court identified six criteria, each of which could indi-

**1236**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

vidually signal the presence of a political question:

> [ (1) A] textually demonstrable constitutional commitment of the issue to a coordinate political department; [ (2) ] a lack of judicially discoverable and manageable standards for resolving it; [ (3) ] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [ (4) ] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [ (5) ] an unusual need for unquestioning adherence to a political decision already made; or [ (6) ] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691. The *Baker* tests "are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality op.). The factors overlap, with the analyses "often collapsing into one another." *Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005). The "common underlying inquiry" is whether "the question is one that can properly be decided by the judiciary." *Id.*

**[6–8]** Determining whether the political question doctrine requires abstention calls on a court to balance profoundly important interests. On the one hand, the separation of powers is fundamental to our system of government, known "[e]ven before the birth of this country" to be "a defense against tyranny." *Loving v. United States*, 517 U.S. 748, 756, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). It is a "basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 757, 116 S.Ct. 1737. On the other hand, "[t]he decision to deny access to judicial relief" should never be made "lightly," because federal courts "have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them." *Alperin*, 410 F.3d at 539 (quoting *Liu v. Rep. of China*, 892 F.2d 1419, 1433 (9th Cir. 1989) and *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 409, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990)). Accordingly, a court cannot simply err on the side of declining to exercise jurisdiction when it fears a political question may exist; it must instead diligently map the precise limits of jurisdiction.

**[9]** Climate change, energy policy, and environmental regulation are certainly "political" in the sense that they have "motivated partisan and sectional debate during important portions of our history." *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992). But a case does not present a political question merely because it "raises an issue of great importance to the political branches." *Id.* Instead, dismissal on political question grounds is appropriate only if one of the *Baker* considerations is "inextricable" from the case. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. As a result, federal courts regularly adjudicate claims that arise in connection with politically charged issues. *See, e.g., Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (electronic surveillance); *Chiles v. Thornburgh*, 865 F.2d 1197, 1216 (11th Cir. 1989) (detention of undocumented immigrants); *Planned Parenthood Fed'n of Am, Inc. v. Agency for Int'l Dev.*, 838 F.2d 649, 656 (2d Cir. 1988) (international funding for birth control and abortion). In each of the above cases, the court engaged in "discriminating inquiry into the precise facts" before concluding the controversy was justiciable. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. A similar rigorous analysis is necessary here.

14a

JULIANA v. U.S.                    1237
Cite as 217 F.Supp.3d 1224 (D.Or. 2016)

A. *First* Baker *Factor*

The first *Baker* factor requires abstention "[w]hen a case would require a court to decide an issue whose resolution is textually committed to a coordinate political department" because "the court lacks authority to resolve that issue." *Zivotofsky ex rel Zivotofsky v. Clinton*, 566 U.S. 189, 132 S.Ct. 1421, 1431, 182 L.Ed.2d 423 (2012) (Sotomayor, J., concurring). Since *Baker*, the Supreme Court has found such "textual commitment" in very few cases. In *Nixon v. United States*, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993), a former federal judge sought to challenge the Senate's processes for taking evidence during impeachment trials. *Id.* at 226, 113 S.Ct. 732. The Court found his claim nonjusticiable due to the Constitution's clear statement granting the Senate "the sole Power to try ail Impeachments." *Id.* at 229, 113 S.Ct. 732 (quoting U.S. Const, art. I, § 3, cl. 6). The Court found the provision's use of the word "sole" to be "of considerable significance." *Id.* at 231, 113 S.Ct. 732. The Court also discussed the history of the clause at issue, noting that the "Framers labored over the question of where the impeachment power should lie" and "at least two considered"—and rejected—placing that power within the federal judiciary. *Id.* at 233, 113 S.Ct. 732.

In *Davis v. Passman*, 442 U.S. 228, 235 n.11, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Court characterized the Speech or Debate Clause as the "paradigm example" of a "textually demonstrable constitutional commitment." That clause provides that Senators and Representatives, "for any Speech or Debate in either House, . . . shall not be questioned in any other place." U.S. Const. Art. I, § 6, cl. 1. The Court explained that the clause plainly shields statements of federal legislators made during speech or debate in committees or on the House or Senate floor from *any* sort of judicial review, and thus speaks "directly to . . . separation-of-powers concerns." *Davis*, 442 U.S. at 235 n.11, 99 S.Ct. 2264.

Most recently, in *Zivotofsky ex rel. Zivotofsky v. Kerry*, the Court held that the Constitution gives the president the exclusive authority to recognize foreign nations and governments. —— U.S. ——, 135 S.Ct. at 2086, 192 L.Ed.2d 83. The Court acknowledged that the Constitution does not use the term "recognition." *Id.* at 2084. Nonetheless, the Court determined that the Constitution granted the recognition power to the Executive Branch "[a]s a matter of constitutional structure." *Id.* at 2085. The Court concluded that the clauses giving the president exclusive authority to receive ambassadors and to negotiate treaties implicitly granted the recognition power. *Id.* at 2086. That determination rested in part on the Court's conclusion that recognition was uniquely "a topic on which the Nation much speak with one voice." *Id.* at 2086 (quotation marks and ellipsis omitted). If Congress had the power to decline to recognize a foreign state the Executive had decided to recognize, the president would be unable to assure that foreign state that its ambassadors would be received, its officials would be immune from suit in federal court, and it would be permitted to initiate lawsuits in the United States to vindicate its rights. *Id.* In issuing its decision, the Court expressly declined to hold that the Constitution gives the president the "unbounded power" to "conduct diplomatic relations" and exercise "the bulk of foreign-affairs powers." *Id.* at 2089.

[10] Unlike in the constitutional provisions at issue *Nixon* and *Passman*, the constitutional provisions cited here contain nothing approaching a clear reference to the subject matter of this case. The Constitution does not mention environmental policy, atmospheric emissions, or global warming. And unlike in *Zivotofksy*, climate

change policy is not a fundamental power on which any other power allocated exclusively to other branches of government rests. Intervenors correctly point out that the Constitution gives the political branches authority over commerce, foreign relations, national defense, and federal lands—all areas affected by climate change policy. *See* U.S. Const. art. I, § 8 cl. 3 (Congress has authority to "regulate commerce with foreign nations, and among the several states"); *Zivotofsky*, 135 S.Ct. at 2084–86 (discussing various constitutional provisions granting the Executive Branch foreign relations authority); U.S. Const. art. I, § 8 cl. 11–16 (detailing Congress's powers relating to war and the military); U.S. Const, art. II, § 2, cl. 1 (President is commander in chief of armed forces); U.S. Const. art. IV, § 3, cl. 2 (Congress has power to "dispose of and make all needful rules and regulations" regarding federal land). But holding the first *Baker* factor applies in any case relating to these topic areas would permit the exception to swallow the rule. The question is not whether a case *implicates* issues that appear in the portions of the Constitution allocating power to the Legislative and Executive Branches—such a test would, by definition, shield nearly all legislative and executive action from legal challenge, Rather, the question is whether adjudicating a claim would require the Judicial Branch to second-guess decisions committed exclusively to another branch of government.

In the lower courts, the first *Baker* factor has found its broadest application in foreign policy cases. *See, e.g., Corrie*, 503 F.3d at 983 ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."); *Gonzalez–Vera v. Kissinger*, 449 F.3d 1260, 1263 (D.C. Cir. 2006) (decision to take "drastic measures" to keep Chilean dictator Augusto Pinochet in power was a foreign policy decision textually committed to the Execu-

tive Branch); *Sadowski v. Bush*, 293 F.Supp.2d 15, 21 (D.C. Cir. 2003) (decision to go to war in Afghanistan was not justiciable, "primarily because war powers have been explicitly committed to the political branches"), As a result, I give special consideration to the argument that granting plaintiffs' requested relief would usurp the Executive Branch's foreign relations authority. Climate change policy has global implications and so is sometimes the subject of international agreements. But unlike the decisions to go to war, take action to keep a particular foreign leader in power, or give aid to another country, climate change policy is not *inherently*, or even primarily, a foreign policy decision. Moreover, in the foreign policy context, *Baker* expressly warned against framing the "textually committed" inquiry too broadly. *See Baker*, 369 U.S. at 211, 82 S.Ct. 691 ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.") The first *Baker* factor does not apply.

### B. *Second and Third* Baker *Factors*

"The second and third *Baker* factors reflect circumstances in which a dispute calls for decisionmaking beyond courts' competence." *Zivotofsky*, 132 S.Ct. at 1432 (Sotomayor, J., concurring). "When a court is given no standard by which to adjudicate a dispute, or cannot resolve a dispute in the absence of a yet-unmade policy determination charged to a political branch, resolution of the suit is beyond the judicial role envisioned by Article III." *Id.*

**[11]** Defendants' and intervenors' arguments on the second and third *Baker* factors can be divided into two main points. First, intervenors contend the Court cannot set a permissible emissions level without making *ad hoc* policy determinations about how to weigh competing economic and environmental concerns. But

plaintiffs do not ask this Court to pinpoint the "best" emissions level; they ask this Court to determine what emissions level would be sufficient to redress their injuries. That question can be answered without any consideration of competing interests. *Cf. Coleman v. Schwarzenegger*, 2010 WL 99000, *1 (E.D. Cal. & N.D. Cal. Jan. 12, 2010) (requiring state to reduce the population of adult prisons to 137.5% of their total design capacity, a target which "extend[ed] no further than necessary to correct the violation of California inmates' federal constitutional rights"). The science may well be complex, but logistical difficulties are immaterial to the political question analysis. *See Alperin*, 410 F.3d at 552, 555 ("[T]he crux of th[e political question] inquiry is . . . not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint," but rather whether "a legal framework exists by which courts can evaluate . . . claims in a reasoned manner.").

[12] Second, intervenors aver the Court would have to choose which agencies and sectors should reduce emissions, and by how much. At oral argument, intervenors contended this would require review of every environmental rule and regulation in the last one hundred years. These arguments mischaracterize the relief plaintiffs seek. Plaintiffs do not seek to have this Court direct any individual agency to issue or enforce any particular regulation. Rather, they ask the Court to declare the United States' current environmental policy infringes their fundamental rights, direct the agencies to conduct a consumption-based inventory of United States $CO_2$ emissions, and use that inventory to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ so as to stabilize the climate system and protect the vital resources on which Plaintiffs now and in the future will depend." First

Am. Compl. at 94. This Court could issue the requested declaration without directing any individual agency to take any particular action.

[13] Finally, defendants and intervenors contend that plaintiffs' failure to identify violations of precise statutory or regulatory provisions leaves this court without any legal standard by which to judge plaintiffs' claims, Plaintiffs could have brought a lawsuit predicated on technical regulatory violations, but they chose a different path. As masters of their complaint, they have elected to assert constitutional rather than statutory claims. Every day, federal courts apply the legal standards governing due process claims to new sets of facts. The facts in this case, though novel, are amenable to those well-established standards. Neither the second nor the third *Baker* factor divests this Court of jurisdiction.

[14] In the political question section of their objections to Judge Coffin's F & R, defendants assert the allegations in the complaint are not specific enough to put them on notice of plaintiffs' claims. This argument relates to the second and third *Baker* factors and the competence of this Court to adjudicate those claims, considerations which are addressed above. The argument also touches on concerns about causation and redressability, which are discussed in Section II of this opinion. However, the argument is also phrased in terms common to cases governing general pleading standards. *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (complaint in federal court must contain enough information to "give the defendant fair notice" of both the claim and the "grounds upon which it rests" (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). To the extent defendants challenge the First Amended Complaint as inadequately pleaded, that challenge fails. This is not a

**1240**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

typical environmental case, Plaintiffs are not arguing defendants issued any particular permit in violation of a statutory provision in the Clean Air Act or the Clean Water Act. They are not arguing any specific tax break, royalty rate, or contract runs afoul of an agency's governing regulations. Rather, the theory of plaintiffs' case is much broader: it is that defendants' *aggregate actions* violate their substantive due process rights and the government's public trust obligations. That theory, which requires no citation to particular statutory or regulatory provisions, is clear from the face of the First Amended Complaint.

### C. *Fourth through Sixth* Baker *Factors*

The fourth through sixth *Baker* factors "address circumstances in which prudence may counsel against a court's resolution of an issue presented." *Zivotofsky*, 132 S.Ct. at 1432 (Sotomayor, J., concurring). Only in "rare" cases will *Baker*'s "final factors alone render a case nonjusticiable." *Id.* at 1434.

[15] Intervenors contend the fourth *Baker* factor, which concerns a court expressing lack of respect to another branch of government, applies in this case. They argue that because the Executive and Legislative branches have taken numerous steps to address climate change, a ruling in plaintiffs' favor would be disrespectful to those efforts. Intervenors would have this Court hold the political question doctrine prevents a court from determining whether the federal government has violated a plaintiff's constitutional rights so long as the government has taken some steps to mitigate the damage. However, intervenors cite no cases—and this Court is aware of none—to support such a broad application of the fourth *Baker* factor. Rather, courts have found the fourth factor applies in cases asking a court to "question the good faith with which another branch attests to the authenticity of its

internal acts." *Id.* at 1433. The fourth factor has also been held relevant when "judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).

Consistent with those formulations, federal appellate courts have found the fourth *Baker* factor present when judicial adjudication of a claim would be wholly incompatible with foreign-relations decisions made by one of the political branches. *See, e.g., Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 59 (2d Cir. 2005) (political question doctrine prevented court from adjudicating claims against Austrian government for seizure of property from Jewish families during World War II because two presidential administrations had "committed the United States to a policy of resolving Holocaust-era restitution claims through international agreements rather than litigation."); *Schneider v. Kissinger*, 412 F.3d 190, 198 (D.C. Cir. 2005) (political question doctrine barred review of Executive Branch decision to participate in covert operations in Chile, a decision that had already been the subject of congressional inquiry).

Although the United States has made international commitments regarding climate change, granting the relief requested here would be fully consistent with those commitments. There is no contradiction between promising other nations the United States will reduce $CO_2$ emissions and a judicial order directing the United States to go beyond its international commitments to *more aggressively* reduce $CO_2$ emissions. Because this Court could grant plaintiffs' requested relief without expressing disrespect for the Executive Branch's

international climate change agreements, the fourth *Baker* factor does not apply.

**[16]** Neither intervenors nor defendants suggest the fifth or sixth *Baker* factors apply here. Nonetheless, I address those factors because federal courts have an "independent obligation to assure [them]selves of" the existence of subject matter jurisdiction. *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 769 n.5 (9th Cir. 2008). On the face of the complaint, I see no evidence of an "unusual need for unquestioning adherence to a political decision already made" or any "potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217, 82 S.Ct. 691. I conclude neither of the two final *Baker* factors deprives this Court of subject matter jurisdiction.

D. *Summary: This Case Does Not Raise a Nonjusticiable Political Question*

**[17]** There is no need to step outside the core role of the judiciary to decide this case. At its heart, this lawsuit asks this Court to determine whether defendants have violated plaintiffs' constitutional rights. That question is squarely within the purview of the judiciary. *See INS v. Chadha*, 462 U.S. 919, 941, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (judiciary is bound to determine whether the political branches have "chosen a constitutionally permissible means of implementing [their] power"); *Jewel*, 673 F.3d at 912 (although lawsuit challenging federal agencies' surveillance practices "strikes at the heart of a major public policy controversy," claims were justiciable because they were "straightforward claims of statutory and constitutional rights, not political questions").

This case shares some key features with *Baker* itself, In *Baker*, a group of voters challenged a statute governing the apportionment of state legislative districts. 369 U.S. at 188–95, 82 S.Ct. 691. Sixty years of population growth without legislative reapportionment had led to some votes carrying much more weight than others. *Id.* at 192–93, 82 S.Ct. 691. Here, the majority of youth plaintiffs are minors who cannot vote and must depend on others to protect their political interests. Thus, as amicus the League of Women Voters persuasively argues, the youth plaintiffs' claims are similar to the *Baker* claims because they are "rooted in a 'debasement of their votes' and an accompanying diminishment of their voice in representational government." Br. for the League of Women Voters in the United States et al. as Amici Curiae at 19–20 (doc. 79–1).[4] In *Baker*, the Court acknowledged that the plaintiffs' claims had political dimensions and ramifications—but nonetheless concluded none of the *Baker* factors was inextricable from the case. 369 U.S. at 209, 82 S.Ct. 691. Similarly, as discussed in detail above, this case raises political issues yet is not barred by the political question doctrine.

**[18, 19]** Should plaintiffs prevail on the merits, this Court would no doubt be compelled to exercise great care to avoid separation-of-powers problems in crafting a remedy. The separation of powers might, for example, permit the Court to direct defendants to ameliorate plaintiffs' injuries but limit its ability to specify precisely how to do so. *Cf. S. Burlington Cnty. N.A.A.C.P. v. Mt. Laurel Twp.*, 67 N.J. 151, 336 A.2d 713, 734 (1975) (leaving to municipality "in the first instance at least" the determination of how to remedy the constitutional problems with a local zoning ordinance). That said, federal courts retain

---

**4.** The motion of the League of Women Voters of the United States and the League of Wom- en Voters of Oregon to appear as amici curiae (doc. 79) is granted.

**1242**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

broad authority "to fashion practical remedies when confronted with complex and intractable constitutional violations." *Brown v. Plata*, 563 U.S. 493, 526, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011). In any event, speculation about the difficulty of crafting a remedy could not support dismissal at this early stage. *See Baker*, 369 U.S. at 198, 82 S.Ct. 691 ("Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at trial.") Because no *Baker* factor is inextricable from the merits of this case, the political question doctrine is not a barrier to plaintiffs' claims.

## II. *Standing to Sue*

[20–24]   "A threshold question in every federal case is . . . whether at least one plaintiff has standing." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citation and quotation marks omitted). Standing requires a plaintiff to allege "such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers[.]" *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To demonstrate standing, a plaintiff must show (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff must support each element of the standing test "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. Accordingly, at the motion to dismiss stage "general allegations" suffice to establish

standing because those allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Id.* (citation and quotation marks omitted).

