IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

KELSEY CASCADIA ROSE JULIANA, *et al.*,

       Plaintiffs,

v.

UNITED STATES OF AMERICA, *et al.*,

       Defendants.

Case No. 6:15-cv-01517-AA
**OPINION AND ORDER**

---

AIKEN, Judge:[1]

In this civil rights action, plaintiffs—a group of young people who were between the ages of eight and nineteen when this lawsuit was filed; Earth Guardians, a nonprofit association of young environmental activists; and Dr. James Hansen, acting as guardian for plaintiff "future

---

[1] As with the Court's previous Order and Opinion on the federal defendants' motions to dismiss, student externs worked on each stage of the preparation of this opinion. The Court would be remiss if it did not acknowledge the invaluable contributions of JoAnna Atkinson (George Washington University Law School), Trevor Byrd (Willamette University Law School), Doyle Canning (University of Oregon School of Law), Omeed Ghafarri (University of Washington School of Law), Tyler Hardman (University of Oregon School of Law), Maggie Massey (University of Oregon School of Law), and Patrick Rosand (Boston University School of Law), Elise Williard (University of Oregon School of Law).

generations"—allege that the federal government is violating their rights under the Fifth Amendment to the United States Constitution.

Before the Court are two dispositive motions: federal defendants' Motion for Judgment on the Pleadings (doc. 195) and federal defendants' Motion for Summary Judgment (doc. 207). For the reasons set forth below, the Motion for Judgment on the Pleadings is granted in part and denied in part, and the Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

Plaintiffs filed this action in August 2015, naming the United States, President Barack Obama, and the heads of numerous executive agencies (collectively, "federal defendants") as defendants.[2] Plaintiffs allege that federal defendants have known for more than fifty years that carbon dioxide ("$CO_2$") produced by the industrial scale burning of fossil fuels was "causing global warming and dangerous climate change, and that continuing to burn fossil fuels would destabilize the climate system on which present and future generations of our nation depend for their wellbeing and survival." First Am. Compl. ¶ 1. Plaintiffs further allege that federal defendants have long "known of the unusually dangerous risks of harm to human life, liberty, and property that would be caused by continued fossil fuel burning." *Id.* ¶ 5. Plaintiffs assert that, rather than responding to this knowledge by "implement[ing] a rational course of effective action to phase out carbon pollution," federal defendants "have continued to permit, authorize, and subsidize fossil fuel extraction, development, consumption and exportation[,]" thereby

---

[2] The First Amended Complaint names as defendants the United States, the President, and the heads of the Council on Environmental Quality, the Office of Management and Budget, the Office of Science and Technology Policy, the Department of Energy, the Department of the Interior, the Department of Transportation, the Department of Agriculture, the Department of Commerce, the Department of Defense, the Department of State, and the Environmental Protection Agency.

"deliberately allow[ing] atmospheric $CO_2$ concentrations to escalate to levels unprecedented in human history[.]" *Id.* ¶¶ 5, 7.

Plaintiffs contend that federal defendants' policy on fossil fuels deprives plaintiffs of life, liberty, and property without due process of law; impermissibly discriminates against "young citizens, who will disproportionately experience the destabilized climate system in our country[;]" and fails to live up to federal defendants' obligations to hold certain essential natural resources in trust for the benefit of all citizens. *Id.* ¶ 8. Plaintiffs seek injunctive and declaratory relief, asserting that there is "an extremely limited amount of time to preserve a habitable climate system for our country" before "the warming of our nation will become locked in or rendered increasingly severe." *Id.* ¶ 10.

In November 2015, federal defendants moved to dismiss for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (doc. 27) Federal defendants argued that plaintiffs lacked standing to sue; that plaintiffs' public trust claims failed as a matter of law because the public trust doctrine does not apply to the federal government; that plaintiffs' equal protection claims could not proceed because plaintiffs are not members of a protected class and the government's energy and climate policies have a rational basis; and that plaintiffs' due process claims were deficient because they had not alleged violation of a fundamental right.

Also in November 2015, three national trade organizations—the National Association of Manufacturers, American Petroleum Institute, and American Fuel & Petrochemical Manufacturers (collectively, "intervenor-defendants")—moved to intervene under Federal Rule of Civil Procedure 24(a) and dismiss the complaint. (doc. 14 & 19) Like federal defendants, intervenor-defendants argued that plaintiffs lacked standing to sue. Intervenor defendants also

argued that plaintiffs had failed to identify a cognizable cause of action and that dismissal was required because the case presented non-justiciable political questions.

In January 2016, Magistrate Judge Coffin granted intervenor-defendants' motion to intervene. *Juliana v. United States*, 2016 WL 138903, at *5 (D. Or. Jan. 14, 2016). In April 2016, following oral argument, Judge Coffin issued his Findings and Recommendation ("F&R"), recommending that the Court deny both motions to dismiss. (doc. 68) Federal defendants and intervenor-defendants filed objections to the F&R and the Court held oral argument in September 2016. (doc. 73, 74 & 81) Following that argument, in November 2016, the Court issued an opinion and order adopting Judge Coffin's F&R and denying the motions to dismiss. *Juliana v. United States*, 217 F. Supp. 3d 1224, 1276 (D. Or. 2016).

In January 2017, federal defendants filed their Answer. (doc. 98) They agreed with many of the scientific and factual allegations in the First Amended Complaint, including that:

- "for over fifty years some officials and persons employed by the federal government have been aware of a growing scientific body of research concerning the effects of fossil fuel emissions on atmospheric concentrations of $CO_2$—including that increased concentrations of atmospheric $CO_2$ could cause measureable long-lasting changes to the global climate, resulting in an array of severe and deleterious effects to human beings, which will worsen over time;"

- "global atmospheric concentrations of $CO_2$, methane, and nitrous oxide are at unprecedentedly high levels compared to the past 800,000 years of historical data and pose risks to human health and welfare;"

- "Federal Defendants . . . permit, authorize, and subsidize fossil fuel extraction, development, consumption, and exportation;"

- "fossil fuel extraction, development, and consumption produce $CO_2$ emissions and . . . past emissions of $CO_2$ from such activities have increased the atmospheric concentration of $CO_2$;"

- "EPA has concluded . . . that, combined, emissions of six well-mixed [greenhouse gases] are the primary and best understood drivers of current and projected climate change;"

- "the consequences of climate change are already occurring and, in general, those consequences will become more severe with more fossil fuel emissions;"

- "climate change is damaging human and natural systems, increasing the risk of loss of life, and requiring adaptation on larger and faster scales than current species have successfully achieved in the past, potentially increasing the risk of extinction or severe disruption for many species;" and

- "human activity is likely to have been the dominant cause of observed warming since the mid-1900s."

Fed. Defs.' Answer to First Am. Compl. ¶¶ 1; 5; 7; 10; 213; 217. Those admissions and federal defendants' other filings make clear that plaintiffs and federal defendants agree on the following contentions: climate change is happening, is caused in significant part by humans, specifically human induced fossil fuel combustion, and poses a "monumental" danger to Americans' health and welfare. *See Juliana*, 217 F. Supp. 3d at 1234 n.3 (quoting federal defendants' objections to Judge Coffin's F&R recommending denial of the motions to dismiss). The pleadings also make clear that plaintiffs and federal defendants agree that federal defendants' policies regarding fossil fuels and greenhouse gas emissions play a role in global climate change, though federal defendants dispute that their actions can fairly be deemed to have caused plaintiffs' alleged injuries.[3]

In January 2017, Barack Obama left office and Donald J. Trump assumed the presidency. In March 2017, both federal defendants and intervenor-defendants moved to certify the opinion and order denying their motion to dismiss for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). (doc. 120 & 122) That same day, federal defendants sought a stay of

---

[3] Intervenor-defendants' Answer, by contrast, contained no admissions with respect to plaintiffs' factual and scientific assertions about climate change. (doc. 93) Intervenor-defendants asserted that they lacked sufficient information to admit or deny those allegations. At a series of status conferences in 2017, Judge Coffin pressed intervenor-defendants to clarify their position regarding whether the issues to be litigated at trial would include whether climate change is happening or whether humans play a role in causing climate change. Intervenor-defendants withdrew from the lawsuit before taking a position on those questions.

proceedings pending this Court's resolution of the motion to certify for interlocutory appeal and the Ninth Circuit's resolution of that proposed appeal. (doc. 121) In April 2017, Judge Coffin denied the request for a stay. (doc. 137) In May 2017, Judge Coffin issued his F&R recommending that the Court deny the motions to certify. (doc. 146) Federal defendants and intervenor-defendants filed objections, and in June 2017, the Court adopted Judge Coffin's F&R and declined to certify the opinion and order for interlocutory appeal. *Juliana v. United States*, 2017 WL 2483705, at *2 (D. Or. June 8, 2017).

In May and June 2017, intervenor-defendants moved to withdraw from this lawsuit. (docs. 163, 166 & 167) Judge Coffin granted that motion. (doc. 182)

In June 2017, federal defendants filed a petition for writ of mandamus in the Ninth Circuit, seeking an order directing this Court to dismiss the case. (doc. 177) Federal defendants asked the Ninth Circuit to stay all proceedings in this Court pending resolution of that petition. *Id.* In July 2017, the Ninth Circuit granted the request for a stay and ordered plaintiffs to file a response to the petition for writ of mandamus. Ninth Circuit Case No. 17-71692.

On March 7, 2018, the Ninth Circuit denied the petition for writ of mandamus. *In re United States*, 884 F.3d 830, 833 (9th Cir. 2018). The denial rested on the court's determination that federal defendants had not satisfied any of the factors justifying the extraordinary remedy of mandamus. *Id.* at 834–38.

On May 7, 2018, federal defendants filed a motion for judgment on the pleadings. (doc. 195) In that motion, they seek to dismiss President Trump as a party and to obtain dismissal of the entire lawsuit on the grounds that plaintiffs failed to state a claim under the Administrative Procedure Act ("APA"). Additionally, federal defendants argue that plaintiffs' requested relief is barred by the separation of powers. Federal defendants also moved for a protective order,

seeking a stay of all discovery on the theory that discovery in this case is barred by the APA. (doc. 196) Specifically, federal defendants sought a stay of discovery pending the resolution of the motion for a protective order, the motion for judgment on the pleadings, and a not-yet-filed motion for summary judgment. On May 22, 2018, federal defendants filed a motion for summary judgment. (doc. 207) In that motion, they seek a judgment as a matter of law in their favor, arguing that (1) there are no genuine issues of material fact; (2) plaintiffs lack Article III standing to sue; (3) plaintiffs have failed to assert a valid cause of action under the APA; (4) plaintiffs' claims violate separation of powers principles; (5) plaintiffs have no due process right to a climate system capable of sustaining human life; and (6) the federal government has no obligations under the public trust doctrine.

Meanwhile, the Solicitor General was considering seeking Supreme Court review of the Ninth Circuit's opinion denying mandamus relief. The presumptive deadline to file a petition for writ of certiorari to review that opinion was June 5, 2018. On May 24, 2018, the Solicitor General sought to extend the time for filing a petition for writ of certiorari to July 5, 2018. That request was docketed in *United States v. U.S. District Court for the District of Oregon*, Supreme Court No. 17A1304. Justice Kennedy granted the extension.

On May 25, 2018, Judge Coffin denied federal defendants' motion for a protective order and a stay. (doc. 212) On June 1, 2018, federal defendants filed objections to Judge Coffin's denial of the protective order and requested a stay of discovery pending resolution of those objections. (doc. 215 & 216) On June 14, 2018, the Court denied that request for a stay by minute order. (doc. 238)

On June 25, 2018, federal defendants sought a second extension of the deadline for filing a petition for writ of certiorari. Justice Kennedy granted that request and extended the deadline to August 4, 2018.

On June 29, 2018, the Court affirmed Judge Coffin's denial of federal defendants' request to stay all discovery. (doc. 300) On July 5, 2018, federal defendants sought review of that decision through a second petition for writ of mandamus in the Ninth Circuit. In separate filings, federal defendants asked this Court and the Ninth Circuit to stay all discovery and trial pending the Ninth Circuit's resolution of that petition. On July 16, 2018, the Ninth Circuit denied the request for a stay. On July 17, 2018, the Court denied the request for a stay. (doc. 324) That same day, the Solicitor General petitioned Justice Kennedy for a stay of proceedings pending the Ninth Circuit's resolution of the mandamus petition. That request was docketed at *United States v. U.S. District Court for the District of Oregon*, Supreme Court No. 18A65. In his application for a stay, the Solicitor General suggested to Justice Kennedy that he could construe the stay application as a petition for writ of mandamus directing this Court to dismiss the lawsuit or as a petition for a writ of certiorari to review the Ninth Circuit's first mandamus decision.

