THE PRESIDENT HAS SEEN
10-6-97

6212

THE WHITE HOUSE

WASHINGTON

October 5, 1997

MR. PRESIDENT:

This is a decision memo on climate change. I am forwarding it to you now because you may want to look it over before the White House Conference on Monday. *However, you should under no circumstances actually check off a decision before the White House Conference is held, since that Conference is intended to be a forum that is still able to inform your policy thinking.* In addition, since the memo was just finished late tonight, other relevant White House staff, like Erskine, Rahm, John Podesta and John Hilley, haven't had a chance to comment on it yet. I also expect that you may want to have one more meeting on this subject before reaching a final decision. Because of the late hour at which it was finished, and the fact that it is not yet ripe for decision, Phil hasn't done a summary of it yet.

Todd Stern

Copied
Stern
Sperling
McGinty
Tarullo
Steinberg
COS

**COPY**

P00000129344

October 4, 1997

MEMORANDUM FOR THE PRESIDENT

FROM:   GENE SPERLING
        KATHLEEN McGINTY
        DANIEL TARULLO
        JIM STEINBERG
        TODD STERN

SUBJECT:   Climate Change Recommendations

Together with principals, we have worked hard over the past several weeks to put together options for you on climate change. As we note below, we have reached consensus in many areas -- such as our general stance towards developing countries, and a preliminary package of policies that we could embrace independently of the international negotiations. But reflecting the magnitudes of the tradeoffs involved in this issue, we have not been able to reach full Cabinet consensus on some fundamental aspects of our policy stance. This memorandum therefore presents three different plans, with their supporters and their pros and cons.

The memorandum is organized into four sections:

I.   Summary of difficulties we face
II.  Developing country policy
III. Common components of all three options
IV.  The three options

## I. SUMMARY OF DIFFICULTIES

As we have emphasized in previous memos and meetings, the complexity of the issue is reflected in four different constraints:

- <u>Environmental</u>. This issue is the premier environmental challenge of our generation. The environmental community is pushing for strong, early action to reduce greenhouse gas emissions.

- <u>Diplomatic</u>. Much of the world is calling for deep, early emissions reductions. The European Union is proposing 10-15 percent cuts from 1990 emissions levels by 2010; Japan is proposing 0-5 percent cuts in the same period.

**COPY**

- Economic. Costs are substantially higher the earlier emissions reductions are required. The cost of deep, early emissions reductions could be very large.

- Business/Labor/Hill. Aggressive approaches would expose us to well-financed campaigns -- by major corporations and labor unions -- that demagogue our policies as excessively costly and as a large energy tax increase.

In essence, the three different plans represent different views about the importance of the first two constraints relative to the second two constraints:

- The first plan moves away from the 1990 target and substitutes a lower-cost approach for achieving emissions reductions. This strategy emphasizes the third and fourth constraints by allowing a more gradual adjustment period.

- The second plan commits the nation to 1990 by 2015 or 2020 -- while capping the economic cost. It tries to address all four constraints, but could be viewed as not meeting any of them adequately.

- The third plan, which involves a commitment to 1990 levels by 2010 or 2015 while capping the cost at a higher level than under the second plan, emphasizes the importance of our environmental responsibilities and maximizes our chances for (but does not in any way guarantee) a successful agreement at Kyoto.

## II. DEVELOPING COUNTRY POLICY

Given domestic political realities and the underlying environmental imperative, your advisers favor a tougher line on developing countries than we have taken to date. It is important to emphasize that developing countries are unlikely to agree to even our current demands, let alone tougher ones, in the foreseeable future. Furthermore, we will get little (if any) support from other developed countries for our position. *The position recommended by your advisers on this issue could very well endanger an agreement being signed this December in Kyoto.*

In particular, your advisers favor pushing for a "Kyoto Mandate" this December. The mandate would set the terms for a new round of negotiations with respect to:

- Binding emissions targets for key developing countries (China, India, etc.); and

- A "graduation mechanism," under which countries automatically assume additional obligations as they develop.

Developing country targets would be less stringent than those for developed countries, and might include a ceiling on costs.

2

**COPY**

P00000129346

There is some disagreement among your advisers on exactly how to proceed as we seek greater commitments from developing countries.



