LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, New York 10005
BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
MARK S. GRUBE*  (NY No. 5038195)
  *Assistant Solicitor General*
mark.grube@ag.ny.gov
212-416-8028
***Counsel of Record**

*Counsel for Amici Curiae States:*
*New York, Delaware, Hawai'i, Minnesota, Oregon, and Vermont*

| | |
|---|---|
| KELSEY CASCADIA ROSE JULIANA; XIUHTEZCATL TONATIUH M., through his Guardian Tamara Roske-Martinez; et al., <br><br>                 *Plaintiffs,* <br><br>     v. <br><br> The UNITED STATES OF AMERICA; et al., <br><br>                 *Defendants.* | Case No.: 6:15-cv-01517-AA <br><br> **BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I, MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE** |

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I, MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................. ii

INTEREST OF AMICI CURIAE ................................................................... 1

ARGUMENT .................................................................................................. 3

POINT I

As Amici States' Experiences Show, Proposed Intervenors' Examples
of Purported Collusion Did Not Involve Any Collusion ............................... 3

    A.    The Challenges to the Title X Rule Brought by Amici States and
           Others Were Resolved Through a Lawful Exercise of Executive
           Authority ............................................................................................ 4

    B.    The Challenges to the Public Charge Rule Brought by Some of the
           Amici States and Others Were Resolved Through Lawful
           Executive Authority and Discretion. ................................................ 7

POINT II

Amici States' Experiences Show That Climate Change Poses Serious
Harms to State Lands and State Residents ................................................... 10

CONCLUSION ............................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*American Fuel & Petrochem. Mfrs. v. O'Keeffe*,
    903 F.3d 903 (9th Cir. 2018) ....................................................... 2, 11, 13

*Becerra v. Mayor & City Council of Baltimore*,
    No. 20-454, 2021 WL 1951787 (U.S. May 17, 2021)................................ 6

*California v. Azar*,
    385 F. Supp. 3d 960 (N.D. Cal. 2019) ..................................................... 5

*California v. Azar*,
    950 F.3d 1067 (9th Cir. 2020) ................................................................. 5

*Casa de Maryland, Inc. v. Trump*,
    971 F.3d 220 (4th Cir. 2020) ................................................................... 8

*Casa de Maryland, Inc. v. Trump*,
    981 F.3d 311 (4th Cir. 2020) ................................................................... 8

*City & County of San Francisco v. United States Citizenship & Immigr. Servs.*,
    981 F.3d 742 (9th Cir. 2020) ................................................................... 7

*City & County of San Francisco v. United States Citizenship & Immigr. Servs.*,
    992 F.3d 742 (9th Cir. 2021) ............................................................... 4, 9

*Cochran v. Mayor & City Council of Baltimore*,
    141 S. Ct. 1369 (2021) ............................................................................ 5

*Cook County v. Wolf*,
    498 F. Supp. 3d 999 (N.D. Ill. 2020) ...................................................... 8

*Cook County v. Wolf*,
    962 F.3d 208 (7th Cir. 2020) ................................................................... 7

*Department of Homeland Sec. v. New York*,
    141 S. Ct. 1370 (2021) ............................................................................ 8

*Diffenderfer v. Central Baptist Church of Miami*,
    404 U.S. 412 (1972) .............................................................................. 10

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) ............................................................ 1, 14

**Cases**                                                                           **Page(s)**

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ........................................................................... 11

*Mayor & City Council of Baltimore v. Azar,*
   392 F. Supp. 3d 602 (D. Md. 2019) .................................................. 5

*Mayor & City Council of Baltimore v. Azar,*
   439 F. Supp. 3d 591 (D. Md. 2020) .................................................. 5

*Mayor & City Council of Baltimore v. Azar,*
   973 F.3d 258 (4th Cir. 2020) ............................................................ 5

*New York State Rifle & Pistol Ass'n v. City of New York,*
   140 S. Ct. 1525 (2020) ...................................................................... 10

*New York v. Department of Homeland Sec.,*
   969 F.3d 42 (2d Cir. 2020) ................................................................ 7

