IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **KELSEY CASCADIA ROSE JULIANA,** *et al.*, | Civ. No. 6:15-cv-01517-AA |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **THE UNITED STATES OF AMERICA,** *et al.*, | |
| Defendants. | |

_____

AIKEN, District Judge:

In 2015, twenty-one plaintiffs—a group of young people, including "future generations"—brought this civil rights action against the federal government, alleging injury from the devastation of climate change and contending that the Constitution guarantees the right to a stable climate system that can sustain human life. Through the years of litigating this case, plaintiffs maintain that their

government, by subsidizing fossil fuel extraction and consumption, is responsible for destroying the climate system on which all life, liberty, and property depends, violating plaintiffs' fundamental rights under the Due Process Clause of the Constitution and the historical public trust doctrine. On June 1, 2023, the Court granted plaintiffs' motion to file a second amended complaint.

Now before the Court is defendants' motion to dismiss the second amended complaint. ECF No. 547. For the reasons explained, the Court DENIES defendants' motion to dismiss, ECF No. 547; DENIES defendants' motion for an order certifying its prior order, ECF No. 540, for interlocutory appeal, ECF No. 551; and DENIES defendants' motion to stay litigation, ECF No. 552. The Court GRANTS plaintiffs' motion to set a pretrial conference, ECF No. 543.

## INTRODUCTION

The parties do not disagree that the climate crisis threatens our ability to survive on planet Earth. This catastrophe is *the* great emergency of our time and compels urgent action.[1] As this lawsuit demonstrates, young people—too young to vote and effect change through the political process—are exercising the institutional procedure available to plead with their government to change course. While facts

---

[1]    *See* David Wallace-Wells, The Uninhabitable Earth: Life After Warming (2019); Andrew Freedman & Jason Samenow, *Humidity and Heat Extremes Are on the Verge of Exceeding Limits of Human Survivability, Study Finds*, Washington Post (May 8, 2020) (reporting study warning that highly populated regions of the world will be rendered uninhabitable sooner than previously thought for parts of the year); Nafeez Ahmed, *New Report Suggests 'High Likelihood of Human Civilization Coming to an End' Starting in 2050*, VICE (June 3, 2019).

remain to be proved, lawsuits like this highlight young people's despair with the drawn-out pace of the unhurried, inchmeal, bureaucratic response to our most dire emergency. Top elected officials have declared that the climate emergency spells out "code red for humanity."[2] Burning fossil fuels changes the climate more than any other human activity.[3] The government does not deny that it has promoted fossil fuel combustion through subsidies; tax exemptions; permits for fossil fuel development projects; leases on federal lands and offshore areas; permits for imports and exports; and permits for energy facilities.[4] Despite many climate change suits around the country, in 2023, the United States witnessed record-breaking levels of oil and gas production.[5] And recent calculations conservatively estimate that the United States

---

[2]    President Joseph Biden, Remarks on "Actions to Tackle the Climate Crisis" at Brayton Point Power Station, Somerset, Massachusetts (July 20, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/20/remarks-by-president-biden-on-actions-to-tackle-the-climate-crisis/ [https://perma.cc/LU2U-CTFM].

[3]    Environmental Protection Agency, Sec. Environmental Topics, Climate Change, *Causes of Climate Change*, (last updated April 25, 2023), https://www.epa.gov/climatechange-science/causes-climate-change [https://perma.cc/UGU4-B6EF].

[4]    *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) ("The government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land.").

[5]    *Energy Poverty Prevention and Accountability Act of 2023: Hearing on H.R.6474 and H.R.6481 before the H. Nat. Resources Subcomm. on Energy and Min. Resources, 118th Cong.* (statement of J. Mijin Cha, Assistant Professor, Univ. of Cal.) (citing Oliver Milman, "*US Oil and Gas Production Set to Break Record in 2023 despite UN Climate Goals*," The Guardian, November 27, 2023, sec. Environment, https://www.theguardian.com/environment/2023/nov/27/us-oil-gas-record-fossil-fuels-cop28-united-nations [https://perma.cc/VJ4C-KZGH]).

provides the oil and gas industry $20,000,000,000.00 annually in an array of subsidies.[6]

Defendants maintain that, because tackling the climate crisis is complex, and no single remedy may *entirely* redress plaintiffs' harms caused by climate change, the judiciary is constrained by the Constitution from offering any redress at all. *See* defs.' mot. to dismiss ("Mot.") at 11-13. Defendants contend that the issue of climate change is political in its nature, and that redress of plaintiffs' alleged injuries must be sought from Congress. *Id*. at 28. That unnecessarily narrow view overlooks one clear and constitutional path to shielding future generations from impacts of the onslaught of environmental disaster: that it is the responsibility of the judiciary to declare the law that the government may not deprive the People of their Constitutional guarantee of the God-given right to life. U.S. CONST. art III; U.S. CONST. amend. V; *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).

Plaintiffs' allegations are that collective resolve at every level and in every branch of government is critical to reducing fossil fuel emissions and vital to combating climate change. That curbing climate change requires an all-hands-on-deck approach does not oust the Court from its province or discharge it of its duty under the Constitution to say what the law is. *Marbury* 5 U.S. at 170.[7] Combatting

---

[6]    *Id.* (Statement of J. Mijin Cha) (citing Environmental and Energy Study Institute, Fact Sheet, *"Proposals to Reduce Fossil Fuel Subsidies (2021),"* (July 23, 2021) https://www.eesi.org/papers/view/fact-sheet-proposals-to-reduce-fossil-fuel-subsidies-2021 [https://perma.cc/SD8B-7P6B].

[7]    *See also* Edith M. Lederer, *UN Chief: World Must Prevent Runaway Climate Change by 2020*, Associated Press News (Sept. 10, 2018) (describing massive

climate change may require all to act in accord, but that does not mean that the courts must "throw up [our] hands" in defeat. *See Juliana v. United States*, 947 F.3d 1159, 1175 (9th Cir. 2020) (Staton, J., dissenting).

The legislative and executive branches of government wield constitutional powers entrusted to those branches by the People through the democratic process. *See* U.S. CONST. art. I and art. II. So too, as part of a coequal branch of government, the Court cannot shrink from its role to decide on the rights of the individuals duly presenting their case and controversy. *Marbury*, 5 U.S. at 170. Indeed, courts at home and abroad are capably grappling with climate change lawsuits seeking redress against both government and private actors on a range of legal theories, many novel.[8] In Montana, Judge Kathy Seeley presided over the first climate change trial in the United States, piercing through expert testimony and scientific evidence to provide factual findings and conclusions of law, ruling that the state's failure to consider climate change when approving fossil fuel projects was unconstitutional. *See Held v. Montana*, Findings of Fact, Conclusions of Law, and Order, Civil Action CDV-2020-307 (Mont. First Jud. D. Ct. Lewis and Clark County, Aug. 14, 2023).

---

decarbonization effort necessary to avoid climate "tipping points."), https://apnews.com/article/floods-united-nations-antonio-guterres-us-news-climate-71ab1abf44c14605bf2dda29d6b5ebcc [https://perma.cc/84E6-D24C].

[8]     The Sabin Center for Climate Change Law of Columbia University has assembled for public access the "Climate Change Litigation Database" containing summaries and court dockets for climate change lawsuits brought in the United States and abroad. *Climate Change Litigation Databases,* Colum. L. Sch.: Sabin Ctr. For Climate Change L., https://climatecasechart.com/ [https://perma.cc/B89Z-YN4M].

The judiciary is capable and duty-bound to provide redress for the irreparable harm government fossil fuel promotion has caused. Legal scholar and professor Mary Christina Wood contends that the all-encompassing breadth of ongoing "irreparable harm" sets the climate emergency apart from any other crisis, in terms of the human interests at stake.[9] As Professor Wood eloquently states: "Because no crisis is as ominous, imminent, and far reaching, the climate emergency must be considered *sui generis*," that is, "in a class of its own."[10] The legal approach must "rise to the emergency rather than repeat a failed past paradigm."[11] In the context of Australian youth's challenge to government approval of a coal mine, Justice Bromberg wrote that failure to curb climate change is "what might fairly be described as the greatest inter-generational injustice ever inflicted by one generation of humans upon the next."[12]

---

[9]    Mary C. Wood, *"On the Eve of Destruction": Courts Confronting the Climate Emergency*, 97 Ind. L.J. 239, 249 (2022) (hereinafter "Wood, *Eve of Destruction*").