## A. *Injury in Fact*

[25]   In an environmental case, a plaintiff cannot demonstrate injury in fact merely by alleging injury to the environment; there must be an allegation that the challenged conduct is harming (or imminently will harm) the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). For example, a plaintiff may meet the injury in fact requirement by alleging the challenged activity "impairs his or her economic interests or aesthetic and environmental wellbeing." *Wash. Envt'l Council v. Bellon*, 732 F.3d 1131, 1140 (9th Cir. 2013) (quotation marks omitted and alterations normalized).

[26]   Plaintiffs adequately allege injury in fact. Lead plaintiff Kelsey Juliana alleges algae blooms harm the water she drinks, and low water levels caused by drought kill the wild salmon she eats. First Am. Compl. ¶¶ 17–18. Plaintiff Xiuhtezcatl Roske–Martinez alleges increased wildfires and extreme flooding jeopardize his personal safety. *Id.* ¶ 21. Plaintiff Alexander Loznak alleges record-setting temperatures harm the health of the hazelnut orchard on his family farm, an important source of both revenue and food for him and his family. *Id.* ¶ 26. Plaintiff Jacob Lebel alleges drought conditions required his family to install an irrigation system at their farm. *Id.* ¶ 32. Plaintiff Zealand B. alleges he has been unable to ski during the winter as a result of decreased snowpack. *Id.* ¶ 38. Plaintiff Sahara V. alleges hot, dry conditions caused by forest fires aggravate her asthma. *Id.* ¶ 46.

The most recent allegations of injury appear in the supplemental declaration of plaintiff Jayden F., a thirteen-year-old resident of Rayne, Louisiana. Jayden alleges that at five o'clock the morning of August 13, 2016, her siblings woke her up. Decl. Jayden F. ¶ 5 Sept. 7, 2016 (doc. 78). She stepped out of bed into ankle-deep water. By the end of the day,

Flood waters were pouring into our home through every possible opening. We tried to stop it with towels, blankets, and boards. The water was flowing down the hallway, into my Mom's room and my sisters' room. The water drenched my living room and began to cover our kitchen floor. Our toilets, sinks, and bathtubs began to overflow with awful smelling sewage because our town's sewer system also flooded. Soon the sewage was everywhere. We had a stream of sewage and water running through our house.

*Id.* ¶ 8. With no shelters available and nowhere else to go, the family remained in the flooded house for weeks. *Id.* ¶ 10. The floodwaters eventually receded, but the damage remains: the carpets are soaked with sewage water. *Id.* ¶ 12. The water-logged walls must be torn down to prevent the growth of black mold. *Id.* The entire family sleeps together in the living room because the bedrooms are uninhabitable. *Id.* ¶ 15. Jayden alleges the storm that destroyed her home "ordinarily would happen once every 1,000 years, but is happening now as a result of climate change." *Id.* ¶ 2.

The government contends these injuries are not particular to plaintiffs because they are caused by climate change, which broadly affects the entire planet (and all people on it) in some way. According to the government, this renders plaintiffs' injuries nonjusticiable generalized grievances. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ⸺ U.S. ⸺, 134 S.Ct. 1377, 1387 n.3, 188 L.Ed.2d 392 (2014)

(explaining that generalized grievances do not meet Article III's case or controversy requirement).

[27–29] The government misunderstands the generalized grievance rule. As the Ninth Circuit recently explained, federal courts lack jurisdiction to hear a case when the harm at issue is "not only widely shared, but is also of an abstract and indefinite nature—for example, harm to the common concern for obedience to the law." *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quoting *Fed. Elec. Comm'n v. Akins*, 524 U.S. 11, 23, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998)). Standing alone, "the fact that a harm is widely shared does not necessarily render it a generalized grievance." *Jewel*, 673 F.3d at 909; *see also Massachusetts v. EPA*, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) ("[I]t does not matter how many persons have been injured by the challenged action" so long as "the party bringing suit shows that the action injures him in a concrete and personal way." (quotation marks omitted and alterations normalized)); *Akins*, 524 U.S. at 24, 118 S.Ct. 1777 ("[A]n injury . . . . widely shared . . . does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an 'injury in fact.' "); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 651 (9th Cir. 2004) (Gould, J., concurring) ("[T]he most recent Supreme Court precedent appears to have rejected the notion that injury to all is injury to none for standing purposes."); *Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001) ("So long as the plaintiff . . . has a concrete and particularized injury, it does not matter that legions of other persons have the same injury."). Indeed, even if "the experience at the root of [the] complaint was shared by virtually every American," the inquiry remains whether that

**1244**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

shared experience caused an injury that is concrete and particular *to the plaintiff*. *Jewel*, 673 F.3d at 910. Applying the correct formulation of the generalized grievance rule, plaintiffs' alleged injuries—harm to their personal, economic and aesthetic interests—are concrete and particularized, not abstract or indefinite.

[30–32] That leaves imminence. Plaintiffs must demonstrate standing for each claim they seek to press and for each form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). Because plaintiffs seek injunctive relief, they must show their injuries are "ongoing or likely to recur." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1197 (9th Cir. 2016) (quoting *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)). They have met this requirement. The complaint alleges that "[t]he present level of $CO_2$ and its warming, both realized and latent, are already in the zone of danger." First Am, Compl, ¶ 8. It also alleges that "our country is now in a period of carbon overshoot, with early consequences that are already threatening and that will, in the short term, rise to unbearable unless Defendants take immediate action[.]" *Id.* ¶ 10 (quotation marks omitted). Youth plaintiffs each allege harm that is ongoing and likely to continue in the future. *See, e.g., id.* ¶ 17 (alleging current harm and harm "[i]n the coming decades" from ocean acidification and rising sea levels); *id.* ¶ 45 (alleging damage to freshwater resources now and in the future "if immediate action is not taken" to reduce $CO_2$ emissions). This is sufficient to satisfy the imminence requirement.

By alleging injuries that are concrete, particularized, and actual or imminent, plaintiffs have satisfied the first prong of the standing test.

**B. *Causation***

[33, 34] The second requirement of standing is causation. A plaintiff must show the injury alleged is "fairly traceable" to the challenged action of the defendant and not the result of "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (citation and quotation marks omitted). Although a defendant's action need not be the sole source of injury to support standing, *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011), "[t]he line of causation between the defendant's action and the plaintiff's harm must be more than attenuated," *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012) (citations and quotation marks omitted). However, a "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Id.* (citations, quotation marks, and bracket omitted).

The government contends plaintiffs have not adequately alleged causation, relying on the Ninth Circuit's decision in *Bellon*. In that case, environmental advocacy groups sought to compel the Washington State Department of Ecology and other regional agencies "to regulate greenhouse gas emissions" ("GHGs") from five oil refineries. *Bellon*, 732 F.3d at 1135. The court held plaintiffs lacked standing to sue because the causal link between the agencies' regulatory decisions and the plaintiffs' injuries was "too attenuated." *Id.* at 1141. The court explained the special challenge of showing causation with respect to the production of greenhouse gases:

> Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime. Current research on how greenhouse gases influence global climate change has focused

on the cumulative environmental effects from aggregate regional or global sources. But there is limited scientific capability in assessing, detecting, or measuring the relationship between a certain GHG emission source and localized climate impacts in a given region. *Id.* at 1143. The court noted that the five oil refineries at issue were responsible for just under six percent of total greenhouse gas emissions produced in the state of Washington, and quoted the state's expert's declaration that the effect of those emissions on global climate change was "scientifically indiscernible, given the emission levels, the dispersal of GHGs worldwide, and the absence of any meaningful nexus between Washington refinery emissions and global GHG concentrations now or as projected in the future." *Id.* at 1144 (quotation marks omitted). The court concluded the "causal chain [wa]s too tenuous to support standing." *Id.*

This case is distinguishable from *Bellon* in two important respects. First, the procedural posture is different. In *Bellon*, the appeal was taken from a grant of summary judgment. *Id.* at 1138. That procedural posture is underscored by the court's reliance on expert declarations in rendering its decision. Plaintiffs have alleged a causal relationship between their injuries and defendants' conduct. At this stage, I am bound to accept those allegations as true. This rule appropriately acknowledges the limits of the judiciary's expertise: at the motion to dismiss stage, a federal court is in no position to say it is impossible to introduce evidence to support a well-pleaded causal connection. *See Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 347 (2d Cir. 2009) (holding that causation in climate change cases is "best left to the rigors of evidentiary proof at a future stage of the proceedings, rather than dispensed with as a threshold question of constitutional standing"), *rev'd on other grounds, Am. Elec. Power Co., Inc. v. Con-*

*necticut*, 564 U.S. 410, 429, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011). 1 note, too, that climate science is constantly evolving. *See* Kirsten Engel & Jonathan Overpeck, *Adaptation and the Courtroom: Judging Climate Science*, 3 Mich. J. Envt'l & Admin. L. 1, 25 (2013) (although "climate impacts at the regional and local levels are subject, among other things, to the uncertainties of downscaling techniques[,] . . . our knowledge of the climate is developing at a breakneck pace.") As a result, 1 cannot interpret *Bellon*—which relied on a summary judgment record developed more than five years ago—to forever close the courthouse doors to climate change claims.

[35] Second, the emissions at issue in this case, unlike the emissions at issue in *Bellon*, make up a significant share of global emissions, In *Bellon*, as noted, the five oil refineries were responsible for just under six percent of the greenhouse gas emissions generated in the state of Washington. The Ninth Circuit recently explained that in *Bellon*, "causation was lacking because the defendant oil refineries were such minor contributors to greenhouse gas emissions, and the independent third-party causes of climate change were so numerous, that the contribution of the defendant oil refineries was 'scientifically undiscernable.' " *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1158 (9th Cir. 2015) (quoting *Bellon*, 732 F.3d at 1144). Here, by contrast, plaintiffs' chain of causation rests on the core allegation that defendants are responsible for a substantial share of worldwide greenhouse gas emissions. Plaintiffs allege that over the 263 years between 1751 and 2014, the United States produced more than twenty-five percent of global $CO_2$ emissions. First Am. Compl. ¶ 151. Greenhouse gas emissions produced in the United States continue to increase. *Id.* ¶ 152. In 2012, the United States was the second largest pro-

**1246**        **217 FEDERAL SUPPLEMENT, 3d SERIES**

ducer and consumer of energy in the world. *Id.* ¶ 160. *Bellon*'s reasoning, which rested on a determination the oil refineries were "minor contributors" to climate change, does not apply. *WildEarth Guardians*, 795 F.3d at 1158.

The government broadly asserts that *Bellon* rejected "the argument that allegations that a source 'contributed' to climate change are sufficient to satisfy Article III's causation requirement[.]" Fed. Defs.' Mem. of Points & Auth. in Supp. of Mot. Dismiss at 12 (doc. 27–1). Not so. *Bellon* rejected—*at the summary judgment stage*—"vague, conclusory" statements purporting to establish a causal relationship between the emissions of five refineries and the plaintiffs' injuries. 732 F.3d at 1142. Although the Constitution did not require the *Bellon* plaintiffs to "connect each molecule to their injuries," it demanded more than "simply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way and to some undefined degree) to their injuries[.]" *Id.* at 1142–43.

The causal chain alleged by plaintiffs here is conclusory, but that is because they have not yet had the opportunity to present evidence. And unlike in *Bellon*, plaintiffs' causation allegations are not vague. At oral argument, plaintiffs explained that their theory of causation has two components. The first relates to defendants' affirmative acts. Specifically, plaintiffs allege that fossil fuel combustion accounts for approximately ninety-four percent of United States $CO_2$ emissions. First Am. Compl. ¶ 158. Defendants lease public lands for oil, gas, and coal production; undercharge royalties in connection with those leases; provide tax breaks to companies to encourage fossil fuel development; permit the import and export of fossil fuels; and incentivize the purchase of sport utility vehicles. *Id.* ¶¶ 164, 166, 171, 173, 181, 190.

Here, the chain of causation is: fossil fuel combustion accounts for the lion's share of greenhouse gas emissions produced in the United States; defendants have the power to increase or decrease those emissions; and defendants use that power to engage in a variety of activities that actively cause and promote higher levels of fossil fuel combustion.

The second component of plaintiffs' causation theory involves defendants' failure to act in areas where they have authority to do so. Plaintiffs allege that together, power plants and transportation produce nearly two-thirds of $CO_2$ emissions in the United States. *Id.* ¶ 115 (transportation produces approximately twenty-seven percent of annual emissions); *id.* ¶ 125 (power plants produce roughly thirty-seven percent of annual emissions). Plaintiffs also allege DOT and EPA have broad power to set emissions standards in these sectors. So the chain of causation is: DOT and EPA have jurisdiction over sectors producing sixty-four percent of United States emissions, which in turn constitute roughly fourteen percent of emissions worldwide; they allow high emissions levels by failing to set demanding standards; high emissions levels cause climate change; and climate change causes plaintiffs' injuries.

Each link in these causal chains may be difficult to prove, but the "spectre of difficulty down the road does not inform [the] justiciability determination at this early stage of the proceedings." *Alperin*, 410 F.3d at 539. At the pleading stage, plaintiffs have adequately alleged a causal link between defendants' conduct and the asserted injuries.

### C. *Redressability*

[36, 37]   The final prong of the standing inquiry is redressability. The causation and redressability prongs of the standing inquiry "overlap and are two facets of a

single causation requirement." *Bellon*, 732 F.3d at 1146 (citation and quotation marks omitted). They are distinct in that causation "examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief." *Id.* A plaintiff need not show a favorable decision is certain to redress his injury, but must show a substantial likelihood it will do so. *Id.* It is sufficient for the redressability inquiry to show that the requested remedy would "slow or reduce" the harm, *Massachusetts*, 549 U.S. at 525, 127 S.Ct. 1438 (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982)).

[38]  The declaratory and injunctive relief plaintiffs request meets this standard. Most notably, plaintiffs ask this Court to "[o]rder Defendants to prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$[.]" First Am. Compl. ¶ 94. If plaintiffs can show, as they have alleged, that defendants have control over a quarter of the planet's greenhouse gas emissions, and that a reduction in those emissions would reduce atmospheric $CO_2$ and slow climate change, then plaintiffs' requested relief would redress their injuries.

*Bellon* is not to the contrary. In *Bellon*, the court concluded the plaintiff's injuries would continue unabated even if the five oil refineries shut down, repeating its conclusion that the effect of the emissions produced by those refineries on global emissions levels was "scientifically indiscernable." 732 F.3d at 1147 (quotation marks omitted), Thus, *Bellon*'s redressability holding, like its causation holding, rested on a factor not present here: that the defendants were minor contributors to global climate change. Accordingly, *Bellon*'s reasoning does not apply.

[39]  Defendants and intervenors essentially argue that because many entities contribute to global warming, an injunction operating on one entity—even a major player—would offer no guarantee of an overall reduction in greenhouse gas emissions. But whether the Court could guarantee an overall reduction in greenhouse gas emissions is the wrong inquiry for at least two reasons. First, redressability does not require certainty, it requires only a substantial likelihood that the Court could provide meaningful relief. Second, the possibility that some other individual or entity might later cause the same injury does not defeat standing—the question is whether the injury *caused by the defendant* can be redressed.

Redressability in this case is scientifically complex, particularly in light of the specter of "irreversible climate change," wherein greenhouse gas emissions above a certain level push the planet past "points of no return, beyond which irreversible consequences become inevitable, out of humanity's control." Hansen Decl. ¶ 13 & Ex. 2 at 13 Sept. 10, 2015 (docs. 7–1 & 7–3) (quotation marks omitted). This raises a host of questions, among them: What part of plaintiffs' injuries are attributable to causes beyond this Court's control? Even if emissions increase elsewhere, will the magnitude of plaintiffs' injuries be less if they obtain the relief they seek in this lawsuit? When would we reach this point of no return, and do defendants have it within their power to avert reaching it even without cooperation from third parties? All of these questions are inextricably bound up in the causation inquiry, and none of them can be answered at the motion to dismiss stage.

[40]  Plaintiffs ask this Court to "order Defendants to cease their permitting, authorizing, and subsidizing of fossil fuels and, instead, move to swiftly phase out

$CO_2$ emissions, as well as take such other action necessary to ensure that atmospheric $CO_2$ is no more concentrated than 350 ppm by 2100, including to develop a national plan to restore Earth's energy balance, and implement that national plan so as to stabilize the climate system." First Am. Compl. ¶ 12 (emphasis omitted). Construing the complaint in plaintiffs' favor, they allege that this relief would at least partially redress their asserted injuries. Youth plaintiffs have adequately alleged they have standing to sue.[5]

### III. Due Process Claims [6]

The Due Process Clause of the Fifth Amendment to the United States Constitution bars the federal government from depriving a person of "life, liberty, or property" without "due process of law." U.S. Const. amend. V. Plaintiffs allege defendants have violated their due process rights by "directly caus[ing] atmospheric $CO_2$ to rise to levels that dangerously interfere with a stable climate system required alike by our nation and Plaintiffs[,]" First Am. Compl. ¶ 279; "knowingly endanger[ing] Plaintiffs' health and welfare by approving and promoting fossil fuel development, including exploration, extraction, production, transportation, importation, exportation, and combustion," id. ¶ 280; and, "[a]fter knowingly creating this dangerous situation for Plaintiffs, . . . continu[ing] to knowingly enhance that danger by allowing fossil fuel production, consumption, and combustion at dangerous levels," id. ¶ 284.

Defendants and intervenors challenge plaintiffs' due process claims on two grounds. First, they assert any challenge to defendants' affirmative actions (i.e. leasing land, issuing permits) cannot proceed because plaintiffs have failed to identify infringement of a fundamental right or discrimination against a suspect class of persons. Second, they argue plaintiffs cannot challenge defendants' inaction (i.e., failure to prevent third parties from emitting $CO_2$ at dangerous levels) because defendants have no affirmative duty to protect plaintiffs from climate change.

#### A. Infringement of a Fundamental Right

**[41–43]**  When a plaintiff challenges affirmative government action under the due process clause, the threshold inquiry is the applicable level of judicial scrutiny. Witt v. Dep't of the Air Force, 527 F.3d 806, 813 (9th Cir. 2008). The default level of scrutiny is rational basis, which requires a reviewing court to uphold the challenged governmental action so long as it "implements a rational means of achieving a legitimate governmental end[.]" Kim v. United States, 121 F.3d 1269, 1273 (9th Cir. 1997) (quotation marks omitted). When the government infringes a "fundamental right," however, a reviewing court applies strict scrutiny. Witt, 527 F.3d at 817. Substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a com-

---

5.  Defendants and intervenors also challenge the standing of future generations plaintiffs on a number of grounds. It is not necessary to address these arguments because once a federal court concludes one plaintiff has standing, it need not determine whether the remaining plaintiffs have standing, Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown, 567 F.3d 521, 523 (9th Cir. 2009).