On July 18, 2018, the parties appeared for oral argument before this Court on the Motion for Judgment on the Pleadings and Motion for Summary Judgment.

On July 20, 2018, the Ninth Circuit denied federal defendants' second mandamus petition, holding that federal defendants had not met the standard to qualify for mandamus relief. *In re United States,* ___F.3d___, 2018 WL 3484444, at *1 (9th Cir. July 20, 2018). The court concluded that because "no new circumstances justify this second petition," it "remains the case that the issues the government raises in its petition are better addressed through the ordinary course of litigation." *Id.*

That same day, the Solicitor General wrote to Justice Kennedy to reiterate his request that he construe the application for a stay in Supreme Court Case No. 18A65 as a petition for a writ of certiorari to review the Ninth Circuit's first mandamus decision. Alternatively, he suggested that Justice Kennedy could construe the application as a petition for a writ of certiorari to review the Ninth Circuit's second mandamus decision. On July 30, 2018, Justice Kennedy referred the application for a stay to the entire Supreme Court. In a summary order, the Supreme Court denied as the Solicitor General's application as premature.

This leaves two substantive motions before the Court, which the Court now addresses in Sections I and II below: federal defendants' motion for judgment on the pleadings, and federal defendants' motion for summary judgment. Defendants have also requested that the Court certify any portion of this opinion and order denying their substantive motions for interlocutory appeal, this is addressed in Section III. Plaintiffs' Motion *in Limine*, (doc. 254) seeking judicial notice of certain documents, is addressed in Section IV.

## STANDARDS

A party may move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (citation and quotation marks omitted). Accordingly, "[a] judgment on the pleadings is properly granted when, taking all allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quotation marks omitted). To survive a motion for judgment on the pleadings, "the non-

conclusory 'factual content' [of the complaint]," and reasonable inferences from that content, "must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. Summary judgment is inappropriate if a rational trier of fact, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). Any doubt as to the existence of a genuine issue for trial should be resolved against the moving party. *Celotex*, 477 U.S. at 339. Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

/ / /

/ / /

## DISCUSSION

There are two motions before the Court in this now three year old case: federal defendants' Motion for Judgment on the Pleadings (doc. 195) and Motion for Summary Judgment (doc. 207). Many of the issues raised in these motions are interrelated. Given the nature of the arguments presented, it is more efficient and likely to avoid confusion to deal with all of the pending issues in a single opinion and order. Thus, the Court addresses each motion in turn.

I. *Motion for Judgment on the Pleadings* [4]

Federal defendants' motion for judgment on the pleadings rests on four grounds, two of which they raise for the first time in their 12(c) motion and two of which the Court has already considered and ruled upon. First, federal defendants move to dismiss President Trump as a defendant, arguing that he is not essential to effective relief and his presence in the lawsuit violates the separation of powers. Second, federal defendants seek dismissal of the lawsuit in its entirety, on the theory that the APA governs all challenges to federal agency action and plaintiffs have failed to state a claim under the APA. Third, federal defendants invite the Court to reconsider all aspects of its opinion and order denying their November 2016 motion to dismiss

---

[4] Even though federal defendants could have raised each argument in its 12(c) motion in its initial motion to dismiss, that failure is not a bar to asserting the arguments now. *See* Fed. R. Civ. P. 12(g) (prohibiting subsequent Rule 12 motions "based on [a] defense or objection . . . omitted" in a prior Rule 12 motion "except . . . as provided in subdivision (h)(2)"); Fed. R. Civ. P. 12(h)(2) ("A defense of failure to state a claim upon which relief can be granted . . . may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits."). There are reasons to question the wisdom of permitting failure-to-state-a-claim defenses to be raised on different legal theories in back-to-back 12(b)(6) and 12(c) motions. *See Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 311 F. Supp. 2d 898, 905 (S.D. Cal. 2004) ("It is a waste of judicial resources to consider motion after motion in which defendants raise the same defense over and over, each time testing a new argument. Allowing such a tactic means that defendants potentially could stall litigation indefinitely as long as they can conjure up a new argument on which to base a failure to state a claim defense."). But as presently written, the rules plainly permit such successive motions.

and urge dismissal of the lawsuit on the grounds raised in that motion. Finally, echoing arguments raised two years ago by intervenor-defendants, federal defendants contend that dismissal of this action is required because the Court cannot redress plaintiffs' injuries without violating the separation of powers.

A.    *Motion to Dismiss President Trump as a Defendant*

Federal defendants first move to dismiss President Trump as a defendant. The Ninth Circuit declined to address federal defendants' argument on that point in its denial of the 2017 mandamus petition because defendants had not first raised the issue in this Court. *See In re United States*, 884 F.3d at 836 ("First, to the extent the defendants argue that the President himself has been named as a party unnecessarily and that defending this litigation would unreasonably burden him, this argument is premature because the defendants never moved in the district court to dismiss the President as a party.").

At oral argument, the parties reported that plaintiffs were willing to stipulate to the dismissal of the President without prejudice. Federal defendants rejected that offer and request dismissal with prejudice. In the absence of a stipulation, the Court must address both whether dismissal is warranted and, if it is, whether that dismissal should be with or without prejudice.

Federal defendants assert that it would violate separation of powers principles for this Court to issue an injunction or declaration against President Trump in connection with his official duties. The extent to which a federal court may issue equitable relief against a sitting President is unsettled and hotly contested. As Justice O'Connor, writing for a plurality of the Court, explained twenty-five years ago:

> While injunctive relief against executive officials like the Secretary of Commerce is within the courts' power, *see Youngstown Sheet & Tube Co. v. Sawyer*, [343 U.S. 579 (1952),] the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows. We

have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely "ministerial" duty, *Mississippi v. Johnson,* 4 Wall. 475, 498–499 (1867), and we have held that the President may be subject to a subpoena to provide information relevant to an ongoing criminal prosecution, *United States v. Nixon,* 418 U.S. 683 (1974), but in general "this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* [4 Wall. at 501]. At the threshold, the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether appellees' injuries were nonetheless redressable.

*Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality op.) (parallel citations omitted). Justice O'Connor ultimately concluded that it was unnecessary to "decide whether injunctive relief against the President was appropriate" because "the injury alleged [wa]s likely to be redressed by declaratory relief against the Secretary [of Commerce] alone." *Id.* at 803.

Since *Franklin*, subsequent cases have made clear that there is no absolute bar on issuance of declaratory and injunctive relief against a sitting president, even with regard to the exercise of his official duties. For example, in *Clinton v. City of New York*, 524 U.S. 417, 449 (1998), the Supreme Court affirmed a declaratory judgment holding that certain actions taken by President Clinton under the Line Item Veto Act violated the Constitution's allocation of lawmaking authority between Congress and the President.

In its recent decision on President Trump's second "travel ban" executive order, the Ninth Circuit cited *Franklin* for the proposition that when adequate equitable relief is likely available from some inferior governmental official (or group of officials) the President ought to be dismissed out of respect for separation of powers:

Finally, the Government argues that the district court erred by issuing an injunction that runs against the President himself. This position of the Government is well taken. Generally, we lack "jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall. ) 475, 501 (1866)); *see id.* at 802 ("[I]njunctive relief against the President himself is extraordinary, and should . . . raise [ ] judicial eyebrows."). Injunctive relief, however, may run against executive officials, including the Secretary of

Homeland Security and the Secretary of State. *See, e.g., Youngstown Sheet & Tube Co.*, 343 U.S. at 588–89 (holding that President Truman did not act within his constitutional power in seizing steel mills and affirming the district court's decision enjoining the Secretary of Commerce from carrying out the order); *Franklin*, 505 U.S. at 802–03.

We conclude that Plaintiffs' injuries can be redressed fully by injunctive relief against the remaining Defendants, and that the extraordinary remedy of enjoining the President is not appropriate here. *See Franklin*, 505 U.S. at 803. We therefore vacate the district court's injunction to the extent the order runs against the President, but affirm to the extent that it runs against the remaining "Defendants and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them."

*Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated and remanded on mootness grounds*, 138 S. Ct. 377 (2017). *Hawaii* makes *Franklin*'s plurality opinion on this point binding Ninth Circuit precedent. The inquiry is not into the President's action or inaction in relationship to the injuries complained of, but rather into the relief requested, and whether or not equitable remedies involving the President himself are essential to that relief. As adopted in *Hawaii*, *Franklin*'s rule on when the President is an appropriate defendant is best understood as a strain of the canon of constitutional avoidance: because granting equitable relief against the President of the United States raises serious constitutional questions, dismissal of the President as a defendant is appropriate whenever it appears likely that the plaintiffs' injuries can be redressed through relief against another defendant.

Plaintiffs' opposition to dismissing President Trump boils down to a general assertion that complete relief may be unavailable without the President as a defendant. They argue that further development of the factual record is necessary to determine whether injunctive or declaratory relief is available against President Trump and whether plaintiffs' injuries are redressable in the absence of such relief. The Court is not persuaded. This lawsuit is, at its heart, a challenge to the environmental and energy policies of the federal government as

expressed through the action (or inaction) of federal agencies. Because the Supreme Court and Ninth Circuit have spoken so clearly about the separation of powers concerns inherent in awarding equitable relief against a sitting president, the burden is on plaintiffs to explain with specificity why relief against President Trump is essential to redressing their injuries. They have failed to carry that burden.

In an attempt to demonstrate why President Trump is necessary to effective equitable relief, plaintiffs cite a number of specific presidential actions in their Amended Complaint and briefs. For example, plaintiffs cite:

- An Executive Order in which President Trump directed a rollback of the Clean Power Plan by rescinding the moratorium on coal mining on federal lands and six other Obama-era executive orders aimed at curbing climate change and regulating emissions;

- An Executive Order in which President Trump ordered the expedition of environmental reviews and approvals for infrastructure projects;

- An Executive Order in which President Trump ordered a review of the "Waters of the United States" Rule; and

- Presidential memoranda encouraging approval of the Dakota Access Pipeline and the Keystone XL Pipeline.

The problem with those examples is that it is not enough, under *Hawaii*, to show that the President was involved in the challenged action; plaintiffs must show that effective relief is *unavailable* unless it is awarded against the President. Like the "travel ban" challenged in *Hawaii*, each of the foregoing orders and memoranda included express directives to be carried out by other governmental officials. *See, e.g.* Exec. Order No. 13783, 82 Fed. Reg. 16093 (Mar. 28, 2017) (issuing orders to "[t]he heads of agencies" including to the "Administrator of the Environmental Protection Agency" and the "Secretary of the Interior"); Exec. Order No. 13766, 82 Fed. Reg. 8657 (directing the Chairman of the White House Council on Environmental Quality the Director of the Office of Management and Budget to take certain actions); Exec.

Order No. 13778, 82 Fed. Reg. 12497 (Feb. 28, 2017) (addressing "the Administrator, the Assistant Secretary, and the heads of all executive departments and agencies" including the Administrator of the Environmental Protection Agency); President Trump Takes Action to Expedite Priority Energy and Infrastructure Projects (Jan. 24, 2017), https://www.whitehouse.gov/briefings-statements/president-trump-takes-action-expedite-priority-energy-infrastructure-projects/ (summarizing memoranda addressed to "relevant Federal agencies"). Thus, with respect to the propriety of the President as a defendant, this case is indistinguishable from *Hawaii* and *Franklin*: because lower governmental officials are charged with executing the challenged presidential policies, equitable relief against President Trump is not essential to redressability.

Plaintiffs note that *Hawaii* concerned injunctive relief only, and certainly injunctive relief implicates more serious separation of powers concerns than declaratory relief. But as articulated in *Franklin, any* equitable relief awarded against a sitting president with respect to his official duties raises constitutional concerns. Accordingly, when effective relief is available against lower administration officials, the Court concludes that dismissal of the President is the correct decision for either type of equitable relief. *See Franklin*, 505 U.S. at 827–828 (Stevens, J., concurring) (arguing that declaratory relief against the president, like injunctive relief, "would produce needless head-on confrontations between district judges and the Chief Executive"). On the current record, the Court concludes that President Trump is not essential to effective relief because "[p]laintiffs' injuries can be redressed fully by injunctive [or declaratory] relief against the remaining [d]efendants." *Hawaii*, 859 F.3d at 788. Due respect for separation of powers therefore requires dismissal of President Trump as a defendant.