- Under the "two-step approach," which is favored by the State Department, Energy Department and your environmental team, we would try to reach agreement among developed countries in Kyoto, but not seek to implement that agreement until negotiations with respect to developing country commitments are complete (several years, at a minimum). One possibility would be for you to issue an authoritative statement that we would not submit a treaty for ratification until the Kyoto Mandate was met. Another possibility would be to take a formal reservation to any agreement in Kyoto for the same purpose.

- Under the "one-step approach," which is favored by some on the economics team, we would decline to adopt an agreement in Kyoto, and not adopt any new agreement with respect to developed country commitments until developing country commitments are agreed as well.

The two-step approach offers the possibility of maintaining momentum in the international negotiations (although even this approach will provoke a negative reaction abroad and could preclude an agreement in Kyoto). The cost is that we will have committed to a target and timetable before we know what we'll get from developing countries. It is unclear how the Senate would react to such a strategy.

Our best approach may be to maintain some ambiguity about our precise intentions: to emphasize that we won't bring back a treaty without real commitments from the developing countries. Since we don't know precisely how other countries will react to the one-step or two-step approach, it may be best to emphasize the general point -- and to maintain some flexibility for our negotiators in Kyoto.

*Regardless of our approach, however, demanding binding targets from key developing countries implies that we will not be ratifying any international climate agreement for at least several years. Furthermore, insisting on a Kyoto Mandate may produce an extremely negative reaction abroad, and that reaction could preclude any agreement in Kyoto even under the two-step approach.*

### III. COMMON COMPONENTS OF ALL THREE PLANS

In addition to toughening our stance on developing countries, your advisers agree that the following policy components should form part of any plan on climate change:

**1. Tax cuts**

- There is much interest in a Climate Change Tax Plan package of tax *cuts* in the near term

3

COPY

P00000129347

to spur energy efficiency and lower-carbon technologies. But there are two critical questions about such a tax package:

- An overall strategic question, given the budget agreement, is whether we want to offer tax cuts in any area. A potential danger with proposing a Climate Change Tax Plan -- emphasized in particular by Secretary Rubin -- is that we could open up a bidding war over tax cuts generally. If we decide to include tax cuts in our FY 1999 budget anyway, this is clearly less of a problem.

- A specific question, if we decide to offer a tax cut package, is how best to design the package. Treasury is working with DOE, EPA, and other agencies to put together a package of tax cuts amounting to perhaps $1.5 billion per year. But accordint to Treasury staff, the options are unlikely to produce carbon reductions for less than $100 per ton.



Some of the preliminary ideas include: tax subsidies to convert coal-fired power plants to gas; extension of the existing tax incentive for wind and "closed loop" biomass energy; tax credits for purchases of "superstar" energy-efficient devices and fuel-efficient cars; investment credits for energy-efficient buildings; and an expanded research tax credit for energy-efficiency research. The package will be further developed and refined over the next week. The goal is to be prepared in case you want to announce the broad outlines of a tax cut plan when you announce our overall policy package later this month.

## 2. Federal R&D effort

Your advisers support an aggressive Federal technology and R&D effort, including an additional $500 million per year starting in FY 1999 and ramping up to an additional $1 billion by FY 2003. The Department of Energy's 5-Labs study, the Department of Energy's 11-Nation Labs draft study, and the recent report from the President's Committee of Advisors on Science and Technology (PCAST) have all studied potential technologies that could help to reduce the cost of carbon emissions reductions.

The effort would focus on promising areas including:

- Energy efficient equipment (e.g., a public service campaign to attract attention to the "Energy Star" label);

- 21st Century Housing (streamline federal, state, and local building and utility regulations in ways that encourage innovation in construction);

- Expanded Partnership for the Next Generation Vehicle (expand work on the next generation vehicle technologies including fuel cells; and expand PNGV to include light trucks/sport-utility vehicles);

4



COPY

P00000129348

- PNGV for Heavy Trucks (partnership with engine manufacturers to double the efficiency of heavy-duty trucks for civilian and military applications);

- Industries of the Future (enhance industry/government research partnerships in areas such as chemicals, aluminum, forest products and steel manufacturing technologies); and

- Renewables R&D (expand research partnerships in key renewable technologies such as wind, photovoltaics, geothermal, biomass and hydropower to accelerate cost reductions).