*Oregon v. Azar,*
   389 F. Supp. 3d 898 (D. Or. 2019) .................................................. 5

*Oregon v. Cochran,*
   141 S. Ct. 1369 (2021) ...................................................................... 5

*Triangle Improvement Council v. Ritchie,*
   402 U.S. 497 (1971) .......................................................................... 10

*Washington v. Azar,*
   376 F. Supp. 3d 1119 (E.D. Wash. 2019) ...................................... 5

**Statutes**

Del. Code Ann. tit. 26, § 354(a) ........................................................... 13

Minn. Stat. Ann. § 216H.02(1) ............................................................. 13

Climate Leadership and Community Protection Act,
   ch. 106, 2019 McKinney's N.Y. Laws 856 ..................................... 13

Or. Rev. Stat. Ann. §§ 468A.265-468A.277 ....................................... 13

**Administrative & Executive Sources**                                                              **Page(s)**

49 C.F.R.
    § 59.14 ................................................................................................................ 4
    § 59.15 ................................................................................................................ 4

84 Fed. Reg. 41,292 (Aug. 14, 2019) ................................................................... 1

84 Fed. Reg. 7,714 (Mar. 4, 2019) ....................................................................... 1

Inadmissibility on Public Charge Grounds; Implementation of Vacatur,
    86 Fed. Reg. 14,221 (Mar. 15, 2021) ........................................................... 9

86 Fed. Reg. 19,812 (Apr. 15, 2021) .................................................................... 6

Exec. Order No. 14,012, 86 Fed. Reg. 8,277 (Feb. 2, 2021) ............................... 8

Memorandum on Protecting Women's Health at Home and Abroad,
    2021 Daily Comp. Pres. Doc. 100 (Jan. 28, 2021) ...................................... 5

Or. Admin. R. 340-253-0000 to 340-253-8100 .................................................. 13

Vt. Pub. Util. Comm'n, Renewable Energy Standard Rule § 4.401 .................... 13

**Rules**

4th Cir. R. 35(c) ..................................................................................................... 8

**Miscellaneous Authorities**

Acadia Ctr., *Outpacing the Nation: RGGI's Environmental and
    Economic Success* (Sept. 2017), http://acadiacenter.org/wp-
    content/uploads/2017/09/Acadia-Center_RGGI-Report_Outpacing-
    the-Nation.pdf ............................................................................................. 14

Alex Harris, *Miami's Sea Level Rise Bill is $4 Billion by 2060. It Won't Keep
    Every Neighborhood Dry*, Miami Herald (last updated Apr. 23, 2021),
    https://www.miamiherald.com/news/local/environment/article250781284.
    html ............................................................................................................... 11

*The Biden Plan for Securing Our Values as a Nation of Immigrant*s,
    https://joebiden.com/immigration/ ............................................................... 8

## Miscellaneous Authorities                                           Page(s)

Myles Allen et al., Summary for Policymakers, *in* Intergovernmental
    Panel on Climate Change*, Global Warming of 1.5°C* (2018),
    https://www.ipcc.ch/site/assets/uploads/sites/2/2019/05/SR15_SPM_
    version_report_LR.pdf ............................................................................. 13

Nadja Popovich & Christopher Flavelle, *Summer in the City Is Hot, but Some
    Neighborhoods Suffer More*, N.Y. Times (Aug. 9, 2019),
    https://www.nytimes.com/interactive/2019/08/09/climate/city-heat-
    islands.html ............................................................................................... 12

National Integrated Drought Info. Sys., Nat'l Oceanic & Atmospheric Admin.,
    U.S. Dep't of Com., *Southwest and California Drought Status Updated*
    (May 2021), https://www.drought.gov/sites/default/files/2021-
    05/SouthwestStatusUpdate_May20_Final.pdf ..................................... 12

Obama White House, *The Threat of Carbon Pollution: Alabama*,
    https://obamawhitehouse.archives.gov/sites/default/files/docs/state-
    reports/climate/Alabama%20Fact%20Sheet.pdf .................................... 11