[10]    *Id*.

[11]    *Id*.

[12]    *Sharma v. Minister for the Env't* [2021] FCA 560 1, 90 (27 May 2021) (Austl.). The court stated:

> "It is difficult to characterise in a single phrase the devastation that the plausible evidence presented in this proceeding forecasts for the Children. As Australian adults know their country, Australia will be lost and the World as we know it gone as well. The physical environment will be harsher, far more extreme and devastatingly brutal when angry. As for the human experience—quality of life, opportunities to partake in nature's treasures, the capacity to grow and prosper—all will be greatly diminished. Lives will be cut short. Trauma will be far more common and good health harder to hold and maintain. None of this will be the fault of nature itself. It will largely be inflicted by the inaction of this generation of adults, in what might fairly be described as the greatest

Some may balk at the Court's approach as errant or unmeasured,[13] but more likely than not, future generations may look back to this hour and say that the judiciary failed to measure up at all.  In any case over which trial courts have jurisdiction, where the plaintiffs have stated a legal claim, it is the proper and peculiar province of the courts to impartially find facts, faithfully interpret and apply the law, and render reasoned judgment.[14]  Such is the case here.

## BACKGROUND

### I.    Plaintiffs' Lawsuit

In 2015, plaintiffs filed this civil rights lawsuit that journalists later coined "The Biggest Case on the Planet."[15]  At the start of this case, the twenty-one plaintiffs were between the ages of eight and nineteen.  They brought suit along with "future generations" through their guardian, Dr. James Hansen.  Plaintiffs named as

---

inter-generational injustice ever inflicted by one generation of humans upon the next."
*Id.*

[13]    *Juliana v. United States*, 947 F.3d 1159, 1174 (9th Cir. 2020) ("Not every problem posing a threat—even a clear and present danger—to the American Experiment can be solved by federal judges.  As Judge Cardozo once aptly warned, a judicial commission does not confer the power of 'a knight errant, roaming at will in pursuit of his own ideal of beauty or of goodness'; rather, we are bound 'to exercise a discretion informed by tradition, methodized by analogy, disciplined by system.'") (quoting Benjamin N. Cardozo, The Nature of the Judicial Process 141 (1921)).

[14]    *See* The Federalist No. 78 (Alexander Hamilton).

[15]    Laura Parker, *"Biggest Case on the Planet" Pits Kids v. Climate Change*, Nat'l Geographic (Nov. 9, 2018), https://www.nationalgeographic.com/science/article/kids-sue-us-government-climate-change [https://perma.cc/2J7J-74C2].

defendants all federal agencies that plaintiffs alleged were responsible for the U.S. energy policy, including the Department of Agriculture, Department of Transportation, Environmental Protection Agency, Department of Interior, the State Department, Council on Environmental Quality, Department of Defense, and Department of Commerce. Compl., ECF No. 1; First Am. Compl. ("FAC"), ECF No. 7.

Plaintiffs compiled an abundance of factual evidence to support their claim that the government has known about the dangers posed by fossil fuel production, and, despite that knowledge, chose to promote production and consumption of coal, oil, and gas at increasing levels over decades. The record is extensive. The evidence, as the Ninth Circuit stated, "leaves little basis for denying that climate change is occurring at an increasingly rapid pace . . . and stems from fossil fuel combustion." *Juliana*, 947 F.3d at 1166.

From the beginning, plaintiffs alleged that, as early as the year 1899, scientists understood that $CO_2$ concentration in the atmosphere caused heat retention, global heating, and climate change. FAC ¶ 131. Plaintiffs stated that for over fifty years, the United States of America has known that $CO_2$ pollution from burning fossil fuels was causing global warming and dangerous climate change, and that continuing to burn fossil fuels would destabilize the climate system on which present and future generations of our nation depend for survival. *Id.* ¶¶ 132-35. Recounting over a dozen signpost junctures, plaintiffs provide letters, memoranda, and reports to the political branches from scientific experts and government agencies cautioning about the

danger of carbon pollution and warning that a lack of action would be felt for decades. *Id*. ¶¶ 136-50.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing; failure to state a cognizable constitutional claim; and failure to state a claim on a public trust theory. ECF No. 27. The Court denied that motion in November 2016. *See* Nov. 10, 2016 Op. & Order, ECF No. 83. Defendants also moved for judgment on the pleadings and summary judgment. ECF Nos. 195, 207. For the most part, the Court denied those motions.

When the Court denied defendants' motions to certify its dispositive orders for interlocutory appeal, defendants petitioned the Supreme Court for a writ of mandamus, ECF No. 390-1, and to stay proceedings, ECF No. 391-1, both which were denied. Defendants asked the district court to reconsider certifying its orders for interlocutory appeal, and, that time, the Ninth Circuit invited the district court to do so. *See* Nov. 21, 2018 Order, ECF Nos. 444, 445. Defendants then sought permission to appeal, which the Ninth Circuit granted. Filed Ord., *Juliana v. United States*, No. 18-36082 (9th Cir. Dec. 26, 2018).

On January 17, 2020, a divided panel of the Ninth Circuit issued a decision reversing the district court's certified orders and remanding the case with instructions to dismiss for lack of Article III standing. *Juliana*, 947 F.3d at 1175. Writing for the majority, Judge Hurwitz, joined by Judge Murguia, began with the basics: "To have standing under Article III, a plaintiff must have (1) a concrete and

particularized injury that (2) is caused by . . . challenged conduct and (3) is likely redressable by a favorable judicial decision." *Id*. at 1168.

Agreeing with the district court, Judge Hurwitz found that "[a]t least some plaintiffs" had claimed "particularized injuries," since climate change threatened to harm certain plaintiffs in "concrete and personal" ways if left unchecked. *Id*. The appellate court described the dire circumstances faced by one plaintiff who had had to evacuate his coastal home because of climate change. *Id*. And some plaintiffs had also established causation because there was "at least a genuine factual dispute as to whether" U.S. climate policy was a "substantial factor" in exacerbating plaintiffs' climate change-related injuries. *Id*. at 1169. Thus, plaintiffs' standing turned on redressability: "whether the plaintiffs' claimed injuries [were] redressable by an Article III court." *Id*.

Plaintiffs claimed defendants had violated their constitutional right to a climate system capable of sustaining life, and to redress that violation, sought injunctive relief, including an order directing defendants to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ to stabilize the climate system." FAC at 94 ¶¶ 2, 6, 7.

"Reluctantly," the panel found such relief "beyond [the district court's] constitutional power." *Juliana*, 947 F.3d at 1165. To establish redressability, the appellate court explained, plaintiffs must have identified relief that was both "(1) substantially likely to redress their injuries" and "(2) within the district court's power to award." *Id*. at 1170. On the first prong, the panel found that plaintiffs' own experts

had stated that only a comprehensive, government-led plan to reduce U.S. greenhouse gas emissions could mitigate "the global consequences of climate change" and thereby bring plaintiffs' total redress. *Id*. Turning to the second prong, the panel found that supervising such a plan "would necessarily require" judges to make "a host of complex policy decisions." *Id*. at 1171.

Plaintiffs told the appellate court that even partial relief would suffice to redress their injuries, and that the district court "need not itself make policy decisions," because if plaintiffs' request for a remedial plan were granted, the political branches "could decide what policies" would be best to "draw down excess atmospheric $CO_2$." *Id*. at 1172. But the panel determined that, "even under such a scenario," the district court would need to pass judgment on the sufficiency of the government's response to the order. In the Ninth Circuit's view, a district court could not engage in passing judgment on the sufficiency of the government's response to a court order, because it "necessarily would entail a broad range of policymaking." *Id*.

The panel continued: "[A] constitutional directive or legal standard[ ] must guide the court's exercise of equitable power," and, on the other hand, "limited and precise" legal rules simply could not resolve the range of policy-related questions plaintiffs' claims raised. *Id*. at 1173. The appellate court determined that no remedy subject to limited and precise definition could redress plaintiffs' injuries and therefore issuing such relief was not within the district court's power. *Id*.