6.  Plaintiffs' due process claims encompass asserted equal protection violations and violations of unenumerated rights secured by the Ninth Amendment. For simplicity's sake, this opinion refers to these claims collectively as "due process claims."

pelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (emphasis in original). It appears undisputed by plaintiffs, and in any event is clear to this Court, that defendants' affirmative actions would survive rational basis review. Resolution of this part of the motions to dismiss therefore hinges on whether plaintiffs have alleged infringement of a fundamental right.[7]

[44, 45]  Fundamental liberty rights include both rights enumerated elsewhere in the Constitution and rights and liberties which are either (1) "deeply rooted in this Nation's history and tradition" or (2) "fundamental to our scheme of ordered liberty[.]" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (internal citations, quotations, and emphasis omitted). The Supreme Court has cautioned that federal courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into" judicial policy preferences. *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citation and quotation marks omitted).

[46, 47]  This does not mean that "new" fundamental rights are out of bounds, though. When the Supreme Court broke new legal ground by recognizing a constitutional right to same-sex marriage, Justice Kennedy wrote that

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights . . . did not presume to know the extent of freedom in all its

dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

*Obergefell v. Hodges*, —— U.S. ——, 135 S.Ct. 2584, 2598, 192 L.Ed.2d 609 (2015). Thus, "[t]he identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution . . . [that] has not been reduced to any formula." *Id.* (citation and quotation marks omitted). In determining whether a right is fundamental, courts must exercise "reasoned judgment," keeping in mind that "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries." *Id.* The genius of the Constitution is that its text allows "future generations [to] protect . . . the right of all persons to enjoy liberty as we learn its meaning," *Id.*

Often, an unenumerated fundamental right draws on more than one Constitutional source, The idea is that certain rights may be necessary to enable the exercise of other rights, whether enumerated or unenumerated. In *Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court exhaustively chronicled the jurisprudential history of the fundamental right to privacy—another right not mentioned in the text of the Constitution. *Roe*'s central holding rests on the Due Process Clause of the Fourteenth Amendment. *Id.* at 153, 93 S.Ct. 705. But the Court also found "roots" of the right to privacy in the First Amendment, the

---

**7.**  Strict scrutiny also is triggered by an allegation that the government discriminated on the basis of a suspect classification, regardless of whether the government action infringed a fundamental right. *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003). Because I

conclude that plaintiffs have alleged a violation of their fundamental rights, I need not address whether youth or future generations are suspect classifications for equal protection purposes.

Fourth Amendment, the Fifth Amendment, the penumbras of the Bill of Rights, and the Ninth Amendment. *Id.* at 152, 93 S.Ct. 705. Similarly, in *Obergefell*, the Court's recognition of a fundamental right to many was grounded in an understanding of marriage as a right underlying and supporting other vital liberties. *See* 135 S.Ct. at 2599 ("[I]t would be contradictory to recognize a right to privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is at the foundation of the family in our society." (citation and quotation marks omitted)); *id.* at 2601 ("[M]arriage is a keystone of our social order.").

[48] Exercising my "reasoned judgment," *id.* at 2598, I have no doubt that the right to a climate system capable of sustaining human life is fundamental to a free and ordered society. Just as marriage is the "foundation of the family," a stable climate system is quite literally the foundation "of society, without which there would be neither civilization nor progress." *Id.* (quoting *Maynard v. Hill*, 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888)); *cf. Minors Oposa v. Sec'y of the Dep't of Envt'l & Natural Res.*, G.R. No. 101083, 33 I.L.M. 173, 187–88 (S.C., Jul. 30, 1993) (Phil.) (without "a balanced and healthful ecology," future generations "stand to inherit nothing but parched earth incapable of sustaining life.").

Defendants and intervenors contend plaintiffs are asserting a right to be free from pollution or climate change, and that courts have consistently rejected attempts to define such rights as fundamental. Defendants and intervenors mischaracterize the right plaintiffs assert. Plaintiffs do not object to the government's role in producing *any* pollution or in causing *any* climate change; rather, they assert the government has caused pollution and climate change on a catastrophic level, and that if the government's actions continue unchecked, they will permanently and irreversibly damage plaintiffs' property, their economic livelihood, their recreational opportunities, their health, and ultimately their (and their children's) ability to live long, healthy lives. Echoing *Obergefell*'s reasoning, plaintiffs allege a stable climate system is a necessary condition to exercising other rights to life, liberty, and property.

In framing the fundamental right at issue as the right to a climate system capable of sustaining human life, I intend to strike a balance and to provide some protection against the constitutionalization of all environmental claims. On the one hand, the phrase "capable of sustaining human life" should not be read to require a plaintiff to allege that governmental action will result in the extinction of humans as a species. On the other hand, acknowledgment of this fundamental right does not transform any minor or even moderate act that contributes to the warming of the planet into a constitutional violation. In this opinion, this Court simply holds that where a complaint alleges governmental action is affirmatively and substantially damaging the climate system in a way that will cause human deaths, shorten human lifespans, result in widespread damage to property, threaten human food sources, and dramatically alter the planet's ecosystem, it states a claim for a due process violation. To hold otherwise would be to say that the Constitution affords no protection against a government's knowing decision to poison the air its citizens breathe or the water its citizens drink. Plaintiffs have adequately alleged infringement of a fundamental right.

### B. *"Danger Creation" Challenge to Inaction*

[49–52] With limited exceptions, the Due Process Clause does not impose on the government an affirmative obligation to act, even when "such aid may be neces-

sary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). This rule is subject to two exceptions: "(1) the 'special relationship' exception; and (2) the 'danger creation' exception," *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). The "special relationship" exception provides that when the government takes an individual into custody against his or her will, it assumes some responsibility to ensure that individual's safety. *Id.* The "danger creation" exception permits a substantive due process claim when government conduct "places a person in peril in deliberate indifference to their safety[.]" *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997). Plaintiffs purport to challenge the government's failure to limit third-party $CO_2$ emissions pursuant to the danger creation *DeShaney* exception.

**[53, 54]** In the Ninth Circuit, a plaintiff challenging government inaction on a danger creation theory must first show the "state actor create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). The state action must place the plaintiff "in a worse position than that in which he would have been had the state not acted at all." *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (quotation marks omitted and alterations normalized). Second, the plaintiff must show the "state actor . . . recognize[d]" the unreasonable risks to the plaintiff and "actually intend[ed] to expose the plaintiff to such

risks without regard to the consequences to the plaintiff." *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 846 (9th Cir. 2011) (brackets and quotation marks omitted). The defendant must have acted with "[d]eliberate indifference," which "requires a culpable mental state more than gross negligence." *Pauluk*, 836 F.3d at 1125 (quotation marks omitted).

**[55]** Plaintiffs allege that "[a]cting with full appreciation of the consequences of their acts, Defendants knowingly caused, and continue to cause, dangerous interference with our atmosphere and climate system." First Am. Compl. ¶ 85. They allege this danger stems, "in substantial part, [from] Defendants' historic and continuing permitting, authorizing, and subsidizing of fossil fuel extraction, production, transportation, and utilization." *Id.* ¶ 279. Plaintiffs allege defendants acted "with full appreciation" of the consequences of their acts, *id.* ¶¶ 278–79, specifically "[harm to] Plaintiffs' dignity, including their capacity to provide for their basic human needs, safely raise families, practice their religious and spiritual beliefs, maintain their bodily integrity, and lead lives with access to clean air, water, shelter, and food." *Id.* ¶ 283. In the face of these risks, plaintiffs allege defendants "have had longstanding, actual knowledge of the serious risks of harm and have failed to take necessary steps to address and ameliorate the known, serious risk to which they have exposed Plaintiffs." *Id.* ¶ 285. In sum: plaintiffs allege defendants played a unique and central role in the creation of our current climate crisis; that they contributed to the crisis with full knowledge of the significant and unreasonable risks posed by climate change;[8] and

---

8. At oral argument, plaintiffs supplied the Court with a timeline documenting purported evidence of defendants' knowledge of climate change. The timeline, which dates back to 1955, includes the 1988 testimony of Dr. James Hansen before the Senate Committee

on Energy and Natural Resources. Dr. Hansen, who appears in this lawsuit as a guardian for his granddaughter and for future generations, testified about rising global temperatures and their relationship to human activity. First Session on the Greenhouse Effect and

**1252**             **217 FEDERAL SUPPLEMENT, 3d SERIES**

that the Due Process Clause therefore imposes a special duty on defendants to use their statutory and regulatory authority to reduce greenhouse gas emissions. Accepting the allegations of the complaint as true, plaintiffs have adequately alleged a danger creation claim.

Defendants argue the *DeShaney* exceptions are inapplicable when the actor is the federal government rather than a state government. It is true that *DeShaney* was a section 1983 case and that the Ninth Circuit cases interpreting the *DeShaney* exceptions are also section 1983 cases. But in *DeShaney*, the Supreme Court was mapping the contours of the Due Process Clause, not section 1983. Defendants have cited no case or legal principle to justify limiting *DeShaney* to the section 1983 context.

Next, defendants contend application of the *DeShaney* danger creation exception in this context would permit plaintiffs to "raise a substantive due process claim to challenge virtually any government program"—for example, to challenge foreign policy decisions that heighten or exacerbate international tensions, or to health and safety regulations the plaintiff deems insufficiently stringent. Fed. Defs.' Obj. 18. Defendants fail to recognize that *DeShaney* imposes rigorous proof requirements. A plaintiff asserting a danger-creation due process claim must show (1) the government's acts created the danger to the plaintiff; (2) the government *knew* its acts caused that danger; and (3) the government with *deliberate indifference* failed to

act to prevent the alleged harm. These stringent standards are sufficient safeguards against the flood of litigation concerns raised by defendants—indeed, they pose a significant challenge for plaintiffs in this very lawsuit.[9]

Questions about difficulty of proof, however, must be left for another day. At the motion to dismiss stage, I am bound to accept the factual allegations in the complaint as true. Plaintiffs have alleged that defendants played a significant role in creating the current climate crisis, that defendants acted with full knowledge of the consequences of their actions, and that defendants have failed to correct or mitigate the harms they helped create in deliberate indifference to the injuries caused by climate change. They may therefore proceed with their substantive due process challenge to defendants' failure to adequately regulate $CO_2$ emissions.

IV. *Public Trust Claims*

[56–58] In its broadest sense, the term "public trust" refers to the fundamental understanding that no government can legitimately abdicate its core sovereign powers. *See Stone v. Mississippi*, 101 U.S. 814, 820, 25 L.Ed. 1079 (1879) ("[T]he power of governing is a trust committed by the people to the government, no part of which can be granted away.") The public trust doctrine rests on the fundamental principle that "[e]very succeeding legislature possesses the same jurisdiction and power with respect to [the public interest] as its

---

Global Climate Change Before the Comm. on Energy & Natural Res., 100th Cong. 39 (1988). He urged legislators to take action to limit greenhouse gas emissions. *Id.* at 158. Dr. Hansen's testimony was preceded by a statement from Senator Dale Bumpers of Arkansas, who bemoaned, "We're not going to have a lot of political support for this. Nobody wants to take on the automobile industry. Nobody wants to take on any of the industries

that produce the things we throw up into the atmosphere." *Id.* at 38.

**9.** There are other barriers to asserting defendants' hypothetical danger-creation claims. For example, as discussed in Part I of this opinion, the political question doctrine sharply limits judicial review of decisions inherently entangled with the conduct of foreign relations.

predecessors." *Newton v. Mahoning Cnty. Comm'rs*, 100 U.S. 548, 559, 25 L.Ed. 710 (1879). The doctrine conceives of certain powers and obligations—for example, the police power—as inherent aspects of sovereignty. *Id.* at 554. Permitting the government to permanently give one of these powers to another entity runs afoul of the public trust doctrine because it diminishes the power of future legislatures to promote the general welfare.

[59] Plaintiffs' public trust claims arise from the particular application of the public trust doctrine to essential natural resources. With respect to these core resources, the sovereign's public trust obligations prevent it from "depriving a future legislature of the natural resources necessary to provide for the well-being and survival of its citizens." Br. of Amici Curiae Global Catholic Climate Movement and Leadership Council of Women Religious at 3 (footnote omitted) (doc. 51–1). Application of the public trust doctrine to natural resources predates the United States of America. Its roots are in the Institutes of Justinian, part of the Corpus Juris Civilis, the body of Roman law that is the "foundation for modern civil law systems." Timothy G. Kearley, *Justice Fred Blume and the Translation of Justinian's Code*, 99 Law Libr. J. 525, ¶ 1 (2007). The Institutes of Justinian declared "the following things are by natural law common to all—the air, running water, the sea, and consequently the seashore." J. Inst. 2.1.1 (J.B. Moyle trans.). The doctrine made its way to the United States through the English common law. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 284, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) ("American law adopted as its own much of the English law respecting navigable waters, including the principle that submerged lands are held for a public purpose."); *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 473, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988)

("At common law, the title and dominion in lands flowed by the tide water were in the King for the benefit of the nation ... Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders[.]" (quoting *Shively v. Bowlby*, 152 U.S. 1, 57, 14 S.Ct. 548, 38 L.Ed. 331 (1894)); Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 475–76 (1970) (discussing the history of the public trust doctrine in the United States).

The first court in this country to address the applicability of the public trust doctrine to natural resources was the New Jersey Supreme Court, in 1821. The court explained that public trust assets were part of a taxonomy of property:

Every thing susceptible of property is considered as belonging to the nation that possesses the country, as forming the entire mass of its wealth. But the nation does not possess all those things in the same manner. By very far the greater part of them are divided among the individuals of the nation, and become *private property*. Those things not divided among the individuals still belong to the nation, and are called *public property*. Of these, again, some are reserved for the necessities of the state, and are used for the public benefit, and those are called "*the domain of the crown or of the republic*," others remain common to all the citizens, who take of them and use them, each according to his necessities, and according to the laws which regulate their use, and are called *common property*. Of this latter kind, according to the writers upon the law of nature and of nations, and upon the civil law, are the air, the running water, the sea, the fish, and the wild beasts.

**1254**                    **217 FEDERAL SUPPLEMENT, 3d SERIES**

*Arnold v. Mundy*, 6 N.J.L. 1, 71 (N.J. 1821) (emphasis in original).

The seminal United States Supreme Court case on the public trust is *Illinois Central Railroad Company v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). The Illinois legislature had conveyed to the Illinois Central Railroad Company title to part of the submerged lands beneath the harbor of Chicago, with the intent to give the company control over the waters above the submerged lands "against any future exercise of power over them by the state." *Id.* at 452, 13 S.Ct. 110, The Supreme Court held the legislature's attempt to give up its title to lands submerged beneath navigable waters was either void on its face or always subject to revocation. *Id.* at 453, 13 S.Ct. 110. "The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them ... than it can abdicate its police powers in the administration of government and the preservation of the peace." *Id.* In light of the "immense value" the harbor of Chicago carried for the people of Illinois, the "idea that its legislature can deprive the state of control over its bed and waters, and place the same in the hands of a private corporation" could not "be defended." *Id.* at 454, 13 S.Ct. 110.

[60, 61] The natural resources trust operates according to basic trust principles, which impose upon the trustee a fiduciary duty to "protect the trust property against damage or destruction." George G. Bogert et al., Bogert's Trusts and Trustees, § 582 (2016). The trustee owes this duty equally to both current and future beneficiaries of the trust. Restatement (Second) of Trusts § 183 (1959). In natural resources cases, the trust property consists of a set of resources important enough to the people to warrant public trust protection. *See* Mary C. Wood, A Nature's Trust; Environmental Law for a New Ecological Age 167–75 (2014). The government, as trustee, has a fiduciary duty to protect the trust assets from damage so that current and future trust beneficiaries will be able to enjoy the benefits of the trust. *Id.* The public trust doctrine is generally thought to impose three types of restrictions on governmental authority:

> [F]irst, the property subject to the trust must not only be used for a public purpose, but it must be held available for use by the general public; second, the property may not be sold, even for a fair cash equivalent; and third, the property must be maintained for particular types of uses.

Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 477 (1970).

This lawsuit is part of a wave of recent environmental cases asserting state and national governments have abdicated their responsibilities under the public trust doctrine. *See, e.g., Alec L. v. Jackson*, 863 F.Supp.2d 11 (D.D.C. 2012); *Sanders–Reed ex rel. Sanders–Reed v. Martinez*, 350 P.3d 1221 (N.M. Ct. App. 2015); *Kanuk ex rel. Kanuk v. State, Dep't of Natural Res.*, 335 P.3d 1088 (Alaska 2014); *Chernaik v. Kitzhaber*, 263 Or.App. 463, 328 P.3d 799 (2014). These lawsuits depart from the "traditional" public trust litigation model, which generally centers on the second restriction, the prohibition against alienation of a public trust asset. Instead, plaintiffs assert defendants have violated their duties as trustees by nominally retaining control over trust assets while actually allowing their depletion and destruction, effectively violating the first and third restrictions by excluding the public from use and enjoyment of public resources.

Defendants and intervenors argue the public trust doctrine has no application in this case. They advance four arguments:

(1) the atmosphere, the central natural resource at issue in this lawsuit, is not a public trust asset; (2) the federal government, unlike the states, has no public trust obligations; (3) any common-law public trust claims have been displaced by federal statutes; and (4) even if there is a federal public trust, plaintiffs lack a right of action to enforce it. I address each contention in turn.