The next question is whether dismissal should be with or without prejudice. Across a host of contexts, the default rule is dismissal without prejudice. *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (stating that dismissal under Federal Rule of Civil Procedure 12(b)(6) should be with prejudice only if the court determines that the pleading "could not possibly be cured by the allegation of other facts"); *Hamilton Copper & Steel Corp. v. Primary Steel, Inc.*, 898 F.2d 1428, 1429 (9th Cir. 1990) (explaining that, even when a party's misconduct justifies the sanction of dismissal, dismissal with prejudice is "extreme" and rarely deployed); Fed. R. Civ. P. 41(a)(2) (providing that dismissal at the plaintiff's request shall be without prejudice unless the dismissal order states otherwise); *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liability Litig.*, 111 F. Supp. 3d 103, 106 (D. Mass. 2015) (explaining that dismissal with prejudice under Rule 41(a)(2) generally is justified only in situations where it is clear that there is "no way for any plaintiff to bring the same claim" in the future, for example when the applicable statute of limitations has "conclusively run"); *Lepesh v. Barr*, 2001 WL 34041885, *3 (D. Or. 2001) (citing Ninth Circuit precedent governing when amendment of a pleading would be futile for the proposition that dismissal should be with prejudice only if it "appear[s] to a certainty that Plaintiff would not be entitled to relief under any set of facts that could be proven").

Federal defendants argue that President Trump should be dismissed with prejudice because Supreme Court and Ninth Circuit precedent is clear that federal courts lack jurisdiction to issue equitable relief in connection with a sitting president's performance of his official duties. As explained above, however, neither the Supreme Court nor the Ninth Circuit has gone so far. Indeed, it is clear that under some limited circumstances and when required by the constitution, such equitable relief is available. *Clinton*, for example, involved a challenge to President

Clinton's use of the line-item veto. *Clinton*, 524 U.S. at 449. The veto power is, of course, exercised directly by the President and not by subordinate agencies, so no other federal official would have been an appropriate defendant in that case. More recently, in a case involving alleged violations of the Foreign and Domestic Emoluments Clauses of the Constitution, the U.S. District Court for the District of Maryland addressed the availability of equitable relief against President Trump:

> The Court also disagrees that the President's status as the sole defendant changes this analysis, given that no official other than he could be sued to enforce the purported violations at issue. "[I]t would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he and/or the Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974).

*District of Columbia v. Trump*, 291 F. Supp. 3d 725, 751–52 (D. Md. 2018). The Emoluments Clauses, like the veto power, are specific to the President. A lawsuit asserting violation of those clauses therefore could not be directed to federal agency heads or other federal officials.

As explained above, on the current record, it appears that this is a case in which effective relief is available through a lawsuit addressed only to lower federal officials. It is not possible to know how developments to the record in the course of the litigation may change the analysis. The Court cannot conclude with certainty that President Trump will never become essential to affording complete relief. For that reason, the Court concludes that dismissal without prejudice is the appropriate course. Any harm the President will suffer from the continuing *hypothetical possibility* that he might be joined as a defendant in the future is minimal. Moreover, that minimal harm is further mitigated by the fact that federal defendants would be free to oppose any future motion for leave to amend the complaint and add the President as a defendant on the

grounds that permitting such amendment would cause "undue prejudice to the opposing party." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Federal defendants' motion to dismiss President Trump from this lawsuit is granted. The dismissal is without prejudice.

B.    *Motion to Dismiss for Failure to State a Claim under the APA*

Federal defendants next argue that this entire case must be dismissed because plaintiffs are challenging the actions (and inactions) of federal agencies, and thus must bring their suit, if at all, under the APA.[5] The APA provides a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review." *Id.* § 704. A reviewing court has authority both to "compel agency action unlawfully withheld or unreasonably delayed" and to

---

[5] As a threshold matter, plaintiffs contend that this Court already has rejected federal defendants' APA argument, and that the Ninth Circuit affirmed that rejection under the "no clear error" standard. Neither contention is correct. First, this Court has not addressed federal defendants' APA argument. Federal defendants argued in their motion to dismiss that plaintiffs had failed to identify a viable cause of action, but they did not argue that the APA was the exclusive vehicle for claims that a federal agency has violated a plaintiff's constitutional rights. Second, the Ninth Circuit did not "affirm" any of this Court's determinations under the "clear error" standard. It is true that in both mandamus opinions, the Ninth Circuit held that the government had not shown that this Court's order was "clearly erroneous as a matter of law," as required to satisfy the third factor of the five-factor test for mandamus relief. *In re United States*, 884 F.3d at 837–38; *see also In re United States*, 2018 WL 3484444, at *2 ("As detailed in our opinion denying the first mandamus petition, the government does not satisfy the third, fourth, or fifth *Bauman* factors."). But in finding that the third factor had not been satisfied, the Ninth Circuit declined to take a position on whether this Court's rulings were clearly erroneous. *See In re United States*, 884 F.3d at 837 ("[W]e decline to exercise our discretion to intervene at this stage of the litigation to review preliminary legal decisions made by the district court or otherwise opine on the merits."). Because this is the first time either this Court or the Ninth Circuit has addressed federal defendants' APA argument, the Court will address the argument on its merits. *See Sprint Telephony*, 311 F. Supp. 2d at 905 (holding that application of the law of the case doctrine was inappropriate because, "although the court previously considered defendants' failure to state a claim *defense* in its earlier order, the court has not considered the *issues* defendants now raise in their motion presently before the court").

"set aside agency action" on several grounds, including that the action is "arbitrary, capricious, [or] an abuse of discretion;" is "contrary to constitutional right, power, privilege, or immunity"; or exceeds the agency's statutory authority. *Id.* § 706(1) & (2)(A)–(C). The APA's judicial review provisions apply only in limited circumstances such as when agency action is final or "otherwise reviewable by statute." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017).

When a plaintiff asserts an APA claim, the court must determine whether the plaintiff has identified a final agency action subject to judicial review. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990). But here, plaintiffs have not asserted APA claims; their claims are brought directly under the United States Constitution, which has no "final agency action" requirement. As a general rule, plaintiffs are "master[s] of [their] complaint" and may choose which claims to assert and which legal theories to press. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398–99 (1987). Federal defendants' APA argument succeeds only if they can demonstrate that the APA is the only available avenue to judicial review of the government's conduct that plaintiffs challenge in this lawsuit.

Federal defendants' argument that the APA is the exclusive means to challenge *any* agency action rests on the proposition that "[w]here Congress has created a remedial scheme for the enforcement of a particular federal right," courts "have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). Federal defendants indiscriminately cite cases involving both claims for damages and claims for equitable relief in arguing that the APA is a comprehensive statutory scheme demonstrating Congressional intent to cut off common law claims. But in order to properly analyze federal defendants' argument, it is critical to avoid conflating the

Supreme Court's treatment of claims for damages with its treatment of claims for equitable relief.

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 396 (1971), the Supreme Court broke new ground by permitting a suit for damages against federal officials for violations of the Fourth Amendment, even though no federal statute created such a cause of action. The Court subsequently extended *Bivens* to two other contexts. In *Davis v. Passman*, 442 U.S. 228, 247 (1979), the Court recognized an implied right of action to sue for damages based on an allegation that a U.S. Congressman had discriminated against an employee on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment. And in *Carlson v. Green*, 446 U.S. 14, 20 (1980), the Court recognized a *Bivens* cause of action for a federal prisoner alleging violations of his rights under the Eighth Amendment.

"Since *Carlson*, however, the Supreme Court has consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Western Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1119 (9th Cir. 2009); *see also, Armstrong v. Exceptional Child Ctr., Inc.*,___U.S.___, 135 S. Ct. 1378, 1384 (2015) (rejecting the argument that the Supremacy Clause creates an implied cause of action for every violation of federal law). As the Ninth Circuit has explained, whether to recognize a *Bivens* cause of action in a new context involves a two-step inquiry:

> First, the Court determines whether there is any alternative, existing process for protecting the plaintiff's interests. Such an alternative remedy would raise the inference that Congress expected the Judiciary to stay its *Bivens* hand and refrain from providing a new and freestanding remedy in damages. The Court has explained that, when the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies. . . .
>
> . . . .

Second, if the Court cannot infer that Congress intended a statutory remedial scheme to take the place of a judge-made remedy, the Court next asks whether there nevertheless are factors counseling hesitation before devising such an implied right of action. Even where Congress has given plaintiffs no damages remedy for a constitutional violation, the Court has declined to create a right of action under *Bivens* when doing so would be plainly inconsistent with Congress' authority in this field.

*Id.* at 1120–21 (citations and internal quotation marks omitted).

Applying that two-step inquiry in *Western Radio*, the Ninth Circuit determined that the APA is the sort of "comprehensive remedial scheme" that indicates "Congress's intent that courts should not devise additional, judicially crafted default remedies." *Id.* at 1123. Based on that determination, the court held "that the APA leaves no room for *Bivens* claims based on agency action or inaction." *Id.* Federal defendants cite *Western Radio* for its broad language on the comprehensiveness of the APA. However, Ninth Circuit and Supreme Court precedent make clear that the analysis for *Bivens* claims is specific to the availability of remedies *for damages*.

The process for determining whether Congress intended to cut off common law claims *for equitable relief*—such as those contained in plaintiffs' petition—is substantially different. With respect to equitable relief, the Supreme Court has expressly required a "heightened" showing of clear legislative intent to displace constitutional claims in part to avoid the "serious constitutional question" that would arise "if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988). In *Webster*, the Supreme Court expressly rejected the argument that the APA provided the only available route to judicial review of agency action and inaction. *Id.* That rejection is brought into sharp relief by Justice Scalia's assertion, in dissent, that "at least with respect to all entities that come within the [APA]'s definition of 'agency,' if review is not available under the APA it is not available at all." *Id.* at 607 n.* (Scalia, J., dissenting).

The APA contains no express language suggesting that Congress intended it to displace constitutional claims for equitable relief. Indeed, the Ninth Circuit has held that § 702 of the APA "is an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable"—whether such actions are asserted under the APA or under the general federal question jurisdiction statute. *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 & n.9 (9th Cir. 1989). Recognition of causes of action against federal agencies that fall outside the APA is implicit in *Presbyterian Church*; it makes little sense to hold that the APA waives sovereign immunity for both APA and non-APA claims against federal agencies if the only viable claims are subject to the APA's judicial review provisions.

In a recent case involving a challenge to "the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy," the Supreme Court underscored the difference between claims for damages and claims for equitable relief:

> It is of central importance, too, that this is not a case like *Bivens* or *Davis* in which it is damages or nothing. Unlike the plaintiffs in those cases, respondents do not challenge individual instances of discrimination or law enforcement overreach, which due to their very nature are difficult to address except by way of damages actions after the fact. Respondents instead challenge large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners. *To address those kinds of decisions, detainees may seek injunctive relief.*

*Ziglar v. Abbasi,___U.S.___137 S. Ct. 1843, 1862 (2017) (citations and internal quotation marks omitted) (emphasis added). The Court expressly noted that separation-of-powers concerns "are . . . more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable belief" because "the risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions[.]" *Id.* at 1861.

Supreme Court, Ninth Circuit, and other cases plainly show that challenge to federal agency action may, depending on the circumstances, be stated as an APA claim or a constitutional claim. *See, e.g., Franklin*, 505 U.S. at 801 ("Although the apportionment challenge is not subject to review under the standards of the APA, that does not dispose of appellees' constitutional claims."); *Webster*, 486 U.S. at 603 (holding that § 102(c) of the National Security Act rendered the CIA director's personnel decisions unreviewable under the APA, but rejecting that argument that the same statute precluded a claim that those decisions violated the Constitution); *Navajo Nation*, 876 F.3d at 1170 ("Claims not grounded in the APA, like . . . constitutional claims . . . , do not depend on the cause of action found in the first sentence of § 702 [of the APA] and thus § 704's limitation does not apply to them.") (internal quotation marks omitted and alterations normalized); *Stone v. Trump*, 280 F. Supp. 3d 747, 772 (D. Md. 2017) (dismissing the plaintiffs' APA claim but permitting equal protection and due process claims to proceed in a case challenging the ban on transgender individuals serving in the military); *L. v. U.S. Immigration & Customs Enforcement*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018) (dismissing the plaintiffs' APA claim but permitting their due process claim to proceed in a case challenging the federal practice of separating migrant children from their parents at the border).