DOE and EPA believe that such a package could have a substantial effect on carbon emissions by 2010. Others believe that the package will be beneficial, but that its results will only manifest themselves over a longer period of time.

### 3. Federal procurement system

The federal government spends more than $7 billion per year on energy. While Federal energy consumption is a tiny fraction of the total U.S. energy consumption, we are still the nation's single largest consumer of energy. Significant strides have already been made during the past decade -- energy consumption per square foot in federal buildings, for instance, is down by 15 percent from the 1985 level, and energy use in federal vehicles (both civilian and military) is down about 27 percent from 1985. We can still do more, for example by expanding the use of Energy Savings Performance Contracts, reinventing federal procurement, taking a "sustainable design" approach to federal facilities, and developing more efficient military propulsion systems. This effort could include a 6-12 month review of existing Executive Orders on purchases and a directive to federal agencies to prepare greenhouse gas reductions plans.

### 4. Industry out-reach

Several industries have approached us recently to offer cooperation in reducing greenhouse gases. Steel, for example, believes it could reduce emissions 10 percent *below* 1990 levels by 2010 with a sectoral plan. The cement industry believes it can significantly reduce emissions in the same time frame.

Your advisers recommend that you ask leading industrial sectors to prepare greenhouse gas reduction plans over the next 6-12 months. These plans could help inform our domestic implementation strategies, including the design of our domestic emissions trading program. It could also help build a constituency for action among moderate business groups.

### 5. 5-Year Science Reviews

Under the existing climate treaty, the Intergovernmental Panel on Climate Change is charged with reviewing the state of the science every five years. Several corporate and Congressional leaders have suggested supplementing these reviews with additional studies by the

5

COPY

P00000129349

National Academy of Sciences or your Committee of Advisors on Science and Technology (PCAST), on a similar 5-year cycle.

## 6. Emphasize long-term goal of stabilizing concentrations

The goal of the existing climate treaty is "to stabilize concentrations of greenhouse gases in the atmosphere at levels that avoid dangerous anthropogenic interference with the climate system." However, the Parties to the climate treaty have never defined precisely what levels are dangerous. Support for a specific, long-term goal would be well-received in both the business and environmental communities. Many business constituencies have advocated focus on the long-term goal, to assist with planning. Environmental constituencies believe such a focus would help educate the public.

Your advisers believe the United States should announce support for a specific, long-term goal. The task of defining the goal (e.g., to keep concentrations of greenhouse gases from significantly exceeding twice pre-industrial levels, or roughly 550 ppm) could be assigned to the National Academy of Sciences as part of the first five-year scientific review mentioned above.

## 7. Global Environmental Facility

The United States is significantly in arrears to the Global Environmental Facility, which assists developing countries in reducing greenhouse gas emissions. (Of the $430 million pledged for FY93-FY97, we have been able to contribute roughly $185 million.) These arrears reduce our leverage with developing countries in negotiations under the climate treaty.

Your advisers recommend you reemphasize your strong commitment to the Global Environment Facility and support clearing U.S. arrears at the earliest practical date. Funding for the Global Environment Facility should be pursued as a top priority.

## 8. Bilateral dialogues

We are pursuing bilateral dialogues with key developing countries (including China, Brazil and India) to promote clean energy. Often, interest in energy efficiency and renewable energy is greater in these settings than in the politicized, multilateral setting of the Climate Convention. Discussions focus on regulatory structures for clean energy development, technical assistance, export credit and related items.

You or members of your Cabinet will sign several agreements of this type during your upcoming trip to Latin America. Work is underway in this area in connection with the Jiang Zemin state visit later this month. Your advisers recommend that we pursue these dialogues with increased effort in the years ahead.


COPY

## 9. Other possibilities

Other possible elements, which have not yet been fully vetted, include a renewable portfolio standard and other carbon-reducing policies in electricity deregulation; National Environmental Policy Act (NEPA) guidance with respect to greenhouse gas emissions; common energy-efficiency guidelines for export credit agencies; a corporate greenhouse gas reporting system modeled after Toxic Release Inventory; and streamlined standards to improve energy efficiency, where appropriate.