Office of Population Affairs, HHS, *Statement on Proposed Revision of Title X
    Regulations* (Mar. 18, 2021), https://opa.hhs.gov/about/news/opa-newsroom ....... 5

Pacific Coast Collaborative, *About*, http://pacificcoastcollaborative.org/about/ ........ 14

Press Release, DHS Statement on Litigation Related to the Public
    Charge Ground of Inadmissibility (Mar. 9, 2021),
    https://www.dhs.gov/news/2021/03/09/dhs-statement-litigation-
    related-public-charge-ground-inadmissibility ........................................ 9

Regional Greenhouse Gas Initiative, *Elements of RGGI*,
    https://www.rggi.org/program-overview-and-design/elements ............................. 14

U.S. Citizenship & Immigr. Servs., DHS, RIN 1615-AC74, Inadmissibility
    on Public Charge Grounds (Spring 2021),
    https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RI
    N=1615-AC74 ........................................................................................... 9

U.S. Dep't of Agric., USDA Technical Bull. No. 1935, *Climate Change and
    Agriculture in the United States: Effects and Adaptation* (Feb. 2013),
    https://www.usda.gov/sites/default/files/documents/CC%20and%20Agric
    ulture%20Report%20(02-04-2013)b.pdf................................................. 12

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I,            Page v
MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

**Miscellaneous Authorities**                                    **Page(s)**

U.S. Glob. Change Rsch. Program, *The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment* (Apr. 2016), https://health2016.globalchange.gov/low/ClimateHealth2016_FullReport_small.pdf ............................................................................................................. 12

U.S. Glob. Change Rsch. Program, *Fourth National Climate Assessment: Vol. II* (2018), https://nca2018.globalchange.gov/downloads/NCA4_2018_FullReport.pdf ......... 11

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAIʻI,          Page vi
MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

### INTEREST OF AMICI CURIAE

This lawsuit concerns the federal government's long history of promoting "fossil fuel use despite knowing that it can cause catastrophic climate change" and "that failure to change existing policy may hasten an environmental apocalypse." *Juliana v. United States*, 947 F.3d 1159, 1164 (9th Cir. 2020). Following this Court's order referring the parties to a magistrate judge for a settlement conference, a coalition of States moved to intervene. The amici here—Delaware, Hawaii, Minnesota, New York, Oregon, and Vermont—have interests that are implicated by proposed intervenors' arguments and they submit this amicus brief to correct two aspects of proposed intervenors' submissions.

*First*, amici States have an interest in correcting proposed intervenors' erroneous assertions about purported collusion between the parties in two legal disputes in which amici were among the plaintiffs: namely, litigation challenging a 2019 U.S. Department of Health and Human Services (HHS) rule concerning the Title X program, *see* 84 Fed. Reg. 7,714 (Mar. 4, 2019) (Title X Rule), and litigation challenging a 2019 U.S. Department of Homeland Security (DHS) rule that expanded the Immigration and Nationality Act's statutory definition of "public charge," *see* 84 Fed. Reg. 41,292, 41,501 (Aug. 14, 2019) (Public Charge Rule). In explaining why they believe they need to intervene in this suit, the proposed intervenors argue that "the federal government has recently engaged in collusive litigation tactics to achieve the Executive's policy goals through federal courts." Mot. for Limited Intervention &

Mem. in Supp. (Intervenors' Br.) at 7-9. As plaintiffs in the two disputes that proposed intervenors proffer as examples of collusion (*see id.*), amici States are well positioned to explain the context for the resolution of their claims and show that proposed intervenors' claims of collusion are baseless. As the experiences of the amici States demonstrate, the public benefits when the federal government is able to exercise its lawful rulemaking authority and discretion to resolve claims brought by States and state residents.

*Second*, amici States have an interest in correcting proposed intervenors' incomplete picture of the effects that federal action to address climate change will have on States and state residents. Proposed intervenors argue that curtailing the use of fossil fuels will result in certain adverse economic consequences. *See id.* at 9-11. However, as the Ninth Circuit has recognized, States also have an "interest in combatting the adverse effects of climate change on their residents." *American Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018). States have "'quasi-sovereign interests in the health and well-being—both physical and economic—of [their] residents,'" as proposed intervenors acknowledge. *See* Intervenors' Br. at 10 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). Here, the wide-ranging effects of climate change—including the costs of combatting rising sea levels, health risks posed by rising temperatures, and threats to States' food and water supplies, among others—implicate far broader quasi-

sovereign interests in the health and well-being of state residents than those noted by proposed intervenors.