Judge Josephine L. Staton dissented. "Plaintiffs bring suit," she lamented, "to enforce the most basic structural principle embedded in our system of ordered liberty:

that the Constitution does not condone the Nation's willful destruction." *Id*. at 1175. In Judge Staton's view, the district court had the power to award plaintiffs' relief unless plaintiffs' claims ran afoul of the political question doctrine. *See id*. at 1184-85. Since plaintiffs' claims did not pose political questions, she continued, they should have proceeded. *Id*. at 1185-86. "[O]ur history is no stranger to widespread, programmatic changes . . . ushered in by the judiciary[]," Judge Staton concluded, and the "slow churn" of institutional-reform litigation "should not dissuade us here." *Id*. at 1188-89. At end of the day, the narrower understanding prevailed: that Article III courts cannot order injunctive relief unless constrained by more "limited and precise" legal standards, discernable in the Constitution, and that plaintiffs must make their case to the political branches. *Id*. at 1175. The Ninth Circuit "reverse[d] the certified orders of the district court and remand[ed]" the case "with instructions to dismiss for lack of Article III standing." *Id*.

Plaintiffs moved to file an amended complaint, removing from their prayer for relief the injunction that the Ninth Circuit had found objectionable. ECF No. 462. The Court granted it because (1) the Ninth Circuit did not foreclose the possibility of amendment when it mandated dismissal; (2) plaintiffs had notified the Court of a Supreme Court case providing a new and more expansive interpretation of declaratory judgments; and (3) plaintiffs' proposed complaint narrowed the scope of the injunctive relief it had initially requested. *See Juliana v. United States*, No. 6:15-CV-01517-AA, 2023 WL 3750334 (D. Or. June 1, 2023).

## II.    Plaintiffs File a Second Amended Complaint

In plaintiffs' second amended complaint, they maintain earlier factual allegations, contending that defendants implemented no recommendation provided to them via scientific reports warning of catastrophic climate change. Second Am. Compl. ("SAC") ¶ 153. Plaintiffs contend that, if defendants had not disregarded the evidence, "$CO_2$ emissions today would be reduced by 35% from 1987 levels." *Id.* Instead, since 1991, plaintiffs state that defendants have allowed $CO_2$ emissions from fossil fuel combustion to increase. *Id.* Plaintiffs provide tables setting forth data from government sources showing that fossil fuel production, fossil fuel energy consumption, and fossil fuel emissions have climbed substantially since 1965, and that by 2011, fossil fuel combustion in the U.S. accounted for 94% of $CO_2$ emissions. *Id.* ¶¶ 155-58. By 2012, data plaintiffs provide shows that the U.S. was the largest producer of natural gas, and the second largest producer of coal and energy production. *Id.* ¶ 160. By 2014, according to the United States Energy Information Administration, the U.S. had become the largest producer of total petroleum in the world. *Id.* ¶ 161.

Plaintiffs assert that defendants knew the harmful effect of their actions would significantly endanger many, like plaintiffs, with damage persisting for millennia. *Id.* ¶¶ 1, 161. Despite that knowledge, plaintiffs allege defendants continued their policies and practices of promoting the exploitation of fossil fuels and that defendants acted with deliberate indifference to the peril they knowingly created. *Id.*

Plaintiffs' inventory cataloguing the regulatory permits, export permits, and approvals for leasing, drilling, and mining on public lands is substantial. The

accounting of exploitation for fossil fuel extraction, coal tracts, and oil and gas leases is staggering. *Id.* ¶¶ 164-70. Plaintiffs comprehensively inventory the affirmative governmental promotion of fossil fuel combustion over decades. *Id.* ¶¶ 171-78.

Plaintiffs also include allegations drawing from scientific evidence documenting the tangible impacts of climate change. Evidence describes rising sea levels, severe droughts, hurricanes, wildfires, extreme heat, flash flooding, unprecedented ocean acidification, and rapid depletion of sea ice. *Id.* ¶¶ 213-41. Such events alter our air quality, water availability, water quality, crop yields, animal agriculture, and housing security. *Id.* Plaintiffs' allegations about what the future holds if climate change is unabated are harrowing. *Id.* ¶¶ 242-55.

As the legal basis for their claims, plaintiffs maintain that defendants have violated the Due Process Clause and Equal Protection Clause of the Fifth Amendment; the "unenumerated rights preserved for the people by the Ninth Amendment"; and the public trust doctrine. FAC at 84, 88, 91, 92; SAC at 133, 137, 140, 141 (bringing same claims for relief).

Plaintiffs seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. SAC ¶ 14. Requested relief includes a declaration that the United States national energy system that creates the harmful conditions described above has violated and continues to violate the Fifth Amendment of the U.S. Constitution and plaintiffs' constitutional rights to substantive due process and equal protection of the law. *Id.* at 143 ¶ 1. Further, plaintiffs seek a declaration that defendants violated public trust rights and a declaration that the Energy Policy Act, Section 201

is unconstitutional. *Id.* at 143 ¶¶ 2-3.[16]  Plaintiffs request injunctive relief only if necessary and "as appropriate." *Id.* at 143 ¶ 4.

## III.    The Government Files a Motion to Dismiss

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), asserting that plaintiffs lack standing; that plaintiffs cannot bring claims in the absence of a statutory right of action; that plaintiffs ask the Court to exercise authority that exceeds the scope of its power under Article III of the Constitution; and that all of plaintiffs' claims fail on the merits.  Defendants also assert that, if the Court denies their motion, it should again certify its decision for interlocutory appeal.

## LEGAL STANDARDS

## I.    Motion to Dismiss – FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

A court reviews a motion to dismiss a complaint for lack of Article III standing under Rule 12(b)(1). *Naruto v. Slater*, 888 F.3d 418, 425 n.7 (9th Cir. 2018) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011)).  If the jurisdictional attack is facial, courts determine whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the

---

[16]    As noted earlier, plaintiffs had initially sought injunctive relief, including an order directing defendants to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ to stabilize the climate system."  FAC at 94 ¶¶ 2, 6, 7.

party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[A] party must establish an Article III case or controversy before [a court can] exert subject matter jurisdiction." *Matter of E. Coast Foods, Inc.*, 66 F.4th 1214, 1218 (9th Cir. 2023). To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct and show that a court can provide (3) a remedy likely to redress that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

## II. Motion to Dismiss – FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* The tenet that a court must accept as true all allegations contained in a complaint is inapplicable to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* (citing *Twombly*, 550 U.S. at 555). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556
U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

## DISCUSSION

Over the eight years litigating this case, plaintiffs have presented evidence
spanning over 50 years describing defendants' contribution to climate change through
both inaction and affirmative promotion of fossil fuel use.  The Court recalls plaintiffs'
evidence included a letter by a top aide to President Nixon's domestic policy adviser
emphasizing the effect of rising sea levels in 1969: "Goodbye New York.  Goodbye
Washington, for that matter."[17]  In 1986, a Senate subcommittee observed that "there
is a very real possibility that man—through ignorance or indifference, or both—is
irreversibly altering the ability of our atmosphere to perform basic life support
functions for the planet."[18]   Those are but two documents out of hundreds
highlighting the lengthy nature of government knowledge of the dangers of fossil fuel
combustion.  By and large, defendants have not disputed the factual premises of
plaintiffs' claims.  *Juliana*, 947 F.3d at 1167 (so stating).  However, plaintiffs have
not legally established that evidence.  In reviewing defendants' motion to dismiss, the
Court notes that, though it has held evidentiary hearings and painstakingly reviewed

---

[17]    Memorandum from Daniel P. Moynihan, Assistant to the President for
Domestic Pol'y, to John Ehrlichman, Assistant to the President for Domestic Affs.
(Sept. 17, 1969), [https://perma.cc/G92P-AKLJ].

[18]    *Ozone Depletion, the Greenhouse Effect, and Climate Change: Hearing Before
the Subcomm. on Env't Pollution of the Comm. on Env't & Pub. Works*, 99th Cong. 2
(1986) (opening statement of Sen. John H. Chafee, Chairman, Subcomm. on Env't
Pollution).

thousands of pages of declarations and exhibits, today, its task is solely to decide whether plaintiffs have standing to bring suit and state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(1), (6).