### A. Scope of Public Trust Assets

[62] The complaint alleges defendants violated their duties as trustees by failing to protect the atmosphere, water, seas, seashores, and wildlife. First Am. Compl. ¶ 309. Defendants and intervenors argue

plaintiffs' public trust claims fail because the complaint focuses on harm to the atmosphere, which is not a public trust asset. I conclude that it is not necessary at this stage to determine whether the atmosphere is a public trust asset because plaintiffs have alleged violations of the public trust doctrine in connection with the territorial sea.[10]

[63, 64] The federal government holds title to the submerged lands between three and twelve miles from the coastlines of the United States. See Restatement (Third) of The Foreign Relations Law of the United States § 511(a) (1987) (international law permits a nation to claim as its territorial sea an area up to twelve miles from its

---

10. To be clear, today's opinion should not be taken to suggest that the atmosphere is not a public trust asset. The Institutes of Justinian included the air in the list of assets "by natural law common to all." J. Inst. 2.1.1 (J.B. Moyle trans.). The New Jersey Supreme Court in *Arnold* similarly included air in its list of "common property." 6 N.J.L. at 71. Even Supreme Court case law suggests the atmosphere may properly be deemed part of the public trust *res. See United States v. Causby*, 328 U.S. 256, 261, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (holding that private rights to airspace have "no place in the modern world" because recognition of such claims would "transfer into private ownership that to which only the public has a just claim.") The dearth of litigation focusing on atmosphere may reflect the limited state of scientific knowledge rather than signal a determination that the air is outside the scope of the public trust. *See* Mary C. Wood, *Atmospheric Trust Litigation Across the World, in* Fiduciary Duty and the Atmospheric Trust 113 (Ken Coghill et al. Eds. 2012) (hypothesizing that the atmosphere does not appear in early public trust case law because air was long thought to be indestructible and incapable of privatization).

Even if the atmosphere was not always considered a public trust asset, some courts have concluded the doctrine should "be molded and extended to meet changing conditions and needs of the public it was created to benefit." *Matthews v. Bay Head Improvement Ass'n*, 95 N.J. 306, 471 A.2d 355, 365 (1984) (citation and quotation marks omitted). Just

last year, Judge Hollis Hill reasoned that it "misses the point" to mechanically rely on what has been identified as a public trust asset in the past because "[t]he navigable waters and the atmosphere are intertwined and to argue a separation of the two, or to argue that [greenhouse gas] emissions do not affect navigable waters is nonsensical." *Foster v. Wash. Dep't of Ecology*, No. 14–2–25295–1, slip op. at 8, 2015 WL 7721362 (Wash. King Cnty. Super. Ct. Nov. 19, 2015). At least one state court has held in recent years that "the concept of public natural resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna (including fish) that are outside the scope of purely private property." *Robinson Twp., Wash. Cnty., Pa. v. Pennsylvania*, 623 Pa. 564, 83 A.3d 901, 955 (Pa. Sup. Ct. 2013).

The Supreme Court arguably endorsed this pragmatic approach to the identification of trust assets in *Illinois Central*, where it held, contrary to English common law, that lakes and rivers unaffected by the ebb and flow of the tide could be navigable waters within the meaning of the public trust doctrine. 146 U.S. at 436, 13 S.Ct. 110 (English rule for determining navigability would not work in the United States, which contains "rivers [that] are navigable for great distances above the flow of the tide—indeed, for hundreds of miles").

**1256**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

coast); Presidential Proclamation of Dec. 27, 1988, No. 5928, 3 C.F.R. § 547 (1989) (President Reagan expanding United States' claim from three-mile territorial sea to twelve-mile territorial sea); 43 U.S.C. § 1312 (seaward boundary of a coastal state is "a line three geographical miles distant from its coast line"). Time and again, the Supreme Court has held that the public trust doctrine applies to "lands beneath tidal waters." *See Phillips Petroleum Co.*, 484 U.S. at 474, 108 S.Ct. 791 (discussing *Shively*, 152 U.S. at 57, 14 S.Ct. 548 and *Knight v. U.S. Land Ass'n*, 142 U.S. 161, 183, 12 S.Ct. 258, 35 L.Ed. 974 (1891)); *Alabama v. Texas*, 347 U.S. 272, 278, 74 S.Ct. 481, 98 L.Ed. 689 (1954) (Black, J., dissenting) ("In ocean waters bordering our country, if nowhere else, day-to-day national power—complete, undivided, flexible, and immediately available—is an essential attribute of federal sovereignty."); *id.* at 282, 74 S.Ct. 481 (Douglas, J., dissenting) ("Thus we are dealing here with incidents of national sovereignty . . . . The authority over [the sea] can no more be abdicated than any of the other great powers of the Federal Government. It is to be exercised for the benefit of the whole."); *see also* Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law; Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 556 (1970) (public trust law covers "that aspect of the public domain below the low-water mark on the margin of the sea and the great lakes, the waters over those lands, and the waters within rivers and streams of any consequence"). Because a number of plaintiffs' injuries relate to the effects of ocean acidification and rising ocean temperatures,[11] they have adequately alleged harm to public trust assets.

## B. *Applicability of Public Trust to the Federal Government*

[65] Defendants and intervenors contend that in the United States, the public trust doctrine applies only to the states and not to the federal government. This argument rests primarily on a passing statement in *PPL Montana, LLC v. Montana*, 565 U.S. 576, 132 S.Ct. 1215, 182 L.Ed.2d 77 (2012). A close examination of that case reveals that it cannot fairly be read to foreclose application of the public trust doctrine to assets owned by the federal government.

*PPL Montana* was not a public trust case. Its central concern was the equal footing doctrine. PPL Montana, LLC used three rivers flowing through the state of Montana for hydroelectric projects. *Id.* at 580, 132 S.Ct. 1215. Montana sought rent for the use of the riverbeds, arguing it had gained title to the rivers pursuant to the equal footing doctrine when it became a state in 1889. *Id.* The Montana Supreme Court granted summary judgment on title to Montana, On writ of certiorari to the United States Supreme Court, review hinged on whether the rivers in question were "navigable" in 1889, because the "title consequences of the equal-footing doctrine" are that "[u]pon statehood, the State gains title within its borders to the beds of

---

11.    *See, e.g.*, First Am. Compl. ¶ 16 ("An important part of Kelsey's diet includes food that comes from the marine waters and fresh-water rivers, including salmon, cod, tuna, clams, mussels, and crab."); *id.* ¶ 27 ("Other food sources for Alex, including crab and seafood, are negatively impacted by ocean acidification, warming, and sea level rise caused by Defendants."); *id.* ¶ 33 ("Ocean acidification caused by Defendants has already begun to adversely impact shellfish along the coast, and is predicted to take its toll on crab, mussels, and all shelled seafood."); *id.* ¶ 45 ("On the Oregon coast, Sahara enjoys climbing rocks and sand dunes, swimming, and tidepooling to see marine life. Sahara's enjoyment of these activities is being increasingly harmed in the future by sea level rise, greater erosion, enhanced ocean acidification, and increased water temperatures.").

waters then navigable (or tidally influenced . . .)[.]" *Id.* at 589–90, 132 S.Ct. 1215. The Court reversed and remanded, holding that the Montana courts had applied the wrong methodology for determining navigability.

In addition to its main argument that the rivers were navigable, Montana argued that denying it title to the riverbeds in dispute would "undermine the public trust doctrine." *Id.* at 601, 132 S.Ct. 1215. The Supreme Court rejected this argument in short order:

> Unlike the equal-footing doctrine, . . . which is the constitutional foundation for the navigability rule of riverbed title, the public trust doctrine remains a matter of state law, subject as well to the federal power to regulate vessels and navigation under the Commerce Clause and admiralty power. While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, the contours of that public trust do not depend upon the Constitution. Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.

*Id.* at 603, 132 S.Ct. 1215 (citations omitted).

Defendants and intervenors take the phrase "the public trust doctrine remains a matter of state law," and interpret it in isolation to foreclose all federal public trust claims. That is not a plausible interpretation of *PPL Montana.* The Court was simply stating that federal law, not state law, determined whether Montana has title to the riverbeds, and that if Montana had title, state law would define the scope of Montana's public trust obligations. *PPL Montana* said nothing at all about the viability of federal public trust claims with respect to federally-owned trust assets.

In a string citation, *PPL Montana* cited *Coeur d'Alene,* 521 U.S. at 285, 117 S.Ct. 2028, and *Appleby v. City of New York,* 271 U.S. 364, 395, 46 S.Ct. 569, 70 L.Ed. 992 (1926), for the proposition that *Illinois Central* "was necessarily a statement of Illinois law." 132 S.Ct. at 1235. That statement is not surprising given the nature of the public trust doctrine. Public trust obligations are inherent aspects of sovereignty; it follows that any case applying the public trust doctrine to a particular state is necessarily a statement of that state's law rather than a statement of the law of another sovereign. In *Coeur d'Alene,* the Supreme Court explained that even though *Illinois Central* interpreted Illinois law, its central tenets could be applied broadly (for example, to Idaho) because it "invoked the principle in American law recognizing the weighty public interests in submerged lands." 521 U.S. at 285, 117 S.Ct. 2028. The Court then detailed how the American public trust doctrine, which has diverged from the English public trust doctrine in important ways, has developed as "a natural outgrowth of the perceived public character of submerged lands, a perception which underlies and informs the principle that these lands are tied in a unique way to sovereignty." *Id.* at 286, 117 S.Ct. 2028. There is no reason why the central tenets of *Illinois Central* should apply to another state, but not to the federal government.

Defendants and intervenors also contend recognizing a federal public trust claim is contrary to *United States v. 32.42 Acres of Land, More or Less, Located in San Diego County, California,* 683 F.3d 1030, 1038 (9th Cir. 2012), which repeated *PPL Montana*'s statement that "the public trust doctrine remains a matter of state law" in concluding that the federal government's eminent domain powers trumped any

state-law public trust concerns. That case did not foreclose a federal public trust claim, however, because the Ninth Circuit *expressly* declined to address the viability of the federal public trust the district court imposed on the federal government after it ruled the land could be taken pursuant to eminent domain. *Id.* at 1033 & 1039 n. 2.

In 2012, the federal district court for the District of Columbia held the public trust doctrine does not apply to the federal government. *Alec L.* was substantially similar to the instant action: five youth plaintiffs and two environmental advocacy organizations sued a variety of heads of federal agencies, alleging the defendants had "wasted and failed to preserve and protect the atmosphere Public Trust asset." 863 F.Supp.2d at 12. The court dismissed the suit with prejudice, holding the plaintiffs' federal public trust claims were foreclosed by *PPL Montana*'s statement that "the public trust doctrine remains a matter of state law." *Id.* at 15 (quoting *PPL Montana*, 565 U.S. at 603, 132 S.Ct. 1215). The court also relied on the D.C. Circuit's observation that " '[i]n this country the public trust doctrine has developed almost exclusively as a matter of state law.' " *Id.* (quoting *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1082 (D.C. Cir. 1984)). In an unpublished memorandum decision, the D.C. Circuit affirmed, holding that "[t]he Supreme Court in *PPL Montana* . . . directly and categorically rejected any federal constitutional foundation for that doctrine, without qualification or reservation." *Alec L. ex rel. Loorz v. McCarthy*, 561 Fed.Appx. 7, 8 (D.C. Cir. 2014).

I am not persuaded by the reasoning of the *Alec L.* courts. As explained above, a close reading of *PPL Montana* reveals that it says nothing about the viability of federal public trust claims. And in *Air Florida*, the D.C. Circuit emphasized that "we imply no opinion regarding either the applicability of the public trust doctrine to the federal government or the appropriateness of using the doctrine to afford trustees a means for recovering from tortfeasors the cost of restoring public waters to their pre-injury condition." 750 F.2d at 1084.

Two federal courts—the district courts for the Northern District of California and the District of Massachusetts—have concluded the public trust doctrine applies to the federal government. The decisions, from the 1980s, concerned the federal government's acquisition of various state-owned public trust assets—for example, submerged land beneath navigable rivers or tidelands—through the power of eminent domain. The courts held that the federal government has no public trust obligations under *state* law, but does take the land subject to a *federal* public trust. As one court explained, "[t]he trust is of such a nature that it can be held only by the sovereign, and can only be destroyed by the destruction of the sovereign." *United States v. 1.58 Acres of Land Situated in the City of Boston, Suffolk Cnty., Mass.*, 523 F.Supp. 120, 124 (D. Mass. 1981). Through eminent domain, the federal government "may take property . . . in 'full fee simple' insofar as no other principal may hold a greater right to such land, It must be recognized, however, that the federal government is as restricted as the Commonwealth in its ability to abdicate to private individuals" its title to the land. *Id.* at 124–25. In other words, "[b]y condemnation, the United States simply acquires the land subject to the public trust as though no party had held an interest in the land before." *City of Alameda v. Todd Shipyards Corp.*, 635 F.Supp. 1447, 1450 (N.D. Cal. 1986). *32.42 Acres of Land* is wholly consistent with these opinions; in that case, the Ninth Circuit held that when the federal government condemns state land, it takes title free and clear of any *state* public trust obligations—and that to hold

otherwise would violate the Supremacy Clause by subjugating the federal eminent domain power to state public trust law, 683 F.3d at 1038. As noted, however, the court said nothing about the lower court's determination that the condemned tidelands had been taken subject to a federal public trust. *32.42 Acres of Land*, 683 F.3d at 1033 & 1039 n.2.

I am persuaded that the *City of Alameda* and *1.58 Acres of Land* courts were correct. Their decisions rested on the history of the public trust doctrine and the public trust's unique relationship to sovereignty. I can think of no reason why the public trust doctrine, which came to this country through the Roman and English roots of our civil law system, would apply to the states but not to the federal government.

Defendants' final argument is that recognition of a federal public trust doctrine cannot be reconciled With *Kleppe v. New Mexico*, 426 U.S. 529, 539, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), in which the Supreme Court stated that "[t]he power over public land" entrusted to Congress by the Property Clause of the United States Constitution is "without limitations." Again, defendants take the Supreme Court's statement out of context. In *Kleppe*, New Mexico challenged the federal government's authority to regulate and protect wild horses and burros, arguing that the Constitution granted Congress only the power to "dispose of and make incidental rules regarding the use of federal property" and "the power to protect" the federal property itself, *i.e.*, the land but not animals living on it. 426 U.S. at 536, 96 S.Ct. 2285. The Supreme Court rejected New Mexico's attempt to limit Congress's power to regulate wildlife living on federal lands. It is in that context that the Court stated the "power over public land" was "without limitations." *Id.* at 539, 96 S.Ct. 2285. Indeed, in the *very same sentence* the Supreme Court acknowledged that "the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved[.]" *Id.* The Supreme Court in *Kleppe* simply did not have before it the question whether the Constitution grants the federal government unlimited authority to do whatever it wants with any parcel of federal land, regardless of whether its actions violate individual constitutional rights or run afoul of public trust obligations.

The federal government, like the states, holds public assets—at a minimum, the territorial seas—in trust for the people. Plaintiffs' federal public trust claims are cognizable in federal court.

## C. *Displacement of Public Trust Claims*

Defendants and intervenors next argue that any common-law public trust claims have been displaced by a variety of acts of Congress, including the Clean Air Act and the Clean Water Act. For this proposition, they rely on *American Electric Power Company, Inc. v. Connecticut*, 564 U.S. 410, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011) ("*AEP*"). In *AEP*, the plaintiffs sued five power companies, alleging the companies' $CO_2$ emissions were a public nuisance under federal common law. *Id.* at 415, 131 S.Ct. 2527. The Supreme Court held the nuisance claim could not proceed because "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." *Id.* at 424, 131 S.Ct. 2527.

Defendants and intervenors contend that *AEP* controls the displacement analysis. The district court in *Alec L.* agreed with them.[12] The court relied heavily on *AEP*'s statement that the Clean Air Act displaces " 'any federal common law right' " to challenge $CO_2$ emissions, and

**12.** The D.C. Circuit did not address the dis-          placement question on appeal.

also discussed at length the *AEP* court's concerns about authorizing a judicial order setting $CO_2$ emissions limits would require federal judges to make decisions involving competing policy interests—decisions an "expert agency 'is surely better equipped to [make] than individual district judges issuing ad hoc, case-by-case injunctions.'" *Alec L.*, 863 F.Supp.2d at 16 (quoting *AEP*, 564 U.S. at 424, 428, 131 S.Ct. 2527).

I am not persuaded by the *Alec L.* court's reasoning regarding displacement. In *AEP*, the Court did not have public trust claims before it and so it had no cause to consider the differences between public trust claims and other types of claims. Public trust claims are unique because they concern inherent attributes of sovereignty. The public trust imposes on the government an obligation to protect the *res* of the trust. A defining feature of that obligation is that it cannot be legislated away, Because of the nature of public trust claims, a displacement analysis simply does not apply.

The interplay between Congress's decision to grant regulatory authority to various federal agencies and the authority of the courts to adjudicate public trust claims raises weightier concerns. Those concerns go to whether this case presents a nonjusticiable political question, and have been addressed in Section I of this opinion.

## D. *Enforceability of Public Trust Obligations in Federal Court*

As a final challenge to plaintiffs' public trust claims, defendants contend that even if the public trust doctrine applies to the federal government, plaintiffs lack a cause of action to enforce the public trust obligations. Relatedly, defendants argue that creation of a right of action to permit plaintiffs to assert their claims in federal court would be an exercise in federal common law-making subject to the same statutory displacement arguments outlined above.

In order to evaluate the merits of these arguments, I must first locate the source of plaintiffs' public trust claims. I conclude plaintiffs' public trust rights both predated the Constitution and are secured by it. *See* Gerald Tones & Nathan Bellinger, *The Public Trust: The Law's DNA*, 4 Wake Forest J. L. & Pol'y 281, 288–94 (2014).