Plaintiffs' claims simply do not fall within the scope of the APA. As federal defendants correctly point out, the Supreme Court has made clear that review under the APA requires a "case-by-case approach" to determine whether "a specific final agency action has an actual or immediately threatened effect." *Lujan*, 497 U.S. at 892. By its terms, the APA contains no provisions by which plaintiffs may "seek *wholesale* improvement of [an agency] program by court decree[.]" *Id.* at 891 (emphasis in original). But that case law does not support the

conclusion that plaintiffs' claims must be dismissed; it simply underscores that plaintiffs' claims are not APA claims. Plaintiffs do not contend that any single agency action is causing their asserted injuries—nor could they, given the complex chain of causation involved in climate change. They seek review of *aggregate action* by *multiple agencies*, something the APA's judicial review provisions do not address. The APA does not govern plaintiffs' claims. As a result, plaintiffs' failure to state a claim under the APA is not a ground for dismissal of this action.

C.  *Motion to Dismiss on Separation of Powers Grounds & Request to Reconsider the November 2016 Denial of the Government's 12(b)(6) Motion*

Finally, federal defendants raise a set of arguments on which this Court already has ruled. First, federal defendants open their Rule 12(c) motion by asserting "that [they are] entitled to judgment as a matter of law for the reasons set forth in [their] November 2015 motion to dismiss." Defs.' Mot. for J. on the Pleadings 6. Federal defendants ask the Court to "revisit its order denying the motion to dismiss and grant judgment to Defendants on some or all of Plaintiffs' claims." *Id.* at 7. Second and more specifically, federal defendants argue that any claim brought outside the APA's framework is foreclosed by the separation of powers.

As an initial matter, the Court acknowledges now, as it did in 2016, that the allocation of power among the branches of government is a critical consideration in this case and reiterate that, "[s]hould plaintiffs prevail on the merits, this Court would no doubt be compelled to exercise great care to avoid separation-of-powers problems in crafting a remedy." *Juliana*, 217 F. Supp. 3d at 1241. The Court recognizes that there are limits to the power of the judicial branch, as demonstrated by the Court's determination that President Trump is not a proper defendant in this case.

This is the first time that federal defendants have highlighted separation of powers concerns; they did not raise that argument, except in passing, in their 12(b)(6) motion. But former defendant-intervenors raised and fully briefed separation-of-powers arguments in the section of their motion to dismiss addressing the political question doctrine. Although this is the first time federal defendants are raising a political question challenge, their brief on the subject largely reiterates arguments considered and rejected in the opinion and order on the motion to dismiss. And obviously, the invitation to reconsider the November 2016 order and opinion necessarily implicates issues on which this Court has already ruled.

In order to determine how to address federal defendants' attempt to re-raise these issues, the Court begins by considering the application of the law of the case doctrine. Under that doctrine, "a court is ordinarily precluded from reexamining an issue previously decided by the same court." *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002). The doctrine is "founded upon the sound public policy that litigation must come to an end." *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc). It also "serves to maintain consistency." *Id.* The doctrine has three exceptions: reconsideration is permitted when "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Old Person*, 114 F.3d at 1039. Although the federal rules permit back-to-back motions to dismiss for failure to state a claim, *see* Section I n.3, *supra*, courts are under no obligation to give full consideration to a rehash of arguments already presented in a 12(b)(6) motion. *See Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 434 (M.D.N.C. 2011) (declining to "reconsider issues that it addressed fully at the Rule 12(b)(6) stage" in adjudicating a Rule 12(c) motion).

To the extent that federal defendants seek reconsideration on questions unrelated to the Court's subject matter jurisdiction, the Court declines to revisit its earlier rulings. The Court gave full and fair consideration to the arguments federal defendants now raise in their November 2016 opinion. Nothing has changed to warrant expending judicial resources in retreading that ground at this juncture. The same legal standard applies to motions under Rules 12(b)(6) and 12(c) and federal defendants have cited no intervening changes in the law.

To the extent that federal defendants' arguments challenge subject matter jurisdiction, the law of the case doctrine does not apply. *United States v. Houser*, 804 F.2d 565, 569 (9th Cir. 1986). But federal defendants have pointed to no relevant change in circumstances or the governing law between November 2016 and today. Accordingly, the Court has little to add to the prior opinion, which addressed the separation of powers issue at length. *See Juliana*, 217 F. Supp. 3d at 1235–42, 1270–71. The separation of powers did not require dismissal of this lawsuit in November 2016, and it does not require dismissal of this lawsuit now.

Due respect for the separation of powers has informed, and will continue to inform, the Court's approach to this case at every step of the litigation. The Court remains mindful, however, that it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Courts have an obligation not to overstep the bounds of their jurisdiction, but they have an equally important duty to fulfill their role as a check on any unconstitutional actions of the other branches of government.

/ / /

/ / /

/ / /

/ / /

II.    *Motion for Summary Judgment*[6]

Federal defendants raise several arguments in their motion for summary judgment, many of which were previously considered in the November 2016 Order. Namely, federal defendants reiterate their contention that plaintiffs lack Article III standing because their injuries are not concrete and particularized; the harms alleged by plaintiffs are not fairly traceably to federal defendants; and plaintiffs' claims are not redressable by this Court. Federal defendants also argue that plaintiffs have failed to adequately state a claim under the APA and that plaintiffs' claims would violate separation of powers principles. Federal defendants further argue, as they did in their previous motion to dismiss, that there is no fundamental right to a climate system capable of sustaining human life; that plaintiffs cannot establish a state-created danger claim; and that the public trust doctrine does not apply to the federal government.

In response, plaintiffs proffer the declarations of the named plaintiffs as well as declarations from eighteen expert witnesses.[7] They argue that genuine issues of material fact exist as to standing, separation of powers, and their due process and public trust claims.

---

[6] Subsequent to Oral Argument in July 2018, plaintiffs filed what they style as a Notice of Supplemental Disputed Facts Raised by federal defendants' Expert Reports in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. (doc. 338) Essentially, plaintiffs submit excerpts from defendant's expert reports and argue that these submissions show that genuine issues of material fact remain for trial. However, the Court declines to consider the notice as it is untimely and prohibited under the District's Local Rules. L.R. 7-1(f).

[7] Many of documents referenced by plaintiffs' in their response to the motion for summary judgment, and supporting declarations, are subject to their motion *in limine* (doc. 254) seeking judicial notice of certain documents. The Court has examined which of those documents are judicially noticeable in a contemporaneous opinion. Further, at oral argument plaintiffs requested that the Court take judicial notice of the announcement of the Department of Interior's plan to offer 78 million acres offshore of the Gulf Coast for oil and gas exploration and development. The Court has located the announcement of the plan available on the Department's public website. https://www.doi.gov/pressreleases/interior-announces-region-wide-oil-and-gas-lease-sale-gulf-mexico. Consistent with the Court's analysis the contemporaneous opinion regarding plaintiffs' first motion *in limine*, the Court takes judicial notice of the announcement.

Many of these arguments raised in the present motion are substantially similar to those raised in federal defendants' and the former defendant-intervenors' motions to dismiss. However, federal defendants correctly note that the standard for this Court in reviewing a motion for summary judgment is different than the standard which was applied in the previous order. Thus the Court must review the briefing and record to determine whether there is any genuine dispute as to any material fact and the government is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A.    *Standing*

Federal defendants argue, as they did at the pleadings stage, that plaintiffs lack Article III standing to bring their claims. While many of the arguments offered in the present summary judgment motion are substantially similar to those offered in the federal defendants' previous motion to dismiss, a different standard applies at this stage of the proceedings.

To avoid summary judgment, plaintiffs need not establish that they in fact have standing but only that there is a genuine question of material fact as to the standing elements. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002). To demonstrate standing, a plaintiff must show that (1) she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must support each element of the standing test "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. General factual allegations of injury resulting from the defendant's conduct will suffice in responding to a motion to dismiss. *Id.* In responding to a motion for summary judgment, however, a plaintiff can no longer rest on "'mere allegations,' but must 'set forth' by affidavit or

other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.* And at the final stage of standing evaluation, those facts (if controverted) must be supported adequately by the evidence adduced at trial. *Id.*

> i. *Injury in Fact*

In an environmental case, a plaintiff cannot demonstrate injury in fact merely by alleging injury to the environment; there must be an allegation that the challenged conduct is harming (or imminently will harm) the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). For example, a plaintiff may meet the injury in fact requirement by alleging that the challenged activity "impairs his or her economic interests or aesthetic and environmental well-being." *Wash. Envt 'l Council v. Bellon*, 732 F.3d 1131, 1140 (9th Cir. 2013) (quotation marks omitted and alterations normalized).

Plaintiffs have filed sworn declarations attesting to a broad range of personal injuries caused by human induced climate change. For example, plaintiff Jayden F. attests to being injured by extreme weather events in 2016 and 2017 which led to the flooding in both 2016 and 2017 of her home in Rayne, Louisiana. Jayden Decl. ¶ 2-16; ¶ 26; ¶ 28-32. This has caused emotional trauma, lost recreational opportunities, as well as lost personal and economic security. *Id.* at ¶ 36; 39-42. Other plaintiffs also attest to injuries caused by flooding caused by sea level rise and extreme weather events. *See* Journey Decl. ¶¶ 21-27; Levi Decl. ¶¶ 3; 12-16; Tia Decl. ¶ 9; Victoria Decl. ¶¶ 8–9. Similarly, plaintiff Journey attests that harm to his health, personal safety, cultural practices, economic stability, food security and recreation interests have occurred due to climate destabilization and ocean acidification. Journey Decl. ¶¶ 1; 11-20;; *See also* Journey Decl. 21-27; Levi Decl. ¶¶ 3; 12-16; Tia Decl. ¶ 9; Victoria Decl. ¶¶ 8–9; Jacob Decl. ¶ 20; Wanless Decl. Ex. 1 at 30.

Plaintiff Kelsey Juliana attests that climate change has harmed her recreational interests in Oregon's freshwater lakes, rivers, forests, and mountains and has degraded the quality of local food sources and drinking water. Kelsey Decl. ¶¶ 10-12. She, like other plaintiffs, also alleges adverse health and recreation impacts caused by the increased occurrence and intensity of seasonal wildfires. *Id.* ¶ 15; Aji Decl. ¶¶ 2-3; Alexander Decl. ¶¶ 33-41; Jaime Decl. ¶ 17; Kirin Decl. ¶¶ 6-8; Xiuhtezcatl Decl. ¶ 15; Zealand Decl. ¶ 6. Some plaintiffs attest that they are suffering psychological trauma as result of fossil-fuel induced climate change caused by federal defendants. *See* Levi Decl. ¶ 5; Victoria Decl. ¶¶ 8-10, 16-18; Jayden Decl. ¶ 42; Nicholas Decl. ¶¶ 4, 7, 17. Other plaintiffs attest to injuries to their indigenous and cultural practices and values. Miko Decl. ¶¶, 6-7, Jamie Decl. ¶¶ 12-14; Xiuhtezcatl Decl. ¶¶6-8. These are merely a selection of the many injuries alleged.

Plaintiffs further offer expert testimony tying injuries alleged by plaintiffs to fossil fuel induced global warming. *See* Trenberth Decl. 23 ("[I]t is my expert opinion that Plaintiffs including Jayden, Levi, Xiuhtezcatl, Victoria, Jaime, Journey, Zealand, and Nathan are already experiencing extreme weather events that have been exacerbated due to anthropogenic climate change."); Frumpkin Decl. Ex. 1, 2 & 11; Running Decl. 13 ("This will impact the many Plaintiffs in the West who suffer increased risk and severity of impacts from wildfires near their homes, in places that they visit for recreation, and in the air they breathe during the extended fire season, including Xiuhtezcatl, Jaime Lynn, Jacob, Sahara, Kelsey, Alex, Zealand, Nick, Aji, Nathan, Hazel and Avery."); Van Sustern Decl. Ex. 1, 17 ("The Plaintiffs I interviewed are suffering a range of emotional injuries from acute and chronic exposure to climate change – from being personally harmed by climate change impacts like drought and extreme weather events, to empathic identification with others who are harmed by climate change, to profound fears about

future harm – consistent with those injuries described in the literature."); Stiglitz Decl. Ex. 1 ¶ 29 ("Youth Plaintiffs themselves will suffer the disproportionate, increased financial burdens of climate change as the impacts of climate change propagate throughout the economy.").

Federal defendants argue that these declarations fail to show that plaintiffs' injuries are concrete and particularized to them; rather federal defendants' contend that the injuries alleged are generalized widespread environmental phenomena which affect all other humans on the planet, making them nonjusticiable. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.,___U.S.___134 S. Ct. 1377, 1387 n.3 (2014) (explaining that generalized grievances do not meet Article III's case or controversy requirement).