*[Handwritten notes:]*

wallace

- easier to do heat + power
- renewables get boost (through fed. mandate)
- green labeling
- greater competition ↑ efficiency

## IV. THREE OPTIONS

## PACKAGE 1

### OVERALL STRATEGY

- The long-term goal of the treaty is to *stabilize concentrations* of greenhouse gases in the atmosphere at a level that will prevent dangerous anthropogenic interference with the climate system. This goal could be achieved with concentrations at or somewhat above a doubling of pre-industrial levels in the next one hundred years.

- The strategy here is to propose the least-cost approach, both in terms of timing and developing countries, to stabilizing concentrations over the long run. The logic is that only by proceeding in this least-cost approach could we get domestic agreement to undertake a serious climate change policy.

### TARGETS AND TIMETABLES

- Concentrations can be stabilized through the following targets and timetables:

    *Reduce emissions growth* in the United States in the near term (for example, growth from 2000-2010 less than growth over 1990-2000); then

    *Eliminate emissions growth* in developed countries 10 to 20 years after treaty is signed (e.g., 2010-2020); then

    *Reduce emissions levels* in developed countries gradually to reach — and then to decline below — 1990 levels in later years to be decided, stabilizing concentrations.

- This timetable begins effective action soon to establish Presidential leadership.

- The schedule of reducing emissions and emissions growth is determined by the degree of economic cost that is acceptable, coupled with the rate of improvement in emissions-reduction technologies that results from increases in carbon prices.

- As in the second plan (see below), there would be periodic review of the underlying science, the data on the path of emissions, and the economic impact, to allow for adjustments in the policy.

- Insist on the current U.S. flexibility positions of international trading, multiple multi-year targets, joint implementation (subsidies of non-carbon energy sources in developing countries), banking, and borrowing.

8



COPY

P00000129352

## DEVELOPING COUNTRIES

- The goal is the least-cost global approach to stabilization of carbon concentrations in the atmosphere.

- Negotiate and begin a new Kyoto Mandate, requiring developing country participation (in stages), starting with more-advanced (Annex B) developing countries, with graduation as countries develop. Developing countries commit to reduce the rate of growth of emissions consistent with stabilizing carbon concentrations and continued economic growth, with ceilings on costs.

- One-step: the U.S. will not initial agreement until Annex B countries have binding commitments.

## DOMESTIC IMPLEMENTATION

- Develop a tradable permits system, with auction of all permits (rather than grandfathering), in the near term; impose the system at a level of emissions near the baseline (for example, with an implied permit price of perhaps $10 per ton). The system could take effect while the Kyoto Mandate was negotiated, to emphasize U.S. leadership and credibility; or it could be postponed until the treaty was ratified, as an incentive for developing-country compliance. (A carbon tax, if feasible, would be an alternative method of implementation.)

- Change the number of permits in small, gradual, predetermined steps, based on economic cost and aggressive technological progress (with the implied permit price rising to perhaps $22 per ton or more by 2015). As in the second plan below, review domestic implementation system periodically.

- A portion of funds raised would be used for cost-effective technology research and diffusion programs, including basic research. The bulk would be available for a range of domestic priorities (tax relief for individuals; business investment incentives; the solution to the fiscal effects of the demographic imbalance; infrastructure; etc.) chosen to make the program attractive.

- Begin a series of voluntary industry programs to develop plans to meet the targets.

- Provide for banking and borrowing to deal with short-term fluctuations. Borrowed permits would be issued at a premium cost, and banked permits could be resold later at higher prices.

- Provide economic growth insurance or a cost cap on permits that would allow the sale of additional permits. The price would be set consistent with our estimate of the acceptable

9

COPY

P00000129353

economic cost, and would be high enough to encourage emissions-efficient investment choices in the near term. (If the cost cap were in effect over an extended period, the target would not be met.)

- These policies are market-oriented. There would be no inefficient, command-and-control regulations used to reduce emissions.

- Include common components listed above.

**SUPPORTERS**

Larry Summers, Janet Yellen, Frank Raines, Secretary Daley, and Secretary Herman.

**PROS**

- The principal benefit of this approach is that it reduces the cost of beginning to address climate change by allowing more time for the economy to adjust gradually to the new constraints being placed on it.

- Business and labor groups would support this approach.

- The approach would also be strongly supported by leading economists, such as William Nordhaus of Yale. It is consistent with the economics consensus on the least-cost path to the environmental goal of stabilizing concentrations in the very long run.