## ARGUMENT

### POINT I

#### AS AMICI STATES' EXPERIENCES SHOW, PROPOSED INTERVENORS' EXAMPLES OF PURPORTED COLLUSION DID NOT INVOLVE ANY COLLUSION

Proposed intervenors moved to intervene in this lawsuit following this Court's order referring the parties to a magistrate judge for a settlement conference. *See* Minute Order (May 13, 2021), ECF No. 472. Emphasizing the federal government's "agreement" to comply with this Court's order (*see* Intervenors' Br. at 3), proposed intervenors argue that they need party status in order to prevent a "collusive settlement" (*id.* at 12). They base their request on an assertion "that the federal government has recently engaged in collusive litigation tactics to achieve the Executive's policy goals through federal courts." *Id.* at 7.

But the two examples proposed intervenors discuss as purportedly illustrative of those tactics did not in fact involve either collusion or executive branch arrogation of "policymaking powers that the People entrusted to their elected representatives" (*id.* at 3). Rather, in those litigations, the claims of amici States and the other plaintiffs were resolved through ordinary and lawful exercises of executive rulemaking authority and discretion. Specifically, an incoming administration decided to replace a challenged administrative rule that was inconsistent with its

policy priorities, and the parties to lawsuits challenging the rule decided not to continue their potentially moot litigation over the validity of the former rule.

Changes in course with respect to administrative rules and related litigation are "neither surprising nor particularly unusual" after an election brings into office a "new presidential administration[], especially of a different party." *See City & County of San Francisco v. United States Citizenship & Immigr. Servs.*, 992 F.3d 742, 743 (9th Cir. 2021) (Vandyke, J., dissenting).  And the public benefits when injuries that the federal government has caused States and state residents can be addressed through executive rulemaking rather than lengthy and costly litigation.

A.    **The Challenges to the Title X Rule Brought by Amici States and Others Were Resolved Through a Lawful Exercise of Executive Authority.**

Proposed intervenors are mistaken in asserting that the federal government collusively resolved the challenges to the Title X Rule that were brought by amici States here and other plaintiffs. *See* Intervenors' Br. at 8-9. In fact, those claims were resolved when HHS announced and then published a proposed new rule that eliminated the aspects of the Title X Rule that plaintiffs were challenging.

Multiple States (including amici here), local governments, individuals, and private entities challenged the Title X Rule's prohibition on abortion referrals by recipients of Title X funds and the rule's requirement that Title X projects maintain physical and financial separation from abortion-related activities. *See* 42 C.F.R. §§ 59.14(a), 59.15. Four district courts entered preliminary injunctions against the

Title X Rule's enforcement, and one district court ultimately entered a permanent injunction blocking enforcement of the rule in Maryland.[1] The Fourth Circuit then affirmed the permanent injunction barring enforcement of the rule in Maryland, while the Ninth Circuit vacated the preliminary injunctions against the rule entered by district courts in Washington, California, and Oregon.[2]

Following the change in administration in January 2021, HHS commenced a review of the Title X Rule.[3] In February 2021, while HHS was reviewing the rule, the Supreme Court granted petitions for a writ of certiorari filed by plaintiffs in the Ninth Circuit cases and defendants in the Fourth Circuit case.[4] In March 2021, HHS determined that it would promulgate a new rule that would be substantively similar to the rule that the Title X Rule replaced.[5] Such a rule would resolve the legal

---

[1] *See Washington v. Azar*, 376 F. Supp. 3d 1119 (E.D. Wash. 2019); *California v. Azar*, 385 F. Supp. 3d 960 (N.D. Cal. 2019); *Oregon v. Azar*, 389 F. Supp. 3d 898 (D. Or. 2019); *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602 (D. Md. 2019); *see also Mayor & City Council of Baltimore v. Azar*, 439 F. Supp. 3d 591 (D. Md. 2020) (permanent injunction).