As an initial matter, defendants assert that the Court must consider whether the rule of mandate, as a jurisdictional rule, requires the Court to dismiss the second amended complaint. Mot. at 10. Next, defendants maintain that plaintiffs have failed to bring a justiciable case and that the Court must dismiss plaintiffs' claims under Rule 12(b)(1) for lack of subject matter jurisdiction. *Id.* at 10-16. Finally, defendants urge the Court to find that plaintiffs' claims fail on the merits and that plaintiffs should have brought this action under the Administrative Procedure Act ("APA") but failed to do so. *Id.* at 32.

## I.  Mandate of the Court of Appeals for the Ninth Circuit

Defendants state that the Ninth Circuit was clear when it remanded the case to the Court with instructions to dismiss. *Id.* at 11. Defendants argue that, when the scope of the remand is clear, a district court cannot vary or examine the mandate of an appellate court "for any other purpose than execution." *Id.* at 10 (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). Defendants contend that, rather than examine whether plaintiffs' amended pleadings establish redressability to satisfy the requirement of standing, the Court should reconsider the Ninth Circuit's mandate and dismiss the second amended complaint. *Id.* at 11. Because it is jurisdictional error to contravene a rule of mandate, the Court duly reconsiders the mandate of the Ninth Circuit and does not take the matter lightly.

"A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012). "Violation of the rule of mandate is a jurisdictional error." *Id.* at 1067. "But while the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it leaves to the district court any issue not expressly or impliedly disposed of on appeal." *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 574 (9th Cir. 2019) (quoting *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986)). In determining which matters fall within the compass of a mandate, "[d]istrict courts must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713, 719 (9th Cir. 1999) (as amended) (quoting *Delgrosso v. Spang & Co.*, 903 F.2d 234, 240 (3d Cir. 1990)).

"Absent a mandate which explicitly directs to the contrary, a district court upon remand can permit the plaintiff to file additional pleadings . . . " *S.F. Herring,* 946 F.3d at 574 (quoting *Nguyen*, 792 F.2d at 1502); *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988). When the mandate in the prior appeal does not expressly address the possibility of amendment and does not indicate a clear intent to deny amendment seeking to raise new issues not decided, that mandate does not purport "to shut the courthouse doors." *S.F. Herring,* 946 F.3d at 574.

In *S.F. Herring,* the Ninth Circuit discussed its mandate in a prior appeal, which vacated the district court's order entering summary judgment in the

defendants' favor and directed the district court to dismiss the complaint. *See S.F. Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 581 (9th Cir. 2017) (vacating judgment and remanding case with instructions to dismiss for lack of subject matter jurisdiction). On remand, the district court allowed the plaintiff to file a second amended complaint. In the later appeal, the Ninth Circuit determined that the district court correctly found that the earlier mandate to dismiss did not prevent the plaintiff from seeking leave to re-plead. *S.F. Herring*, 946 F.3d at 574. The appellate court reasoned that in instructing the district court to dismiss, the mandate was silent on whether dismissal should be with or without leave to amend, and the mandate therefore did not preclude the district court from allowing plaintiff to file amended pleadings. *Id*. at 572-574.

When this Court granted plaintiffs' motion for leave to amend, it "consider[ed] plaintiffs' new factual allegations under the Declaratory Judgment Act and plaintiffs' amended request for relief, in light of intervening recent precedent, to be a new issue that, while discussed, was not decided by the Ninth Circuit in the interlocutory appeal." *Juliana v. United States*, No. 6:15-CV-01517-AA, 2023 WL 3750334, at *5 (D. Or. June 1, 2023). The Court once again finds that the Ninth Circuit's mandate did not address whether amendment, if permitted, would cure the deficiency it identified in plaintiffs' complaint.

The Ninth Circuit also did not instruct the Court to dismiss without leave to amend. Accordingly, its mandate to dismiss did not foreclose that opportunity, and the Court, on reconsideration, finds that in permitting plaintiffs to proceed with their

second amended complaint, the rule of mandate is not contravened. *S.F. Herring*, 946 F.3d at 574; *see also Creech v. Tewalt*, 84 F.4th 777, 783 (9th Cir. 2023) (where appellate court remanded and stated that plaintiff should have leave to amend, district court did not violate rule of mandate by dismissing *without* leave to amend, because appellate court did not expressly foreclose that option).

## II.    Standing

The Ninth Circuit determined that plaintiffs had established an injury in fact, traceable to defendants—the first two elements of constitutional standing. *Juliana* 947 F.3d at 1168-70.  For completeness in its standing analysis, this Court adopts the Ninth Circuit's determination.  Defendants reserve the right to "oppose" the Ninth Circuit's ruling.  Mot. at 12.

Defendants contend that plaintiffs have not satisfied the third element of standing, because they failed to demonstrate that their injuries are "redressable" and that they are entitled to injunctive or declaratory relief.  Defendants maintain that plaintiffs' requested relief fails, because plaintiffs cannot show that the relief they seek is (1) substantially likely to redress their injuries or (2) within the Court's power to award.  *Id*. at 4-5, 12; *see also Spokeo,* 578 U.S. at 338.

A plaintiff must support each element of the standing test "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (1992).  Accordingly, at the motion-to-dismiss stage, "general allegations" suffice to establish standing because those allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Id*.  A plaintiff need not

show a favorable decision is "certain" to redress his injury but must show a substantial likelihood it will do so. *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013). The injury need not be completely redressable; it is sufficient that the injury be partially redressed. *Meese v. Keene*, 481 U.S. 465, 476 (1987) ("enjoining the application of the words political propaganda to the films would at least partially redress the reputational injury of which appellee complains.").

As for plaintiffs' request for declaratory relief, the Ninth Circuit determined that a declaration would be "unlikely by itself to remediate [plaintiffs'] alleged injuries." *Juliana* 947 F.3d at 1170. For injunctive relief, the Ninth Circuit was "skeptical," but assumed without deciding that plaintiffs might be able to show that their injuries could be redressed by an order in their favor. *Id*. at 1171. That said, the appellate court based its ruling on the second redressability prong, stating that an injunction was "beyond the power of an Article III court to order, design, supervise, or implement." *Id*. Plaintiffs' second amended complaint scales down the requested injunctive relief, seeking "an injunction restraining [d]efendants from carrying out policies, practices, and affirmative actions that render the national energy system unconstitutional in a manner that harms [p]laintiffs," and only "if deemed necessary, just and proper." SAC at 143 ¶ 4.

Accordingly, for plaintiffs' claim for both injunctive relief and declaratory relief, the Court will evaluate whether each form of relief is (1) substantially likely to redress their injuries and (2) within the Court's power to award. *Spokeo,* 578 U.S. at 338.

A.    Injunctive Relief

1.    **Substantial Likelihood of Redress**

Defendants assert that an order enjoining defendants' fossil fuel activities will not stop catastrophic climate change or even partially ameliorate plaintiffs' injuries, and therefore, any such injunction is not substantially likely to redress plaintiffs' injuries and satisfy standing.  Mot. at 12.

Whether a court order will halt *all* climate change by restraining defendants from carrying out fossil fuel activities is the wrong inquiry for at least two reasons. First, redressability does not require certainty, it requires only a substantial likelihood that the Court could provide meaningful relief.  *Spokeo,* 578 U.S. at 338. Second, the possibility that some other individual or entity might cause the same injury does not defeat standing—the question is whether the injury *caused by the defendant* can be redressed.

Defendants have not disputed plaintiffs' factual allegations that they produce a quarter of all emissions on Earth.  *Juliana*, 947 F.3d at 169.   Based on plaintiffs' alleged facts, an order to defendants to refrain from certain fossil fuel activities which are causing plaintiffs' injuries would redress those injuries.  On the spectrum of likely to unlikely, a favorable court order is much closer to likely, *i.e.,* substantially likely, to redress plaintiffs' harm.

"Substantially likely" is a *legal* characterization, not an evidence based, scientific number.  Quantifying a threshold datapoint at which plaintiffs' harm would be remedied would involve rigorous, disciplined fact-finding, and inevitably would

raise a host of questions: What part of plaintiffs' injuries stem from causes beyond defendants' control?  Even if emissions increase elsewhere, will the extent of plaintiffs' injuries be less if they obtain the relief they seek in this lawsuit?  When would we reach this "point of no return" that plaintiffs' evidence describes, and do defendants have it within their power to avert reaching it, even without cooperation from third parties?  All these questions are inextricably bound up in an evidentiary inquiry, and none of them can be answered at the motion-to-dismiss stage.  At this junction, the Court finds that plaintiffs have shown that a favorable decision from this Court would be substantially likely to redress plaintiffs' injuries.  Defendants' motion to dismiss is denied as to this issue.