The public trust doctrine defines inherent aspects of sovereignty. The Social Contract theory, which heavily influenced Thomas Jefferson and other Founding Fathers, provides that people possess certain inalienable lights and that governments were established by consent of the governed for the purpose of securing those rights.[13] Accordingly, the Declaration of

---

**13.** The Founding Fathers were also influenced by intergenerational considerations. They believed the inalienable rights to life, liberty, and property were rooted in a philosophy of intergenerational equity. Thomas Jefferson, for example, thought that each generation had the obligation to pass the natural estate undiminished to future generations. *See* Br. of Amicus Curiae John Davidson at 21–25 (doc. 60). In a 1789 letter to James Madison, Jefferson wrote that "no man can, by natural right, oblige lands he occupied . . . to the payments of debts contracted by him. For if he could, he might, during his own life, eat up the usufruct of the lands for several generations to come, and then the lands would belong to the dead, and not to than the living,

which would be the reverse of our principle. What is true of every member of the society individually is true of them all collectively, since the rights of the whole can be no more than the sum of the rights of the individuals." Letter from Thomas Jefferson to James Madison, Sept. 6, 1789, *in* The Founders' Constitution (Philip B. Kurland & Ralph Lerner, eds.) (1986), *available at* press-pubs.uchicago.edu/founders/documents/v1ch2s23.html (last visited Nov. 7, 2016). Although I find it unnecessary today to address the standing of future generations or the merits of plaintiffs' argument that youth and posterity are suspect classifications, I am mindful of the intergen-

JULIANA v. U.S.    **1261**
Cite as 217 F.Supp.3d 1224 (D.Or. 2016)

Independence and the Constitution did not *create* the rights to life, liberty, or the pursuit of happiness—the documents are, instead, vehicles for protecting and promoting those already-existing rights. *Cf. Robinson Twp.*, 83 A.3d at 948 (plurality opinion) (rights expressed in the public trust provision of Pennsylvania Constitution are "preserved rather than created" by that document); *Minors Oposa*, 33 I.L.M. at 187 (the right of future generations to a "balanced and healthful ecology" is so basic that it "need not even be written in the Constitution for [it is] assumed to exist from the inception of humankind"). Governments, in turn, possess certain powers that permit them to safeguard the rights of the people; these powers are inherent in the authority to govern and cannot be sold or bargained away. One example is the police power. *Stone*, 101 U.S. at 817. Another is the status as trustee pursuant to the public trust doctrine. *Illinois Central*, 146 U.S. at 459–60, 13 S.Ct. 110.

[66] Although the public trust predates the Constitution, plaintiffs' right of action to enforce the government's obligations as trustee arises from the Constitution. I agree with Judge Coffin that plaintiffs' public trust claims are properly categorized as substantive due process claims. As explained, the Due Process Clause's substantive component safeguards fundamental rights that are "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition," *McDonald*, 561 U.S. at 761, 767, 130 S.Ct. 3020 (internal citations, quotations, and emphasis omitted). Plaintiffs' public trust rights, related as they are to inherent aspects of sovereignty and the consent of the governed from which the United States' authority derives, satisfy both tests. Because the public trust is not enumerated in the Constitution, substantive due process

protection also derives from the Ninth Amendment. *See* U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."); *Raich v. Gonzales*, 500 F.3d 850, 861–66 (9th Cir. 2007) (considering whether the right to use medical marijuana was a fundamental right safeguarded by the Ninth Amendment and the Fifth Amendment's substantive due process clause). But it is the Fifth Amendment that provides the right of action.

Plaintiffs' claims rest "directly on the Due Process Clause of the Fifth Amendment." *Davis*, 442 U.S. at 243, 99 S.Ct. 2264 (1979); *see also Carlson v. Green*, 446 U.S. 14, 18, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) ("[T]he victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.") They may, therefore, be asserted in federal court.

**CONCLUSION**

Throughout their objections, defendants and intervenors attempt to subject a lawsuit alleging constitutional injuries to case law governing statutory and common-law environmental claims. They are correct that plaintiffs likely could not obtain the relief they seek through citizen suits brought under the Clean Air Act, the Clean Water Act, or other environmental laws. But that argument misses the point. This action is of a different order than the typical environmental case. It alleges that defendants' actions and inactions—whether or not they violate any specific statutory duty—have so profoundly damaged our home planet that they threaten plaintiffs' fundamental constitutional rights to life and liberty.

erational dimensions of the public trust doctrine in issuing this opinion.

A deep resistance to change runs through defendants' and intervenors' arguments for dismissal: they contend a decision recognizing plaintiffs' standing to sue, deeming the controversy justiciable, and recognizing a federal public trust and a fundamental right to climate system capable of sustaining human life would be unprecedented, as though that alone requires its dismissal. This lawsuit may be groundbreaking, but that fact does not alter the legal standards governing the motions to dismiss. Indeed, the seriousness of plaintiffs' allegations underscores how vitally important it is for this Court to apply those standards carefully and correctly.

Federal courts too often have been cautious and overly deferential in the arena of environmental law, and the world has suffered for it. As Judge Goodwin recently wrote,

> The current state of affairs . . . reveals a wholesale failure of the legal system to protect humanity from the collapse of finite natural resources by the uncontrolled pursuit of short-term profits . . . . [T]he modern judiciary has enfeebled itself to the point that law enforcement can rarely be accomplished by taking environmental predators to court . . . .
>
> The third branch can, and should, take another long and careful look at the barriers to litigation created by modern doctrines of subject-matter jurisdiction and deference to the legislative and administrative branches of government.

Alfred T. Goodwin, *A Wake–Up Call for Judges*, 2015 Wis. L. Rev. 785, 785–86, 788 (2015).

Judge Goodwin is no stranger to highly politicized legal disputes. Nearly fifty years ago, he authored the landmark opinion that secured Oregon's ocean beaches for public use. Private landowners wanted to construct fences and otherwise keep private the beaches in front of their properties; they brought suit to challenge an Oregon state law requiring public access to all dry sand beaches. *State ex rel. Thornton v. Hay*, 254 Or. 584, 462 P.2d 671, 672–73 (1969). Writing for five of the six members of the Oregon Supreme Court, then-Justice Goodwin rooted his determination the beaches were public property in a concept from English common law:

> Because so much of our law is the product of legislation, we sometimes lose sight of the importance of custom as a source of law in our society. It seems particularly appropriate in the case at bar to look to an ancient and accepted custom in this state as the source of a rule of law. The rule in this case, based upon custom, is salutary in confirming a public right, and at the same time it takes from no man anything which he has a legitimate reason to regard as exclusively his.[14]

*Id.* at 678.

In an argument with strong echoes in defendants' and intervenors' objections here, the plaintiff private property owner contended it was "constitutionally impermissible . . . to dredge up an inapplicable, ancient English doctrine that has been universally rejected in modern America." Kathryn A. Straten, *Oregon's Beaches: A Birthright Preserved* 65 (Or. State Parks & Recreation 1977). The Oregon Supreme Court was not persuaded by this call to judicial conservatism. Because of the application of an ancient doctrine, Oregon's

---

**14.** The sixth justice concurred in the judgment. He found the English rule of custom useful by analogy, but would have held the beaches were public property pursuant to the public trust doctrine. *Hay*, 462 P.2d at 679 (Denecke, J., concurring) ("These rights of the public in tidelands and in the beds of navigable streams have been called 'jus publicum' and we have consistently and recently reaffirmed their existence.").

beaches remain open to the public now and forever.

"A strong and independent judiciary is the cornerstone of our liberties." These words, spoken by Oregon Senator Mark O. Hatfield, are etched into the walls of the Portland United States courthouse for the District of Oregon. The words appear on the first floor, a daily reminder that it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. Even when a case implicates hotly contested political issues, the judiciary must not shrink from its role as a coequal branch of government.

I ADOPT Judge Coffin's Findings & Recommendation (doc. 68), as elaborated in this opinion, Defendants' Motion to Dismiss (doc. 27) and Intervenors' Motion to Dismiss (doc. 19) are DENIED.

IT IS SO ORDERED.

### ORDER and FINDINGS & RECOMMENDATION

Coffin, Magistrate Judge:

The motions before the court are directed against a relatively unprecedented lawsuit that, in essence, seeks relief from government action and inaction that allegedly results in carbon pollution of the atmosphere, climate destabilization, and ocean acidification. The government action and inaction allegedly threatens catastrophic consequences which have already began and will progressively worsen in the near future.

Plaintiffs include a group of younger individuals (aged 8–19) who assert concrete harm from excessive carbon emissions. Also among the plaintiffs are associations of activists who assert they are beneficiaries of a federal public trust which is being harmed by allegedly substantial impairment and alienation of public trust resources through ongoing actions to allow fossil fuel exploitation. Finally, plaintiff

Dr. James Hansen participates as a guardian for plaintiff "future generations."

Plaintiffs are suing the United States and various government officials and agencies because, they assert, the government has known for decades that carbon dioxide ($CO_2$) pollution has been causing catastrophic climate change and has failed to take necessary action to curtail fossil fuel emissions. Moreover, plaintiffs allege that the government and its agencies have taken action or failed to take action that has resulted in increased carbon pollution through fossil fuel extraction, production, consumption, transportation, and exportation. Plaintiffs assert that a reduction of global $CO_2$ concentrations to less than 350 parts per million is possible, but action must be taken immediately to prevent further ocean acidification and ocean warming. Plaintiffs allege the current actions and omissions of defendants make it extremely difficult for plaintiffs to protect their vital natural systems and a livable world. Consequently, plaintiffs seek immediate action to restore energy balance and implementation of a plan to put the nation on a trajectory (that if adhered to by other major emitters) will reduce atmospheric $CO_2$ concentrations to no more than 350 parts per million by 2100.

Plaintiffs assert the actions and omissions of defendants that increased $CO_2$ emissions "shock the conscience," and are infringing the plaintiffs' right to life and liberty in violation of their substantive due process rights. Plaintiffs also allege defendants have violated plaintiffs' equal protection rights embedded in the Fifth Amendment by denying them protections afforded to previous generations and by favoring short term economic interests of certain citizens. Plaintiffs further allege defendants' acts and omissions violate the implicit right, via the Ninth Amendment, to a stable climate and an ocean and atmo-

sphere free from dangerous levels of $CO_2$. Finally, plaintiffs allege defendants have violated a public trust doctrine, secured by the Ninth Amendment, by denying future generations essential natural resources.

Through this action, plaintiffs ask the court to:

1.  Declare that Defendants have violated and are violating Plaintiffs' fundamental constitutional rights to life, liberty, and property by substantially causing or contributing to a dangerous concentration of $CO_2$ in the atmosphere, and that, in so doing, Defendants dangerously interfere with a stable climate system required by our nation and Plaintiffs alike;

2.  Enjoin Defendants from further violations of the Constitution underlying each claim for relief;

3.  Declare the Energy Policy Act, Section 201, to be unconstitutional on its face;

4.  Declare DOE/FE Order No. 3041, granting long-term multi-contract authorization to Jordan Cove Energy for LNG exports from its Coos Bay terminal, to be unconstitutional as applied and set it aside;

5.  Declare Defendants' public trust violations and enjoin Defendants from violating the public trust doctrine underlying each claim for relief;

6.  Order Defendants to prepare a consumption-based inventory of U.S. $CO_2$ emissions;

7.  Order Defendants to prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ so as to stabilize the climate system and protect the vital resources on which Plaintiffs now and in the future will depend . . .

First Amended Complaint (# 7) at 94. Plaintiffs also seek to have this court retain jurisdiction over this action to monitor and enforce defendants' compliance with a national remedial plan and associated orders requiring the above.

In essence, plaintiffs assert a novel theory somewhere between a civil rights action and NEPA/Clean Air Act/Clean Water Act suit to force the government to take action to reduce harmful pollution. Although, plaintiffs, for the most part, do not challenge a specific agency action and urge the court to order government-wide action for the benefit of the earth and mankind, they also seek "other relief as the Court deems just and proper." Id.

The court has previously granted the National Association of Manufacturers (NAM), American Fuel & Petrochemical Manufacturers (AFPM), and American Petroleum Institute (API) motion to intervene in this action. These organizations represent various entities in the coal, oil, and gas industry, including businesses that extract, refine, and use such energy sources. The intervenors move to dismiss the amended complaint. The government similarly moves to dismiss all claims.[1]

Movants assert plaintiffs lack standing to bring this suit, raise non-justiciable political questions, and they fail to state a constitutional claim. In addition, the movants assert the public trust doctrine does not provide a cognizable federal cause of action.

A.  Standing

Plaintiffs must demonstrate standing for each claim they seek to press and for each form of relief sought. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). At the

---

1.  The government also moves to strike various exhibits to declarations and declarations submitted by plaintiffs in opposition to the motion to dismiss. This recommendation is made without resort to these materials. Accordingly, the motion to strike is denied.

JULIANA v. U.S.                    1265
Cite as 217 F.Supp.3d 1224 (D.Or. 2016)

pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For Article III standing, plaintiffs must satisfy three "irreducible constitutional minimum" requirements: (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. Id. at 560–61, 112 S.Ct. 2130.

### 1. Concrete, Particularized, Imminent Injury

Plaintiffs allege that climate change endangers humanity and nature and is a consequence of human caused or influenced green house gases, primarily $CO_2$, derived from the combustion of fossil fuels. First Amended Complaint (FAC)(# 7) at ¶ 202. Plaintiffs allege because $CO_2$ persists in the atmosphere, future emissions will lead to severe impacts on children and future generations and the current level of $CO_2$ has already taken our country into the "danger zone." Id. At 206–07. Plaintiffs aver emissions must be rapidly and systematically reduced in order to avoid crossing the tipping points that set in motion disastrous, irrevocable impacts to human civilization and nature. Id. At 208. According to plaintiffs it will be nearly impossible for them to adapt to all of the current climate change impacts in the quick time-frame in which they will occur and that, therefore, "the survival and well-being of plaintiffs is significantly threatened by climate destabilization." Id. at ¶ 208, ¶ 211. Plaintiffs further allege that climate change is "already damaging human and natural systems, causing loss of life and pressing species to extinction." Id. at ¶ 213. Plaintiffs allege specifics regarding global changes that also lead to local harm such as: disintegration of both the West and East Antarctic ice sheets with concomitant sea level rise damaging coastal regions; changing rainfall and atmospheric conditions affecting water and heat distribution causing severe storm surges, floods, hurricanes, droughts, insect infestation, reduced crop yields, increased invasive vegetation, and fires; ocean acidification damaging sea life; increase in allergies, asthma, cancer, and other diseases; and harm to national security causing destabilization in various regions of the world. Id. at ¶¶ 213–241.

However, plaintiffs also assert injuries that are personal in nature such as: jeopardy to family farms resulting from the planned Jordan Cove gas line,[2] increased temperatures, and wildfires (FAC at ¶¶ 31–34, 23–30); lost recreational opportunities (e.g., FAC at ¶¶ 28–29, 31–34); and harm to family dwellings from superstorms (e.g., FAC at ¶ 71–72),[3] etc. See,

2. Following oral argument on the motions, the Federal Energy Regulatory Commission denied applications to locate the Jordan Cove Energy Project in Coos Bay, Oregon and its associated pipeline. The decision, balancing the need of the project against adverse impacts on landowners and the environment appears to be primarily based on a lack of current market need from natural gas customers in Asia. The applicants, Veresen Inc. and the Williams Partners, are free to reapply in the future and the Commission will reconsider the planned pipeline if they can demonstrate a market need for liquified natural gas.

In addition, the applicants plan to file a request to rehear the decision. For purposes of the motion to dismiss, the court takes as true the allegations of an imminent threat from the proposed project.

3. Plaintiff Victoria B's allegations(in addition to other plaintiffs) raise another issue not addressed in the motions to dismiss regarding this court's jurisdiction to address harms arising outside of the district from action and inaction by various government agencies that often also arise outside of the District of Oregon. See, e.g., FAC at ¶ 72–73 (damage to

**1266**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

Memorandum of Plaintiffs in Opposition to Federal Defendants' Motion to Dismiss (# 41) at pp. 29–33. While the personal harms are a consequence of the alleged broader harms, noted above, that does not discount the concrete harms already suffered by individual plaintiffs or likely to be suffered by these plaintiffs in particular in the future. See Federal Election Com'n v. Akins, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998).

> Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found "injury in fact." See Public Citizen [v. U.S. Dept. of Justice], 491 U.S. [at 440,] 449–50, 109 S.Ct. at [2558,] 2564–2565[, 105 L.Ed.2d 377 (1989) ] ("The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure . . . does not lessen [their] asserted injury"). Thus the fact that a political forum may be more readily available where an injury is widely shared (while counseling against, say, interpreting a statute as conferring standing) does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an "injury in fact." This conclusion seems particularly obvious where (to use a hypothetical example) large numbers of individuals suffer the same common-law injury (say, a widespread mass tort), or where large numbers of voters suffer interference with voting rights conferred by law. C.f. Lujan, supra, at 572, 112 S.Ct. at 2142–2143; Shaw v. Hunt, 517 U.S. 899, 905, 116 S.Ct. 1894, 1900–1901, 135 L.Ed.2d 207 (1996).

home and school in New York as a result of superstorm Sandy). While such allegations highlight the unwieldy nature of the case, the allegations establish that $CO_2$ emissions cross

The court must accept the allegations as true and those allegations plausibly allege harm, though widespread, that is concrete.

[67] Of course, federal courts are not forums in which to air generalized grievances about the conduct of government. See Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The constitutional limits on standing eliminate claims in which a plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, a plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim. For example, a litigant normally must assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens." Warth v. Seldin, 422 U.S. at 499, 95 S.Ct. at 2205. He also must assert his own legal interests rather than those of third parties, [footnote omitted] Ibid. Accord, Arlington Heights v. Metropolitan Housing Dev. Corp., supra, 429 U.S. at 263, 97 S.Ct. at 561.

geographic boundaries and cause harm within the district and outside the district from many of the same sources regulated by the defendants.

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

Given the allegations of direct or threatened direct harm, albeit shared by most of the population or future population, the court should be loath to decline standing to persons suffering an alleged concrete injury of a constitutional magnitude. See U.S. v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973):

> standing is not to be denied simply because many people suffer the same injury. Indeed some of the cases on which we relied in Sierra Club demonstrated the patent fact that persons across the Nation could be adversely affected by major governmental actions. See, e.g., Environmental Defense Fund v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1097 [ (D.C. Cir. 1970) ] (interests of consumers affected by decision of Secretary of Agriculture refusing to suspend registration of certain pesticides containing DDT); Reade v. Ewing, 205 F.2d 630, 631–632 [ (2d Cir. 1953) ] (interests of consumers of oleomargarine in fair labeling of product regulated by Federal Security Administration). To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.

While the FAC identifies numerous climatic, meteorologic, and political harms that the Earth and its inhabitants will suffer as a result of the government's action and failure to act with respect to $CO_2$ emissions, the plaintiffs differentiate the impacts by alleging greater harm to youth and future generations.[4] At this stage of the proceedings, the allegations, which must be taken as true, establish standing to action that injures plaintiffs in a concrete and personal way.