However, as the Court noted in its November 2016 order:

> The government misunderstands the generalized grievance rule. As the Ninth Circuit recently explained, federal courts lack jurisdiction to hear a case when the harm at issue is "not only widely shared, but is also of an abstract and indefinite nature - for example, harm to the common concern for obedience to the law." *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quoting *Fed Elec. Comm 'n v. Akins*, 524 U.S. 11, 23 (1998)). Standing alone, "the fact that a harm is widely shared does not necessarily render it a generalized grievance." *Jewel*, 673 F .3d at 909; *see also Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) ("[I]t does not matter how many persons have been injured by the challenged action" so long as "the party bringing suit shows that the action injures him in a concrete and personal way." (quotation marks omitted and alterations normalized)); *Akins*, 524 U.S. at 24 ("[A]n injury .... widely shared ... does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an 'injury in fact."); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 651 (9th Cir. 2004) (Gould, J., concurring) ("[T]he most recent Supreme Court precedent appears to have rejected the notion that injury to all is injury to none for standing purposes."); *Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001) ("So long as the plaintiff ... has a concrete and particularized injury, it does not matter that legions of other persons have the same injury."). Indeed, even if the experience at the root of [the] complaint was shared by virtually every American," the inquiry remains whether that shared experience caused an injury that is concrete and particular to the plaintiff. *Jewel*, 673 F.3d at 910.

*Juliana*, 217 F. Supp.3d at 1243–44.

Further, denying "standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 687 (1973). Federal defendants have presented no new controlling authority or other evidence which changes the Court's previous analysis.

As to imminence, plaintiffs must demonstrate standing for each claim they seek to press and for each form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Because plaintiffs seek injunctive relief, they must show that their injuries are "ongoing or likely to recur." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1197 (9th Cir. 2016) (quoting *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)). Plaintiffs have met this requirement under the summary judgment standard.

Plaintiffs submit evidence that fossil fuel emissions are responsible for most of the increase in atmospheric $CO_2$, and that increasing $CO_2$, in turn, is the main cause of global warming, and that atmospheric concentrations of greenhouse gasses, due to fossil fuel combustion, are increasing quickly such that planetary warming is accelerating at rates never before seen in human history. Hansen Decl. Ex. A, at 38. Further, not only are concentrations of atmospheric $CO_2$ continuing to increase, but the rate of increase has also nearly doubled since measurements began being recorded pushing humanity closer to the "point of no return." *Id.* at 29, 38. Estimates show that extreme weather events are likely to continue to increase as the global surface temperature continues to rise. *Id.* at 35; Trenberth Decl. Ex. 1, at 1, 8, 13. Indeed, the five hottest years in the 123 years of record-keeping in the United States have all occurred in the past decade. Trenberth Decl. Ex. 1, at 3. Plaintiffs present evidence that 2017 saw record

setting events such as extreme wildfires in the western United States[8] and abnormally strong hurricanes in the southeastern United States and Gulf of Mexico (Hurricanes Harvey, Irma, and Maria), all of which were exacerbated by climate change. *Id.* at 7-11.

Further, plaintiffs offer that global sea level rise will continue unabated under current conditions. Plaintiffs' expert Dr. James Hansen has submitted video animations showing how the future impacts of seal level rise will flood or impact the livability of the homes of plaintiffs in Louisiana, Oregon, Washington, Florida, New York, and Hawaii based on current assumptions about carbon emission. Hansen Decl. Ex. E-R. The most recent projections from the National Oceanic and Atmospheric Administration ("NOAA") provide that global mean sea level will rise between 1.5–2.5 m (5– 8.2 ft.) by 2100 and that it is expected to continue to rise and even accelerate more after 2100. Wanless Decl. Ex. 1 at 12.

In sum, the Court is left with plaintiffs' sworn affidavits attesting to their specific injuries, as well as a swath of extensive expert declarations showing those injuries are linked to fossil fuel-induced climate change and if current conditions remain unchanged, these injuries are likely to continue or worsen. Federal defendants offer nothing to contradict these submissions, and merely recycle arguments from their previous motion. Thus, for the purposes of this case, the declarations submitted by plaintiffs and their experts have provided "specific facts," of immediate and concrete injuries. *Lujan,* 504 U.S. at 561; *See Bellon*, 732 F.3d at 1141.

/ / /

---

[8] "By 2006, scientists documented that the wildfire season in the western United States was 87 days longer than it was in the 1980s (Westerling et al. 2006). The number of large fires, >1000 acres, had grown four times, and the number of acres burned per year had increased six times. Recent studies have found the global wildfire season increased 19 [percent] globally from 1979–2013, and the global area vulnerable to wildfire increased 108 [percent] (Jolly et al. 2015)." Running Decl. Ex. 1, 13. Future wildfire activity may be 200– 600 [percent] higher than today in the Pacific Northwest alone. *Id.* at 28.

ii. *Causation*

A plaintiff must show the injury alleged is "fairly traceable" to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation and quotation marks omitted). Although a defendant's action need not be the sole source of injury to support standing, *Barnum Timber Co. v. EPA*, 633 F.3d 894, 901 (9th Cir. 2011), "[t]he line of causation between the defendant's action and the plaintiffs harm must be more than attenuated," *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012) (citations and quotation marks omitted). However, a "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Id.* (citations, quotation marks, and alterations omitted). At the summary judgment stage, the "causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000)

Here, federal defendants argue again that the association between the conduct of which plaintiffs complain, namely the government's subsidizing the fossil fuel industry; allowing the transportation, exportation, and importation of fossil fuels; setting of energy and efficiency standards for vehicles, appliances, and buildings; reducing carbon sequestration capacity and expanding areas for fossil fuel extraction and production through federal land leasing policies is tenuous and filled with many intervening actions by third parties. Thus, they argue that plaintiffs have failed to tether their injuries, both direct and indirect, to specific actions of the United States.

Federal defendants again rely on the Ninth Circuit's holding in *Bellon* to support their argument that "the causal chain is too weak to support standing" for plaintiffs' injuries. *Bellon*, 732 F.3d at 1142. The Court discussed *Bellon* in detail in its November 2016 Order on the motions to dismiss. *See Juliana*, 217 F. Supp. 3d at 1244-1246. Briefly, the court in *Bellon* found that the five oil refineries at issue in that case were responsible for just under six percent of total greenhouse gas emissions produced in the State of Washington. The court quoted the state's expert's declaration that the effect of those emissions on global climate change was "scientifically indiscernible, given the emission levels, the dispersal of greenhouse gases world-wide, and the absence of any meaningful nexus between Washington refinery emissions and global greenhouse gases concentrations now or as projected in the future." *Bellon,* 732 F.3d at 1144 (quotation marks omitted).

Previously, the Court distinguished *Bellon* on the procedural basis that it was considering motions to dismiss, while the court in *Bellon* reviewed an order on a motion for summary judgment. Now on summary judgment in this case, the Court still finds that *Bellon* does not foreclose standing for plaintiffs. The court in *Bellon* relied on the scientific evidence, presented in an "*unchallenged declaration*" from the defendants' expert that showed that the causal connection between the regulatory actions of the defendants, the greenhouse gas emissions in question, and the injuries complained of by the plaintiffs were too tenuous to support standing. *Id.* at 1143-44 (emphasis added). The Ninth Circuit later clarified, "causation was lacking [in *Bellon*] because the defendant oil refineries were such minor contributors to greenhouse gas emissions, and the independent third-party causes of climate change were so numerous, that the contribution of the defendant oil refineries was 'scientifically indiscernible.'" *WildEarth*

*Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1158 (9th Cir. 2015) (quoting *Bellon*, 732 F.3d at 1144).

Unlike in *Bellon,* plaintiffs' claims do not challenge the global impact of such specific emissions. Rather, plaintiffs have proffered uncontradicted evidence showing that the government has historically known about the dangers of greenhouse gases but has continued to take steps promoting a fossil fuel based energy system, thus increasing greenhouse gas emissions. As the Court noted in the November 2016 Order, climate science and our ability to understand the effects of climate change are constantly evolving. *Juliana*, 217 F.Supp 3d at 1245 (quoting Kirsten Engel & Jonathan Overpeck, *Adaptation and the Courtroom: Judging Climate Science*, 3 Mich. J. Envt'l & Admin. L. 1, 25 (2013) (although "climate impacts at the regional and local levels are subject, among other things, to the uncertainties of downscaling techniques [,] ... our knowledge of the climate is developing at a breakneck pace.")). *Bellon* does not foreclose standing in any suit simply because it is based on actions causing dangerous levels atmospheric carbon emissions.

In further contrast to *Bellon*, the pattern of federally authorized emissions challenged by plaintiffs in this case do make up a significant portion of global emissions. Federal defendants have admitted that "from 1850 to 2012, $CO_2$ emissions from sources within the United States including from land use "comprised more than 25 [percent] of cumulative global $CO_2$ emissions." Answer at ¶ 151. At oral argument, federal defendants noted that plaintiffs' evidence only shows "United States' current global contribution to current emissions is around 14 to 15 percent." July 18, 2018 Hearing Trans. 29. In a different context the Supreme Court held that United States motor-vehicle emissions which were responsible for six percent of worldwide $CO_2$ "make a meaningful contribution to greenhouse gas concentrations" when

"judged by any standard."[9] *Mass. v. EPA*, 549 U.S. at 524–25. The emissions implicated by federal defendants' conduct in the case outstrip either of those considered in either *Bellon* or *Massachusetts*.

Still, federal defendants contend that plaintiffs do not adequately show a causal connection between a specific action taken by federal defendants and their climate change related injuries. They argue that plaintiffs' causal connection is based on the actions of third-party emitters. However, plaintiffs challenge not only the direct emissions of federal defendants through their use of fossil fuels to power its buildings and vehicles[10], but also the emissions that are caused and supported by their policies. Plaintiffs have alleged that federal defendants' systematic conduct, which includes "government policies practices, and actions, showing how each Defendant permits, licenses, leases, authorizes, and/or incentivizes the extraction, development, processing, combustion, and transportation of fossil fuel" caused plaintiffs' injuries. Plaintiffs' Resp. to Mot. for Summ J. 11. And plaintiffs provide evidence that federal defendants' actions (or inaction), such as coal leasing, oil development, fossil fuel industry subsidies, and the setting of fuel efficiency standards for vehicles, led to plaintiffs' injuries.

For example, regarding federal leasing policy, more than five million acres of National Forest lands are currently leased for oil, natural gas, coal, and phosphate development. Olsen Decl. Ex. 73. In 2016, the Department of Interior administered some 5000 active oil and gas

---

[9] The court in *Bellon* declined to extend the rationale of *Massachusetts* in part because while the 6 percent of Washington state emissions at issue in that case might be significant in that state, the plaintiffs did not "provide any evidence that places this statistic in national or global perspective to assess whether the refineries' emissions are a meaningful contribution to global greenhouse gas levels." 732 F.3d 1131, 1146 (9th Cir. 2013) (internal citation omitted).

[10] These emissions are not insignificant. In 2016, the federal government had 1,340,000 cars and 1,810,000 trucks in its fleet. Olson Decl. Ex.136. In 2015, the federal fleet consumed 310,416 gallons of gasoline and 66,736 gallons of diesel. *Id.* The Department of Defense uses enough electricity to power 2.6 million average American homes. *Id.* at Ex. 217

leases on nearly 27 million acres in the Outer Continental Shelf. *Id.* Ex. 215. In 2015, 782 million barrels of crude oil, five trillion cubic feet of natural gas, and 421 million tons of coal were produced on federal lands managed by the Department of Interior. *See Id.* Ex. 74. Between 1905 and 2016, the United States Department of Agriculture authorized the harvest of 525,484,148 billion board feet of timber from federal land, thus reducing the country's carbon sequestration capacity. *Id.* Ex. 45. Federal defendants permit livestock grazing on over 95 million acres of National Forest lands in 26 states, further reducing carbon sequestration capacity and increasing methane emissions. *Id.* 42, 46, 52, 50-55, 70. It is uncontested that federal defendants control leasing and permitting on federal land. Third parties could not extract fossil fuels or make other use of the land without Federal Defendants' permission.

Federal defendants also set energy and efficiency standards that do impact the rate at which individual and businesses emit greenhouse gases. The Department of Energy sets energy conservation standards for more than 60 categories of appliances and equipment, which covers roughly 90 percent of home energy use. *Id.* Ex. 92. Likewise, passenger cars and light trucks cannot be sold in the United States unless they comply with the Fuel Economy Standards set by the Department of Transportation, which historically have been lower in the United States than other developed nations. *Id.* Ex. 151.