**CONS**

- This approach would be completely unacceptable to the environmental and international communities. We could respond that if the emissions path it envisions is met, it would stabilize concentrations and thus produce the same climate benefits as other paths that are substantially more economically costly.

- This option depends on steep -- and possibly implausible -- emissions reductions in distant decades to achieve our environmental goals.

- It would be awkward to reconcile this approach with previous statements made by both you and the Vice President. We could respond that we are starting over with a new Kyoto Mandate, and that part of that mandate will be to achieve environmental goals through the least-cost approach.

- There is no chance of an international agreement in Kyoto or the near future with this proposal. But if an agreement is reached that incorporates this approach, it may be much easier to ratify.

COPY

P00000129354

# PACKAGE 2

## OVERALL STRATEGY

- This approach involves a hybrid plan that includes a commitment to reduce emissions to 1990 levels by 2015 or 2020 with a safety valve to cap economic costs.

  *[handwritten margin note: Below 2025?]*

- The approach begins with the tax cuts, R&D, and other initial steps in the common components section above, before the permit system becomes effective.

- The safety valve would ensure that permit prices could never rise above some ceiling, by allowing the U.S. Government to sell an open-ended number of additional permits at that price. This approach thus allows you to set an ambitious goal for the country while insuring that the costs are not excessive. But with a relatively low ceiling price, the overwhelming majority of economists will claim that we could not possibly avoid having to trigger the safety valve and thus fail to meet the stated goal of 1990 by 2015 or 2020. Opponents could attack the approach as lacking in credibility.

## TARGET AND TIMETABLE

- 1990 by 2015 *or* 1990 by 2020, with a safety valve (explained below). The purpose of the safety valve is to allow us to adopt a relatively aggressive target and timetable, with the understanding that we will only meet it if possible to do so at reasonable cost.

- An issue that needs to be resolved is how the safety valve would be handled in the international negotiations, if at all.

- Additional reductions (to be determined) after 2015 or 2020.

- Support international trading and joint implementation.

## DEVELOPING COUNTRY

- Kyoto Mandate for negotiations, with a goal for them to be completed by 1999.

## DOMESTIC IMPLEMENTATION

**Initial actions**

- Common components plan. Emphasize tax cuts and R&D to build corporate support.

- Emphasize commitment to market-oriented policy tools to reduce emissions.

COPY

P00000129355

- Avoid decisions about grandfathering vs. auctions. Instead appoint commission to suggest structure of domestic emissions trading program -- auctioning with tax cuts, or grandfathering with an excess profits tax.

    -- The commission would work with industry groups to evaluate their vision of the trading system.

    -- The commission would also study possible adjustment programs for areas and sectors that will bear a disproportionate burden from emissions reductions.

    -- One possibility would be to give the commission's recommendations base-closing legislative treatment, although there may be concerns about such a mechanism given the scope and importance of the commission's work.

    -- Deadline for commission to report would be early 1999 or 12 months following treaty.

**Domestic emissions trading program (with safety valve) starts in 2005**

-- Commission decides on structure of permit program.

-- The permit requirements between 2005 and the first review in 2008 could be set slightly below business-as-usual levels.

-- Ceiling on permit price, as defined below, to cap economic costs

**Safety valve (ceiling on price) in permit trading system**

-- The tradeable permit system would include a safety valve: the U.S. government would stand ready to sell a potentially unlimited number of permits at a given price, ensuring that the permit price could not rise above that level. *This safety valve is absolutely essential to the domestic viability of this approach.*

-- The price would start at $10 per ton in 2005 and rise in real terms by $1-$2 per year (0.25-0.5 cents per gallon) until it reaches $30 per ton in 2015 or 2020.

-- If any funds are raised from the safety valve mechanism, they could be devoted to further emissions reductions -- additional tax cuts for families, for carbon-reducing investments by businesses or families, tax cuts for R&D, Federal investments in R&D or energy-efficiency, or for investments in carbon-reducing efforts in other countries.

**5-Year review process**

- The Clean Air Act requires EPA to undertake a regular 5-year review of air quality



P00000129356

standards, and other statutes require similar reviews. Similarly, every five years, a commission -- which builds on the implementation commission above -- would review progress on emissions reductions, and how the economy was responding. It would then make recommendations to the President and Congress about how to adjust the policy stance toward climate change.