[2] *See Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) (en banc); *California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc).

[3] *See* Memorandum on Protecting Women's Health at Home and Abroad at 1-2, 2021 Daily Comp. Pres. Doc. 100 (Jan. 28, 2021) (directing HHS to review the Title X Rule and to consider "as soon as practicable, whether to suspend, revise, or rescind, or publish for notice and comment proposed rules suspending, revising, or rescinding [the Title X Rule]").

[4] *See Cochran v. Mayor & City Council of Baltimore*, 141 S. Ct. 1369 (2021); *Oregon v. Cochran*, 141 S. Ct. 1369 (2021).

[5] *See* Office of Population Affairs, HHS, *Statement on Proposed Revision of Title X Regulations* (Mar. 18, 2021) (internet). For internet sources, URLs are provided in the Table of Authorities.  All sites last visited July 6, 2021.

challenges that amici States and the other plaintiffs challenging the Title X Rule had brought in their lawsuits.

Anticipating that the Title X Rule would no longer be in effect by the time that the Supreme Court could hear the challenge to it, the parties to the Supreme Court proceedings stipulated to dismiss those proceedings. A coalition of States and a group of private medical associations that supported the Title X Rule moved to intervene to continue the litigation, arguing that the parties sought to enter "collusive agreements" to prevent the Supreme Court "from saying what the law is." Suppl. Br. in Supp. of Intervention of Proposed Intervenors Ohio & 18 Other States at 2, *American Med. Ass'n v. Cochran*, No. 20-429 (U.S. Mar. 15, 2021).

In April 2021, while the motions to intervene in the Supreme Court proceeding were still pending, HHS published the proposed new rule. 86 Fed. Reg. 19,812 (Apr. 15, 2021). In response to an inquiry from the Supreme Court, the federal government represented "that it will continue enforcing the challenged rule and regulations outside the State of Maryland for as long as they remain operative" and "that it will either oppose [future litigation challenging the Title X Rule] on threshold grounds or seek to hold the litigation in abeyance pending the completion of notice and comment." *Becerra v. Mayor & City Council of Baltimore*, No. 20-454, 2021 WL 1951787 (U.S. May 17, 2021). The Supreme Court then denied the intervention motions and granted the stipulations of dismissal.

The record of the Title X Rule litigation thus contains no support for proposed intervenors' assertion of past collusion that, if repeated here, would "deprive[] the States of procedural guarantees under the [Administrative Procedure Act] and the Constitution." *See* Intervenors' Br. at 15. To the contrary, the resolution of the Title X Rule litigation reflects a legitimate exercise of executive authority that obviated the need for further costly and unnecessary litigation.

B.    **The Challenges to the Public Charge Rule Brought by Some of the Amici States and Others Were Resolved Through Lawful Executive Authority and Discretion.**

Proposed intervenors are also incorrect in suggesting that the federal government collusively resolved lawsuits—brought by some of amici States and others—challenging the Public Charge Rule. *See* Intervenors' Br. at 7-8. Plaintiffs' claims there were resolved not by settlement but through lawful exercises of executive rulemaking authority and discretion.

Before the new administration took office, the Second, Seventh, and Ninth Circuits all upheld preliminary injunctions in challenges to the Public Charge Rule brought by some of the amici States and others. *See New York v. Department of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020); *Cook County v. Wolf*, 962 F.3d 208 (7th Cir. 2020); *City & County of San Francisco v. United States Citizenship & Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020). In subsequent proceedings in *Cook County*, the district court entered summary judgment for the plaintiffs there and entered a final

judgment vacating the Public Charge Rule. *See Cook County v. Wolf*, 498 F. Supp. 3d 999 (N.D. Ill. 2020).[6]