### 2.    The Court's Power to Provide Redress

Defendants assert that the Ninth Circuit determined that the injunction plaintiffs sought in their first amended complaint would "necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches," *Juliana*, 947 F.3d at 1171, decisions "which must be made by the People's elected representatives." *Id*. at 1172.  Defendants maintain that, even with amendment, plaintiffs' requested injunctive relief is unavailable, because it would "enjoin the executive branch from exercising discretionary authority" granted to it by statute, and would enjoin Congress from exercising power expressly granted to it by the Constitution.  Mot. at 13 (citing the Property Clause, U.S. CONST. art. IV, § 3, cl. 2).  In defendants' view, the requested injunction remains beyond a district court's power to award.  *Id*.

While crafting and implementing injunctions in cases involving longstanding agency shortcomings may require rigorous, adversarial fact-finding to penetrate questions of science, there is nothing exceptional about a federal court issuing injunctions against federal agencies. *See e.g.*, *Nw. Env't Def. Ctr. v. United States Army Corps of Engineers*, No. 3:18-CV-00437-HZ, 2021 WL 3924046 (D. Or. Sept. 1, 2021) (injunction requiring U.S. Army Corps of Engineers to implement drawdown, spill, and specific fish management actions at its facilities; establishing an expert panel to craft implementation plans; and requiring status reports from agency).

Other federal district courts have similarly ordered agency action, and appellate courts have affirmed that granting this type of injunctive relief falls within the "broad equitable powers" of district courts. *Cobell VI*, 240 F.3d 1081, 1108 (D.C. Cir. 2001); *Gautreaux v. Romney*, 457 F.2d 124, 132 (7th Cir. 1972). Courts may also issue injunctions even when "ordering what is in effect nationwide relief." *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987).

Without any explicit statutory command to the contrary, no court has held that these powers *categorically* fail on separation-of-powers grounds. *See* Samuel Buckberry Joyce, *Climate Injunctions: The Power of Courts to Award Structural Relief Against Federal Agencies*, 42 Stan. Env'tl. L.J. 241, 268-281, May 2023 (compiling cases featuring structural injunctions against the federal government).

Familiar instances of large-scale institutional litigation in modern American history include cases that ordered busing to desegregate schools;[19] the treaty rights cases that assured a fair share of fish for American Indian treaty fishers;[20] cases instituting  prison condition reform;[21] and cases relating to land use and low-income housing.[22]  Legal scholars have cited those cases and explained that injunctions in those cases "aimed to break down, scrutinize, and reform institutional dynamics and practices that caused the government to repeatedly violate fundamental rights of citizens to bring about enduring constitutional and civil rights compliance."[23]

In their first amended complaint, plaintiffs' requested remedy was an injunction requiring the government not only to "cease permitting, authorizing, and subsidizing" fossil fuel use, but also to "prepare a remedial plan subject to judicial approval to draw down harmful emissions." *Juliana*, 947 F.3d at 1170.

When it determined that plaintiffs' requested relief was beyond the power of an Article III court to order, the Ninth Circuit did not offer any explicit guidance on

---

[19]     *See, e.g.*, *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954); *Swann v. Charlotte- Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971); *Milliken v. Bradley*, 418 U.S. 717 (1974); *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430 (1968).

[20]     *See, e.g.*, *United States v. Washington*, 520 F.2d 676 (9th Cir. 1975); *Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).

[21]     *See, e.g.*, *Brown v. Plata*, 563 U.S. 493 (2011); *Hudson v. McMillian*, 503 U.S. 1 (1992); *Hutto v. Finney*, 437 U.S. 678 (1978).

[22]     *See Hills v. Gautreaux*, 425 U.S. 284, 298 (1976).

[23]     Wood, *Eve of Destruction*, at 262.

how to distinguish other structural injunction cases, where the district court has power to order specific, injunctive relief, from this case, where the relief necessary to redress plaintiffs' injuries is held to be too broad.

Plaintiffs have scaled back the specific directives they at first sought in the injunction in their first amended complaint. At this point in the litigation, where the facts alleged are accepted as true, the Court can only identify one distinction between the injunction plaintiffs' request and the injunctions issued in the structural reform cases described above. In other reform cases, those plaintiffs' obtained injunctions against a single agency for a discreet violation of law. In this case, plaintiffs seek relief on constitutional grounds and historical trust principles against a host of governmental defendants.

The Court appreciates that, under existing precedent, an injunction of the scope plaintiffs first requested, and the "scaled down" request plaintiffs make now, against every named defendant in this suit, would be more expansive than any case of which the Court is aware.

On the other hand, requiring plaintiffs to bring piecemeal statutory actions against individual agencies perpetuates a status quo unlikely to bring about the all-out course correction necessary to avoid the impending crisis. Requiring plaintiffs to file individual suits premised on discreet agency shortcomings may be a viable path to achieving protections for the environment. However, a court order directing the agencies to work together, outside their silos to oversee resolution of a complex,

multiagency problem may prove especially constructive where a practical solution has eluded the entire government for decades.

Such an order has not proven to be necessary—and is perhaps premature—at this point in the case. Plaintiffs' amended request for injunction, though narrower, still treads on ground over which Ninth Circuit cautioned the Court not to step. If the reform plaintiffs seek is to prod a negotiated change of behavior, it is unnecessary to seek injunctive relief at this point to do so. Defendants' motion to dismiss plaintiffs' claim for injunctive relief is granted.

## B.    Declaratory Relief

Plaintiffs' second amended complaint seeks a declaration that "the national energy system" violates the Constitution and the public trust doctrine. SAC at 143, ¶¶ 1-3. Defendants contend that plaintiffs' claim for declaratory relief must be dismissed, asserting that the declaration is not materially distinct from the declaration plaintiffs sought in their first amended complaint. And defendants argue that plaintiffs cannot satisfy the two prongs for redressability, because an "unbounded declaration" alone will not redress plaintiffs' injuries, and declaring an "energy system" unconstitutional would "functionally declare unconstitutional unspecified laws, regulations, and policies," and such a declaration is therefore not within the power of a federal court. Mot. at 14.

### 1.    Substantial Likelihood of Redress

Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, courts can grant declaratory relief in the first instance and later consider if further relief is

warranted. "In a case of actual controversy within its jurisdiction, [ ] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201. "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

The Supreme Court has long recognized that declaratory judgment actions can provide redressability, even where relief obtained is a declaratory judgment alone. *See generally Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) *and Utah v. Evans*, 536 U.S. 452 (2002). In *Franklin* and *Evans*, states objected to the technique used by the Census Bureau to count people and those states sued government officials.

In *Franklin v. Massachusetts*, the Supreme Court stated that "[f]or purposes of establishing standing," it did not need to decide whether injunctive relief was appropriate where "the injury alleged is likely to be redressed by declaratory relief," and the court could "assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court." 505 U.S. at 803. In *Utah v. Evans*, the Supreme Court referenced *Franklin*, explaining that, in terms of its "standing" precedent, declaratory relief affects a change in legal status, and the practical consequence of that change would "amount to a significant increase

in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." 536 U.S. 452 (2002).

Other cases recognize the role of declaratory relief in resolving Constitutional cases. *See, e.g.*, *Evers v. Dwyer*, 358 U.S. 202, 202-04 (1958) (ongoing governmental enforcement of segregation laws created actual controversy for declaratory judgment); *Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A court may grant declaratory relief even though it chooses not to issue an injunction or mandamus.").

Finally, the Supreme Court held that, for the purpose of Article III standing, nominal damages—a form of declaratory relief—provide the necessary redress for a completed violation of a legal right, even where the underlying unlawful conduct had ceased. *Uzuegbunam*, 592 U.S. 279, ---, 141 S. Ct. 792, 802. *Uzuegbunam* illustrates that when a plaintiff shows a completed violation of a legal right, as plaintiffs have shown here, standing survives, even when relief is nominal, trivial, or partial. As Justice Thomas stated, in the context of nominal damages, "True, a single dollar often cannot provide full redress, but the ability to effectuate a partial remedy satisfies the redressability requirement. 592 U.S. at --- ,141 S. Ct. at 801 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992).