The debate about climate change and its impact has been before various political bodies for some time now. Plaintiffs give this debate justiciability by asserting harms that befall or will befall them personally and to a greater extent than older segments of society. It may be that eventually the alleged harms, assuming the correctness of plaintiffs' analysis of the impacts of global climate change, will befall all of us. But the intractability of the debates before Congress and state legislatures and the alleged valuing of short term economic interest despite the cost to human life, necessitates a need for the courts to evaluate the constitutional parameters of the action or inaction taken by the government. This is especially true when such harms have an alleged disparate impact on a discrete class of society.

To reiterate, at this stage of the proceedings the court must accept the allegations of concrete particularized harm or imminent threat of such harm as true. The question then becomes whether the alleged harm is traceable to defendants' conduct and whether the court can redress such harm.

2.  Causation

As noted above, there must be a causal connection between the injury and the conduct of which plaintiffs complained. In other words, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26,

---

4. The plaintiffs essentially allege that the defendants have "discounted" emissions so as to pass on more severe impacts to younger and future generations to allow the present (and older) generations to reap the economic benefits of higher carbon emissions.

**1268**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

At the pleading stage, general factual allegations of injury resulting from the defendants' conduct may suffice because the court must presume that general allegations embrace those specific facts that are necessary to support the claim. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The government asserts that the association between the complained of conduct (such as subsidizing the fossil fuel industry, favorable revenue code provisions, allowing transport of fossil fuels, and authorizing fossil fuel combustion in the energy/refinery/transportation/manufacturing sectors) and the associated greenhouse gas emissions that ultimately cause the harm is tenuous and filled with countless intervening actions by unidentified third parties. However, as alleged, without the complained of conduct, the third parties would not be able to engage as extensively in the activities that allegedly cause climate change and the resulting harm.

To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a line of causation between defendants' action and their alleged harm that is more than attenuated. Allen v. Wright, 468 U.S. 737, 757, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). A causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible. Nat'l Audubon Soc., Inc. v. Davis, 307 F.3d 835, 849 (9th Cir.2002). In cases where a chain of causation involves numerous third parties whose independent decisions collec-

tively have a significant effect on plaintiffs' injuries, the causal chain may be too weak to support standing at the pleading stage. See Allen, 468 U.S. at 759, 104 S.Ct. 3315.

But here, there is an alleged strong link between all the supposedly independent and numerous third party decisions given the government's regulation of $CO_2$ emissions. See, e.g., 42 U.S.C. § 7409 (providing the EPA the authority to regulate national ambient air quality standards for the attainment and maintenance of the public health); Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (EPA has power to regulate greenhouse gas emissions). If the allegations in the complaint are to be believed, the failure to regulate the emissions has resulted in a danger of constitutional proportions to the public health. Presumably, sweeping regulations by this agency (the EPA) alone could result in curtailing of major $CO_2$ producing activities by not just the defendant agencies, but by the purported independent third parties as well.[5] At this pleading stage, the court need not sort out the necessity or propriety of all the various agencies and individuals to participate as defendants, at least with respect to issues of standing. For now, it is sufficient that EPA's action/inaction with respect to the regulation of greenhouse gases allegedly results in the numerous instances of emissions that purportedly cause or will cause the plaintiffs harm. Assuming lack of EPA or other government action to reduce emissions, the analysis turns to redressability.

---

**5.** The court is aware that there are administrative procedures to petition EPA to make rules and that a denial of that decision is reviewable by the courts. The plaintiffs have apparently not sought such rulemaking to limit $CO_2$ emissions, but the court does have jurisdiction to address alleged constitutional

violations by government agencies and to provide equitable relief. C.f. Reeves Brothers, Inc. v. EPA, 956 F.Supp. 665 (W.D.Va.1995) (CERCLA general prohibition against federal court jurisdiction over challenges to remedial actions did not bar constitutional challenges to actions of EPA).

### 3.   Redressability of the Injury

At this stage of the proceedings, the court's job is not to determine whether increased greenhouse gases have impacted the climate and will have dire consequences for future generations. The issue is whether the court can fashion a remedy to address that alleged harm should plaintiffs prove it. Redressability does not require certainty, but it does require a substantial likelihood that the injury will be redressed by a favorable judicial decision. Wolfson v. Brammer, 616 F.3d 1045, 1056 (9th Cir.2010).

Assuming plaintiffs are correct that the United States is responsible for about 25% of the global $CO_2$ emissions, the court cannot say, without the record being developed, that it is speculation to posit that a court order to undertake regulation of greenhouse gas emissions to protect the public health will not effectively redress the alleged resulting harm. The impact is an issue for the experts to present to the court after the case moves beyond the pleading stage. And although this court has no authority outside of its jurisdiction, it is worth noting that a Dutch court, on June 24, 2015, did order a reduction of greenhouse gas emissions nationwide by at least 25% by 2020. See Urgenda Foundation v. The State of The Netherlands, The Hague District Court, Chamber for Commercial Affairs, Case No. C/09/456689/HA ZA 13–1396 (June 24, 2015) (http://deeplink.rechtspraak.nl/uitspraak?id=ECLI:NL:RBDHA:2015:7196) (rejecting arguments that a reduction of Netherlands' emissions would be ineffectual in light of other nations' practices, observing that "The state should not hide behind the argument that the solution to the global climate problem does not depend solely on Dutch efforts. Any reduction of emissions contributes to the prevention of dangerous climate change and as a developed country the Netherlands should take the lead in this."). Thus, regulation by this country, in combination with regulation already being undertaken by other countries, may very well have sufficient impact to redress the alleged harms. The effect may or may not be scientifically indiscernible, but that is an issue better resolved at summary judgment or trial rather than on a motion to dismiss. See Washington Environmental Council v. Bellon, 732 F.3d 1131, 1142–43 (9th Cir.2013) (deciding at the summary judgment stage that numerous greenhouse gas sources inside and outside the U.S. contribute to the effect and that the nexus between the state's refinery emissions and localized impacts was too scientifically uncertain). Plaintiffs allege that expert evidence will show that the effect resulting from a court order for the government to take action to deter fossil fuel production and regulate emissions will have a discernible impact on the alleged constitutional harms likely to befall plaintiffs if the court does nothing.

At this stage, the court will not dismiss the premise that an order to regulate, per EPA's statutory authority to regulate $CO_2$, will result in that impact. The allegations establish that, for instance, the EPA's failure to regulate impacts the younger population within this district and it may very well be that an order to act to protect the public health as directed will address that harm.[6] Given the complexities of the allegations and the need for expert opinion to establish the harm associated with government action and the extent to which a court order can limit that harm, the issue may be better addressed at the summary judgment stage.

In sum, for the above reasons, the court should decline to dismiss the case for a lack of standing.

---

**6.**   Plaintiffs allege that 'events, omissions, and harms giving rise to the claims herein arise in substantial part in this judicial district.' (FAC at ¶ 15)

47a

1270            217 FEDERAL SUPPLEMENT, 3d SERIES

### B.  Political Question

Closely related to the standing issue, is the issue of non-justiciable political questions. As plaintiffs note, "Standing is just the obverse of political question.  If a litigant claims that an individual right has been invaded, the lawsuit by definition does not involve a political question." Plaintiffs' Memorandum in Opposition to Intervenors' Motion to Dismiss (# 56) at p. 16, n. 12 (citing Howard Fink & Mark Tushnet, *Federal Jurisdiction: Policy and Practice* 231 (2d ed.1987).

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers.  Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

While on the surface this case appears to implicate authority of the Congress,

courts can order agencies delegated that authority (via Congress) to craft regulations, to engage in such process.  Some defendant agencies have undertaken regulation of greenhouse gases allegedly exercising their discretion to prioritize relatively cheap energy over deleterious impacts to the environment.  While courts cannot intervene to assert "better" policy, see, e.g., Massachusetts v. E.P.A., 549 U.S. at 533, 127 S.Ct. 1438 (once EPA has responded to a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute), they can address constitutional violations by government agencies and provide equitable relief.  C.f. Reeves Brothers, Inc. v. EPA, 956 F.Supp. 665 (W.D.Va. 1995) (CERCLA general prohibition against federal court jurisdiction over challenges to remedial actions did not bar constitutional challenges to actions of EPA).  The complaint does raise issues of whether government action/inaction violates the Constitution and these are issues committed to the courts rather than either of the political branches.

As implied above, the amended complaint's broad request for relief does implicate some unmanageable issues, but that does not bar the case completely.  As also noted, at a minimum, the EPA is charged with regulating greenhouse gas emissions to protect the public health.  While the efficacy of any proposed regulations is perhaps beyond the expertise of the court, it can evaluate the competing experts on either side of the issues and direct the EPA to take a hard look at the best available scientific evidence.  The court need not dictate any regulations, only direct the EPA to adopt standards that prevent the alleged constitutional harm to the youth and future generation plaintiffs, should plaintiffs prevail in demonstrating such is possible.[7]  Again, it is too early in the

---

**7.**  Although not the route plaintiffs have expressly chosen in the prayer for remedies,

proceedings to determine whether the issue can be resolved without expressing lack of respect due to the executive branch in conducting its rule-making authority delegated it by Congress. The motion to dismiss, on this basis, should be denied at this time.

Turning to the next issue, plaintiffs' standing and the lack of political questions require a valid constitutional claim.

## C. Valid Constitutional Claim

Defendants argue that there is no constitutional right to be free from $CO_2$ emissions, that the complaint fails to allege a classification appropriate for an equal protection claim, that the Ninth Amendment does not provide any substantive rights, and that the plaintiffs have failed to allege an otherwise complete lack of any rational basis for the purported aggregate action/inaction taken by defendants. However, at this stage of the proceedings, defendants take an overly simplistic approach in construing the constitutional claims raised by plaintiffs. The complaint does not assert a right to be free from $CO_2$ emissions.[8] Plaintiffs assert that the defendants' action/inaction with respect to their obligations regarding regulating environmental pollutants has violated their substantive due process rights and has done so in favor of older generations.

The Fifth Amendment provides in part that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

[68] Courts must employ caution and restraint when employing substantive due process protections to government action. See Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). However, courts must not abandon substantive due process rights either. Id. Accordingly, substantive due process rights are limited by careful respect for the teachings of history and recognition of the basic values that underlie our society. Id. at 503, 97 S.Ct. 1932. Therefore, only official conduct that "shocks the conscience" is cognizable as a due process violation. Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir.2008).

Generally, the Due Process Clause limits the government's power to act, but does not guarantee certain minimal levels of safety and security. DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The language of the Due Process Clause does not impose an affirmative obligation on the government to ensure that those interests do not come to harm through other means. Id. However, there is an exception where government action creates the danger. See L.W. v. Grubbs, 974 F.2d 119, 121–22 (9th Cir.1992). In such cases, deliberate indifference may suffice to establish a due process violation. See L.W. v. Grubbs, 92 F.3d 894, 896 (9th Cir.1996). Deliberate indifference requires creation of a dangerous situation with actual knowledge or willful ignorance of impending harm. Id. at 900. Plaintiffs

---

they have asked for "other relief [deemed] just and proper" and, the court can compel EPA to perform nondiscretionary acts or duties. 42 U.S.C. § 7604(a)(2); see, e.g., Sierra Club v. Thomas, 828 F.2d 783, 787–92 (D.C.Cir.1987). The court's authority in this regard demonstrates that simply ordering an agency to take action delegated it by Congress in order to avoid constitutional harms does implicate justiciability and negates a finding

that the issue is committed solely to another branch of government.

8. Plaintiffs do, however, assert that future generations are a suspect class. The court should decline to create a new separate suspect class based on posterity. Nonetheless, the complaint does allege discrimination against a class of younger individuals with respect to a fundamental right protected by substantive due process.

allege that the defendants' action in this case has created a life-threatening situation and that defendants have willfully ignored long-standing and overwhelming scientific evidence of that impending harm to the young and future generations.

The government argues that the complaint fails to allege a clear and present danger of imminent harm, an overt government act that proximately causes the dangerous situation, deliberate indifference on the part of the government to plaintiffs' safety, or subsequent physical harm or loss of life. For purposes of a motion to dismiss, plaintiffs need only plead government action, or failure to act where it has a duty to do so, which creates a threat of imminent harm, and the government's deliberate indifference to that threat of harm.

In this case, the government has allegedly taken action through subsidies, regulations, etc. that creates massive $CO_2$ emissions, and has failed to limit such emissions despite a duty to do so. Plaintiffs further allege they are prevented any means of escape from the resulting climate that threatens their property, health, and even existence. As noted above, the EPA has a duty to regulate $CO_2$ emissions for the benefit of the public health and plaintiffs allege a deliberate indifference to the purported catastrophic risk to their health and well-being. Whether such action, or inaction in the face of a duty to act, shocks the conscience cannot be determined on a motion to dismiss, which is focused solely on the plaintiffs' complaint and is bereft of any evidentiary record.[9] Accordingly, the court should decline to dismiss the complaint for failure to allege a substantive due process claim.

### D.  Public Trust Doctrine

Similarly, the court should decline to dismiss any notions in the amended complaint that the Due Process Clause also provides a substantive right under the public trust doctrine. As noted above, the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," Moore, 431 U.S. at 503, 97 S.Ct. 1932; Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

Defendants argue that the Supreme Court and the Ninth Circuit have already foreclosed on the possibility of an independent cause of action under the doctrine against the federal government by a private individual. See PPL Montana, LLC v. Montana, 565 U.S. 576, 132 S.Ct. 1215, 1235, 182 L.Ed.2d 77 (2012) (the public trust doctrine remains a matter of state law); U.S. v. 32.42 Acres of Land. More or Less. Located in San Diego County, Cal., 683 F.3d 1030, 1038 (9th Cir.2012) (While the equal-footing doctrine is grounded in the Constitution, "the public trust doctrine remains a matter of state law").

However, the cases cited by defendants are distinguishable. In PPL Montana. LLC, the Supreme Court essentially held that the State of Montana did not hold title to riverbeds under segments of river that were non-navigable at the time of statehood. Under the equal footing doctrine,

---

**9.** For example, discovery may produce evidence regarding when defendants and intervenors were aware of the harmful effects of $CO_2$ emissions and whether the public was

purposely misled about those effects, which evidence would be relevant to the "shocks the conscience" standard.

which is embedded in the Constitution, a State takes title to all riverbeds of navigable rivers upon statehood. In response to the State of Montana's argument that "denying the State title to the riverbeds here in dispute will undermine the public trust doctrine," the Court observed:

> While equal-footing cases have noted that the State takes title to the navigable waters and their beds in trust for the public, see Shively, 152 U.S. at 49, 15–17, 24, 46, 14 S.Ct. 548, the contours of that public trust do not depend upon the Constitution. Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.

PPL Montana, LLC, 132 S.Ct. at 1235.

In other words, Montana's argument essentially was an attempt to conflate the equal footing doctrine with the public trust doctrine resulting in the State having title to even non-navigable riverbeds pursuant to the latter doctrine. The Court merely rejected this contention as "apples and oranges," pointing out that the equal footing doctrine requires that a State take title to riverbeds of *navigable* rivers upon statehood, and that thereafter state law determines the scope of the public trust over such waters. The question whether the United States has public trust obligations for waters over which it alone has sovereignty (e.g., the territorial seas of its coastline) was simply not presented to or decided by the Court in PPL Montana, LLC.

The seminal case for the public trust doctrine is Illinois Cent. R. Co. v. State of Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892) which likewise implicated an equal footing question and in which the Court noted:

> That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under tide water, by the common law, we have already shown; and that title necessarily carries with it control over the waters above them, whenever the lands are subjected to use. But it is a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties.

Id. at 452, 13 S.Ct. 110.

Once the State obtains sovereignty over navigable riverbeds, the United States has ceded all its title and thus the public trust doctrine governing the State's disposition of such lands "remains a matter of state law." PPL Montana, LLC, 132 S.Ct. at 1235.

Likewise, in U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal., the Ninth Circuit dealt with a case wherein the federal government exercised its powers of eminent domain to acquire San Diego Port District tidelands (for use by the United States Navy) which had been transferred to the State of California under the equal footing doctrine in 1850 when California was admitted to the Union. In response to the California Lands Commission argument that the public trust doctrine restricted the ability of both federal and State governments to alienate public trust lands free of the public trust, the Ninth Circuit held:

**1274**        **217 FEDERAL SUPPLEMENT, 3d SERIES**

While the equal-footing doctrine is grounded in the Constitution, "the public trust doctrine remains a matter of state law," the contours of which are determined by the states, not by the United States Constitution.  PPL Montana, 565 U.S. 576, 132 S.Ct. 1215 at 1235, 182 L.Ed.2d 77.  Holding that California's public trust interest in the Property survives the federal government's attempt to condemn it would subjugate the federal government's eminent domain power to California's state law public trust doctrine.  See [U.S. v. ]Carmack, 329 U.S. at[230, ]240–42, 67 S.Ct. 252[, 91 L.Ed. 209 (1946) ];  United States v. 11.037 Acres of Land, 685 F.Supp. 214, 217 (N.D.Cal.1988) (holding that California's public trust is extinguished by United States' declaration of taking because state law public trust is trumped by federal power).  The Supremacy Clause prevents this outcome.  U.S. Const., art. VI, cl. 2.

U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal., 683 F.3d at 1038.

I also note that in the 32.42 Acres case the district court had specifically found, over the government's objection, that a portion of the land acquired by the United States within the tidelands (4.88 acres) was acquired subject to its own federal trust. See Order dated April 28, 2006(# 24) at p. 11 in United States v. 32.42 Acres of Land, Case No. 05–cv–1137–DMS, (S.D.Cal. April 28, 2006) (emphases added).  The government did not cross-appeal this part of the district court's order and it was not disturbed or addressed by the Ninth Circuit.

This case is different in that it does not at all implicate the equal footing doctrine or public trust obligations of the State of Oregon.  The public trust doctrine invoked instead is directed against the United States and its unique sovereign interests over the territorial ocean waters and atmosphere of the nation.

The doctrine is deeply rooted in our nation's history and indeed predates it. See, e.g., Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894) (recounting the American history of the doctrine).  As observed in Shively :

At common law, the title and the dominion in lands flowed by the tide were in the king for the benefit of the nation.  Upon the settlement of the colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established.  Upon the American Revolution, these rights, charged with a like trust, were vested in the original states within their respective borders, subject to the rights surrendered by the constitution to the United States.