Federal defendants' actions impact the import, export, and transport of fossil fuels. For example, in 2015, Congress lifted a ban on crude oil exports and exports rose rapidly thereafter. *Id.* Ex. 96. No offshore liquefied natural gas or oil import and export facility can legally operate without a license from the Department of Transportation. *Id.* at 120 189. The Federal Energy Regulatory Commission must approve interstate transport of fossil fuel, and Department of Transportation permitting is required for transportation of hazardous material including fossil

fuels. *Id.* at 384, 385. These examples are merely illustrative of the evidence proffered by plaintiffs.

Plaintiffs' expert declarations also provide evidence that federal defendants' actions have led to led to plaintiffs' complained of injuries. Plaintiffs' expert Dr. James Hansen asserts that "[t]he United States is, by far, the nation most responsible for the associated increase in global temperatures. The [United States] alone is responsible for a 0.15°C increase in global temperature." Hansen Decl. 28. Plaintiffs' expert Dr. Joseph Stiglitz offers that "the current national energy system, in which approximately 80 percent of energy comes from fossil fuels, is a direct result of decisions and actions taken by Defendants." Stiglitz Decl. Ex. 1 ¶ 27. That is echoed by plaintiffs' expert Dr. Mark Jacobson who notes that "fossil fuels supply more than 80 [percent] of our all-purpose energy in the United States, not out of necessity, but because of political preference and historic government support that led to the development and maintenance of a widespread fossil-fuel infrastructure." Jacobson Decl. Ex. 1, 5. Plaintiffs' expert Peter Erickson submitted that by subsidizing the low cost of oil the United States government has historically and is currently substantially expanding the country's future oil production relative to the production that would occur if these subsidies were not in place. Erickson Decl. Ex.1, 15.

Plaintiffs' experts tether plaintiffs' specific injuries to climate change and climate change related weather events. *See generally* Section 2.A.ii. Plaintiffs' expert Dr. Harold Wanless opines that sea level rise solely caused by fossil fuel-induced climate change poses clear and irreversible harm to plaintiffs like Levi whose community will likely be uninhabitable in future. Wanless Decl. Ex. 1 at 1-2. Likewise, plaintiffs' expert Dr. Kevin Trenberth offers, as an example of climate change related weather events harming plaintiffs, localized extreme weather

events like the flooding affecting plaintiff Jayden and her home were heightened by climate change. Trenberth Decl. Ex. 1 at 20-22. The magnitude of rainfall and the extent of flooding near Jayden's home would not have occurred without fossil fuel-induced climate change. *Id.* Dr. Steven Running notes that the pattern of drought that led plaintiff Jaime to move from her home on the Navajo Reservation in New Mexico is directly linked to climate change. Running Decl. 6.

At this stage of the proceedings, the Court finds that plaintiffs have provided sufficient evidence showing that causation for their claims is more than attenuated. Plaintiffs' "need not connect each molecule" of domestically emitted carbon to their specific injuries to meet the causation standard. *Bellon*, 732 F.3d 1142-43. The ultimate issue of causation will require perhaps the most extensive evidence to determine at trial, but at this stage of the proceedings, plaintiffs have proffered sufficient evidence to show that genuine issues of material fact remain on this issue. A final ruling on this issue will benefit from a fully developed factual record where the Court can consider and weigh evidence from both parties.

   iii. *Redressability*

The final prong of the standing inquiry is redressability. The causation and redressability prongs of the standing inquiry "overlap and are two facets of a single causation requirement." *Bellon*, 732 F.3d at 1146 (citation and quotation marks omitted). They are distinct in that causation "examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief." *Id.* A plaintiff need not show that a favorable decision is certain to redress her injury, but must show a substantial likelihood that it will do so. *Id.* For the redressability inquiry, it is sufficient

to show that the requested remedy would "slow or reduce" the harm.[11] *Mass. v. EPA*, 549 U.S. at

525 (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

Federal defendants contend that there is no possible redress in this case because the

remedies sought by plaintiffs are beyond the Court's authority to provide.[12]  Further, they argue

that even if this Court did find in favor of plaintiffs, any remedy it fashioned would not redress

the harms alleged by plaintiffs, because fossil fuel emissions from other entities would still

contribute to continuing global warming.  Thus, they argue that there is no evidence that any

immediate reduction in emissions caused by the United States would manifest in a reduction of

climate change induced weather phenomena.  As the Court has stated before, whether the Court

could guarantee a reduction in greenhouse gas emission is the wrong inquiry because

redressability does not require certainty.  Rather, at this stage, it only requires a substantial

likelihood that the Court could provide meaningful relief.  Moreover, the possibility that some

other individual or entity might later cause the same injury does not defeat standing; the question

remains whether the injury caused by the defendants in this suit can be redressed.  *Juliana*, 217

F. Supp. 3d at 1247; *See also WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157

(9th Cir. 2015) ("[T]he mere existence of multiple causes of an injury does not defeat

redressability, particularly for a procedural injury. So long as a defendant is at least partially

---

[11] "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Mass. v. EPA*, 549 U.S. at 525

[12] Federal defendants rely on *Norton v. Southern Utah Wilderness Alliance* for the proposition that the Court may only compel ministerial action. 542 U.S. 55, 57–58 (2004). However, that case involved a claim brought under the APA.  The Court has already held that these claims are not governed by the APA.  *See* Sections 1.B. and 2.C.

causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.").

Here, plaintiffs request declaratory and injunctive relief as well as any other relief as the Court deems just and proper. They ask the Court, *inter alia*, to "[o]rder Defendants to prepare and implement an enforceable national remedial plan to phase out fossil fuel emission and draw down excess atmospheric $CO_2$." First Am. Compl. ¶ 94. Plaintiffs dispute federal defendants' contention, however, that they are asking this Court to create a highly specific plan that federal defendants must use remedy any constitutional violations. Instead, plaintiffs urge that their request for relief, at its core, is one for a declaration that their constitutional rights have been violated and an order for federal defendants to develop their own plan, using existing resources, capacities, and legal authority, to bring their conduct into constitutional compliance. Plaintiffs point to various statutory authorities by which they claim federal defendants could affect the relief they request. Plaintiffs' Resp. to Mot. for Summ. J. 24-25. *See inter alia* 30 U.S.C §§ 351-359; 33 U.S.C. § 1344; 42 U.S.C. §§ 7112; 6291-6296; 7401-7431;[13] 49 U.S.C. § 32902; 33 U.S.C. § 1344.

Plaintiffs also offer evidence that the injuries they allege can be redressed through actions by federal defendants. *See* Hansen Decl. Ex. 1, 4 (staving off the effects of catastrophic climate change "remains possible if [the United States] phases out [greenhouse gas emissions] within several decades and actively draw[s] down excess atmospheric $CO_2$ [,]" which can be largely achieved "via reforestation of marginal lands with improved forestry and agricultural

---

[13] Judge Coffin cited to § 7409 (providing the Environmental Protection Agency with the authority to regulate national ambient air quality standards for the attainment and maintenance of the public welfare) in his F&R as supporting a "strong link between all the supposedly independent and numerous third party decisions given the government's regulation of $CO_2$ emissions." (doc. 68 at *10); *See also Mass. v. EPA*, 549 U.S. 497, 524 (2007). (A "reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere.")

practices."); Robertson Decl. Ex 1 at 6 ("All told, technology is available today to store carbon or avoid future greenhouse gas emissions from agriculture in the U.S. equivalent to more than 30 [gigatonnes of carbon] by 2100); Jacobson Decl. Ex. 1 at 7 ("[I]t is technologically and economically possible to electrify fully the energy infrastructures of all 50 United States and provide that electricity with 100 [percent] clean, renewable wind, water, and sunlight (WWS) at low cost by 2030 or 2050."); Williams Decl. Ex. 1 at 3 & 64 ("[I]t is technically feasible to develop and implement a plan to achieve an 80 [percent] greenhouse gas reduction below 1990 levels by 2050 in the United States . . . with overall net [greenhouse gas] emissions of no more than 1,080 [million tons of carbon], and fossil fuel combustion emissions of no more than 750 [million tons of carbon]."); Stiglitz Decl. Ex. 1, ¶¶ 44-49 (explaining that transitioning the United States economy away from fossil fuels is feasible and beneficial).

It is clearly within a district court's authority to declare a violation of plaintiffs' constitutional rights. *See*, e.g., *Obergefell v. Hodges,*___U.S.____135 S. Ct. 2584 (2015); *Brown v. Bd of Educ.*, 347 U.S. 483 (1954); *Lawrence v. Texas*, 539 U.S. 558 (2003). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15. (1970). As mentioned elsewhere in this opinion, should the Court find a constitution violation, it would need to exercise great care in fashioning any form relief, even if it were primarily declaratory in nature.[14] The Court has considered the summary judgment record regarding traceability and plaintiffs' experts' opinions that reducing domestic emissions, which plaintiffs contend are controlled by federal defendants'

---

[14] Indeed, the "remedial powers of an equity court . . . are not unlimited." *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971).

actions, could slow or reduce the harm plaintiffs are suffering. The Court concludes, for the purposes of this motion, that plaintiffs have shown an issue of material fact that must be considered at trial on full factual record.

Regarding standing, federal defendants have offered similar legal arguments to those in their motion to dismiss. Plaintiffs, in contrast, have gone beyond the pleadings to submit sufficient evidence to show genuine issues of material facts on whether they satisfy the standing elements. The Court has considered all of the arguments and voluminous summary judgment record, and the Court finds that plaintiffs show that genuine issues of material fact exist as to each element. As the Court notes elsewhere in this opinion, the Court will revisit all of the elements of standing after the factual record has been fully developed at trial. For now, the Court simply holds that plaintiffs have met their burden to avoid summary judgment at this time.

B.      *Failure to State a Claim under the APA*

Federal defendants next argue that even if the Court finds that plaintiffs have established standing, plaintiffs still have not identified a valid right of action. Essentially, federal defendants argue once again that this case must be dismissed because the APA provides the "sole mechanism" by which plaintiffs must bring their claims. Defs.' Mot. for Summ. J. 18. This issue is substantively explored in Section I.B, *infra*, and applies with equal force to this motion for summary judgment. Plaintiffs' claims are not governed by the APA. Thus, federal defendants are not entitled to summary judgment on this issue.

C.      *Separation of Powers*

Federal defendants contend, once again that plaintiffs' claims and the relief sought are broader than what can be entertained as a case or controversy under Article III of the United

States Constitution. The Court has already discussed similar arguments in the November 2016 Order and in Section I.C of this Opinion.

Federal defendants offer no new evidence or controlling authority on this issue that warrant reconsideration of the Court's previous analysis.[15] Nor do they offer a rationale as to why the outcome should be different under the summary judgment standard. Indeed, they contend that the issue here is "purely legal" in nature and that "factual development" is not relevant to whether plaintiffs' requested remedy violates separation of powers issues. Defs.' Reply to Mot. for Summ. J. 26.