- The commission to report on domestic implementation (mentioned above) would be the first of these commissions. The first report would thus occur in 1999 or 12 months following the treaty. The second report would be in 2004, and the third in 2009. The third commission report would be able to evaluate the operation of the domestic permit system after four years of experience (since the permit system will begin in 2005).

**SUPPORTERS**

> Gene Sperling and Katie McGinty constructed this compromise plan, as requested by Erskine. They worked closely with Todd Stern in developing a package that the three of them support with one difference. Gene supports a 1990 by 2020 timetable, while Katie supports the 1990 by 2015 timetable.
>
> Gene feels that the 2020 date is important for three reasons:
>
> 1. It boosts the credibility of the relatively low price ceiling in the plan, by allowing more time for the economy to adjust before the timetable binds and thus raising the probability that the safety valve would not have to be invoked;
>
> 2. It attenuates corporate and union opposition to the plan; and
>
> 3. It allows us some room to bargain from at the international negotiations in Kyoto and beyond.
>
> Katie feels that the 2015 date is important for three reasons:
>
> 1. Your announcement of any date after 2015 would pose unacceptable risks of immediately cratering the Kyoto negotiations.
>
> 2. With any date later than 2015, there is little or no chance that we will be able to convince the international community to accept other components of our position (e.g., joint implementation, Annex I international trading, the safety valve, and our developing country stance).
>
> 3. A 2015 timetable offers at least some possibility of support from moderate environmental groups -- especially if we also commit to some reductions, even small ones, from 1990 levels by 2020.

13

COPY

P00000129357

Secretary Pena and Secretary Slater both support the package. Todd Stern supports it with a 1990 by 2015 timetable.

Dan Tarullo supports a hybrid of Package 1 and Package 2. As in Package 1, he supports starting the domestic implementation package immediately upon agreeing to a treaty, not in 2005. He also believes strongly in auctioning permits or some other mechanism of raising revenue, rather than grandfathering permits. But he believes that we can commit to 1990 levels by 2020, with the explicit acknowledgment that the uncertainties of technological development and diffusion, as well as consumer behavior. He favors a reassessment in 2007 to see if the targets and timetables need to be adjusted.

Your economic team urges that if you choose this option, you should choose the 2020 timetable and emphasize that you will *not* use command-and-control regulations to avoid invoking the safety valve. They would also urge a careful analysis of the best level for the trigger price.

**NOTES**

The fundamental strategy here is four-fold:

- First, we will focus our entire policy efforts up to 2005 on tax cuts, R&D efforts, Federal energy efficiency improvements, and the other components of the policy package listed in Section III of the memo.

- Second, the permit system would start in 2005 -- so that the debate over energy price increases explicitly pertain only to 2005 and beyond. At the same time, environmental groups will appreciate that the permit system begins within the next 10 years.

- Third, the plan puts a ceiling on the permit price to limit the economic downside and stunt opposition attacks about the economic costs involved.

- Finally, the plan still gives the nation a goal of reaching 1990 emission levels by 2015 or 2020 -- a goal that is subject to a cost cap, but is more binding than the non-binding aim agreed at Rio.

The main problem with this option is that it may be harshly criticized as promising more than the implementation plan can deliver. Current models almost uniformly suggest that we would not be able to meet our target and timetable at a price below $30 -- i.e., that we could not avoid triggering the safety valve. To put the point another way, this approach will limit the permit price to $10 to $30 per ton ($15 to $45 billion year). But economic models almost uniformly suggest that permit prices would have to be substantially higher to achieve 1990 emissions levels in 2015 or 2020. Therefore we could be attacked on our credibility -- that our plan did not contain enough restraint to meet its stated emissions reduction goal.

14

Those who support this option believe that the answer to the credibility argument is not a fight over economic models. Rather, they argue that in the face of incredible uncertainty over events twenty years away, it is best to put forward a sound -- even if highly optimistic -- plan for the nation. In particular, we should not unnecessarily impose economic hardship when technological breakthroughs, new scientific understandings or successful international trading could lower costs. If we take on the economic model debate directly, we will almost certainly lose. The best tact is to emphasize the uncertainty, and to note that future administrations and Congresses will assess new information every 5 years and make appropriate adjustments. We could get some outside validation for our emphasis on uncertainty from those who believe that international trading is possible, from those who believe that economic models tend to exaggerate the costs of meeting environmental goals, and from those who believe that technological development and diffusion could respond strongly to even a limited price signal. The safety valve idea could also receive outside validation: similar ideas have been embraced by Resources for the Future and Brookings, although they may not agree with our trigger price.