Shortly thereafter, the incoming presidential administration declared that it would reverse the Public Charge Rule within its first one hundred days in office. *See The Biden Plan for Securing Our Values as a Nation of Immigrant*s (underlined link) (internet). Following the change in administration, President Biden directed DHS, the Department of State, and the Department of Justice to review their actions on public charge inadmissibility in light of the effects of those actions "on the integrity of the Nation's immigration system and public health," as well as the administration's priorities of promoting "integration, inclusion, and citizenship." *See* Exec. Order No. 14,012, §§ 1, 4, 86 Fed. Reg. 8277, 8277-78 (Feb. 2, 2021). On February 22, 2021, while the policy review directed by President Biden was still ongoing, the Supreme Court granted a petition for a writ of certiorari from the Second Circuit's decision, the briefing on which was completed before the inauguration. *See Department of Homeland Sec. v. New York*, 141 S. Ct. 1370 (2021).

On March 9, 2021, DHS issued a statement concluding that "continuing to defend the [Public Charge Rule] is neither in the public interest nor an efficient use

---

[6] A panel of the Fourth Circuit initially reversed a preliminary injunction against the Public Charge Rule, *see Casa de Maryland, Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020), but the full court granted en banc review, vacating the panel decision, *see Casa de Maryland, Inc. v. Trump*, 981 F.3d 311 (4th Cir. 2020); 4th Cir. R. 35(c) ("Granting of rehearing en banc vacates the previous panel judgment and opinion.").

of limited government resources," and explaining that the Department of Justice would "no longer pursue appellate review of judicial decisions invalidating or enjoining enforcement of the [Public Charge Rule]."[7] The parties to the Supreme Court proceeding thus stipulated to the dismissal of that proceeding, and the federal government moved to dismiss its other open appeals concerning the Public Charge Rule, leaving in place the nationwide injunction entered by the district court in Illinois.[8]

DHS published a rule in the Federal Register to implement the vacatur of the Public Charge Rule by the court in *Cook County*,[9] and then announced that it will proceed with a new rulemaking "to define the term public charge and identify considerations relevant to the public charge inadmissibility determination."[10] These

---

[7] Press Release, DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility (Mar. 9, 2021) (internet).

[8] A coalition of States attempted to intervene for the purposes of challenging the dismissals in the Fourth and Ninth Circuits, but those courts denied their motions. *See* Order, *Casa de Maryland, Inc. v. Trump*, No. 19-2222 (4th Cir. Mar. 18, 2021), ECF No. 216; *City & County of San Francisco v. United States Citizenship & Immigr. Servs.*, 992 F.3d 742 (9th Cir. 2021). In the Illinois proceeding, a motion by a coalition of States to intervene and vacate the judgment there is still pending. A full recitation of the complex procedural history of these cases can be found in the federal government's opposition to the intervention motion in the Illinois proceeding. *See* Combined Mem. in Resp. to Mot. to Intervene & Mot. for Relief Under Fed. R. Civ. P. 60(b) at 4-10, *Cook County v. Mayorkas*, No. 19-cv-6334 (N.D. Ill. June 15, 2021), ECF No. 269.

[9] *See* Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221, 14,221 (Mar. 15, 2021).

[10] U.S. Citizenship & Immigr. Servs., DHS, RIN 1615-AC74, Inadmissibility on Public Charge Grounds (Spring 2021) (internet).

actions do not reflect any improper collusion between the federal government and the plaintiffs in the public charge litigation, or any bypassing of "proper channels in the executive or legislative branches." *See* Intervenors' Br. at 7. Moreover, the federal government's decision to cease litigating over the Public Charge Rule's validity is consistent with well-settled principles—redounding to the benefit of the taxpaying public—that counsel against prolonging lawsuits over a rule that the executive branch anticipates replacing. *See New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam) (challenge to rule mooted by its amendment to remove challenged provision); *Diffenderfer v. Central Baptist Church of Miami*, 404 U.S. 412, 414-15 (1972) (per curiam) (challenge to statute mooted by repeal); *Triangle Improvement Council v. Ritchie*, 402 U.S. 497, 498-99 (1971) (Harlan, J., concurring) (writ of certiorari dismissed as improvidently granted after statute at issue is repealed).