To satisfy redressability under Article III, plaintiffs need not allege that a declaration alone would solve their every ill. To plead a justiciable case, a court need only evaluate "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

There is nothing in § 2201 preventing a court from granting declaratory relief even if it is the only relief awarded.  Section 2201 provides that declaratory relief may be granted "whether or not further relief is or could be sought."  *Id.*  Under the statute, the relief plaintiffs seek fits like a glove where plaintiffs' request declaratory relief independently of other forms of relief, such as an injunction.  *See Steffel v. Thompson*, 415 U.S. 452, 475, (1974) (stating in a different context that "regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded.").  A declaration that defendants are violating plaintiffs' constitutional rights may be enough to bring about relief by changed conduct.

### 2.    The Court's Power to Provide Redress

As expressed in *Marbury v. Madison*: "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.  Over the course of American history, courts have corrected longstanding, systemic wrongs of political branches that encroach on the fundamental rights of citizens.

The judiciary has the unique and singular duty to both declare constitutional rights and prevent political acts that would curb or violate those rights.  *Id.* at 167.  It is a foundational doctrine that when government conduct harms American citizens, the judiciary is constitutionally required to perform its independent role and determine whether the challenged conduct, not exclusively committed to any branch by the Constitution, is unconstitutional.  *Id.* at 176-78.

The Act gives "federal courts competence to make a declaration of rights." *Pub. Affairs Associates v. Rickover*, 369 U.S. 111, 112 (1962). The Supreme Court has found it "consistent with the statute . . . to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *MedImmune,* 549 U.S. at 136.

A declaratory judgment need not be "unbound" as defendants assert but may precisely describe and quantify the government's obligations. For example, in the landmark treaty fishing cases, courts declared the tribes right to take up to 50 percent of the harvestable quantities of fish. *United States v. Washington*, 520 F.2d 676, 687 (9th Cir. 1975).

Declaratory judgments are thus firmly sited within the core competences of the courts in a way that structural injunctions are not. Declaratory judgments ask courts to declare actions lawful or unlawful, applying legal standards to a set of facts. Unlike structural injunctions, which envision an on-going dialogue between the court and the parties, the declaratory relief model facilitates a dialogue between the parties. Following a court's declaration of rights, which serves as the baseline below which a defendant may not fall, the various stakeholders are left to handle the details.[24]

---

[24]    *See generally* Emily Chiang, *Reviving the Declaratory Judgment: A New Path to Structural Reform*, 63 Buff. L. Rev. 549 (May 2015) (discussing models of structural reform and encouraging public interest lawyers to consider declaratory relief as an effective and uniquely suited tool for structural reform in the modern age).

From the beginning, the Court has envisioned that the government defendants would be interested in collectively developing a remedial plan of their own making—not of the Court's making—containing measures that they decide are appropriate to bring the agencies into constitutional compliance.

Following a declaratory judgment outlining the constitutional benchmark, a fact-finding stage often requires scientific analysis (a proficiency in which defendants are well-equipped) along with production of data defendants most likely already possess. To avoid complex remedial issues from clouding the foundational task of defining plaintiffs' basic rights and defendants' consequent obligations, the Court would bifurcate the case into a "liability" stage and a "remedy" stage.

The liability stage may allow the Court to specify legal obligations in a declaratory judgment, while the remedy stage demands a more innovative judicial role to supervise the parties in crafting a plan. During the remedy stage, the Court could invoke the usual standards of deference to the agency, while the case remains open under its ongoing jurisdiction so that parties can challenge aspects of the remedy implementation without bringing a new lawsuit.

One model of supervision involves the appointment of a special master to handle complex factual issues, make determinations on recurring issues, and make recommendations to the court. Consent decrees are used in many contexts of long-lasting government violations. Professor Wood points out one notable example in the environmental context that arose from a treaty fishing case, *United States v. Oregon*,

handled by Judge Belloni, U.S. District Court of Oregon.[25]  The litigation "culminated in a consent decree" and the Columbia River Fish Management Plan ("CRFMP") became "a model of judicial administration that gained nationwide acclaim."[26]

The CRFMP established a system of co-management between nine sovereigns (states, tribes, and the federal government) managing treaty fisheries in the Columbia River Basin.  *See United States v. Oregon*, 699 F. Supp. at 1469 (describing and approving Columbia River Fish Management Plan).  The CRFMP set forth detailed management criteria for each fishery, established technical and policy committees, and created a dispute resolution process that involved the court only as a last resort.  Professor Wood argues that by "allowing the sovereign parties to identify points of agreement and work out the details of a remedy using their own administrative and scientific expertise, the consent decree process can create an enduring remedy structure to fit complex institutional and biological circumstances."[27]

Defendants have not shown that plaintiffs' claim for declaratory relief falls outside the scope of the Court's authority, where "facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [its] grasp."  *MedImmune,* 549 U.S. at 136.  Accordingly, defendants' motion to dismiss is denied as to this issue.

---

[25]  Wood, *Eve of Destruction*, at 264 (citing *United States v. Oregon*, 699 F. Supp. 1456, 1469 (D. Or. 1988) (describing and approving the CRFMP)).

[26]  *Id*.

[27]  *Id*.

### III.    Political Question Doctrine

Defendants maintain that plaintiffs' claims present political questions over which the Court lacks jurisdiction.  Mot. at 12-19.  In defendants' view, plaintiffs ask the Court to "review and assess the entirety of Congress's and the Executive Branch's programs and regulatory decisions relating to climate change and then to pass on the comprehensive constitutionality of all of those policies, programs, and inaction in the aggregate." *Id.* at 17.  Defendants assert that no federal court "has ever purported to use the judicial [p]ower to perform such a sweeping policy review." *Id.*

Defendants appear to misunderstand the function of the Court acting within its prescribed authority to declare what the law is—it is not the Court which will perform "a sweeping policy review," it is *defendants.*

There is no need for the Court to step outside its prescribed role to decide this case.  At its heart, this lawsuit asks the Court to determine whether defendants have violated plaintiffs' constitutional rights.   That question is squarely within the purview of the judiciary.  *See INS v. Chadha*, 462 U.S. 919, 941 (1983) (the judiciary is bound to determine whether the political branches have "chosen a constitutionally permissible means of implementing [their] power"); *Jewel v. Nat'l Sec. Agency,* 673 F.3d 902, 912 (9th Cir. 2011) (although lawsuit challenging federal agencies' surveillance practices "strikes at the heart of a major public policy controversy," claims were justiciable because they were "straightforward claims of statutory and constitutional rights, not political questions.").

The Court previously analyzed whether plaintiffs' claims presented a political question under *Baker v. Carr*, 369 U.S. 186 (1962) and adopts that analysis here. *See Juliana v. United States*, 217 F. Supp. 3d 1224, 1235-42 (D. Or. 2016) *rev'd and remanded on other grounds*, 947 F.3d 1159 (9th Cir. 2020). The Ninth Circuit explicitly stated that it did not find that plaintiffs had presented a political question. *Juliana*, 947 F.3d at 1174 n.9 ("Contrary to the dissent, we do not find this to be a political question, although that doctrine's factors often overlap with redressability concerns").

Here the Constitution entrusts defendants with the power to oversee departments and agencies in the executive branch in their administration of the broad range of laws committed to their implementation. Mot. at 18. Speculation about the remedial stage does not support dismissal. *Baker*, 369 U.S. at 198 ("Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at trial."). Because the Court finds that under *Baker*, the political question doctrine does not impede plaintiffs' claims, defendants' motion to dismiss is denied on this issue.

## IV.    First Claim for Relief – Due Process Clause of the Fifth Amendment

Plaintiffs allege that the Due Process Clause of the Fifth Amendment recognizes and preserves the fundamental right of citizens to be free from government actions that harm "life, liberty, and property." SAC ¶ 278. Plaintiffs maintain that these "inherent and inalienable rights" reflect the basic societal contract of the

Constitution to protect citizens and "posterity"—future generations—from government infringement upon basic freedoms and basic rights. *Id*. Plaintiffs state that defendants' affirmative aggregate acts have been and are infringing on plaintiffs' liberties, by knowingly creating a destabilized climate system that is causing irreversible harm.