Upon the acquisition of a territory by the United States, whether by cession from one of the states, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and in trust for the several states to be ultimately created out of the territory.

The new states admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands under them, within their respective jurisdictions.  The title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several states, subject to the rights granted to the United States by the Constitution.

Id. at 57–58, 14 S.Ct. 548.

While the scope of the public trust doctrine may only reach the low water mark on the regions of the sea and great lakes, the water over those lands, and the waters

JULIANA v. U.S.                    1275
Cite as 217 F.Supp.3d 1224 (D.Or. 2016)

and streams of any consequence, see, e.g., *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L.Rev. 471, 556 (1970), the complaint touches upon protected areas (territorial ocean waters at a minimum) impacted by the government's alleged conduct and harm to many plaintiffs given the alleged sea level rise, ocean acidification, and atmosphere change.

What emerges from an analysis of the public trust doctrine is that it is rare to find instances where the United States retains vestiges of trust obligations once territories become states and title vests in the newly formed state pursuant to the equal footing doctrine of the Constitution. Some guidance is found, however, in those cases wherein the United States has reacquired tidelands through eminent domain from the State. One such case is United States v. 32.42 Acres of Land, supra. Another is City of Alameda v. Todd Shipyards Corp., 635 F.Supp. 1447 (N.D.Cal.1986), wherein the court squarely held that "The United States may not abdicate the role of trustee for the public when it acquires land by condemnation." Id. at 1450. See also United States v. 1.58 Acres of Land Situated in City of Boston, Suffolk County, Com. of Mass., 523 F.Supp. 120, 124–25 (D.Mass.1981):

we hold that the federal government may take property below the low water mark in "full fee simple" insofar as no other principal may hold a greater right to such land. It must be recognized, however, that the federal government is as restricted as the Commonwealth in its ability to abdicate to private individuals its sovereign jus publicum in the land. So restricted, neither the Commonwealth's nor the federal government's trust responsibilities are destroyed by virtue of this taking, since neither government has the power to destroy the trust or to destroy the other sovereign.

The court's intervention in this area may seemingly touch upon powers committed to Congress under Article IV, § 3, Cl. 2 (Congress shall have the power to dispose and make all needful rules and regulations respecting the territory and other property of the United States). In addition, it is not for the courts to say how the trust in resources and the territory shall be administered, that is for Congress to determine. State of Alabama v. State of Texas, 347 U.S. 272, 273, 74 S.Ct. 481, 98 L.Ed. 689 (1954) (citing United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) ("the constitutional power of Congress under Article IV, § 3, Cl. 2 is without limitation."). However, even defendant Department of the Interior has recognized limits on government control over the territorial sea. See United States Department of Justice, Office of Legal Counsel, Memorandum Opinion for the Solicitor Department of the Interior, *Administration of Coral Reef Resources in the Northwest Hawaiian Islands*, 2000 WL 34475732 at *7 (September 15, 2000) (the public trust doctrine, which the Court did not address in Alabama, might limit in some ways the extent of the Government's control over the territorial sea). The Department further noted that doctrine does grant the government power to exercise dominion over that area to protect it and its resources for public enjoyment and noted the government's role as public trustee. Id. And, as noted above, courts have noted and restricted the federal government's actions with respect to tidelands based on the federal public trust. United States v. 32.42 Acres of Land, Case No. 05–cv–1137–DMS, supra ; City of Alameda v. Todd Shipyards Corp., 635 F.Supp. 1447, supra.

At the hearing on defendants and intervenors' motions to dismiss, the court their queried counsel whether, hypothetically, Congress could alienate the territorial wa-

**1276**          **217 FEDERAL SUPPLEMENT, 3d SERIES**

ters of the United States off the West Coast to a private corporation, or whether that would implicate a public trust issue under the Constitution.  Both parties suggested Congress could cede the territorial waters to a private corporation, and that <u>PPL Montana, LLC,</u> forecloses any argument that the public trust doctrine applies to the federal government.

As explained above, I cannot read <u>PPL Montana, LLC,</u> given the context of the argument being addressed by the Courts to have such a sweeping and profound effect.[10]  Nor can I imagine that our coastal sea waters could possibly be privatized without implicating principles that reflect core values of our Constitution and the very essence of the purpose of our nation's government.

When combined with the EPA's duty to protect the public health from airborne pollutants and the government's public trust duties deeply ingrained in this country's history, the allegations in the complaint state, for purposes of a motion to dismiss, a substantive due process claim.  At this stage of the proceedings, the court cannot say that the public trust doctrine does not provide at least some substantive due process protections for some plaintiffs within the navigable water areas of Oregon.  Accordingly, the court should not dismiss any claims under the public trust doctrine to that extent.

The nascent nature of these proceedings dictate further development of the record before the court can adjudicate whether any claims or parties should not survive for trial.  Accordingly, the court should deny the motions to dismiss.

CONCLUSION

For the reasons stated above, the intervenors' motion to dismiss (# 19) and the government's motion to dismiss (# 27) should be denied.  The government's motion to strike (# 58) is denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.  The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court.  Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.



---

**10.**  In <u>Shively,</u> which the Court cited in its <u>PPL Montana, LLC</u> decision, expressly held that ''[u]pon the acquisition of a territory by the United States, whether by cession from one of the states, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and <u>in trust</u> for the several states to be ultimately created out of the territory.  <u>Shively,</u> 152 U.S. at 57, 14 S.Ct. 548.  Thus, a federal public trust doctrine was recognized in <u>Shively,</u> and <u>PPL Montana. LLC</u> did not overrule this precedent.

54a

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

# FILED

JUL 25 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re:  UNITED STATES OF AMERICA; et al.<br><br>⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯<br><br>UNITED STATES OF AMERICA; et al.,<br><br>      Petitioners,<br><br> v.<br><br>UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON, EUGENE,<br><br>      Respondent,<br><br>KELSEY CASCADIA ROSE JULIANA; et al.,<br><br>      Real Parties in Interest. | No.    17-71692<br><br>D.C. No.<br>6:15-cv-01517-TC-AA<br>District of Oregon, Eugene<br><br>ORDER |

Before:  GOODWIN, KOZINSKI, and BERZON, Circuit Judges.

The Court stays district court proceedings, temporarily, pending further order from this court.  *See* Ninth Circuit Gen. Ord. 6.8(a).

The petition for a writ of mandamus and all other pending motions will be addressed by separate order.

LAB/MOATT

**830**    884 **FEDERAL REPORTER, 3d SERIES**

by the post-appeal restitution proceedings." Because we reverse the district court's restitution award to PSM, the district court's rationale for denying Defendants' motion to retax is undermined, at least in part. Accordingly, we vacate the district court's denial and remand for further consideration in light of today's opinion.

### III.

For the reasons set forth above:

1.  In No. 15-55026 & 15-55087, we reverse the district court's December 17, 2014, order with respect to the order's award of $1.1 million in restitution to PSM.[9] We dismiss as moot PSM's appeal of the district court's denial of prejudgment interest. We affirm the December 17 order in all other respects, including as to the issue of QSA rescission.

2.  In No. 15-55941, we reverse the district court's May 19, 2015, order awarding attorneys' fees to Defendants. In No. 15-55943, Defendants' appeal of the district court's reduction of the lodestar fee amount is dismissed as moot.

3.  In No. 15-56184, because we reverse PSM's restitution award, we vacate the district court's July 14, 2015, order denying Defendants' motion to retax costs and remand for reconsideration in light of the changed circumstances.

4.  In each of these five appeals, each party shall bear its own costs on appeal.

**AFFIRMED in part, REVERSED in part, VACATED and REMANDED in part, and DISMISSED in part.**



**IN RE UNITED STATES of America,**

**United States of America; Christy Gold-fuss, in her official capacity as Director of the Council on Environmental Quality; Mick Mulvaney, in his official capacity as Director of the Office of Management and Budget; John Holdren, Dr., in his official capacity as Director of the Office of Science and Technology Policy; Rick Perry, in his official capacity as Secretary of Energy; U.S. Department of the Interior; Ryan Zinke, in his official capacity as Secretary of Interior; U.S. Department of Transportation; Elaine Chao, in her official capacity as Secretary of Transportation; U.S. Department of Agriculture; Sonny Perdue, in his official capacity as Secretary of Agriculture; U.S. Department of Commerce; Wilbur Ross, in his official capacity as Secretary of Commerce; U.S. Department of Defense; Jim Mattis, in his official capacity as Secretary of Defense; U.S. Department of State; Office of the President of the United States; U.S. Environmental Protection Agency; U.S. Department of Energy; Donald J. Trump, in his official capacity as President of the United States; The National Association of Manufacturers; American Fuel & Petrochemical Manufacturers; American Petroleum Institute, Petitioners,**

v.

**United States District Court for the District of Oregon, Eugene, Respondent,**

---

**9.** We recognize that, in awarding PSM a $700,000 offset, the district court also required PSM to return the account receivable to BAIC. This $700,000 formed a part of the award to PSM that we now reverse, and so we also reverse that aspect of the district court's order that required PSM to return the receivable to BAIC.

Kelsey Cascadia Rose Juliana; Xiuh-tezcatl Tonatiuh M., through his Guardian Tamara Roske–Martinez; Alexander Loznak; Jacob Lebel; Zealand B., through his Guardian Kimberly Pash-Bell; Avery M., through her Guardian Holly McRae; Sahara V., through her Guardian Toa Aguilar; Kiran Isaac Oommen; Tia Marie Hatton; Isaac V., through his Guardian Pamela Vergun; Miko V., through her Guardian Pamela Vergun; Hazel V., through her Guardian Margo Van Ummersen; Sophie K., through her Guardian Dr. James Hansen; Jaime B., through her Guardian Jamescita Peshlakai; Journey Z., through her Guardian Erika Schneider; Victoria B., through her Guardian Daisy Calderon; Nathaniel B., through his Guardian Sharon Baring; Aji P., through his Guardian Helaina Piper; Levi D., through his Guardian Leigh-Ann Draheim; Jayden F., through her Guardian Cherri Foytlin; Nicholas V., through his Guardian Marie Venner; Earth Guardians, a nonprofit organization; Future Generations, through their Guardian Dr. James Hansen, Real Parties in Interest.

No. 17-71692

United States Court of Appeals, Ninth Circuit.

Argued and Submitted December 11, 2017 San Francisco, California

Filed March 7, 2018

**Background:** Environmental activists who were too young to vote, and purported guardian for future generations, brought action for declaratory and injunctive relief against United States, President, and various Executive Branch officials and agencies, alleging that greenhouse gas emissions from carbon dioxide, produced by burning fossil fuels, were destabilizing climate system, and asserting violations of substantive due process and defendants' obligation to hold natural resources in public trust. Industry associations intervened. After the United States District Court for the District of Oregon, No. 6:15-cv-01517-TC-AA, Ann L. Aiken, J., 217 F.Supp.3d 1224, denied defendants' and intervenors' motions to dismiss, government defendants filed petition for writ of mandamus requiring district court to dismiss case.

**Holding:** The Court of Appeals, Thomas, Chief Judge, held that mandamus relief requiring district court to dismiss action was not warranted.

Petition denied.

1. Mandamus ⟛1, 26, 28

    Writ of mandamus is drastic and extraordinary remedy reserved for really extraordinary causes, and only exceptional circumstances amounting to judicial usurpation of power or clear abuse of discretion will justify invocation of this extraordinary remedy.

2. Mandamus ⟛1

    In considering whether to grant writ of mandamus requiring district court to take action, court should consider: (1) whether petitioner has no other means, such as direct appeal, to obtain desired relief; (2) whether petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether district court's order is clearly erroneous as matter of law; (4) whether district court's order is oft repeated error or manifests persistent disregard of federal rules; and (5) whether district court's order raises new and important problems or issues of first impression.

3. Mandamus ⟛3(11), 11, 32

    Federal agencies and officials were not entitled to mandamus relief requiring

**832**    **884 FEDERAL REPORTER, 3d SERIES**

district court to dismiss action alleging that government policies enabling carbon dioxide emissions from burning of fossil fuels contributed to climate change, in violation of plaintiffs' constitutional rights, despite government's contention that mandamus was only means of obtaining relief from potentially burdensome discovery and of avoiding violation of separation of powers, where district court had not issued any discovery orders, plaintiffs had not filed any motions to compel discovery, any merits errors were correctable through ordinary course of litigation, there was no controlling authority on theories asserted by plaintiffs, and there was no oft-repeated error in case.

**4. Mandamus ⟺4(1)**

Writ of mandamus may not be used as substitute for appeal even though hardship may result from delay and perhaps unnecessary trial.

**5. Mandamus ⟺3(11), 32**

Mandamus relief to avoid burdensome or improper discovery is inappropriate where party has never sought relief before district court to resolve discovery dispute.

**6. Mandamus ⟺4(1)**

For mandamus petitioner to show that it will be damaged or prejudiced in any way not correctable on appeal, it must demonstrate some burden other than mere cost and delay that are regrettable, yet normal, features of legal system.

**7. Mandamus ⟺4(1)**

Prejudice serious enough to warrant mandamus relief includes situations in which one's claim will obviously be moot by time appeal is possible, or in which one will not have ability to appeal.

**8. Mandamus ⟺1**

Absence of controlling precedent weighs strongly against finding of clear error for mandamus purposes.

Appeal from the United States District Court for the District of Oregon, Ann L. Aiken, District Judge, Presiding, D.C. No. 6:15-cv-01517-TC-AA

Eric Grant (argued), Deputy Assistant Attorney General; Andrew C. Mergen, David C. Shilton, and Robert J. Lundman, Appellate Section; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; for Petitioners.

Julia Ann Olson (argued), Wild Earth Advocates, Eugene, Oregon; Philip L. Gregory, Cotchett Pitre & McCarthy LLP, Burlingame, California; for Real Parties in Interest.

William John Snape III and David Hunter, American University, Washington College of Law, Washington, D.C., for Amici Curiae Center for International Environmental Law and Environmental Law Alliance Worldwide—US.

David Bookbinder, Niskanen Center, Washington, D.C., for Amicus Curiae Niskanen Center.

Courtney B. Johnson, Crag Law Center, Portland, Oregon, for Amici Curiae League of Women Voters of the United States and League of Women Voters of Oregon.

Sarah H. Burt, Earthjustice, San Francisco, California; Patti Goldman, Earthjustice, Seattle, Washington; for Amicus Curiae EarthRights International, Center for Biological Diversity, Defenders of Wildlife, and Union of Concerned Scientists.

James R. May and Erin Daly, Dignity Rights Project, Widener University, Delaware Law School, Wilmington, Delaware; Rachael Paschal Osborn, Vashon, Washington; for Amici Curiae Law Professors.

IN RE U.S.    **833**
Cite as 884 F.3d 830 (9th Cir. 2018)

Joanne Spalding, Sierra Club, Oakland, California; Alejandra Nuñez and Andres Restrepo, Sierra Club, Washington, D.C.; for Amicus Curiae Sierra Club.

Charles M. Tebbutt, Law Offices of Charles M. Tebbutt P.C., Eugene, Oregon, for Amici Curiae Global Catholic Climate Movement; Leadership Conference of Women Religious; Interfaith Power and Light; The Sisters of Mercy of the Americas' Institute Leadership Team; Sisters of Mercy Northeast Leadership Team; Interfaith Moral Action on Climate; Franciscan Action Network; The National Religious Coalition for Creation Care and Interfaith Oceans; The Faith Alliance for Climate Solutions; Eco-Justice Ministries; San Francisco Zen Center; The Shalom Center; GreenFaith; The Office of Apostolic Action & Advocacy; Christian life Community-USA; and Quaker Earthcare Witness.

Zachary B. Corrigan, Food & Water Watch Inc., Washington, D.C., for Amici Curiae Food & Water Watch Inc., Friends of the Earth—US, and Greenpeace Inc.

Before: Sidney R. Thomas, Chief Judge, and Marsha S. Berzon and Michelle T. Friedland, Circuit Judges.*

## OPINION

THOMAS, Chief Judge:

In this petition for a writ of mandamus, the defendants ask us to direct the district court to dismiss a case seeking various environmental remedies. The defendants argue that allowing the case to proceed will result in burdensome discovery obligations on the federal government that will threaten the separation of powers. We have jurisdiction over this petition pursuant to the All Writs Act, 28 U.S.C. § 1651.

_____
* Following the retirement of Judge Kozinski, Judge Friedland was randomly drawn to replace him on the panel. She has read the

Because the defendants have not met the high bar for mandamus relief, we deny the petition.

## I

Twenty-one young plaintiffs brought suit against the United States, the President, and various Executive Branch officials and agencies, alleging that the defendants have contributed to climate change in violation of the plaintiffs' constitutional rights. They allege that the defendants have known for decades that carbon dioxide emissions from the burning of fossil fuels destabilize the climate. The plaintiffs aver that the defendants have nevertheless enabled and continue to enable, through various government policies, the burning of fossil fuels, allowing atmospheric carbon dioxide concentrations to reach historically unprecedented levels. They allege that climate change is injuring them and will continue to injure them. The plaintiffs claim that, in light of these facts, the defendants have violated their constitutional rights.

The defendants moved to dismiss the suit for lack of jurisdiction and for failure to state a claim. The district court denied the motion. The court held that the plaintiffs plausibly alleged that they have Article III standing, did not raise non-justiciable political questions, and asserted plausible claims under the Due Process Clause of the Fifth Amendment.

The defendants moved the district court to stay the litigation and to certify its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court denied the motions. Anticipating burdensome discovery, the defendants petitioned this Court for a writ of mandamus and requested a stay of the litigation. In their petition,

_____
briefs, reviewed the record, and watched a video recording of the oral argument held on December 11, 2017.

the defendants ask that we direct the district court to dismiss the case. We granted the request for a stay and now consider the petition.

## II

**[1, 2]**  "The writ of mandamus is a drastic and extraordinary remedy reserved for really extraordinary causes." *In re Van Dusen*, 654 F.3d 838, 840 (9th Cir. 2011) (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947) ) (internal quotation marks omitted). "[O]nly exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify the invocation of this extraordinary remedy." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (internal quotation marks and citations omitted). In considering whether to grant a writ of mandamus, we are guided by the five factors identified in *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650 (9th Cir. 1977):

(1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief;

(2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal;

(3) whether the district court's order is clearly erroneous as a matter of law;

(4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and

(5) whether the district court's order raises new and important problems or issues of first impression.