As the Court noted above, the allocation of powers between the branches of government is a critical consideration in this case, but it is the clear province of the judiciary to say what the law is. *Marbury*, 5 U.S. at 177. After a fuller development of the record and weighing of evidence presented at trial, should the Court find a constitutional violation, then it would exercise great care in fashioning a remedy determined by the nature and scope of that violation. Additionally, many potential outcomes and remedies remain at issue in this case. The Court

---

[15] Federal defendants point to a recent public nuisance case from the Northern District of California to support their position that this case violates separation of powers principles. *See City of Oakland v. BP P.L.C., et al.*, 2018 WL 3109726 (N.D. Cal. 2018). There, a district court dismissed claims brought by certain cities in California against several large oil and natural gas producers. The plaintiffs alleged that the worldwide production and sale of fossil fuels by the defendants were causing climate change, the effects of which caused damage to the cities. *City of Oakland* is readily distinguishable. Here, plaintiffs allege constitutional violations against the federal government based on federal defendants' domestic carbon emissions as well as a promulgation of a domestic energy market based on fossil fuels in spite of their awareness of the dangers of such emissions. The court in *City of Oakland* focused on nuisance claims, brought for money damages, and the resulting balancing test, as well as extraterritoriality concerns stemming from the plaintiffs' attempt to impose liability on the defendants for the production and sale of fossil fuels worldwide. *Id.* at *7. ("Because this relief would effectively allow plaintiffs to govern conduct and control energy policy on foreign soil, we must exercise great caution.") Here, plaintiffs' claims are limited to the territorial boundaries of the United States. The Court is not persuaded that *City of Oakland* offers relevant guidance for the Court's consideration of this motion given the vastly different nature of the claims, requested remedies, and parties.

could find that there is no violation of plaintiffs' rights; that plaintiffs fail to meet one or more of the requirements of standing; or, after the full development of the factual record, that the requested remedies would indeed violate the separation of powers doctrine. As has been noted before, even should plaintiffs prevail at trial, the Court, in fashioning an appropriate remedy, need not micro-manage federal agencies or make policy judgments that the Constitution leaves to other branches. The record before the Court at this stage of the proceedings, however, does not warrant summary dismissal. To grant summary judgment on these grounds at this stage— when plaintiffs have supplied ample evidence to show genuine issues of material fact—would be premature.[16]

Federal defendants also contend that merely participating in ongoing discovery and a court trial violates separation of powers principles. Federal defendants previously made this argument in their Motion for Protective Order and Stay of All Discovery. (doc. 196) This rationale was rejected by Judge Coffin in his Order denying the motion (doc. 212), which the Court later affirmed over Federal Defendant's objections. (doc. 300) Moreover, the Ninth Circuit considered this argument in federal defendant's latest petition for mandamus. The panel noted in its opinion that the government made the same argument in their first mandamus petition, and the panel "rejected" it for the purposes of the mandamus. *In re United States*,___F.3d___, 2018 WL 3484444 at *9 (citing *In re United States*, 884 F.3d at 836). Once again, the Court does not find federal defendants' argument persuasive and concludes that generally participating in discovery and trial here does not in and of itself violate separation of

---

[16] Respect for separation of powers might, for example, permit the Court to grant declaratory relief, directing federal defendants to ameliorate plaintiffs' injuries without limiting its ability to specify precisely how to do so. That said, federal courts retain broad authority "to fashion practical remedies when confronted with complex and intractable constitutional violations." *Brown v. Plata*, 563 U.S. 493, 526 (2011). Here the Court has not yet determined the scope, if any, of federal defendants' constitutional violations or plaintiffs' injuries.

powers concerns. Federal defendants have been free to raise objections to specific discovery requests and orders which they believe implicate separation of powers concerns.

D. *Due Process Claims*

Federal defendants argue that plaintiffs' individual due process claims fail as a matter of law. The Court addresses each in turn.

i. *Fundamental Right to an Environment Capable of Sustaining Human Life*

Federal defendants argue, as they did in their previous motion to dismiss that there is no right to a climate system capable of sustaining human life. They note that this issue is "a purely legal question" and that factual development at trial is not necessary to resolve it. Defs.' Reply to Mot. for Summ. J. 29. Federal defendants offer substantially similar arguments to those from their motion dismiss here.[17] The Court addressed these arguments in the previous order, and nothing in the current briefing persuades the Court to change its previous rationale. As stated in the November 2016 order, this Court has simply held that:

> where a complaint alleges knowing governmental action is affirmatively and substantially damaging the climate system in a way that will cause human deaths, shorten human lifespans, result in widespread damage to property, threaten human food sources, and dramatically alter the planet's ecosystem, it states a claim for a due process violation. To hold otherwise would be to say that the Constitution affords no protection against a government's knowing decision to poison the air its citizens breathe or the water its citizens drink.

*Juliana*, 217 F. Supp. 3d at 1250.

---

[17] Federal defendants do cite a recent case from D.C. Circuit Court of Appeals arguing that it rejected the notion of a federal due process right to a stable environment. *Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 895 F.3d 102, (D.C. Cir. 2018). However, the analysis in that case involved the Environmental Rights Amendment to the Pennsylvania State Constitution, and the court ultimately held that the rights created by the amendment in question bound only "only state and local governments." *Id.* at 110. The court noted that the plaintiffs grounded their claims on the right outlined in the Pennsylvania Constitution as creating "a protected liberty or property interest as a matter of federal due process." *Id.* at 108. The court found that "the Amendment is too vague and indeterminate to create a federally cognizable property interest." *Id.* at 109. Because the court's analysis centered on the specific Pennsylvania Environmental Rights Amendment, it is not controlling here.

Reviewing the summary judgment record, plaintiffs have offered expert testimony on the catastrophic harms of climate change. *See* Section 2.A. They also submitted evidence, in the form of expert declarations and government documents, supporting their argument that the federal defendants' actions have led to these changes and are linked to the harms alleged by plaintiffs. At this stage, federal defendants have offered no legal or factual rationale significantly different from those offered in their previous motion to dismiss. As such, the Court finds no reason to re-examine the previous ruling on the existence of this due process right. Moreover, further factual development of the record will help this Court and other reviewing courts better reach a final conclusion as to plaintiffs' claims under this theory.

      ii.     *State-Created Danger Theory*

Federal defendants urge that plaintiffs' claims based on the state created danger doctrine must fail. First, they argue that plaintiffs do not show a special relationship between themselves and the government. More importantly, federal defendants argue that plaintiffs cannot show that government conduct proximately caused a dangerous situation in deliberate indifference to plaintiffs' safety or that harm or loss of life has resulted from such conduct. Plaintiffs contend that they have proffered ample evidence to show genuine issues of material fact as to whether federal defendants have liability for the conduct alleged in their complaint.

With limited exceptions, the Due Process Clause does not impose an affirmative obligation on the government to act, even when "such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). This rule is subject to two exceptions: "(1) the 'special relationship' exception; and (2) the 'danger creation' exception." *L. W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). The "special relationship"

exception provides that when the government takes an individual into custody against his or her will, it assumes some responsibility to ensure that individual's safety. *Id.* The "danger creation" exception permits a substantive due process claim when government conduct "places a person in peril in deliberate indifference to their safety[.]" *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997).

A plaintiff challenging government inaction on a danger creation theory must first show the "state actor create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). The state action must place the plaintiff "in a worse position than that in which he would have been had the state not acted at all." *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (quotation marks omitted and alterations normalized). Second, the plaintiff must show the "state actor ... recognize[d]" the unreasonable risks to the plaintiff and "actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 846 (9th Cir. 2011) (brackets and quotation marks omitted). The defendant must have acted with "[d]eliberate indifference," which "requires a culpable mental state more than gross negligence." *Pauluk*, 836 F.3d at 1125 (quotation marks omitted).

Federal defendants' main argument is that plaintiffs' allegations regarding the government's knowledge of the dangers posed to plaintiffs by climate change do not rise to the required level of "deliberate indifference." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (internal citation and quotations omitted.)). Plaintiffs' point to their expert declarations to demonstrate that federal

defendants have known of, and disregarded, the consequences of continued fossil fuel use on the United States and its citizens. Federal defendants do not meaningfully refute the factual allegations, but instead deny their bearing on the issue. Therefore, there is a genuine issue of disputed facts surrounding the government's knowledge of climate change's dangers and summary judgment before trial, is inappropriate.

Plaintiffs specifically refer to the declaration from their expert Gus Speth, former chairman of the Council on Environmental Quality under President Jimmy Carter. Mr. Speth's declaration examines a historical record spanning ten presidential administrations and references a number of documents, statements of government officials, and federal policy actions that go directly to the government's knowledge of the links between fossil fuels and increasing global mean temperature and the dangers associated therein, such as sea level rise to Americans at the time and in future.

For example, in 1969 Daniel Moynihan, then counselor to the President Richard Nixon, wrote to John Ehrlichman, President Nixon's Assistant for Domestic Affairs, summarizing the climate problem:

> The process is a simple one. Carbon dioxide in the atmosphere has the effect of a pane of glass in a greenhouse. The $CO_2$ content is normally in a stable cycle, but recently man has begun to introduce instability through the burning of fossil fuels. At the turn of the century several persons raised the question whether this would change the temperature of the atmosphere. Over the years the hypothesis has been refined, and more evidence has come along to support it. It is now pretty clearly agreed that the $CO_2$ content will rise 25 [percent] by 2000. This could increase the average temperature near the earth's surface by 7 degrees Fahrenheit. *This in turn could raise the level of the sea by 10 feet. Goodbye New York. Goodbye Washington, for that matter.*

Speth Decl. ¶ 18. (citing Olsen Dec. Ex. 2) (emphasis added)

In 1977, President Jimmy Carter's science advisor Frank Press wrote to the President explaining:

Fossil fuel combustion has increased at an exponential rate over the last 100 years. As a result, the atmospheric concentration of $CO_2$ is now 12 percent above the pre-industrial revolution level and may grow 1.5 to 2.0 times that level within 60 years. Because of the greenhouse effect of atmospheric $CO_2$, the increased concentration will induce a global climatic warming of anywhere from 0.5° to 5° C. . . . The urgency of the problem derives from our inability to shift rapidly to non-fossil fuel sources once the climatic effects become evident not long after the year 2000; the situation could grow out of control before alternate energy sources and other remedial actions become effective.

*Id.* ¶ 21 (citing Olsen Decl. Ex. 4.)

Another example of the alleged knowledge and deliberate indifference of the federal defendants cited by plaintiffs is the United Nations Framework Convention on Climate Change, which was signed by the President George H.W. Bush and ratified by the U.S. Senate in 1992. Speth Decl. ¶ 44. The preamble to the Convention provided that:

[H]uman activities have been substantially increasing the atmospheric concentrations of greenhouse gases, that these increases enhance the natural greenhouse effect, and that this will result on average in an additional warming of the Earth's surface and atmosphere and may adversely affect natural ecosystems and humankind

Olson Decl. Ex. 23

Plaintiffs further contend that the dangers of global warming were well known during the administration of Presidents William Clinton and George W. Bush. In 1996, the Council on Environmental Quality reported to Congress: "[t]he average global temperature is projected to rise 2 to 6 degrees over the next century . . . the longer we wait to reduce our emissions, the more difficult the job, and the greater the risks." Olson Decl., Ex. 25, at xi. Further, a 2007 report from the House of Representatives Committee on Oversight and Government Reform alleged that the Bush Administration misled the public regarding the effects of climate change, concluding:

The Committee's 16-month investigation reveals a systematic White House effort to censor climate scientists by controlling their access to the press and editing

testimony to Congress. The White House was particularly active in stifling discussions of the link between increased hurricane intensity and global warming. The White House also sought to minimize the significance and certainty of climate change by extensively editing government climate change reports. Other actions taken by the White House involved editing EPA legal opinions and op-eds on climate change.

Olson Decl., Ex. 34, at ii.

In June 2009, the U.S. Global Change Research Program ("USGCRP"), government advisory council, released its Second National Climate Assessment which noted that "[c]limate change is likely to exacerbate these challenges as changes in temperature, precipitation, sea levels, and extreme weather events increasingly affect homes, communities, water supplies, land resources, transportation, urban infrastructure, and regional characteristics that people have come to value and depend on." Olson Decl. Ex. 35 at 100. Recently, in August 2017, the USGCRP Fifth National Climate Assessment found "that reversing course on climate, as expected with the passage of time, is more urgent than ever." Speth Decl. ¶ 76.

At this stage of the proceedings, plaintiffs have introduced sufficient evidence and experts' opinions to demonstrate a question of material fact as to federal defendants' knowledge, actions, and alleged deliberate indifference. Once this claim is reviewed with a full factual record, plaintiffs must still clear a very high bar to ultimately succeed.

Additionally, based on the proffered evidence and the complex issues involved in this claim, the Court exercises its discretion to "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 256.

The Ninth Circuit has reserved summary judgment in the past to obtain a more robust record. *See Anderson v. Hodel*, 899 F.2d 766, 770 (9th Cir 1990) ("[A]ppellate courts, including the Supreme Court, have reversed summary judgments where the lower court records have not

been sufficiently developed to allow the courts to make fully informed decisions on particularly difficult and far reaching issues." (internal quotation marks omitted) (alterations omitted)); *see also Eby v. Reb Realty, Inc.*, 495 F.2d 646, 649 (9th Cir. 1974) ("In certain cases summary judgment may be inapposite because the legal issue is so complex, difficult, or insufficiently highlighted that further factual elucidation is essential for its prudently considered resolution."). The Ninth Circuit has further explained that

> [C]ourts must not rush to dispose summarily of cases—especially novel, complex, or otherwise difficult cases of public importance—unless it is clear that more complete factual development could not possibly alter the outcome and that the credibility of the witnesses' statements or testimony is not at issue. Even when the expense of further proceedings is great and the moving party's case seems to the court quite likely to succeed, speculation about the facts must not take the place of investigation, proof, and direct observation.

*TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 684 (9th Cir. 1990)

Undoubtedly, this claim involves complicated and novel questions about standing, historical context, and constitutional rights. To allow a summary judgment decision without cultivating the most exhaustive record possible during a trial would be a disservice to the case, which is certainly a complex case of "public importance."[18] *Id.*

E.    *Public Trust Doctrine*

Federal defendants again ask this Court to reconsider the previous ruling on the applicability of the public trust doctrine to the federal government. They allege no new circumstances or any substantially new arguments for the Court to consider on summary judgment. Indeed, federal defendants repeatedly stresses that "[n]o discovery or expert opinion is necessary" for this Court to decide "the purely legal question of whether the public trust

---

[18] This analysis applies with equal force to all of the issues raised in federal defendants' motion for summary judgment.

doctrine provides a cause of action against the federal government." Defs.' Reply to Mot. for Summ. J. 38.

Similar to the issues discussed in Sections I.C, II.C, and II.D, the November 2016 Order extensively covered this legal argument, and the Court finds no need to revisit its analysis based on the nearly identical arguments in this motion. *See Juliana*, 217 F. Supp. 3d at 1252-1261. The Court does not find that its previous order, holding that the public trust doctrine is deeply rooted in our nation's history and that plaintiffs' claims are viable was clearly erroneous. *Id.* at 1259, 1261. There have been no changes in the factual record or legal authority that would justify a different outcome given the current record and the fact that the arguments presented by federal defendants in this motion are substantively the same, the Court declines to revisit its previous ruling. Genuine issues of material fact remain as to the specific allegations made by plaintiffs. The application of the public trust doctrine to these claims would be better served with a full factual record to help guide this Court and any reviewing courts.

F.      *Plaintiffs' Remaining Claims*

In their motion for summary judgment, federal defendants state that "[t]his Court's order [denying the motions to dismiss] did not address [federal d]efendants' arguments concerning [p]laintiffs' Equal Protection claim under the Fifth Amendment or Plaintiffs' Ninth Amendment Claim." Defs.' Mem. of Law in Supp. of Mot. for Summ. J. 4. They assert that "the Equal Protection and Ninth Amendment claims are no longer at issue." *Id.* 24 n.8. Although federal defendants overstate their position with respect to the equal protection and Ninth Amendment claims, they are correct that the prior opinion and order was somewhat unclear with respect to those claims and some clarification is warranted.

The Court begins with plaintiffs' third claim for relief, which is pleaded as a freestanding claim under the Ninth Amendment. This claim is not viable as a matter of law. The Ninth Amendment "has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim." *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986). Federal defendants are therefore entitled to summary judgment on plaintiffs' third claim for relief.

Plaintiffs' equal protection claim requires a more substantive discussion, as it is linked to the allegation of fundamental rights violations.

When a federal court is presented with an equal protection claim, the first step is to "ascertain the appropriate level of scrutiny to employ[.]" *Aleman v. Glickman*, 217 F.3d 1191, 1197 (9th Cir. 2000). The default level of scrutiny is rational basis review, which affords governmental classifications "a strong presumption of validity." *Id.* at 1200 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). The applicable analysis changes, however, when the plaintiff alleges either discrimination against a "suspect or semi-suspect class" or infringement of a fundamental right. *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1141 (9th Cir. 2011). A classification withstands rational basis review so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 1201 (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993)).

Plaintiffs contend that "posterity"—which they defined to include both unborn members of plaintiff "future generations" and minor children who cannot vote—is a suspect classification. They contend that, for decades, federal defendants have prioritized present-day political and economic advantage over prevention of future environmental damage. Plaintiffs assert that young people and future generations will be disproportionately harmed by climate change

because climate change and its effects are worsening over time. They assert that federal defendants' climate and energy policy treats "posterity" differently than other, similarly situated individuals, in violation of the Equal Protection Clause.

Judge Coffin recommended against recognizing "a new separate suspect class based on posterity." *Juliana*, 217 F. Supp. 3d at 1271 n.8. Although the Court stated in the introduction to the opinion and order that the Court was adopting Judge Coffin's findings and recommendation "as elaborated in this opinion," the Court expressly declined to decide whether youth or future generations were suspect classes. *Id.* at 1233 & 1249 n.7.

Both the Supreme Court and the Ninth Circuit have held that age is not a suspect class. *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989); *United States v. Flores-Villar*, 536 F.3d 990, 998 (9th Cir. 2008). Plaintiffs argue that the Supreme Court has rejected only *old* age as a suspect classification, but that is not the case. *Stanglin* upheld "modest impairment of the liberty of teenagers"—specifically, 14- to 18-year-olds—in the form of an age-based restriction on entry to a dance hall. 490 U.S. at 28 (Stevens, J., concurring). *Flores-Villar* addressed the constitutionality of an immigration policy that treated United States citizen fathers differently depending on whether they lived in the United States for at least five years after the age of fourteen.[19] 536 F.3d at 993. *Stanglin* and *Flores-Villar* both applied rational basis review to governmental action that discriminated against teenagers of a similar age to plaintiffs in this case. In both cases, that discrimination was found to be permissible if it had a rational basis.

Even if plaintiffs' suspect-class argument were not foreclosed by precedent, the Court would not be persuaded to break new ground in this area. *See Cunningham v. Beavers*, 858 F.2d

---

[19] *Flores-Villar* also upheld the immigration policy in question against the argument that it impermissibly treated mothers and fathers differently. *Sessions v. Morales-Santana*, 137 S. Ct. 1698 (2017), abrogated *Flores-Villar*'s gender-discrimination holding but left untouched its age-discrimination holding.

269, 273 (5th Cir. 1988) ("No cases have ever held, and we decline to hold, that children are a suspect class."). Suspect classification triggers strict scrutiny, a famously difficult test to survive. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 832 (2007) (discussing strict scrutiny's somewhat-exaggerated reputation as "strict in theory, but fatal in fact"). Balancing competing interests is at the heart of executive and especially legislative decision-making, and it is the rare governmental decision that does not have *some* effect on children or posterity. Holding that "posterity" or even just minor children are a suspect class would hamstring governmental decision-making, potentially foreclosing even run-of-the-mill decisions such as prioritizing construction of a new senior center over construction of a new playground or allocating state money to veterans' healthcare rather than to the public schools. Applying strict scrutiny to every governmental decision that treats young people differently than others is unworkable and unsupported by precedent.

However, the rejection of plaintiffs' proposed suspect class does not fully resolve their equal protection claim. As explained above, strict scrutiny is also triggered by alleged infringement of a fundamental right. *Wright*, 665 F.3d at 1141. Plaintiffs' equal protection claim rests on alleged interference with their right to a climate system capable of sustaining human life—a right the Court has already held to be fundamental. *Juliana*, 217 F. Supp. 3d at 1249–50; *see also id.* at 1271 n.8 ("Nonetheless, the complaint does allege discrimination against a class of younger individuals with respect to a fundamental right protected by substantive due process."); *Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1430 (9th Cir. 1989) (stopping short of identifying a fundamental right but stating that "[h]uman life, itself a fundamental right, will vanish if we continue our heedless exploitation of this planet's natural resources"). Plaintiffs' equal protection and due process claims both involve violation of a fundamental right and, as

such, must be evaluated through the lens of strict scrutiny, which would be aided by further development of the factual record.

III.    *Request to Certify for Interlocutory Appeal*

Federal defendants seek certification for interlocutory appeal any portion of this opinion and order denying their motions for judgment on the pleadings or summary judgment.

The final judgment rule gives the federal courts of appeal jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. Congress created a narrow exception to this rule: a district judge may certify for appeal an order that "involves a controlling question of law as to which there is substantial ground for difference of opinion" if "an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]" *Id.* § 1292(b). The requirements of § 1292(b) are jurisdictional, so a district court may not certify an order for interlocutory appeal if they are not met. *Couch v. Telescope, Inc.,* 611 F.3d 629, 633 (9th Cir. 2010). Congress did not intend district courts to certify interlocutory appeals "merely to provide review of difficult rulings in hard cases." *U.S. Rubber Co. v. Wright,* 359 F.2d 784, 785 (9th Cir. 1966). Rather, certification pursuant to § 1292(b) is reserved for "the most extraordinary situations." *Penk v. Or. State Bd. of Higher Educ.,* 99 F.R.D. 508, 509 (D. Or. 1982). Even when all three of § 1292(b)'s criteria are met, the district court retains unfettered discretion to deny a motion to certify for interlocutory review. *Mowat Constr. Co. v. Dorena Hydro, LLC*, 2015 WL 5665302, at *5 (D. Or. Sept. 23, 2015).

As a preliminary matter, the Court notes that to the extent federal defendants seek to certify for interlocutory appeal the legal rulings contained in the November 2016 Opinion and Order denying the motion to dismiss, the Court already declined to certify those questions for interlocutory appeal. *Juliana*, 2017 WL 2483705, at *2. That denial is now the law of the case.

The Court therefore denies federal defendants' request to certify the rulings on standing, the political question doctrine, the viability of public trust claims against the federal government, and the existence of a fundamental right to a climate system capable of sustaining human life.

As to the argument that plaintiffs' claims must proceed (if at all) under the APA, the "substantial ground for difference of opinion" standard is not met.

> To determine if a 'substantial ground for difference of opinion' exists under § 1292(b), courts must examine to what extent the controlling law is unclear. Courts traditionally will find that a substantial ground for difference of opinion exists where "the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented."

*Couch*, 611 F.3d at 631 (quoting 3 Federal Procedure, Lawyers Edition § 3:212 (2010)). As explained in Section I.B, *supra*, Supreme Court and Ninth Circuit precedent make it abundantly clear that plaintiffs may (and frequently do) challenge agency action outside the framework of the APA. Moreover, even if the "substantial ground for difference of opinion" standard were met, certification of the APA issue in isolation would not materially advance the litigation. Instead, it would protract the litigation by requiring the parties to proceed on dual tracks.

The request for interlocutory appeal as to the issues raised in the summary judgment motion must also fail. As to standing, the issues presented are not purely legal questions, but rather implicate mixed questions of law and fact regarding all three prongs of the standing inquiry. As genuine issues of material fact remain, this case would benefit from the further development of the factual record both for this Court and any reviewing court on final appeal. This is also true for plaintiffs' state created danger theory, which directly implicates disputed factual questions.

The Court has already explained why it would be inappropriate to certify an appeal on the issue of the applicability of the APA. As to the legal questions involving in federal defendants'

arguments regarding separation of powers, the viability of public trust claims against the federal government, and the existence of a due process right to a climate system capable of supporting human life, the Court has already denied certification on these issues.[20] Moreover, certifying a narrow piecemeal appeal on some of these legal issues would not materially advance this litigation, rather it would merely reshuffle the procedural deck and force the parties to proceed on separate tracks for separate claims, which is precisely what the final judgment rule seeks to prevent.[21] Accordingly, the requests to certify for interlocutory appeal made both in the motion for judgment on the pleadings and motion for summary judgment are denied.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[20] Federal defendants argue in their motion that this Court's previous holding is at odds with certain out of circuit cases. The Court has addressed these concerns in this order and see no need to revisit the Court's analysis of those cases. Federal defendants also argue in a Notice to this the Court (doc. 330) that the Supreme Court's recent ruling denying their application implies that this Court should certify an interlocutory appeal. The Court has considered the concerns raised in the one paragraph order, both in this order and previous orders. The Court does not find that Order removes the Court's discretion to deny the request for interlocutory appeal.

[21] The Supreme Court has cautioned that:

[i]t would seem to us to be a disservice to the Court, to litigants in general and to the idea of speedy justice if we were to succumb to enticing suggestions to abandon the deeply-held distaste for piecemeal litigation in every instance of temptation. Moreover, to find appealability in those close cases where the merits of the dispute may attract the deep interest of the court would lead, eventually, to a lack of principled adjudication or perhaps the ultimate devitalization of the finality rule as enacted by Congress.

*Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 440 (1985) (internal quotations omitted)

## CONCLUSION

Federal defendants' Motion for Judgment on the Pleadings (doc. 195) is GRANTED IN PART and DENIED IN PART as follows: the motion to dismiss President Trump as a defendant is granted, without prejudice, and is otherwise denied. Federal defendants' Motion for Summary Judgment (doc. 207) is GRANTED in part and DENIED in part as explained in this opinion. Federal defendants' requests to certify this opinion and order for interlocutory appeal are DENIED.

IT IS SO ORDERED.

Dated this 15th day of October 2018.

Ann Aiken
United States District Judge