Another key aspect of defending this plan is to emphasize that we are not supporting using command-and-control measures if the ceiling price does not produce the full reductions needed to hit the emissions target. Specifically, when asked about whether setting an optimistic target with the ceiling price would mean that higher energy taxes or command-and-control regulations in the future, we should state that we are against such measures and that we would assume that future Congresses would also oppose such measures. Without this guarantee, opponents may feel threatened instead of comforted by our reasonable ceiling. Furthermore, we would point out that such scenarios would not take place for a decade, and that we would not expect future Congresses to support such command and control alternatives as well.

With this posture, we would be arguing that we are committed to reaching 1990 levels by 2015 or 2020 -- but not at any cost. We would not expect future administrations or Congresses to allow the costs of complying with the treaty to become extreme or excessive. We would also note that the 5-year reviews would allow us to adjust our policy stance as more information becomes available. Finally, it is important to note that we would still taking real steps to reduce emissions even if the safety valve *is* triggered. Indeed, the *policy steps* under this approach if the safety valve were triggered are equivalent to those proposed under Plan 3. Even with the cap, the cost to polluting would be higher than today, and thus we would divert emissions from the business-as-usual path. We would also start the emissions trading program by the relatively early date of 2005, which should help to address some of the concerns environmental groups may have with this approach.

PROS

- Seeks to hit a middle ground -- still proclaims a target and timetable, but only at reasonable economic cost. With a target of 1990 by 2015 or 2020 -- tempered by the safety valve, but still stronger than our Rio commitment -- we would have a chance of remaining "in the game" in the international and environmental communities. By limiting the economic costs, we could avoid undue disruption to the economy and stunt potential attacks.

COPY

- Permit system starts in 2005, so that we begin to deflect from business-as-usual path within a decade. The early start date would also help utilities to integrate their planning for reductions of NOX (under EPA's recent clean air rule) and carbon emissions.

- Consistent with our language of "binding but *realistic*" and "reducing emissions while we grow the economy."

- Starting with only tax cuts and R&D for 7 years, and not beginning the permit system until 2005, *may* make it harder for the Administration to be demagogued on tax increases.

**CONS**

- Risks splitting the loaf and pleasing no one:

    -- Business groups may still demagogue the plan, arguing for example that $20 per ton is approximately the same size as the BTU tax proposed in 1993. If we decide that the plan would be revenue-neutral, we could respond with that point, and note that it would not become effective for several years.

    -- Business groups could also charge that the combination of a relatively tight target and timetable with a low trigger price would imply that command-and-control regulations would be used to fill the gap. We could respond by emphasizing our commitment to market-based solutions.

    -- Many environmental groups will oppose, arguing that the 2015 or 2020 date is too late and that the safety valve undermines our environmental commitment. We could respond that on their optimistic predictions about new technologies, the safety valve would not be needed. We could also respond that our policy is a politically realistic way of addressing the climate change problem. Some more moderate groups may support the package, especially in light of the 2005 start for the permit system and if the package includes further reductions beyond 2015 or 2020. Although environmental groups are calling for reductions below 1990 levels by 2010, a relevant threshold for many of them is reductions below 1990 levels at least by 2020.

- Mainstream models almost uniformly suggest that without worldwide international trading, there is little likelihood that we could avoid triggering the safety valve at $30 per ton. Some of your advisers could be forced to admit that the overwhelming weight of conventional economic analysis suggests that the safety valve would be triggered.

- Will seriously complicate international negotiations. In combination, the 2015 or 2020 date, our domestic cost cap and our insistence that developing countries do more will be perceived as lack of U.S. leadership.

16

**COPY**

## PACKAGE 3

### OVERALL STRATEGY

- This package is similar to Package 2 in containing a safety valve, but it involves steeper emissions reductions and higher economic costs than under Package 2. In this sense, it conforms most closely to the first two constraints noted in the first section above (environmental and international). It involves less dramatic reductions than those proposed by the EU or Japan, but has some chance of being accepted internationally. Despite provisions that cap the permit price at about $50 per ton, this package would likely be strongly opposed by much of the U.S. business community. And as above, the cost cap comes with a real risk: it implies that we could fail to reduce emissions to 1990 levels by 2010 or 2015.