## POINT II

### AMICI STATES' EXPERIENCES SHOW THAT CLIMATE CHANGE POSES SERIOUS HARMS TO STATE LANDS AND STATE RESIDENTS

Amici States also have an interest in correcting proposed intervenors' incomplete description of the state interests implicated by policies addressing climate change. Proposed intervenors assert that they will suffer adverse economic consequences from any settlement of this case that results in curtailing the use of fossil fuels (*see* Intervenors' Br. at 9-11), but they ignore the States' recognized

"interest in combatting the adverse effects of climate change on their residents," *American Fuel*, 903 F.3d at 913.

Climate-change risks are locally significant and "widely shared." *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 522-23 (2007) (quotation marks omitted). The proposed intervenors' statement of economic interests fails to account for the massive costs that state and local governments are incurring—and will continue incur—to combat the risks posed by climate change, including rising sea levels, extreme heat, reduced agricultural yields, and declining water supplies.[11] In Alabama, in April 2009 alone, flooding caused over $25 million in damages to roads and buildings.[12] And as of 2016, Charleston, South Carolina had spent $235 million to respond to increased flooding.[13] These costs will continue to escalate going forward. Miami officials estimate that it will cost nearly $4 billion over the next forty years to protect Miami's residents from rising sea levels, and even that level of spending will not be enough to save every neighborhood.[14]

---

[11] *See, e.g.*, U.S. Glob. Change Rsch. Program, *Fourth National Climate Assessment: Vol. II* 1321 (2018) (underline internet) ("Nationally, estimates of adaptation costs range from tens to hundreds of billions of dollars per year.").

[12] *See* Obama White House, *The Threat of Carbon Pollution: Alabama* (internet).

[13] *See Fourth National Climate Assessment*, *supra*, at 760.

[14] *See* Alex Harris, *Miami's Sea Level Rise Bill is $4 Billion by 2060. It Won't Keep Every Neighborhood Dry*, Miami Herald (last updated Apr. 23, 2021) (internet).

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I, MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

The consequences of climate change are not limited to coastal States. Rising temperatures are adversely affecting localities throughout the country, creating health risks to sensitive populations like the elderly, children, and people with chronic illnesses.[15]

The threat of rising temperatures also threatens the water supply, particularly in much of the southwest, which is currently suffering from a historic drought.[16] In addition, as the summary judgment record here shows, climate change threatens food security and the economic interests of the agriculture industry.[17]

Recognizing the threat that climate change presents to their lands and residents, and the urgent need to act immediately to combat climate change,[18] amici

---

[15] *See* Nadja Popovich & Christopher Flavelle, *Summer in the City Is Hot, but Some Neighborhoods Suffer More*, N.Y. Times (Aug. 9, 2019) (internet); U.S. Glob. Change Rsch. Program, *The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment* 44-60 (Apr. 2016) (internet).

[16] *See* Nat'l Integrated Drought Info. Sys., Nat'l Oceanic & Atmospheric Admin., U.S. Dep't of Com., *Southwest and California Drought Status Updated* (May 2021) (internet).

[17] *See The Impacts of Climate Change on Human Health*, *supra*, at 16, 190 (appended as Ex. 303 to Decl. of Andrea Rogers in Supp. of Pls.' Second Mot. in Lim. Seeking Judicial Notice of Publicly Available Docs. (Aug. 24, 2018), ECF No. 341); U.S. Dep't of Agric., USDA Technical Bull. No. 1935, *Climate Change and Agriculture in the United States: Effects and Adaptation* 1-2 (Feb. 2013) (internet) (appended as Ex. 24 to Decl. of Julia Olson in Supp. of Pls.' Mot. in Lim. Seeking Judicial Notice of Fed. Gov't Docs. (June 28, 2018), ECF No. 270).