Defendants challenge plaintiffs' due process claims on two grounds. First, they assert any challenge to defendants' affirmative actions (*i.e.*, leasing land, issuing permits) cannot proceed because plaintiffs have failed to identify infringement of a fundamental right or discrimination against a suspect class of persons.

Second, they argue plaintiffs cannot challenge defendants' inaction (*i.e.*, failure to prevent third parties from emitting $CO_2$ at dangerous levels). Defendants maintain that the Constitution "does not impose an affirmative duty to protect individuals, and plaintiffs have failed to allege a cognizable claim under the "state-created danger" exception to that rule. Mot. at 21.

Defendants state that the Supreme Court has repeatedly instructed courts considering novel due process claims to "exercise the utmost care whenever . . . asked to break new ground in this field, . . . lest the liberty protected by the Due Process Clause be subtly transformed" into judicial policy preferences. *Id*. at 19-20 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Defendants maintain that plaintiffs' request to recognize an implied fundamental right to a stable climate system, SAC ¶ 304, "contradicts that directive, because such a purported right is without basis in the Nation's history or tradition." Mot. at 20.

Page 37 – OPINION AND ORDER

### A.    Affirmative Government Action and Due Process

The Due Process Clause of the Fifth Amendment to the United States Constitution bars the federal government from depriving a person of "life, liberty, or property" without due process of law.  U.S. CONST. amend. V.

When a plaintiff challenges affirmative government action under the Due Process Clause, the threshold inquiry is the applicable level of judicial scrutiny.  *Witt v. Dep't of the Air Force*, 527 F.3d 806, 813 (9th Cir. 2008).  The default level of scrutiny is rational basis, which requires a reviewing court to uphold the challenged governmental action so long as it "implements a rational means of achieving a legitimate governmental end[.]"  *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997) (quotation marks omitted).  When the government infringes on a "fundamental right," however, a reviewing court applies strict scrutiny.  *Witt*, 527 F.3d at 817.  Substantive due process "forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 302, (1993).

It appears undisputed by plaintiffs, and in any event is clear to this Court, that defendants' affirmative actions would survive rational basis review.  Resolution of this part of the motion to dismiss therefore hinges on whether plaintiffs have alleged infringement of a fundamental right.

Fundamental liberty rights include both rights enumerated elsewhere in the Constitution and rights and liberties which are either (1) "deeply rooted in this

Nation's history and tradition" or (2) "fundamental to our scheme of ordered liberty[.]" *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (internal citations, quotations, and emphasis omitted). Seemingly "new" fundamental rights are not out of bounds. When the Supreme Court broke new legal ground by recognizing a constitutional right to same-sex marriage, Justice Kennedy wrote that

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights ... did not presume to know the extent of freedom in all its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitutions central protections and a received legal stricture, a claim to liberty must be addressed.

*Obergefell v. Hodges,* 576 U.S. 644, 664 (2015). Thus, "[t]he identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution . . . [that] has not been reduced to any formula." *Id.* at 663-64 (citation and quotation marks omitted). In determining whether a right is fundamental, courts must exercise "reasoned judgment," keeping in mind that "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries." *Id.* at 664. The genius of the Constitution is that its text allows "future generations [to] protect . . . the right of all persons to enjoy liberty as we learn its meaning." *Id.*

Exercising "reasoned judgment," *id.*, the Court finds that the right to a climate system that can sustain human life is fundamental to a free and ordered society.

Defendants contend plaintiffs are asserting a right to be free from pollution or climate change, and that courts have consistently rejected attempts to define such

rights as fundamental. Mot. at 20. Defendants mischaracterize the right plaintiffs assert. Plaintiffs do not object to the government's role in producing any pollution or in causing any climate change; they assert the government has caused pollution and climate change on a catastrophic level, and that if the government's actions continue unchecked, they will permanently and irreversibly damage plaintiffs' property, their economic livelihood, their recreational opportunities, their health, and ultimately their (and their children's) ability to live.

In this opinion, this Court simply holds that where a complaint alleges governmental action is affirmatively and substantially damaging the climate system in a way that will cause human deaths, shorten human lifespans, damage property, threaten human food sources, and dramatically alter the planets ecosystem, it states a claim for a due process violation. To hold otherwise would be to say that the Constitution affords no protection against a government's knowing decision to poison the air its citizens breathe or the water its citizens drink.

How can the judiciary uphold the Constitution's guarantee that the government shall not deprive its citizens of life without due process, while also upholding government "actions that could leave [future generations] a world with an environment on the brink of ruin and no mechanism to assert their rights." *Aji P. v. State*, 198 Wash. 2d 1025, 497 P.3d 350, 351 (2021) (Gonzalez, C.J.) (dissenting). We cannot vow to uphold the Constitution's protection of a God-given right to life, and at the same time, exercise "judicial restraint" by telling plaintiffs that "life" cannot possibly include the right to be free from knowing government destruction of their

ability to breathe, to drink, or to live.  "It cannot be presumed that any clause in the [C]onstitution is intended to be without effect."  *Marbury*, 5 U.S. at 174.  Plaintiffs have adequately alleged infringement of a fundamental right and defendants' motion to dismiss is denied on this issue.

### B.    Government Inaction Under the Due Process Clause

Plaintiffs allege that "[a]cting with full appreciation of the consequences of their acts, defendants knowingly caused, and continue to cause, dangerous interference with our atmosphere and climate system." SAC ¶ 280.  They allege this danger stems, "in substantial part, [from] [d]efendants' historic and continuing permitting, authorizing, and subsidizing of fossil fuel extraction, production, transportation, and utilization."  *Id.* ¶ 279.  Plaintiffs allege defendants acted "with full appreciation" of the consequences of their acts.  *Id.* ¶¶ 278–79.  Plaintiffs challenge defendants' failure to limit third-party $CO_2$ emissions under the danger creation exception stated in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).

The Due Process Clause imposes no duty on the government to protect persons from harm inflicted by third parties that would violate due process if inflicted by the government.  *Id.* at 196; *accord Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011).  As a general matter:

> [The Due Process Clause] is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney,* 489 U.S. at 194-95.  The Ninth Circuit recognizes two narrow exceptions to the no-duty-to-protect rule from *DeShaney*: (1) the "special-relationship" exception, which applies to individuals involuntarily placed in state custody; and (2) the state-created danger exception.  *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023).

In the Ninth Circuit, a plaintiff challenging government inaction on a danger creation theory must first show the "state actor create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).  The state action must place the plaintiff "in a worse position than that in which he would have been had the state not acted at all."  *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (quotation marks omitted and alterations normalized).

Second, the plaintiff must show the "state actor . . . recognize[d]" the unreasonable risks to the plaintiff and "actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff."  *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 846 (9th Cir. 2011) (brackets and quotation marks omitted).  The defendant must have acted with "[d]eliberate indifference," which "requires a culpable mental state more than gross negligence."  *Pauluk*, 836 F.3d at 1125 (quotation marks omitted).

Defendants assert that applying the *DeShaney* exception to the circumstances of this case would cause the exception to swallow the rule, arguing that "[e]very instance" in which the Ninth Circuit has "permitted a state-created danger theory to proceed has [also] involved an act by a government official that created an obvious,

immediate, and particularized danger to a specific person known to that official." Mot. at 22; *Pauluk*, 836 F.3d at 1129-30 (Murguia, J., concurring in part and dissenting in part) (internal quotation marks omitted). Defendants assert that plaintiffs fail to identify immediate harm to their personal security or bodily integrity and identify no government actions or actors that put them in danger—only general degradation of the climate, without the immediate, direct, physical, and personal harms at issue in the above referenced cases. Mot. at 20.

Plaintiffs' allegations include "[harm to] plaintiffs' dignity, including their capacity to provide for their basic human needs, safely raise families, practice their religious and spiritual beliefs, maintain their bodily integrity, and lead lives with access to clean air, water, shelter, and food." SAC ¶ 283. In the face of these risks, plaintiffs allege defendants "have had longstanding, actual knowledge of the serious risks of harm and have failed to take necessary steps to address and ameliorate the known, serious risk to which they have exposed [p]laintiffs." *Id.* ¶ 285.