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (citing *Bauman*, 557 F.2d at 654–55). "All factors are not relevant in every case and the factors may point in different directions in any one

case." *Christensen v. U.S. Dist. Ct.*, 844 F.2d 694, 697 (9th Cir. 1988).

## III

**[3]**  The defendants do not satisfy the *Bauman* factors at this stage of the litigation. The issues that the defendants raise on mandamus are better addressed through the ordinary course of litigation. We therefore decline to exercise our discretion to grant mandamus relief. *See San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1099 (9th Cir. 1999) ("Mandamus review is at bottom discretionary—even where [all] the *Bauman* factors are satisfied, the court may deny the petition.").

## A

**[4]**  The first *Bauman* factor is whether the petitioner will "ha[ve] no other means . . . to obtain the desired relief." *Perry*, 591 F.3d at 1156. This factor ensures that a writ of mandamus will not "be used as a substitute for appeal even though hardship may result from delay and perhaps unnecessary trial." *Schlagenhauf v. Holder*, 379 U.S. 104, 110, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (internal citation omitted). Here, the defendants argue that mandamus is their only means of obtaining relief from potentially burdensome discovery.

The defendants' argument fails because the district court has not issued a single discovery order, nor have the plaintiffs filed a single motion seeking to compel discovery. Rather, the parties have employed the usual meet-and-confer process of resolving discovery disputes. *See* Fed. R. Civ. P. 37(a)(1). Indeed, both sides have submitted declarations attesting that they have thus far resolved a number of discovery disputes without either side asking the district court for an order. Indeed, the plaintiffs have withdrawn a number of re-

quests for production. The defendants rely on informal communications as to the scope of discovery—in particular, the plaintiffs' litigation hold and demand letter—but the plaintiffs have clarified that these communications were not discovery requests.

If a specific discovery dispute arises, the defendants can challenge that specific discovery request on the basis of privilege or relevance. *See McDaniel v. U.S. Dist. Ct.*, 127 F.3d 886, 888–89 (9th Cir. 1997) (per curiam) (holding that mandamus "is not the State's only adequate means of relief" from burdensome discovery because, "as discovery proceeds, the State is not foreclosed from making routine challenges to specific discovery requests on the basis of privilege or relevance"). In addition, the defendants can seek protective orders, as appropriate, under Federal Rule of Civil Procedure 26(c).

[5] Mandamus relief is inappropriate where the party has never sought relief before the district court to resolve a discovery dispute. As we have noted, "courts of appeals cannot afford to become involved with the daily details of discovery." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (quoting *Perry*, 591 F.3d at 1157). Rather, we have only granted mandamus relief to review discovery orders in exceptional circumstances. *Id.* And neither we nor the Supreme Court have ever done so before a party has filed a motion for a protective order in the district court or prior to the issuance of a discovery order by the district court. The defendants will have ample remedies if they believe a specific discovery request from the plaintiffs is too broad or burdensome. Absent any discovery order from the district court, or even any attempt to seek one, however, the defendants have not shown that they have no other means of obtaining relief from burdensome or otherwise improper discovery.

The defendants rely on two cases in which a writ of mandamus issued because of alleged discovery burdens: *Cheney*, and *Credit Suisse v. U.S. Dist. Ct.*, 130 F.3d 1342 (9th Cir. 1997). In both cases, the district courts had issued orders compelling document production. *Cheney*, 542 U.S. at 376, 379, 124 S.Ct. 2576 (defendant moved for a protective order, but district court issued order allowing discovery to proceed); *Credit Suisse*, 130 F.3d at 1346 (district court issued order compelling defendants to respond to discovery requests).[1]

Absent any district court order concerning discovery, mandamus relief is inappropriate. If the defendants become aggrieved by a future discovery order, they can seek mandamus relief as to that order. But their current request for mandamus relief is entirely premature. The defendants have not satisfied the first *Bauman* factor.

**B**

[6, 7] The second *Bauman* factor is whether the petitioner "will be damaged or prejudiced in any way not correctable on appeal." *Perry*, 591 F.3d at 1156. To satisfy this factor, the defendants "must demonstrate some burden . . . other than the mere cost and delay that are the regretta-

---

1. The defendants also raised, via a letter filed after argument, the Supreme Court's recent summary disposition in an appeal challenging a discovery order. *See In re United States*, ––– U.S. ––––, 138 S.Ct. 443, 199 L.Ed.2d 351 (2017). When the government filed a petition for mandamus in that case, the district court had compelled the government to complete the administrative record over the government's opposition that the administrative record was already complete and had deferred ruling on the defendants' earlier motion to dismiss. Neither circumstance exists here.

ble, yet normal, features of our imperfect legal system." *DeGeorge v. U.S. Dist. Ct.*, 219 F.3d 930, 935 (9th Cir. 2000) (alteration in original) (quoting *Calderon v. U.S. Dist. Ct.*, 163 F.3d 530, 535 (9th Cir. 1998) (en banc) ). Prejudice serious enough to warrant mandamus relief "includes situations in which one's 'claim will obviously be moot by the time an appeal is possible,' or in which one 'will not have the ability to appeal.' " *Id.* (quoting *Calderon*, 163 F.3d at 535).

The defendants argue that holding a trial on the plaintiffs' claims and allowing the district court potentially to grant relief would threaten the separation of powers. We are not persuaded that simply allowing the usual legal processes to go forward will have that effect in a way not correctable on appellate review.

First, to the extent the defendants argue that the President himself has been named as a defendant unnecessarily and that defending this litigation would unreasonably burden him, this argument is premature because the defendants never moved in the district court to dismiss the President as a party. *See United States v. U.S. Dist. Ct.*, 384 F.3d 1202, 1205 (9th Cir. 2004) (explaining that there is no injustice from declining to consider a new issue on mandamus review because a petitioner may still be able to raise the issue below). Nor has any formal discovery been sought against the President.

To the extent that the defendants are arguing that executive branch officials and agencies in general should not be burdened by this lawsuit, Congress has not exempted the government from the normal rules of appellate procedure, which anticipate that sometimes defendants will incur

burdens of litigating cases that lack merit but still must wait for the normal appeals process to contest rulings against them. The United States is a defendant in close to one-fifth of the civil cases filed in federal court.[2] The government cannot satisfy the burden requirement for mandamus simply because it, or its officials or agencies, is a defendant.

Distilled to its essence, the defendants' argument is that it is a burden to defend against the plaintiffs' claims, which they contend are too broad to be legally sustainable. That well may be. But, as noted, litigation burdens are part of our legal system, and the defendants still have the usual remedies before the district court for nonmeritorious litigation, for example, seeking summary judgment on the claims. And if relief is not forthcoming, any legal error can be remedied on appeal. "The first two criteria articulated in *Bauman* are designed to insure that mandamus, rather than some other form of relief, is the appropriate remedy." *In re Cement Antitrust Litig. (MDL No. 296)*, 688 F.2d 1297, 1301 (9th Cir. 1982), *aff'd sub nom. Arizona v. U.S. Dist. Ct.*, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983) (mem.). Because the merits errors now asserted are correctable through the ordinary course of litigation, the defendants have not satisfied the second *Bauman* factor.

C

The third *Bauman* factor is whether the district court's order "is clearly erroneous as a matter of law." *Perry*, 591 F.3d at 1156. Our review of this factor "is significantly deferential and [this factor] is not

---

**2.** *See* U.S. Courts, *Federal Judicial Caseload Statistics 2017,* http://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2017 (last visited Feb. 14, 2018) (The

United States was a defendant in 56,987 of the 292,076 civil cases filed in federal court in the 12-month period ending March 31, 2017).

IN RE U.S.    837
Cite as 884 F.3d 830 (9th Cir. 2018)

met unless the reviewing court is left with a definite and firm conviction that a mistake has been committed." *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016) (quoting *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015) ).

[8]  "The absence of controlling precedent weighs strongly against a finding of clear error [for mandamus purposes]." *In re Van Dusen*, 654 F.3d 838, 845 (9th Cir. 2011). Here, the defendants concede that there is no controlling Ninth Circuit authority on any of the theories asserted by the plaintiffs. Indeed, the defendants strongly argue that the theories are unprecedented. Thus, the absence of controlling precedent in this case weighs strongly against a finding of clear error. *Id.*

We also underscore that this case is at a very early stage, and that the defendants have ample opportunity to raise legal challenges to decisions made by the district court on a more fully developed record, including decisions as to whether to focus the litigation on specific governmental decisions and orders. Once the litigation proceeds, the defendants will have ample opportunity to raise and litigate any legal objections they have.

However, absent controlling precedent, we decline to exercise our discretion to intervene at this stage of the litigation to review preliminary legal decisions made by the district court or otherwise opine on the merits.

D

The fourth *Bauman* factor is whether the district court's order is "an oft repeated error or manifests a persistent disregard of the federal rules." *Perry*, 591 F.3d at 1156. Absent controlling authority, there is no "oft-repeated error" in this case, *In re Swift Transp. Co.*, 830 F.3d at 917, and the defendants do not contend

that the district court violated any federal rule. The defendants do not satisfy the fourth factor.

E

The final factor is whether the district court's order "raises new and important problems or issues of first impression." *Perry*, 591 F.3d at 1156. In general, we have relied upon this factor when there is a "novel and important question" that "may repeatedly evade review." *Id.* at 1159; *see also In re Cement Antitrust Litig.*, 688 F.2d at 1304–05 ("[A]n important question of first impression will evade review unless it is considered under our supervisory mandamus authority. Moreover, that question may continue to evade review in other cases as well.").

There is little doubt that the legal theories asserted in this case raise issues of first impression. But the district court's order denying a motion to dismiss on the pleadings—which is all that has happened thus far—does not present the possibility that those issues will evade appellate review. The defendants have not satisfied the fifth *Bauman* factor.

IV

There is enduring value in the orderly administration of litigation by the trial courts, free of needless appellate interference. In turn, appellate review is aided by a developed record and full consideration of issues by the trial courts. If appellate review could be invoked whenever a district court denied a motion to dismiss, we would be quickly overwhelmed with such requests, and the resolution of cases would be unnecessarily delayed.

We are mindful that some of the plaintiffs' claims as currently pleaded are quite broad, and some of the remedies the plaintiffs seek may not be available as redress.

**838**        **884 FEDERAL REPORTER, 3d SERIES**

However, the district court needs to consider those issues further in the first instance. Claims and remedies often are vastly narrowed as litigation proceeds; we have no reason to assume this case will be any different. Nor would the defendants be precluded from reasserting a challenge to standing, particularly as to redressability, once the record is more fully developed, or from seeking mandamus in the future, if circumstances justify it. And the defendants retain the option of asking the district court to certify orders for interlocutory appeal of later rulings, pursuant to 28 U.S.C. § 1292(b).

Because petitioners have not satisfied the *Bauman* factors, we deny the petition without prejudice. Absent any discovery order, the mandamus petition is premature insofar as it is premised on a fear of burdensome discovery. The issues pertaining to the merits of this case can be resolved by the district court, in a future appeal, or, if extraordinary circumstances later present themselves, by mandamus relief. For these reasons, we decline to exercise our discretion to grant mandamus relief at this stage of the litigation.

**PETITION DENIED WITHOUT PREJUDICE.**



**Lonnie Craig PATTERSON, Plaintiff–Appellant,**

v.

**CITY OF YUBA CITY, Defendant–Appellee.**

**No. 16-16001**

United States Court of Appeals, Ninth Circuit.

Filed March 7, 2018

**Background:** Arrestee brought action against city asserting a § 1983 claim of unlawful seizure under the Fourth Amendment, as well as state law claims of negligent infliction of emotional distress and false arrest/false imprisonment. The United States District Court for the Eastern District of California, D.C. No. 2:12-cv-01350-MCE-CKD, Morrison C. England, Jr., J., 2016 WL 3126052, granted summary judgment to city, and arrestee appealed.

**Holding:** The Court of Appeals held that it was appropriate to certify question to California Supreme Court as to whether finding of probable cause to arrest at preliminary hearing precluded false arrest claim under California law.

Question certified.

**1. False Imprisonment** ⬤13

Under California law, probable cause to arrest is an affirmative defense to a claim of false arrest.  U.S. Const. Amend. 4.

**2. Federal Courts** ⬤3107

It was appropriate for Court of Appeals to certify question to California Supreme Court as to whether a finding of probable cause to arrest at a preliminary hearing precluded a false arrest claim under California law; the answer of the question was dispositive of arrestee's appeal of district court's grant of summary judgment to city on arrestee's claim of false arrest and imprisonment, no controlling California precedent answered the question, California Courts of Appeal had split on the issue, and resolving the question would likely require diligent and thoughtful parsing of California's issue preclusion requirements, a magistrate judge's powers and obligations at a preliminary hearing, and a criminal defendant's ability to ade-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

KELSEY CASCADE ROSE JULIANA; et al.,                    6:15-cv-1517-TC

                         Plaintiffs,                    ORDER

        v.

The UNITED STATES OF AMERICA; et al.,

                          Defendants.

COFFIN, Magistrate Judge:

    Before the court is defendants' motion for a protective order and for a stay of discovery.

(#196). In essence, defendants' motion is based on the assertion that "Plaintiff's claim must proceed

under the [Administrative Procedure Act] APA" and APA claims must be reviewed solely on the

Administrative record. Thus "APA plaintiffs are ... not entitled to discovery ...." Defendants' Motion

For A Protective Order And For A Stay Of Discovery (#196) at p. 10.

    But the plaintiffs' complaint does not contain an APA claim. No such claim is pleaded, and

the defendants have no ability to edit the complaint to cobble the claim into one of their choosing

Page 1 - ORDER

65a

to derail discovery. The plaintiffs' claims in this case, which have survived previous efforts by the defendants to dismiss, are claims based on alleged violations of their constitutional rights. As to these claims, the court has denied the defendants' earlier motion to dismiss, an order which defendants challenged through writ of mandamus to the Ninth Circuit, which was denied. The Ninth Circuit further noted the case should proceed through discovery and the normal process of trial and the development of a record before any appellate review would be appropriate.

The defendants' motion for a protective order and stay is simply a recasting of their position that the plaintiffs' claims should all be dismissed and the District Court should revisit its previous ruling to the contrary.

Beyond whatever procedural impediments exist to the government's efforts to reconstruct its motion to dismiss under a different theory, this court is not at all persuaded by their argument that the APA is the sole avenue of relief for the plaintiffs for the asserted violations of their constitutional rights.

Indeed, the District Court has already rejected this very argument in its Order denying defendants' motion to dismiss:

Plaintiffs could have brought a lawsuit predicated on technical regulatory violations, but they chose a different path. As masters of their complaint, they have elected to assert constitutional rather than statutory claims. Every day, federal courts apply the legal standards governing due process claims to new sets of facts. The facts in this case, though novel, are amenable to those well-established standards.

Order dated November 10, 2017 (#83) at p. 13.

In sum, defendants' efforts to transform plaintiffs' constitutional claims into an APA case to bar discovery is unavailing.

Finally, the defendants argue that the separation of powers doctrine justifies an order barring

Page 2 - ORDER

66a

or staying all discovery in this case based on wholly hypothetical scenarios that may implicate matters of privilege during the discovery process. Under such rationale, the government could avoid all discovery in any litigation in which it is named as a defendant simply by asserting hypothetical discovery requests that a litigant might make during the litigation. Should a specific discovery request arise during discovery in this case that implicates a claim of privilege the government wishes to assert, the government may file a motion for a protective order directed at any such specific request. None has arisen so far in this particular case that the parties have been unable to resolve in the meet and confer process that the court is aware of.

The motion for a protective order and stay of all discovery is hereby denied.

## CONCLUSION

For the reasons stated above, defendants' motion for a protective order and stay (#196) is denied.

DATED this $\underline{25}$ day of May 2018.

THOMAS M. COFFIN
United States Magistrate Judge

Page 3 - ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| KELSEY CASCADIA ROSE JULIANA, et al., | Civ. No. 6:15-cv-01517-AA |
| Plaintiffs, | **ORDER** |
| v. | |
| THE UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

AIKEN, District Judge.

On May 9, 2018, Defendants filed a Motion for Protective Order and Motion for Stay of All Discovery. ECF No. 196. On May 25, 2018, Magistrate Judge Coffin denied Defendants' motion.[1] ECF No. 212. Defendants have filed Objections to Judge Coffin's Order, ECF No. 215, Plaintiffs have filed their Response, ECF No. 242, and the matter is now before this Court.

In accordance with Rule 72(a), "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision." Fed. R. Civ. P. 72(a). The standard of review for an order with objections is "clearly erroneous" or "contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

---

[1] Defendants complain, *inter alia*, that Judge Coffin denied their motion without allowing them the opportunity to file a reply. The Local Rules of the District of Oregon do not permit replies in support of discovery motions. LR 26-3(c) ("Unless otherwise directed by the Court, a movant may not file a reply supporting a discovery motion."). The timing of Judge Coffin's ruling was therefore appropriate.

68a

The Court has carefully reviewed Judge Coffin's order in light of Defendants' objections. The Court concludes that the order is not clearly erroneous or contrary to law. Accordingly, the Court AFFIRMS Magistrate Judge Coffin's Order, ECF No. 212, denying Defendants' Motion for Protective Order and Stay of All Discovery, ECF No.196. The Court declines to certify this decision for interlocutory appeal under 28 U.S.C. § 1292(b).

It is so ORDERED and DATED this ___29th___ day of June, 2018.

ANN AIKEN
United States District Judge

FILED

UNITED STATES COURT OF APPEALS

JUL 16 2018

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re:  UNITED STATES OF AMERICA; et al., _____ UNITED STATES OF AMERICA; et al., Petitioners, v. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON, EUGENE, Respondent, KELSEY CASCADIA ROSE JULIANA; et al., Real Parties in Interest. | No.    18-71928 D.C. No. 6:15-cv-01517-TC District of Oregon, Eugene ORDER |

Before:  THOMAS, Chief Judge, and BERZON and FRIEDLAND, Circuit Judges.

Petitioners' emergency motion for a stay of discovery and trial is DENIED.

The panel will rule on the petition for writ of mandamus on an expedited basis.