### TARGET AND TIMETABLE

- 1990 levels by 2010 with safety valve *or* 1990 levels by 2015 with safety valve

- Further reductions at a later date.

- The permit price would be capped at roughly $50 per ton by allowing the U.S. Government to sell an unlimited number of additional permits at that price.

- Require adequate provisions for international emissions trading, joint implementation and banking.

### DEVELOPING COUNTRIES

- Two-step approach as outlined above. Kyoto Mandate for negotiations, with a goal for them to be completed by 1999.

### DOMESTIC IMPLEMENTATION

- Domestic permit trading system, with a safety valve that ensures a ceiling of about $50 on the permit price.

- Common components plan. Emphasize tax cuts and R&D in near term to build corporate support.

### SUPPORTERS

Carol Browner, Secretary Babbitt, and Brian Atwood support the plan -- but only with the 1990 by 2010 timetable.

17

**COPY**

P00000129361

Jim Steinberg supports this package, emphasizing the importance of a credible trigger price (one set high enough that it could be defended as a reasonable estimate of the cost of meeting the target).

Jack Gibbons supports this approach, but emphasizes the importance of a significant reduction in the 2020-2030 timeframe linked to a long-term stabilization goal.

Strobe Talbott supports this general approach. He could also be supportive of Plan 2. Secretary Glickman supports this package, but is also willing to support Plan 2.

## PROS

- Kyoto agreement perhaps possible (especially if 1990 by 2010), although not guaranteed -- especially given the safety valve and our position with respect to developing countries.

- Some support from environmental groups (especially if 1990 by 2010), although some will consider the emissions reductions to be too weak and the safety valve to be problematic.

- Stronger start in addressing environmental problem limits need to depend on steep -- and arguably implausible -- emissions reductions in distant decades to reach environmental goals.

## CONS

- The commitment would be attacked as the largest energy tax hike in history -- costing $75 billion per year. Despite the safety valve, many would charge that a commitment of this nature could have substantially adverse effects on the economy.

- Strong corporate opposition -- especially if 1990 by 2010 -- for not allowing enough time for the economy to adjust.

- Relative to the $30 ceiling in Plan 2, this plan would produce greater economic dislocation and more powerful ammunition for opponents that want to attack the economic costs of the plan.

- The ceiling poses many of the same tensions as in Plan 2. A $50 ceiling may prove inadequate to meet a target of 1990 by 2010.

COPY

P00000129362

DRAFT #2: October 14, 1997

MEMORANDUM FOR THE PRESIDENT

FROM:  GENE SPERLING
       KATHLEEN McGINTY
       DANIEL TARULLO
       JIM STEINBERG
       TODD STERN

SUBJECT:  Climate change decision memorandum

This memorandum follows up on our earlier climate change memoranda and meetings with you. It requests specific decisions from you on various elements of our overall climate change policy. Your responses will allow us to put together a climate change policy package that you could then announce in approximately a week, while the penultimate negotiations take place in Bonn.

I. Target, timetable, and safety valve

The most difficult decision you must make involves the target and timetable, and whether to include a ceiling price as part of our proposal. We believe that you are well aware of the pros and cons of different courses of actions.

*Beginning date for permit system*

Your advisers -- including Gene, Katie, and Todd -- generally support starting the permit system in 2005. The first few years of the permit system -- before any internationally binding obligation would take hold -- could involve auctioning or grandfathering enough permits for the permit price to be relatively low. (If the difference between the number of permits in a given year and the business-as-usual emissions level is small enough, the permit price will remain low. The flipside of obtaining that low price, however, is that the deflection from business-as-usual would have to start small.) As discussed below, we could also impose a ceiling price on the permit system for the first few years of its operation.

The benefit of an early start is that it allows time for the system to become operational in the run-up to the internationally binding goal, and begins to deflect emissions from the business-as-usual path. The cost is that in order to affect emissions, it moves forward the time at which energy prices will rise from their business-as-usual path.

_____  Approve starting the permit system in 2005

**COPY**

P00000129363