[18] As plaintiffs have demonstrated, the overwhelming scientific consensus is that immediate and continual progress toward a near-zero greenhouse gas emission economy by mid-century is necessary to avoid catastrophic consequences. *See, e.g.*,

States are undertaking actions to address the problem. To curb the emission of greenhouse gases, New York is requiring 70% of retail electricity sales in the State to come from renewable sources by 2030.[19] Oregon has adopted a Clean Fuels Program to reduce the carbon intensity of fuel.[20] Delaware requires utilities to obtain 40% of their electricity from renewable sources, and 10% from solar, by 2035.[21] Minnesota has a goal of reducing statewide greenhouse gas emissions by at least 80% below 2005 levels by 2050.[22] And Vermont is requiring 75% of retail electricity sales to come from renewable sources by 2032.[23]

States also have collaborated on successful regional efforts to reduce greenhouse gas emissions through market-based systems. Rhode Island, Maryland, Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Vermont, and Virginia participate in the Regional Greenhouse Gas Initiative, a regional cap-and-trade program that uses an increasingly stringent carbon

---

Myles Allen et al., Summary for Policymakers, *in* Intergovernmental Panel on Climate Change*, Global Warming of 1.5°C*, at 12-15 (2018) (internet).

[19] Climate Leadership and Community Protection Act, ch. 106, § 4, 2019 McKinney's N.Y. Laws 856, 871.

[20] Or. Rev. Stat. Ann. §§ 468A.265-468A.277; Or. Admin. R. 340-253-0000 to 340-253-8100; *see American Fuel*, 903 F.3d 903 (rejecting challenge to Oregon's Clean Fuels Program).

[21] Del. Code Ann. tit. 26, § 354(a).

[22] Minn. Stat. Ann. § 216H.02(1).

[23] Vt. Pub. Util. Comm'n, Renewable Energy Standard Rule § 4.401(b)(1).

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I,                    Page 13
MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

emissions cap to reduce carbon pollution from power plants.[24] Participating States have reduced carbon emissions from the electricity generating sector by 40% since the program launched.[25] In addition, on the west coast, the Pacific Coast Collaborative represents a series of agreements among California, Oregon, Washington, British Columbia, and the cities of Los Angeles, Oakland, San Francisco, Portland, Seattle, and Vancouver to reduce greenhouse gas emissions dramatically by 2050.[26]

But the risks climate change poses cannot be solved by state and local governments alone. As the Ninth Circuit recognized, the federal government "affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana*, 947 F.3d at 1167. And the federal government exercises exclusive control over a substantial portion of fossil fuel production: "[a]bout 25% of fossil fuels extracted in the United States come from federal waters and lands, an activity that requires authorization from the federal government." *Id.* at 1169 (citing 30 U.S.C. §§ 181-196, 201).

In sum, States have a broad and unique range of interests in federal action to combat the wide-ranging effects of climate change—including the costs of combatting

---

[24] *See* Reg'l Greenhouse Gas Initiative, *Elements of RGGI* (internet).

[25] Acadia Ctr., *Outpacing the Nation: RGGI's Environmental and Economic Success* 3 (Sept. 2017) (internet).

[26] *See* Pac. Coast Collaborative, *About* (internet).

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I,            Page 14
MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

rising sea levels, the health risks posed by rising temperatures, and threats to States'
food and water supplies, among others—that are not reflected in proposed
intervenors' statement of interests.

## CONCLUSION

For the foregoing reasons, when assessing the merits of proposed intervenors'
intervention motion, this Court should decline to give weight to their claims of
collusive litigation tactics and should consider the broader landscape of state
interests implicated by this suit.

Dated:    New York, New York
          July 6, 2021

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Amici States

By:   */s/ Mark S. Grube*
      MARK S. GRUBE
      Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
MARK S. GRUBE
  *Assistant Solicitor General*
      *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-8028

(*Counsel list continues on next page.*)

BRIEF FOR THE STATES OF NEW YORK, DELAWARE, HAWAI'I,        Page 15
MINNESOTA, OREGON, AND VERMONT AS AMICI CURIAE

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French Street
Wilmington, DE 19801

CLARE E. CONNORS
 *Attorney General*
 *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capital
75 Rev. Dr. Martin Luther King Jr. Blvd
Saint Paul, MN 55101

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court Street NE
Salem, OR 97301

THOMAS J. DONOVAN, JR.
 *Attorney General*
 *State of Vermont*
Office of the Attorney General
109 State Street
Montpelier, VT 05609