Accepting the allegations of the complaint as true, plaintiffs have adequately alleged a danger creation claim. Defendants' arguments do not reflect that *DeShaney* imposes rigorous proof requirements. A plaintiff asserting a danger-creation due process claim must show (1) the government's acts created the danger to the plaintiff; (2) the government knew its acts caused that danger; and (3) the government with deliberate indifference failed to act to prevent the alleged harm. These stringent standards are sufficient safeguards against the flood of litigation concerns raised by defendants.

At the motion-to-dismiss stage, the Court accepts the factual allegations in the complaint as true. Plaintiffs have alleged that defendants helped create the current climate crisis, that defendants acted with full knowledge of the consequences of their actions, and that defendants have failed to correct or mitigate the harms they helped create in deliberate indifference to the injuries caused by climate change. Plaintiffs may therefore proceed with their substantive due process challenge to defendants' failure to adequately regulate $CO_2$ emissions and defendants' motion to dismiss is denied as to this issue.

## V.    Second Claim for Relief: Equal Protection Under the Fifth Amendment

Plaintiffs allege that both unborn members of "future generations" and minor children who cannot vote are a suspect classification. SAC ¶¶ 290-301. Plaintiffs state that, for purposes of this action, they should be treated as protected classes because many harmful effects caused by the acts of defendants will occur again. *Id.* ¶ 297. Plaintiffs maintain that the Court should determine they must be treated as protected classes, and federal laws and actions that disproportionately discriminate against and endanger them must be invalidated. *Id.*

Defendants assert that "[n]one of the government actions that [p]laintiffs complain of classify or affect youth or posterity any differently than they affect other persons." Mot. at 29. While plaintiffs' allegations are to the contrary, asserting that future generations will be decidedly more effected by climate change, defendants assert that their actions furthering fossil fuel combustion survive rational basis

review, because plaintiffs cannot allege that there is no conceivable set of facts that could provide a rational basis for defendants' actions.  *Id*.

Both the Supreme Court and the Ninth Circuit have held that age is not a suspect class.  *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989); *United States v. Flores-Villar*, 536 F.3d 990, 998 (9th Cir. 2008).  *Stanglin* and *Flores-Villar* both applied rational basis review to governmental action that discriminated against teenagers of a similar age to plaintiffs here.  In both cases, that discrimination was found to be permissible if it had a rational basis.

Even if plaintiffs' suspect-class argument were not foreclosed by precedent, the Court would not be persuaded to break new ground in this area.  *See Cunningham v. Beavers*, 858 F.2d 269, 273 (5th Cir. 1988) ("No cases have ever held, and we decline to hold, that children are a suspect class.").

Accordingly, defendants' motion to dismiss plaintiffs' equal protection claim based on plaintiffs' constituting a suspect class is granted.

## VI.    Third Claim for Relief: Unenumerated Rights Under the Ninth Amendment

Plaintiffs' third claim for relief, which is pleaded as a freestanding claim under the Ninth Amendment, alleges that the Nation's founders intended that the federal government would have both the authority and the responsibility to be a steward of our country's essential natural resources.  SAC ¶ 303.  This stewardship, plaintiffs assert, is clear from the delegation of powers to manage lands and the conveyed authority to address major challenges facing our nation.  *Id*.  Plaintiffs allege that among the "implicit liberties protected from government intrusion by the Ninth

Amendment" is the right to be "sustained by our country's vital natural systems, including our climate system." *Id*.

Defendants assert that the Ninth Amendment has never been recognized as independently securing any constitutional right, and that this claim must be dismissed. Mot. at 21; *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986).

Defendants are correct. Plaintiffs' Ninth Amendment claim is not viable. *Id*. Defendants' motion to dismiss plaintiffs' third claim for relief is granted.

## VII. Fourth Claim for Relief: Rights Under Public Trust Doctrine

Plaintiffs' public trust claim arises from the particular application of the public trust doctrine to essential natural resources. The complaint alleges that the overarching public trust resource is our country's life-sustaining climate system, which encompasses our atmosphere, waters, oceans, and biosphere. SAC ¶ 308. Plaintiffs assert that defendants must take affirmative steps to protect those trust resources. *Id*. As sovereign trustees, plaintiffs contend that defendants have a duty to refrain from "substantial impairment" of these essential natural resources. *Id*. ¶ 309. The affirmative aggregate acts of defendants, in plaintiffs' view, in fossil fuel production and consumption have "unconstitutionally caused, and continue to cause, substantial impairment to the essential public trust resources." *Id*.

Plaintiffs allege that defendants have failed in their duty of care to safeguard plaintiffs' interest as the present and future beneficiaries of the public trust, and that such an abdication of duty abrogates the ability of succeeding members of the

Executive Branch and Congress to provide for the survival and welfare of our citizens and to promote the endurance of our nation. *Id*.

Defendants assert that plaintiffs' fourth claim for relief, asserting public trust claims, should be dismissed for two independent reasons. Mot. at 24. First, any public trust doctrine is a creature of state law that applies narrowly and exclusively to particular types of state-owned property not at issue here. *Id*; U.S. CONST. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). Defendants contend there is no basis for plaintiffs' public trust claim against the federal government under federal law. Second, the "climate system" or atmosphere is not within any conceivable federal public trust. *Id*.

The Court has expended innumerable hours in research and analysis of plaintiffs' public trust claim and, in prior orders, determined that plaintiffs have alleged violations of the public trust doctrine in connection with the territorial sea. *See Juliana v. United States*, 217 F. Supp. 3d 1224, 1255 (D. Or. 2016), *rev'd and remanded on other grounds,* 947 F.3d 1159 (9th Cir. 2020). Because the Ninth Circuit did not reach the merits of plaintiffs' claims, the Court incorporates its analysis and legal conclusions, as stated in *Juliana*, 217 F. Supp at 1255-61 (finding that plaintiffs' alleged injuries relate to the effects of ocean acidification and rising ocean temperatures, thus pleadings adequately alleged harm to public trust assets; the public trust doctrine applies to the federal government; the federal government, like the states, holds public assets, including the territorial seas, in trust for the people;

environmental statutes have not displaced the venerable public trust doctrine; and plaintiffs' claims rest "directly on the Due Process Clause of the Fifth Amendment and are enforceable against the federal government.").

Accordingly, the Court finds that plaintiffs have stated a claim under a purported public trust doctrine. Defendants' motion to dismiss plaintiffs' fourth claim for relief is denied.

## VIII. Action Under Administrative Procedure Act

Defendants argue that plaintiffs needed to bring their claims under the Administrative Procedure Act ("APA") and failed to do so. Mot. at 32.

The Court finds that the APA does not govern plaintiffs' claims, and that, as a result, plaintiffs' failure to state a claim under the APA is not a ground for dismissing this action. The Ninth Circuit found that "[w]hatever the merits of the plaintiffs' claims, they may proceed independently of the review procedures mandated by the APA." *Juliana*, 947 F.3d at 1167-68. Defendants' motion to dismiss is denied as to this issue. Defendants reserve their right to disagree with the Ninth Circuit's determination on this point but concede that the Ninth Circuit's decision governs, and respectfully preserve their arguments on the applicability of the APA for potential further review.

## CONCLUSION

Other courts across the United States have noted that "[w]ith each year, the impacts of climate change amplify and the chances to mitigate dwindle." *Matter of Hawai'i Elec. Light Co., Inc.*, 152 Haw. 352, 359 (2023). The judicial branch of

government can no longer "abdicat[e] responsibility to apply the rule of law." *Id.* at 365 (Wilson, J., concurring).    For the reasons explained, Defendants' motion to dismiss the second amended complaint, ECF No. 547, is GRANTED in part and DENIED in part.    The Court also DENIES defendants' request to certify for interlocutory review this opinion and order; DENIES defendants' motion for an order certifying its prior order, ECF No. 540, for interlocutory appeal, ECF No. 551; and DENIES defendants' motion to stay litigation, ECF No. 552.    The Court GRANTS plaintiffs' motion to set a pretrial conference, ECF No. 543, and ORDERS the parties to confer and contact the Court to schedule a telephonic status conference to discuss next steps in this case.

It is so ORDERED on this day, December 29, 2023.


Ann L. Aiken

_____/s/Ann L. Aiken_____
UNITED STATES DISTRICT JUDGE